## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DK ACQUISITION PARTNERS, L.P., KENSINGTON INTERNATIONAL LIMITED, RUSHMORE CAPITAL-I, L.L.C., RUSHMORE CAPITAL-II, L.L.C., and SPRINGFIELD ASSOCIATES, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>J.P. MORGAN CHASE & CO., JPMORGAN CHASE BANK, J.P. MORGAN SECURITIES INC., CITIGROUP INC., CITIBANK, N.A., and CITIGROUP GLOBAL MARKETS, INC. f/k/a SALOMON SMITH BARNEY,<br><br>Defendants. | § § § § § § § § § § § § § § § § § § | Case No. 08 cv 446<br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

Pursuant to the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Southern District of New York, Plaintiffs DK Acquisition Partners, L.P., Kensington International Limited, Rushmore Capital-I, L.L.C., Rushmore Capital-II, L.L.C. and Springfield Associates, LLC (collectively, "Plaintiffs"), hereby state their Second Amended Complaint against Defendants J.P. Morgan Chase & Co., JPMorgan Chase Bank, J.P. Morgan Securities, Inc., Citigroup, Inc., Citibank, N.A. and Citigroup Global Markets, Inc. f/k/a Salomon Smith Barney, Inc. (collectively, "Defendants"):

## NATURE OF THE ACTION

1.      Plaintiffs bring this action to seek redress for losses suffered as a result of Defendants' fraud, aiding and abetting fraud, breaches of contract and other wrongful conduct in connection with certain loans that Plaintiffs' predecessors-in-interest (the "Lenders") made to the now-bankrupt Enron Corporation ("Enron").[1]

---

[1]  The Lenders include all predecessors-in-interest from which Plaintiffs have acquired or will acquire the debt that is the subject of this action.  As of the date this Second Amended Complaint is filed, the Lenders include without limitation ABN Amro Bank N.V., Arab Bank plc, Australia New Zealand Banking Group Limited, Banca di Roma, Banca Intesa SPA, Banca Nazionale del Lavoro SPA, Banca Popolare di Milano, Banco Bilbao Vizcaya Argentaria, Banco Santander Central Hispano S.A., NY Branch, Bank of America, N.A., Bank of China, Bank of Montreal, The Bank of New York, The Bank of Tokyo-Mitsubishi, Ltd.,  BankOne, N.A., Barclays Bank PLC, Bayerische Hypo-und Vereinsbank AG, BBL International (U.K.) Limited, Bear Stearns Corporate Lending Inc., BNP Paribas, CIBC Inc., Commerzbank AG, Calyon (Crédit Agricole), Calyon (Crédit Lyonnais), Credit Suisse First Boston, The Dai-Ichi Kangyo Bank, Limited, DLJ Capital Funding, Inc., DZ Bank AG Deutsche Zentral, Fleet National Bank, Fortis Bank, The Fuji Bank, Limited, HSBC Bank USA, Hua Nan Commercial Bank, The Industrial Bank of Japan Trust Company, ING Capital LLC, KBC Bank, N.V., Lehman Commercial Paper Inc., Merrill Lynch Bank USA, Mizuho Corporate Bank, Ltd., Natexis Banques Populaires, National Australia Bank Ltd., Nordea Bank Finland PLC, Northern Trust Company, Royal Bank of Canada, The Bank of Nova Scotia (Scotiabank), Société Générale, Sumitomo Mitsui Banking Corp., SunTrust Bank, Toronto Dominion (TX) Inc., UBS AG (Stamford), UFJ (f/k/a The Sanwa Bank), the Wachovia Bank and Trust, N.A., West LB AG, and any of these entities' successors-in-interest who advanced any of the funds at issue in this action.

2.      The Lenders made the loans at issue pursuant to the following two credit agreements:  (1) $1.25 billion, five-year revolving credit agreement dated as of May 18, 2000 (the "May 2000 Credit Agreement"); and (2) $1.75 billion, 364-day revolving credit agreement dated as of May 14, 2001 (the "May 2001 Credit Agreement") (collectively, the "Credit Agreements").  Defendant Citibank was the paying agent for the Credit Agreements; Defendants JPMorgan Chase Bank and Citibank were the co-administrative agents for the Credit Agreements; and Defendants J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc. (f/k/a Salomon Smith Barney) were the co-lead arrangers for the Credit Agreements.

3.      On or about October 25, 2001, just five weeks before declaring bankruptcy, Enron borrowed the entire $3 billion available under the Credit Agreements.  Plaintiffs now hold more than half of the debt, which Enron's bankruptcy estate cannot repay in full.

4.      Enron's October 25, 2001 borrowing was fraudulent.  Enron and the Defendants knew – but the Lenders did not – that, for two distinct reasons, Enron was not entitled to borrow and the Lenders were not obligated to lend:

(a)     First, the Credit Agreements required that certain of Enron's financial statements fairly present Enron's financial condition in conformity with Generally Accepted Accounting Principles ("GAAP"), and that upon borrowing Enron again represent that those financial statements fairly presented Enron's financial condition in conformity with GAAP.  Enron and Defendants knew – but the Lenders did not – that those financial statements did not fairly present Enron's financial condition in conformity with GAAP, and that on October 25, 2001, Enron could not truthfully

represent that those financial statements fairly presented Enron's financial

condition in conformity with GAAP.

(b)    Separately, the Credit Agreements required, as an initial condition

precedent to any obligation to advance funds, that certain of Defendants

receive and approve as to form and substance certified resolutions of the

Enron Board of Directors approving each notice of borrowing under the

Credit Agreements.  Enron and Defendants knew – but the Lenders did not

– that the Enron Board of Directors never passed any such resolutions.

5.    Defendants knew that Enron committed fraud on the Lenders by entering into the

Credit Agreements in May 2000 and May 2001 and that Enron was again committing fraud on

the Lenders on or about October 25, 2001 by borrowing under the Credit Agreements.  At all

relevant times, Defendants knew that the Lenders were relying on false information concerning

Enron's financial condition, including certain of Enron's financial statements.  Defendants knew

the information was false because Defendants helped Enron to manufacture it, working with

Enron for years to misrepresent Enron's financial condition by structuring transactions designed

to make Enron appear creditworthy when in fact it was not.

6.    Defendants gained even deeper knowledge of Enron's accounting fraud in the

days immediately preceding Enron's October 25, 2001 borrowing, because at that time Enron

invited Defendants (but not the Lenders) to send secret due diligence "SWAT" teams to Enron to

learn more about Enron's financial condition.  Defendants flew New York personnel to Houston

to join their Houston personnel already working side-by-side with Enron.  As a result of their

prior work for Enron, confirmed by their secret due diligence in the days immediately preceding

Enron's October 25, 2001 borrowing, Defendants knew that Enron's October 25, 2001

representations about its financial statements were intentionally false, concealing from the Lenders the disastrous state of Enron's financial condition.

7.     Separately, Defendants knew that the Enron Board of Directors had not approved Enron's October 25, 2001 borrowing, a condition precedent to any obligation to advance funds under the Credit Agreements. Defendant Citibank, in its role as paying agent for both Credit Agreements, was contractually obligated to receive a certified copy of a resolution of the Enron Board of Directors approving any notice of borrowing under the Credit Agreements. In fact, unbeknownst to the Lenders, the Enron Board of Directors never passed any such resolution. This leaves no room for doubt that Defendant Citibank breached its contractual duty to receive a certified copy of such a resolution. This breach of contract was either grossly negligent or a willful effort to continue assisting Enron in its fraud on the Lenders.

8.     Similarly, Defendants JPMorgan Chase Bank and Citibank, in their roles as co-administrative agents for both Credit Agreements, were contractually obligated to be satisfied with the form and substance of any resolution of the Enron Board of Directors approving any notice of borrowing under the Credit Agreements. Again, because the Enron Board of Directors never even passed such a resolution, there is no question that Defendants JPMorgan Chase Bank and Citibank breached their contractual duties to be satisfied as to the form and substance of any such resolution. These breaches of contract were either grossly negligent or willful efforts to continue assisting Enron in its fraud on the Lenders.

9.     Defendants not only knew of Enron's fraud on the Lenders but affirmatively assisted Enron in executing that fraud. Defendants actively helped Enron falsify its financial statements and otherwise misrepresent its financial condition. Then, on October 25, 2001, Defendants acted in their various administrative capacities under the Credit Agreements to

facilitate Enron's fraudulent October 25, 2001 borrowing by engaging in misconduct that included: forwarding to the Lenders the notices of borrowing from Enron that Defendants knew were fraudulent; organizing and participating in conference calls among the Lenders that Defendants knew Enron would use to defraud the Lenders; working the phones on or about October 25, 2001 to allay any concerns that Lenders expressed about Enron's rights to draw down the loans; physically collecting the Lenders' money and passing it on to Enron; and funding their own portions of the loans so as to help Enron maintain its façade of creditworthiness.

10.    Defendants' wrongdoing injured the Lenders.  Defendants actively assisted Enron in inducing, encouraging and directing the Lenders to rely upon false information, which the Lenders did to their detriment when they entered into the Credit Agreements and when they later advanced funds in response to Enron's fraudulent notices of borrowing under the Credit Agreements.  Only five weeks later, Enron declared bankruptcy, no longer able to hide – even with Defendants' eager assistance – that it had no ability to pay back its enormous debts, including its debts to the Lenders.

## PARTIES

### Plaintiffs

11.    Plaintiff DK Acquisition Partners, L.P., is a New York limited partnership with its principal place of business in New York.

12.    Plaintiff Kensington International Limited is a Cayman Islands corporation with its principal place of business on Grand Cayman Island.

13.    Plaintiff Rushmore Capital-I, L.L.C., is a Massachusetts limited liability company with its principal place of business in Massachusetts.

14.    Plaintiff Rushmore Capital-II, L.L.C., is a Massachusetts limited liability company with its principal place of business in Massachusetts.

15.    Plaintiff Springfield Associates, LLC, is a Delaware limited liability company with its principal place of business in New York.

16.    Plaintiffs purchase commercial debt in the secondary debt market.  Original lenders, typically banks, make loans to borrowers.  The secondary debt market allows original lenders to sell commercial loans, directly or through brokers or dealers, to purchasers in the secondary debt market.  The purchasers of commercial loans may, in turn, sell those loans to other purchasers, and so on.  This secondary debt market allows original lenders and other debt holders to maintain liquidity (*i.e.*, to buy and to sell loans in an active market), to reduce credit exposure to deteriorating credits, and to transfer the effort and potential uncertainty associated with collecting debt.  The secondary debt market is an important part of the global capital markets.  Defendants also participate actively in the secondary debt market.

17.    When original lenders sell commercial debt, they assign rights to the purchasers.  Lenders assign purchasers the right to collect the debt from the borrower, and when the debt is trading at a significant discount to par, they typically transfer other rights as well, including tort and contract rights against third parties arising under or in connection with the underlying loans.  Purchasers then stand in the shoes of the original lenders.

18.    In this lawsuit, Plaintiffs have been assigned the right to collect debt from Enron as well as other rights, including tort and contract rights against Defendants, arising in connection with underlying loans that Plaintiffs' predecessors-in-interest, the Lenders, made under the Credit Agreements.

6

**Defendants**

19.    Defendant J.P. Morgan Chase & Co. ("JPMC") is a Delaware corporation with its principal place of business in New York.

20.    Defendant JPMorgan Chase Bank is a national banking association wholly-owned by Defendant JPMC.  JPMorgan Chase Bank is the successor to both The Chase Manhattan Bank and Morgan Guaranty Trust Company.  JPMorgan Chase Bank is a subsidiary of Defendant JPMC.

21.    Defendant J.P. Morgan Securities, Inc. ("J.P. Morgan Securities") is a Delaware corporation with its principal place of business in New York.  It is the successor to Chase Securities, Inc.  J.P. Morgan Securities is a subsidiary of Defendant JPMC.

22.    Defendant Citigroup, Inc. ("Citigroup") is a Delaware corporation with its principal place of business in New York.  In October 1998, Citicorp merged with a wholly owned subsidiary of Travelers Group, Inc., which had previously acquired the investment bank Salomon Brothers.  The merged company adopted the name Citigroup, Inc.

23.    Defendant Citibank is a nonresident national banking association with its principal place of business in New York.  Citibank is a subsidiary of Defendant Citigroup.

24.    Defendant Citigroup Global Markets, Inc. f/k/a Salomon Smith Barney, Inc. ("Salomon Smith Barney") is a New York corporation with its principal place of business in New York.  Salomon Smith Barney is a subsidiary of Defendant Citigroup.

25.    Defendants JPMC, JPMorgan Chase Bank and J.P. Morgan Securities are sometimes referred to collectively herein as the "JPMC Defendants."

26.    Defendants Citigroup, Citibank and Salomon Smith Barney are sometimes referred to collectively herein as the "Citigroup Defendants."

27.     Defendants JPMorgan Chase Bank and Citibank are sometimes referred to collectively herein as the "Defendant Banks."

28.     Defendants J.P. Morgan Securities and Salomon Smith Barney are sometimes referred to collectively herein as the "Defendant Securities Subsidiaries."

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 1452(a).

30.     Personal jurisdiction exists over each Defendant.

31.     Venue is proper in this Court under 28 U.S.C. § 1391.

## ENRON'S OCTOBER 25, 2001 FRAUD ON THE LENDERS

32.     On or about October 25, 2001, the Lenders loaned money to Enron under the Credit Agreements. The Credit Agreements were written contracts that set out the rights and obligations of the Defendant Banks, the Defendant Securities Subsidiaries, Enron and the Lenders.

33.     Section 4.01 of each of the Credit Agreements contained representations by Enron. Section 4.01(d) of the May 2000 Credit Agreement contained a representation by Enron that Enron's December 31, 1999 and March 31, 2000 financial statements fairly presented Enron's financial condition in conformity with GAAP:

> (d)    The audited consolidated balance sheet of the Borrower and its Subsidiaries as of December 31, 1999 and the related audited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the fiscal year then ended and the unaudited consolidated balance sheet of the Borrower and its Subsidiaries as of March 31, 2000 and the related unaudited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the three months then ended, certified by the chief financial or accounting officer of the Borrower, copies of which have been delivered to each of the Banks, fairly present, in conformity with GAAP except as otherwise expressly noted therein, the consolidated financial position of the Borrower and its Subsidiaries as of such dates and their consolidated results of operations and changes in financial position for such fiscal periods, subject (in the case of the unaudited balance sheet and statements) to changes resulting from audit and normal year-end adjustments.

Section 4.01(d) of the May 2001 Credit Agreement contained an identical representation, except that Enron's representation in the May 2001 Credit Agreement was that Enron's December 31, 2000 and March 31, 2001 financial statements (rather than the December 31, 1999 and March 31, 2000 financial statements) fairly presented Enron's financial condition in conformity with GAAP:

> (d)    The audited consolidated balance sheet of the Borrower and its Subsidiaries as of December 31, 2000 and the related audited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the fiscal year then ended and the unaudited consolidated balance sheet of the Borrower and its Subsidiaries as of March 31, 2001 and the related unaudited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the three months then ended, certified by the chief financial or accounting officer of the Borrower, copies of which have been delivered to each of the Banks, fairly present, in conformity with GAAP except as otherwise expressly noted therein, the consolidated financial position of the Borrower and its Subsidiaries as of such dates and their consolidated results of operations and changes in financial position for such fiscal periods, subject (in the case of the unaudited balance sheet and statements) to changes resulting from audit and normal year-end adjustments.

34.    On October 25, 2001, Enron sent from Houston a Notice of Borrowing under each of the Credit Agreements. Ken Lay, Enron's Chairman and Chief Executive Officer signed each of these two notices of borrowing in Houston. Each Notice of Borrowing represented to the Lenders on October 25, 2001 that "the representations and warranties contained in Section 4.01

of the Credit Agreement are correct (other than those representations and warranties that relate

solely to a specific earlier date, which shall remain correct as of such earlier date) . . ." as

reflected below for the May 2000 Credit Agreement:

10/25/2001 08:58 FAX 7138535323          KEN LAY'S OFFICE                        @002

**NOTICE OF BORROWING**
October 25, 2001

Citibank, N.A., as Paying Agent
399 Park Avenue
New York, New York 10043

Attention:    Energy Department, North American Banking Group

Ladies and Gentlemen:

The undersigned, Enron Corp., refers to the U.S. $1,250,000,000 Long-Term Revolving Credit Agreement, dated as of May 18, 2000 (such Long-Term Revolving Credit Agreement, as amended from time to time, being herein referred to as the "Credit Agreement," the terms defined therein being used herein as therein defined), among the undersigned, certain Banks parties thereto, Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent, and hereby gives you notice, irrevocably, pursuant to Section 2.02 of the Credit Agreement that the undersigned hereby requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.02(a) of the Credit Agreement.

(i)    The Business Day of the Proposed Borrowing is October 25, 2001.

(ii)    The Type of Advances comprising the Proposed Borrowing is Base Rate Advances.

(iii)    The aggregate amount of the Proposed Borrowing is $1,250,000,000.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

(A)    the representations and warranties contained in Section 4.01 of the Credit Agreement are correct (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom, as though made on and as of such date; and

RECEIVED TIME OCT. 25.  9:58AM          PRINT TIME OCT. 25.  10:00AM

**CITINEWBY 00006461**

35.    Also, under Section 3.02(a)(i) of the May 2000 and May 2001 Credit Agreements,

Enron represented to the Lenders that the representations about its financial statements contained

in Section 4.01 were true on any day that Enron gave a Notice of Borrowing and on any day that

Enron accepted money from the Lenders.  As alleged above, Enron gave notices of borrowing

and accepted money from the Lenders under the May 2000 and May 2001 Credit Agreements on

October 25, 2001.  The following excerpt contains Section 3.02(a)(i) as reflected in the

May 2000 Credit Agreement (Section 3.02(a)(i) of the May 2001 Credit Agreement is identical):

> SECTION 3.02.    Additional Conditions Precedent to Each Advance. The obligation of each Bank to make any Advance shall be subject to the additional conditions precedent that on the date of such Advance (a) the following statements shall be true (and each of the giving of the applicable Notice of Borrowing and the acceptance by the Borrower of the proceeds of such Advance shall constitute a representation and warranty by the Borrower that on the date of such Advance such statements are true):
>
> (i)    The representations and warranties contained in Section 4.01 of this Agreement are correct on and as of the date of such Advance (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to such Advance and the Borrowing of which such Advance is a part and to the application of the proceeds therefrom, as though made on and as of such date, and
>
> (ii)    No event has occurred and is continuing, or would result from such Advance or the Borrowing of which such Advance is a part or from the application of the proceeds therefrom, which constitutes a Default, an Event of Default or both;
>
> and (b) the Paying Agent shall have received such other approvals, opinions or documents as any Bank through the Paying Agent may reasonably request. For avoidance of doubt, this Section 3.02 shall not apply to the Conversion, combination, division or continuation pursuant to this Agreement of Advances previously made.

36.    Thus, on six separate and distinct occasions on October 25, 2001, Enron made

representations to the Lenders that certain of its financial statements fairly presented Enron's

financial condition in conformity with GAAP:

(a)    The first two representations by Enron to the Lenders occurred in the text of the

two notices of borrowing that Lay signed.

(b)    The third and fourth representations by Enron to the Lenders occurred by virtue of

Enron giving a Notice of Borrowing under each of the May 2000 and May 2001

11

Credit Agreements, since a Notice of Borrowing under each of the May 2000 and

May 2001 Credit Agreements constituted a representation under each agreement's

Section 3.02(a)(i) that the representations in Section 4.01(d) were true, and

Section 4.01(d) contained explicit representations that certain of Enron's financial

statements fairly presented Enron's financial condition in conformity with GAAP.

(c)     The fifth and sixth representations by Enron to the Lenders occurred by virtue of

Enron accepting money from the Lenders under each of the May 2000 and

May 2001 Credit Agreements, because accepting money from the Lenders under

each of the May 2000 and May 2001 Credit Agreements constituted a

representation under each agreement's Section 3.02(a)(i) that the representations

in Section 4.01(d) were true, and Section 4.01(d) contained explicit

representations that certain of Enron's financial statements fairly presented

Enron's financial condition in conformity with GAAP.

37.     Three of these six representations by Enron to the Lenders on or about October

25, 2001, represented to the Lenders that Enron's December 31, 1999 and March 31, 2000

financial statements fairly presented Enron's financial condition in conformity with GAAP.

Those were the representations by Enron to the Lenders arising from and relating to the May

2000 Credit Agreement.

38.     The remaining three of these six representations by Enron to the Lenders on or

about October 25, 2001 represented to the Lenders that Enron's December 31, 2000 and March

31, 2001 financial statements fairly presented Enron's financial condition in conformity with

GAAP.  Those were the representations by Enron to the Lenders arising from and relating to the

May 2001 Credit Agreement.

39.     Each of these six representations that Enron made to the Lenders on or about October 25, 2001 was materially false.  As described below, Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements did not fairly present Enron's financial condition in conformity with GAAP.  To the contrary, Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements violated GAAP by materially understating Enron's true GAAP debt and materially overstating Enron's true GAAP operating cash flow.  Defendants knew of these GAAP violations because they resulted directly from numerous transactions that Defendants structured for Enron.  Indeed, Defendants structured these transactions for the very purpose of enabling Enron to understate its true GAAP debt and to overstate its true GAAP operating cash flow.

40.     Enron, through officers including Lay, Ben Glisan (Enron's Treasurer) and Jeff McMahon (Enron's Chief Financial Officer), intended to and did knowingly make these false representations to the Lenders on behalf of Enron.  These Enron officers each knew on or about October 25, 2001 that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements did not fairly present Enron's financial condition in conformity with GAAP.

41.     Enron's officers including Andy Fastow (Enron's former Chief Financial Officer), Glisan and McMahon, acting within the scope of their employment and for the benefit of Enron, had worked with Defendants to structure the very transactions that these Enron officers and Defendants alike knew were reported on Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements in violation of GAAP.  Lay, McMahon and Glisan knew on or about October 25, 2001 that Enron had improperly recorded these transactions on Enron's December 31, 1999, March 31, 2000, December 31, 2000, and

13

March 31, 2001 financial statements in violation of GAAP. Mr. Fastow is now serving a six-year sentence in a federal prison. While in detention, Mr. Fastow gave a deposition in numerous civil cases related to Enron's fraud. Mr. Fastow sat for a week and a half, dressed every day in the same drab green prison fatigues issued by the Houston Detention Center, and answered questions from defendants and plaintiffs alike. Mr. Fastow testified that Enron had three main financial institution partners who designed Enron's deceptive and misleading structured finance transactions: Citibank, N.A., Credit Suisse First Boston, and JPMorgan Chase. Mr. Fastow testified that the transactions that Enron conducted were "deceptive," "misleading," and "circular contrivances." Mr. Fastow recounted conversations with specific, named personnel from Defendants that demonstrate that those bankers understood the deceptive and misleading, and ultimately illegal, nature of Enron's financial statements.

42.     Nevertheless, on or about October 25, 2001 in Houston, Lay, McMahon and Glisan lied to the Lenders to get money. Lay lied to get money from the Lenders when, in Houston on October 25, 2001, he signed the two notices of borrowing for the May 2000 and May 2001 Credit Agreements. Lay, Glisan and McMahon lied to get money from the Lenders when, in Houston on or about October 25, 2001, they took affirmative steps to allow Enron to issue notices of borrowing and to accept funds from the Lenders knowing that Enron's notices of borrowing and Enron's acceptance of funds from the Lenders constituted false representations that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements were fairly presented in compliance with GAAP. Lay's, Glisan's and McMahon's affirmative actions included coordinating the collection of the funds with the Defendants. McMahon's affirmative actions included speaking on a conference call attended by Lenders and Defendants on the afternoon of October 25, 2001. Lay, Glisan and McMahon took

all of their actions in Houston on October 25, 2001 while acting within the scope of their employment by Enron and for the benefit of Enron.

43.    The Lenders loaned money to Enron in actual, justifiable and reasonable reliance on Enron's false representations that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements fairly presented Enron's financial condition in conformity with GAAP. Enron knew – because Lay, Glisan and McMahon, among others, had acquired this knowledge in the scope of their employment with Enron and for Enron's benefit – that the Lenders, as commercial bankers, placed great importance on Enron's financial integrity, creditworthiness and honesty.

44.    Enron also knew – because Lay, Glisan and McMahon, among others, had acquired this knowledge in the scope of their employment with Enron and for Enron's benefit – that the Lenders would not have loaned money to Enron if they had known that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements did not fairly present Enron's financial condition in conformity with GAAP.

45.    The Lenders suffered damages as a result of Enron's fraud on them. Enron's lies about its December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements concealed from the Lenders the fact that Enron was utterly incapable of repaying the money that Enron borrowed from the Lenders on or about October 25, 2001. The fraudulent façade of creditworthiness that Defendants had assisted in structuring for Enron concealed from the Lenders both the fact that Enron had much more debt than it could repay and the fact that Enron was generating much less cash flow from operations than its financial statements reported. Just five weeks later, on December 2, 2001, Enron could no longer hide its fraud and its precarious financial condition. On that day, Enron declared bankruptcy.

46.     Lay, Glisan and McMahon could reasonably foresee the Lenders' losses. Each of these three Enron officers knew that Enron was deeply insolvent on October 25, 2001, both before and after the drawdown of the Lenders' loans, and that Enron would be unable to repay the Lenders. Each of these three also agreed with the Defendants that the Defendants would assist them in the fraud they committed on the Lenders on October 25, 2001.

### THE JPMC DEFENDANTS KNEW OF ENRON'S OCTOBER 25, 2001 FRAUD ON THE LENDERS

47.     The JPMC Defendants knew, on October 25, 2001, that Enron was defrauding the Lenders when it borrowed funds under the Credit Agreements. In particular, the JPMC Defendants knew that Enron was representing to the Lenders that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements fairly presented Enron's financial condition in conformity with GAAP. The JPMC Defendants knew that those representations were intentionally false and that Enron made those intentionally false representations to the Lenders to get money from the Lenders that Enron would not be able to repay given Enron's financial condition.

48.     The JPMC Defendants knew that Enron's representations to the Lenders – that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements were fairly presented in accordance with GAAP – were materially false because the JPMC Defendants *themselves* had structured numerous fraudulent transactions for Enron that the JPMC Defendants knew Enron did not fairly present on its financial statements in conformity with GAAP. Indeed, the JPMC Defendants had *designed* these transactions to enable Enron to understate its true GAAP debt and to overstate its true GAAP operating cash flow. Defendants JPMorgan Chase Bank and J.P. Morgan Securities designed these transactions to hide the fact

that Enron was raising debt financing while simultaneously making it appear as if Enron was generating more cash flow from its business than Enron actually was generating.

49.    Until Enron's bankruptcy, Enron was one of the JPMC Defendants' most important clients. As early as 1995, the JPMC Defendants considered Enron to be a "bonanza in terms of deal flow." The JPMC Defendants received about $82 million in revenue from Enron in the 1997-to-2000 period alone. Just as Enron was one of the JPMC Defendants' most important clients, Defendant JPMorgan Chase Bank was one of Enron's most important banks, gaining a detailed understanding of Enron's finances as a result. Defendant JPMorgan Chase Bank considered itself to be "Enron's major financing firm" and consistently achieved and maintained the most elite "Tier 1" status among Enron's banks. On May 11, 1999, Richard Walker and Robert Traband wrote to Enron officers, "we believe we understand the Enron corporate financing structure as well as anyone outside your firm." On May 15, 2001, Robert Traband wrote to a senior J.P. Morgan Chase Bank credit officer, "We know Enron's credit as well as anyone."

50.    Defendant J.P. Morgan Securities was no less important to Enron. As Andrew Fastow, Enron's Chief Financial Officer until October 24, 2001, expressed to Rick Walker, a J.P. Morgan Securities managing director, just before Enron's October 25, 2001 fraud on the Lenders, "I think you know the credit and the businesses as well as (and better) than anyone in the world, so I'm counting on you to lead the way."

51.    During the five-year period prior to Enron's bankruptcy, the JPMC Defendants completed over 70 transactions with Enron, an average of more than one per month. The JPMC Defendants' specialty, however, was a particular type of fraudulent transaction known as a "prepay." The most significant of these prepay transactions was a series of transactions known

as the Mahonia transactions, which took place from 1992 through 2001.  From December 1992

through September 2001, Defendant JPMorgan Chase Bank structured twelve secret loans

disguised as prepay transactions, knowing that Enron would improperly (and in violation of

GAAP) report the loan proceeds as operating cash flow and would improperly (and in violation

of GAAP) fail to report the repayment obligations as debt:

(a)    a $75 million secret loan from JPMorgan Chase Bank to Enron, originated
in or about December 1992 (known as "Chase I");

(b)    a $230 million secret loan from JPMorgan Chase Bank to Enron,
originated on or about June 1993 (known as "Chase II");

(c)    a $207.9 million secret loan from JPMorgan Chase Bank to Enron,
originated in or about December 1994 (known as "Chase III");

(d)    a $225 million secret loan from JPMorgan Chase Bank to Enron,
originated in or about September 1995 (known as "Chase IV");

(e)    a $350 million secret loan from JPMorgan Chase Bank to Enron,
originated on or about December 16, 1996 (known as "Chase V");

(f)    a $300 million secret loan from JPMorgan Chase Bank to Enron,
originated on or about December 18, 1997 (known as "Chase VI");

(g)    a $250 million secret loan from JPMorgan Chase Bank to Enron,
originated on or about June 26, 1998 (known as "Chase VII");

(h)    a $250 million secret loan from JPMorgan Chase Bank to Enron,
originated on or about December 1, 1998  (known as "Chase VIII");

(i)    a $500 million secret loan from JPMorgan Chase Bank to Enron,
originated on or about June 28, 1999 (known as "Chase IX");

(j)     a $650 million secret loan from JPMorgan Chase Bank to Enron, originated on or about June 28, 2000 (known as "Chase X");

(k)     a $330 million secret loan from JPMorgan Chase Bank to Enron, originated on or about December 28, 2000 (known as "Chase XI"); and

(l)     a $350 million secret loan from JPMorgan Chase Bank, originated on or about September 28, 2001 (known as "Chase XII").

52.     As the above list makes clear, Enron typically asked JPMorgan Chase Bank for these loans near quarter-end to window dress Enron's financial statements with GAAP misrepresentations.  When Richard Walker wrote to Jeffrey Dellapina, a managing director at JPMorgan Chase Bank, Robert Traband, and George Serice on August 31, 2001, the subject line of his email – "Its Prepay Time" – reflected the routine way that Enron and JPMorgan joined forces near quarter-end to manipulate Enron's financial statements.

53.     Through the Mahonia transactions, the JPMC Defendants provided Enron with an aggregate of $3.717 billion in secret loans.  At least $1.5 billion of these secret and fraudulent transactions remained on Enron's books as of the October 25, 2001 fraud.  Because of these fraudulent transactions, the JPMC Defendants knew that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements violated GAAP, drastically understating Enron's true GAAP debt and overstating Enron's true GAAP operating cash flow.

54.     The Mahonia transactions were overseen and manipulated by Marc Shapiro, a senior credit officer at Defendant JPMorgan Chase Bank, who kept other top JPMorgan Chase Bank officials informed about these transactions.  Others involved with the Mahonia transactions from the JPMC Defendants included Jeff Dellapina, a managing director at JPMorgan Chase Bank, and Rick Walker and Robert Traband of J.P. Morgan Securities.  These employees and

officers of the JPMC Defendants took all of their actions in connection with the Mahonia transactions while acting within the scope of their employment by the JPMC Defendants and for the benefit of the JPMC Defendants.

55.    The JPMC Defendants knew that the Mahonia transactions were actually loans to Enron and that the amount of money provided to Enron in any of the transactions was determined by how much cash Enron wanted to borrow rather than what volume of any commodity any party wanted to trade.  Accordingly, the JPMC Defendants also knew that Enron should have recorded the Mahonia transactions (but did not record them) as debt under GAAP. The JPMC Defendants also knew that Enron reported the proceeds it received in violation of GAAP as cash provided by operating activities rather than as cash provided by financing activities.

56.    Internal JPMC documents leave no doubt that the JPMC Defendants acted intentionally and with full understanding of the wrongdoing they were committing with Enron. For example:

(a)    In December 14, 1992 notes of a telephone conversation with JPMC's Mark Webster concerning the Chase I prepay, Ian James (representing JPMC-controlled Mahonia) wrote "loan to Enron," "look like oil sale" and "effective loan = off balance."

(b)    In a June 23, 1993 letter proposing the Chase II prepay, JPMC's Mark Webster describes the various transactions that will be involved and then says, "The transactions described above are representative, in effect, of a fixed interest rate loan by CMB [Chase Manhattan Bank] to Enron."

20

(c)    In an October 29, 1993 internal Executive Approval Memorandum concerning

Enron, JPMorgan Chase Bank admitted that from its perspective as "lender,"

prepay transactions were the same as interest-bearing loans: "a funded swap is a

means by which an energy company can raise capital by receiving a prepayment

for oil sales.  In essence, a lender such as Chase pays in advance for future

deliveries of oil.  By entering into swaps or other hedges, Chase is able to create a

known cash flow which recovers the prepaid amount plus interest."

(d)    In a February 5, 1996 internal memorandum, Richard Walker (Managing Director

of J.P. Morgan Chase Securities' Global Oil and Gas Division) admitted that the

prepay structure "enables Enron to take a more aggressive accounting posture on

the deal" and that "we have never let the market know anything about the

underlying structure."

(e)    In a September 26, 1996 internal memorandum, JP Morgan Chase Bank's head of

Corporate Accounting Policies, Diane Butterfield, admitted that JP Morgan Chase

Bank was engaged in "loans/borrowings documented as derivatives," referring to

"transactions in which the timing of cash flows had been crafted in a way that the

transactions were economically equivalent to lending by the bank."

(f)    In an October 3, 1997 internal memorandum, Butterfield again addressed

"loans/borrowings documented as derivatives," saying the bank had "revisited"

the accounting for such transactions and decided that "the form of the

loan/borrowing dictates the accounting."  Butterfield admitted, however, that

despite accounting for such transactions as derivatives, "[f]or risk-based capital

purposes loans documented as derivatives will continue to be risk weighted as

21

loans." (A JP Morgan Chase Bank managing director, Janet Caruso, subsequently referred to JP Morgan Chase Bank's Corporate Accounting Policies group, which Butterfield headed, as a "bunch of idiots.")

(g)    In an October 29, 1997 email, JPMorgan Chase Bank executive George Serice admitted that the prepays were "balance sheet advantaged and are used as a year end management tool. Enron is thus enticed to pay a premium for these transactions."

(h)    In a November 13, 1997 email, Butterfield again addressed "loans/borrowings documented as derivatives," this time admitting that JP Morgan Chase Bank had decided to account for such transactions as derivatives, rather than as loans, when such transactions "are confirmed with the counterparty as derivatives."

(i)    An internal May 18, 1998 memorandum reviewing the market risk activities of JP Morgan Chase Bank's Global Commodities group admits: "In conjunction with the lending areas, *Global Commodities* transacted several prepaid swaps and/or forwards in 1997. These transactions involved lendings where principal and interest were paid by periodic deliveries of natural gas and base metals." (emphasis in original)

(j)    On or about November 25, 1998, JPMorgan Chase Bank executive Serice wrote in an internal email to other JPMorgan Chase Bank executives admitting that "Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) book it as deferred rev[enue] or (better yet) bury it in their trading liabilities.":

22



George Serice             11/25/1998 10:01 AM

Global Syndicated Finance  713-216-8079   Fax Number: 713-216-2339

To:       Karen Simon/CHASE@CHASE
cc:       Jeffrey W. Dellapina/CHASE
Subject:   Re: Pre-pays

Karen,

The latest developments on the famed Enron prepays is that we are no longer utilizing the bank markets to lay off the Chase risk through Performance Letters of Credit. Rather, Chase is laying-off its concentration risk through Surety Bonds provided by Enron's insurance companies. They get a great rate (as the insurance risk pricing is better than the PLC pricing we can get) and an ancillary benefit for Enron is to free-up precious bank capacity.

Jeff Dellapina and Bob Mertensotto worked on a deal this summer where they took out a couple of the older Prepay PLC's with these surety bonds. Jeff is also working on another prepay for Enron now. So, the last time we were actually in the market with a PLC-backed deal was quite a while back (1 year?) ... bottom line, Jeff doesn't need me anymore.

Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) book it as deferred rev or (better yet) bury it in their trading liabilities. There are, however, tax attributes to the structure that can "freshen" NOL's. This attribute was key in a transaction which was done for Crystal Oil. Short story is that sale can accelerate gains to the year in which the prepay is consumated, which gains can be offset by (expiring) NOL's. Following years yield larger than otherwise losses, which build back "freshened" NOL's.

I am attaching the latest Prepay bank universe that I have.

(k)      A December 18, 1998 internal report from Walker of J.P. Morgan Securities refers to prepays as being among the "debt capital" that Enron does not report on its balance sheet.

(l)      In a series of internal emails in December 1998, JPMC personnel discuss the fact that a prepay transaction is "priced as if it is a loan with 100% retention using the Bank's model." Walker of J.P. Morgan Securities has admitted that "the prepay transactions had been analyzed on, you know, a loan equivalent basis."

(m)      On or about May 10, 1999, JPMorgan Chase Bank executive Donald Layton wrote an internal email to Dennis Oakley and other JPMorgan Chase Bank

executives regarding a "PREPAID OIL SWAP." Layton's email admitted: "THERE IS A CATEGORY OF 'DISGUISED LOAN' THAT SHOWS UP IN MANY UNITS OF GLOBAL MARKETS. THIS IS JUST ONE SUCH EXAMPLE."

(n)    On or about May 11, 1999, J.P. Morgan Securities executive Traband, with the knowledge of J.P. Morgan Securities executive Walker, marked up a copy of Enron's 1998 and 1997 annual financial statements to show their understanding of how Enron accounted for the prepay transactions.

(o)    On or about May 12, 1999, Layton of JPMorgan Chase Bank sent another internal email in which he admitted the prepay transactions were "disguised loans": "WE ARE MAKING DISGUISED LOANS, USUALLY BURIED IN COMMODITIES OR EQUITIES DERIVATIVES (AND I'M SURE IN OTHER AREAS). WITH A FEW EXCEPTIONS, THEY ARE UNDERSTOOD TO BE DISGUISED LOANS AND APPROVED AS SUCH. BUT I AM QUEASY ABOUT THE PROCESS."

(p)    On or about June 7, 1999, JP Morgan Chase Bank managing director Janet Caruso wrote an internal email concerning prepays, referring to them as "loan related deals" and "loan related products."

(q)    Also about June 1999, Caruso wrote another internal email asking about the approval process for "all deals that were loans disguised as a derivative."

(r)    On or about July 8, 1999, Caruso wrote another internal email concerning prepays in which she referred to "the loan component of the prepaid" and generally referred to prepays as "prepaid loans."

(s)     Also on or about July 8, 1999, Caruso wrote an internal email concerning a "Confidential" meeting regarding prepays, admitting that it was "Market Risk's view that there was no market risk in the transaction," which she later admitted meant no commodity price risk.

(t)     On or about August 17, 1999, Caruso sent an internal memorandum to a number of other JP Morgan Chase Bank executives, announcing that "[l]oans disguised as derivatives are now known as Derivatives Based Funding," and acknowledging that this category of transactions included prepays.

(u)     On or about September 2, 1999, Patrick O'Brien of JPMorgan Chase Bank's Corporate Accounting Policies group distributed a paper in which he described prepay transactions as "analogous to a loan" and recommended that JPMorgan Chase Bank account for such transactions "as Debt and Equity Instruments," rather than as derivatives, because "in substance the transaction is a loan, which would be considered a debt instrument." O'Brien added, "A large portion of the income earned on the transaction is the interest income (*i.e.*, the accretion of the discount on the cash flows) earned over time. It would be misleading to say that this was truly Trading Revenue (although it is clearly Trading-related Revenue)." After reading O'Brien's paper, Caruso told him that "[s]ome of the contents I agreed with generally (prepaids)."

(v)     On or about January 28, 2000, as part of a broader internal discussion within JPMorgan Chase Bank as to how the bank should account for transactions including prepays like those it was structuring for Enron, Jeremy Hood admitted

in an internal email that JPMorgan Chase Bank's Corporate Accounting Policies group had concerns about "'disguised bank loans.'"

(w)    In an August 7, 2001 internal email exchange between Christopher Teague and Walker, both of J.P. Morgan Securities, among others, Teague asks Walker with respect to Walker's description of an Enron plan to get certain assets off its balance sheet, "is this another hide-thedebt structure?"

(x)    On September 5, 2001, Dellapina sent the following chart to senior JPMorgan Chase Bank credit officer Jim Ballentine, copying J.P. Morgan Securities executives Walker and Traband analyzing the paydown of prepay "principal," again showing that the JPMC Defendants viewed the prepay transactions as loans with principal and interest payments, not as genuine commodity transactions:



(y)     On or about September 20, 2001, Traband of J.P. Morgan Securities admitted

once again in an internal communication summarizing JPMorgan Chase Bank's

own credit exposure to Enron, that a meaningful credit analysis of Enron would

treat the sham prepay transactions "as debt."

(z)     On or about September 24, 2001, Traband sent an internal email to Monte Elliff

and Jeff Dellapina, attaching a "return model" for a prepay that Traband has since

admitted was "not really a model that's intended to calculate a return on a transaction like a prepay, this is a return model for loan."

(aa)    A non-public J.P. Morgan pitch book referred to prepay transactions as "balance sheet friendly" and noted the "[a]ttractive accounting impact by converting funded debt to 'deferred revenue,' or a long term trade payable." The pitch book went on to state that prepays could be "executed with little market visibility."

57.    The JPMC Defendants also knew that Enron's auditor, Arthur Andersen LLP ("Andersen"), did not understand the true nature of the Mahonia transactions. In fact, the JPMC Defendants actively assisted Enron in making misleading representations to Andersen so that Andersen would approve Enron's non-GAAP accounting for the transactions. For example, most of the fraudulent prepays that the JPMC Defendants structured for Enron involved Mahonia, a family of shell corporations located in the Channel Islands near England. Andersen believed that Mahonia was an independent entity but, in reality, Defendant JPMorgan Chase Bank had established and controlled Mahonia from its inception. Indeed, in a November 29, 2001 email summarizing the Enron/JPMC prepay transactions, a JPMorgan Chase Bank employee, Michael Sabloff, uses the phrase "[w]e (Mahonia)," succinctly expressing the functional identity of JPMorgan Chase Bank and Mahonia.

58.    Defendant JPMorgan Chase Bank formed Mahonia solely for the purpose of assisting in "transactions arranged by Chase." An October 24, 1995 letter shows that Mahonia then appointed Chase as its agent for the purposes of arranging "all of its physical natural gas receipts and deliveries until further notice," which was in effect a perpetual appointment because there was never any "further notice." When Andersen raised questions about Mahonia's independence and requested a letter from Mahonia representing that it was an independent

business apart from Defendant JPMorgan Chase Bank and Enron, personnel from Defendant JPMorgan Chase Bank provided the letter. A taped telephone conversation on September 13, 2001, among Defendant JPMorgan Chase Bank and Enron employees discussing the Andersen request shows that they were knowingly contributing to a fiction that Mahonia was independent. One of the participants noted that Defendant JPMorgan Chase Bank and Enron wanted to make certain that "Mahonia seems independent."

59.　　The JPMC Defendants knew that Enron reported the fraudulent Mahonia transactions in violation of GAAP on Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements. The JPMC Defendants also knew that the fraudulent Mahonia transactions were reported in violation of GAAP on Enron's December 31, 1999 and December 31, 2000 financial statements, understating Enron's GAAP debt by at least $1.4 billion and $2.3 billion, respectively, and overstating Enron's GAAP cash flows from operating activities by at least $348 million and $981 million, respectively. The transactions had effects of similar magnitude on Enron's March 31, 2000 and March 31, 2001 financial statements.

60.　　The sham nature of the prepay transactions that the JPMC Defendants structured for Enron is illustrated by the Chase XI prepay transaction, which involved a secret loan from Defendant JPMorgan Chase Bank to Enron in the amount of $330 million that closed in December 2000. The JPMC Defendants knew that the financing in Chase XI was a "loan," as admitted in the following email from George Serice to Robert Traband, both of J.P. Morgan Securities:

From: George Serice
To: Robert Traband
CC:
BCC:
Subject: Prepay Struc Sum
Date: 11/29/2000 6:27:26 PM

Attachments:

looks OK to me. do you need to reference that loan is booked in Dellapina's world?

61.     Chase XI was designed for accounting purposes to look like a physically settled prepay that required the delivery of natural gas among four supposedly independent parties:  The Chase Manhattan Bank ("Chase", a predecessor of JPMorgan Chase Bank); Mahonia Natural Gas Limited; Stoneville Aegean Limited ("Stoneville"), a shell corporation controlled by Defendant JPMorgan Chase Bank; and Enron North America Corp. ("ENA").

62.     The JPMC Defendants structured Chase XI legally to require the delivery of gas from Chase to Stoneville and then from Stoneville to Enron as shown in the following JPMorgan Chase Bank document reflecting the transaction's "Legal Entity Structure":



63.    Remarkably, however, Stoneville was not authorized to take delivery of gas on any pipeline in the world, a fact that apparently occurred to no one among Enron and the JPMC Defendants as they structured the fraudulent "trades" that comprised Chase XI.  Defendant JPMorgan Chase Bank employees subsequently decided to simply write Stoneville out of the deal, from an operational perspective, without making any changes or amendments to the underlying legal documents.  No one from Stoneville ever complained, of course, since Stoneville was nothing but a sham shell corporation that the JPMC Defendants controlled.  Defendant JPMorgan Chase Bank employees altered internal documents reflecting the legal requirements of Chase XI and then prepared a document illustrating the true nature of the sham transaction, which they referred to as the transaction's "Operational Structure" as opposed to the "Legal Entity Structure" reflected above:



64.    Defendant JPMorgan Chase Bank's "Operational Structure" completely conflicted with the legal documents that Enron's auditors, Andersen, used to opine on Enron's accounting.  The JPMC Defendants knew that Enron's accounting depended, in part, on the presence and independence of Stoneville as an independent third party taking and delivering natural gas.  Nevertheless, Defendant JPMorgan Chase Bank altered the transaction's "operational" structure – literally scratching out Stoneville on internal trade documents and writing in "Chase" – to eliminate the problem of Stoneville's inability to make and take deliveries of gas.  Defendant JPMorgan Chase Bank's domination of Stoneville and Mahonia was so complete that no one from "Stoneville" ever complained about its failure to receive delivery from Chase of more than $300 million of natural gas.

65.    Like the other fraudulent prepays that the JPMC Defendants structured for Enron, Enron reported Chase XI on Enron's financial statements in violation of GAAP. Enron's December 31, 2000 and March 31, 2001 financial statements understated Enron's true debt by the amount of the loan that Enron received in Chase XI and also overstated Enron's cash flow from operations. Defendant JPMorgan Chase Bank and the other JPMC Defendants knew that Enron's December 31, 2000 and March 31, 2001 financial statements reported Chase XI in violation of GAAP.

66.    George Serice of J.P. Morgan Securities emailed with his Citibank colleague Chris Lyons on October 19, 2001, discussing how each was manipulating the perceptions of the Lenders:



**George Serice**
10/19/2001 11:54 AM



JP Morgan Global Syndicated Finance, George.Serice@JPMChase.com  713-216-8079    Fax Number: 713-216-4583

To:       "Lyons, Chris [FI]" <chris.lyons@citi.com>
cc:
Subject:  RE: Enron launches

I've rec'd a number of calls wanting our view.  My spin is that no one is going to lose money and the company has plenty of liquidity.  They tend to agree, but say their $ well is dry re: ANY new commitments.  Also heard of a Canadian bank (I'm guessing TD) telling market they are through with E and will let existing commitments run off.  Thankfully I have no launches pending for them.

I've heard Barclays was planning a small share settled swap deal for 4Q.


"Lyons, Chris [FI]" <chris.lyons@citi.com> on 10/19/2001 11:42:09 AM



        "Lyons, Chris [FI]" <chris.lyons@citi.com> on 10/19/2001 11:42:09 AM


To:       George Serice/CHASE@CHASE
cc:
Subject:  RE: Enron launches

On a more serious note, have you heard any noise about banks backing away from
ene?  I'm starting to get "off the record" calls from banks asking what our view is.
Outwardly I'm keeping the bullish face on, but internally there's certainly more than enough worry to go around.

-----Original Message-----
From: GEORGE.SERICE@chase.com [mailto:GEORGE.SERICE@chase.com]
Sent: Thursday, October 18, 2001 1:43 PM
To: john.lyons@citicorp.com
Subject: Enron launches

So are you guys launching anything for Enron in the near future?  Maybe a new LJM facility?



JPMNBY100043146

34

67.    By October 25, 2001, the JPMC Defendants knew even more reasons why Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements were in violation of GAAP.  By October 24, 2001, JPMorgan Chase Bank had put Enron on its internal "vulnerable list" as a potentially problematic credit, and the JPMC Defendants were sending a due diligence team to Houston (at Enron's invitation, extended also to the Citigroup Defendants but not to the Lenders) to conduct an intensive and secret due diligence effort at Enron, in cooperation with the Citigroup Defendants.  As part of this secret due diligence effort, which by October 23, 2001 involved JPMC restructuring personnel who dealt in part with bankruptcies, the JPMC Defendants acquired knowledge about Enron's fraudulent transactions with the Citigroup Defendants, described below.  On the evening of October 24, 2001 – the day before the Lenders loaned money to Enron under the May 2000 and May 2001 Credit Agreements in reliance on Enron's representations about its December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements – an internal email exchange among JPMC employees George Serice and Rick Walker summed up the JPMC Defendant's knowledge of the full extent of Enron's fraudulent prepay transactions:

68.    Serice, a vice-president at J.P. Morgan Securities, sent this email from his Houston office after getting a phone call from Traband, also of J.P. Morgan Securities, telling Serice that Enron had $5 billion in prepays, an astounding amount. Traband was with Walker, also of J.P. Morgan Securities, at Enron's Houston office at the time. Traband called Serice to update him on Enron. Serice then sent this email to Walker (even though Walker already had this info, being with Traband) expressing his amazement at the extent to which Enron's fraudulent prepays went beyond those that the JPMC Defendants had structured for Enron.

69.    Another member of the JPMC's secret due diligence team later wrote that he concluded during the due diligence team's visit to Enron that Enron was "overextended" and in need of "substantial refinancing" and that the situation was "uncomfortable!"

70.    Despite all that the JPMC Defendants knew by October 25, 2001, however, Enron continued to enjoy investment-grade credit ratings through October 25, 2001. In particular, for senior unsecured debt, Enron's credit ratings were BBB+ from Duff & Phelps, BBB+ from Fitch IBCA, Baa1 from Moody's, A- from R and I (Japan), and BBB+ from Standard & Poor's. Significantly, the agencies' ratings were based upon published financial statements and other data that the JPMC Defendants knew to be false.

71.    Indeed, contrary to these credit ratings, by October 23, 2001, senior management of the JPMC Defendants was concerned that "Enron could go under at any moment." Also by October 23, 2001, at least one executive in JPMorgan Chase Bank's Syndicated Global Finance Group, Karen Simon, had concluded that Enron was "on the verge of bankruptcy." Also by October 23, 2001, Serice of J.P. Morgan Securities had concluded that Enron was "in trouble" and JPMorgan Chase Bank executives were discussing internally the prospects of an Enron bankruptcy, focusing in particular on the priority of Enron's prepay liabilities compared to "all

other debt."  The same day, Robert Traband sent the following email to Jim Ballentine, a senior

credit officer at JPMorgan Chase Bank referring to the "vulnerable list," JPMorgan Chase

Bank's internal list of troubled credits:

From: Robert Traband
To: James Ballentine
CC:
BCC:
Subject: Enron
Date: 10/23/2001 8:22:49 AM

Attachments:

I know we have a lot more to learn about Enron, but until this settles down, I
think I probably should add them to the vulnerable list. Hopefully things
settle down quickly and we could take them back off. Any thoughts?

Rob

72.    On October 25, 2001, one employee of the JPMC Defendants who was on his way

to Enron's offices as part of the secret due diligence effort, privately called Enron "one of the

biggest train wrecks in corporate America."

### THE JPMC DEFENDANTS PROVIDED SUBSTANTIAL ASSISTANCE TO HELP ENRON COMMIT ITS OCTOBER 25, 2001 FRAUD

73.    The JPMC Defendants provided substantial assistance to Enron in committing

fraud on the Lenders on and about Thursday, October 25, 2001. The JPMC Defendants hoped to

earn large fees from providing new *secured* financings to Enron that would be recovered more

easily in an Enron bankruptcy, and because the JPMC Defendants hoped to facilitate a merger

between Enron and another corporation, Dynegy, to absorb Enron and its disastrous financial

condition.  If successful, the merger of Enron and Dynegy would also prevent disclosure of the fraudulent transactions that the JPMC Defendants had structured for Enron, and might even obligate Dynegy to repay the loans that Defendant JPMorgan Chase Bank had outstanding to Enron through the fraudulent prepays and otherwise.  In addition, the JPMC Defendants expected to earn huge fees if the Enron/Dynegy merger was consummated and expected to have a lucrative, continuing business relationship with the post-merger entity.

74.    None of this would be possible, however, if Enron failed before the JPMC Defendants could put the new secured financings in place and facilitate the merger.  Therefore, on the morning of October 25, 2001 in Houston, the JPMC Defendants agreed with the Citigroup Defendants (which had similar motives, detailed below) to assist Enron in defrauding the Lenders.  Defendant Citibank conveyed to the Lenders the notices of borrowing under the May 2000 and May 2001 Credit Agreements.  After the Lenders received the notices of borrowing, but before the Lenders had made any funds available to Citibank as Paying Agent, the JPMC Defendants convened a telephone conference with the participating banks, including the Lenders, to discuss the notices of borrowing.

75.    Defendant JPMorgan Chase Bank provided additional assistance to Enron on October 25, 2001 by funding its portion of Enron's borrowing under the May 2000 and May 2001 Credit Agreements.  Defendant JPMorgan Chase Bank knew that it was under no obligation to fund, since it knew that Enron was lying in its representations.  Nevertheless, Defendant JPMorgan Chase Bank funded, knowing that its failure to do so would torpedo its chances of prolonging Enron's corporate life long enough to earn huge fees and security interests in restructuring Enron's debt and to facilitate the merger of Enron into Dynegy.

76.    **The Role of the Arranger.**  Defendant J.P. Morgan Securities was an arranger or co-arranger (with Defendant Salomon Smith Barney) for the May 2000 Credit Agreement, and the May 2001 Credit Agreement.  In arranging the various credit facilities for Enron, Defendant J.P. Morgan Securities participated with Enron, at Enron's direction, to organize and negotiate with the Lenders.

77.    **The Role of the Administrative Agent.**  Defendant JPMorgan Chase Bank was an administrative agent or co-administrative agent (with Defendant Citibank) for the May 2000 Credit Agreement and the May 2001 Credit Agreement.  As the administrative agent or co-administrative agent for these credit facilities, Defendant JPMorgan Chase Bank was the managerial leader of the credit facility, charged with numerous managerial and administrative duties under the relevant credit agreements.

78.    **The Fraudulent April 25, 2000 Informational Memorandum.**  In April and May 2000, Defendant J.P. Morgan Securities (through its predecessor) acted as Co-Lead Arranger and Co-Book Runner for the May 2000 Credit Agreement.  In connection with its role, Defendant J.P. Morgan Securities created the April 25, 2000 Informational Memorandum and circulated it to all the Lenders.  To create the April 25, 2000 Informational Memorandum, Defendant J.P. Morgan Securities compiled information from Enron's 1995-1999 financial statements and presented that information in chart form to show a purported "growth trend" from 1995 to 1999.  The April 25, 2000 Informational Memorandum also presented a summary of, among other things, Enron's publicly reported funds flows from operations and Enron's total debt for the years 1996 through 1999.  In a note to this summary, the Informational Memorandum specifically directed anyone seeking more detailed information on Enron's

financial performance and credit statistics to "see Enron's Annual report for the related year," as if any such report were reliable.

79.     Additionally, the April 25, 2000 Informational Memorandum required any interested lender, including each of the Lenders, to respond to the memorandum with a letter stating that its credit analysis and decision was "based on the financial statements of Enron Corp." In so doing, Defendant J.P. Morgan Securities encouraged the Lenders to trust as reliable the very financial statements that Defendant J.P. Morgan Securities knew to violate GAAP. The April 25, 2000 Informational Memorandum listed as "contacts" some of the very J.P. Morgan Securities individuals who knew that Enron's financial statements violated GAAP, including Christopher Teague, Rick Walker, and Robert Traband. By issuing the April 25, 2000 Informational Memorandum, Defendant J.P. Morgan Securities intended to defraud the Lenders into believing that Enron's financial statements fairly presented Enron's financial condition in conformity with GAAP when Defendant J.P. Morgan Securities knew that to be false.

80.     The Lenders reasonably relied on Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 25, 2000 Informational Memorandum. Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 25, 2000 Informational Memorandum proximately caused harm to the Lenders. In particular, Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 25, 2000 Informational Memorandum proximately caused the Lenders to continue extending credit to Enron. By October 25, 2001, Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 25, 2000 Informational Memorandum led to the disastrous result that the Lenders loaned money to Enron, a hopelessly insolvent corporation. In addition, Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 25, 2000 Informational

Memorandum proximately caused the Lenders to lose money that they loaned to Enron because those violations hid from the Lenders the disastrous financial condition that caused those Lenders' losses.

81.     Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 25, 2000 Informational Memorandum resulted in a new and independent obligation to be truthful to the Lenders.  Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 25, 2000 Informational Memorandum also created new, independent risks for the defrauded Lenders.  Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 25, 2000 Informational Memorandum supplied fraudulent information – including Enron's financial statements  that failed to properly reflect the transactions that Defendant J.P. Morgan Securities knew rendered them in violation of GAAP – with the intent that those Lenders would make credit available to Enron based on that very inaccurate information.

82.     In addition, Defendant J.P. Morgan Securities prominently placed its name on the front of the May 2000 Credit Agreement, further inducing the Lenders to rely on the representations contained there – representations that Defendant J.P. Morgan Securities knew to be intentionally false – that Enron's financial statements fairly presented Enron's financial condition in conformity with GAAP.

83.     **The May 2000 Credit Agreement.**  On or about May 18, 2000, the Lenders executed the May 2000 Credit Agreement.  The May 2000 Credit Agreement appointed Defendant JPMorgan Chase Bank (through its predecessor, Chase Manhattan Bank) as Co-Administrative Agent "to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Administrative Agent . . . ."  The terms of the

May 2000 Credit Agreement required that each lender signatory, including each member of the Lenders, acknowledge its reliance upon certain Enron financial statements and represented those financial statements to be fairly presented in conformity with GAAP. Defendant JPMorgan Chase Bank signed the May 2000 Credit Agreement as Co-Administrative Agent.

84.     In signing the May 2000 Credit Agreement, Defendant JPMorgan Chase Bank encouraged the Lenders to trust as reliable the very financial statements that Defendant JPMorgan Chase Bank knew to violate GAAP for reasons described above. In signing the May 2000 Credit Agreement as Co-Administrative Agent, JPMorgan Chase Bank intended to defraud the Lenders by means of false and fraudulent pretenses and representations about Enron's financial statements. Defendant JPMorgan Chase Bank intended to defraud the other Lenders into believing that Enron's financial statements fairly presented Enron's financial condition in conformity with GAAP when Defendant JPMorgan Chase Bank knew that to be false.

85.     The Lenders reasonably relied on Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in signing the May 2000 Credit Agreement. Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2000 Credit Agreement proximately caused harm to the Lenders. In particular, Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2000 Credit Agreement proximately caused the Lenders to continue extending credit to Enron. By October 25, 2001, Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2000 Credit Agreement led to the disastrous result that the Lenders loaned money to Enron, a hopelessly insolvent corporation. In addition, Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2000 Credit Agreement proximately caused the Lenders to lose money that they loaned to

Enron because those violations hid from the Lenders the disastrous financial condition that caused those Lenders' losses.

86.     In Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2000 Credit Agreement, defendant JPMorgan Chase Bank had a new and independent obligation to be truthful to the Lenders.  In Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2000 Credit Agreement, Defendant JPMorgan Chase Bank also created new, independent risks for the defrauded Lenders.

87.     In Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2000 Credit Agreement, Defendant JPMorgan Chase Bank supplied fraudulent information with the intent that the Lenders would make credit available to Enron based on that very inaccurate information.

88.     Under Section 5.01(a)(ii) of the May 2000 Credit Agreement, Enron delivered to each bank, in a form acceptable to Defendant JPMorgan Chase Bank as Co-Administrative Agent, a certificate of the chief financial officer or the chief accounting officer of Enron stating that no Event of Default existed under the May 2000 Credit Agreement.  However, under section 6.01(b) an Event of Default existed if one of the representations made in the May 2000 Credit Agreement was incorrect in any material respect when made and such materiality was continuing.  Section 4.01(d) of the May 2000 Credit Agreement contained the representation that Enron's December 31, 1999 and March 31, 2000 financial statements fairly presented Enron's financial condition in conformity with GAAP.  Defendant JPMorgan Chase Bank knew that representation to be materially false because of its role in structuring numerous transactions described above.  With Defendant JPMorgan Chase Bank's approval, Enron made the fraudulent representation that no Event of Default existed at least quarterly to the Lenders from 2000

through mid-2001.  Defendant JPMorgan Chase Bank knew those representations to be

materially false.

89.    **The Fraudulent April 20, 2001 Invitation to Offer.**  In April and May 2001,

Defendant J.P. Morgan Securities (through its predecessor) acted as Co-Lead Arranger and Co-

Book Runner for the May 2001 Credit Agreement.  In connection with its role, Defendant J.P.

Morgan Securities created the April 20, 2001 Invitation to Offer and circulated it to the Lenders.

The April 20, 2001 Invitation to Offer endorsed Enron's public financial statements, dating to

1995, as reliable.  Indeed, the April 20, 2001 Invitation to Offer compiled information from

Enron's 1995-2000 financial statements and presented that information in chart form to represent

Enron's "growth trend" from 1995 to 2000.  The April 20, 2001 Invitation to Offer also

presented a summary of, among other things, Enron's publicly reported revenues and total debt

for the years 1997 through 2000.

90.    Additionally, the April 25, 2001 Invitation to Offer required any interested lender,

including each Lender, to respond to the memorandum with a letter stating that its credit analysis

and decision was "based on the financial statements of Enron Corp."  In so doing, J.P. Morgan

Securities encouraged the Lenders to trust as reliable the very financial statements that

Defendant J.P. Morgan Securities knew to violate GAAP.  The April 20, 2001 Invitation to Offer

memorandum listed  as "contacts" some of the very J.P. Morgan Securities individuals who

knew that Enron's financial statements violated GAAP, including George Serice, Christopher

Teague, Rick Walker, and Robert Traband.  The April 20, 2001 Invitation to Offer by Defendant

J.P. Morgan Securities was intended to defraud the Lenders into believing that Enron's financial

statements fairly presented Enron's financial condition in conformity with GAAP when

Defendant J.P. Morgan Securities knew that to be false.

91.     The Lenders reasonably relied on Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer.  Reliance upon Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer proximately caused harm to the Lenders.  In particular, reliance upon Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer proximately caused the Lenders to continue extending credit to Enron.  By October 25, 2001, Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer led to the disastrous result that the Lenders loaned money to Enron, a hopelessly insolvent corporation.  In addition, Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer proximately caused the Lenders to lose money that they loaned to Enron because those violations hid from the Lenders the disastrous financial condition that caused those Lenders' losses.

92.     In Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer, Defendant J.P. Morgan Securities had a new and independent obligation to be truthful to the Lenders.  In Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer, Defendant J.P. Morgan Securities also created new, independent risks for the defrauded Lenders.  In Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer, Defendant J.P. Morgan Securities supplied fraudulent information – including Enron's financial statements that failed to properly reflect the transactions that Defendant J.P. Morgan Securities knew rendered them in violation of GAAP – with the intent that the Lenders would make credit available to Enron based on that very inaccurate information.

93.    In addition, Defendant J.P. Morgan Securities prominently placed its name on the front of the May 2001 Credit Agreement, further inducing the Lenders to rely on the representations contained there – representations that Defendant J.P. Morgan Securities knew to be intentionally false – that Enron's financial statements fairly presented Enron's financial condition in conformity with GAAP.

94.    **The May 2001 Credit Agreement.** On or about May 14, 2000, the Lenders executed the May 2001 Credit Agreement. The May 2001 Credit Agreement appointed Defendant JPMorgan Chase Bank (through its predecessor, Chase Manhattan Bank) as Co-Administrative Agent "to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Administrative Agent . . . ." The terms of the May 2001 Credit Agreement required that each lender signatory, including each of the Lenders, acknowledge its reliance upon certain Enron financial statements and represented those financial statements to be fairly presented in conformity with GAAP. Defendant JPMorgan Chase Bank signed the May 2001 Credit Agreement as Co-Administrative Agent.

95.    In signing the May 2001 Credit Agreement, Defendant JPMorgan Chase Bank encouraged the Lenders to trust as reliable the very financial statements that Defendant JPMorgan Chase Bank knew to violate GAAP for reasons described above. Defendant JPMorgan Chase Bank intended to defraud the Lenders into believing that Enron's financial statements fairly presented Enron's financial condition in conformity with GAAP when Defendant JPMorgan Chase Bank knew that to be false.

96.    The Lenders reasonably relied on Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in signing the May 2001 Credit Agreement. Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2001 Credit Agreement

proximately caused harm to the Lenders. In particular, Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2001 Credit Agreement proximately caused the Lenders to continue extending credit to Enron. By October 25, 2001, Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2001 Credit Agreement led to the disastrous result that the Lenders loaned money to Enron, a hopelessly insolvent corporation. In addition, Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2001 Credit Agreement proximately caused the Lenders to lose money that they loaned to Enron because those violations hid from the Lenders the disastrous financial condition that caused those Lenders' losses.

97.    In Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2001 Credit Agreement, Defendant JPMorgan Chase Bank had a new and independent obligation to be truthful to the Lenders. In Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2001 Credit Agreement, Defendant JPMorgan Chase Bank also created new, independent risks for the defrauded Lenders.

98.    In Defendant JPMorgan Chase Bank's fraudulent pretenses and representations in the May 2001 Credit Agreement, Defendant JPMorgan Chase Bank supplied fraudulent information with the intent that the Lenders would make credit available to Enron based on that very inaccurate information.

99.    Under Section 5.01(a)(ii) of the May 2001 Credit Agreement, Enron delivered to each bank, in a form acceptable to Defendant JPMorgan Chase Bank as Co-Administrative Agent, a certificate of the chief financial officer or the chief accounting officer of Enron stating that no Event of Default existed under the May 2001 Credit Agreement. However, under section 6.01(b) an Event of Default existed if one of the representations in the May 2001 Credit

Agreement was incorrect in any material respect when made and such materiality was continuing. Section 4.01(d) of the May 2001 Credit Agreement contained the representation that Enron's December 31, 2000 and March 31, 2001 financial statements fairly presented Enron's financial condition in conformity with GAAP. Defendant JPMorgan Chase Bank knew that representation to be materially false because of its role in structuring numerous transactions described above. With Defendant JPMorgan Chase Bank's approval, Enron made the fraudulent representation that no Event of Default existed at least once in mid-2001. Defendant JPMorgan Chase Bank knew those representations to be materially false.

      100.    **The October 25, 2001 Conference Call.** On October 25, 2001, Enron sent to the Lenders from Houston a Notice of Borrowing under each of the May 2000 and May 2001 Credit Agreements. Ken Lay, Enron's Chairman and Chief Executive Officer, signed each Notice of Borrowing in Houston. After the Lenders received the Notices of Borrowing, but before the Lenders had made any funds available to Defendant Citibank as paying agent, Defendant J.P. Morgan Securities convened a telephone conference with the Lenders to discuss the Notices of Borrowing. On the call, Claire O'Connor, a Managing Director of Defendant J.P. Morgan Securities, represented that the purpose of the call was for Enron to explain that it immediately needed cash in order to redeem its commercial paper. Also on the call, O'Connor represented that Enron's purpose in drawing down the funds was to reestablish the market's confidence in Enron. Also on the call, Jeff McMahon of Enron lied to the Lenders by telling them that Enron was not in default under Credit Agreements, which Defendant J.P. Morgan Securities knew to be false; O'Connor and all other J.P. Morgan Securities representatives on the call were silent.

101. After the main conference call with Enron, George Serice of J.P. Morgan Securities spent much of the rest of the day fielding calls from Lenders. At least one dozen banks called Serice at his Houston office on October 25, 2001.

102. By convening the October 25, 2001 conference call, by its conduct on that call, and in fielding calls from Lenders, Defendant J.P. Morgan Securities encouraged the Lenders to believe that Enron had the legal right to drawdown the May 2000 and May 2001 Credit Agreements, when Defendant J.P. Morgan Securities knew that no such obligation existed given Enron's fraudulent misrepresentations about Enron's financial statements. Defendant J.P. Morgan Securities convened this conference call with the intent to defraud the Lenders into believing that Enron had the legal right to drawdown the May 2000 and May 2001 Credit Agreements, when Defendant J.P. Morgan Securities knew that no such obligation existed given Enron's fraudulent misrepresentations about Enron's financial statements.

103. The Lenders reasonably relied on Defendant J.P. Morgan Securities' fraudulent pretenses and representations in the October 25, 2001 conference call. Defendant J.P. Morgan Securities' false representations on the October 25, 2001 conference call proximately caused harm to the Lenders. In particular, Defendant J.P. Morgan Securities' false representations on the October 25, 2001 conference call proximately caused the Lenders to loan money to Enron, a hopelessly insolvent corporation. In addition, Defendant J.P. Morgan Securities' false representations on the October 25, 2001 conference call proximately caused the Lenders to lose money that they loaned to Enron because it was Enron's disastrous financial condition – the very thing that deprived Enron of its legal right to drawdown the May 2000 and May 2001 Credit Agreements – that caused those Lenders' losses.

104.    In Defendant J.P. Morgan Securities' October 25, 2001 conference call, Defendant J.P. Morgan Securities had a new and independent obligation to be truthful to the Lenders.  In Defendant J.P. Morgan Securities' October 25, 2001 conference call, Defendant J.P. Morgan Securities created new, independent risks for the defrauded Lenders.

## THE JPMC DEFENDANTS' CONDUCT
## INJURED THE LENDERS

105.    As a result of Defendant J.P. Morgan Securities' conduct, the Lenders sustained injury.  Defendant J.P. Morgan Securities knew that each of the Lenders would fall victim to the false representations that Defendant J.P. Morgan Securities executed in conducting and participating in the affairs of the Lenders.  It was reasonably foreseeable to Defendant J.P. Morgan Securities that its false representations about the financial condition of Enron would proximately cause the Lenders to continue extending credit to Enron.  It was reasonably foreseeable to Defendant J.P. Morgan Securities on October 25, 2001, that its conduct would proximately cause the Lenders to loan money to Enron, a hopelessly insolvent corporation. Defendant J.P. Morgan Securities' conduct caused the Lenders to lose money that they loaned to Enron because it was Enron's disastrous financial condition – the very thing that Defendant J.P. Morgan Securities' interactions with Enron were intended to hide – that caused their losses.

106.    As a result of Defendant JPMorgan Chase Bank's conduct, the Lenders sustained injury to their business and property for which Plaintiffs seek damages and other appropriate relief.  Defendant JPMorgan Chase Bank knew that each of the Lenders would reasonably rely on the fraudulent pretenses and representations repeatedly set forth by Defendant JPMorgan Chase Bank.  It was reasonably foreseeable to Defendant JPMorgan Chase Bank that its actions would proximately cause the Lenders to continue extending credit to Enron.  It was reasonably

foreseeable to Defendant JPMorgan Chase Bank on October 25, 2001, that its conduct would proximately cause the Lenders to loan money to Enron, a hopelessly insolvent corporation. Defendant JPMorgan Chase Bank's conduct caused the Lenders to lose money that they loaned to Enron because it was Enron's disastrous financial condition – the very thing that Defendant JPMorgan Chase Bank's conduct was intended to hide – that caused their losses.

## THE JPMC DEFENDANTS' SUBSTANTIAL ASSISTANCE INJURED THE LENDERS

107.    The JPMC Defendants' knowledge and substantial assistance, combined with Enron's fraud, proximately caused the Lenders' massive losses. The JPMC Defendants' direct participation in and inducement of Enron's decision to borrow funds from the Lenders on or about October 25, 2001 caused the Lenders to make loans to a company with virtually no hope of repaying them. The JPMC Defendants knew on and about October 25, 2001 that it was reasonably foreseeable that Enron would be unable to repay the money that the JPMC Defendants assisted Enron in borrowing that day. The JPMC Defendants knew prior to October 25, 2001 that Enron had engaged in massive financial manipulation to hide Enron's disastrous financial condition. The JPMC Defendants also knew that the fraudulent transactions the JPMC Defendants had structured for Enron masked Enron's lack of meaningful operating cash flow, and massively understated the amount of debt Enron owed.

108.    Further, on or about October 25, 2001, when the Lenders loaned money to Enron, the JPMC Defendants' personnel were in Houston – side-by-side with the Citigroup Defendants' personnel – conducting an intensive and massive due diligence effort that demonstrated to the JPMC Defendants the full extent of Enron's deep insolvency. In the course of their work, the JPMC Defendants identified a multi-billion dollar "hole" between Enron's sources of cash and

the amounts Enron owed to its creditors. The JPMC Defendants directly and proximately caused the Lenders' losses by causing the Lenders to fund loans to Enron, a company with no underlying ability to repay those loans. On or about November 28, 2001, the three major credit rating agencies all downgraded Enron's credit ratings to "junk," or below investment grade. Three days later, on or about December 2, 2001, Enron filed for bankruptcy protection.

## THE CITIGROUP DEFENDANTS KNEW OF ENRON'S OCTOBER 25, 2001 FRAUD

109.    The Citigroup Defendants knew, on and about October 25, 2001, that Enron was defrauding the Lenders when it borrowed funds under the Credit Agreements. In particular, the Citigroup Defendants knew that Enron was representing to the Lenders that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements fairly presented Enron's financial condition in conformity with GAAP. The Citigroup Defendants knew that those representations were intentionally false and that Enron made those intentionally false representations to the Lenders to get money from the Lenders that Enron would not be able to repay given Enron's financial condition.

110.    The Citigroup Defendants knew that Enron's representations to the Lenders – that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements were fairly presented in accordance with GAAP – were materially false because the Citigroup Defendants *themselves* had structured numerous fraudulent transactions for Enron that the Citigroup Defendants knew Enron did not fairly present on its financial statements in conformity with GAAP. Indeed, the Citigroup Defendants had *designed* these transactions to enable Enron to understate its true GAAP debt and to overstate its true GAAP operating cash flow. Defendants Citibank and Salomon Smith Barney designed these transactions to hide the

fact that Enron was raising debt financing while simultaneously making it appear as if Enron were generating more cash flow from its business than Enron actually was generating.

111.    By 1997, Enron considered Citibank to be one of its most important banking relationships. From 1997 through 2001, Enron utilized the services of more than thirty banks in total and obtained debt and privately placed equity investments from more than 200 institutional investors. Citibank, however, never failed to be among Enron's group of nine or ten "Tier 1" banks. One Enron employee described Citibank as "one of the solid performers" for his business unit, "provid[ing] us with good ideas and valuable insight." Enron wrote that Citibank was the "[p]rimary banking relationship for Enron in 1999. They line up perfectly with us – we should reward this structure."

112.    The Citigroup Defendants' involvement with Enron was extensive and frequent. During the period 1997 through December 2, 2001, the Citigroup Defendants completed over 60 transactions with Enron, an average of more than one per month. In connection with these transactions, the Citigroup Defendants played a wide variety of roles in assisting Enron. These roles included lender, arranger, syndicator, underwriter, financial adviser and investor, among others. The transactions included term loans and revolving lines of credit, syndications, debt and equity offerings, mergers and acquisitions, and many types of structured financings. The Citigroup Defendants received approximately $188 million in revenue related to Enron transactions during the period 1997 through 2001.

113.    As a result of the many varied roles that the Citigroup Defendants played for Enron, the Citigroup Defendants had access to substantial information about Enron. As lenders, underwriters and investors, the Citigroup Defendants performed due diligence with respect to all aspects of Enron's operations, and most particularly with respect to Enron's financial condition.

Many of the internal approval documents relating to Enron transactions included lengthy reviews of Enron. These reviews often included sections on market statistics, core businesses, historical financial information, capital structure (including on- and-off balance sheet debt), credit rating, recent developments, financial and stock market performance, strategy, strengths and risk factors. Often, these memoranda also included detailed descriptions about specific structured finance transactions that Enron had outstanding at the time, including some in which the Citigroup Defendants were not involved. They also often included detailed information about Enron's directors and officers.

114.    For this five-year period, the Citigroup Defendants had an essentially continuous opportunity for due diligence and had the need to stay abreast of Enron's operations and financial condition. The Citigroup Defendants had some type of transaction in progress with Enron at all times during this period. Thus, the Citigroup Defendants' relationships with Enron presented them with the opportunity to maintain substantial current, detailed and nonpublic information about the company. As early as 1993, Citigroup was aware that Enron had significant amounts of off-balance sheet obligations that were not included in Enron's publicly disclosed debt.

115.    The fraudulent transactions that the Citigroup Defendants structured for Enron were designed to meet Enron's need for cash and Enron's need to maintain an investment grade credit rating. Virtually all of the fraudulent transactions that the Citigroup Defendants structured for Enron were designed to hide the fact that Enron was raising debt financing while simultaneously making it appear as if Enron were generating more cash flow from its business than Enron actually was generating. Among the fraudulent transactions were prepay transactions with Enron between 1998 and 2001, totaling over $3.8 billion. The Citigroup Defendants also

participated in other structured finance transactions with Enron – including Nighthawk,

Rawhide, Nahanni, Bacchus and Sundance – which provided Enron almost $2 billion of

financing. The Citigroup Defendants structured these fraudulently reported transactions to

enable Enron to borrow approximately $5.9 billion without reporting the borrowed funds as debt.

The Citigroup Defendants knew that Enron was reporting these transactions in violation of

GAAP. For example, these transactions understated the debt on Enron's December 31, 2000

balance sheet by nearly $2 billion and overstated Enron's operating cash flow.

 116. In its prepay transactions, Citibank often used a special purpose entity called

Delta. Delta was located in the Cayman Islands. Delta was intended to appear to be an

independent entity but, in reality, was established and controlled by Citibank. Delta had no

employees, no office, and no business operations independent of Citibank, and Citibank provided

all of the legal advice, paperwork and financial support necessary for Delta to participate in the

prepay transactions. Citibank took steps, however, to make Delta appear independent in order to

help Enron deceive Andersen, Enron's outside auditor. For instance, when Andersen raised

questions about the independence of Delta and requested certain representations from Delta as to

Delta's independent, "non-SPE" status, Enron contacted Citibank (not Delta) with a copy of

Andersen's letter, noting such confirmation was necessary if Enron were to achieve its deceptive

accounting objectives. Eventually, Citibank caused Delta to deliver a letter to Andersen

containing the requested representations. However, Citibank subsequently admitted that Delta

was in fact an SPE.

 117. The minutes of a June 22, 1999 meeting of Citibank's Capital Markets Approval

Committee ("CMAC") indicate that Citibank internally recognized the prepays as loans:

"Additionally, the internal approval for the transaction will acknowledge the fact that we were

basically making a loan to [Enron]." Salomon Smith Barney's September 1999 internal report showed a level of indebtedness for Enron that included prepays and was significantly higher than what was reported in Enron's public financial statements. Specifically, the internal report's estimate of Enron's debt was 38% higher than the debt reported in Enron's financial statements. In August 2000, Salomon Smith Barney's internal estimate of Enron's debt was 40-53% higher than the debt reported in Enron's public financial statements. In April 2001, Salomon Smith Barney prepared a third internal credit analysis, using the same methodology employed in the September 1999 and August 2000 analyses, in which it internally estimated Enron's debt to be 57-92% higher than the debt level reported in Enron's public financial statements.

118.    On or about September 28, 2000, Steve Wagman, a managing director at Salomon Smith Barney, admitted in an internal email that certain oil commodity prepays were just sham, circular transactions to disguise a loan: "Oil goes in acircle [sic] so they all cancel . . . net economically like a loan." The same email noted Enron's reasons for wanting to disguise such loans as prepays: "gets cash flow, shows up as other liab[ility] not debt . . . Gives some oomph to revenues . . . E[nron] gets money that gives them flow but does not show up on books as big D debt."

119.    In July 2001, Paul Deards, the head of Citigroup's Derivatives group, which handled the Citigroup/Enron prepays, compared his group's involvement with that of Citigroup's Commodities group: "if as you say, much of what you do does not involve management of commodity exposures at all, but is simply manipulating cash flows, there may be a much greater overlap in our businesses than i had been led to believe." On October 25, 2001, the day of Enron's fraud on the Lenders, Mr. Deards asked a colleague: "also want to get your confirmation that (apart from the fact we put deals together for Enron which we knew confused

the ratings agencies) there is no skellington in the closet," seemingly referring to Jeff Skilling,

Enron's recently departed Chief Executive Officer. Previously, in internal emails on April 4 and

5, 2001, Deards had repeatedly compared Enron to Long Term Capital Management, the fund

that spectacularly collapsed in the late 1990s. He asked, for example, "When Enron blows up,

will it be worse than long term capital?"

120.    The Citigroup Defendants designed the following transactions for Enron to

understate Enron's true GAAP debt and to overstate Enron's true GAAP operating cash flow,

knowing that Enron did not fairly present these transactions in conformity with GAAP on

Enron's financial statements, including, in several instances, Enron's December 31, 1999, March

31, 2000, December 31, 2000, and March 31, 2001 financial statements.

121.    **Nighthawk**. Nighthawk was a $500 million secret loan to Enron that Citibank

and Enron disguised as a minority interest transaction. Citibank financed the Nighthawk loan

with an off-balance sheet special purpose vehicle and asset-backed commercial paper conduit

called CXC. Citibank founded and established CXC. Citibank used its control and domination

of CXC in Nighthawk and other Enron transactions to extend credit without having those loans

or advances appear on Citibank's own balance sheet. The Citigroup Defendants knew that Enron

would improperly report the loan proceeds as minority interests and would improperly fail to

report the repayment obligations as debt. Citibank's own accountants determined and admitted

internally that Enron should have consolidated the $500 million raised in this "minority interest"

financing on Enron's balance sheet as debt. Enron's improper use and accounting treatment of

Nighthawk caused a 9% artificial improvement in Enron's reported debt-to-equity ratio at year-

end 1997. The Citigroup Defendants knew that Enron's accounting for Nighthawk on Enron's

December 31, 1997 financial statements violated GAAP.

122.    **Rawhide**.  Rawhide was a $750 million secret loan from Citibank to Enron, originated in or about December 1998, and also disguised as a minority interest structure.  In an internal Citibank memorandum to Pete Dillon dated January 6, 2000, Bob Dewing and Nasir Khan admitted that Enron's obligations to Citibank in Project Rawhide was in substance "Debt," noting that "we [Citibank] now have recourse to Enron in an amount of 100% of the Rawhide Debt."  This memorandum shows that Citibank knew that Enron's financial statements violated GAAP when they reflected Rawhide's $750 million recourse loan as a minority interest rather than debt.  The Citigroup Defendants knew that Enron's accounting for Rawhide on Enron's financial statements from December 31, 1998 through June 30, 2001 violated GAAP.

123.    **The Roosevelt Prepay**.  Defendant Citibank closed the Roosevelt prepay on December 30, 1998.  The Roosevelt prepay was a secret $500 million loan to Enron.  Citibank and Enron amended the Roosevelt Prepay in 1999 based on verbal assurances from Enron that illustrate Defendant Citibank's complicity in Enron's accounting fraud.  On or about April 27, 1999, Citibank executive Jim Reilly admitted in an internal email that Enron had agreed to repay the secret loan disguised as the Roosevelt Prepay by September 30, 1999, but noted that "[t]he papers cannot stipulate that as it would require recategorizing the prepaid as simple debt."  Reilly's email also instructed that "[t]he paperwork cannot reflect their agreement, as it would unfavorably alter the accounting."  The Citigroup Defendants knew that Enron recorded the Roosevelt Prepay on its December 31, 1998 financial statements in violation of GAAP.

124.    **The Truman Prepay**.  Defendant Citibank closed the Truman Prepay on June 29, 1999.  The Truman Prepay was a secret $500 million loan to Enron.  The Citigroup Defendants knew that the Truman Prepay was in substance a loan that Enron recorded on Enron's June 30, 1999 financial statements in violation of GAAP.  On September 29, 1999, Truman was

refinanced through a secret $675 million loan to Enron. Citibank's internal Global Loans Approval Memorandum for the Truman refinancing, signed by several vice presidents and managing directors of the bank as well as Onno Ruding, a Citibank Vice Chairman, refers to the refinanced Truman transaction as a "loan" and also includes a discussion that generally categorizes all of Enron's prepays as "off-balance sheet debt." Onno Ruding also referred to repayment of the Truman Prepay as "debt repayment."

125.    **Yosemite I.** Defendant Citibank closed Yosemite I in November 1999 and again in December 1999. The "Yosemite" transactions – including Yosemite I, II, III and IV, used a common structure that Citibank and Salomon Smith Barney developed specifically for Enron in 1999. The Yosemite structure had two main objectives: (i) to transfer Enron credit risk held by Enron's various banks, including Citibank, to investors in the longer-term capital market, thereby avoiding increased Citibank credit exposure to Enron, and (ii) to maintain the veil of secrecy around the sham prepay transactions. Enron ultimately used Citibank's Yosemite structure to secretly finance over $2.3 billion in sham prepay transactions.

126.    Citibank knew that Enron reported the Yosemite I transaction in violation of GAAP on its December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements. A senior accountant at Citigroup concluded and admitted internally that Enron should consolidate the entity that issued the notes, which would have resulted in Enron having to report as debt on its balance sheet the note proceeds from Yosemite I. Despite knowing this conclusion was inconsistent with Enron's desired accounting and thus at odds with the purpose of the entire structure, the Citigroup Defendants elected to proceed anyway, stating that the issue was "the customer's risk to accept or reject." Another Citigroup accountant admitted internally that he had concern about this course of action: "[I]f we have structured a

transaction to help a client avoid consolidation, how can we turn around and take the position

that they should be consolidating? I'm not suggesting that we are responsible for their

accounting, but I am afraid that if we ever had to defend this we would either (a) embarrass the

client or (b) lose the accounting argument."

127.    **The Nixon Prepay.** Defendant Citibank closed the Nixon prepay in December

1999 as a secret $324 million loan to Enron. Citibank knew that the Nixon Prepay was in

substance a loan and that Enron reported the transaction in violation of GAAP on its

December 31, 1999 financial statements.

128.    **Nahanni.** Nahanni was a $500 million secret loan from Citibank to Enron,

originated in or about December 1999, disguised as a minority interest structure. Project

Nahanni was designed so that Enron would improperly record $500 million in cash flow from

operating activities for year-end 1999. Through Project Nahanni, Enron borrowed $500 million,

bought Treasury securities with it, sold the Treasury securities, recognized $500 million of

operating cash flow, and repaid the loan – all within 30 days straddling its 1999 year-end –

without reflecting the loan as debt on its financial statements. As a result, Enron manipulated its

reported year-end 1999 financial results to make its 1999 performance appear significantly better

than it actually was. Citibank knew that Nahanni was in substance a loan and that Enron

reported the transaction in violation of GAAP on its December 31, 1999 financial statements.

129.    Citibank involved itself deeply in Enron's accounting presentation of the Nahanni

transaction. On December 6, 1999, Otto Jager of Citibank sent an email to William Fox of

Citibank with suggested footnote disclosure language to use in Enron's financial statements for

Nahanni:



130.    **Yosemite II.**  Defendant Citibank closed Yosemite II in February 2000.  Citibank

knew that Enron recorded the impact of Yosemite II on Enron's financial statements in violation

of GAAP.  As with Yosemite I, Citibank knew that Enron should have consolidated the

borrowing entities in the Yosemite II transactions for accounting purposes and, therefore, should

have reflected the note proceeds as debt on Enron's balance sheet.  Citibank knew that Enron

reported Yosemite II in violation of GAAP on its December 31, 2000 and March 31, 2001

financial statements.

131.    **Yosemite III.**  Defendant Citibank closed Yosemite III in August 2000.  Citibank

knew that Enron recorded the impact of Yosemite III on Enron's financial statements in violation

of GAAP. Citibank knew that Enron reported the prepay with Delta funded by Yosemite III in violation of GAAP on Enron's December 31, 2000 and March 31, 2001 financial statements.

132. **Bacchus.** In December 2000, Enron recorded a $112 million gain on a $200 million sale to Citigroup of an equity interest in certain entities holding pulp and paper assets. This transaction, referred to as Project Bacchus, was purportedly effected as a Statement of Financial Accounting Standards No. 125 ("FAS 125") transaction. However, to properly treat a transfer of assets as a sale under FAS 125, the transferor must surrender control of those assets. Citigroup signed written agreements that were drafted by Enron to allow Enron to achieve sale treatment pursuant to FAS 125. However, an internal Citibank memorandum dated December 6, 2000 admitted that Enron, through Fastow, had provided Citibank with "verbal support" for the "equity" portion of Citibank's funding. The Citigroup Defendants were fully aware of the deceptive purpose of the Bacchus transaction and knew that Enron recorded that transaction on its December 31, 2000 financial statements in violation of GAAP.

133. **Yosemite IV.** Defendant Citibank closed Yosemite IV in May 2001. The Citigroup Defendants knew that Enron reported the prepay with Delta funded by Yosemite IV in violation of GAAP on Enron's December 31, 2000 and March 31, 2001 financial statements.

134. **Project Sundance.** Project Sundance was set into motion six months after Bacchus, in June 2001. Just two days before the transaction closed, David Bushnell, Head of Global Risk Management for Citibank, wrote a memorandum and copied Alan MacDonald, a Vice Chairman at the bank. In this memorandum, Bushnell explained his refusal to approve the transaction, which was based in part on accounting concerns. Bushnell wrote: "The GAAP accounting is aggressive and a franchise risk to us if there is publicity (a la Xerox)." Citibank's accountant believed that Enron was reporting Project Sundance in violation of GAAP on Enron's

financial statements. The Citigroup Defendants knew Enron recorded Project Sundance in violation of GAAP on Enron's June 30, 2001 financial statements.

135.    **June 2001 Prepay.** Defendant Citibank closed the June 2001 prepay on June 28, 2001 as a secret $250 million loan from Citibank to Enron. Three days before closing, on or about June 25, 2001, Citibank admitted in an internal presentation that the sham prepay transactions received "non-'D' debt treatment" on Enron's financial statements, and that the prepays caused "[o]perating cash flow increases" on Enron's financial statements. Separately, Paul Deards of Citigroup admitted in an internal email that this prepay involved "no underlying commodity exposure at all" and that there was "no commodity risk being hedged." After the prepay closed, when Deards was asked about the gas pricing that was used in the prepay, he responded "since this is all a circle, why does it matter?"

136.    The professionals who structured the June 2001 Prepay, including Citibank's relationship manager for Enron, Michael Nepveux, referred to the June 2001 Prepay as a $250 million "loan." The Citigroup Defendants knew Enron recorded the June 2001 Prepay in violation of GAAP on Enron's June 30, 2001 financial statements. When Citibank was scrambling to determine the extent of its exposure to Enron on October 24, 2001 – as its secret due diligence team worked at analyzing Enron's disastrous finances – Citibank still identified the June 2001 prepay as a "loan." Paul Deards, a senior Citibank executive, noted in several internal emails that the June 2001 Prepay had no commodity exposure and that the details of natural gas pricing did not matter "since this is all a circle, why does it matter?"

137.    Citibank also made its own independent analysis of the impact of the June 2001 Prepay on Enron's financial statements. Citibank employees created the following detailed accounting analysis of the prepaid in the days before the June 2001 Prepay closed:



138.    By October 24, 2001, the Citigroup Defendants were deeply involved (at Enron's invitation, an invitation not extended to the Lenders) in the intensive and secret due diligence effort at Enron, described above, in cooperation with the JPMC Defendants.  As part of that due diligence effort, the Citigroup Defendants acquired knowledge about Enron's fraudulent transactions with the JPMC Defendants, also described above.  Also by October 24, 2001, Citibank was internally surveying its personnel for information on Enron transactions, including what would happen to each transaction upon an Enron bankruptcy.  Throughout the day on October 24, 2001, Citibank's senior credit officers were downgrading Enron's internal credit rating.

139.    By October 25, 2001, the Citigroup Defendants knew even more reasons why Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements were in violation of GAAP.  When the Lenders loaned money to Enron, the Citigroup Defendants' personnel were in Houston conducting an intensive and massive due diligence effort with the JPMC Defendants' personnel that demonstrated to the Citigroup Defendants the full extent of Enron's deep insolvency.

140.    The Citigroup Defendants understood the implications of their discoveries.  On the morning of October 25, 2001, Steven Victorin, head of global loans syndication for Citibank, wrote an email to Anne Clarke Wolff, Randolph Barker, and Chad Leat.  Anne Clarke Wolff was a senior executive in Citibank's debt capital markets business, Randolph Barker ran the Credit Markets business for Citibank, and Chad Leat ran Citibank's Global Loans business.  On the morning that Victorin boarded a Citigroup corporate jet to fly to Houston to join the secret due diligence team, he wrote that Enron "may not be able to make their litigation reps and borrow under their revolver.":

Unknown

From:           Barker, Randolph [FI]
Sent:           Thursday, October 25, 2001 6:24 AM
To:             Victorin, Steven R [FI]
Subject:        RE ENE

Make sure you and Banzinger check in with me a few hours after things get going to give me
an update. Thx.

-----Original Message-----
From: Victorin, Steven R [FI]
Sent: Thursday, October 25, 2001 5:25 AM
To: Clarke Wolff, Anne [FI]; Barker, Randolph [FI]; Leat, Chad A [FI]
Subject: ENE

Company may have difficulty rolling CP this AM and may not be able to make their
litigation reps and borrow under their revolver. $220MM today and $90MM tomorrow. Richard
Banzigor is flying in from SF this AM and will meet us in Houston. Company is meeting with
lawyers at 8AM to determine if they can make their litigation MAC and request an advance.
I'll check-in with BLS - Bill Carpenter - in Delaware and make sure he is aware of the
situation.

Tracking:         Recipient
                  Victorin, Steven R.[FI]

## THE CITIGROUP DEFENDANTS PROVIDED SUBSTANTIAL ASSISTANCE TO HELP ENRON COMMIT ITS OCTOBER 25, 2001 FRAUD

141.     The Citigroup Defendants provided substantial assistance to Enron in committing fraud on the Lenders on and about Thursday, October 25, 2001.  The Citigroup Defendants provided this substantial assistance to Enron in hopes of earning large fees, in hopes of providing new *secured* financings to Enron that would be recovered more easily in an Enron bankruptcy, and because the Citigroup Defendants hoped to facilitate a merger between Enron and Dynegy to absorb Enron and its disastrous financial condition.  If successful, the merger of Enron and Dynegy would also prevent disclosure of the fraudulent transactions that the Citigroup Defendants had structured for Enron, and might even obligate Dynegy to repay the loans Defendant Citibank had outstanding to Enron through the fraudulent prepays and otherwise.  In addition, the Citigroup Defendants expected to earn huge fees if the Enron/Dynegy merger were consummated, and expected to have a lucrative, continuing business relationship with the post-merger entity.

142.    None of this would be possible, however, if Enron failed before the Citigroup Defendants could put the new secured financings in place and facilitate the merger. Therefore, on the morning of October 25, 2001 in Houston, the Citigroup Defendants agreed with the JPMC Defendants (which had similar motives, detailed above) to assist Enron in defrauding the Lenders. Defendant Citibank conveyed to the Lenders the notices of borrowing under the May 2000 and May 2001 Credit Agreements. After the Lenders received the notices of borrowing, but before the Lenders had made any funds available to Citibank as Paying Agent, the Citigroup Defendants participated in the telephone conference convened by the JPMC Defendants to discuss the notices of borrowing, as described above. Then Citibank, as Paying Agent under both facilities, collected money from the Lenders and passed that money to Enron.

143.    Defendant Citibank provided additional assistance to Enron on October 25, 2001 by funding its portion of Enron's borrowing under the May 2000 and May 2001 Credit Agreements. Defendant Citibank knew that it was under no obligation to fund, since it knew that Enron was lying in its representations. Nevertheless, Defendant Citibank funded, knowing that its failure to do so would torpedo its chances of prolonging Enron's corporate life long enough to earn huge fees and security interests in restructuring Enron's debt and to facilitate the merger of Enron into Dynegy.

144.    **The Role of the Arranger.** Defendant Salomon Smith Barney was an arranger or co-arranger (with Defendant J.P. Morgan Securities) for the May 2000 Credit Agreement, and the May 2001 Credit Agreement. As the arranger or co-arranger of these credit facilities, Defendant Salomon Smith Barney was charged with bringing a particular proposed credit facility to the Lenders on behalf of Enron. In arranging the various credit facilities for Enron, Defendant

Salomon Smith Barney participated with Enron, at Enron's direction, to organize and negotiate with the Lenders.

145.    **The Role of the Administrative Agent.**  Defendant Citibank was an administrative agent or co-administrative agent (with Defendant JPMorgan Chase Bank) for the August 1999 Credit Agreement, the May 2000 Credit Agreement, and the May 2001 Credit Agreement.  As the administrative agent or co-administrative agent of these credit facilities, Defendant Citibank was the managerial leader of the credit facility, charged with numerous managerial and administrative duties under the relevant credit agreements.

146.    **The Fraudulent April 25, 2000 Informational Memorandum (Defendant Salomon Smith Barney).**  In April and May 2000, Defendant Salomon Smith Barney acted as Co-Lead Arranger and Co-Book Runner for the May 2000 Credit Agreement.  In connection with its role, Defendant Salomon Smith Barney created the April 25, 2000 Informational Memorandum and circulated it to all the Lenders.  To create the April 25, 2000 Informational Memorandum, Defendant Salomon Smith Barney compiled information from Enron's 1995-1999 financial statements and presented that information in chart form to show a purported "growth trend" from 1995 to 1999.  The April 25, 2000 Informational Memorandum also presented a summary of, among other things, Enron's publicly reported funds flows from operations and Enron's total debt for the years 1996 through 1999.  In a note to this summary, the Informational Memorandum specifically directed anyone seeking more detailed information on Enron's financial performance and credit statistics to "see Enron's Annual report for the related year," as if any such report were reliable.

147.    Additionally, the April 25, 2000 Informational Memorandum required any interested lender, including each member of the Lenders, to respond to the memorandum with a

letter stating that its credit analysis and decision was "based on the financial statements of Enron

Corp." In so doing, Defendant Salomon Smith Barney encouraged the Lenders to trust as

reliable the very financial statements that Defendant Salomon Smith Barney knew to violate

GAAP. The April 25, 2000 Informational Memorandum listed as "contacts" some of the very

Salomon Smith Barney individuals who knew that Enron's financial statements violated GAAP,

including Jim Reilly.

148.    By issuing the April 25, 2000 Informational Memorandum, Defendant Salomon

Smith Barney intended to defraud the Lenders and to obtain for Enron moneys, funds, and

credits owned by, or under the custody or control of, the Lenders by means of false and

fraudulent pretenses and representations about Enron's financial statements. Defendant Salomon

Smith Barney intended to defraud the other Lenders into believing that Enron's financial

statements fairly presented Enron's financial condition in conformity with GAAP when

Defendant Salomon Smith Barney knew that to be false.

149.    The Lenders reasonably relied on Defendant Salomon Smith Barney's fraudulent

pretenses and representations in the April 25, 2000 Informational Memorandum. Defendant

Salomon Smith Barney's fraudulent pretenses and representations in the April 25, 2000

Informational Memorandum proximately caused harm to the Lenders. In particular, Defendant

Salomon Smith Barney's fraudulent pretenses and representations in the April 25, 2000

Informational Memorandum proximately caused the Lenders to continue extending credit to

Enron. By October 25, 2001, Defendant Salomon Smith Barney's fraudulent pretenses and

representations in the April 25, 2000 Informational Memorandum led to the disastrous result that

the Lenders loaned money to Enron, a hopelessly insolvent corporation. In addition, Defendant

Salomon Smith Barney's fraudulent pretenses and representations in the April 25, 2000

Informational Memorandum proximately caused the Lenders to lose money that they loaned to Enron because those violations hid from the Lenders the disastrous financial condition that caused those Lenders' losses.

150.    In Defendant Salomon Smith Barney's fraudulent pretenses and representations in the April 25, 2000 Informational Memorandum, Defendant Salomon Smith Barney had a new and independent obligation to be truthful to the Lenders.  In Defendant Salomon Smith Barney's fraudulent pretenses and representations in the April 25, 2000 Informational Memorandum, Defendant Salomon Smith Barney created new, independent risks for the defrauded Lenders.  In Defendant Salomon Smith Barney's fraudulent pretenses and representations in the April 25, 2000 Informational Memorandum, Defendant Salomon Smith Barney supplied fraudulent information – including Enron's financial statements that failed to properly reflect the transactions that Defendant Salomon Smith Barney knew rendered them in violation of GAAP – with the intent that those Lenders would make credit available to Enron based on that very inaccurate information.

151.    In addition, Defendant Salomon Smith Barney prominently placed its name on the front of the May 2000 Credit Agreement, further inducing the Lenders to rely on the representations contained there – representations that Defendant Salomon Smith Barney knew to be intentionally false – that Enron's financial statements fairly presented Enron's financial condition in conformity with GAAP.

152.    **The May 2000 Credit Agreement.**  On or about May 18, 2000, the Lenders executed the May 2000 Credit Agreement.  The May 2000 Credit Agreement appointed Defendant Citibank as Co-Administrative Agent "to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Administrative Agent

. . ." and as Paying Agent. The terms of the May 2000 Credit Agreement required that each

lender signatory, including each member of the Lenders, acknowledge its reliance upon certain

Enron financial statements and represented those financial statements to be fairly presented in

conformity with GAAP. Defendant Citibank signed the May 2000 Credit Agreement as Co-

Administrative Agent and Paying Agent.

153.   In signing the May 2000 Credit Agreement, Defendant Citibank encouraged the

Lenders to trust as reliable the very financial statements that Defendant Citibank knew to violate

GAAP for reasons described above. Defendant Citibank intended to defraud the other Lenders

into believing that Enron's financial statements fairly presented Enron's financial condition in

conformity with GAAP when Defendant Citibank knew that to be false.

154.   The Lenders reasonably relied on Defendant Citibank's fraudulent pretenses and

representations in signing the May 2000 Credit Agreement. Defendant Citibank's fraudulent

pretenses and representations in signing the May 2000 Credit Agreement proximately caused

harm to the Lenders. In particular, Defendant Citibank's fraudulent pretenses and

representations in signing the May 2000 Credit Agreement proximately caused the Lenders to

continue extending credit to Enron. By October 25, 2001, Defendant Citibank's fraudulent

pretenses and representations in signing the May 2000 Credit Agreement led to the disastrous

result that the Lenders loaned money to Enron, a hopelessly insolvent corporation. In addition,

Defendant Citibank's fraudulent pretenses and representations in signing the May 2000 Credit

Agreement proximately caused the Lenders to lose money that they loaned to Enron because

those violations hid from the Lenders the disastrous financial condition that caused those

Lenders' losses.

155.    Defendant Citibank's fraudulent pretenses and representations in signing the May 2000 Credit Agreement created a new and independent obligation for Defendant Citibank to be truthful to the Lenders. Defendant Citibank's fraudulent pretenses and representations in signing the May 2000 Credit Agreement also created new, independent risks for the defrauded Lenders.

156.    In Defendant Citibank's fraudulent pretenses and representations in signing the May 2000 Credit Agreement, Defendant Citibank supplied fraudulent information with the intent that those Lenders would make credit available to Enron based on inaccurate information. Under Section 5.01(a)(ii) of the May 2000 Credit Agreement, Enron delivered to each bank, in a form acceptable to Defendant Citibank as Co-Administrative Agent, a certificate of the chief financial officer or the chief accounting officer of Enron stating that no Event of Default existed under the May 2000 Credit Agreement.

157.    However, under section 6.01(b) an Event of Default existed if one of the representations made in the May 2000 Credit Agreement was incorrect in any material respect when made and such materiality was continuing. Section 4.01(d) of the May 2000 Credit Agreement contained the representation that Enron's December 31, 1999 and March 31, 2000 financial statements fairly presented Enron's financial condition in conformity with GAAP. Defendant Citibank knew that representation to be materially false because of its role in structuring numerous transactions described above. With Defendant Citibank's approval, Enron made the fraudulent representation that no Event of Default existed at least quarterly to the Lenders from 2000 through mid-2001. Defendant Citibank knew those representations to be materially false.

158.    **The Fraudulent April 20, 2001 Invitation to Offer.** In April and May 2001, Defendant Salomon Smith Barney acted as Co-Lead Arranger and Co-Book Runner for the

May 2001 Credit Agreement.  In connection with its role, Defendant Salomon Smith Barney created the April 20, 2001 Invitation to Offer and circulated it to all the Lenders.  The April 20, 2001 Invitation to Offer endorsed Enron's public financial statements, dating to 1995, as reliable.  Indeed, the April 20, 2001 Invitation to Offer compiled information from Enron's 1995-2000 financial statements and presented that information in chart form to represent Enron's "growth trend" from 1995 to 2000.  The April 20, 2001 Invitation to Offer also presented a summary of, among other things, Enron's publicly reported revenues and total debt for the years 1997 through 2000.

159.    Additionally, the April 25, 2001 Invitation to Offer required any interested lender, including each member of the Lenders, to respond to the memorandum with a letter stating that its credit analysis and decision was "based on the financial statements of Enron Corp."  In so doing Salomon Smith Barney encouraged the Lenders to trust as reliable the very financial statements that the Defendant Salomon Smith Barney knew to violate GAAP.  Defendant Salomon Smith Barney intended to defraud the other Lenders into believing that Enron's financial statements fairly presented Enron's financial condition in conformity with GAAP when Defendant Salomon Smith Barney knew that to be false.

160.    The Lenders reasonably relied on Defendant Salomon Smith Barney's fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer.  Defendant Salomon Smith Barney's fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer proximately caused harm to the Lenders.  In particular, Defendant Salomon Smith Barney's fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer proximately caused the Lenders to continue extending credit to Enron.  By October 25, 2001, this led to the disastrous result that the Lenders loaned money to Enron, a hopelessly insolvent corporation.  In

addition, Defendant Salomon Smith Barney's fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer proximately caused the Lenders to lose money that they loaned to Enron because those violations hid from the Lenders the disastrous financial condition that caused those Lenders' losses.

161.    In Defendant Salomon Smith Barney's fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer, Defendant Salomon Smith Barney had a new and independent obligation to be truthful to the Lenders.  In Defendant Salomon Smith Barney's fraudulent pretenses and representations in the April 20, 2001 Invitation to Offer, Defendant Salomon Smith Barney created new, independent risks for the defrauded Lenders.  In the April 20, 2001 Invitation to Offer, Defendant Salomon Smith Barney supplied fraudulent information – including Enron's financial statements that failed to properly reflect the transactions that Defendant Salomon Smith Barney knew rendered them in violation of GAAP – with the intent that those Lenders would make credit available to Enron based on that very inaccurate information.

162.    In addition, Defendant Salomon Smith Barney prominently placed its name on the front of the May 2001 Credit Agreement, further inducing the Lenders to rely on the representations contained there – representations that Defendant Salomon Smith Barney knew to be intentionally false – that Enron's financial statements fairly presented Enron's financial condition in conformity with GAAP.

163.    **The May 2001 Credit Agreement.**  On or about May 14, 2000, the Lenders executed the May 2001 Credit Agreement.  The May 2001 Credit Agreement appointed Defendant Citibank as Co-Administrative Agent "to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Administrative Agent

. . ." and as Paying Agent. The terms of the May 2001 Credit Agreement required that each

lender signatory, including the Lenders, acknowledge its reliance upon certain Enron financial

statements and represented those financial statements to be fairly presented in conformity with

GAAP. Defendant Citibank signed the May 2001 Credit Agreement as Co-Administrative Agent

and Paying Agent.

164.    In signing the May 2001 Credit Agreement, Defendant Citibank encouraged the

Lenders to trust as reliable the very financial statements that Defendant Citibank knew to violate

GAAP for reasons described above. Defendant Citibank intended to defraud the other Lenders

into believing that Enron's financial statements fairly presented Enron's financial condition in

conformity with GAAP when Defendant Citibank knew that to be false.

165.    The Lenders reasonably relied on Defendant Citibank's fraudulent pretenses and

representations in signing the May 2001 Credit Agreement. Defendant Citibank's fraudulent

pretenses and representations in signing the May 2001 Credit Agreement proximately caused

harm to the Lenders. In particular, Defendant Citibank's fraudulent pretenses and

representations in signing the May 2001 Credit Agreement proximately caused the Lenders to

continue extending credit to Enron. By October 25, 2001, this led to the disastrous result that the

Lenders loaned money to Enron, a hopelessly insolvent corporation. In addition, Defendant

Citibank's fraudulent pretenses and representations in signing the May 2001 Credit Agreement

proximately caused the Lenders to lose money that they loaned to Enron because those violations

hid from the Lenders the disastrous financial condition that caused those Lenders' losses.

166.    In Defendant Citibank's fraudulent pretenses and representations in signing the

May 2001 Credit Agreement, Defendant Citibank created a new and independent obligation to be

truthful to the Lenders. In Defendant Citibank's fraudulent pretenses and representations in

signing the May 2001 Credit Agreement, Defendant Citibank also created new, independent risks
for the defrauded Lenders.

167.    In Defendant Citibank's fraudulent pretenses and representations in signing the
May 2001 Credit Agreement, Defendant Citibank supplied fraudulent information with the intent
that those Lenders would make credit available to Enron based on inaccurate information.  Under
Section 5.01(a)(ii) of the May 2001 Credit Agreement, Enron delivered to each bank, in a form
acceptable to Defendant Citibank as Co-Administrative Agent, a certificate of the chief financial
officer or the chief accounting officer of Enron stating that no Event of Default existed under the
May 2001 Credit Agreement.

168.    However, under section 6.01(b) an Event of Default existed if one of the
representations made in the May 2001 Credit Agreement was incorrect in any material respect
when made and such materiality was continuing.  Section 4.01(d) of the May 2001 Credit
Agreement contained the representation that Enron's December 31, 2000 and March 31, 2001
financial statements fairly presented Enron's financial condition in conformity with GAAP.
Defendant Citibank knew that representation to be materially false because of its role in
structuring numerous transactions described above.  With Defendant Citibank's approval, Enron
made the fraudulent representation that no Event of Default existed at least once in mid-2001.
Defendant Citibank knew those representations to be materially false.

169.    **The October 25, 2001 Notices of Borrowing.**  On October 25, 2001, Enron sent
to the Lenders from Houston a Notice of Borrowing under each of the May 2000 and May 2001
Credit Agreements.  Ken Lay, Enron's Chairman and Chief Executive Officer, signed, in
Houston, each Notice of Borrowing and faxed them to Citibank.  Citibank faxed these Notices of
Borrowing that same day to the Lenders and the Lenders relied on these fraudulent wires.

170.    By sending the Notices of Borrowing to the Lenders, Defendant Citibank encouraged the Lenders to believe that Enron had the legal right to drawdown the May 2000 and May 2001 Credit Agreements when Defendant Citibank knew that no such obligation existed, given Enron's fraudulent misrepresentations about Enron's financial statements. Defendant Citibank intended to defraud the other Lenders into believing that Enron had the legal right to drawdown the May 2000 and May 2001 Credit Agreements when Defendant Citibank knew that no such obligation existed given Enron's fraudulent misrepresentations about Enron's financial statements.

171.    The Lenders reasonably relied on Defendant Citibank's fraudulent pretenses and representations in the October 25, 2001 Notices of Borrowing. Defendant Citibank's fraudulent pretenses and representations in the October 25, 2001 notices of borrowing proximately caused harm to the Lenders. In particular, Defendant Citibank's fraudulent pretenses and representations in the October 25, 2001 Notices of Borrowing proximately caused the Lenders to loan money to Enron, a hopelessly insolvent corporation. In addition, Defendant Citibank's fraudulent pretenses and representations in the October 25, 2001 Notices of Borrowing proximately caused the Lenders to lose money that they loaned to Enron because it was Enron's disastrous financial condition – the very thing that deprived Enron of its legal right to drawdown the May 2000 and May 2001 Credit Agreements – that caused those Lenders' losses.

172.    In Defendant Citibank's fraudulent pretenses and representations in the October 25, 2001 Notices of Borrowing, Defendant Citibank had a new and independent obligation to be truthful to the Lenders. In Defendant Citibank's fraudulent pretenses and representations in the October 25, 2001 Notices of Borrowing, Defendant Citibank also created new, independent risks for the defrauded Lenders.

## THE CITIGROUP DEFENDANTS' SUBSTANTIAL ASSISTANCE
## INJURED THE LENDERS

173.    As a result of Defendant Salomon Smith Barney's conduct, the Lenders sustained injury to their business and property for which Plaintiffs seek damages and other appropriate relief.  Defendant Salomon Smith Barney knew that each of the Lenders would fall victim to the fraudulent pretenses and representations that Defendant Salomon Smith Barney executed in conducting and participating in the affairs of the Lenders.  It was reasonably foreseeable to Defendant Salomon Smith Barney that its fraudulent pretenses and representations would proximately cause the Lenders to continue extending credit to Enron.  It was reasonably foreseeable to Defendant Salomon Smith Barney on October 25, 2001, that its conduct would proximately cause the Lenders to loan money to Enron, a hopelessly insolvent corporation.  The fraudulent pretenses and representations that Defendant Salomon Smith Barney employed caused the Lenders to lose money that they loaned to Enron because it was Enron's disastrous financial condition – the very thing that Defendant Salomon Smith Barney's conduct was intended to hide – that caused their losses.

174.    As a result of Defendant Citibank's conduct, the Lenders sustained injury to their business and property for which Plaintiffs seek damages and other appropriate relief.  It was reasonably foreseeable to Defendant Citibank that its fraudulent pretenses and representations would proximately cause the Lenders to continue extending credit to Enron.  It was reasonably foreseeable to Defendant Citibank on October 25, 2001, that its conduct would proximately cause the Lenders to loan money to Enron, a hopelessly insolvent corporation.  The fraudulent pretenses and representations that Defendant Citibank employed caused the Lenders to lose money that they loaned to Enron because it was Enron's disastrous financial condition – the very thing that Defendant Citibank's conduct intended to hide – that caused their losses.

78

175.    The Citigroup Defendants' knowledge and substantial assistance, combined with Enron's fraud, proximately caused the Lenders' massive losses.  The Citigroup Defendants' direct participation in and inducement of Enron's decision to borrow funds from the Lenders on October 25, 2001 caused the Lenders to make loans to a company with virtually no hope of repaying them.  The Citigroup Defendants knew on or about October 25, 2001 that it was reasonably foreseeable that Enron would be unable to repay the money that the Citigroup Defendants assisted Enron in borrowing that day.  The Citigroup Defendants knew, prior to October 25, 2001, that Enron had engaged in massive financial manipulation to hide Enron's disastrous financial condition.  The Citigroup Defendants also knew that the fraudulent transactions the Citigroup Defendants had structured for Enron masked Enron's lack of meaningful operating cash flow, and massively understated the amount of debt Enron owed.

176.    In the course of their work on October 25, 2001, the secret due diligence team from Citigroup identified a multi-billion dollar "hole" between Enron's sources of cash and the amounts Enron owed to its creditors.  The Citigroup Defendants directly and proximately caused the Lenders' losses by causing the Lenders to fund loans to Enron, a company with no underlying ability to repay those loans.  On or about November 28, 2001, the three major credit rating agencies all downgraded Enron's credit ratings to "junk," or below investment grade. Three days later, on or about December 2, 2001, Enron filed for bankruptcy protection.

## JPMORGAN CHASE BANK BREACHED ITS CONTRACTUAL DUTIES TO THE LENDERS IN A GROSSLY NEGLIGENT, WANTON AND WILFUL MANNER

177.    Defendant JPMorgan Chase Bank assumed contractual duties under the May 2000 and May 2001 Credit Agreements to ensure that the Enron Board of Directors had passed a resolution approving each notice of borrowing under the May 2000 and May 2001 Credit

Agreements. It was a condition precedent to the Lenders' obligation to advance funds under each of the Credit Agreements that Enron provide such resolutions, in form and substance satisfactory to JPMorgan Chase Bank. Defendant JPMorgan Chase Bank breached its contractual duties in a gross, willful and wanton manner by failing to obtain or to review any such resolutions. Indeed, Plaintiffs have discovered that Enron's Board of Directors never passed any such resolutions.

178.     More particularly, in its role as Co-Administrative Agent of the May 2000 and May 2001 Credit Agreements, Defendant JPMorgan Chase Bank accepted the contractual obligation under Section 3.01(b), as a condition precedent to any advances, to receive "[c]ertified copies of the resolutions of the Board of Directors of [Enron] approving this Agreement, each Note and each Notice of Borrowing . . . ." The following excerpt of Section 3.01(b) is from the May 2001 Credit Agreement; the provision in the May 2000 Credit Agreement is identical:

intention to reduce or terminate any Commitment pursuant to this Section 2.19. Upon the termination of a Bank's Commitment in whole in accordance with the provisions of this Section 2.19, such Bank shall cease to be a "Bank" hereunder for all purposes and its Commitment shall be deemed terminated, except that the rights under Sections 2.06, 2.10, 2.13 and 9.04 of such Bank shall continue with respect to events and occurrences occurring before or concurrently with such ceasing to be a "Bank" hereunder.

SECTION 2.20. Certificates of Banks. Without limitation to the requirements of Section 2.10(c), any Bank demanding or giving notice of amounts due to such Bank under this Article II shall, as part of each demand or notice for payment required under this Article II, deliver to the Borrower (with a copy to the Paying Agent) a certificate setting forth in reasonable detail the amount and basis of the increased costs or additional amounts payable to such Bank hereunder and such certificate shall be conclusive and binding on the Borrower in the absence of manifest error.

### ARTICLE III

### CONDITIONS TO ADVANCES

SECTION 3.01. Initial Condition Precedent. The obligation of each Bank to make Advances pursuant to the terms and conditions of this Agreement is subject to the condition precedent that the Paying Agent shall have received on or before the day of the initial Advance the following, each dated on or before such day, in form and substance satisfactory to each Co-Administrative Agent (copies of which shall have been provided to the Co-Administrative Agents):

(a)     The Notes to the order of the Banks, respectively.

(b)     Certified copies of the resolutions of the Board of Directors of the Borrower approving this Agreement, each Note and each Notice of Borrowing, and of all other documents, in each case evidencing any necessary corporate action and governmental approvals, if any, with respect to each such Loan Document and certified copies of the amended and restated articles of incorporation, as amended, and bylaws, as amended, of the Borrower.

(c)     A certificate of the Secretary, Deputy Corporate Secretary or an Assistant Secretary of the Borrower certifying the names and true signatures of the officers of the Borrower authorized to sign each Loan Document to which it is a party and the other documents to be delivered hereunder.

(d)     A favorable opinion of Vinson & Elkins L.L.P., counsel for the Borrower, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents, at the express instruction of the Borrower, substantially in the form of Exhibit C hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

(e)     A favorable opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents, at the express instruction of the Borrower, in substantially the form of Exhibit D hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

HOUSTON 1280475.11

-23-

JPMUCI 0003193

179.     Defendant JPMorgan Chase Bank breached its contractual duties by failing to

ascertain the satisfactory form or substance of the required resolutions.  Defendant JPMorgan

Chase Bank's breach was grossly negligent. Defendant JPMorgan Chase Bank had a duty to act in accordance with the standard of care for sophisticated agent banks. Defendant JPMorgan Chase Bank was, and held itself out to the Lenders to be, a sophisticated and experienced agent bank.

180.    At the same time, Defendant JPMorgan Chase Bank's tasks under Section 3.01(b) of the May 2000 and May 2001 Credit Agreements were simple and mechanical. Section 3.01(b) simply required Defendant JPMorgan Chase Bank to (i) physically inspect a certified copy of a board resolution; and (ii) compare the language of the resolution to the language in Section 3.01(b). If no resolution was available for inspection, Defendant JPMorgan Chase Bank should have alerted the Lenders that a condition precedent to funding was unsatisfied.

181.    Defendant JPMorgan Chase Bank's failure to carry out its contractual duties under Section 3.01(b) was total. Defendant JPMorgan Chase Bank made no effort to inspect any resolution and failed to inform the Lenders of the failure of the condition precedent.

182.    Because Defendant JPMorgan Chase Bank breached its contractual duties to ensure compliance with these crucial conditions precedent (and did so in a gross, willful and wanton manner), the Lenders funded Enron's borrowings under the May 2000 and May 2001 Credit Agreements without knowing that they were under no obligation to lend money to Enron. Defendant JPMorgan Chase Bank's gross, willful and wanton breaches of duty occurred at the very moment that JPMorgan Chase Bank personnel were in Houston endeavoring wrongfully to prolong Enron's life through the fraudulent expansion of Enron's debt, hoping to reap large fees through a merger of Enron with Dynegy Corporation, one of Enron's competitors. As a result of Defendant JPMorgan Chase Bank's grossly negligent, willful and wanton breaches of its

contractual duties, the Lenders funded a loan that they were under no legal obligation to fund, and were never repaid.

## CITIBANK BREACHED ITS CONTRACTUAL DUTIES TO THE LENDERS IN A GROSSLY NEGLIGENT, WANTON AND WILFUL MANNER

183.    Defendant Citibank assumed contractual duties under the May 2000 and May 2001 Credit Agreements to ensure that the Enron Board of Directors had passed a resolution approving each notice of borrowing under the May 2000 and May 2001 Credit Agreements.  Citibank's receipt of such resolutions, in form and substance satisfactory to Citibank, was a condition precedent to the Lenders' obligation to advance funds under each of the Credit Agreements.  Defendant Citibank breached its contractual duties in a gross, willful and wanton manner by failing to obtain or to review any such resolutions.

184.    More particularly, in its roles as Co-Administrative Agent and Paying Agent of the May 2000 and May 2001 Credit Agreements, Defendant JPMorgan Chase Bank accepted the contractual obligation under Section 3.01(b), as a condition precedent to any advances.  The following excerpt of Section 3.01(b) is from the May 2001 Credit Agreement; the provision in the May 2000 Credit Agreement is identical:

intention to reduce or terminate any Commitment pursuant to this Section 2.19. Upon the termination of a Bank's Commitment in whole in accordance with the provisions of this Section 2.19, such Bank shall cease to be a "Bank" hereunder for all purposes and its Commitment shall be deemed terminated, except that the rights under Sections 2.06, 2.10, 2.13 and 9.04 of such Bank shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder.

SECTION 2.20. Certificates of Banks. Without limitation to the requirements of Section 2.10(c), any Bank demanding or giving notice of amounts due to such Bank under this Article II shall, as part of each demand or notice for payment required under this Article II, deliver to the Borrower (with a copy to the Paying Agent) a certificate setting forth in reasonable detail the amount and basis of the increased costs or additional amounts payable to such Bank hereunder and such certificate shall be conclusive and binding on the Borrower in the absence of manifest error.

### ARTICLE III

### CONDITIONS TO ADVANCES

SECTION 3.01. Initial Condition Precedent. The obligation of each Bank to make Advances pursuant to the terms and conditions of this Agreement is subject to the condition precedent that the Paying Agent shall have received on or before the day of the initial Advance the following, each dated on or before such day, in form and substance satisfactory to each Co-Administrative Agent (copies of which shall have been provided to the Co-Administrative Agents):

(a)     The Notes to the order of the Banks, respectively.

(b)     Certified copies of the resolutions of the Board of Directors of the Borrower approving this Agreement, each Note and each Notice of Borrowing, and of all other documents, in each case evidencing any necessary corporate action and governmental approvals, if any, with respect to each such Loan Document and certified copies of the amended and restated articles of incorporation, as amended, and bylaws, as amended, of the Borrower.

(c)     A certificate of the Secretary, Deputy Corporate Secretary or an Assistant Secretary of the Borrower certifying the names and true signatures of the officers of the Borrower authorized to sign each Loan Document to which it is a party and the other documents to be delivered hereunder.

(d)     A favorable opinion of Vinson & Elkins L.L.P., counsel for the Borrower, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents, at the express instruction of the Borrower, substantially in the form of Exhibit C hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

(e)     A favorable opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents, at the express instruction of the Borrower, in substantially the form of Exhibit D hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

JPMUCI 0003193

185.    Defendant Citibank breached its contractual duties by failing to receive copies of, and to ascertain the satisfactory form or substance of, the required resolutions.

186.    Defendant Citibank's breach was grossly negligent.  Defendant Citibank had a duty to act in accordance with the standard of care for sophisticated agent banks.  Defendant Citibank was, and held itself out to the Lenders to be, a sophisticated and experienced agent bank.

187.    At the same time, Defendant Citibank's tasks under Section 3.01(b) of the May 2000 and May 2001 Credit Agreements were simple and mechanical.  Section 3.01(b) simply required Defendant Citibank to (i) physically receive a certified copy of a board resolution; (ii) physically inspect the resolution; and (iii) compare the language of the resolution to the language in Section 3.01(b).  If no resolution was received, Defendant Citibank should have alerted the Lenders that a condition precedent to funding was unsatisfied, and should not have advanced funds to Enron until the condition precedent was satisfied.

188.    Defendant Citibank's failure to carry out its contractual duties under Section 3.01(b) was total.  Defendant Citibank failed to receive or inspect any resolution, failed to inform the Lenders of the failure of the condition precedent, and advanced the Lenders' funds to Enron without the legal right to do so.

189.    Because Defendant Citibank breached its contractual duties to ensure compliance with these crucial conditions precedent (and did so in a gross, willful and wanton manner), the Lenders funded Enron's borrowings under the May 2000 and May 2001 Credit Agreements without knowing that they were under no obligation to lend money to Enron.  Defendant Citibank's gross, willful and wanton breaches of duty occurred at the very moment that Citibank personnel were in Houston endeavoring wrongfully to prolong Enron's life through the

fraudulent expansion of Enron's debt, hoping to reap large fees through a merger of Enron with Dynegy Corporation, one of Enron's competitors. As a result of Defendant Citibank's grossly negligent, willful and wanton breaches of its contractual duties, the Lenders funded a loan that they were under no legal obligation to fund, and were never repaid.

190.    The grossly negligent nature of Citibank's breach of contract was in direct contrast with Citibank's own internal credit documentation standards. On October 16, 2001, only nine days before Citibank facilitated Enron's failure to meet the conditions precedent under the Credit Agreements, Citibank instituted credit documentation standards that left no doubt that Citibank was not to allow any drawdown of facilities unless the conditions precedent in credit agreements were met:

---

**Documentation Standards**

**Credit Documentation Standards**

It is GCIB policy that no advance or takedown is permitted until all documentation (subject to deferral procedures described herein) is completed, executed, delivered, and registered if necessary, and all conditions precedent have been met. Certain activities may be exempt from these requirements if they are covered by approved Credit Programs that establish the specific alternative documentation requirements.

Responsibility for the completeness and content of legal documentation or for obtaining waivers or deferrals lies with the Sponsoring Officer.

This section applies to loans, leases and other credit agreements. It does not apply to account opening documentation, transaction services agreements or other types of transactions, all of which are subject to documentation procedures established by the relevant business units.

For traded product documentation standards, see Section VII, Capital Markets.

---

## CAUSES OF ACTION

### Count One:
### Fraud Against All Defendants

191.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

192.    Prior to, contemporaneously with, and following the execution of the Credit Agreements and the Lenders' October 25, 2001 advances of funds thereunder, Defendants concealed material information concerning Enron's true revenues and liabilities and Enron's illicit use of secret transactions to falsify its financial statements.

193.    Specifically, Defendants failed to disclose, *inter alia*:  (i) Enron's true revenues and liabilities, including bank debt; (ii) Enron's insolvency; (iii) Enron's true senior debt to capitalization ratio; and (iv) Enron's systematic illicit use of secret transactions with Defendants and/or SPEs that Defendants created and in which they invested, in order to distort Enron's public financial statements.

194.    The material information concealed by Defendants was peculiarly within the possession of Defendants and Enron.  Because of the joint efforts of Defendants and Enron to conceal such information, the Lenders could not with reasonable diligence, and did not, discover the material information regarding Enron's true financial condition and its illicit transactions.

195.    Defendants knew that the Lenders were relying upon materially false and misleading information in deciding whether to enter into the Credit Agreements.  Defendants knew that the Lenders were relying upon materially false and misleading information when they advanced funds pursuant to Enron's October 25, 2001 requests under the Credit Agreements. Specifically, Defendants knew that the Lenders were relying upon Enron's false financial

statements. Defendants also knew or should have known that the Lenders were relying upon the false public statements made by Enron regarding its financial condition.

196.    As a result of Defendants' superior information and their knowledge that the Lenders were relying upon false and misleading information, Defendants had a duty to disclose to the Lenders their superior information regarding Enron's true financial condition and Enron's illicit transactions.

197.    Defendant Securities Subsidiaries and Defendant Banks also misrepresented the financial condition of Enron in communications with the Lenders, including the April 25, 2000 Information Memorandum and the April 20, 2001 Invitation to Offer, prepared by JPMorgan Chase Securities and Salomon Smith Barney and disseminated by them at the direction of JPMorgan Chase Bank and Citibank.

198.    Defendant Securities Subsidiaries and Defendant Banks further misrepresented material information concerning Enron by disseminating, and directing and requiring the Lenders to rely upon, false information from Enron, including *inter alia*, Enron's public financial statements, including its filings with the SEC, and in particular the disclosures concerning Enron's earnings, revenues, debt and liabilities contained therein, as well as information accompanying the April 25, 2000 Information Memorandum and the April 20, 2001 Invitation to Offer, and information disseminated on October 25, 2001. Defendants knew that this and other information emanating from Enron was false at the time they disseminated it to the Lenders.

199.    Defendants misrepresented and concealed material information with the intent that the Lenders would rely upon the misrepresentations and omissions.

200.    The Lenders reasonably relied upon and were deceived by Defendants' misrepresentations and omissions.

201.   As the Lenders' assignees, Plaintiffs are entitled to recover all damages proximately caused by Defendants' fraudulent inducement, as described above, in an amount to be determined at trial.  The damages sought are within the jurisdictional limits of this Court.

**Count Two:**
**Fraudulent Inducement**
**Against All Defendants**

202.   Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

203.   As set forth in the preceding paragraphs, prior to the execution of the Credit Agreements, Defendants materially misrepresented the true financial condition of the borrower, Enron.

204.   Specifically, Defendants failed to disclose and actively concealed, *inter alia*: (i) Enron's true revenues and liabilities, including bank debt; (ii) Enron's true senior debt-to-capitalization ratio; and (iii) Enron's systematic illicit use of secret transactions with Defendants and/or SPEs that Defendants created and in which they invested, in order to distort Enron's public financial statements.

205.   Defendants had a duty to disclose this information to the Lenders.

206.   Defendant Securities Subsidiaries and Defendant Banks also misrepresented the financial condition of Enron in communications with the Lenders, including the April 25, 2000 Information Memorandum and the April 20, 2001 Invitation to Offer.

207.   Defendant Securities Subsidiaries and Defendant Banks further misrepresented material information concerning Enron by disseminating, and directing and encouraging the Lenders to rely upon, false information from Enron, including *inter alia*, Enron's public financial statements, including its filings with the SEC, and in particular the disclosures concerning

Enron's earnings, revenues, debt and liabilities contained therein, as well as information accompanying the April 25, 2000 Information Memorandum and the April 20, 2001 Invitation to Offer, and information disseminated on October 25, 2001. Defendants knew that this and other information emanating from Enron was false at the time they disseminated it to the Lenders.

208.    Defendants misrepresented and concealed material information with the intent that the Lenders would rely upon the fraudulent misrepresentations and omissions.

209.    The Lenders reasonably relied upon and were deceived by Defendants' fraudulent misrepresentations and omissions.

210.    As a direct and proximate result of the foregoing, the Lenders were induced to enter into the May 2000 and May 2001 Credit Agreements.

211.    As the Lenders' assignees, Plaintiffs are entitled to recover all damages caused by Defendants' fraudulent inducement, as described above, in an amount to be determined at trial. The damages sought are within the jurisdictional limits of this Court.

**Count Three:**
**[Omitted]**

**Count Four:**
**[Omitted]**

## Count Five:
## Aiding and Abetting Fraud
## Against All Defendants

212.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

213.    Prior to, contemporaneously with and following the execution of each of the Credit Agreements and Enron's October 25, 2001 request for funds there under, Enron systematically and materially misrepresented its financial condition.  Enron significantly inflated its reported revenues and concealed significant liabilities.

214.    Enron also concealed material information regarding its manipulation of its financial statements through the widespread illicit use of SPEs, Mahonia and Delta, as described above.

215.    Enron's misrepresentations and omissions were made in its public filings, including its 10-K filings with the SEC from 1996 through 2000 and its 10-Q filings through September 30, 2001.

216.    Enron misrepresented its financial condition willfully and intentionally for the purpose of deceiving lenders and investors, including the Lenders.

217.    The Lenders reasonably relied upon Enron's representations concerning its financial condition.  As a result of Enron's misrepresentations and the Lenders' reliance thereon, the Lenders sustained substantial damages.

218.    Through their participation in secret, off-balance sheet transactions such as the disguised loans detailed above, and their close relationship with Enron, Defendants knew of Enron's fraud.

219.    Defendants knew that the Lenders were not aware of Enron's true financial condition or of Enron's massive and systematic falsification of its financial statements.

220.    Defendants knowingly and intentionally provided substantial assistance to Enron in committing its fraud by, *inter alia*:  (i) arranging and structuring numerous illicit off-balance sheet transactions through which Enron deceived the Lenders and the investing public; (ii) actively working to ensure that the misrepresentations of Enron's financial statements remained hidden from parties not involved in the illicit transactions; (iii) disseminating false information regarding Enron's financial conditions to banks, including the Lenders, to induce them to enter into the Credit Agreements and to advance funds under the Credit Agreements; and (iv) other conduct alleged hereinabove.

221.    As the Lenders' assignees, Plaintiffs are entitled to recover all damages proximately caused by Enron's fraud and Defendants' substantial assistance of such fraud, as described above, in an amount to be determined at trial.

### Count Six:
### Aiding and Abetting Fraudulent Inducement
### Against All Defendants

222.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

223.    As set forth in the preceding paragraphs, prior to the execution of the Credit Agreements, Enron systematically and materially misrepresented its financial condition.

224.    Enron misrepresented and concealed material information with the intent that the Lenders would rely upon the fraudulent misrepresentations and omissions.

225.    The Lenders reasonably relied upon and were deceived by Enron's fraudulent misrepresentations and omissions.

226.    As a direct and proximate result of the foregoing, the Lenders were induced to enter into the Credit Agreements.

227.     Through their participation in secret, off-balance sheet transactions such as the disguised loans detailed above, and their close relationships with Enron, Defendants knew of Enron's fraud.

228.     Defendants knew that the Lenders were not aware of Enron's true financial condition or of Enron's massive and systematic falsification of its financial statements.

229.     Defendants knowingly and intentionally provided substantial assistance to Enron in committing its fraudulent inducement by, *inter alia*:  (i) arranging and structuring numerous illicit off-balance sheet transactions through which Enron deceived the Lenders and the investing public; (ii) investing and participating in SPEs, to falsify Enron's financial statements; (iii) actively working to ensure that the misrepresentations of Enron's financial statements remained hidden from parties not involved in the illicit transactions; (iv) disseminating false information regarding Enron's financial conditions to banks, including the Lenders, to induce them to enter into the Credit Agreements; and (v) other conduct alleged hereinabove.

230.     As the Lenders' assignees, Plaintiffs are entitled to recover all damages caused by Defendants' aiding and abetting of Enron's fraudulent inducement, as described above, in an amount to be determined at trial.  The damages sought are within the jurisdictional limits of this Court.

**Count Seven:**
**[Omitted]**

**Count Eight:**
**Aiding and Abetting Breach of Fiduciary Duty**
**Against All Defendants**

231.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

232.    By October 25, 2001, unbeknownst to the Lenders, Enron was insolvent by any accepted measure.  The sum of Enron's true debts was greater than all of Enron's property, at a fair valuation; Enron was engaged in business with unreasonably small capital; and Enron had incurred, and intended to continue to incur, debts that were and would be beyond its ability to pay as such debts matured.

233.    As a result of Enron's insolvency, one or more of Enron's directors and officers, including without limitation Lay, Fastow and McMahon, had a fiduciary relationship with Enron's creditors, including the Lenders, and owed fiduciary duties to Enron's creditors, including the Lenders.

234.    As described herein, prior to and contemporaneous with Enron's October 25, 2001 request for funds, one or more of Enron's directors and officers breached their fiduciary duties to Enron's creditors, including the Lenders, by, among other things, misrepresenting and concealing Enron's true financial condition.

235.    Through their participation in secret and disguised, off-balance sheet transactions such as the disguised loans detailed above, and their close relationship with Enron's directors and officers, Defendants knew that one or more of Enron's directors' and officers' tortious conduct constituted a breach of their fiduciary duties to Enron's creditors, including the Lenders.

236.    Defendants knew that the Lenders were not aware of the true state of Enron's financial condition or of one or more of Enron's directors' and officers' misrepresentation of its true financial condition.

94

237.    Defendants knew or should have known that the Lenders would reasonably rely upon Enron's directors' and officers' misrepresentations and omissions regarding Enron's financial condition in deciding whether to make funds available under the Credit Agreements.

238.    Defendants knowingly and intentionally provided substantial assistance to one or more of Enron's directors' and officers' breach of fiduciary duty by, *inter alia*:  (i) actively working to ensure that the false and misleading nature of Enron's financial statements remained hidden from parties not involved in Enron's illicit transactions, including the Lenders; (ii) endorsing the false information disseminated by Enron and its directors and officers to the Lenders regarding Enron's financial condition; and (iii) other conduct alleged hereinabove. As the Lenders' assignees, Plaintiffs are entitled to recover all damages caused by the breach of fiduciary duty by one or more of Enron's directors and officers and Defendants' substantial assistance of such breach, as described above, in an amount to be determined at trial.  The damages sought are within the jurisdictional limits of this Court.

**Count Nine:**
**[Omitted]**

95

**Count Ten:**
**Civil Conspiracy**
**Against All Defendants**

239.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

240.    The JPMorgan Chase Defendants and Enron conspired to accomplish an unlawful objective, *i.e.*, to defraud Enron's investors and lenders, including the Lenders, by falsifying Enron's financial condition.

241.    The Citigroup Defendants and Enron conspired to accomplish an unlawful objective, *i.e.*, to defraud Enron's investors and lenders, including the Lenders, by falsifying Enron's financial condition.

242.    The conspirators agreed to conceal from the Lenders the full extent of Enron's liabilities, to artificially inflate its revenues, to falsely enhance its debt-to-capitalization ratio, and to fraudulently preserve or improve its credit rating.

243.    Defendants and Enron further agreed to distort Enron's reported financial condition through the illicit use of SPEs through which they hid Enron's liabilities and artificially inflated its revenues.

244.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it.

245.    As described above, Defendants furthered the conspiracy by, *inter alia*, investing in the SPEs through which Enron falsified its financial statements, creating the SPEs through which Enron engaged in illicit transactions, and participating in fraudulent transactions such as those detailed above.

246.    As the Lenders' assignees, Plaintiffs are entitled to recover all damages proximately caused by the foregoing, in an amount to be determined at trial.  The damages sought are within the jurisdictional limits of this Court.

**Count Eleven:**
**Breach of Implied Duty of Good Faith in the Credit Agreements**
**Against Defendants JPMorgan Chase Bank and Citibank**

247.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

248.    The Credit Agreements to which the Lenders are parties contain an implied covenant of good faith and fair dealing.

249.    The Lenders contracted for certain rights and powers under the Credit Agreements, including the right, when joined by others comprising the majority of participating banks, as defined, to instruct the lead banks to act or refrain from acting in their interests, as evidenced by Sections 6.01, 7.01 and 8.01 of the Credit Agreements.

250.    The Lenders further contracted for the right, when joined by others comprising the majority of participating banks, as defined, to require the amendment of the Credit Agreements, as set forth in Sections 9.01 of the Credit Agreements.

251.    The Lenders further contracted for the right to payment of outstanding notes and securitization of their exposure under the Credit Agreements upon the occurrence of an event of default.

252.    As evidenced by Sections 3.02, 4.01(d), 5.01 and 5.02(b) of the Credit Agreements, the Lenders contracted to extend credit to a borrower the financial condition of which was intended to be determinable from the review of its public financial statements.

253.    JPMorgan Chase Bank and Citibank actively, intentionally and in bad faith assisted Enron in concealing its liabilities, inflating its revenues, and distorting the public financial statements upon which they knew the Lenders would rely.

254.    JPMorgan Chase Bank and Citibank actively, intentionally and in bad faith concealed from the Lenders information concerning the existence of events of default and concerning Enron's true financial condition.

255.    Defendants' willful misconduct deprived the Lenders of the benefits which they reasonably expected to receive and to which they were entitled under the Credit Agreements.

256.    As a result of the foregoing, Defendants breached the implied covenant of good faith and fair dealing.

257.    As the Lenders' assignees, Plaintiffs are entitled to recover all damages proximately caused by the foregoing, in an amount to be determined at trial.  The damages sought are within the jurisdictional limits of this Court.

### Count Twelve
### Grossly Negligent Breach of Contract Against
### Defendants JPMorgan Chase Bank and Citibank

258.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

259.    Defendants JPMorgan Chase Bank and Citibank entered into each of the contracts defined collectively above as the Credit Agreements, with other parties including the Lenders.

260.    By entering into the each of the Credit Agreements, Defendants JPMorgan Chase Bank and Citibank agreed to perform, among other contractual duties, their respective contractual duties provided for in Section 3.01(b) of each of the Credit Agreements.

261.    Despite being the Paying Agent as that term is defined in each of the Credit Agreements, Defendant Citibank failed to perform the contractual duties of the Paying Agent provided for in Section 3.01(b) of each of the Credit Agreements.

262.    Despite being one of the Co-Administrative Agents as that term is defined in each of the Credit Agreements, Defendant Citibank failed to perform the contractual duties of each Co-Administrative Agent provided for in Section 3.01(b) of each of the Credit Agreements.

263.    Despite being one of the Co-Administrative Agents as that term is defined in each of the Credit Agreements, Defendant JPMorgan Chase Bank failed to perform the contractual duties of each Co-Administrative Agent provided for in Section 3.01(b) of each of the Credit Agreements.

264.    The failures to perform by Defendants JPMorgan Chase Bank and Citibank, and each of them, were grossly negligent because they were total failures to perform, lacking even in any effort to perform, and because they departed grossly from the standards of care employed by reasonably careful administrative agents and paying agents in similar circumstances.

265.    The failures to perform by Defendants JPMorgan Chase Bank and Citibank, and each of them, constituted the failure of an Initial Condition Precedent with respect to each of the Credit Agreements, such that pursuant to the terms of Section 3.01(b) of each of the Credit Agreements, no Lender was obligated to make any Advance (as that term is defined in each of the Credit Agreements) pursuant to the terms of either of the Credit Agreements.  The failures to perform by Defendants JPMorgan Chase Bank and Citibank, and each of them, were thus breaches of the contracts that went to the foundation of each contract and substantially defeated the purpose of each contract, entitling Plaintiffs to rescind the contracts and to recover the Advances made by the Lenders.

266.     The failures to perform by Defendants JPMorgan Chase Bank and Citibank, and each of them, also caused the Lenders damages in the amounts that each advanced without any legal obligation to do so, entitling Plaintiffs to damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.     for judgment in Plaintiffs' favor on the counts recited above;

B.     for rescission of the May 2000 Credit Agreement and the May 2001 Credit Agreement, awarding to Plaintiffs the amount advanced by the Lenders pursuant to those Credit Agreements;

C.     for compensatory damages which are within the jurisdictional limits of this Court in an amount to be proved at trial;

D.     for punitive/exemplary damages to the full extent permitted by law;

E.     for pre-judgment and post-judgment interest and court costs; and

G.     for such other relief as the Court may deem proper and just.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  March 25, 2008

Respectfully submitted,


Philip S. Beck
James B. Heaton, III
Cindy L. Sobel
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, 3rd Floor
Chicago, IL  60610
Telephone:  (312) 494-4400
Facsimile:  (312) 494-4440


KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

By: _____
David Parker
Marc R. Rosen
551 Fifth Avenue
New York, NY  10176
Telephone:  (212) 986-6000
Facsimile:  (212) 986-8866

ATTORNEYS FOR PLAINTIFFS
DK ACQUISITION PARTNERS, L.P.,
KENSINGTON INTERNATIONAL LIMITED,
RUSHMORE CAPITAL-I, L.L.C.,
RUSHMORE CAPITAL-II, L.L.C., and
SPRINGFIELD ASSOCIATES, LLC