# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

DK ACQUISITION PARTNERS, L.P.,
KENSINGTON INTERNATIONAL LIMITED,
RUSHMORE CAPITAL-I, L.L.C., RUSHMORE
CAPITAL-II, L.L.C., and SPRINGFIELD
ASSOCIATES, LLC.,

                                Plaintiffs,

        Case No. 08 Civ. 446 (LTS)

   v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, J.P. MORGAN SECURITIES,
INC., CITIGROUP INC., CITIBANK, N.A. and
CITIGROUP GLOBAL MARKETS, INC. f/k/a
Salomon Smith Barney,

                                Defendants.

---------------------------------------------------------------X

[Caption continued on following page]

---------------------------------------------------------------x
AVENUE CAPITAL MANAGEMENT II, L.P., :
GRACIE CAPITAL, L.P., HALCYON FUND, :
L.P., KING STREET CAPITAL, L.P., :
LONGACRE MASTER FUND, LTD., MAN MAC :
3 LIMITED, ORE HILL FUND HUB LTD., :
MARATHON SPECIAL OPPORTUNITY :
MASTER FUND, LTD., RCG CARPATHIA :
MASTER FUND, LTD., REDWOOD MASTER :
FUND, LTD., SCOGGIN CAPITAL :
MANAGEMENT, L.P. II, SCOGGIN :
INTERNATIONAL FUND, LTD., SCOTTWOOD :
CAPITAL MANAGEMENT, LLC, SPCP GROUP, :
LLC, STRATEGIC VALUE CREDIT :    Case No. 08 Civ. 447 (LTS)
OPPORTUNITIES MASTER FUND, L.P., :
STRATEGIC VALUE MASTER FUND, LTD., :
and TRILOGY CAPITAL, LLC, :
                                  :
                     Plaintiffs,  :
                                  :
        v.                        :
                                  :
JPMORGAN CHASE & CO., JPMORGAN    :
CHASE BANK, J.P. MORGAN SECURITIES, :
INC., CITIGROUP INC., CITIBANK, N.A., and :
CITIGROUP GLOBAL MARKETS, INC. f/k/a :
Salomon Smith Barney,             :
                                  :
                     Defendants.  :
---------------------------------------------------------------x
---------------------------------------------------------------x
UNICREDITO ITALIANO SPA and BANK  :
POLSKA KASA OPIEKI SA             :
                                  :
                     Plaintiffs,  :
                                  :
        v.                        :
                                  :    Case No. 02 Civ. 5328 (LTS)
JPMORGAN CHASE BANK, J.P. MORGAN  :
CHASE & CO., J.P. MORGAN SECURITIES, :
INC., CITIBANK, N.A., CITIGROUP, INC. and :
CITIGROUP GLOBAL MARKETS INC.     :
(FORMERLY SALOMON SMITH BARNEY    :
INC.)                             :
                                  :
                     Defendants.  :
---------------------------------------------------------------x

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1, IN SUPPORT OF
<u>THEIR MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Local Civil Rule 56.1 of the Local Rules for the Southern District of New York, Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities Inc. (collectively, "JPMorgan Chase"), and Citigroup Inc., Citibank, N.A., and Citigroup Global Markets, Inc., f/k/a Salomon Smith Barney Inc. (collectively, "Citigroup") submit this Statement of Material Facts in support of their motion for summary judgment:[1]

## I. The Credit Facilities

1. In May 2000, over 50 of the world's largest financial institutions entered into an agreement to provide Enron with a $1.25 billion, five-year revolving credit facility (the "Long-Term Revolver"). Supp. Ex. 1[2]; *see also DK Acquisition* Cplt. ¶ 2; *Avenue Capital* Cplt. ¶ 5; *UCI* Cplt. ¶ 2.[3]

2. One year later, in May 2001, many of these same banks participated in a $1.75 billion, 364-day revolving credit facility (the "Short-Term Revolver"; together with the Long-Term Revolver, the "Revolvers"). Supp. Ex. 2; *see also DK Acquisition* Cplt ¶ 2; *Avenue Capital* Cplt. ¶ 5; *UCI* Cplt. ¶ 2. The Short-Term Revolver was a replacement facility for a 364-day, $1.75 billion facility entered into on May 18, 2000, contemporaneously with the Long-Term Revolver. Supp. Ex. 3.

---

[1] Defendants' Motion for Summary Judgment was filed when these actions were pending in the United States District Court for the Southern District of Texas, which does not require submission of a separate statement of undisputed facts in support of a motion for summary judgment. Accordingly, in light of the recent transfer of these actions to this Court, Defendants are providing this Statement of Undisputed Facts at this time to ensure that the Motion complies with the rules of this Court and to facilitate the Court's disposition of the Motion.

[2] All citations to "Supp. Ex. __" refer to the exhibits to the Supplemental Affidavit of David J. Woll submitted herewith.

[3] All citations to "*DK Acquisition* Cplt" are to the Second Amended Complaint in *DK Acquisition Partners L.P., et al. v. JPMorgan Chase & Co., et al.*, No. 08 Civ. 446; all citations to "*Avenue Capital* Cplt" are to the First Amended Complaint in *Avenue Capital Management II, L.P., et al. v. JPMorgan Chase & Co., et al.*, No. 08 Civ. 447; and all citations to "*UCI* Cplt" are to the Fourth Amended Complaint in *UniCredito Italiano SpA, et al. v. JPMorgan Chase Bank, et al.*, No. 02 Civ. 5328.

3. The Revolvers were initially unfunded and were meant to "be used for general corporate purposes, including the backstopping of Enron's commercial paper program." Supp. Exs. 4, 5.

4. A third facility – a $500 million letter of credit involving the same banks as the Short-Term Revolver and that is relevant only for purposes of the *Avenue Capital* and *UCI* actions – was also put in place in May 2001 (the "LC Facility"; together with the Revolvers, the "Credit Facilities"). Supp. Ex. 6; *see also Avenue Capital* Cplt. ¶ 5; *UCI* Cplt. ¶ 2.

5. JPMorgan Chase and Citigroup, which were the two syndicate members that had the largest individual commitments of all the lenders under the Credit Facilities – approximately $120 million each – acted as Co-Arrangers and Co-Administrative Agents under the Credit Facilities, with Citigroup also acting as Paying Agent under the Revolvers and JPMorgan Chase as Paying Agent under the LC Facility. Supp. Exs. 1, 2, 6.

6. On October 25, 2001, Enron drew down the full $3 billion available under the Revolvers. Citigroup, as paying agent, received Enron's borrowing notices requesting that each participating bank (collectively, the "Lenders") fund its portion of the facilities the very same day, which they all did (with the exception of Bank of China, which funded on or about five days later). Supp. Exs. 7, 8; *see also DK Acquisition* Cplt ¶¶ 3, 32; *Avenue Capital* Cplt. ¶ 298; *UCI* Cplt. ¶ 143.

7. In addition to drawing down on the Revolvers, Enron had periodically utilized the LC Facility. A total of nine letters of letters of credit were issued and drawn under this facility. *Avenue Capital* Cplt. ¶ 248.

8. Enron filed for bankruptcy on December 2, 2001. The syndicate members had not been repaid the $3 billion they had advanced to Enron under the Revolvers. Enron's

bankruptcy also prevented timely repayment of the approximately $374 million worth of letters of credit that had been issued and drawn under the LC Facility.  *DK Acquisition* Cplt ¶ 3; *Avenue Capital* Cplt. ¶ 210; *UCI* Cplt. ¶ 161.

## II.   Plaintiffs

9.   Plaintiff UniCredito Italiano SpA ("UCI"), a financial institution headquartered in Italy, was an original lender to Enron under the Credit Facilities, committing approximately $25.4 million in all three facilities combined.  Supp. Exs. 1, 2, 6.[4]

10.   UCI is the majority owner of Plaintiff Polska Kasa Opieki SA ("Bank Pekao"), a financial institution headquartered in Poland that purchased a $6.25 million participating interest in the Long-Term Revolver from one of the Lenders prior to the October 25, 2001 drawdown.  *UCI* Cplt. ¶¶ 38-39, 124.

11.   The *DK Acquisition* and *Avenue Capital* Plaintiffs are 22 distressed debt investment funds that purchased Enron debt after Enron filed for bankruptcy and claim to assert the litigation rights – or "stand in the shoes" – of over 50 of the Lenders.  *DK Acquisition* Cplt. ¶¶ 1 n.1, 16-18; *Avenue Capital* Cplt. ¶¶ 1 n.1, 33-34.

12.   The aggregate amount of debt claimed by the *DK Acquisition* Plaintiffs under the Credit Facilities is approximately $1.57 billion; the *Avenue Capital* Plaintiffs claim approximately $552 million.  Ex. 1 at 7; Ex. 2 at 3.[5]

---

[4]   UCI also asserts claims stemming from a separate, bilateral credit facility that UCI provided to Enron in May 2000, originally for $10 million, but which was increased to $30 million in August 2000.  *UCI* Cplt. ¶ 2.

[5]   All citations to "Ex. __" refer to the exhibits to the Affidavit of David J. Woll submitted on December 6, 2007 with the Motion.

### III. Plaintiffs' Claims

13.     Plaintiffs' claim for damages is predicated on Enron's failure to repay all the amounts due under the Credit Facilities in full.  For example, Paragraph 3 of the *DK Acquisition* Complaint states:

> On or about October 25, 2001, just five weeks before declaring bankruptcy, Enron borrowed the entire $3 billion available under the Credit Agreements.  Plaintiffs now hold more than half of the debt, which Enron's bankruptcy estate cannot repay in full.[6]

14.     Similarly, both William C. Carey and Stephen R. Braunstein – the experts designated by the *DK Acquisition* and *Avenue Capital* Plaintiffs, respectively, to opine on the damages that Plaintiffs seek to recover – acknowledge that those damages are based on the Shortfall – *i.e.*, the amount that Enron ultimately fails to repay the Lenders or their successors-in-interest.  Ex. 1 at 27-29, 34; Ex. 2 at 2.

15.     The transactions that Defendants engaged in with Enron, which Plaintiffs contend Enron accounted for improperly (the "Challenged Transactions"), collectively provided Enron with several billion dollars in financing in 2000 and 2001 alone.  There is no reason to believe that these cash infusions, as opposed to the crisis in confidence in Enron's trading business at the end of 2001 or Enron's money-losing businesses, proximately caused Enron's failure to repay in full the Lenders (or their successors-in-interest) under the Credit Facilities, which arose when Enron filed for bankruptcy on December 2, 2001.

16.     Enron's losses due to several of its failed businesses, including Enron Broadband, Enron Energy Services and Enron International, have been well documented:

- Enron contributed close to $1 billion as part of its 80% stake in the $2.4 billion trouble-ridden Dabhol power plant in India, which at the time

---

[6]   *See also Avenue Capital* Cplt. ¶ 35; *UCI* Cplt. ¶ 36.

4

represented the largest foreign investment in the country, yet the venture never generated profits for the company.[7]

- Enron poured over $1.7 billion into the Elektro Electricidade Project in Brazil as part of its ambitious international expansion in South America, but failed to recoup its investment in part because of the Brazilian currency devaluations in 1999. As of July 1999, Enron had invested over $2.2 billion in Brazil alone.[8]

- Enron spent billions on the failed Azurix Corp. ("Azurix") water project, including expenditures relating to Azurix's $2.2 billion acquisition of Wessex Water in Britain, its $483.6 million acquisition of AGOSBA in Buenos Aires, and its $72 million acquisition of Mendoza in Argentina, with little to show for these investments. Azurix went public in 1999 and less than 18 months later the Azurix Board agreed to be bought out by Enron following a precipitous decline in the water company's stock price.[9]

- Enron invested heavily in Cuiaba, a project to build a pipeline through the Bolivian rainforest, but quickly confronted environmental and political obstacles, as well as cost overruns approaching $250 million.[10]

- Enron incurred significant losses in connection with its retail energy service business ("EES"). Even though, in 2000, EES reported contracts valued at over $16 billion, EES's valuation methodology was highly suspect, EES was plagued with control and operational problems, and the company's contracts were often not profitable. Enron ended up spending a "large amount of dollars and human capital" on EES, with little return on its investment.[11]

- Enron's much touted broadband business ("EBS") was another costly failure. By early 2001, EBS had invested hundreds of millions of dollars

---

[7] Ex. 3, Deposition of Joseph W. Sutton, Oct. 26, 2005, at 121:22—122:22 (noting equity investment in Dabhol of close to $1 billion).

[8] Ex. 4 at EC000344382.

[9] Ex. 5 at 5-9 (Enron board approves $2.24 billion to acquire Wessex); Ex. 6 at 10-12 (Enron board approves bid for AGOSBA); Ex. 7 (Enron board presentation noting $72 million capital expenditure on Mendoza); Ex. 8 (Enron press release announcing Enron's purchase of Azurix's shares).

[10] *See, e.g.,* Ex. 9, Deposition of Jim Bannantine, Feb. 24-25, 2005, at 136:6—137:21; 309:10—16 (noting challenges faced by Cuiaba); Ex. 10 (seeking approval of additional $259 million to cover project costs and noting "[t]he development of the Cuiaba project has experienced numerous difficulties including governmental force majeure events that have led to construction delays, multiple problems with local communities and large cost overruns").

[11] *See, e.g.,* Ex. 11, E-mail from M. Ceconi, dated Aug. 29, 2001 (noting that "EES had been doing deals for 2 years and was losing money on almost all the deals they had booked"); Ex. 12, Deposition of Wanda Cason Curry, Nov. 15, 2004, at 212:17—213:5 (explaining problems at EES); Ex. 13, Deposition of Richard Carson, Oct. 26, 2004, at 62:22—63:10 (same).

5

> into developing its broadband network and was incurring operating expenses of well over $500 million a year, yet the company failed to generate recurring income as its products were neither technologically nor commercially viable.[12]
>
> - In April 2001, Enron announced that its 16-month effort to sell its Portland General Electric unit, which the company had acquired in 1997 for $1.86 billion in stock and the assumption of $1.1 billion in debt, had failed. Ex. 17.

17.     Furthermore, a series of public disclosures and developments at the second half of 2001 also contributed to the downfall of Enron.  On August 14, 2001, Enron unexpectedly announced that its President and Chief Executive Officer, Jeffrey Skilling, was resigning from the company "for personal reasons."  Ex. 18.

18.     On October 16, 2001, Enron announced that it had recorded a $1 billion after-tax charge to its quarterly earnings and taken a $1.2 billion reduction in shareholders' equity in connection with the unwinding of certain related-party transactions, known as the Raptor transactions, as well as losses relating to Azurix and EBS.  Ex. 19.

19.     Also on October 16, 2001, Moody's announced that Enron's long-term debt obligations were on review for a possible downgrade.  Ex. 20.

20.     On October 22, 2001, Enron disclosed that the Securities and Exchange Commission had launched an informal inquiry into Enron's accounting for the Raptor transactions.  Ex. 21.

---

[12] *See, e.g.,* Ex. 14, Deposition of James B. Fallon, Sep. 29, 2004, at 386:17—387:12 ("We generated very little revenue from recurring operations . . . .  We had deployed capital for numerous platforms that were not commercially viable."); Ex. 15, E-mail from James B. Fallon, dated Nov. 20, 2000 (noting that EBS had "burn[ed] up in excess of $500 million" while "accomplishing virtually nothing"); Ex. 16, Deposition of William Collins, Sep. 27, 2004, at 118:11—122:17 (noting various EBS projects that were not commercially viable).

21.     On the same day, October 22, 2001, the first of several securities class action lawsuits was filed against Enron and its auditor, Arthur Andersen, alleging that Enron's financial statements were materially false and misleading.

22.     On October 24, 2001, Enron announced that its Chief Financial Officer, Andrew Fastow, had been placed on a leave of absence. Ex. 22.

23.     Between October 16 and October 24, Enron's stock price fell by more than 50%. Ex. 23. Then, on October 25, 2001, Enron drew down the full $3 billion available under the Revolvers. Supp. Exs. 7, 8.

24.     As the foregoing events were unfolding, Enron was suffering a crisis of confidence in its crucial trading business. Counterparties were either demanding more collateral from Enron, resulting in a liquidity crunch, or refusing to do business with Enron altogether.[13]

25.     Ultimately, Enron filed for bankruptcy on December 2, 2001.

26.     None of these disclosures or developments had anything to do with alleged wrongdoing in connection with the prepays or the other Challenged Transactions. Although the Raptor transactions and another set of transactions known as the Chewco transactions were discussed in the late 2001 disclosures by Enron, neither Citigroup nor JPMorgan Chase was involved in designing or implementing the Raptors, nor is there any evidence whatsoever that Defendants had any knowledge of or responsibility for any alleged accounting improprieties relating to Chewco.

27.     Moreover, none of the Plaintiffs have offered expert opinions on the accounting for the Raptor or Chewco transactions, much less as to whether those transactions proximately caused Enron's non-payment.

---

[13]  *See* Ex. 24, E-mail from R. Barone, dated Nov. 15, 2001 (noting the continued erosion of investor confidence in Enron in the fall of 2001).

Dated:  April 14, 2008

        Respectfully submitted,

        /s/ David J. Woll
        Thomas C. Rice
        David J. Woll
        SIMPSON THACHER & BARTLETT LLP
        425 Lexington Avenue
        New York, NY  10017
        Telephone:  (212) 455-2000
        Facsimile:  (212) 455-2502

        *Attorneys for Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities Inc.*


        /s/ Michael E. Gertzman
        Brad S. Karp
        Richard A. Rosen
        Michael E. Gertzman
        Claudia L. Hammerman
        Robyn F. Tarnofsky
        Julia Tarver Mason
        Jonathan H. Hurwitz
        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
        1285 Avenue of the Americas
        New York, New York 10019-6064
        (212) 373-3000
        (212) 757-3990 (Facsimile)

        *Attorneys For Defendants Citigroup Inc., Citibank N.A., and Citigroup Global Markets Inc. (f/k/a Salomon Smith Barney Inc.)*