**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
DK ACQUISITION PARTNERS, L.P.,
KENSINGTON INTERNATIONAL LIMITED,
RUSHMORE CAPITAL-I, L.L.C., RUSHMORE
CAPITAL-II, L.L.C., and SPRINGFIELD
ASSOCIATES, LLC.,

                                     Plaintiffs,

                  v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, J.P. MORGAN SECURITIES,
INC., CITIGROUP INC., CITIBANK, N.A. and
CITIGROUP GLOBAL MARKETS, INC. f/k/a
Salomon Smith Barney,

                                    Defendants.
---------------------------------------------------------------- x

Civil Action No. 08 Civ. 0446 (LTS)

**STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1, IN SUPPORT OF DEFENDANTS JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., AND J.P. MORGAN SECURITIES, INC.'s MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFFS' CLAIMS BASED ON WESTLB DEBT**

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
*Attorneys for Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities, Inc.*

Pursuant to Local Civil Rule 56.1 of the Local Rules for the Southern District of New York, Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities, Inc. (collectively, the "JPMorgan Chase Defendants" or "JPMC") submit this Statement of Material Facts in support of their motion for summary judgment.

I.  **THE PRESENT ACTION**

1. The Complaint in this action alleges that more than fifty five sophisticated international banking institutions who were original lenders to Enron under two revolving credit facilities were defrauded by certain prepay transactions involving Mahonia Limited, JPMC and Enron (the "JPMC Prepays").  Plaintiffs' Second Amended Complaint ("Compl.") (Turner Aff. Ex. B)[1] ¶¶ 47-48; 109-110.

2. The two revolving credit facilities are:  (i) a May 2000, $1.25 billion, five-year revolving credit facility; and (ii) a May 2001, $1.75 billion, 364-day revolving credit facility (collectively, the "Revolving Credit Facilities").

3. Plaintiffs claim to be the successors in interest to more than fifty of the original lenders under the Revolving Credit Facilities, including WestLB AG ("WestLB"), and claim to "stand in the shoes of the original lenders" in bringing this lawsuit against the Defendants. Compl. ¶¶ 1 n.1, 17-18.

4. Plaintiffs contend here, just as WestLB did in *Mahonia Limited and JPMorgan Chase Bank v. WestLB AG*, Queens Bench, Commercial Division, Case No. 2001/1400 (Cooke J.) (the "WestLB Action"), that the JPMC Prepays were not accounted for or disclosed properly by Enron – contentions that the English High Court categorically rejected in its judgment of August 3, 2004 (the "WestLB Judgment").  (Turner Aff. Ex. A.).

---

[1] References to "Turner Aff." are to the accompanying affidavit of Alan C. Turner, sworn to on July 11, 2008, and the exhibits attached thereto.

5.     Plaintiffs in this action allege that the JPMC Prepays were accounted for and disclosed improperly by Enron and that JPMC "aided and abetted" and/or "conspired" with Enron in connection with Enron's allegedly improper accounting and disclosure. *See, e.g.*, Compl. ¶¶ 51, 55, 220, 240.

6.     Plaintiffs further allege that as a result of JPMC's allegedly improper conduct, JPMC (and Citi) are legally obligated to pay damages to Plaintiffs based on the losses allegedly suffered – not by Plaintiffs – but by the original lenders in whose shoes Plaintiffs seek to stand, including WestLB. Compl. ¶¶ 1, 10, 18, Prayer for Relief.

7.     Documents produced by Plaintiffs in discovery indicate that they purport to hold approximately $75,750,000 (face value) of debt originally held by WestLB, made up as follows:

- $33,666,666 in 364-Day Revolver (DK Acquisition Partners, L.P.) (purchased 10/3/2003) (*See* Turner Aff. Ex. C.)

- $12,083,333 in Long-Term Revolver (DK Acquisition Partners, L.P.) (purchased 10/31/2003) (*See* Turner Aff. Ex. D.)

- $20,000,000 in the 364-Day Revolver (Rushmore Capital – I, L.L.C.) (purchased 1/12/2004) (*See* Turner Aff. Ex. E.)

- $10,000,000 in the Long-Term Revolver (DK Acquisition Partners, L.P.) (purchased 3/9/2004) (*See* Turner Aff. Ex. F.)

8.     In seeking damages based on their holdings of debt originally held by WestLB, Plaintiffs advance the very same allegations and arguments that WestLB advanced, and which were rejected by the English High Court, in the WestLB Action, including, *inter alia*, that:

- the JPMC Prepays were allegedly nothing other than a multi-billion dollar series of "secret loans" or "sham" transactions that JPMorgan Chase structured for Enron (Compl. ¶¶ 51, 60; WestLB Judgment ¶ 9, 281);

- JPMC allegedly knew that Enron's disclosures did not accurately reflect its financial condition and failed to reveal that fact to WestLB (Compl. ¶¶ 47, 48; WestLB Judgment ¶ 281);

- Enron's accounting for the JPMC Prepays allegedly did not comply with GAAP because Enron accounted for the proceeds and obligations created by the Prepays as coming from "operating activities" and "price risk management activities" rather than financing activities and debt (Compl. ¶ 55; WestLB Judgment ¶ 153); and

- JPMC was allegedly aware at all times of Enron's allegedly improper accounting for the JPMC Prepays (Compl. ¶ 39; WestLB Judgment ¶¶ 281-82).

## II. THE WESTLB ACTION

9. The WestLB Action concerned a letter of credit issued by WestLB to support Enron's payment obligation on a prepay transaction involving JPMorgan Chase. WestLB Judgment ¶¶ 1, 9. After Enron entered bankruptcy, WestLB resisted payment on the letter of credit in favor of JPMorgan Chase, alleging that the prepay transaction in question, and the other prepay transactions between Enron and JPMorgan Chase, were fraudulent. *Id*.

10. During the six-week trial, WestLB attempted to establish the following contentions: (i) the JPMC Prepays were actually "disguised loans"; (ii) JPMC conspired with Enron to devise the JPMC Prepays to enable Enron wrongfully to account for the transactions under U.S. Generally Accepted Accounting Principles ("GAAP"); (iii) Enron failed to properly account for the JPMC Prepays under GAAP; and (iv) JPMC knew that Enron's accounting was improper. WestLB Judgment ¶ 8.

11. In the WestLB Judgment, the English High Court considered and rejected ***all*** of these (and other) arguments attacking the JPMC Prepays, ultimately concluding that "West[LB]'s claims against Chase all fail." WestLB Judgment ¶¶ 436-37.

### A. Enron's Accounting for the Prepay Transactions Complied with Generally Accepted Accounting Principles

12. The lynchpin of WestLB's allegations in the WestLB Action – and Plaintiffs' allegations in the present action – is the now-disproven claim that Enron's accounting for the JPMC Prepays was improper. WestLB Judgment ¶ 153; Compl. ¶¶ 47, 48.

13. There is no dispute that the JPMC Prepays were accounted for *on* Enron's balance sheet as liabilities. WestLB Judgment ¶ 154. Nonetheless, WestLB argued in the WestLB Action that Enron's accounting treatment of the JPMC Prepays failed to comply with GAAP because Enron accounted for the prepay-related liabilities as "price risk management liabilities" instead of accounting for them as "debt". WestLB Judgment ¶¶ 9, 154.

14. WestLB further argued that the monies received by Enron as a result of the JPMC Prepays should have been accounted for as "cash flow from financing" instead of as "cash flow from operations." WestLB Judgment ¶ 153.

15. The English Court squarely addressed WestLB's allegations of improper accounting, conducting a thorough analysis of the accounting issues based on expert evidence offered by both sides. WestLB Judgment ¶¶ 153-228. After so doing, the Court held that it was completely appropriate for Enron to accord "non-debt" treatment to the JPMC Prepays and to account for these transactions on Enron's balance sheet as price risk management liabilities. *Id.*

16. The English Court also ruled that it was completely appropriate for Enron to account for the associated cash flows on Enron's cash flow statements as "operating cash flows." WestLB Judgment ¶¶ 153-228. As the English Court explained:

> ENAC was justified in giving the prepays "non-debt" treatment on its Balance Sheet and accounting for them as Price Risk Management Activities . . . . It follows from this conclusion that ENAC was entitled also to account for cash flows resulting from these Swaps as "operating cash flows" rather than "financing cash flows."

4

WestLB Judgment ¶¶ 221-22.

17.     In reaching this conclusion, the Court found that the JPMC Prepays involved numerous features that distinguished them in material respects from loan transactions.  For example, noting that the JPMC Prepays involved swap contracts and associated margin agreements that are not present in loan agreements and that impose significantly different obligations than loan transactions, the English Court ruled that the transaction documents "contained provisions which made them swap contracts [as opposed to loans] with margin obligations to make payments which depended on the market movement of gas prices."  WestLB Judgment ¶ 220.

18.     Likewise, the Court found that Enron did not violate GAAP by treating separately the contracts comprising the prepay transactions, because a "faithful representation of those contracts required them to be treated as the contracts they were and not on some composite basis."  WestLB Judgment ¶ 220.

19.     Moreover, the Court found that the JPMC Prepays contained price risks regardless of whether viewed on a composite basis or as individual swap agreements.  WestLB Judgment ¶ 209.  As the English Court made clear:

> In energy trading portfolios there are often contracts which are fully hedged from a price risk point of view if the counterparties perform, but they all fall to be accounted for as energy trading contracts.  Here there is both individual price risk in each transaction and even should a box be put round the two contracts in question and the Chase/Mahonia Swap taken into account, there was a collective[] price risk linked to credit or default risk.

WestLB Judgment. ¶ 212.

20.     The Court was not persuaded by the testimony of WestLB's accounting expert, Lynn Turner, a former chief accounting officer for the SEC.  WestLB Judgment ¶ 220.  As the English Court noted, by the time of trial Mr. Turner had changed his analysis "significantly and

5

fundamentally" and "the matters relied on by him when giving evidence to the [Senate Permanent Subcommittee on Investigations] were different from those upon which he relied in his evidence before me." WestLB Judgment ¶ 220.

21. Having heard expert testimony from both Mr. Turner and JPMC's accounting expert, the Court said of Mr. Turner: "Insofar as he sought to say that there was only one legitimate way to account for the [JPMC Prepays], *I reject his evidence.*" WestLB Judgment ¶ 220 (emphasis added).

22. In sum, the court concluded that there was nothing improper about Enron's accounting for the Prepay Transactions. WestLB Judgment ¶¶ 220-28, 236 ("Enron's accounting for the prepays was not in breach of US GAAP").

### B. JPMC Did Not Believe That Enron's Accounting for the Prepay Transactions Was Improper Or Unlawful and Did Not Act with any Intent to Defraud

23. The English Court also squarely rejected WestLB's assertion that JPMC believed that Enron's accounting was improper: "There is no basis therefore for contending that Chase knew that Enron's accounting for [the JPMC Prepays] . . . was contrary to GAAP, constituted misaccounting or was wrongful." WestLB Judgment ¶ 331.

24. Despite extensive testimony from and lengthy cross-examination of each of the JPMC individuals who were principally involved in the JPMC Prepays, WestLB failed to establish any fraudulent conduct on behalf of JPMC: "In my judgment [WestLB] cannot succeed in showing that Chase knew that Enron's accounting of [the Prepay Transactions] nor its prospective accounting for [the September 2001 Prepay Transaction] was or would be wrongful or contrary to GAAP, nor that its financial statements had not or would not contain proper accounting treatment of the prepays or disclosure in accordance with GAAP." WestLB Judgment ¶ 334.

6

25. In reaching this conclusion, the Court found that JPMC reasonably assumed that Arthur Andersen – Enron's auditors and accountants who, unlike JPMC, were actually responsible for Enron's accounting – had scrutinized Enron's accounting and ensured its compliance with GAAP:

- "I have no hesitation in finding that all the relevant Chase personnel, throughout the relevant period, not only considered that Enron had accounted for prior prepays in accordance with the advice of their well known accountants, Andersens, but that future accounting of such prepays would be vetted by those accountants also." WestLB Judgment ¶ 329.

- "What is plain from the evidence of each of the four members of the [JPMC] deal team is that they considered that Enron's own accountants, Andersens were fully involved in the issue of accounting treatment of the prepay transactions by Enron and that the structure of the transactions was vetted by Andersens in order to give it 'non-debt' classification on the balance sheet." WestLB Judgment ¶ 327.

- JPMC employees were "entitled to take the view that the manner of accounting for the prepays was a matter for Enron and Andersens," and "the general view among Chase personnel at all times was that prepays did carry with them legitimate non debt accounting treatment on the balance sheet in compliance with GAAP." WestLB Judgment ¶ 329.

26. The English High Court concluded that:

> Chase and Mahonia . . . at all times considered that Enron's past accounting and proposed accounting for the prepays, including [the September 2001 Prepay Transaction], was lawful and conducted in accordance with responsible advice from experienced and able accountants.

WestLB Judgment ¶ 435.

### C. There Was No Conspiracy Between JPMC and Enron

27. Regarding WestLB's allegation of conspiracy between JPMC and Enron, the English Court held that "West[LB] cannot show that there was any conspiracy between Enron, Mahonia and Chase to devise[,] arrange and implement transactions in order to enable Enron to account wrongfully." WestLB Judgment ¶ 236.

28.     The English Court further found that:

> Equally, West cannot show that Chase . . . conspired with Enron to put together a transaction in circumstances where they knew that Enron would account wrongfully for it. There was therefore simply no agreement or combination that Enron should take unlawful action and no unlawful action actually taken in any event. Whether the allegation is expressed as an agreement, a combination, a conspiracy, a plan, a scheme, an understanding, a joint enterprise or a common purpose to account wrongfully, there is no basis in fact for it.

WestLB Judgment ¶ 354.

29.     The English Court concluded that "West's claims against Chase all fail because Chase was not a party to any conspiracy with Enron, whether to devise a transaction to enable Enron wrongfully to account or to mislead West[LB] as to the nature of the underlying transaction or the true purpose of the L/C." WestLB Judgment ¶ 436.

**D.     Mahonia Was an Independent Entity**

30.     In the WestLB Action, WestLB also sought to challenge the accounting for the JPMC Prepays by contending that Mahonia was not independent of JPMC. The Court ruled against WestLB on this point as well, concluding that Mahonia was independent of JPMorgan Chase for the purposes of accounting for the JPMC Prepays: "I find that Mahonia was independent of Chase." WestLB Judgment ¶ 58; *see generally* ¶¶ 46-70. "Mahonia was not owned by or controlled by Chase. It decided whether or not to conclude the transactions that Chase brought to it." WestLB Judgment ¶ 58. Thus, Mahonia was "never controlled by Chase, even though, by agreement, it entrusted Chase or Chase related parties or nominees to control the transactions which it had independently concluded." WestLB Judgment ¶ 58.

E.  **WestLB Had A Clear Understanding of the Use of Prepay Structures For Financing Purposes**

31.     Contrary to WestLB's suggestion that its employees had little understanding of the use of prepaid commodities transactions as financing, the English Court reviewed the trial testimony, which included testimony from several WestLB officers, and found that: "I find therefore that, prior to October 2001, there were [WestLB] personnel in London, including in particular Mr. Taylor, who had a clear understanding of prepay structures for financing purposes."  WestLB Judgment ¶ 406.

32.     Indeed, the English Court found that the prepay structures with which WestLB was familiar included the use of "circular Swaps" and SPV's" and that WestLB itself was "considering involvement" in these transactions.  WestLB Judgment ¶ 406.

III.    **COMPARISON BETWEEN PLAINTIFFS' ALLEGATIONS IN THIS ACTION AND THE FINDINGS OF THE ENGLISH HIGH COURT IN THE WESTLB JUDGMENT**

33.     Plaintiffs here allege that: "From December 1992 through September 2001, Defendant JPMorgan Chase Bank structured twelve secret loans disguised as prepay transactions, knowing that Enron would improperly (and in violation of GAAP) report the loan proceeds as operating cash flow and would improperly (and in violation of GAAP) fail to report the repayment obligations as debt." Compl. ¶ 51.

34.     In the WestLB Judgment, the English High Court ruled: "I also take the view that ENAC was justified in treating the ENAC/Mahonia Swap as an energy trading contract and the ENAC/Chase Swap as a derivative so that both were accounted for on ENAC's balance sheet as price risk management assets or liabilities. . . . Thus ENAC was justified in giving the prepays 'non debt' treatment on its Balance Sheet and accounting for them as Price Risk Management Activities".  WestLB Judgment ¶ 221.

35. Plaintiffs here allege that: "The JPMC Defendants knew that the Mahonia transactions were actually loans to Enron and that the amount of money provided to Enron in any of the transactions was determined by how much cash Enron wanted to borrow rather than what volume of any commodity any party wanted to trade. Accordingly, the JPMC Defendants also knew that Enron should have recorded the Mahonia transactions (but did not record them) as debt under GAAP. The JPMC Defendants also knew that Enron reported the proceeds it received in violation of GAAP as cash provided by operating activities rather than as cash provided by financing activities." Compl. ¶ 55.

36. In the WestLB Judgment, the English High Court ruled that Enron "was justified in giving the prepays 'non debt' treatment on its Balance Sheet and accounting for them as Price Risk Management Activities." WestLB Judgment ¶ 221. The Court further ruled that Enron "was entitled also to account for cash flows resulting from these Swaps as 'operating cash flows' rather than 'financing cash flows." WestLB Judgment ¶ 222.

37. Plaintiffs here allege that "Defendants knew of these GAAP violations because they resulted directly from numerous transactions that Defendants structured for Enron. Indeed, Defendants structured these transactions for the very purpose of enabling Enron to understate its true GAAP debt and to overstate its true GAAP operating cash flow." Compl. ¶ 39.

38. In the WestLB Judgment, the English High Court ruled that "West[LB]'s claims against Chase all fail because Chase was not party to any conspiracy with Enron, whether to devise a transaction to enable Enron wrongfully to account or to mislead West as to the nature of the underlying transaction or the true purpose of the L/C." WestLB Judgment ¶ 436.

39. Plaintiffs here allege that "Enron's officers … had worked with Defendants to structure the very transactions that these Enron officers and Defendants alike knew were reported

on Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements in violation of GAAP." Compl. ¶ 41.

40.     In the WestLB Judgment, the English High Court ruled that "West[LB] cannot succeed in showing that Enron's . . . financial statements had not or would not contain proper accounting treatment of the prepays or disclosure in accordance with GAAP." WestLB Judgment ¶ 334.

41.     Plaintiffs here allege that "Because of these fraudulent transactions, the JPMC Defendants knew that Enron's December 31, 1999, March 31, 2000, and March 31, 2001 financial statements violated GAAP, drastically understating Enron's true GAAP debt and overstating Enron's true GAAP operating cash flow." Compl. ¶ 53.

42.     In the WestLB Judgment, the English High Court ruled that "Whilst therefore there may be other ways in which the transactions could properly be accounted, on the evidence before me, I cannot conclude that the accounting treatment actually adopted was contrary to GAAP." WestLB Judgment ¶ 228.

43.     Plaintiffs here allege that "The JPMC Defendants also knew that Enron's auditor, Arthur Andersen LLP ("Andersen"), did not understand the true nature of the Mahonia transactions. In fact, the JPMC Defendants actively assisted Enron in making misleading representations to Andersen so that Andersen would approve Enron's non-GAAP accounting for the transactions." Compl. ¶ 57.

44.     In the WestLB Judgment, the English High Court ruled that "Chase . . . at all times considered that Enron's past accounting and proposed accounting for the prepays, including Chase XII [the September 2001 Prepay], was lawful and conducted in accordance with responsible advice from experienced and able accountants." WestLB Judgment ¶ 435.

45.     Plaintiffs here allege that "The JPMorgan Chase Defendants [and the Citigroup Defendants] and Enron conspired to accomplish an unlawful objective, *i.e.* to defraud Enron's investors and lenders, including the Lenders, by falsifying Enron's financial condition."  Compl. ¶¶ 240, 241.

46.     In the WestLB Judgment, the English High Court ruled that "Equally, West[LB] cannot show that Chase (or Mahonia) conspired with Enron to put together a transaction in circumstances where they knew that Enron would account wrongfully for it.  There was therefore simply no agreement or combination that Enron should take unlawful action and no unlawful action actually taken in any event.  Whether the allegation is expressed as an agreement, a combination, a conspiracy, a plan, a scheme, an understanding, a joint enterprise or a common purpose to account wrongfully, there is no basis in fact for it."  WestLB Judgment ¶ 354.

47.     Plaintiffs here allege that "Andersen believed that Mahonia was an independent entity but, in reality, Defendant JPMorgan Chase Bank had established and controlled Mahonia from its inception."  Compl. ¶ 57.

48.     In the WestLB Judgment, the English High Court ruled that "I find that Mahonia was independent of Chase."  WestLB Judgment ¶ 58.

**IV.     WESTLB JUDGMENT IS FINAL, AND THE COURT HAD JURISDICTION**

49.     A final judgment has issued in the WestLB Action.  *See* WestLB Judgment (captioned as "Approved Judgment").

50.     The WestLB Judgment will remain final, pursuant to an order of the High Court of October 22, 2004 whereby WestLB consented that it "shall not make any application to the Court to appeal, or for permission to appeal, in respect of any aspect of the proceedings [in the WestLB Action]."  *See* Declaration of Richard Andrew Swallow, executed on July 9, 2008 and submitted herewith, at ¶ 8, and Ex. A thereto.

51.     WestLB raised no objection to the Court's jurisdiction and, in fact, asserted several causes of action as counterclaims that were all thoroughly analyzed and rejected by the Court. WestLB Judgment ¶ 8.

Dated: July 11, 2008

                                  Respectfully submitted,

                                    /s/  Thomas C. Rice
                                  Thomas C. Rice
                                  David J. Woll
                                  SIMPSON THACHER & BARTLETT LLP
                                  425 Lexington Avenue
                                  New York, NY  10017
                                  Telephone:  (212) 455-2000
                                  Facsimile:  (212) 455-2502
                                  trice@stblaw.com

                                  *Attorneys for Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities, Inc.*