**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------- X
DK ACQUISITION PARTNERS, L.P.,                 :
KENSINGTON INTERNATIONAL LIMITED,              :
RUSHMORE CAPITAL-I, L.L.C., RUSHMORE           :
CAPITAL-II, L.L.C., and SPRINGFIELD            :
ASSOCIATES, LLC.,                              :
                                               :
                                               :
                        Plaintiffs,            :        Civil Action No. 08 Civ. 0446 (LTS)
                                               :
                                               :
            v.                                 :
                                               :
                                               :
JPMORGAN CHASE & CO., JPMORGAN                 :
CHASE BANK, J.P. MORGAN SECURITIES,            :
INC., CITIGROUP INC., CITIBANK, N.A. and       :
CITIGROUP GLOBAL MARKETS, INC. f/k/a           :
Salomon Smith Barney,                          :
                                               :
                        Defendants.            :
-------------------------------------------------------------- X
```

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., AND J.P.
MORGAN SECURITIES, INC.'s MOTION FOR SUMMARY JUDGMENT
WITH RESPECT TO PLAINTIFFS' CLAIMS BASED ON WESTLB DEBT**

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
*Attorneys for Defendants JPMorgan Chase & Co.,
JPMorgan Chase Bank, N.A., and J.P. Morgan
Securities Inc.*

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................ 1

Factual Background ................................................................................................... 3

I.         The Present Action .................................................................................... 3

II.        The WestLB Action ................................................................................... 5

           A.     Enron's Accounting for the Prepay Transactions Complied with
                  Generally Accepted Accounting Principles ................................. 5

           B.     JPMC Did Not Believe That Enron's Accounting for the Prepay
                  Transactions Was Improper Or Unlawful and Did Not Act with
                  any Intent to Defraud ................................................................... 8

           C.     There Was No Conspiracy Between JPMC and Enron ............... 9

           D.     Mahonia Was an Independent Entity ........................................... 10

           E.     WestLB Had A Clear Understanding of the Use of Prepay
                  Structures For Financing Purposes .............................................. 10

Argument .................................................................................................................. 11

I.         Summary Judgment Standard .................................................................... 11

II.        Plaintiffs' WestLB Claims Are Subject To The Same Defenses As If
           WestLB Were Itself Bringing The Claims ................................................ 11

III.       The WestLB Judgment Must Be Given Preclusive Effect ......................... 12

           A.     Choice of Law .............................................................................. 12

           B.     The Elements of Collateral Estoppel, or Issue Estoppel, Are
                  Satisfied Here ............................................................................... 14

                  (1)    The Same Question Was Necessarily Decided ............... 16

                  (2)    The Prior Decision Involved The Same Parties or Their
                         Privies ............................................................................ 19

                  (3)    The Prior Decision Was Final And Was Rendered By A
                         Court With Jurisdiction .................................................. 20

CONCLUSION ........................................................................................................ 22

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996 (2d Cir. 1993)................................................................. 14

*Benson v. Wanda Petroleum Co.* 468 S.W.2d 361 (Tex. 1971) ................................................................... 19

*Brown v. Lanier Worldwide, Inc.*, 124 S.W.3d 883 (Tex. App. - Houston [14 Dist.] 2004).................................. 13

*Buechel v. Bain*, 97 N.Y.2d 295 (N.Y. 2001) .......................... 20

*Burns v. Bishop*, 48 S.W.3d 459 (Tex. App. 2001).................. 12

*Camperlengo v. Barell*, 78 N.Y.2d 674 (N.Y. 1991) ......................................... 15, 19

*Caribbean S.S. Co., S.A. v. Sonmez Denizcilik Ve Ticaret A.S.*, 598 F.2d 1264 (2d Cir. 1979)....................... 11

*Carl Zeiss Stiftung v. Rayner & Keeler Ltd.*, 1 A.C. 853 (H.L. 1966) .....................................................15, 19, 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................... 11

*D'Arata v. New York Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d 659 (N.Y. 1990)................................................... 20

*Ferens v. John Deere Co.*, 494 U.S. 516 (1990)...................... 13

*Guidi v. Hoffman*, 95 Civ. 9006, 2002 U.S. Dist. LEXIS 14833 (S.D.N.Y. Aug. 12, 2002)........................... 14

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104 (2d Cir. 2000) .......................................... 11

*In re Gaston & Snow*, 243 F.3d 599 (2d Cir. 2001) ................. 12

*In re Parmalat Securities Litigation*, slip op., 2007 WL 541466 (S.D.N.Y. 2007) ........................................... 12

*Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana*, 347 F.3d 589 (5th Cir. 2003)................... 14

Page(s)

*International Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121 (N.Y. 1975) ........................................................... 12

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex. 1998) ........................................... 16

*Kendall v. Avon Prods., Inc.*, 711 F.Supp. 1178 (S.D.N.Y. 1989) ...................................................................... 11

*Kim v. Co-op. Centrale Raiffeisen-Boerenleebank B.A.*, 364 F.Supp.2d 346 (S.D.N.Y. 2005) ............................. 14

*Kirby Lumber Corp. v. Southern Lumber Co.*, 196 S.W.2d 387 (1946) .................................................................. 16

*Kolden Holdings Ltd v Rodette Commerce Ltd* [2008] 1 C.L.C. 1 .......................................................................... 19

*Kulak v. City of New York*, 88 F.3d 63 (2d Cir. 1996) .................................................................................... 19

*Latino Officers Ass'n v. City of New York*, 253 F. Supp. 2d 771 (S.D.N.Y. 2003) ........................................ 15

*Mpiliris v. Hellenic Lines, Ltd.*, 323 F. Supp. 865 (S.D. Tex. 1970) ...................................................................... 13

*Neidich v. Estate of Neidich*, 222 F.Supp.2d 357 (S.D.N.Y. 2002) ...................................................................... 11

*Neptune Orient Lines v. Halla Merchant Marine Co.*, No. 97-3828 SECTION K(2), 1998 U.S. Dist. LEXIS 3745 (Mar. 20, 1998 E.D. La.) ........................ 15

*Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322 (1979) ...................................................................................... 19

*Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354 (10th Cir. 1996) ...................................................................... 13

*Purcell v. Bellinger*, 940 S.W.2d 599 (Tex. 1997) ...................... 13

*Purdy v. Zeldes*, 337 F.3d 253 (2d Cir. 2003) ............................. 11

*Sheldon v. PHH Corp.*, 135 F.3d 848 (2d. Cir. 1998) ...................................................................................... 13

*Society of Lloyd's v. Ashenden*, 233 F.3d 473 (7th Cir. 2000) ...................................................................... 14

iii

**Page(s)**

*Society of Lloyd's v. Edelman*, 2005 WL 639412
(S.D.N.Y., March 21, 2005) ..................................................................... 14

*Society of Lloyd's v. Turner*, 303 F.3d 325 (5th Cir.
2002) ........................................................................................................... 14

*Sphere Drake Ins., Ltd., v. All Am. Life Ins. Co.*, 221
F. Supp. 2d. 874 (N.D. Ill. 2002) ............................................................. 15

*Success Motivation Inst. of Japan Ltd. v. Success
Motivation Inst., Inc.,* 966 F.2d 1007 (5th Cir.
1992) ........................................................................................................... 13

*United States v. Shahani-Jahromi*, 286 F. Supp. 2d.
723 (E.D. Va. 2003) .................................................................................. 15

*Varnelo v. Eastwind Transp.*, 02 Civ. 2084, 2003
U.S. Dist. LEXIS 1424 (Feb. 3, 2003 S.D.N.Y.) ................................... 15

*Voreep v. Tarom Romanian Air Transp.*, 96 Civ.
1384, 1999 WL 311811 (S.D.N.Y. May 18,
1999) ........................................................................................................... 14

*Wilhite v. Adams*, 640 S.W.2d 875 (Tex. 1982) ................................ 15, 19

**Treatises**

*29 Williston on Contracts* § 74:47 (4th ed. 2003) .................................... 12

48 Tex. Jur. 3d Judgments § 402 ................................................................ 13

Spencer Bower, Turner & Handley, *The Doctrine of
Res Judicata* (3rd ed., 1996) ................................................................... 15

Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities, Inc. (collectively "JPMC") respectfully submit this memorandum of law, together with the Affidavit of Alan C. Turner, sworn to on July 11, 2008, submitted herewith (the "Turner Affidavit"), and the exhibits annexed thereto, and the Declaration of Richard Andrew Swallow, executed on July 9, 2008, also submitted herewith (the "Swallow Declaration"), and the exhibit annexed thereto, and the English cases and authorities appended to this memorandum of law, in support of JPMC's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) dismissing with prejudice the claims asserted by Plaintiffs DK Acquisition Partners, L.P. and Rushmore Capital – I, L.L.C. ("Plaintiffs") to the extent they seek to "stand in the shoes" of WestLB AG ("WestLB").

## PRELIMINARY STATEMENT

Plaintiffs are distressed debt traders who purportedly acquired interests in Enron debt after the company filed for bankruptcy.  In this action, Plaintiffs claim to stand in the shoes of more than fifty original lenders who were members of a bank syndicate that advanced $3 billion to Enron on October 25, 2001 pursuant to two revolving credit facilities (the "Revolving Credit Facilities").[1]  WestLB is one of the original lenders under the Revolving Credit Facilities whose interests Plaintiffs claim to have acquired and in whose shoes Plaintiffs seek to stand. Based on documents produced in discovery, Plaintiffs purportedly own approximately $75 million of WestLB debt (the "WestLB Claims").  Judgment should be entered in favor of JPMC, dismissing Plaintiffs' WestLB Claims in their entirety, because those claims have already been exhaustively litigated, conclusively adjudicated and dismissed with prejudice by the English High Court of Justice in a case captioned *Mahonia Limited and JPMorgan Chase Bank v.*

---

[1]     The Revolving Credit Facilities are:  (i) a May 2000, $1.25 billion, five-year revolving credit facility; and (ii) a May 2001, $1.75 billion, 364-day revolving credit facility.

1

*WestLB AG*, Queens Bench, Commercial Division, Case No. 2001/1400 (Cooke J.) (the "WestLB Action").  Plaintiffs, as successors in interest to WestLB, are collaterally estopped from re-asserting the WestLB Claims in this action.

The Complaint in this action alleges, in substance, that certain prepaid forward commodity transactions involving Mahonia Limited, JPMC and Enron (the "JPMC Prepays")[2] were, in reality, "disguised loans" that were fraudulently accounted for by Enron, inadequately disclosed by Enron, and undertaken for an improper purpose by Enron.  These are the very same allegations previously made by WestLB in the WestLB Action.  Following a six-week trial, during which twenty-four witnesses testified, including all of the principal JPMC employees involved in the JPMC Prepays, the English High Court issued a 221-page Judgment, which is final and unappealable, and which unequivocally rejected WestLB's assertions of accounting fraud (the "WestLB Judgment").  (Turner Aff., Ex. A.)  After hearing extensive testimony, including expert accounting evidence from both sides, and reviewing voluminous documentary evidence, the English High Court ruled that the JPMC Prepays were accounted for and disclosed **properly** in Enron's financial statements.  This determination is fatal to Plaintiffs' WestLB Claims, all of which are dependent on a finding that the JPMC Prepays were accounted for improperly.  The English Court further held that JPMC's conduct in connection with the JPMC Prepays was not improper **in any way**:

> Chase . . . had no knowledge of any unlawfulness in prior accounting and there was no actual unlawfulness.  Equally, [WestLB] cannot show that Chase . . . conspired with Enron to put together a transaction in circumstances where they knew that Enron would account wrongfully for it.  There was therefore simply no agreement or combination that Enron should take unlawful action and no unlawful action actually taken in any event.

---

[2]    The Complaint also makes allegations concerning certain prepay transactions involving defendant Citibank, N.A, which are not the subject of this motion.

> Whether the allegation is expressed as an agreement, a combination, a conspiracy, a plan, a scheme, an understanding, a joint enterprise or a common purpose to account wrongfully, there is no basis in fact for it.

WestLB Judgment ¶ 354.

As a result of this thorough and unequivocal dismissal of WestLB's fraud claims, Plaintiffs are barred by the doctrine of collateral estoppel (also referred to as "issue estoppel" and "issue preclusion") from seeking to relitigate WestLB's failed claims in this proceeding. Plaintiffs, who seek to "stand in the shoes" of WestLB with respect to $75 million of their claims, took any assignment of those claims subject to exactly the same defenses as if WestLB were pursuing this action on its own behalf. Accordingly, summary judgment should be entered dismissing Plaintiffs' WestLB Claims against JPMC.

## FACTUAL BACKGROUND

### I.    THE PRESENT ACTION

The gravamen of the Complaint in this action is that more than fifty five sophisticated international banking institutions who were original lenders to Enron under the Revolving Credit Facilities were defrauded by Defendants' prepay transactions with Enron. Compl. ¶¶ 47-48; 109-110.[3]  Plaintiffs claim to be the successors in interest to more than fifty of the original lenders, including WestLB, and claim to "stand in the shoes of the original lenders" in bringing this lawsuit against the Defendants. Compl. ¶¶ 1, 17-18.  Plaintiffs contend here, just as WestLB did in the WestLB Action, that the JPMC Prepays were not accounted for or disclosed properly by Enron – contentions that the English High Court categorically rejected in the WestLB Judgment.

---

[3]    References to the Complaint or "Compl." are to the Plaintiffs' Second Amended Complaint, attached as Exhibit B to the Turner Affidavit filed herewith.

3

Plaintiffs in this action allege that the JPMC Prepays were accounted for and disclosed improperly by Enron and that JPMC "aided and abetted" and/or "conspired" with Enron in connection with Enron's allegedly improper accounting and disclosure. *See, e.g.*, Compl. ¶¶ 51, 55, 220, 240. Plaintiffs further allege that as a result of JPMC's allegedly improper conduct, JPMC (and Citi) are legally obligated to pay damages to Plaintiffs based on the losses allegedly suffered – not by Plaintiffs – but by the original lenders in whose shoes Plaintiffs seek to stand, including WestLB. Documents produced by Plaintiffs in discovery indicate that they purport to assert claims in this action based on their holdings of approximately $75,750,000 (face value) of debt originally held by WestLB. *See* Turner Aff. Exs. C, D, E, F.

However, in seeking damages based on their holdings of debt held by original lenders including WestLB, Plaintiffs advance the very same allegations and arguments that WestLB advanced, and which were rejected by the English High Court, in the WestLB Action, including, *inter alia*, that:

- the JPMC Prepays were allegedly nothing other than a multi-billion dollar series of "secret loans" or "sham" transactions that JPMorgan Chase structured for Enron (Compl. ¶¶ 51, 60; WestLB Judgment ¶ 9, 281);

- JPMC allegedly knew that Enron's disclosures did not accurately reflect its financial condition and failed to reveal that fact to WestLB (Compl. ¶¶ 47, 48; WestLB Judgment ¶ 281);

- Enron's accounting for the JPMC Prepays allegedly did not comply with GAAP because Enron accounted for the proceeds and obligations created by the Prepays as coming from "operating activities" and "price risk management activities" rather than financing activities and debt (Compl. ¶ 55; WestLB Judgment ¶ 153); and

- JPMC was allegedly aware at all times of Enron's allegedly improper accounting for the JPMC Prepays (Compl. ¶ 39; WestLB Judgment ¶¶ 281-82).

Consequently, the facts and theories pressed by WestLB in the WestLB Action are virtually identical to those that Plaintiffs allege in this action.

4

## II.    THE WESTLB ACTION

The WestLB Action concerned a letter of credit issued by WestLB to support Enron's payment obligation on a prepay transaction involving JPMorgan Chase.  After Enron entered bankruptcy, WestLB resisted payment on the letter of credit in favor of JPMorgan Chase, alleging that the prepay transaction in question, and the other prepay transactions between Enron and JPMorgan Chase, were fraudulent.  WestLB Judgment ¶¶ 1-9.

WestLB and JPMC vigorously litigated the WestLB Action for more than two years.  JPMC produced to WestLB more than one million pages of internal documents, emails, tape recordings and testimony relating to the JPMC Prepays, both in the WestLB Action itself and pursuant to a U.S. proceeding brought to obtain discovery under 18 U.S.C. § 1782.  During the six-week trial, WestLB tried mightily to support the following contentions:  (i) the JPMC Prepays were actually "disguised loans"; (ii) JPMC conspired with Enron to devise the JPMC Prepays to enable Enron wrongfully to account for the transactions under U.S. Generally Accepted Accounting Principles ("GAAP"); (iii) Enron failed to properly account for the JPMC Prepays under GAAP; and (iv) JPMC knew that Enron's accounting was improper.  *See* WestLB Judgment ¶ 8.  In his carefully reasoned Judgment, Justice Cooke considered and rejected *all* of these (and other) arguments attacking the JPMC Prepays, ultimately concluding that "West[LB]'s claims against Chase all fail."  *Id.* ¶ 436-37.  A reading of the WestLB Judgment makes clear that the allegations in the instant action have been thoroughly and conclusively adjudicated with respect to WestLB in the WestLB Action.

### A.    Enron's Accounting for the Prepay Transactions Complied with Generally Accepted Accounting Principles

The lynchpin of WestLB's allegations in the WestLB Action – and Plaintiffs' allegations in the present action – is the now-disproven claim that Enron's accounting for the

JPMC Prepays was improper.  WestLB Judgment ¶ 153; Compl. ¶¶ 47, 48.  There is no dispute that the JPMC Prepays were accounted for *on* Enron's balance sheet as liabilities.  WestLB Judgment ¶ 154.  Nonetheless, WestLB argued in the WestLB Action that Enron's accounting treatment of the JPMC Prepays failed to comply with GAAP because Enron accounted for the prepay-related liabilities as "price risk management liabilities" instead of accounting for them as "debt".  WestLB Judgment ¶¶ 9, 154.  WestLB further argued that the monies received by Enron as a result of the JPMC Prepays should have been accounted for as "cash flow from financing" instead of as "cash flow from operations."  WestLB Judgment ¶ 153.

The English Court squarely addressed WestLB's allegations of improper accounting, conducting a thorough analysis of the accounting issues based on expert evidence offered by both sides.  WestLB Judgment ¶¶ 153-228.  After so doing, the Court held that it was completely appropriate for Enron to accord "non-debt" treatment to the JPMC Prepays and to account for these transactions on Enron's balance sheet as price risk management liabilities.  *Id.* The English Court also ruled that it was completely appropriate for Enron to account for the associated cash flows on Enron's cash flow statements as "operating cash flows."  *Id.*  As the English Court explained:

> ENAC was justified in giving the prepays "non-debt" treatment on its Balance Sheet and accounting for them as Price Risk Management Activities . . . .  It follows from this conclusion that ENAC was entitled also to account for cash flows resulting from these Swaps as "operating cash flows" rather than "financing cash flows."

*Id*. ¶¶ 221-22.

In reaching this conclusion, the Court found that the JPMC Prepays involved numerous features that distinguished them in material respects from loan transactions.  For example, noting that the JPMC Prepays involved swap contracts and associated margin

6

agreements that are not present in loan agreements and that impose significantly different

obligations than loan transactions, the English Court ruled that the transaction documents

"contained provisions which made them swap contracts [as opposed to loans] with margin

obligations to make payments which depended on the market movement of gas prices." *Id.*

¶ 220.  Likewise, the Court found that Enron did not violate GAAP by treating separately the

contracts comprising the prepay transactions, because a "faithful representation of those

contracts required them to be treated as the contracts they were and not on some composite

basis." *Id.*  Moreover, the Court found that the JPMC Prepays contained price risks regardless of

whether viewed on a composite basis or as individual swap agreements. *Id.* ¶ 209.  As the

English Court made clear:

> In energy trading portfolios there are often contracts which are
> fully hedged from a price risk point of view if the counterparties
> perform, but they all fall to be accounted for as energy trading
> contracts.   Here there is both individual price risk in each
> transaction and even should a box be put round the two contracts in
> question and the Chase/Mahonia Swap taken into account, there
> was a collective[] price risk linked to credit or default risk.

*Id.* ¶ 212.

     The Court was not persuaded by the testimony of WestLB's accounting expert,

Lynn Turner, a former chief accounting officer for the SEC. *Id.*, ¶ 220.  As the English Court

noted, by the time of trial Mr. Turner had changed his analysis "significantly and fundamentally"

and "the matters relied on by him when giving evidence to the [Senate Permanent Subcommittee

on Investigations] were different from those upon which he relied in his evidence before me."

*Id.*  Having heard expert testimony from both Mr. Turner and JPMC's accounting expert, the

Court said of Mr. Turner: "Insofar as he sought to say that there was only one legitimate way to

account for the [JPMC Prepays], ***I reject his evidence.***" *Id.* ¶ 220 (emphasis added).  In sum, the

court concluded that there was nothing improper about Enron's accounting for the Prepay

Transactions. *Id.* ¶¶ 220-28, 236 ("Enron's accounting for the prepays was not in breach of US

GAAP").

**B.    JPMC Did Not Believe That Enron's Accounting for the Prepay Transactions Was Improper Or Unlawful and Did Not Act with any Intent to Defraud**

In addition to meticulously dismantling WestLB's accounting contentions, the

English Court also squarely rejected WestLB's assertion that JPMC believed that Enron's

accounting was improper:  "There is no basis therefore for contending that Chase knew that

Enron's accounting for [the JPMC Prepays] . . . was contrary to GAAP, constituted

misaccounting or was wrongful." *Id.* ¶ 331.  Despite extensive testimony from and lengthy

cross-examination of each of the JPMC individuals who were principally involved in the JPMC

Prepays, WestLB failed to establish any fraudulent conduct on behalf of JPMC:  "In my

judgment [WestLB] cannot succeed in showing that Chase knew that Enron's accounting of [the

Prepay Transactions] nor its prospective accounting for [the September 2001 Prepay

Transaction] was or would be wrongful or contrary to GAAP, nor that its financial statements

had not or would not contain proper accounting treatment of the prepays or disclosure in

accordance with GAAP." *Id.* ¶ 334.

In reaching this conclusion, the Court found that JPMC reasonably assumed that

Arthur Andersen – Enron's auditors and accountants who, unlike JPMC, were actually

responsible for Enron's accounting – had scrutinized Enron's accounting and ensured its

compliance with GAAP:

- "I have no hesitation in finding that all the relevant Chase personnel, throughout the relevant period, not only considered that Enron had accounted for prior prepays in accordance with the advice of their well known accountants, Andersens, but that future accounting of such prepays would be vetted by those accountants also." *Id.* ¶ 329.

8

- "What is plain from the evidence of each of the four members of the [JPMC] deal team is that they considered that Enron's own accountants, Andersens were fully involved in the issue of accounting treatment of the prepay transactions by Enron and that the structure of the transactions was vetted by Andersens in order to give it 'non-debt' classification on the balance sheet." *Id.* ¶ 327.

- JPMC employees were "entitled to take the view that the manner of accounting for the prepays was a matter for Enron and Andersens," and "the general view among Chase personnel at all times was that prepays did carry with them legitimate non debt accounting treatment on the balance sheet in compliance with GAAP." *Id.* ¶ 329.

Accordingly, the English High Court concluded that:

> Chase and Mahonia . . . at all times considered that Enron's past accounting and proposed accounting for the prepays, including [the September 2001 Prepay Transaction], was lawful and conducted in accordance with responsible advice from experienced and able accountants.

*Id.* ¶ 435.

## C.    There Was No Conspiracy Between JPMC and Enron

Regarding WestLB's allegation of conspiracy between JPMC and Enron, the English Court held that "West[LB] cannot show that there was any conspiracy between Enron, Mahonia and Chase to devise[,] arrange and implement transactions in order to enable Enron to account wrongfully." *Id.* ¶ 236.  The English Court further found that:

> Equally, West cannot show that Chase . . . conspired with Enron to put together a transaction in circumstances where they knew that Enron would account wrongfully for it.  There was therefore simply no agreement or combination that Enron should take unlawful action and no unlawful action actually taken in any event. Whether the allegation is expressed as an agreement, a combination, a conspiracy, a plan, a scheme, an understanding, a joint enterprise or a common purpose to account wrongfully, there is no basis in fact for it.

*Id.* ¶ 354. Thus the English Court concluded that "West's claims against Chase all fail because Chase was not a party to any conspiracy with Enron, whether to devise a transaction to enable Enron wrongfully to account or to mislead West[LB] as to the nature of the underlying transaction or the true purpose of the L/C." *Id.* ¶ 436.

### D. Mahonia Was an Independent Entity

In the WestLB Action, WestLB also sought to challenge the accounting for the JPMC Prepays by contending that Mahonia was not independent of JPMC. The Court ruled against WestLB on this point as well, concluding that Mahonia was independent of JPMorgan Chase for the purposes of accounting for the JPMC Prepays: "I find that Mahonia was independent of Chase." *Id.* ¶ 58; *see generally* ¶¶ 46-70. "Mahonia was not owned by or controlled by Chase. It decided whether or not to conclude the transactions that Chase brought to it." *Id.* ¶ 58. Thus, Mahonia was "never controlled by Chase, even though, by agreement, it entrusted Chase or Chase related parties or nominees to control the transactions which it had independently concluded." *Id.*

### E. WestLB Had A Clear Understanding of the Use of Prepay Structures For Financing Purposes

Contrary to WestLB's suggestion that its employees had little understanding of the use of prepaid commodities transactions as financing, the English Court reviewed the trial testimony, which included testimony from several WestLB officers, and found that: "I find therefore that, prior to October 2001, there were [WestLB] personnel in London, including in particular Mr. Taylor, who had a clear understanding of prepay structures for financing purposes." *Id.* ¶ 406. Indeed, the English Court found that the prepay structures with which WestLB was familiar included the use of "circular Swaps" and SPV's" and that WestLB itself was "considering involvement" in these transactions. *Id.* ¶ 406.

10

# ARGUMENT[4]

## I.    SUMMARY JUDGMENT STANDARD

To prevail on a summary judgment motion, the moving party must demonstrate that it is entitled to judgment as a matter of law because there is no genuine issue of material fact. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000); *Neidich v. Estate of Neidich*, 222 F.Supp.2d 357, 365 (S.D.N.Y. 2002). Here, the Court need not consider any disputed factual issues to grant judgment for JPMC dismissing Plaintiffs' WestLB claims on collateral estoppel grounds.

Courts routinely grant summary judgment on the basis of collateral estoppel. *See, e.g., Purdy v. Zeldes*, 337 F.3d 253, 257-59 (2d Cir. 2003) (affirming district court's grant of summary judgment on the basis of collateral estoppel); *Kendall v. Avon Prods., Inc.*, 711 F.Supp. 1178, 1186 (S.D.N.Y. 1989) (granting summary judgment on the basis of collateral estoppel). The sole issue presented by this motion is whether, under the doctrine of collateral estoppel, Plaintiffs, who seek to "stand in the shoes" of WestLB, are precluded from relitigating the same allegations and arguments that WestLB raised and lost in the WestLB Action. The answer to this purely legal question is clearly yes.

## II.    PLAINTIFFS' WESTLB CLAIMS ARE SUBJECT TO THE SAME DEFENSES AS IF WESTLB WERE ITSELF BRINGING THE CLAIMS

Plaintiffs allege that they are assignees who stand in the shoes of WestLB with respect to $75 million of claims in this action. It is hornbook law that an assignee takes its claims subject to exactly the same infirmities and defenses as could have been raised against the assignor. *Caribbean S.S. Co., S.A. v. Sonmez Denizcilik Ve Ticaret A.S.*, 598 F.2d 1264, 1266-67

---

[4]    Copies of English cases and authorities cited herein, or cited in the accompanying Declaration of Richard A. Swallow, are appended as Tabs 1-9 hereto.

11

(2d Cir. 1979) (holding that "an assignee of a claim takes with it whatever limitations it had in the hands of the assignor"); *International Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 126 (N.Y. 1975) ("It is elementary ancient law that an assignee never stands in any better position than his assignor.  He is subject to all the equities and burdens which attach to the property assigned because he receives no more and can do no more than his assignor"); *Burns v. Bishop*, 48 S.W.3d 459, 466 (Tex. App. 2001) ("It is axiomatic that an assignee or subrogee walks in the shoes of his assignor and takes the assigned rights subject to all defenses which the opposing party might be able to assert against his assignor.").  *See also 29 Williston on Contracts* § 74:47 (4th ed. 2003) (stating that an assignee is "subject to all defenses that the obligor may have against the assignor, including ... defenses ... that relate to the assigned obligation itself, but also rights ... [that] aris[e] out of separate matters that the obligor might have asserted against its original creditor, the assignor").

Accordingly, Plaintiffs' WestLB Claims are subject to collateral estoppel in exactly the same way as if WestLB was pursuing these claims in its own name.

## III.    THE WESTLB JUDGMENT MUST BE GIVEN PRECLUSIVE EFFECT

### A.    Choice of Law

Where subject matter jurisdiction is based on the case being "related to" a federal bankruptcy proceeding, as Plaintiffs plead here (Compl. ¶ 29), federal courts have generally held that the law of the forum state governs issues regarding recognition of a foreign nation's judgment.  *See, e.g., In re Gaston & Snow*, 243 F.3d 599, 605-08 (2d Cir. 2001); *In re Parmalat Securities Litigation*, slip op. at *8, 2007 WL 541466 (S.D.N.Y. 2007).  *See also Pereira v. Cogan*, 2001 WL 243537, at *17 (S.D.N.Y. Mar. 8, 2001) ("The parties concur that, as in a case

12

based on diversity jurisdiction, a federal court exercising its 'related to' bankruptcy jurisdiction over state law claims applies the choice of law rules of the forum state…").[5]

Where, as here, a case has been transferred pursuant to 28 U.S.C § 1404(a), the "forum" state is the transferor forum. *See, e.g., Ferens v. John Deere Co.*, 494 U.S. 516, 531 (1990); *Sheldon v. PHH Corp.*, 135 F.3d 848, 852 (2d. Cir. 1998). Accordingly, because this action was originally filed in Texas and was transferred to this Court pursuant to 28 U.S.C. § 1404(a), the Court should look to Texas law to determine what effect should be given to the WestLB Judgment in this lawsuit.

While Texas courts do not appear to have directly considered the choice of law rules governing the preclusive effect of a foreign *country* judgment, Texas courts generally hold that the preclusive effect of a judgment must be determined according to the law of the jurisdiction issuing the initial judgment. *See Brown v. Lanier Worldwide, Inc.*, 124 S.W.3d 883, 905 n.37 (Tex. App. - Houston [14 Dist.] 2004) ("The preclusive effect of a judgment must be determined according to the law of the jurisdiction issuing the initial judgment.") (citing *Purcell v. Bellinger*, 940 S.W.2d 599, 601 (Tex. 1997)); see also 48 Tex. Jur. 3d Judgments § 402 (noting same).[6] Likewise, under New York law a foreign country judgment is given whatever preclusive effect it would be accorded in the courts of the jurisdiction that rendered the judgment

---

[5]    The same rule applies in cases based on diversity jurisdiction. *See, e.g., Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 359 (10th Cir. 1996); *Success Motivation Inst. of Japan Ltd. v. Success Motivation Inst., Inc.*, 966 F.2d 1007, 1009-10 (5th Cir. 1992).

[6]    At least one Texas court has suggested that the law of the rendering jurisdiction will normally determine the preclusive effect of a foreign country judgment, at least insofar as those laws would not grant the foreign judgment greater preclusive effect than the local court would apply to a sister-state U.S. judgment. *See Mpiliris v. Hellenic Lines, Ltd.*, 323 F. Supp. 865, 874 (S.D. Tex. 1970) (declining to give greater preclusive effect to a Greek judgment than would apply to a sister-state U.S. judgment, because the case raised issues under the U.S. Jones Act and the litigant was not a party to the Greek proceeding).

in question.[7]  Moreover, under principles of comity, United States courts generally recognize a

foreign judgment and give preclusive effect to the findings and rulings rendered in that

proceeding.  *See Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana,* 347 F.3d 589,

594 (5th Cir. 2003); *Allstate Life Ins. Co. v. Linter Group Ltd*., 994 F.2d 996, 999 (2d Cir. 1993).

Judgments of the courts of England are particularly respected and, absent certain narrow public

policy considerations, English judgments must be recognized.  *See Society of Lloyd's v. Turner*,

303 F.3d 325, 330-31 (5th Cir. 2002); *Society of Lloyd's v. Ashenden*, 233 F.3d 473, 476-77 (7th

Cir. 2000); *Society of Lloyd's v. Edelman*, 2005 WL 639412, at *3 (S.D.N.Y., March 21, 2005).

Applying these principles, a Texas court would likely apply English principles of

collateral estoppel (or "issue estoppel" as it is known in England) in determining the preclusive

effect to be given to the WestLB Judgment in the present action.  In any event, as discussed

below, regardless of whether this Court applies English principles of issue estoppel, or Texas or

New York principles of collateral estoppel, the same result is reached – the WestLB Judgment

should be given preclusive effect, barring Plaintiffs' claims in this action.

**B.      The Elements of Collateral Estoppel, or Issue Estoppel, Are Satisfied Here**

Under English law, the following five requirements must be met for issue

estoppel to be applied:

1.  the question raised in the proceeding in which the estoppel is sought must
    be the same question answered in the prior judgment;

2.  the determination of that question in the prior judgment must have been a
    necessary step in the decision in the prior case though it need not have
    been directly the point in issue;

3.  the prior judgment must have been a judicial one pronounced by a tribunal
    with jurisdiction over the parties and the subject matter;

---

[7]      *See, e.g., Kim v. Co-op. Centrale Raiffeisen-Boerenleebank B.A*., 364 F.Supp.2d 346, 349 (S.D.N.Y. 2005);
*Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270, 274-75 (N.Y. 1970); *Guidi v. Hoffman*, 95 Civ. 9006, 2002 U.S.
Dist. LEXIS 14833, at *11 (S.D.N.Y. Aug. 12, 2002); *Voreep v. Tarom Romanian Air Transp.*, 96 Civ.
1384, 1999 WL 311811, at *3-4 (S.D.N.Y. May 18, 1999).

4.    the prior judicial decision must have been final and on the merits; and

5.    the parties in the proceeding in which the estoppel is sought must be the same parties that participated in the prior litigation, or the privies of these parties.

Swallow Decl., ¶¶ 5-6;[8] *Carl Zeiss Stiftung v. Rayner & Keeler Ltd*., 1 A.C. 853, 935 (H.L. 1966) (opinion of Lord Guest) (Tab 3 hereto); Spencer Bower, Turner & Handley, *The Doctrine of Res Judicata*, at paragraph 19 and chapter 7 (3rd ed., 1996) (Tab 8 hereto).

The requirements for collateral estoppel are substantially similar under New York and Texas law, and would lead to the same result here. *Camperlengo v. Barell*, 78 N.Y.2d 674, 680 (N.Y. 1991) ("[T]he elements of collateral estoppel [are] an identity of the issue[s] necessarily decided in the prior action or proceeding and a full and fair opportunity to contest the decision now said to be controlling."); *Latino Officers Ass'n v. City of New York*, 253 F. Supp. 2d 771, 783 (S.D.N.Y. 2003) ("Under New York law, issue preclusion precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.  Furthermore, the party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the first proceeding."); *Wilhite v. Adams*, 640 S.W.2d 875, 876 (Tex. 1982) ("Under a plea of collateral estoppel, essential issues of fact determined and adjudged by a court of competent jurisdiction are binding in a subsequent

---

[8]    Richard Swallow is an English solicitor who represented JPMC in connection with the WestLB Action. His declaration, submitted herewith, addresses the standard for issue estoppel under English law.  Courts routinely consider affidavits of foreign attorneys in evaluating questions of foreign law.  *See* Rule 44.1 of the Federal Rules of Civil Procedure ("The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."); *Varnelo v. Eastwind Transp.*, 02 Civ. 2084, 2003 U.S. Dist. LEXIS 1424, at *56 (Feb. 3, 2003 S.D.N.Y.) ("[T]he substance of any relevant foreign law is usually established through expert affidavits or declarations."); *United States v. Shahani-Jahromi*, 286 F. Supp. 2d 723, 726 (E.D. Va. 2003); *Sphere Drake Ins., Ltd., v. All Am. Life Ins. Co.*, 221 F. Supp. 2d 874, 884 (N.D. Ill. 2002); *Neptune Orient Lines v. Halla Merchant Marine Co.*, No. 97-3828 SECTION K(2), 1998 U.S. Dist. LEXIS 3745, at *8 (Mar. 20, 1998 E.D. La.).

action between the same parties and those who stand in privity with them.") (citing *Kirby Lumber Corp. v. Southern Lumber Co.*, 196 S.W.2d 387, 388 (1946)); *see also Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 521 (Tex. 1998).

        **(1)**       **The Same Question Was Necessarily Decided**

        Plaintiffs' claims in this lawsuit are rooted in their contention that the JPMC Prepays were accounted for improperly. All of Plaintiffs' contentions about the supposedly improper accounting for the JPMC Prepays were raised by WestLB in the WestLB Action, and were roundly rejected by the English High Court. The following table illustrates how each of the central contentions in the present action was determined against WestLB in the WestLB Judgment:

| COMPARISON OF PLAINTIFFS' ALLEGATIONS IN THIS ACTION AND THE FINDINGS IN THE WESTLB JUDGMENT | |
| --- | --- |
| **Allegations in Present Action** | **WestLB Judgment** |
| **Allegation:** "From December 1992 through September 2001, Defendant JPMorgan Chase Bank structured twelve secret loans disguised as prepay transactions, knowing that Enron would improperly (and in violation of GAAP) report the loan proceeds as operating cash flow and would improperly (and in violation of GAAP) fail to report the repayment obligations as debt." Compl. ¶ 51. | **Finding:** "I also take the view that ENAC was justified in treating the ENAC/Mahonia Swap as an energy trading contract and the ENAC/Chase Swap as a derivative so that both were accounted for on ENAC's balance sheet as price risk management assets or liabilities. . . . Thus ENAC was justified in giving the prepays 'non debt' treatment on its Balance Sheet and accounting for them as Price Risk Management Activities..." WestLB Judgment ¶ 221. |

| COMPARISON OF PLAINTIFFS' ALLEGATIONS IN THIS ACTION AND THE FINDINGS IN THE WESTLB JUDGMENT | |
| --- | --- |
| **Allegations in Present Action** | **WestLB Judgment** |
| **Allegation:** "The JPMC Defendants knew that the Mahonia transactions were actually loans to Enron..."  Compl. ¶ 55.<br><br>"Accordingly, the JPMC Defendants also knew that Enron should have recorded the Mahonia transactions (but did not record them) as debt under GAAP.  The JPMC Defendants also knew that Enron reported the proceeds it received in violation of GAAP as cash provided by operating activities rather than as cash provided by financing activities."  Compl. ¶ 55. | **Finding:**  Enron "was justified in giving the prepays 'non debt' treatment on its Balance Sheet and accounting for them as Price Risk Management Activities."  WestLB Judgment ¶ 221.<br><br>Enron "was entitled also to account for cash flows resulting from these Swaps as 'operating cash flows' rather than 'financing cash flows.'"  WestLB Judgment ¶ 222. |
| **Allegation:**  "Defendants knew of these GAAP violations because they resulted directly from numerous transactions that Defendants structured for Enron.  Indeed, Defendants structured these transactions for the very purpose of enabling Enron to understate its true GAAP debt and to overstate its true GAAP operating cash flow."  Compl. ¶ 39. | **Finding:**  "West[LB]'s claims against Chase all fail because Chase was not party to any conspiracy with Enron, whether to devise a transaction to enable Enron wrongfully to account or to mislead West as to the nature of the underlying transaction or the true purpose of the L/C."  WestLB Judgment ¶ 436. |
| **Allegation:**  "Enron's officers … had worked with Defendants to structure the very transactions that these Enron officers and Defendants alike knew were reported on Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements in violation of GAAP."  Compl. ¶ 41. | **Finding:**  "West[LB] cannot succeed in showing that Enron's . . . financial statements had not or would not contain proper accounting treatment of the prepays or disclosure in accordance with GAAP."  WestLB Judgment ¶ 334. |

17

| COMPARISON OF PLAINTIFFS' ALLEGATIONS IN THIS ACTION AND THE FINDINGS IN THE WESTLB JUDGMENT | |
| --- | --- |
| **Allegations in Present Action** | **WestLB Judgment** |
| **Allegation:** "Because of these fraudulent transactions, the JPMC Defendants knew that Enron's December 31, 1999, March 31, 2000, and March 31, 2001 financial statements violated GAAP, drastically understating Enron's true GAAP debt and overstating Enron's true GAAP operating cash flow." Compl. ¶ 53. | **Finding:** "Whilst therefore there may be other ways in which the transactions could properly be accounted, on the evidence before me, I cannot conclude that the accounting treatment actually adopted was contrary to GAAP." WestLB Judgment ¶ 228. |
| **Allegation:** "The JPMC Defendants also knew that Enron's auditor, Arthur Andersen LLP ("Andersen"), did not understand the true nature of the Mahonia transactions. In fact, the JPMC Defendants actively assisted Enron in making misleading representations to Andersen so that Andersen would approve Enron's non-GAAP accounting for the transactions." Compl. ¶ 57. | **Finding:** "Chase . . . at all times considered that Enron's past accounting and proposed accounting for the prepays… was lawful and conducted in accordance with responsible advice from experienced and able accountants." WestLB Judgment ¶ 435. |
| **Allegation:** "The JPMorgan Chase Defendants [and the Citigroup Defendants] and Enron conspired to accomplish an unlawful objective, *i.e.* to defraud Enron's investors and lenders, including the Lenders, by falsifying Enron's financial condition." Compl. ¶¶ 240, 241. | **Finding:** "Equally, West[LB] cannot show that Chase (or Mahonia) conspired with Enron to put together a transaction in circumstances where they knew that Enron would account wrongfully for it. There was therefore simply no agreement or combination that Enron should take unlawful action and no unlawful action actually taken in any event. Whether the allegation is expressed as an agreement, a combination, a conspiracy, a plan, a scheme, an understanding, a joint enterprise or a common purpose to account wrongfully, there is no basis in fact for it." WestLB Judgment ¶ 354. |
| **Allegation:** "Andersen believed that Mahonia was an independent entity but, in reality, Defendant JPMorgan Chase Bank had established and controlled Mahonia from its inception." Compl. ¶ 57. | **Finding:** "I find that Mahonia was independent of Chase." WestLB Judgment ¶ 58. |

18

As is evident from the foregoing, Plaintiffs' claims in this action are a repeat of WestLB's allegations in the WestLB Action.  Moreover, the conclusions of the WestLB Court concern the central matters disputed in the WestLB Action and were, therefore, plainly necessary to that Court's decision.  Thus, under English law of issue estoppel, as well as New York and Texas law of collateral estoppel, Plaintiffs are precluded from raising in the present action the very same issues that were raised and necessarily decided in the WestLB Judgment.  *See* Swallow Decl., ¶¶ 5-7; *Carl Zeiss Stiftung*, 1 A.C. at 935 (Tab 3 hereto); *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 327 (1979); *Wilhite v. Adams*, 640 S.W.2d 875, 876 (Tex. 1982); *Kulak v. City of New York*, 88 F.3d 63, 71-72 (2d Cir. 1996); *Camperlengo*, 78 N.Y.2d at 680.

### (2)    The Prior Decision Involved The Same Parties or Their Privies

The parties to the WestLB Action were JPMorgan Chase Bank, Mahonia Ltd. and WestLB.  In the present action, Plaintiffs seek to stand in the shoes of WestLB as assignees, and thus are treated under English law, as well as Texas and New York law, as "privies" of WestLB, meaning that the WestLB Judgment has the same preclusive effect in this action as if WestLB were bringing the lawsuit in its own name.

Under English law, issue estoppel applies not only to the actual parties to the prior litigation, but also to their privies, which includes assignees.  As the English Court of Appeal recently confirmed, "[i]n English law, *res judicata* estoppels operate for or against not only the parties, but those who are privy to them in interest, and privies include any person who is identified in estate or interest, and accordingly '*assignees will be bound as privies of the assignor.*'"  *Kolden Holdings Ltd v Rodette Commerce Ltd* [2008] 1 C.L.C. 1 at 25-26 (emphasis added) (Tab 9 hereto); Swallow Decl. ¶ 7.

The same is true under Texas and New York collateral estoppel law.  *See Benson v. Wanda Petroleum Co.* 468 S.W.2d 361, 363 (Tex. 1971) (collateral estoppel binds "a party

19

and those in privity with him"); *Buechel v. Bain*, 97 N.Y.2d 295, 316-17 (N.Y. 2001) (holding that privity exists for the purposes of applying collateral estoppel where the nonparty's rights are "derivative of the rights of the party to the prior litigation"); *D'Arata v. New York Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d 659, 665 (N.Y. 1990) (holding that "plaintiff 'stands in the shoes' of the insured and can have no greater rights than the insured," and that "[p]laintiff, by proceeding directly against defendant, does so as subrogee of the insured's rights and is subject to whatever rules of estoppel would apply to the insured").

Moreover, as discussed above (*See* Argument, Sect. II), under hornbook law governing assignments, an assignee takes their claims subject to the same defenses as would apply to the assignor, such that principles of collateral estoppel and issue estoppel apply here equally as if WestLB were the plaintiff in the present action.

**(3)    The Prior Decision Was Final And Was Rendered By A Court With Jurisdiction**

The other requirements for issue estoppel under English law are (i) that the earlier judicial decision is final, and (ii) that the court which rendered the earlier decision had jurisdiction over the parties and the subject matter.  Swallow Decl., ¶¶ 5-6; *Carl Zeiss Stiftung*, 1 A.C. at 935 (Tab 3 hereto).  These requirements are clearly satisfied by the WestLB Judgment.

A final judgment has been issued in the WestLB Action.  *See* WestLB Judgment (captioned as "Approved Judgment").  The decision will remain final, pursuant to an order of the High Court of October 22, 2004 whereby WestLB consented that it "shall not make any application to the Court to appeal, or for permission to appeal, in respect of any aspect of the proceedings [in the WestLB Action]."  *See* Swallow Decl., ¶ 8.  Thus, there is no question that this requirement is satisfied and that the WestLB judgment is final.

Finally, it cannot reasonably be disputed that the WestLB Court had jurisdiction over the parties and the subject matter in the WestLB Action.  WestLB raised no objection to the Court's jurisdiction and, in fact, asserted several causes of action as counterclaims that were all thoroughly analyzed and rejected by the Court.  WestLB Judgment ¶ 8.

\*       \*       \*

As all of the elements of issue estoppel or collateral estoppel are present in the instant case, Plaintiffs, standing in the shoes of WestLB, are estopped from relitigating issues that WestLB had a full and fair opportunity to litigate, and did in fact litigate and lose, in proceedings before the English High Court.

21

## <u>CONCLUSION</u>

For all the foregoing reasons, JPMC respectfully requests that the Court grant summary judgment in favor of JPMC and against Plaintiffs with respect to all claims in which Plaintiffs seek to stand in the shoes of WestLB.


Dated:  July 11, 2008

                                   Respectfully submitted,


                                    _/s/  Thomas C. Rice_____
                                   Thomas C. Rice
                                   David J. Woll
                                   SIMPSON THACHER & BARTLETT LLP
                                   425 Lexington Avenue
                                   New York, NY  10017
                                   Telephone:  (212) 455-2000
                                   Facsimile:  (212) 455-2502
                                   trice@stblaw.com

                                   *Attorneys for Defendants JPMorgan Chase & Co.,*
                                   *JPMorgan Chase Bank, N.A., and J.P. Morgan*
                                   *Securities Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that true and correct copies of the Notice of Motion By Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities, Inc. for Summary Judgment With Respect to Plaintiffs' Claims Based on WestLB Debt, the accompanying Memorandum of Law and the cases and authorities appended thereto, the Statement of Material Facts pursuant to Local Civil Rule 56.1, the Declaration of Richard A. Swallow executed on July 9, 2008, and the Affidavit of Alan C. Turner sworn on July 11, 2008, have been served upon all known counsel of record by ECF notification on this 11th day of July, 2008.

    /s/  Clyte White
Clyte White

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------- X
```
DK ACQUISITION PARTNERS, L.P.,　　　　　：
KENSINGTON INTERNATIONAL LIMITED,　　：
RUSHMORE CAPITAL-I, L.L.C., RUSHMORE　：
CAPITAL-II, L.L.C., and SPRINGFIELD　　　：
ASSOCIATES, LLC.,　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　Plaintiffs, ：　　　Civil Action No. 08 Civ. 0446 (LTS)
　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　v.　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　：
JPMORGAN CHASE & CO., JPMORGAN　　　　：
CHASE BANK, N.A., J.P. MORGAN　　　　　：
SECURITIES, INC., CITIGROUP INC.,　　　：
CITIBANK, N.A. and CITIGROUP GLOBAL　　：
MARKETS, INC. f/k/a Salomon Smith Barney, ：
　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　Defendants.：
```
------------------------------------------------------------- X
```

**APPENDIX OF ENGLISH CASES AND AUTHORITIES**

Tab 1.　　*Thoday v. Thoday* [1964] P. 181 (C.A.)

Tab 2.　　*Thrasyvoulou v. Secretary of State for the Environment* [1990] 2 A.C. 273 (H.L.)

Tab 3.　　*Carl Zeiss Stiftung v. Rayner & Keeler Ltd.* [1967] 1 A.C. 853 (H.L.)

Tab 4.　　*Midland Bank Trust Co., Ltd., v. Green* [1980] Ch. 590

Tab 5.　　*R v Hartington, Middle Quarter Inhabitants* (1855) 4 E. & B. 780

Tab 6.　　*Hoystead v Commissioner of Taxation* [1926] A.C. 155 (J.C.P.C.)

Tab 7.　　*Re Norway's Application (No 2)* [1990] 1 A.C. 723 (C.A.)

Tab 8.　　Spencer Bower, Turner & Handley, *The Doctrine of Res Judicata*, (3rd ed., 1996), ¶ 19 and Ch. 7

Tab 9.　　*Kolden Holdings Ltd v Rodette Commerce Ltd* [2008] 1 C.L.C. 1

**P.**                          PROBATE DIVISION.                          **181**

Such an inspection in the present case would show, and did show, that the applicant for the writ, the appellant, had been a party to, and was bound by, the judgment of Rees J. in 1962 pronouncing in favour of the force and validity of the will and codicil of 1949 and 1951, which, by the indorsement on his proposed new writ, the appellant was seeking again to challenge. The file would also show that, at the time of the 1957 action, the appellant knew of the interest of his mother's estate in the estate of the testatrix, which he alleges in the indorsement on the proposed writ. It would, therefore, be apparent to the registrar that, if the writ were issued, it could immediately be struck out as an abuse of the process of the court. Since, for the reasons given, he was in my view exercising a quasi-judicial function in determining whether the writ should issue or not, it was not in my view necessary for him to go through the barren form of authorising its issue. The court's inherent jurisdiction to prevent abuse of its process attaches at the earliest moment at which an officer of the court is called upon to exercise a judicial discretion. In fact, as he was entitled to, the registrar referred the matter to Faulks J., who exercised the inherent jurisdiction of the court by refusing to allow the writ to issue. I would therefore also dismiss the second appeal.

<div style="margin-left:2em;">

*Appeals dismissed with costs, payable by the appellant personally together with the costs reserved by Faulks J.*
*Leave to appeal to House of Lords refused.*

</div>

Solicitors: *Baker & Nairne.*

                                                            C. J. E.

C. A.
1964

LANGTON,
DECD., *In the Estate of.*

Diplock L.J.

---

THODAY *v.* THODAY.

*Estoppel—Per rem judicatam—Divorce—Desertion plea after cruelty suit—Wife's cruelty petition dismissed—Similar allegations raised as defence to husband's desertion petition—Whether wife estopped from repeating cruelty allegations — Application to strike out — Principles applicable.*
*Husband and Wife — Divorce — Pleading — Striking out — Estoppel — Desertion plea after dismissal of cruelty suit.*

In December, 1959, a wife petitioned for a divorce on the ground of the husband's cruelty throughout their matrimonial life

C. A.
1963
Dec. 17,
18, 19.

Willmer,
Pearson and
Diplock L.JJ.

182                      PROBATE DIVISION.                **[1964]**

from 1937 until the wife left the husband shortly before the presentation of the petition. At the trial in January, 1961, the husband did not go into the witness box, his counsel electing to stand upon a submission that the wife had not made out a case of cruelty. In a reserved judgment in March, 1961, Collingwood J. accepted that submission and dismissed the wife's petition, holding that he was not prepared to find the charge of cruelty proved, particularly having regard to the absence of satisfactory evidence as to injury to the wife's health.

In December, 1962, the husband presented a petition for divorce on the ground of desertion, an essential part of his pleaded case being that there were frequent arguments over domestic matters leading to the wife's departure from the matrimonial home in December, 1959. In two paragraphs of her answer, the wife put forward a plea of just cause for leaving and also of constructive desertion and she included a cross-prayer on the ground of such desertion. The wife's particulars, relating only to 1959, covered a good deal of the ground which had been traversed in her cruelty petition but went substantially beyond those allegations. Hewson J., varying an order of the registrar, ordered that the two paragraphs be struck out on the ground that they were substantially the same allegations as those which the wife had put forward in her previous unsuccessful suit and he granted the wife leave to amend her answer so as to plead to the charge of desertion by putting forward such allegations as were not covered by the previous decision. On appeal by the wife:—

*Held,* allowing the appeal, that the power to strike out a pleading was only to be exercised in a plain and obvious case and that as the allegations in the paragraphs of the wife's answer which had been ordered to be struck out raised new issues of just cause for separation and constructive desertion which had not been decided in the previous suit, there was no estoppel per rem judicatam.

*Dixon* v. *Dixon* [1953] P. 103; [1953] 2 W.L.R. 748; [1953] 1 All E.R. 910 and *Fisher* v. *Fisher* [1960] P. 36; [1959] 3 W.L.R. 471; [1959] 3 All E.R. 131, C.A. applied.

*Per* Willmer L.J. Unless the wife is permitted to put forward these allegations, the court will not be able properly to perform its statutory duty to inquire into the facts alleged by the husband. The husband will not be precluded at the trial from contending that this or that allegation is one which the wife ought not to be allowed to make (post, p. 194).

*Per* Diplock L.J. I do not think that any estoppel in its common law concept arises in the present case. The particular type of estoppel relied upon by the husband is estoppel per rem judicatam. But " issue estoppel " must not be confused with " fact estoppel " which, although a species of " estoppel in pais," is not a species of estoppel per rem judicatam (post, pp. 197, 198).

APPEAL from Hewson J.

The following statement of facts is taken substantially from the judgment of Willmer L.J. The parties were married on

**P.**                         PROBATE DIVISION.                         183

C. A.

1963

THODAY
*v.*
THODAY.

January 9, 1937.  On December 16, 1959, the wife, Sheila Alice
Thoday, presented a petition on the ground of the cruelty of her
husband, Alfred George Thoday.   That petition alleged cruelty
on the part of the husband persisting throughout the whole period
of the matrimonial life from the date of the marriage in 1937
right up to the end of 1959, when it was common ground that
the wife left the husband.  It was a long petition, but most of
the allegations of cruelty arose out of the relations between the
parties during the earlier part of the marriage and also
between the parties and the wife's parents, with whom there
was apparently a good deal of friction.  In addition to the allega-
tions relating to that earlier period, there were certain allegations
relating to the last year during which the parties cohabited,
namely, 1959.  Those allegations could be summarised quite
briefly under two heads.  First, there was a general allegation of
abuse on the part of the husband; and secondly it was alleged
that on certain occasions which were particularised by date,
the husband was guilty of physical violence of one sort or another
towards the wife.  The answer filed on behalf of the husband to
the wife's petition for cruelty consisted of a plain denial.

The case was tried by Collingwood J. in January, 1961.  The
wife gave evidence, and certain supporting witnesses were called
on her behalf.   The husband did not go into the witness-box, but
his counsel elected to take his stand on a submission that the
wife by her own evidence and that called on her behalf had not
made out any case of cruelty.  The judge reserved his judgment
and delivered it on March 13, 1961.  By his judgment, Colling-
wood J. accepted the submission put forward on behalf of the
husband.  He gave a long and detailed judgment and one of the
difficulties which he felt was that occasioned by the fact that he
had not heard any evidence from the husband.  In brief sum-
mary, the judge found that the wife was not altogether a reliable
witness; on the other hand, he said that he could not altogether
dismiss her allegations of vulgar abuse of which she alleged the
husband was guilty.  He found, however, that there was no
satisfactory evidence of injury or apprehended injury to the wife's
health arising therefrom.  With regard to the allegations of
violence, the judge did not in terms reject any of the wife's
evidence in relation thereto, although he said that the violence
alleged had to be viewed in the light of the mounting dissension
and quarrels between the parties, which were clearly a feature
of the matrimonial life during the last few months of the cohabi-
tation.  For those quarrels and that dissension between the

184                        PROBATE DIVISION.                **[1964]**

C. A.

1963

THODAY
*v.*
THODAY.

parties he thought the wife was herself in part responsible; but he also thought that the husband's conduct, as disclosed by the evidence of the wife, was certainly reprehensible. He was not, however, prepared to find the charge of cruelty proved, and he reached that conclusion more particularly having regard to the absence of satisfactory evidence as to injury to the wife's health.

That petition having been dismissed in 1961, the husband presented a new petition on December 28, 1962, on the ground of desertion. Although it was common ground that the wife did in fact leave the husband at the end of 1959, the husband did not base his petition on a simple act of desertion constituted by the departure of the wife but gave particulars, saying: " Until "about 1961, the petitioner was serving as an officer in the Royal "Navy. During 1959, the respondent was unable to adjust "herself to the petitioner residing permanently at home, and " arguments over domestic matters became increasingly frequent " until the respondent left the matrimonial home on December " 5, 1959, since when she has never returned, in spite of many " efforts on the part of the petitioner to effect a reconciliation."

By her answer dated March 23, 1963, the wife put forward pleas of just cause for separation and also included a cross-prayer on the ground of constructive desertion. Very lengthy particulars were given of the wife's allegations in support of those pleas which related only to the last year of cohabitation, namely, 1959.

The husband applied by summons to strike out the paragraphs in the wife's answer which alleged just cause for separation and constructive desertion. On May 10, 1963, Mr. Registrar Russell ordered that the husband's application be dismissed. On appeal from the registrar's order, Hewson J. on October 25, 1963, ordered that two paragraphs in the wife's answer should be struck out on the ground that they were substantially the same as the allegations which she had previously put forward in support of her earlier unsuccessful petition on the ground of cruelty, the wife being granted leave to amend her answer so as to enable her to plead to the charge of desertion and to put forward such allegations as were not covered by the previous decision in the cruelty case.

The wife appealed on the ground, inter alia, that she should not be held to be estopped per rem judicatam from relying upon the matters set forth in the particulars of the two paragraphs of her answer which had been ordered to be struck out.

*B. J. Wakley for* the wife. The remedy of striking out a

P.    PROBATE DIVISION.    185

pleading should only be exercised in plain and obvious cases. This is not such a case. As between the parties, the wife ought not to be estopped because this is not a case of failed cruelty in the proper sense of the term. Collingwood J. only heard one party and his findings were not clear cut. The issue of just cause for leaving and expulsive words were not dealt with by Collingwood J. No estoppel binds the court, which could not do its duty under section 4 of the Matrimonial Causes Act, 1950, unless the wife were allowed to present her case.

*Waters* v. *Waters* [1] shows that it is preferable for both sides to be heard. *Edwards* v. *Edwards* [2] shows that conduct short of cruelty may amount to constructive desertion. As to striking out, see *Dixon* v. *Dixon*,[3] *Foster* v. *Foster*,[4] *Bright* v. *Bright*,[5] *Hill* v. *Hill* [6] and *Thompson* v. *Thompson*.[7] Strong reliance is placed on *Cooper* v. *Cooper (No. 2)*.[8] [Reference was also made to *Fisher* v. *Fisher*,[9] *Warren* v. *Warren*,[10] *Bohnel* v. *Bohnel (No. 2)* [11] and *Laws* v. *Laws*.[12]] This is not a plain and obvious case. It is not a case of estoppel inter partes.

*G. H. Crispin Q.C.* and *Peter Coni* for the husband. The court should be slow to allow matters to be ventilated a second time at the husband's expense. The wife here is seeking to dress up cruelty under another name; see *Pike* v. *Pike*.[13] Reliance is placed on what Denning L.J. said in that case.[14] The wife calls the husband's conduct constructive desertion, but it is really an allegation of cruelty and the answer is objectionable because the matters have already been dealt with. Hewson J. gave leave to amend it.

*Wakley* in reply. What is now alleged is not cruelty, but just cause for leaving and constructive desertion. In *Timmins* v. *Timmins* [15] the manifestation of bad temper was not cruelty, but it did amount to just cause for separation.

---

[1] [1956] P. 344; [1956] 2 W.L.R. 661; [1956] 1 All E.R. 432, D.C.
[2] [1950] P. 8; 65 T.L.R. 419; [1949] 2 All E.R. 145, C.A.
[3] [1953] P. 103; [1953] 2 W.L.R. 748; [1953] 1 All E.R. 910.
[4] [1954] P. 67; [1953] 3 W.L.R. 623; [1953] 2 All E.R. 518, D.C.
[5] [1954] P. 270; [1953] 3 W.L.R. 659; [1953] 2 All E.R. 939.
[6] [1954] P. 291; [1954] 2 W.L.R. 473; [1954] 1 All E.R. 491.
[7] [1957] P. 19; [1957] 2 W.L.R. 138; [1957] 1 All E.R. 161, C.A.

[8] [1955] P. 168; [1954] 3 W.L.R. 923; [1954] 3 All E.R. 358, D.C.
[9] [1960] P. 36; [1959] 3 W.L.R. 471; [1959] 3 All E.R. 131, C.A.
[10] [1962] 1 W.L.R. 1310; [1962] 3 All E.R. 1031.
[11] [1964] 1 W.L.R. 179; [1963] 2 All E.R. 325.
[12] [1963] 1 W.L.R. 1133; [1963] 3 All E.R. 398, C.A.
[13] [1954] P. 81; [1953] 3 W.L.R. 634; [1953] 1 All E.R. 232, C.A.
[14] 1954] P. 81, 88.
[15] [1953] 1 W.L.R. 757; [1953] 2 All E.R. 187, C.A.

C. A.

1963
———
THODAY
*v.*
THODAY.
———
.

WILLMER L.J.   This is an appeal from an order made in chambers by Hewson J. on October 25, 1963, whereby he varied an order previously made by Mr. Registrar Russell and struck out certain paragraphs of the answer filed on behalf of a wife in a suit instituted by her husband for divorce on the ground of desertion.   The two paragraphs in question were paragraphs which raised, first, a plea of just cause for the separation, and secondly, an allegation of constructive desertion.   On the basis of the latter, the wife herself sought to cross-pray for relief.   The ground on which the judge made the order was that the allegations put forward in support of the plea of just cause and of the cross-charge of constructive desertion were substantially the same as allegations which had previously been put forward by the wife in support of an earlier unsuccessful petition instituted by her for divorce on the ground of cruelty.   The judge, however, in making the order striking out what he regarded as the offending paragraphs, did grant leave to the wife to amend her answer, so as to enable her to plead to the charge of desertion made, and to put forward such allegations as were not covered by the previous decision in the cruelty case.

[His Lordship stated the facts substantially as stated above, said that none of the allegations in the wife's original cruelty petition which related to the relations between the parties during the earlier part of the marriage or between the parties and the wife's parents was in the least relevant to the present application, stated that he read the husband's particulars of desertion in his petition of December 28, 1962, as going to show that it was an essential part of the husband's case that there were frequent arguments over domestic matters which led to the departure of the wife in December, 1959, observed that the judge had clearly found the case one of some difficulty, and continued:] The answer of the wife, which is the subject of the present application, is dated March 23, 1963, and I mean no offence to counsel who settled its terms when I say that it is an immensely long and comprehensive document.   The substance of it, as I have already indicated, is that the wife puts forward a plea of just cause and also includes a cross-prayer on the ground of constructive desertion.   The allegations which she makes in support of those pleas relate only to the last year of cohabitation, namely, 1959.   Very lengthy particulars are given, and they cover a good deal of the same ground as had been traversed in the petition for cruelty to which I have already referred.   But the particulars of the answer to the present petition do go a good deal beyond what

**P.**             PROBATE DIVISION.                    187

C. A.

1963

THODAY
v.
THODAY.

Willmer L.J.

had been alleged in the previous petition for cruelty. Elaborate particulars are given with regard to the quarrels between the parties during the last year of cohabitation. In substance the wife's case appears to be that the husband was a man who gave way to frequent outbursts of quite uncontrollable temper. This, she says, led to intolerable abuse of her on his part, to unfounded charges against her, and to unkind behaviour of one sort or another. It is said that on a number of occasions in his tempers he told her to " clear out " or to " get out "—allegations, of course, which are not without their importance in a suit for desertion. But in addition, amongst all the other allegations put forward in the wife's particulars, she relies also on the same alleged incidents of violence which had been included in the previous petition for cruelty.

It is now said on behalf of the husband that those paragraphs in the answer to which objection is taken amount in effect to an attempt to re-litigate matters which have already been the subject of judicial decision by Collingwood J. in the previous suit. On that ground it is claimed that the two offending paragraphs should be struck out in limine, so that the wife should be precluded from raising the same allegations again. Mr. Crispin, who appeared for the husband, has not suggested that the wife should not be allowed to defend herself against the charge of desertion laid against her. In inviting us to dismiss the appeal, he has said that what he really asks for is that the offending paragraphs and the particulars thereunder should be struck out, but that, as ordered by the judge, the wife should be free to amend her answer by giving such particulars of just cause and such particulars of constructive desertion as can fairly be said not to be covered in any way by the previous decision.

It is, I think, an elementary proposition that the somewhat drastic remedy of striking out a pleading—which is, of course, governed in matrimonial suits, as in any other, by the provisions of R.S.C., Ord. 25, r. 4—is one which is only to be resorted to in plain and obvious cases. I would say at once that, for my part, I am not satisfied that this is such a case. But I venture to emphasise that we are dealing at the present stage only with the matter of pleadings. No decision which we arrive at on this appeal can be taken to preclude the husband from contending at the trial, if he is so advised, that the wife should be precluded from raising this or that particular allegation.

The subject with which we are dealing is one which has arisen in quite a considerable number of cases during recent years

PROBATE DIVISION.           **[1964]**

C. A.

1963

THODAY
*v.*
THODAY.

Willmer L.J.

in connection with matrimonial causes. The common case is the case, such as arises here, where it is sought, in putting forward a plea of just cause or of constructive desertion, to rely on matters which have previously formed the subject of an unsuccessful petition or answer based on cruelty. Most, I think, of the relevant cases have been cited to us in the course of the very interesting argument to which we have listened. I shall have occasion to mention most of them, although I do not think it is necessary to deal with them in detail. It can, I think, be said straight away that the decisions which have been referred to go both ways. In some cases orders have been made striking out offending paragraphs of pleadings; in other cases such orders have been refused. The reason for that, I think, is well expressed in a remark made by Scarman J. in the course of giving his judgment in the recent case of *Warren* v. *Warren*,[1] which was one of the cases cited to us. In the course of his judgment in that case he said[2]: " I would add that only a detailed analysis " of the issue sought to be raised, of the issue raised previously " whose judicial determination is the res judicata relied on, of " the pleadings under challenge, and of the judgment of the " court which is the basis of the challenge, can reveal in any " given case whether an estoppel arises or not." That means to say—and I think it is right to say—that every case must be looked at in the light of its own particular facts and in the light of the particular allegations made in the new and in the old petitions.

Certain general principles, however, do appear to me to emerge from the cases, and these I will endeavour to summarise as briefly as possible. First, it is generally true to say that in matrimonial causes, as in other causes, the maxim " Nemo debet " bis vexari pro una et eadem causa " applies. In other words, parties to a matrimonial cause are subject to the ordinary rule as to estoppel per rem judicatam; but that is qualified to this extent, that the rule cannot be invoked so as to preclude the court from discharging the statutory duty laid upon it under section 4 of the Matrimonial Causes Act, 1950, which requires the court to inquire, so far as it reasonably can, into the facts alleged, and also to inquire into any countercharge which is made against the petitioner. That proposition is, I think, established by the decision of this court, or at any rate of two members of this

---

[1] [1962] 1 W.L.R. 1310; [1962]    [2] [1962] 1 W.L.R. 1310, 1313.
3 All E.R. 1031.

**P.**                    PROBATE DIVISION.

court, in *Thompson* v. *Thompson*.[3]  As I read their judgments, both Denning L.J.[4] and Morris L.J.[5] agreed[6] in stating the principle substantially as I have sought to set it out.  The same principle was followed in a recent decision of this court in *Laws* v. *Laws*.[7]  In the *Thompson* case[8] Denning L.J. expressed himself thus[9]: " The question in this case is, however, whether those " ordinary principles do apply to the Divorce Division.  The " answer is, I think, that they do apply, but subject to the " important qualification that it is the statutory duty of the " divorce court to inquire into the truth of a petition—and of " any countercharge—which is properly before it, and no doctrine " of estoppel by res judicata can abrogate that duty of the court." A little later he went on[9]: " Whether the divorce court should " reopen the issue depends on the circumstances.  If the court " is satisfied that there has already been a full and proper inquiry " in the previous litigation, it will often hold that it is not " necessary to hold another inquiry all over again: but if the " court is not so satisfied, it has a right and a duty to inquire " into it afresh.  If the court does decide to reopen the matter, " then there is no longer any estoppel on either party.  Each can " go into the matter afresh."

Secondly, in a case where the cause of action or the plea in defence in the second action is precisely the same as has been raised in the previous case, and where that has been the subject of a full examination and adjudication in the previous case, the party seeking to re-litigate the matter will normally be held to be estopped.  That was the ground on which this court thought it right to strike out the relevant paragraphs of the pleading in *Holland* v. *Holland*.[10]  In that case there had been a petition for divorce brought by a wife on the ground of cruelty.  The husband denied the charges and cross-prayed for a decree of restitution, and in reply to that plea the wife relied upon her charges of cruelty as amounting to just cause.  The wife's petition was dismissed, and the husband's cross-prayer rejected on the ground that he was wanting in sincerity.  Subsequently, there was a petition by the husband for divorce on the ground of desertion, and by her answer to that petition the wife alleged just cause and

[3] [1957] P. 19; [1957] 2 W.L.R. 138; [1957] 1 All E.R. 161, C.A.
[4] [1957] P. 19, 28.
[5] Ibid. 40.
[6] Ibid. 29, 41.

[7] [1963] 1 W.L.R. 1133; [1963] 3 All E.R. 398, C.A.
[8] [1957] P. 19.
[9] Ibid. 29.
[10] [1961] 1 W.L.R. 194; [1961] 1 All E.R. 226, C.A.

C. A.

1963

THODAY
*v.*
THODAY.

Willmer L.J.

put forward a cross-prayer for divorce on the ground of constructive desertion. The matters relied on were precisely the same matters as had been relied on in the previous petition for cruelty, and as had been relied on in that earlier case as constituting just cause. In those circumstances this court held that the wife's plea in the second action was an attempt to re-litigate precisely the cause of action which had been adjudicated upon in the previous case.

As I understand the decision, *Warren* v. *Warren*,[11] to which I have already referred, comes under the same principle. I make that observation because of the way in which Scarman J. expressed himself in his judgment. He said[12]: " if, upon a " comparison of the two charges and an analysis of the judgment " of the court dismissing the cruelty charges, it is plain that in " the subsequent proceedings the spouse alleging expulsive con- " duct or just cause is in truth putting forward her failed case of " cruelty as being expulsive or just cause because it was cruel, " she ought, in my opinion, and having regard to what I believe " to be the principles in these matters, to be estopped from so " doing. An examination of the particulars delivered in this suit " clearly shows that in so far as they cover the same charges as " were the subject of the litigation before Marshall J., they can " be expulsive conduct only if they were cruel treatment." In other words, he was taking the view that the plea in the second case was precisely the same as that which had been dealt with in the previous suit.

But thirdly, where the cause of action or plea in defence in the second suit is different from that put forward in the earlier suit, then it can be said that the res which was the subject of the previous adjudication is not the same res, and in such circumstances a party will not normally be held to be estopped from raising the plea. That, as I understand it, was the view of two of the members of this court, Hodson and Morris L.JJ., in *Thompson* v. *Thompson*,[13] to which I have already referred. It was also the basis of the decision in *Fisher* v. *Fisher*,[14] which, as I will presently seek to show, seems to me to be the case which of all the cases cited is most in point in the present case. It was, I think, also the ground for the decision in the recent

[11] [1962] 1 W.L.R. 1310.
[12] Ibid. 1314.
[13] [1957] P. 19, 36, 40.

[14] [1960] P. 36; [1959] 3 W.L.R. 471; [1959] 3 All E.R. 131, C.A.

**P.**              PROBATE DIVISION.                        191

case before Cairns J. of *Bohnel* v. *Bohnel* (*No. 2* ).[15]  In this con-
nection I think it useful also to refer to the two Divisional Court
cases to which we have been referred in the course of the argu-
ment, namely, *Foster* v. *Foster* [16] and *Cooper* v. *Cooper* (*No. 2*),[17]
both of which seem to me to proceed upon the same principle.

Fourthly, however, apart from cases in which the same cause
of action or the same plea in defence is raised, there may be
cases in which a party may be held to be estopped from raising
particular issues, if those issues are precisely the same as issues
which have been previously raised and have been the subject of
adjudication.  But, in formulating that proposition, I would go
on to say that it is very necessary to look at the particular circum-
stances of the individual case.  The reason for saying that is that
the adjudication in the previous suit may have been arrived at for
a number of different reasons.  If it is not clear from the judg-
ment in the previous suit that the particular issue has in fact
been specifically dealt with, a party will not be held to be estopped
from raising that issue again in a subsequent suit.  That is what
happened in *Dixon* v. *Dixon*.[18]  If, on the other hand, particular
issues have been the subject of specific adjudication, much may
depend upon how they were dealt with.  For this purpose I take
the case (which is the case here) where issues which were raised
for the first time in relation to a cruelty charge are raised again
in the second suit in relation to a desertion charge.  It is, I think,
clear that, if the previous adjudication went on the basis that the
party raising the issues was not a credible witness, so that the
court could not be satisfied that the events complained of had
ever taken place, then that party should not be allowed to raise
those issues or that issue again.  Similarly, if the charges made
in the previous petition were dismissed on the ground that they
were not such as to show any conduct of a grave and weighty
nature, and for that reason did not amount to cruelty, equally it
should not be permissible to raise them in a subsequent suit for
desertion, either as showing just cause or as amounting to con-
structive desertion.  By way of illustration of those propositions,
I would refer to *Bright* v. *Bright*,[19] and *Hill* v. *Hill*,[20] both
decisions at first instance.  On the other hand, it may be

C. A.

1963

THODAY
*v.*
THODAY.

Willmer L.J.

---

[15] [1964] 1 W.L.R. 179; [1963] 2
All E.R. 325.
[16] [1954] P. 67; [1953] 3 W.L.R.
623; [1953] 2 All E.R. 518, D.C.
[17] [1955] P. 168; [1954] 3 W.L.R.
923; [1954] 3 All E.R. 358, D.C.

[18] [1953] P. 103; [1953] 2 W.L.R.
748; [1953] 1 All E.R. 910.
[19] [1954] P. 270; [1953] 3 W.L.R.
659; [1953] 2 All E.R. 939.
[20] [1954] P. 291; [1954] 2 W.L.R.
473; [1954] 1 All E.R. 491.

C. A.

1963

———

THODAY

*v.*

THODAY.

———

Willmer L.J.

———

otherwise if the evidence in support of the allegations has been accepted in the previous proceedings as being substantially truthful and accurate, but the charges are held not to amount to cruelty because of failure to give satisfactory proof of injury or apprehended injury to health. For it is, I think, well established that conduct of a grave and weighty nature, not amounting to cruelty because of failure to give satisfactory proof of injury to health, may yet constitute just cause as a defence to a charge of desertion or may be sufficient to found a charge of constructive desertion. That was the effect of the decision of this court in *Edwards* v. *Edwards*,[21] following the well-known case of *Russell* v. *Russell*.[22] It is also, I think, clearly brought out by another decision of this court, namely, *Timmins* v. *Timmins*,[23] where charges of cruelty were dismissed, but, at the same time and by the same judgment, a decree of restitution was refused, presumably on the basis that, although cruelty was not proved, it was nevertheless held that the party concerned had just cause for remaining separate.

I hope that that brief analysis of the many cases which have been cited to us is substantially correct.

The problem which now arises is to fit this case within the appropriate principle of those which I have sought to set out. As I think I have already indicated, I find this case virtually indistinguishable from *Fisher* v. *Fisher*.[24] In that case there was a petition for cruelty brought by the husband, to which the wife put in an answer whereby she cross-prayed for divorce on the ground of cruelty. Both the petition and the cross-prayer were rejected, although the commissioner who tried the suit found that the wife's allegations were substantially proved. He held, however, that they did not make out a case of cruelty, largely because he was not satisfied on the matter of injury to health. There was then a petition by the husband for divorce on the ground of the wife's desertion. The wife sought to put in an answer denying the desertion and putting forward a cross-prayer on the ground of constructive desertion, and in support of that she relied upon the same allegations which she had made in the previous proceedings in support of her charge of cruelty. She also relied on a further allegation of expulsive conduct. In those circumstances it was held [25]—and I read from the headnote—" that there could be no

[21] [1950] P. 8; 65 T.L.R. 419; [1949] 2 All E.R. 145, C.A.

[22] [1897] A.C. 395; 13 T.L.R. 516, H.L.

[23] [1953] 1 W.L.R. 757; [1953] 2 All E.R. 187, C.A.

[24] [1960] P. 36.

[25] Ibid.

C. A.
1963
THODAY
v.
THODAY.
Willmer L.J.

" estoppel per rem judicatam where the subject-matter of litiga-
" tion in previous proceedings was different, and, since construc-
" tive desertion was a fresh issue not determined in the previous
" proceedings, the wife was entitled to have her allegations heard
" and assessed in the present proceedings." Hodson L.J., in a
full judgment, said, amongst other things [26]: " In the present
" case, I think that it is the duty of the court quite clearly on
" the facts, as I have stated them, to give the wife an opportunity
" of having heard her case on desertion, and her case in so far
"'as it consists of a denial of her husband's allegations of deser-
" tion.  She has so far been deprived of that opportunity by what
" I regard as a misapplication of the rule applicable to res judi-
" cata." Sellers L.J. said [27]: " . . . whatever the right view is on
" that matter, this is a case in which there can be no estoppel
" because, in my view, quite plainly the issue has never been
" tried in any way whatsoever.  The facts should be given con-
" sideration, not as to whether they amount to cruelty, but looked
" at again to see whether they amount to something other than
" cruelty and establish constructive desertion, because it was
" conceded by counsel there is a difference between the two.  It
" is not necessary in order to establish constructive desertion
" that the facts relied on should of necessity amount to cruelty."
Finally, I think it useful to read substantially the whole of Har-
man L.J.'s very brief judgment, because it seems to me to be
very much to the point.  He said [28]: " It seems to me that the
" result of the present case comes largely from a confusion of
" terms.  That is a very potent source of deception and it arises
" here again.  It can be truly said that this wife has made un-
" founded charges of cruelty against her husband; that may mean
" either that the court rejected the facts alleged or that though
" it accepted them, it decided they did not amount to cruelty as
" that word is understood in the Divorce Court.  The second is
" the present case.  It follows that these charges of cruelty may
" not be repeated as such.  That is a very different matter from
" saying that those same facts did not amount to matters relevant
" to an issue of constructive desertion which, as my Lord has
" said, has never been tried at all. It would indeed be an astonish-
" ing result of the confusion in which words can result if the wife,
" on an issue which has never been before the court, were com-
" pelled to be silent about matters which the court has already

[26] [1960] P. 36, 49.          [28] Ibid.
[27] Ibid. 51.

194                         PROBATE DIVISION.                     **[1964]**

C. A.

1963

THODAY
*v.*
THODAY.

Willmer L.J.

" declared she has truly stated.  That she should be kept silent
" even from true words on a new issue is an astonishing plea.
" With all respect to the very energetic argument we have heard,
" I think this court would be landed in an absurdity if we pre-
" vented this wife from telling the truth about her case."

It seems to me that, with very few verbal alterations, those
words which I have quoted could be applied almost exactly to
the circumstances disclosed in the present case.  Here, although
the judge in the first case did not specifically say that he accepted
everything that the wife said, there was certainly no rejection in
terms of the wife's evidence.  It is clear from his judgment that
he came to the conclusion that the wife's allegations did not make
out a case of cruelty largely because he regarded the evidence
of injury to health as being insufficient and unsatisfactory.  In
those circumstances, it seems to me that there could be no good
reason why the allegations put forward by the wife should not be
" looked at again," to quote Sellers L.J.'s phrase,[29] to see
whether they do or do not make out a case of just cause or con-
structive desertion.  Moreover, it seems to me that, unless the
wife is permitted to put forward these allegations, the court will
not be able properly to perform its statutory duty to inquire into
the facts alleged by the husband.  The husband has chosen by
his petition, particulars of which I have already read, to aver
that there were arguments between the parties which he plainly
regards as of material significance in relation to the wife's
departure.  In those circumstances, it must, as I see it, be the
duty of the court to inquire into the causes of those arguments, to
ascertain, if it can, what was the real reason why the wife left,
and, having found the real reason, to consider whether in all the
circumstances it was or was not justifiable.  As I have already
indicated, the husband will not be precluded at the trial from
contending that this or that allegation is one which the wife ought
not to be allowed to make.  We are not deciding any such thing
on the present appeal.  All we are called upon to decide on this
appeal is whether the drastic remedy of striking out the whole of
the two paragraphs, which really constitute the whole of the
effective part of the wife's answer, is one that should be applied
in the present case.  I do not think that it should.  It seems to
me that this is a case in which the wife ought to be allowed to
have her chance of making good, if she can, the case which she
has chosen to plead.

[29] [1960] P. 36, 51.

**P.**                PROBATE DIVISION.                                    195

In those circumstances, the judge, in my view, came to a
wrong conclusion, and I would allow the appeal and restore the
order made by the registrar.
that paragraphs 1 and 3 of the wife's answer dated March 23,
1963, should be struck out.  The application was evidently made
under R.S.C., Ord. 25, r. 4, or Ord. 19, r. 27, as applied to matri-
monial causes by rule 82 of the Matrimonial Causes Rules.  The
ground of the application has been referred to shortly as res
judicata or as an estoppel per rem judicatam.  The contention
involved is that these paragraphs should be struck out as dis-
closing no reasonable answer to the husband's petition, or as being
frivolous or vexatious, because the substantial issue raised by
these paragraphs is the same as an issue already decided against
the wife in previous proceedings between the same parties, and
the issue, having been so decided, should not be allowed to be
re-litigated or re-agitated in the present proceedings.

The power to strike out a pleading or part of a pleading in
this summary way should not be exercised except in a plain and
obvious case: *Dixon* v. *Dixon*,[30] following other decisions under
R.S.C., Ord. 25, r. 4.  In my judgment, the present case is by
no means a plain and obvious case for the exercise of the power.

It is true that the husband's alleged course of conduct in the
year 1959 was part of the cruelty alleged in the former proceed-
ings, and was held not to amount to cruelty; and substantially the
same alleged course of conduct (though described in more detail)
is now relied upon in paragraph 1 of the wife's answer as good
cause for the wife to leave her husband, and in paragraph 3 as
constituting constructive desertion.  It does not necessarily follow
that, because such conduct did not amount to cruelty, therefore
it could not be "good cause" for the wife to leave the husband
or constructive desertion.  The issues are substantially different
in the present case, as they were in *Fisher* v. *Fisher*,[31] and certain
passages have already been cited by my Lord.  In the former
proceedings the question, put very shortly, was whether there
was ill-treatment of the wife by the husband such as to cause or
be likely to cause injury to her health.  In the present proceedings
the question, also put very shortly, is whether the husband's
alleged expulsive words (telling his wife on many occasions to
"get out"), taken in conjunction with the alleged vulgar abuse

[30] [1953] P. 103.                    [31] [1960] P. 36.

196                          PROBATE DIVISION.                **[1964]**

C. A.

1963

THODAY
*v.*
THODAY.

Pearson L.J.

and alleged ill-tempered, offensive and, on some occasions, violent treatment of the wife by the husband was good cause for her to leave him and caused her to do so.

There is thus a genuine new issue, which has not been decided in the previous proceedings and has to be decided in the present proceedings. Accordingly, paragraphs 1 and 3 of the wife's answer should not be struck out.

The judge gave leave for the wife to amend her answer. Mr. Crispin, supporting the decision, contended that the answer should be amended so as to leave in the allegations of expulsive words, but to delete the allegations of ill-treatment which, by reason of the result of the previous proceedings, could be described as "failed cruelty." In my judgment, such amendment is not required in this case and would not be right. The expulsive words are alleged to have been spoken from time to time in the course of the history, and to have been associated with the alleged vulgar abuse and offensive treatment. The words cannot properly be isolated or severed from the rest of the history. The whole history of the husband's treatment of his wife, both by words and by deeds, in the material period should be open to investigation, and there should be no artificial exclusion of particular incidents by reason of their having been considered in relation to the issue of cruelty in the previous proceedings. It is all one continuous history, and should not be split up.

We have had from counsel a full and helpful citation of the many cases which have been decided on this part of the law. The present case, in my view, does not raise any new question of principle, and can, in the light of the authorities, be decided on its own facts as I have stated above.

I would allow the appeal.

DIPLOCK L.J. This case has little to do with the sanctity of marriage. In the ultimate analysis it is a dispute about money, viz., how much money, if any, the husband will have to pay the wife by way of maintenance. The husband and wife are at one in wishing the marriage to be dissolved; but each, on advice, thinks that the financial question will depend upon which, if either, of them succeeds in proving that the other was guilty of a matrimonial offence. Consequently, the dispute comes before us in the exercise of our appellate jurisdiction in divorce. In that jurisdiction the court is required by section 4 of the Matrimonial Causes Act, 1950, to exercise a quasi-inquisitorial function. To such a function it is not easy to adapt the concept of estoppel

inter partes, which was developed under and is consistent only with the adversary system of legal procedure which it is the function of this court to apply except in the exercise of its jurisdiction in divorce.

" Estoppel " merely means that, under the rules of the adversary system of procedure upon which the common law of England is based, a party is not allowed, in certain circumstances, to prove in litigation particular facts or matters which, if proved, would assist him to succeed as plaintiff or defendant in an action. If the court is required to exercise an inquisitorial function and may inquire into facts which the parties do not choose to prove, or would under the rules of the adversary system be prevented from proving, this is a function to which the common law concept of estoppel is alien. It may well be a rational rule to apply in the exercise of such an inquisitorial function to say that if a court having jurisdiction to do so has once inquired into the truth of a particular allegation of fact and reached a decision thereon, another court of co-ordinate jurisdiction in the exercise of its own discretion should not re-embark upon the same inquiry, but should accept the decision of the first court. But this is a different concept from estoppel as hitherto known in English law. It will be interesting to watch its development in future cases, but fortunately it is not, in my view, necessary to develop it in the present appeal. For, whatever this new concept may involve, it would appear from those cases in which it has been adumbrated that it only becomes relevant in cases where, under the old common law concept of estoppel, a party to matrimonial proceedings would be prevented from proving facts or matters which the court, in the exercise of its inquisitorial functions, might regard as relevant to its decision of those proceedings.

I do not think that any estoppel in its common law concept arises in the present case. The particular type of estoppel relied upon by the husband is estoppel per rem judicatam. This is a generic term which in modern law includes two species. The first species, which I will call " cause of action estoppel," is that which prevents a party to an action from asserting or denying, as against the other party, the existence of a particular cause of action, the non-existence or existence of which has been determined by a court of competent jurisdiction in previous litigation between the same parties. If the cause of action was determined to exist, i.e., judgment was given upon it, it is said to be merged in the judgment, or, for those who prefer Latin, transit in rem judicatam. If it was determined not to exist, the unsuccessful

C. A.

1963

Thoday

*v.*

Thoday.

Diplock L.J.

plaintiff can no longer assert that it does; he is estopped per rem judicatam. This is simply an application of the rule of public policy expressed in the Latin maxim " Nemo debet bis vexari " pro una et eadem causa." In this application of the maxim " causa " bears its literal Latin meaning. The second species, which I will call " issue estoppel," is an extension of the same rule of public policy. There are many causes of action which can only be established by proving that two or more different conditions are fulfilled. Such causes of action involve as many separate issues between the parties as there are conditions to be fulfilled by the plaintiff in order to establish his cause of action; and there may be cases where the fulfilment of an identical condition is a requirement common to two or more different causes of action. If in litigation upon one such cause of action any of such separate issues as to whether a particular condition has been fulfilled is determined by a court of competent juris-diction, either upon evidence or upon admission by a party to the litigation, neither party can, in subsequent litigation between one another upon any cause of action which depends upon the fulfilment of the identical condition, assert that the condition was fulfilled if the court has in the first litigation determined that it was not, or deny that it was fulfilled if the court in the first litigation determined that it was.

But " issue estoppel " must not be confused with " fact estoppel," which, although a species of " estoppel in pais," is not a species of estoppel per rem judicatam. The determination by a court of competent jurisdiction of the existence or non-existence of a fact, the existence of which is not of itself a con-dition the fulfilment of which is necessary to the cause of action which is being litigated before that court, but which is only relevant to proving the fulfilment of such a condition, does not estop at any rate per rem judicatam either party in subsequent litigation from asserting the existence or non-existence of the same fact contrary to the determination of the first court. It may not always be easy to draw the line between facts which give rise to " issue estoppel " and those which do not, but the distinction is important and must be borne in mind. Fortunately, it does not arise in the present case.

In the present case what I have called " cause of action " estoppel " does not arise. Translated into the terminology of the Divorce Court it could be called " matrimonial offence " estoppel." The wife does not seek in the present litigation

**P.**                    PROBATE DIVISION.                    199

to allege the same matrimonial offence, namely, cruelty, as she          C. A..
unsuccessfully alleged in the earlier litigation.                         1963

What she does seek to allege is, first, as a matter of defence,      ⎯⎯⎯
just cause for separating from her husband, and, secondly, as        THODAY
a matrimonial offence, and as a ground for dissolution of marriage,    *v.*
constructive desertion by her husband.  Both these allegations,      THODAY.
it would appear from a number of recent cases which are binding      Diplock L.J.
on this court, involve an issue which is identical with one of the
issues involved in her allegation of cruelty in the earlier litigation.
It is thus a case where, in my view, issue estoppel could arise.
To establish the matrimonial offence of cruelty, two conditions
must be fulfilled.  The marital conduct complained of must
(1) amount to serious ill-treatment of the spouse—this, I take it,
is what is intended by the now fashionable phrase " grave and
" weighty matters," and (2) adversely affect the health of the
spouse or cause reasonable apprehension that it would do so.
To establish the defence of just cause for separating, condition
(1) alone need be fulfilled.  To establish the matrimonial offence
of constructive desertion, condition (1) and also a further con-
dition must be fulfilled, viz., the ill-treatment must be accom-
panied by expulsive words, or amount in itself to expulsive
conduct.

Had Collingwood J. in the earlier litigation made a specific
finding that the husband's conduct during the period before the
wife left him did not amount to serious ill-treatment of the wife,
irrespective of its actual or apprehended effect on her health, this
would, in my view, have given rise to an " issue estoppel " and
would have prevented her from relying upon the same conduct
as constituting the necessary serious ill-treatment for the purposes
of her defence of just cause for separating from her husband or
her allegation against him of the matrimonial offence of con-
structive desertion.  I am inclined to think, with Scarman J. in
*Warren* v. *Warren*,[32] although it is unnecessary to decide, that it
would also have estopped her from alleging any other serious ill-
treatment, of such a character as to cause reasonable appre-
hension that it would affect her health, upon which she could
have relied but did not in fact allege in support of her allegation
of the matrimonial offence of cruelty in the earlier litigation.
But, as I read his judgment, Collingwood J. did not make any
specific finding on this issue of serious ill-treatment.  Some of the
facts relevant to this issue which she alleged a detailed analysis

[32] [1962] 1 W.L.R. 1310.

200                    PROBATE DIVISION.                **[1964]**

C. A.

1963

THODAY
*v.*
THODAY.

Diplock L.J.

of this judgment may show that he rejected, but, of itself, this is not enough to estop her, per rem judicatam at any rate, from seeking to prove them in later litigation. His judgment does not make it clear whether he decided against the wife's case of cruelty (1) on the issue that the husband's conduct, or whatever allegations about it that he thought she had succeeded in establishing, did not amount to serious ill-treatment of her, or (2) on the issue that it did not adversely affect her health or cause reasonable apprehension that it would do so, or upon both issues. He was not bound to make specific findings on these two issues. All he was bound to do was to decide whether the wife had established the matrimonial offence of cruelty she alleged. It is, in my view, very desirable that in cases of this kind, where a failed case of cruelty may be later followed by a case based on actual or constructive desertion, judges should state their findings on each of the issues. But it was not done in this case and consequently, in my view, no " issue estoppel " arises either.

I, too, would allow this appeal.

> *Appeal allowed with costs.*
> *Leave to the husband to appeal to*
> *the House of Lords.*

Solicitors: *Bartlett & Gregory, Bromley; Michael Kramer & Co.*

A. H. B.

---

1963
*April 3, 4.*

Cairns J.

C. A.

1963
*Nov.* 5, 6,
7, 27.

Lord Denning
M.R.,
Donovan and
Danckwerts
L.JJ.

ALEXANDRA TOWING CO. LTD. *v.* MILLET (OWNERS)
AND EGRET (OWNERS) AND OTHERS.

THE BRAMLEY MOORE.

[1962 T. No. 389.]

*Shipping—Limitation of liability—Tug and tow in collision—Different owners of tug and tow—Negligence of tug—Tow not negligent—Whether liability of tug based on tonnage of tug alone or of tug and tow—Merchant Shipping Act, 1894 (57 & 58 Vict. c. 60), s. 503 —Merchant Shipping (Liability of Shipowners and Others) Act, 1958 (6 & 7 Eliz. 2, c. 62), s. 3.*
*Ships' Names—The Bramley Moore.*

---

[Reported by MICHAEL GARDNER, Esq., Barrister-at-Law.]

273

2 A.C.

A                          [HOUSE OF LORDS]

THRASYVOULOU    .    .    .    .    .    .    . RESPONDENT

AND

SECRETARY OF STATE FOR THE ENVIRONMENT    APPELLANT

B   OLIVER AND OTHERS    .    .    .    .    .    . RESPONDENTS

AND

HAVERING LONDON BOROUGH COUNCIL    .    . APPELLANTS

[CONJOINED APPEALS]

C   1989  Oct. 24, 25, 26, 30;                    Lord Bridge of Harwich,
          Dec. 14                    Lord Brandon of Oakbrook, Lord Griffiths,
                                    Lord Jauncey of Tullichettle and Lord Lowry

*Estoppel—Per rem judicatam—Issue estoppel—Planning appeal—
Inspector's decision that properties used as hotels—Enforcement
notices alleging use of properties as hostels—No change of use
since inspector's decision—Whether inspector's decision giving
rise to issue estoppel per rem judicatam—Allegation in enforcement
notice differing from findings as to established use in earlier
enforcement appeal—Whether issue estoppel—Town and Country
Planning Act 1971 (c. 78), ss. 36, 88 (as amended by Local
Government and Planning (Amendment) Act 1981 (c. 41), s. 1,
Sch., para. 1)*

E           In the first appeal, there was an established use certificate
for hotel use in respect of one of a number of properties
which were predominantly used for providing temporary
accommodation for homeless families. In 1982 the owner
appealed under section 36 of the Town and Country Planning
Act 1971 against the wording of planning permission for an
extension to that property. The owner also appealed under
section 88 of the Act of 1971 against enforcement notices issued
F   by the council alleging a material change of use of three other
properties and requiring that use to be terminated. The
inspector found that all four properties were used as hotels.
The council did not appeal. In February 1985 the council issued
further enforcement notices in relation, inter alia, to the four
properties, alleging a material change of use of the properties to
use as hostels. It was common ground that there had been no
change of use since 1982. The owner appealed under section 88
G   and the second inspector found that the properties were used as
hostels. On appeal to the High Court the judge upheld the
inspector's decision. On the owner's appeal on the ground that
an issue estoppel arose as a result of the earlier proceedings and
the inspector's decision in 1982 concerning the four properties,
the Court of Appeal allowed the appeals.
           On appeal by the Secretary of State:—
H           *Held*, dismissing the appeal, that the doctrine of res judicata
was not confined to adjudications in the area of private law;
that in relation to adjudications in the area of public law, which
were subject to a comprehensive self-contained statutory code,
there was a presumption that where the statute had created a

specific jurisdiction for the determination of any issue which    A
established the existence of a legal right, the principle of res
judicata applied to give finality to that determination unless an
intention to exclude that principle could be properly inferred
from the relevant statutory provisions; that a consideration of
the Town and Country Planning Act 1971 led to the conclusion
that the determination in favour of the appellant of an appeal
against an enforcement notice brought on any of the grounds
specified in section 88(2)(*b*) to (*e*) of the Act gave rise to an    B
estoppel per rem judicatam; and that accordingly the inspector
had erred in law in failing to give effect to such an estoppel
(post, pp. 289c–e, 295b, 298a–d).

*Per curiam.* To adopt the terminology and classification
propounded by Diplock L.J. in *Thoday v. Thoday* [1964] P.
181, 197, and applying it by analogy to the issues arising on an
appeal against an enforcement notice on any of the grounds
specified in section 88(2)(*b*) to (*e*) of the Act of 1971, the    C
analogue of a "cause of action estoppel" arises whenever the
determination of the ground decided in favour of the appellant
on an appeal against one enforcement notice can be relied on in
an appeal against a second enforcement notice which is in the
same terms and is directed against the same alleged development
as the first (post, pp. 295c–d, 296a–c).

Dictum of Diplock L.J. in *Thoday v. Thoday* [1964] P. 181,    D
197, C.A. applied.

Decision of the Court of Appeal [1988] Q.B. 809; [1988] 3
W.L.R. 1; [1988] 2 All E.R. 781 affirmed.

In the second appeal, the owners and occupiers of a piece of
land had been served by the council in 1982 with an enforcement
notice relating to a structure situated thereon, alleging a material
change of use of the structure for storage purposes without the    E
grant of planning permission. The owners appealed on the
ground, inter alia, that the use of that structure was part of
the use of the land as a whole as a transport and storage depot
which was an established use having been carried on before
1964. The inspector upheld the appeal. In 1986 the council
served an enforcement notice alleging a material change of the
use of the land to a use for the purposes of a business of    F
merchants, importers, repackers and distributors of various
named goods without the grant of the relevant planning
permission. On appeal by the owners, the inspector dismissed
the appeal and found that there had been a material change in
the character of the land as a whole since 1963 to the use
described in the notice. On appeal by the owners, the deputy
judge allowed the appeal holding that he was bound by the
decision of the Court of Appeal in *Thrasyvoulou v. Secretary of*    G
*State for the Environment* as to the application of issue estoppel
and that in view of the planning history of the land an estoppel
arose which vitiated the 1986 enforcement notice.

On appeal by the council to the House of Lords pursuant to
section 12(1) of the Administration of Justice Act 1969, it being
expressly conceded that there had been no material change in
the character of the use of the land between the dates of the    H
two enforcement notices:—

*Held*, dismissing the appeal, that the first inspector's decision
involved by necessary implication the finding that the use
actually being made of the land at the date of service of the first

275

2 A.C.        Thrasyvoulou v. Environment Secretary (H.L.(E.))

A    enforcement notice was an established use, however described; that accordingly, in the circumstances, the council were now estopped from asserting that there was a material change of use between 1963 and 1982 which expressly contradicted a finding made by the first inspector, since it was a finding not merely incidental or ancillary to his decision but was the fundamental basis for his finding that no breach of planning control was involved in the use being made of the structure which was the
B    subject of the first notice (post, pp. 297D–G, 298A–D).
Decision of Mr. Malcolm Spence Q.C. sitting as a deputy judge of the Queen's Bench Division affirmed.

The following cases are referred to in the opinion of Lord Bridge of Harwich:

C    *Maritime Electric Co. Ltd. v. General Dairies Ltd.* [1937] A.C. 610; [1937] 1 All E.R. 748, P.C.
*Pyx Granite Co. Ltd. v. Ministry of Housing and Local Government* [1960] A.C. 260; [1959] 3 W.L.R. 346; [1959] 3 All E.R. 1, H.L.(E.)
*Southend-on-Sea Corporation v. Hodgson (Wickford) Ltd.* [1962] 1 Q.B. 416; [1961] 2 W.L.R. 806; [1961] 2 All E.R. 46, D.C.
*Square Meals Frozen Foods Ltd. v. Dunstable Corporation* [1974] 1 W.L.R. 59; [1974] 1 All E.R. 441, C.A.
D    *Thoday v. Thoday* [1964] P. 181; [1964] 2 W.L.R. 371; [1964] 1 All E.R. 341, C.A.
*Wakefield Corporation v. Cooke* [1904] A.C. 31, H.L.(E.)
*Young v. Secretary of State for the Environment* [1983] 2 A.C. 662; [1983] 3 W.L.R. 382; [1983] 2 All E.R. 1105, H.L.(E.)

The following additional cases were cited in argument:

E    *English-Speaking Union of the Commonwealth v. Westminster London Borough Council* (1973) 26 P. & C.R. 575
*Fairmount Investments Ltd. v. Secretary of State for the Environment* [1976] 1 W.L.R. 1255; [1976] 2 All E.R. 865, H.L.(E.)
*Fidelitas Shipping Co. Ltd. v. V/O Exportchleb* [1966] 1 Q.B. 630; [1965] 2 W.L.R. 1059; [1965] 2 All E.R. 4, C.A.
*Newbury District Council v. Secretary of State for the Environment* [1981] A.C. 578; [1980] 2 W.L.R. 379; [1980] 1 All E.R. 731, H.L.(E.)
F    *Padfield v. Ministry of Agriculture, Fisheries and Food* [1968] A.C. 997; [1968] 2 W.L.R. 924; [1968] 1 All E.R. 694, H.L.(E.).
*Pioneer Aggregates (U.K.) Ltd. v. Secretary of State for the Environment* [1985] A.C. 132; [1984] 3 W.L.R. 32; [1984] 2 All E.R. 358, H.L.(E.)
*Sennar, The (No. 2)* [1985] 1 W.L.R. 490; [1985] 2 All E.R. 104, H.L.(E.)
*Shephard v. Buckinghamshire County Council* (1966) 18 P. & C.R. 419
G    *Tebbutt v. Haynes* [1981] 2 All E.R. 238, C.A.
*Western Fish Products Ltd. v. Penwith District Council* [1981] 2 All E.R. 204, C.A.

THRASYVOULOU v. SECRETARY OF STATE FOR THE ENVIRONMENT

H    APPEAL from the Court of Appeal.
This was an appeal by the Secretary of State for the Environment against the judgment dated 28 January 1988 of the Court of Appeal (Parker and Ralph Gibson L.JJ. and Caulfield J.) allowing an appeal by the owner, Aristophanes Thrasyvoulou, from the judgment dated 25

November 1986 of McCowan J., dismissing the owner's appeals against   A
enforcement notices dated 7 February 1985 served by Hackney London
Borough Council, relating to properties in Wilberforce Road, London,
N.4.

The facts are stated in the opinion of Lord Bridge of Harwich.

*John Laws* and *Duncan Ouseley* for the Secretary of State.
*Michael Rich Q.C.* and *Joseph Harper* for the owner.   B
The council did not appear and was not represented.

### OLIVER AND OTHERS v. HAVERING LONDON BOROUGH COUNCIL

APPEAL from Mr. Malcolm Spence Q.C. sitting as a deputy judge of
the Queen's Bench Division.   C
This was an appeal by leave dated 21 June 1988 of the House of
Lords by Havering London Borough Council from the judgment dated
28 April 1988 of Mr. Malcolm Spence Q.C. sitting as a deputy judge of
the Queen's Bench Division, whereby he allowed an appeal under
section 246 of the Town and Country Planning Act 1971 (as amended)
by Anthony Cyril Oliver, Elsie May Oliver and Olivers of Hornchurch
Ltd., the freehold owners of land at and at the rear of numbers 13–19,   D
The Avenue, Hornchurch, Essex, against a decision of an inspector
appointed by the Secretary of State for the Environment to determine
an appeal under section 88 of the Act against an enforcement notice
issued by the council. By his order the deputy judge remitted the matter
to the Secretary of State for rehearing and redetermination by him. The
deputy judge by his judgment having held that he was bound by the   E
decision of the Court of Appeal in *Thrasyvoulou v. Secretary of State for
the Environment* granted a certificate pursuant to section 12(1) of the
Administration of Justice Act 1969 that a point of law of general public
importance was involved, namely, whether the concept of issue estoppel
should apply in planning law so as to preclude an inspector appointed by
the Secretary of State from determining an appeal under the Town and
County Planning Act 1971 in accordance with the provisions of the Act.   F
The facts are stated in the opinion of Lord Bridge of Harwich.

*William Glover Q.C.* and *Gregory Stone* for the council.
*John Laws* and *Duncan Ouseley* for the Secretary of State.
*Jeremy Sullivan Q.C.* and *Brian Ash* for the owners.

  G
\**William Glover Q.C.* and *Gregory Stone* for Havering London
Borough Council. The main issue which arises in both appeals is whether
the doctrine of issue estoppel applies to enforcement proceedings
appeals. If the answer is in the affirmative then a second point arises in
the *Oliver* case.
The main issue. The doctrine of issue estoppel does not apply to the
proceedings in question, that is, to proceedings relating to an enforcement   H
notice. The doctrine is a principle of private law and should not be

* Reporter's Note. For administrative reasons counsel for the appellants in the *Oliver*
appeal was heard first.

277

A    brought into public law unless a statute so provides: see *Newbury District Council v. Secretary of State for the Environment* [1981] A.C. 578, 605, *per* Lord Fraser of Tullybelton, and *Pioneer Aggregates Ltd. v. Secretary of State for the Environment* [1985] A.C. 132, 140–141, *per* Lord Scarman. This latter passage illustrates Lord Scarman's approach to the question of planning control. The criticism that is made of the decision of the Court of Appeal in the *Thrasyvoulou* case is that the

B    court asked itself the wrong question. It asked whether issue estoppel was excluded on the proper construction of the relevant statutory provisions. The question that should have been asked was whether the statutory provisions in question showed an intention by Parliament to include issue estoppel within the ambit of the relevant statutory procedures applicable to planning law.

C    On the face of it, a perusal of section 22(1), section 23(1) and section 87(1)–(15) of the Town and Country Planning Act 1971 (as amended by section 1 of and the Schedule to the Local Government and Planning (Amendment) Act 1981) gives no countenance to the suggestion that only one enforcement notice can be served in respect of a given property; there is no suggestion that the right to serve enforcement notices is limited.

D    For the relevant provisions relating to appeals against enforcement notices, see section 88(1)–(4), (6), (10), (11); section 88A(1), (2), (3); section 88B(1) of the Act of 1971 (as amended). The foregoing provisions comprise a complete and comprehensive planning code and they contain nothing which substantiates the proposition that the quashing of an enforcement notice is a complete bar to the serving of another enforcement notice. If this were not the law it could lead to the situation

E    that because an enforcement notice had been quashed in relation to a particular property a public nuisance which subsequently arose in connection with that property could not be dealt with by means of a further enforcement notice. It is not disputed that there are two sides to this argument. On the one hand, a private citizen should not suffer by virtue of having to have a series of enforcement notices served upon

F    him. On the other hand, the public at large should not suffer because the local authority has committed some technical error in endeavouring to enforce proper planning control.

   There are indications of a wide power to serve enforcement notices to be found in section 87(1) and (4) of the Act of 1971 and thus the mistaken withdrawal by a planning authority of an enforcement notice

G    before the hearing of an appeal does not prevent the serving of a further enforcement notice in respect of the property in question. It is difficult to see why the position should be different after the hearing of an appeal. But if issue estoppel applies then the two situations are quite different. Further, Parliament has provided expressly for the circumstances in which an established use certificate can be conclusive for the purposes of an appeal to the Secretary of State against an enforcement notice: see

H    section 94(7). This shows that where under the Act of 1971 a particular force is to be given to any determination it is specifically provided for in the Act. It follows that since the relevant statutory provisions are not completely clear it must be implied as a matter of construction that a

further enforcement notice can be served in the present circumstances.    A
It is always to be borne in mind that the whole purpose of the Act of
1971 is planning control.

There are various types of estoppel and it has been held that
estoppel cannot be used to prevent or hinder the exercise of a statutory
power: see *Maritime Electric Co. Ltd. v. General Dairies Ltd.* [1937]
A.C. 610, 618. An analogy between that case and the present is that the
Town and Country Planning Act 1971 is an Act for the benefit of the    B
public: see also *Southend-on-Sea Corporation v. Hodgson (Wickford)
Ltd.* [1962] 1 Q.B. 416, 422. These cases (i) show a general rule; (ii)
were the background against which the Town and Country Planning Act
1971 was enacted. Accordingly, if Parliament had intended that issue
estoppel should apply in the provisions of the Act it would have so
stated.    C

Section 243(1) of the Act of 1971. In the *Thrasyvoulou* case [1988]
Q.B. 809, Parker L.J. suggested that section 243(1) may operate so as to
prevent a local planning authority from issuing a second enforcement
notice alleging a breach of planning control contrary to a finding of fact
made in an earlier enforcement notice appeal. This is wrong. If, as in
the present case, the first notice had been quashed, there is no extant    D
notice which could be questioned by a second notice. Alternatively, if
the first notice had been upheld, a decision on the second notice could
not affect its validity. Section 243(1) is of no materiality in the present
case.

Before issue estoppel can arise there must be an issue between the
parties and subsequently the same issue must arise between the same
parties. The issue arising on an enforcement notice is dictated by the    E
form of that notice since the enforcement notice shall state the breach of
planning control alleged: section 87(6)–(8) Act of 1971.

The issue raised by the 1982 enforcement notice was a material
change of use. The 1985 enforcement notice was in different terms. The
question arises: could the issues raised by the second notice have been
raised and determined in the first appeal? The answer is in the negative    F
because the first enforcement notice dealt with a substantially different
subject matter, although it is conceded that there was no material
change in the character of the use of this land between 1982 and 1985.

*John Laws* and *Duncan Ouseley* for the Secretary of State in both
appeals. Estoppel cannot be deployed to displace the exercise of a
statutory function. The real point in the present case is that because of
the shape of the statute, Parliament did not intend by implication to    G
bring issue estoppel into section 88, and possibly, section 88A and
section 88B.

The House is invited to consider once again the terms of section 88
in order to see what are the obligations cast upon the Secretary of State
under the section. Judicial review is available if it is alleged that the
procedure laid down by section 87 has not been complied with. Certiorari    H
could be obtained to quash the enforcement notice and an injunction
obtained to restrain its operation until the hearing of the judicial review
proceedings.

2 A.C.        **Thrasyvoulou v. Environment Secretary (H.L.(E.))**

A      As to the ambit of section 88, an appeal can only be brought under one of the eight grounds specified. In fact an appeal in the present case could not arise under section 88(2)(*a*), (*f*), (*g*), (*h*). But it is the Minister's statutory duty to determine an appeal pursuant to section 88(2)(*b*). He cannot refrain from exercising the duty imposed upon him to decide it on the grounds that one of his predecessors had decided the same question. Accordingly, if a Secretary of State or his inspector were to dismiss an appeal because he considered that he was bound so to do in view of a previous decision of a predecessor he would be wrong.

B

     On the face of it the Minister has to decide the appeal on the facts before him and if he considers himself bound by a previous decision he would be acting unlawfully. The principle is that a Minister's discretion must be unfettered.

C      Section 88B(1) provides that on the determination of an appeal, the Secretary of State may grant planning permission for the development to which the enforcement notice relates and determine the use to which the land may lawfully be put: see paras. (*a*) and (*c*). Section 88B(3)(*b*) provides that any such determination shall be final. Section 94 concerns certification of established use. Section 94(7) is an indicator that without a previous statutory use certificate there is no finality because on any appeal the Secretary of State has to decide the matter on the facts then before him. The statute provides for finality in respect of various matters, but it is impossible to construe section 88(2) as implying any such finality in respect of matters such as those under appeal. It is plain that, in effect, the basis of the Court of Appeal's decision was that if the doctrine of issue estoppel were not applicable in this area of planning law there might be a succession of enforcement notices served by planning authorities. But it is not legitimate for the Court of Appeal to allow that fear to colour their approach to the construction of section 88(2). The judgment proceeds on a false premise; it construes section 88(2) as a provision designed to police section 87.

D

E

     It is wrong to approach the present question on the footing that Parliament has not been shown to *exclude* the application of the principle of issue estoppel. The question that must be asked is: whether on its true construction the relevant statutory provision expressly or by necessary implication *includes* the principle of issue estoppel.

F

     Ralph Gibson L.J. founds his decision on *Tebbutt v. Haynes* [1981] 2 All E.R. 238, but that decision and the cases on which it is founded are not concerned with planning matters. The judgment develops no reasoning as to how issue estoppel applies to section 88. As has been contended, it is not possible to incorporate issue estoppel into section 88 unless the section so requires and no basis for that has been shown. Ralph Gibson L.J. was also moved by considerations of unfair action being taken under section 87. If a planning authority acts lawfully there is no possibility of quashing the authority's action—if it has been operating lawfully there is no room for the application of issue estoppel to section 88. If on the other hand, the planning authority has acted unlawfully then such unlawful action will be subject to correction by means of judicial review.

G

H

To summarise the foregoing argument and make some additional   A
points (i) as Mr. Glover has said, to ask whether the doctrine of issue
estoppel is excluded by the statute is to ask the wrong question.
(ii) *Thoday v. Thoday* [1964] P. 181 is based on a doctrine of finality.
But the policy of the courts in relation to finality is simply not applicable
to section 88 which is concerned with rights running with the land.
(iii) Ralph Gibson L.J. appears to have concluded that issue estoppel is
a matter of equity or fairness. But it is based on wider considerations of   B
policy. (iv) The application of issue estoppel here may be said to prove
too much. If applicable it would prevent the Secretary of State
considering a question for the second time on its merits even though the
planning authority had acquired convincing fresh evidence as to what the
use of the land had been all along. If it is said that it does not apply to
new evidence that would be to establish a new and lesser principle.   C
(v) The judgment of Parker L.J. is based on a misunderstanding of the
meaning of the word "validity" in the context of paragraph 2(3) of
Schedule 9 to the Act of 1971. The determination of a subsequent
appeal upon a particular issue in a manner inconsistent with its
determination in an earlier appeal does not involve any challenge to the
validity of the earlier inspector's decision, contrary to paragraph 2(3) of   D
Schedule 9 to the Act of 1971. That paragraph needs to be read in the
light of section 243 of the Act of 1971, so as to achieve consistency of
approach to inspectors' decisions and the Secretary of State's own
decision. Section 243 only precludes challenge to the validity of the
enforcement notice; that is, not to the effect of the subsequent
enforcement notice.

    *Western Fish Products Ltd. v. Penwith District Council* [1981] 2 All   E
E.R. 204 is authority for the proposition that the court is loath to allow
the doctrine of estoppel to be used to prevent a statutory body
performing its statutory duties. That approach should be adopted to the
present appeals for the application of issue estoppel here would derogate
from the duty of the Secretary of State to determine matters arising on
an appeal against an enforcement notice.   F

    In conclusion, the Act of 1971 comprises a statutory code regulating
the use of land. The Secretary of State is given the duty of determining
the matters prescribed in section 88(2)(*a*)–(*h*). Section 88 is no different
from any other statutory provision placing a public duty on a public
figure to determine matters there specified. It is desired to emphasise
that it is illegitimate to use issue estoppel in those cases where the
appropriate remedy for an owner of land aggrieved by the service of a   G
second enforcement notice is to apply for judicial review. Further, it is
difficult to understand how the doctrine of issue estoppel could apply to
the determination by the Secretary of State of a matter pursuant to a
default power granted by section 276 of the Act of 1971: see sub-
sections (3) and (5)(*a*), (*b*). [Reference was also made to sections 23(9),
34 and 92A of the Town and Country Planning Act 1971; paras. 27–29   H
of the General Development Order 1986; *Fidelitas Shipping Co. Ltd. v.
V/O Exportchleb* [1966] 1 Q.B. 630 and *Young v. Secretary of State for
the Environment* [1983] 2 A.C. 662.]

A    *Michael Rich Q.C.* and *Joseph Harper* for Mr. Thrasyvoulou. The principle is accepted that private law rules are not to be introduced into planning legislation. It is also accepted that estoppel by representation cannot be used to prevent the exercise of a statutory discretion. But it is not accepted that issue estoppel is a mere private law rule. It is a rule of public policy. Although it is termed "estoppel" it is not one of the means by which a statutory activity can be held to fetter the discretionary
B    exercise of that activity. It is a rule of evidence recognising a conclusive determination by a competent tribunal exercising its statutory power. It is consistent with the requirement of effective planning control that the restraints of planning control on an owner's use of his land shall be ascertainable and certain.

*Spencer Bower and Turner, Res Judicata,* 2nd ed. (1969) paras. 8–
C    10, shows the branch of the law of estoppel applicable in the present case is based on the need for finality and on the principle that a party should not be troubled twice in the same cause. Both those aspects of estoppel are applicable in the present case. These are matters of public policy: see *Fidelitas Shipping Co. Ltd. v. V/O Exportchleb* [1966] 1 Q.B. 630, 642. Accordingly, unless there is some overriding rule of public
D    policy to exclude this doctrine in the given circumstances, it ought to apply. As to the requirements for the application of estoppel per rem judicatam, see *The Sennar (No. 2)* [1985] 1 W.L.R. 490, 499B, *per* Lord Brandon of Oakbrook. *Spencer Bower and Turner, Res Judicata,* 2nd ed., para. 11 shows that public policy as represented by this doctrine may be overruled by statute, but there is no basis for the contention that the doctrine must be specifically imported to be effective. There has
E    been no authority cited that unless the doctrine can be implied by virtue of the language of the Act of 1971 it must be excluded. Nevertheless, it is accepted that it is not applicable in taxing and rating matters.

*Pyx Granite Co. Ltd. v. Ministry of Housing and Local Government* [1960] A.C. 260, which was applied in *Shephard v. Buckinghamshire County Council* (1966) 18 P. & C.R. 419, is of importance. In that case,
F    this House held that the fact that there was a specific statutory power under the Town and Country Planning Act 1947 to determine the issue of the legality of a proposed development did not prevent the High Court from determining that very issue in proceedings claiming a declaration. It follows that if that procedure was effective at all it surely must have been effective finally to determine the issue in question.

G    Enforcement notices and the procedure for providing appeals therefrom were instituted by the Town and Country Planning Act 1947. The following outline the history of the relevant legislation: Town and Country Planning Act 1947, sections 15(3), 16, 17, 23(1), (3), (4), (5); Town and Country Planning Act 1959, section 31; Caravan Sites and Control of Development Act 1960, sections 33, 34; and Schedule 4; Town and Country Planning Act 1962 (a consolidating Act); Town and
H    Country Planning Act 1968, sections 15, 16(5)(*b*), (7) and 17; and Town and Country Planning Act 1971 (a consolidating Act), amended by the Local Government and Planning (Amendment) Act 1981, which sets out the present requirements for enforcement notices which by the insertion

282

into the Act of 1971 of section 92A requires for the first time registration     A
of those notices.

From an examination of the earlier planning legislation it is seen that
there was a clear procedure to determine whether or not planning
permission was required or for defining a particular use, by way of a
declaration in the High Court which gave finality. That was superseded
by the enforcement notice appeal procedure to the Secretary of State.     B
Accordingly, it would require clear language to support the proposition
that the enforcement notice appeal procedure did away with finality.

*Wakefield Corporation v. Cooke* [1904] A.C. 31 is authority for the
proposition that where a statute had given to justices the exclusive
determination of an issue, their determination of that issue is a final
determination. The same principle applied to a determination by justices
under section 23(4) of the Act of 1947.     C

The substitution of appeal to the Secretary of State should not alter
the position. *Newbury District Council v. Secretary of State for the
Environment* [1981] A.C. 578 is distinguishable for it did not relate to
issue estoppel. Similar considerations apply to *Western Fish Products
Ltd. v. Penwith District Council* [1981] 2 All E.R. 204, which related to
estoppel by representation.     D

As regards paragraph 2(3) of Schedule 9 to the Act of 1971, the
word "validity" in this context cannot be limited to matters of law but
must also extend to matters of fact. It follows that Parker L.J. was
correct in holding that an appeal under section 88 is final and binding on
both parties, subject only to an appeal on a matter of law under section
246.

In conclusion, the pattern of the Act of 1971 is plain. Where issue     E
estoppel cannot apply the Act specifically provides for conclusiveness.
Issue estoppel does not apply to the provisions of section 94(7) because
in the circumstances there postulated there is no lis. That is why the
final decision of the Secretary of State provided for under section 95
attracts the conclusive provisions of section 94(7). Where there is a lis
no such provision for conclusiveness is needed.     F

*Jeremy Sullivan Q.C.* and *Brian Ash* for the owners in the Oliver
appeal. The argument for Mr. Thrasyvoulou is adopted. The planning
law is a self-contained code. This emerges most clearly from *Pioneer
Aggregates (U.K.) Ltd. v. Secretary of State for the Environment* [1985]
A.C. 132. In that case there was an express statutory provision that
governed the duration of planning permission: there was simply no     G
possibility for imputing the doctrine of abandonment of planning
permission. In the present case the Act is silent as to whether issue
estoppel does or does not apply. It is also silent on the issue of the
burden of proof. As enacted in 1947 the code was also silent as to how
appeal proceedings were to be conducted.

Issue estoppel is a rule of public policy which reflects the public
interest in the finality of proceedings and that citizens should not be     H
vexed twice. It is a wide principle and the anomalies are easily
recognised. It has been said that the Act of 1971 is a self-contained
code. But the language of sections 65, 105(1)(c) (since repealed) and

283

A  114(6) support the conclusion that issue estoppel would apply in the circumstances envisaged by those provisions.

Fetter. It is not inconsistent with the general proposition that the exercise of a statutory discretion should not be fettered, validly to contend that, if a local authority exercises its discretion to serve an enforcement notice which has adverse consequences to the citizen, who is given a right of appeal, both parties should be bound by the result of B  the appeal and that neither should be allowed to reopen the issue under appeal. As to the Secretary of State's discretion, it cannot be said that it is disabled if the doctrine of issue estoppel is applicable in the present circumstances. The Secretary of State is no more disabled than if a magistrate had heard an appeal under the 1947 legislation. There is a complete lack of reciprocity in the argument for the Secretary of State.

C  As to the role of third parties, it is to be remembered that a recognition of their rights is relatively recent. Under the Act of 1947 third parties had no locus standi.

Although the Secretary of State may initiate some proceedings the enforcement notice, once issued, is deemed to have been issued by the planning authority in whose area the land in question is situated.

As to section 88B(1)(c) of the Act of 1971 (as amended), that D  language is equally applicable to the owner who has used the land for the same purpose since prior to 1947 and who receives an enforcement notice. He appeals under ground (e), the Secretary of State quashes under ground (e) and may also make a determination under section 88B(1)(c). On the Secretary of State's argument issue estoppel would apply to the latter decision but not the former. Contrast the language of E  section 88(10) which also refers to "final determination."

As to section 94(7) of the Act of 1971, although there is no express language to show that Parliament intended a determination under section 88(2)(e) to be conclusive, it would be extraordinary if Parliament intended a different result depending upon who instituted the procedure. Express provision for finality is necessary in section 94(7) because the certificate is issued by the local planning authority, there is no inquiry, F  hence no possibility to issue estoppel.

Laws in reply. The opposing argument has been wide-ranging but there is one essential chasm between the parties. For the Secretary of State it is contended that for issue estoppel to be applicable the principle has to be found positively in the statute in question. For the respondents it is contended that it is a rule of public policy and applies unless it is G  expressly excluded by the statutory language. The respondents do not contend that the local authority could not issue a second enforcement notice under section 87.

The argument for the owners in the Thrasyvoulou appeal is wrong because it ignores the relationship between section 87 and section 88 of the Act of 1971. This appeal really relates to what are the powers of a local authority under section 87. The opposing argument comes down to H  the proposition that the local planning authority cannot issue a second enforcement notice even if it appears to them that they have acquired new evidence relating to the user of the land in question. The result of dismissing these appeals would be that it would prevent a local authority

Thrasyvoulou v. Environment Secretary (H.L.(E.))                    [1990]

on a change of political control from rectifying the situation where its   A
predecessor had been dilatory in respect of imposing proper planning
control. In the end, the parties join issue on opposing contentions of
principle. For the Secretary of State it is contended that every
enforcement notice which is appealed must be judged by the Secretary
of State on the merits of whatever point on appeal is put to him; he is
only precluded from doing so where the Act provides for finality arising
from some earlier determination. For the respondents it is contended   B
that the Secretary of State is additionally precluded from deciding the
merits of (*b*)–(*e*) appeals by the application of issue estoppel, even
though the Act on its face or by necessary implication does not require
such a result.

The arguments marshalled by the respondents may be summarised
thus: (a) *Wakefield Corporation v. Cooke* [1904] A.C. 31; (b) the   C
historic availability of declarations, for example, as to established use;
(c) the predecessor legislation, which confided appeals on what are now
grounds (*b*)–(*e*) to the magistrate's court; (d) section 88(10)—"final
determination;" (*e*) the consequence of the Secretary of State's argument,
if right, for the operation of other provisions such as sections 65 and
114; (f) the possibility of hardship or injustice to an appellant if issue   D
estoppel does not apply; (g) the general applicability of issue estoppel as
a principle of public policy.

*Wakefield Corporation v. Cooke*, decided under a different statute,
cannot be regarded as a touchstone for the construction of sections 87
and 88 of the Act of 1971: the House in that case was not considering
anything analogous to the scheme of planning control constituted by the
Town and Country Planning Act 1971; the grant of declarations (and at   E
a time before the decision in *O'Reilly v. Mackman* [1983] 2 A.C. 237)
involved no exercise by the court of any such construction; the historic
fact that appeals went to the magistrate's court is insignificant as to the
construction of those sections. Section 88(10) cannot be read as imposing
an important fetter on the Secretary of State's function in subsequent
appeals; reliance on sections 65 and 114 logically carries the argument   F
no further; an appeal to hardship or unfairness ignores both the purpose
of the Act to control the use of land and the availability of judicial
review to monitor the use of the section 87 power; and the fact that
issue estoppel is a rule of public policy in litigation tells one nothing
about how the Town and Country Planning Act 1971 is to be construed.

If issue estoppel runs in enforcement appeals then it is at least   G
possible that it runs in planning appeals also. Its application cannot be
confined to cases in which the appellant asserts some settled *right*; an
identifiable issue can arise as readily in other cases. If an applicant for
planning permission fails because its development would damage some
amenity value, an appeal against the second refusal would raise the
same issue. Yet it is accepted that successive applications, and successive
appeals, can be mounted.   H

The impact of the Secretary of State's default powers under section
276 cannot be brushed aside. If the local planning authority, having lost
an earlier appeal perhaps through their own incompetence, decline to

2 A.C.              Thrasyvoulou v. Environment Secretary (H.L.(E.))

A  enforce again despite much local feeling, the Secretary of State must be entitled to take his own view of the merits in the public interest.

It is beyond doubt that the application of issue estoppel will mean that breaches of planning control may go unenforced in cases other than those (for example under section 87(4), or where the breach took place before the end of 1963) where the Act confers immunity. Such a result frustrates the purpose of the statute and is thus contrary to the principles
B  enunciated in *Padfield v. Minister of Agriculture, Fisheries and Food* [1968] A.C. 997.

*Glover Q.C.* in reply. On the main issue the argument for the Secretary of State is adopted.

Their Lordships took time for consideration.

C

14 December. LORD BRIDGE OF HARWICH. My Lords, these two appeals raise the question whether a decision of the Secretary of State allowing an appeal against an enforcement notice on one of the grounds in paragraphs (*b*) to (*e*) of section 88(2) of the Town and Country Planning Act 1971, as amended by the Local Government and Planning
D  (Amendment) Act 1981, is capable of giving rise to an estoppel per rem judicatam or to an issue estoppel.

The first appeal arises from the service by the Hackney London Borough Council as local planning authority on the respondent, Aristophanes Thrasyvoulou, in February 1985 of enforcement notices alleging in respect of each of four properties, nos. 11, 13, 15 and 25, Wilberforce Road, London N.4, a breach of planning control by making
E  a material change of use to use as a hostel for homeless families without the grant of planning permission required in that behalf. Mr. Thrasyvoulou appealed to the Secretary of State in each case on the ground, inter alia, that the breach of planning control alleged in the notice had not taken place. The appeals were dismissed by the inspector appointed by the Secretary of State to determine them. An appeal against his decision to the High Court under section 246 of the Act of
F  1971 was dismissed by McCowan J. The Court of Appeal (Parker and Ralph Gibson L.JJ. and Caulfield J.) allowed Mr. Thrasyvoulou's appeal and remitted the cases of the four enforcement notices for rehearing and determination in the light of the opinion of the court that the inspector was in the circumstances obliged to allow the appeals to the Secretary of State and quash the enforcement notices. The Secretary of State now
G  appeals to your Lordships' House by leave of the Court of Appeal.

The facts in this case relating to nos. 13 and 15, Wilberforce Road are straightforward. The local planning authority had previously served two enforcement notices in respect of each of these properties in October 1981 which alleged alternatively a breach of planning control by making a material change of use to use as a hotel or to use as a hostel.
H  On appeal to the Secretary of State the inspector appointed to determine the appeal found that the use was correctly characterised as hotel use, not as hostel use, and that the hotel use had been carried on since 1960. He therefore quashed the hostel notices on the ground that the breach of planning control alleged in the notice had not taken place and the

Lord Bridge
of Harwich          **Thrasyvoulou v. Environment Secretary (H.L.(E.))**          [1990]

hotel notices on the ground that the breach of planning control alleged       A
in the hotel notices had occurred before 1964. At the hearing of the
appeals against the 1985 notices it was common ground that there had
been no change in the use of the properties since service of the 1981
notices. The Court of Appeal held that in these circumstances an issue
estoppel arose which prevented the council on the appeals against the
1985 notices from contending that the use of either property was as a       B
hostel (which was assumed to be materially different from use as a
hotel) and that the inspector had erred in failing to give effect to this
estoppel and in making a finding on the evidence and argument before
him that the use was as a hostel which contradicted the finding made by
the inspector who determined the appeals against the 1981 notices that
the use was as a hotel. The facts relating to nos. 11 and 25, Wilberforce
Road are more complex, but since it is common ground that if the       C
doctrine of res judicata and issue estoppel applies to determinations by
the Secretary of State of appeals under section 88 the Court of Appeal
were correct in holding that an issue estoppel arose sufficient to defeat
the 1985 enforcement notices in relation to these properties also, it is
unnecessary for me to go into them.

The second appeal arises from the service by the London Borough of
Havering as local planning authority on the respondents, Mr. and Mrs.       D
Oliver and Olivers of Hornchurch Ltd. ("the Olivers") of an enforcement
notice in January 1986 alleging a breach of planning control by making a
material change of use of land at the rear of nos. 13 to 19, The Avenue,
Hornchurch, to the use described in the notice without the grant of
planning permission required in that behalf. The Olivers appealed
against the notice to the Secretary of State on the ground, inter alia,       E
that the breach of planning control occurred before 1964. The inspector
appointed to determine the appeal dismissed it. The Olivers appealed
to the High Court under section 246. The appeal was heard by Mr.
Malcolm Spence Q.C., sitting as a deputy High Court judge, who rightly
held that he was bound to follow the decision of the Court of Appeal in
*Thrasyvoulou v. Secretary of State for the Environment* [1988] Q.B. 809
as to the application of the doctrine of issue estoppel and concluded in       F
the light of the planning history that an estoppel arose which was fatal
to the 1986 enforcement notice. He ordered that the matter be remitted
to the Secretary of State with the opinion of the court for rehearing and
determination, but he granted the necessary certificate under section
12(1) of the Administration of Justice Act 1969 to enable an appeal
against his decision to be brought direct to your Lordships' House and       G
leave to appeal was granted by the House.

In this case it is the local planning authority who appeal. They join
with the Secretary of State in contending that the doctrine of res
judicata and issue estoppel has no application in law to the determination
by the Secretary of State of an appeal against an enforcement notice
under section 88, but they contend in the alternative that if the doctrine
applies, no case giving rise to a relevant issue estoppel arises on the       H
facts. This subsidiary issue depends on the details of the relevant
planning history which it will be convenient to examine after considering
the issue of principle which is common to both appeals.

**2 A.C.**          **Thrasyvoulou v. Environment Secretary (H.L.(E.))**          Lord Bridge
of Harwich

A          Before turning to the arguments on the issue of principle it is appropriate to refer briefly to the salient features embodied in the statutory code for the enforcement of planning control in the Act of 1971, as amended by the Act of 1981. Under Part III of the Act planning permission is required for development which consists in the carrying out of building, engineering, mining or other operations in, on, over or under land, or the making of any material change in the use of

B          any buildings or other land. If development is carried out without the requisite planning permission or if any conditions or limitations subject to which planning permission was granted have not been complied with there is a breach of planning control: section 87(2). Under section 87(1) the local planning authority may, where it appears to them that there has been a breach of planning control, serve an enforcement notice

C          requiring the breach to be remedied. The notice is required to specify the matters alleged to constitute a breach of planning control. Appeal lies against an enforcement notice to the Secretary of State under section 88 on any of the grounds specified in section 88(2). For brevity I omit consideration of breaches consisting of failure to comply with conditions or limitations and consider only the grounds appropriate where the enforcement notice alleges development without the requisite

D          planning permission. Ground (a) is that planning permission ought to be granted for the development to which the notice relates. Ground (b) is that the matters alleged in the notice do not constitute a breach of planning control. Ground (c) is that the breach of planning control alleged in the notice has not taken place. Ground (d) applies to notices alleging development by carrying out building etc. operations which can

E          only be enforced against within four years of the development taking place. Ground (d) is therefore established if the breach of planning control occurred more than four years before the issue of the enforcement notice. Ground (e) applies to development consisting of making a material change of use of land which can only be enforced against if the change of use was made since 1963. Ground (e) is therefore established if the change of use occurred before the beginning of 1964. The

F          remaining grounds (f) to (h) relate to subsidiary issues which may arise as to the service of the enforcement notice, the steps required to be taken to remedy the breach of planning control alleged and the time for taking those steps and these grounds have no relevance for present purposes.

          An issue on ground (a) arises in every appeal against an enforcement

G          notice since by section 88B(3) there is deemed to be an application for planning permission for the development to which the notice relates. In determining whether to allow an appeal on that ground the Secretary of State will decide as a matter of policy and in the exercise of discretion whether planning permission should be granted and in relation to ground (a) no question of legal right arises. By contrast the question whether any of the grounds (b) to (e) on which the appellant relies have been

H          established will be answered by applying the relevant rules of planning law to the facts found and the answer will determine in each case an important matter of legal right. This may be simply illustrated by examples. Thus, if an issue is raised on appeal against a notice on

ground (*b*) as to whether or not a building operation to which the notice    A
relates was within the terms of planning permission granted either upon
an express application or by the terms of a development order, a
decision of that issue to allow the appeal on ground (*b*) will determine
the status of the building in question as having been lawfully erected. If
an issue is raised on appeal against a notice on ground (*c*) as to whether
a change from one use to another to which the notice relates was a
material change, a decision to allow an appeal on ground (*c*) will again    B
determine the status of the existing use of the land as lawful. So also
under grounds (*d*) and (*e*) a decision that a building operation was
carried out more than four years before the issue of the enforcement
notice or that a use of land was commenced before 1964 will have the
like consequence in determining the status of the building or the use
respectively as immune to enforcement proceedings. The main issue in    C
the appeals is simply whether these determinations are final and
conclusive in their effect, as the respondents contend, or whether it is
open to the local planning authority in fresh enforcement proceedings to
ask the Secretary of State to determine these issues in a contrary sense,
whether in the light of new evidence or otherwise.

    An enforcement notice does not take effect until the final
determination of the proceedings on any appeal against it, including    D
proceedings on appeal to the High Court under section 246 of the Act.
Once a notice has taken effect following the final determination of the
appeal there is no doubt as to its final and conclusive effect in relation
to all issues of right determined by the appeal. By section 243(1)(*a*) the
validity of an enforcement notice may not be questioned in any
proceedings whatsoever on any of the grounds on which an appeal    E
under section 88 may be brought. If the steps required to be taken by
the notice are not taken, this attracts penal sanctions and after those
steps have been taken the notice remains effective to render unlawful
and to attach penal sanctions to any resumption of a use discontinued or
reinstatement of a building demolished in compliance with the notice.

    The arguments advanced by Mr. Laws, for the Secretary of State,
and Mr. Glover, for the London Borough of Havering, in support of the    F
proposition that no estoppel per rem judicatam or issue estoppel can
arise from the determination of an appeal against an enforcement notice
whereby the notice is quashed on any of the grounds set out in section
88(2) may, I hope, be fairly summarised in terms of three broad
submissions. The first submission is that in the performance of its
statutory duties or in the exercise of its statutory powers a statutory    G
body cannot be fettered by any estoppel whatsoever. The second
submission is that the Act of 1971 provides a complete and self-
contained statutory code governing the enforcement of planning control
and that there is no room, as a matter of construction of that code, for
the introduction of rules or doctrines applicable in the field of private
law to litigation between citizens. The third submission is that the
remedy available for the protection of the owner or occupier of land    H
against abuse of enforcement proceedings by the service of repeated
enforcement notices directed against the same development must be
sought by application for judicial review of the decision of the local

289

A    planning authority to issue the enforcement notice of which complaint is
made, not by appeal to the Secretary of State against it.

It is well established that a statutory body cannot by contract fetter
its own freedom to perform its statutory duties or exercise its statutory
powers and by parity of reasoning it has been held that no such fetter
can arise from an estoppel by representation: see *Maritime Electric Co.
Ltd. v. General Dairies Ltd.* [1937] A.C. 610 and *Southend-on-Sea
B    Corporation v. Hodgson (Wickford) Ltd.* [1962] 1 Q.B. 416. But the
rationale which underlies the doctrine of res judicata is so different from
that which underlies the doctrine of estoppel by representation that I do
not think these authorities have any relevance for present purposes.

The doctrine of res judicata rests on the twin principles which cannot
be better expressed than in terms of the two Latin maxims "interest
C    reipublicae ut sit finis litium" and "nemo debet bis vexari pro una et
eadem causa." These principles are of such fundamental importance
that they cannot be confined in their application to litigation in the
private law field. They certainly have their place in criminal law. In
principle they must apply equally to adjudications in the field of public
law. In relation to adjudications subject to a comprehensive self-
contained statutory code, the presumption, in my opinion, must be that
D    where the statute has created a specific jurisdiction for the determination
of any issue which establishes the existence of a legal right, the principle
of res judicata applies to give finality to that determination unless an
intention to exclude that principle can properly be inferred as a matter
of construction of the relevant statutory provisions.

This approach is, I believe, fully supported by the decision of this
E    House in *Wakefield Corporation v. Cooke* [1904] A.C. 31. In that case
a local Act gave the local authority power to carry out private street
works in a private street and to recover the expenses from the frontagers,
but the frontagers had the right to object to the proposed works on the
ground, inter alia, that the street was a highway repairable by the
inhabitants at large. The relevant sections of the local Act corresponded
to sections 6, 7 and 8 of the Private Street Works Act 1892. Under
F    those provisions objections to proposed works were to be heard and
determined by justices. In 1898 the justices held on objection by some
frontagers to certain works proposed to be carried out that the street in
question was highway repairable by the inhabitants at large. In 1901 the
local authority made proposals to carry out works in the same street and
other frontagers objected. The justices upheld the objection on the
G    ground that the matter was res judicata by reason of the earlier decision
and their view was upheld by your Lordships' House. The Earl of
Halsbury L.C. said, at pp. 35–36:

"So that, instead of being, as it is, under the Public Health Act,
something removed from the jurisdiction of the justices . . . in this
Act the very question whether or not a particular road is or is not a
highway repairable by the parish is remitted to that tribunal, and
H    remitted to that tribunal for the purpose of determination. My
Lords, for my part I am wholly unable to see anything more in the
nature of a judgment in rem than that . . . If there is no appeal, it
is a final adjudication and determination. If there is an appeal, I

**Lord Bridge of Harwich**       Thrasyvoulou v. Environment Secretary (H.L.(E.))       **[1990]**

presume from what has happened the question was in this case     A
determined adversely to those who are at present the appellants
against the judgment of the Court of Appeal. In any case it
appears to me that this question has been finally and absolutely
determined . . ."

Lord Robertson said, at pp. 38–39:

"The question is truly whether the local Act has given the justices     B
jurisdiction to determine whether the street in dispute is a highway
repairable by the inhabitants, as a substantive issue, in rem, or
merely as a medium concludendi of the liability or non-liability of
the objectors. If the former be the true view, then a decision on
that issue, properly raised, is good against all concerned. There is
nothing contrary to principle and much convenience in a local     C
tribunal being authorized to adjudicate on a local matter with full
notice to all concerned; and the question is merely whether in this
instance that has been provided by the legislature. On the whole, I
have come to think that it has, and that the appeal therefore fails."

Lord Lindley said, at p. 39:

"It appears to me that the question turns on the fact which occurs     D
in this case . . . namely, the fact that the question raised for the
purpose of being decided in accordance with the Act and the
question which was decided in accordance with the Act was whether
Sludge Lane was a street repairable by the inhabitants at large or
not."

Much of the argument against allowing a plea of res judicata or issue     E
estoppel founded on the determination of an appeal against an
enforcement notice under section 88(2) of the Act rested on the
proposition that such a determination is characterised as a "planning
decision" and emphasis was placed on the rights of members of the
public to be heard. Mr. Laws submitted that no distinction could be
drawn between a decision on ground (*a*) of section 88(2) to grant or
withhold planning permission for the development the subject of an     F
enforcement notice, and a decision of any issue arising under grounds
(*b*) to (*e*). If an estoppel arises in the one case, he submits, it must
equally arise in the other. I cannot accept this submission. A decision
to grant planning permission creates, of course, the rights which such a
grant confers. But a decision to withhold planning permission resolves
no issue of legal right whatever. It is no more than a decision that in     G
existing circumstances and in the light of existing planning policies the
development in question is not one which it would be appropriate to
permit. Consequently, in my view, such a decision cannot give rise to
an estoppel per rem judicatam. I also think that there is a significant
distinction between the issue raised by an appeal under ground (*a*) and
the issues raised by any of grounds (*b*) to (*e*) in that members of the
public have the right to attend any public inquiry and to be heard as     H
objectors against the grant of planning permission, but can have no
locus standi as objectors, although they may be heard as witnesses of
fact, in relation to the issues raised on grounds (*b*) to (*e*).

**2 A.C.**        Thrasyvoulou v. Environment Secretary (H.L.(E.))        Lord Bridge
                                                                         of Harwich

A    The distinction between the issue as to whether planning permission should be granted for development the subject of an enforcement notice and any issue arising as to the legal status of the alleged development which is the subject matter of the notice was more immediately apparent in the original statute which introduced the modern planning code, the Town and Country Planning Act 1947 because under that Act the issues fell for determination by different tribunals. Section 23(3) proviso (*a*) of

B    the Act of 1947 enacted that if, following the service of an enforcement notice, application was made for permission for the retention on the land of any buildings or works, or for the continuance of any use of the land, to which the enforcement notice related, the notice should not take effect until that application was finally determined. In practice this invariably led to an appeal to the Minister. But section 23(4) enabled

C    any person aggrieved by an enforcement notice to appeal against it to a court of summary jurisdiction and provided that on any such appeal the court:

"(*a*) if satisfied that permission was granted under this Part of this Act for the development to which the notice relates, or that no such permission was required in respect thereof . . . shall quash the

D    notice to which the appeal relates; . . ."

Section 23(5) gave a further appeal from the decision of the court of summary jurisdiction to quarter sessions. The language of section 23(4) although not in such wide terms as the language of section 88(2) grounds (*b*) to (*e*), nevertheless gave the court jurisdiction to determine the same essential issues of legal right which arise in relation to a building

E    required to be demolished or a use required to be discontinued by an enforcement notice, viz. was the building or use permitted or alternatively established so as to be beyond the reach of enforcement procedure by reason of the lapse of time (four years in all cases under the Act of 1947) since the development took place.

     Alongside the statutory procedures it was also possible to bring actions in the High Court for declarations to determine the status in

F    planning law of proposed developments or of existing buildings or land uses. In *Pyx Granite Co. Ltd v. Ministry of Housing and Local Government* [1960] A.C. 260 the House rejected the proposition that the availability of a specific statutory jurisdiction under the Act of 1947 for the determination of an issue as to the legality of a proposed development had the effect of depriving the High Court of jurisdiction to determine

G    the self-same issue in proceedings claiming a declaration. The particular issue resolved by *Pyx Granite* related to the statutory procedure under section 17 of the Act of 1947 for the determination of questions as to whether any proposed operations on land or change in the use of land would constitute or involve development and, if so, would require planning permission having regard to the provisions of the development order, and it was the availability of the statutory procedure which the

H    House held not to exclude the High Court's parallel declaratory jurisdiction. But it is implicit in the rationale of the decision that the High Court equally had jurisdiction to entertain proceedings for declarations as to the legality or immunity from enforcement procedure

292

Lord Bridge
of Harwich              Thrasyvoulou v. Environment Secretary (H.L.(E.))              [1990]

of any existing building or use of land raising parallel issues to those    A
which could be raised, following service of an enforcement notice, by
appeal against the notice to justices under section 23(4) of the Act of
1947. A declaration obtained in such proceedings must clearly have
been effective to establish the legality or immunity from enforcement
proceedings of the building or use of land in question as res judicata.

The law as explained in the two foregoing paragraphs continued in
force until 1960. But the multiplicity of jurisdictions proved a great    B
inconvenience in practice, and Parliament enacted provisions to abolish
it by section 33 of the Caravan Sites and Control of Development Act
1960. That section is the antecedent of section 88 of the consolidating
Act of 1971 combining the dichotomy of jurisdictions under sections
23(3) and (4) of the Act of 1947 in a unified jurisdiction by way of
appeal to the Minister against an enforcement notice. It also contained    C
in section 33(8) the antecedent of section 243 of the Act of 1971
providing that the validity of an enforcement notice shall not be
questioned except by way of such an appeal.

The effect of this latter provision was put to the test in *Square Meals
Frozen Foods Ltd. v. Dunstable Corporation* [1974] 1 W.L.R. 59. In
that case the owners of a warehouse had planning permission to use it as
a "wholesale warehouse or repository for any purpose." They wished to    D
use it for selling packages of frozen food to the public on a cash and
carry basis. The local planning authority warned them that such a use
would not be use as a warehouse, and would involve enforcement
proceedings. The owners sought a declaration in the High Court that
the proposed use did not require planning permission, being within the
ambit of the permission already granted. Shortly after instituting the    E
proceedings the owners commenced the use of the premises for the cash
and carry business. The local planning authority thereupon served an
enforcement notice and applied to the court to stay the High Court
proceedings seeking a declaration. The Court of Appeal held, affirming
the stay granted by the judge, that section 243(1)(*a*) operated as a bar
not only to proceedings started after the service of an enforcement
notice but also to proceedings started before the service of such notice    F
in which the validity of the notice would inevitably be questioned.

In the light of this decision it can be seen that the effect of the
changes made by section 33 of the Act of 1960 was to substitute for the
jurisdiction under section 23(4) of the Act of 1947 and for the jurisdiction
of the High Court in proceedings for a declaration directed to the
determination of legal rights in existing buildings or uses of land a new    G
jurisdiction conferred exclusively on the Minister. I am of the opinion
that before this change was effected, a determination by justices under
section 23(4) of the Act of 1947 that an existing building or use of land
was either permitted or beyond the reach of enforcement proceedings
would have been as effective as a High Court declaration to give rise to
an estoppel per rem judicatam. But whether this was so or not, the
most formidable difficulty which the arguments of Mr. Glover and Mr.    H
Laws must surmount, if they are to succeed, is to persuade the House
that the substituted jurisdiction now exercised by the Secretary of State
in relation to grounds (*b*) to (*e*) of section 88(2) of the Act of 1971 is

293

2 A.C.                    Thrasyvoulou v. Environment Secretary (H.L.(E.))        Lord Bridge
                                                                                 of Harwich

A  intended to be of such limited effect that it deprives the owner or
occupier of land of the opportunity which he formerly enjoyed to have it
conclusively determined once and for all, by action for a declaration if
not by application to justices, that his building or use of land is for one
reason or another immune from further attack by enforcement notice.

       Certain other provisions of the Act of 1971 are relied on by the
appellants. Section 88B(1)(c) provides:
B
       "On the determination of an appeal under section 88 of this Act,
       the Secretary of State may . . . determine any purpose for which
       the land may, in the circumstances obtaining at the time of the
       determination, be lawfully used having regard to any past use of it
       and to any planning permission relating to it."

C  Subsection (3)(b) provides that any such determination shall be final.
Section 94 provides a procedure whereby an owner or occupier of land
may apply for and obtain from the local planning authority in the first
instance, or if refused by the local planning authority from the Secretary
of State on appeal under section 95, a certificate referred to as an
"established use certificate," that his existing use of land was begun
before the beginning of 1964 or in certain other circumstances such as to
D  place it beyond attack by enforcement notice. Section 94(7) provides:

       "An established use certificate shall, as respects any matters stated
       therein, be conclusive for the purposes of an appeal to the Secretary
       of State against an enforcement notice served in respect of any land
       to which the certificate relates, but only where the notice is served
       after the date of the application on which the certificate was
E      granted."

The submission made is that the finality of a determination under
section 88B(1)(c), which it is conceded will be effective to defeat an
enforcement notice directed against a use of land resumed in reliance on
the determination, and the conclusive effect of an established use
certificate show that when Parliament intended a determination, in this
F  statutory context, to be final and conclusive of any issue determined, it
made express provision to that effect and that the absence of any such
express provision as to the effect of a determination by the Secretary of
State allowing an appeal on any of the grounds (b) to (e) under section
88(2) demonstrates that Parliament did not intend those determinations
to be conclusive.

G      I do not accept this submission. It seems to me, on the contrary,
that these provisions, on a proper understanding of the role they play
in the context of the planning enforcement machinery, do not detract
from but lend support to the conclusion that Parliament must have
intended the determination of any issue arising under grounds (b) to (e)
of section 88(2) in favour of an appellant to be conclusive. The purpose
of section 88B(1)(c) can only be understood in the light of section 23(9)
H  of the Act of 1971 which provides:

       "Where an enforcement notice has been served in respect of any
       development of land, planning permission is not required for the
       use of that land for the purpose for which (in accordance with the

294

provisions of this Part of this Act) it could lawfully have been used    A
if that development had not been carried out."

The effect of this subsection is that when an owner or occupier of
land discontinues a use of land in compliance with the requirements of
an enforcement notice, it is not enough to entitle him to resume the
immediately preceding use to show that, before the unauthorised change,
that use was immune to enforcement procedure, having been begun    B
before 1964; he may only resume a previous use which was itself begun
lawfully, i.e. without any breach of planning control: *Young v. Secretary
of State for the Environment* [1983] 2 A.C. 662. In these circumstances,
it is obviously desirable that an owner or occupier of land who is to be
required by an enforcement notice to discontinue an existing use of land
to discontinue an existing use of land should be entitled to ascertain    C
what, if any, previous use of the land he may safely resume without
being subject to enforcement proceedings directed against that use. But
this would not be an issue arising for determination in the appeal against
the notice unless express provision authorising its determination were
made, as it is, by section 88B(1)(c). It would be futile to provide for
such a determination unless it was intended to protect the owner or
occupier of land from enforcement proceedings when he resumed the    D
use determined to be lawful; so the concession in this regard is rightly
made. But it would surely be a bizarre result that a decision by the
Secretary of State dismissing an appeal against an enforcement notice
requiring discontinuance of the existing use of land and determining that
a previous use might lawfully be resumed should effectively protect that
use against future enforcement proceedings, but that a decision allowing
the appeal on the ground that the existing use was itself lawful should    E
not.

Very similar reasoning applies to the provision in section 94(7) for
the conclusive effect of an established use certificate. A certificate may
be granted on the application of the owner or occupier of land by the
local planning authority without any dispute. If it is so granted, it does
not result from the determination of any contested issue and, in the    F
absence of express provision, there would again be no basis for
attributing to it conclusive effect. The effect of the express provision is
this. If the owner or occupier of land anticipates that his existing use
may be subject to enforcement proceedings and wishes to have the
matter settled in advance, he may apply for an established use certificate
before any enforcement notice is served and if the local planning    G
authority do not grant the certificate, he may eventually succeed on
appeal under section 95 and obtain a certificate with conclusive effect.
But if the local planning authority forestall him by the service of an
enforcement notice requiring discontinuance of the existing use before
his application for an established use certificate is made, it will then be
too late to apply for a certificate under section 94. Instead he will
appeal against the notice on ground (e) under section 88(2) and the    H
Secretary of State on that appeal will have to determine precisely the
same issue as that which he would have otherwise determined on an
appeal under section 95. It seems to me again a bizarre result which

A  Parliament cannot have contemplated or intended that determination of
the issue in the appellant's favour on the appeal under section 95 should
be conclusive, but that the same determination under section 88 should
not.

All these considerations bring me to the conclusion that the
determination in favour of the appellant of an appeal against an
enforcement notice on any of the grounds (b) to (e) under section 88(2)
B  does give rise to an estoppel per rem judicatam. In these circumstances
I do not need to examine the argument that an alternative protection for
owners and occupiers of land against harrassment by the service of
repeated enforcement notices is available by way of judicial review of
decisions by the local planning authority to issue such notices.

I would accordingly dismiss the Secretary of State's appeal in
C  *Thrasyvoulou.*

So far in this opinion I have used the expressions "estoppel per rem
judicatam" and "issue estoppel" indifferently. But before turning to the
subsidiary issue which arises in the second appeal it is necessary to
distinguish between them by reference to the careful terminology used
by Diplock L.J. in *Thoday v. Thoday* [1964] P. 181. He said, at
pp. 197–198:
D
"The particular type of estoppel relied upon by the husband is
estoppel per rem judicatam. This is a generic term which in
modern law includes two species. The first species, which I will call
'cause of action estoppel,' is that which prevents a party to an
action from asserting or denying, as against the other party, the
existence of a particular cause of action, the non-existence or
E  existence of which has been determined by a court of competent
jurisdiction in previous litigation between the same parties. If the
cause of action was determined to exist, i.e., judgment was given
upon it, it is said to be merged in the judgment, or, for those who
prefer Latin, transit in rem judicatam. If it was determined not to
exist, the unsuccessful plaintiff can no longer assert that it does; he
is estopped per rem judicatam. This is simply an application of the
F  rule of public policy expressed in the Latin maxim 'Nemo debet bis
vexari pro una et eadem causa.' In this application of the maxim
'causa' bears its literal Latin meaning. The second species, which I
will call 'issue estoppel,' is an extension of the same rule of public
policy. There are many causes of action which can only be
established by proving that two or more different conditions are
fulfilled. Such causes of action involve as many separate issues
G  between the parties as there are conditions to be fulfilled by the
plaintiff in order to establish his cause of action; and there may be
cases where the fulfilment of an identical condition is a requirement
common to two or more different causes of action. If in litigation
upon one such cause of action any of such separate issues as to
whether a particular condition has been fulfilled is determined by a
court of competent jurisdiction, either upon evidence or upon
H  admission by a party to the litigation, neither party can, in
subsequent litigation between one another upon any cause of action
which depends upon the fulfilment of the identical condition, assert

296

that the condition was fulfilled if the court has in the first litigation    A
determined that it was not, or deny that it was fulfilled if the court
in the first litigation determined that it was."

Adopting this terminology and classification, and applying it by
analogy to the issues which arise on an appeal against an enforcement
notice on any of the grounds (*b*) to (*e*) of section 88(2), I think the
analogue of a "cause of action estoppel" will arise whenever the    B
determination of the ground decided in favour of the appellant on an
appeal against one enforcement notice can be relied on in an appeal
against a second enforcement notice which is in the same terms and is
directed against the same alleged development as the first. That is the
position in *Thrasyvoulou*, for example, in relation to the 1985 notices
alleging change of use to use as a hostel. On appeal against the earlier    C
notices it had been determined that the use of the premises was not use
as a hostel and, there being no subsequent change of use alleged, that
determination was conclusive in the second appeal. But the subordinate
issue in the *Oliver* appeal is whether an issue estoppel, strictly so called,
arose from a successful appeal against an earlier enforcement notice
which was effective to defeat the enforcement notice which is the subject
of the present proceedings.    D

The land which is the subject of the enforcement notice now in
question is an area of irregular shape behind numbers 13 to 19,
The Avenue, Hornchurch with a narrow strip between numbers 11 and
13 giving access to The Avenue. I shall refer to the land as a whole as
"the site." In 1982 the local planning authority served an enforcement
notice relating to a structure standing on the site and alleging a breach    E
of planning control by making a material change of use of the structure
to a use for storage purposes without the grant of planning permission
required in that behalf. The Olivers appealed against this notice on the
ground, inter alia, that the use of the structure in question was part of
the use of the site as a whole as a transport and storage depot which was
an established use of the site having been commenced before 1964 and
was therefore immune from attack by enforcement notice. The case for    F
the local planning authority before the inspector appointed to determine
that appeal accepted that certain buildings on the site had an established
use for storage purposes and that the open parts of the site on which no
buildings stood had an established use for what were described as
"ancillary purpose such as the parking of vehicles." In effect the local
planning authority were contending that different parts of the site were    G
to be treated as distinct planning units and asserting that the use for
storage of the structure to which the notice related, which consisted of a
trailer stationed on the site, involved the making of a material change in
the use of that unit. The appellants were asserting that the site as a
whole was a single planning unit with the benefit of an established use
and that the use for storage of the structure in question was part of that
established use.    H

The inspector resolved the issue in favour of the appellants. He
found that at the date of service of the enforcement notice the trailer
had become a fixture on the site. He continued:

297

A
    "I take the view that the hard standing, on which the trailer was stationed at the date of service of the notice, is part of the premises which has an established use for storage purposes, which use clearly appertains to the whole of the established use site and not only to the building thereon. Whether or not the trailer, at the date of service of the notice, was a building or structure, its use for storage

B
purposes does not constitute a breach of planning control, and the appeal succeeds on that ground."

    The enforcement notice served on 10 January 1986 alleged a breach of planning control by making a material change of the use of the land to a

C
    "use for the purposes of a business of merchants, importers, repackers and distributors of goods including paper products textiles and candles without the grant of planning permission required in that behalf."

    The inspector who determined the appeal against this notice in favour of the local planning authority found that there had been a material change

D
in the character of the site as a whole since 1963 to the use as described in the notice.

    It is submitted for the local planning authority that no relevant issue estoppel arises from the first inspector's decision because it concerned a part only of the site and concerned only a use for storage purposes. It seems to me, however, that the first inspector's decision involved by

E
necessary implication the finding that the use in fact being made of the site at the date of service of the first enforcement notice was an established use, however described. It is expressly conceded in these proceedings that there had been no material change in the character of the use between the dates of the two enforcement notices. Accordingly it follows, in my opinion, that the local planning authority are now

F
estopped from asserting that there was a material change of use between 1963 and 1982 which expressly contradicts a finding made by the first inspector, which was not merely incidental or ancillary to his decision but was the essential foundation for his conclusion that no breach of planning control was involved in the use being made of the structure which was the subject of the first notice. As Mr. Malcolm Spence Q.C. said in his judgment:

G
    "It does not make the slightest difference to the question of the application or otherwise of issue estoppel to a particular case that on the first occasion the local planning authority described the use in one manner and on the second occasion they described it in another manner, when it is conceded that the actual use is the same use on each occasion. This is merely a matter of language. On each

H
occasion the use was the same, and on each occasion the issue was the same."

    I would accordingly dismiss the second appeal.

LORD BRANDON OF OAKBROOK.  My Lords, for the reasons given in    A
the speech of my noble and learned friend, Lord Bridge of Harwich, I
would dismiss the appeals.

LORD GRIFFITHS.  My Lords, I have had the advantage of reading in
draft the speech prepared by my noble and learned friend Lord Bridge
of Harwich. I agree with it, and for the reasons that he gives I, too,
would dismiss both appeals.                                          B

LORD JAUNCEY OF TULLICHETTLE.  My Lords, I have had the
advantage of reading in draft the speech of my noble and learned friend
Lord Bridge of Harwich. I agree with it, and for the reasons given
therein I, too, would dismiss the Secretary of State's appeal in
Thrasyvoulou. I would also dismiss the second appeal.                C

LORD LOWRY.  My Lords, I have had the advantage of reading in
draft the speech of my noble and learned friend Lord Bridge of
Harwich. I agree with it, and for the reasons given by my noble and
learned friend, I, too, would dismiss both appeals.

*Appeals dismissed with costs.*    D

*Solicitors: Treasury Solicitor; Frank E. C. Forney & Partners;
Michael J. Tink, Romford, Treasury Solicitor; Penningtons.*

J. A. G.

E

_____

[PRIVY COUNCIL]

DAVID HARDY GLYNN    .    .    .    .    .    .    APPELLANT

AND

COMMISSIONER OF INLAND REVENUE .    .    .    RESPONDENT    F

[APPEAL FROM THE COURT OF APPEAL OF HONG KONG]

1989  Dec. 11, 12, 13, 14;          Lord Keith of Kinkel, Lord Templeman,
1990  Jan. 22                       Lord Griffiths, Lord Ackner and Lord Lowry

G

*Revenue—Income tax—Employment—Salaries tax—School fees of
taxpayer's daughter paid directly by employer pursuant to
taxpayer's contract of service—Whether "perquisite" of
employment—Whether payments income of taxpayer assessable to
salaries tax—Applicability in construing Hong Kong legislation of
United Kingdom statutes and cases—Inland Revenue Ordinance
(Laws of Hong Kong, 1981 rev., c. 112), ss. 9(1)(a), 11B,
11D(b)*                                                              H

Section 8(1) of the Inland Revenue Ordinance provided for
salaries tax to be charged for each year of assessment on every
person in respect of his income arising in or derived from Hong

A

[HOUSE OF LORDS]

| | | | | |
|---|---|---|---|---|
| CARL ZEISS STIFTUNG | . | . | . | APPELLANTS |

AND

B     RAYNER & KEELER LTD. AND OTHERS     .     RESPONDENTS

(Original Appeal)

RAYNER & KEELER LTD. AND OTHERS     .     APPELLANTS

AND

C     COURTS AND OTHERS     .     .     .     .     RESPONDENTS

(Cross-Appeal)

H. L. (E.)*
1965
Dec. 1, 2, 6,
7, 8, 9, 13,
14, 15, 16;
1966
Jan. 24, 25,
27, 31;
Feb. 1, 2, 3,
7, 8, 9, 13,
14, 15, 16;
May 18.

D     *International Law—Recognition—Effect—Action begun by English solicitors on behalf of East German organisation—Solicitors instructed by governing body of organisation—Governing body authorised by government not recognised by H.M. Government—Unrecognised government set up by de jure government—Whether governing body of organisation competent to institute proceedings. Conflict of Laws—Foreign judgment—Issue estoppel—Judgment by court of country with unrecognised government.*

E          In 1891 there was established at Jena, in the Grand Duchy of Saxe-Weimar, the Carl-Zeiss-Stiftung (" the foundation "), an organisation with industrial, scientific and charitable objects. Under the articles of its constitution (or " statute ") the legal domicile of the foundation was to be Jena, and for representing it as an incorporate body, for the administration of its estate and effects, and for the supreme direction of its affairs, a " special board " was to be formed, the rights and duties of which were F     to pertain to that department of the state service of the Grand Duchy under which the affairs of the University of Jena were for the time being placed. In the case of the cessation of the special board in consequence of political changes in the state, the representation of the foundation, and its statutory administration, were to be made over to the department of state which, with regard to the University, occupied the place of the State Department of the Grand Duchy, provided that its seat was in Thuringia, G     otherwise to " the highest administrative authorities in Thuringia." In 1918 the Grand Duchy was abolished and Jena became part of the " Land " of Thuringia. In 1949 there was set up in the Russian-administered zone of Germany, the German Democratic Republic,

———————————

* Present: LORD REID, LORD HODSON, LORD GUEST, LORD UPJOHN and LORD WILBERFORCE.

854                         HOUSE OF LORDS                    [1967]

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

and the court in the present case proceeded on the basis that the
Land of Thuringia continued to exist until 1952, when under a
decree of the German Democratic Republic, it was divided into
smaller areas, Jena being in the area of Gera, governed by the Rat
(or Council) of Gera, which was itself set up by that decree.

In 1955 English solicitors, on the instruction of an individual
authorised by the Council of Gera as the special board of the
foundation, issued a writ against the defendants, two English
limited companies and an organisation with its headquarters in
the Federal German Republic (West Germany) also calling itself
Carl-Zeiss-Stiftung, to restrain them (inter alia) from passing off
optical and glass instruments with reference to the name " Carl-
Zeiss-Stiftung " or " Carl Zeiss " or " Zeiss." Meanwhile pro-
ceedings had also been brought in West Germany to restrain this
organisation and the persons appointed to administer it from
administrative and representative activities on behalf of the
foundation; in 1960 the Federal Supreme Court dismissed the
action. In 1956 the defendants in the English proceedings took
out a summons to stay all proceedings in the action and to have
it dismissed on the ground that it had been begun, and was
being maintained, without the authority of the foundation. On
March 6, 1964, Cross J. dismissed the summons, holding that
under the articles of the foundation the proper body to authorise
on its behalf an action such as the present was its " special board,"
which was at the material time the Council of Gera. No point was
taken before Cross J. as to whether Her Majesty's Government had
recognised de jure or de facto the German Democratic Republic
or its Government, or as to the application in the English courts
of East German legislation or decrees. The defendants appealed
and moved the Court of Appeal, asking that a letter be written
to the Foreign Secretary requesting him to certify whether (inter
alia) Her Majesty's Government had granted recognition de
jure or de facto to the German Democratic Republic or to its
Government and, if yes, when. The court,[1] holding that recogni-
tion was a matter which the court of its own motion was bound
to consider, acceded to that request, and the Foreign Secretary
subsequently certified that:

" Her Majesty's Government have not granted any recogni-
tion de jure or de facto to (a) the ' German Democratic
Republic ' or (b) its ' Government.' "

In answer to a further letter from the court,[2] the Secretary of
State certified (inter alia) that since June, 1945, and up to the
present date

" Her Majesty's Government have recognised the State and
Government of the Union of Soviet Socialist Republics as
de jure entitled to exercise governing authority in respect
of [East Germany]."

A

B

C

D

E

F

G

---

[1] *Carl Zeiss Stiftung* v. *Rayner
& Keeler Ltd.* [1965] Ch. 525; [1964]
3 W.L.R. 905; [1964] 3 All E.R. 326,
C.A.

[2] The Times, October 30, 1964.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A

On the defendants' contention that the council of Gera, having been set up by a decree of the unrecognised government of the German Democratic Republic, could not be recognised by the English courts as being the special board of the foundation with authority to institute proceedings therein on its behalf:—

*Held*, (1) that, although the German Democratic Republic is not recognised by Her Majesty's Government, its acts should be recognised by the English courts as lawful, not as the acts of a sovereign state, but as acts done by a subordinate body which the U.S.S.R. set up to act on its behalf, since a de jure governing body cannot disclaim responsibility for the acts of subordinate bodies set up by it.

B

*City of Berne* v. *Bank of England* (1804) 9 Ves. 347; *Taylor* v. *Barclay* (1828) 2 Sim. 213; and *Aksionairnoye Obschestvo A. M. Luther* v. *James Sagor & Co.* [1921] 1 K.B. 456; [1921] 3 K.B. 532; 37 T.L.R. 777, C.A. considered.

C

(2) That the decision of the West German courts does not fulfil the requirements for the application of the doctrine of issue estoppel and accordingly has not made the subject-matter of the present issue res judicata, so that the defendant solicitors are not estopped from contending that they have authority to bring the action in the name of the foundation.

D

(3) That questions relating to the constitution of a foreign corporation should be decided according to the law of the place where it is incorporated and since, on the evidence, every court in the Eastern Zone of Germany would hold that the Council of Gera was the special board of the foundation, the courts of another jurisdiction are debarred from deciding the question in any other way.

E

*Per* Lord Reid, Lord Hodson, Lord Upjohn and Lord Wilberforce. Issue estoppel can be based on a foreign judgment, although in such a case the doctrine should be applied with caution because of the uncertainties arising from the differences of procedure in foreign countries (post, pp. 918B, 927G, 948G, 966C–D, 967F).

*Simpson* v. *Fogo* (1862) 1 H. & M. 195 distinguished.

F

*Per* Lord Reid, Lord Hodson, Lord Guest and Lord Upjohn. There was no complete identity between the parties in the proceedings in West Germany and in the present case, since the solicitors in the present case had no connection with or interest in the German litigation and could not be estopped from now defending themselves and showing that they had authority to act (post, pp. 911A, E, 929A, 937A, C, 946A).

G

*Per* Lord Wilberforce. There is identity of parties in the two sets of proceedings. The reality behind the action is that the Council of Gera is seeking in these proceedings to set up the foundation as plaintiff. To treat the solicitors as parties is lacking in reality and is unduly technical (post, pp. 968D, 969A–B).

*Per* Lord Reid. There was no identity of issues in the two sets of proceedings. The question before the West German courts was whether the Council of Gera were the legal representatives of

H. L. (E.)

1966

─────
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
─────

the foundation at one date. The question here is whether at a    A
different date the solicitors had the authority of the foundation to
bring the action. An answer, yes or no, to the first question does
not necessarily imply an answer to the second (post, p. 913c).

*Per* Lord Upjohn and Lord Wilberforce. The issue whether
the Council of Gera had authority to give instructions to start
proceedings in England in the name of the foundation or
whether the foundation had become paralysed and could not act    B
depends on precisely the same facts, circumstances and argu-
ments as were relied on in the West German courts and rejected
by them (post, pp. 943G—944A, 967G—968A, 972D).

*Per* Lord Guest, Lord Upjohn and Lord Wilberforce. It was
not established that the judgment of the West German courts was
final and conclusive in West Germany as regards other pro-
ceedings between the same parties (post, pp. 936B, 949C, 971B).    C

*Per* Lord Hodson and Lord Wilberforce. There is no ground
for concluding from a communiqué issued on September 19, 1950,
by the Foreign Ministers of France, Great Britain and the United
States of America that the views of the courts of the Federal
German Republic are conclusive as to the law of Germany as a
whole (including the German Democratic Republic), the com-
muniqué being only concerned with political representation (post,    D
pp. 929G—930A, 974D).

Decision of the Court of Appeal [1965] Ch. 596; [1965] 2
W.L.R. 277; [1965] 1 All E.R. 300, C.A. reversed.

APPEAL from the Court of Appeal (Harman, Danckwerts and
Diplock L.JJ.).

This was an appeal by leave of the Court of Appeal by the    E
present appellants, the plaintiffs in the action, Carl-Zeiss-Stiftung
of Jena, from an order of that court dated December 17, 1964,
whereby it allowed the appeal of the respondents, the defendants
in the action, Rayner & Keeler Ltd., Degenhardt & Co. Ltd.
and Carl-Zeiss-Stiftung of Heidenheim, Brenz, from the order    F
of Cross J. dated March 6, 1964.

On March 17, 1965, the respondents presented a petition of
appeal naming as sole respondents thereto Louis Courts, Philip
Max Skelsey, Martin Roy Kagan, Montague Cohen, David
Michael Blackburn and William Hollis, the present individual
partners of the firm of Courts & Co., which firm, but not all the    G
individual partners, had throughout acted in this litigation as
solicitors for the appellants.

On April 12, 1965, the Appellate Committee of the House of
Lords ordered that the respondents should be permitted to present
that appeal by way of cross-appeal in the original appeal by the

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A   appellants, the individual partners being respondents to that cross-
appeal, with liberty to lodge a case in answer to the cross-appeal
and without prejudice to any other contentions, to object therein
to the competency of the cross-appeal.  The respondents were to
have liberty to proceed with the cross-appeal in the event of the
original appeal not being proceeded with.  The individual partners
B   lodged a case in the cross-appeal.

      Carl-Zeiss-Stiftung (Jena) and Carl-Zeiss-Stiftung (Heidenheim,
Brenz) are so referred to in order to distinguish by their respective
seats the rival organisations claiming to be entitled to the name
of the original foundation.

C       This action for passing off was commenced by writ dated
October 20, 1955, in the Chancery Division of the High Court of
Justice by the appellants on the footing that they were a German
foundation, founded in 1891, and had their registered office and
seat (" Sitz ") at Jena which was in that part of Germany now
constituting the territory of the German Democratic Republic.
D   Originally the third defendants (the third respondents) were sued
in the name of Carl-Zeiss, but on service on them of notice of a
concurrent writ, issued by leave under R.S.C., Ord. 11, r. 1 (*f*),
they entered an appearance as " Carl-Zeiss-Stiftung trading as
Carl-Zeiss."  Subsequently the writ was amended by changing
their name to Carl-Zeiss-Stiftung and extending the relief claimed.
E   As amended, the writ claimed:

         " (1) An injunction to restrain the defendants and each of
      them from advertising offering for sale or selling any optical
      instruments or any articles containing or consisting of glass
      under or by reference to the name ' Carl Zeiss ' or any name
      containing ' Zeiss ' unless such goods be those of the plaintiffs
      or an organisation associated with the plaintiffs and generally
F     from passing off any business or goods as and for those of the
      plaintiffs or an organisation associated with the plaintiffs.
      (2) An injunction to restrain the third defendants from using
      the name ' Carl-Zeiss-Stiftung ' or ' Carl Zeiss ' or any name
      containing ' Zeiss ' in relation to their business or goods.
      (3) Delivery up or destruction upon oath of all articles
      calculated to lead to passing off.  (4) An inquiry as to damages
G     or an account of profits.  (5) Further and other relief.
      (6) Costs."

      The facts are stated in the opinions of Lord Reid and Lord
Guest and are also fully set out in the report of the case in the
Court of Appeal.[1]

---

[1] [1965] Ch. 596, 598–606, 637; [1965] 2 W.L.R. 277, 279–286, 289–290, C.A.

858                         HOUSE OF LORDS                    **[1967]**

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

The relevant transactions in relation to the foundation at and    A
after the end of the war may be summarised as follows: Jena
was first occupied by the Americans but it subsequently became
part of the Russian Zone of occupation on July 1, 1945.  When
the Americans left they took with them all the members of the
existing boards of management of the foundation.  The members    B
of the board of management of the optical business had selected
three employees of the foundation, Dr. Hugo Schrade and two
others, who stayed in Jena, as suitable persons to carry on in their
absence.

On October 30, 1945, Marshal Zhukov, head of the Russian
Military Administration in Germany, made an order (SMAD 124),    C
providing for the sequestration of certain types of property in
the Russian Zone.  On June 1, 1948, documents were signed
recording the confiscation of the Zeiss optical works at Jena, and
this was confirmed by the Soviet Military Administration.  The
confiscated businesses became known as Volks Eigene Betriebe
(VEBs), "People's Owned Enterprises."  The confiscation did not    D
involve change in the persons who ran the businesses.

On July 30, 1948, a request was made to the Minister of
Education of Wurtemburg to declare Heidenheim to be the legal
domicile of the foundation in the West and appoint five named
persons the management of the foundation, with jurisdiction out-
side the Russian Zone.  On February 23, 1949, the Minister of    E
State of Wurtemburg ordered that article 3 of the Statute of the
foundation should be amended to read: " The legal seat of the
foundation is at Jena and Heidenheim."  Three named persons
were appointed to administer and represent the foundation in
accordance with article 114 until a special board in accordance
with article 113 should have been reconstituted.  This order was    F
confirmed by the Minister of Education on May 3, 1949, and on
January 15, 1951, the District Court of Heidenheim registered the
firm of Carl-Zeiss in the commercial register as a firm owned by the
Carl-Zeiss-Stiftung domiciled at Heidenheim, with a statement to
the effect that it had transferred its seat from Jena.  By a document
signed by the Minister of Education " by proxy " on June 25,    G
1951, the management of Carl-Zeiss-Stiftung at Jena conferred on
Dr. Schrade a " power of attorney " on behalf of the Stiftung
to undertake all legal proceedings and represent it in law suits.

Meanwhile in 1949 there had been set up in the Russian Zone
of Germany the German Democratic Republic.  On September 16,
1964 the Foreign Secretary certified:

A        " Her Majesty's Government have not granted any recognition
         de jure or de facto to (a) the ' German Democratic Republic '
         or (b) its ' Government.' "

         On November 6, 1964, the Foreign Secretary further certified:

             " From the area allocated to the Union of Soviet Socialist
         Republics, Allied forces under the Supreme Allied Com-
B        mander, General Eisenhower, withdrew at or about the end
         of June, 1945.  Since that time and up to the present date
         Her Majesty's Government have recognised the State and
         Government of the Union of Soviet Socialist Republics as de
         jure entitled to exercise governing authority in respect of that
         zone . . .  In the area comprised in the zones allocated to the
         Governments of the French Republic, the United Kingdom of
C        Great Britain and Northern Ireland and the United States of
         America in pursuance of the protocol of September 12, 1944,
         and the agreement of July 26, 1945, . . . the Government of
         the Federal Republic of Germany was established on Septem-
         ber 21, 1949.  In a communiqué issued by the Foreign Ministers
         of the French Republic, the United Kingdom of Great Britain
         and Northern Ireland and the United States of America on
D        September 19, 1950, it was stated that ' Pending the unification
         of Germany, the three Governments consider the Government
         of the Federal Republic as the only German Government
         freely and legitimately constituted and, therefore, entitled to
         speak for Germany as the representative of the German people
         in international affairs.'  This statement does not constitute
         recognition of the Government of the Federal Republic as
         the de jure Government of all Germany."
E
             There was litigation in West Germany relating to the foundation.
         The Carl-Zeiss-Stiftung of Jena was represented therein by the
         Council of Gera, in the area of which Jena was situated.  The
         council had been set up by a decree of the German Democratic
         Republic in 1952 and had appointed Dr. Schrade as deputy (or
         mandatory) of the foundation under article 4 of its statute.  In an
F        action in the courts of the Federal Republic of Germany in West
         Germany against the firm Carl-Zeiss of Heidenheim, Brenz, and
         the three persons who had been appointed to administer it, the
         relief claimed was that the defendants should desist from
         administrative and representative activities on behalf of the
         foundation and from the use of the name Zeiss and the style
G        Carl-Zeiss.  On November 15, 1960, the Federal Supreme Court
         held that the action should be dismissed.
             Meanwhile there had been litigation in the Russian Zone and
         on March 23, 1961, the Supreme Court of the German Democratic
         Republic determined an action brought by Carl-Zeiss-Stiftung of
         Jena, represented by the Council of Gera in its capacity as special

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

860                          HOUSE OF LORDS                          [1967]

H. L. (E.)
1966
─────
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
─────

board and Dr. Schrade as mandatory, against the firm of Carl-Zeiss    A
in West Germany.  It held that the defendants should refrain from
using the firm name of Carl-Zeiss.

In the present proceedings in England the defendants in the
action applied by summons dated February 7, 1956, for

> " an order that all further proceedings in the action be stayed    B
> and that this action be dismissed on the ground that the same
> was commenced and is being maintained without the plaintiffs'
> authority and that Messrs. Courts & Co. the solicitors purport-
> ing to act for the plaintiffs herein do pay to the defendants
> the costs of this action."

Cross J. dismissed the summons.  The Court of Appeal having
reversed this decision, the plaintiffs appealed to the House of Lords.    C

*Guy Aldous Q.C., D. Falconer* and *E. Lauterpacht* for the
appellants.  It does not matter whether the U.S.S.R. or the German
Democratic Republic is the sovereign of the East German
territory.  In neither event can the laws enacted there be treated
as a nullity in this country, for, if the German Democratic    D
Republic is not independent, then the U.S.S.R. is the sovereign
there.  Thus there is no possible point at issue on which the
certificate of the Foreign Secretary can have any effect.  The law
as to the effect of such a certificate is stated in *Duff Development
Co. Ltd.* v. *Government of Kelantan.*[2]

Finding out what is the law of a foreign country means finding    E
out what is the law which the courts of that country in fact enforce.
There might conceivably be a country in which there was no
sovereign at all recognised by Her Majesty's Government de jure
or de facto and the law of that country would be the law in fact
enforced there.  On this aspect of the case the judgment of Cross J.
was right in every respect.    F

As to the Foreign Secretary's certificate of November 6, 1964,
it is only paragraph (*a*) which is of any materiality.  The U.S.S.R.
are in de jure control of the East German Zone as the occupying
power and, so far as the British Government are concerned, only
the U.S.S.R. exercises control there.  The German Democratic
Republic is a mere creature of the U.S.S.R., subservient to it.    G
The House of Lords must interpret the certificate and it should
not be interpreted so as to produce an unreasonable result.  One
must presume that everything is rightly and properly done, unless
the contrary is proved, and that the laws of East Germany are

─────
2  [1924] A.C. 797, 813, 823–4, 830; 40 T.L.R. 866, H.L.(E.).

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A   validly enacted. The U.S.S.R. is responsible for whatever has happened there; whatever the German Democratic Republic did, it did as a dependent entity. If an occupying power allows an existing government to pass laws, that is done under the aegis of the occupying power, and the only government operative in East Germany is the occupying power. The appellants argue this case

B   on the footing that what the Foreign Secretary says is the case is indeed the case.

In the case of the construction of a document the local law is found by considering how the local courts would interpret it. In construing a foreign contract one must give it the sense which the parties would have understood it to have, and to do that one must

C   go to the foreign law. That has nothing to do with the question whether or not the foreign country has been recognised by our government. Nor has it anything to do with the question in the present case what article 113 of the statute of the Stiftung means to a German. So long as courts are operating in a country, the law of it can be ascertained, even if no government at all is

D   recognised by Her Majesty's Government, and it is to that law that one goes to understand what the parties meant.

It is first submitted that the onus of proof is on the defendants in every respect: *Russian Commercial and Industrial Bank* v. *Comptoir d'Escompte de Mulhouse*.[3]  A person who brings an action is assumed in English law to have authority to do so. The

E   appellants say that the power of attorney under which this action was brought was a good power. The onus is on the respondents to prove the contrary.

The second submission is that what foreign law is must be proved by proper evidence: *Lazard Brothers & Co.* v. *Midland Bank Ltd.*[4]  The present case must depend on the interpretation

F   of the statute of the Stiftung in the light of German law at the material time. See *Banco de Bilbao* v. *Sancha.*[5]

Here there is a recognised government in de facto control of East Germany, the U.S.S.R. The statute of the Stiftung and its operation must be interpreted so as to have regard to the law prevailing from time to time at Jena. That is the law which the

G   U.S.S.R. has applied. If an occupying power does not suspend the law operating in the territory which it occupies, the courts validly administer the law under the authority of that sovereign,

---

[3] [1925] A.C. 112, 119, 129, 140; 40 T.L.R. 837, H.L.(E.).
[4] [1933] A.C. 289, 297–8; 49 T.L.R. 94, H.L.(E.).

[5] [1938] 2 K.B. 176, 194–5; 54 T.L.R. 603; [1938] 2 All E.R. 253, C.A.

862                                   HOUSE OF LORDS                          [1967]

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———

who permits it to continue.  In East Germany there are courts of    A
law, whose authority stems from the fact that the U.S.S.R. permits
them to operate.  Whatever the U.S.S.R. might say to the contrary,
that is the factual position.  The source of the law which the
courts administer is irrelevant.  That law may be judge-made or
customary and need not be enacted.  There is evidence that under
East German law the Council of Gera was the appropriate party          B
to give the relevant authority.  There was evidence that any East
German court would hold that the relevant acts were properly
authorised under the statute of the Stiftung.  That law can be
proved as a fact and the English courts will accept the proof.  The
law of Formosa could be proved in order to interpret a contract,
even though since 1952 Her Majesty's Government has recognised          C
no government there.

Properly understood, *Aksionairnoye Obschestro A. M. Luther
v. James Sagor & Co.*[6] is not contrary to the appellants' submis-
sions: see " Judiciary and Executive in Foreign Affairs " by F. A.
Mann in the Transactions of the Grotius Society, 1943, Vol. XXIX,
pp. 143, 156–9.  That case was rightly decided on the facts, but       D
if there had been courts of law in Russia at the time and place
in question and it could have been proved what their ruling would
have been, the decision might have been the other way: see also
*U.S.* v. *Insurance Companies*,[7] and *Sokoloff* v. *National City Bank
of New York.*[8]  The American approach could mitigate the
consequences of the extreme application of non-recognition.  The       E
courts of a country give validity to those acts which are necessary
to preserve peace and good government and what is lawful is
ascertained by the decisions of the local courts at the particular
time in question.

As to de facto and de jure recognition: see " Recognition " by
Sir John Fischer Williams K.C., Transactions of the Grotius           F
Society, 1929, Vol. XV, pp. 53, 66–70; Oppenheim's International
Law, 8th ed. (1955) Vol. I, pp. 134–6, para. 74 and *Upright* v.
*Business Machines Co. Inc.*[9]

If the House of Lords rejected the appellants' submissions on
this part of the case, it would mean that every judgment in the
courts in East Germany for the last ten years had been a nullity,      G
including decisions on divorces and contracts, and that all officials
appointed had been unlawfully appointed and that, for example, all

⁶ [1921] 1 K.B. 456, 469–72; 37        ⁸ (1924) 145 N.E. 917.
T.L.R. 282; [1921] 3 K.B. 532,          ⁹ (1961) 13 App.Div. 2nd 36; 213
546–7; 37 T.L.R. 777, C.A.            N.Y. 2nd 417.
⁷ (1874) 89 U.S. 99.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———

A    marriages before those officials were invalid.  This is avoided by accepting that the laws are valid because they derive their authority from the only valid government in East Germany, the U.S.S.R.

The recognition point, which was not taken in the court of first instance, should be jealously scrutinised: see *Tasmania*
B    *(Owners)* v. *City of Corinth (Owners)*.[10]  There was no evidence before the court that the German Democratic Republic was independent.  The evidence was all one way that it was dependent on the U.S.S.R. which remained the occupying power.  The respondents have not proved that the laws in question did not validly stem from the U.S.S.R.  In their case they make no
C    distinction between governments which are subservient and those which are not.

Alternatively to the recognition point there is the question whether the Council of Gera was the special board of the Stiftung at the relevant date.  That involves a question of the law in force at Jena.  There is no doubt that it is, according to the law in force
D    in East Germany.  But if one is to go outside what the courts there would say, the matter is one of construction of the statute of the Stiftung, especially article 113, and in construing it no question of the recognition of the German Democratic Republic arises.  The views of Her Majesty's Government on that point have nothing to do with identifying the special board.  Once it is identified, it can
E    sue in this country as the appropriate body to do so: see *Luigi Monta of Genoa* v. *Cechofracht Co. Ltd.*[11]  In East Germany the occupying power is still there and the government there is not independent but is subservient.  The situation is different from that which prevailed in *Salimoff & Co.* v. *Standard Oil Co. of New York*,[12] but that case is relied on.
F    The case for the appellants is summarised in their reasons in their printed case.  (1) This action was properly authorised by the Council of Gera as the special board of the Stiftung and the respondents have not proved the contrary.  (2) This action was properly authorised by Dr. Schrade under his power of attorney dated June 29, 1951, from the Ministry of Education, Thuringia,
G    as the special board of the Stiftung at that time, and the respondents have not proved the contrary.  (3) This action was properly authorised by the board of management of the optical works of the Stiftung under article 114 of the statute, acting by Dr. Schrade

[10] (1890) 15 App.Cas. 223, 225, H.L.(E.).

[11] [1956] 2 Q.B. 552; [1956] 3 W.L.R. 480; [1956] 2 All E.R. 769.
[12] (1933) 186 N.E. 179.

864                                 HOUSE OF LORDS                          [1967]

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

as the sole member of that board, and the respondents have not       A
proved the contrary.   (4) This action was properly authorised by
Dr. Schrade as the mandatory or proxy mandatory of that board
under the provisions of article 9 of the statute, and the respondents
have not proved the contrary.   (5) The respondents ought not to
have been allowed to argue in the Court of Appeal a case
inconsistent with, and contrary to, the case which they put forward       B
in the High Court.   (6) The respondents ought not to have been
allowed to take any point in the Court of Appeal which they had
not taken in the High Court and on which all the material facts
were not before the court as completely as would have been the
case if the controversy had arisen in the High Court.   (7) The
respondents had expressly disclaimed the non-recognition point in       C
the hearings before the High Court, and the Court of Appeal ought
not to have allowed them to take that point in the appeal.   (8) It
is implicit in, or, alternatively, not inconsistent with, the Foreign
Office certificate that, so far as laws are recognised by the East
German courts as valid and have not been, or purported to have
been, made by the German Democratic Republic over the last       D
fifteen years, those laws are to be regarded as having been made by,
or with the authority of, the U.S.S.R. and accordingly those laws
are to be regarded as valid.   (9) It is not disputed that the U.S.S.R.,
which is regarded by Her Majesty's Government as de jure
sovereign authority of East Germany, would regard the laws in
question as valid.   (10) Only the U.S.S.R. as the de jure sovereign       E
in East Germany can say that the laws in question are not valid,
and the U.S.S.R. has not done so.   (11) If the validity of the laws
in question had been put in issue by the respondents in the High
Court, the appellants might have been able to adduce evidence to
establish that such laws did in fact derive their authority from
the U.S.S.R. as the de jure sovereign power in East Germany, and       F
the House of Lords should assume that those laws did in fact so
derive their authority.   (12) There was no issue in the High Court
as to the validity of the laws in East Germany and it is unnecessary
for the House of Lords to take notice of the non-recognition point,
since recognition of the laws of East Germany as valid does not
involve taking any view contrary to that of Her Majesty's Govern-       G
ment.   (13) The laws of East Germany can and should be proved
as matters of fact without it being necessary to inquire as to who is
the sovereign power.   (14) Diplock L.J. was in error in holding
that the hearing before Cross J. was conducted on the erroneous
assumption that the German Democratic Republic was recognised

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
——

A  by the Crown as a sovereign state and its government as a sovereign government.  (15) In the circumstances and having regard to the evidence filed by them in this application the respondents cannot discharge the onus upon them.  (16) The statute of the Stiftung is a private document of a commercial nature and the attitude of Her Majesty's Government as to the recognition or non-recognition of

B  any particular authority is irrelevant to its construction or the intention of the founder.  (17) The "highest administrative authorities in Thuringia" for the purposes of article 113 of the statute of the Stiftung are to be ascertained according to the laws of East Germany, and, as a matter of fact, the Council of Gera is the highest administrative authority in that part of Thüringia in

C  which Jena is situate.

   *Mark Littman Q.C., Michael Kerr Q.C.* and *T. M. Shelford* for the respondents.  The constitutional background of Germany since the war appears from *Rex* v. *Bottrill, Ex parte Kuechenmeister.*[13] Since 1871 Her Majesty's Government has recognised only one German state.  Germany is still one, and there are no West German

D  nationals or East German nationals; all are Germans.  So the domicile of the foundation, which was incorporated before 1945, is Germany as a whole and the determination of its status and the right to represent it are matters which affect Germany as a whole and which, if arising outside Germany, are within the scope of the Foreign Office communiqué set out in the certificate of November 6,

E  1964.  In the determination of such matters the decisions of the courts of the Federal Republic are paramount.  The West German decrees to the effect that Heidenheim is the domicile of the foundation are not relied on for the purposes of this summons: see also *Preston (orse Putynski)* v. *Preston (orse Putynska) (orse Basinska)*[14] and Selected Documents on Germany and the Question

F  of Berlin 1944–61 (Cmnd. 1961 No. 1552), p. 43, document No. 9.

   *Luther* v. *Sagor*[15] was right in holding that the laws of a state not recognised by His Majesty's Government have no legal effect in an English court which cannot give any effect to them.  The law of a subservient state not so recognised does not become the law of the dominant state because it is made under pressure and control

G  of the dominant state.  If the new laws of the unrecognised German Democratic Republic are not given any legal effect, hardship, inconvenience or injustice may result in some cases, but there is not a vacuum.  The old laws would remain in force, whether

---

[13] [1947] K.B. 41; 62 T.L.R. 570; [1946] 2 All E.R. 434, C.A.

[14] [1963] P. 141, 151–2; [1963] 2 W.L.R. 1401; [1962] 3 All E.R. 1057.

[15] [1921] 1 K.B. 456, 473–474.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

customary, statutory or judge-made.  Appointments of judges   A
under the old laws would be valid, though appointments under the
new laws would be invalid.

The question to be decided now is not whether those in West
Germany represent the Stiftung, but whether those in East
Germany represent it.  It might conceivably be held that neither do.

The following propositions are submitted: (1) It is an   B
established rule of constitutional law that it is the sovereign's
prerogative to act as the representative of the nation in international
affairs.  This comes within the province of the sovereign acting
through the executive.  The matters covered include the question
which states and which governments are to be recognised as having
sovereign authority in foreign lands.   C

(2) On such matters the views of the sovereign, given through
the executive, are decisive.  The courts will take judicial notice of
the attitude of the executive and, when any doubt exists, will seek
information from the executive, and that information is conclusive.

(3) In matters thus within the province of the executive there   D
is a principle established over the last hundred and fifty years that
the courts will not speak with a different voice from that of the
executive.  This principle has been applied to a wide variety of
different situations, which include the following: (i) laws purport-
ing to emanate from states or governments unrecognised by Her
Majesty have no legal effect in an English court; (ii) an   E
unrecognised government cannot initiate proceedings in an English
court; (iii) a party cannot found his case on any contention which
involves recognition by an English court of the existence of such
a body as having sovereign powers; (iv) these are matters of
public policy of which the court will take notice of its own motion,
and the court will not decide such matters except on the basis of   F
what it knows or believes to be the true facts.

(4) These principles are probably founded, as a matter of
constitutional law, on the fact that in law the courts are the
Queen's courts and that she will not speak with one voice through
the executive and another through the judges.   G

(5) Whatever its constitutional origins, this is founded on
practical policy.  Her Majesty's Government must consider many
matters besides legal questions, such as injustice to individuals,
treaty obligations and political consequences, as also the boundaries
and functions of states, for example, whether or not to recognise a
division of Germany.  This is recognised by the authorities.

A.C.                AND PRIVY COUNCIL                867

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    (6) Non-recognition may create a practical vacuum so far as enforcement in an English court is concerned. But all the law already established in the area goes on in the country itself. The law in the Eastern Zone is the law at the end of the Hitler regime, save so far as it has been changed by the United States or the Soviet military administrations; for example, the German Civil
B    Code continues in force.

    (7) As to retroactivity: (a) When a non-recognised state becomes recognised, the English courts are bound to treat the acts of the government as valid, with retroactive effect. (b) The judiciary is dependent on the Crown and in effect the act of recognition compels the courts to apply a different set of laws from that which
C    they would otherwise apply. (c) The recognition brings in acts emanating from a state which was formerly unrecognised. It is wrong to say that if there is a sovereign recognised de jure, the courts regard everything done in that territory as having been done by that sovereign. In the present case three possible positions can be put forward: (i) that everything in East Germany is done by
D    the U.S.S.R.; (ii) that what exists there is a usurping government purporting to be making laws but in fact acting without the consent of the de jure government; or (iii) that the de facto power is acting with the consent of the de jure government.

    (8) The court cannot let this action continue for these reasons: (i) The appellants cannot rely on the Council of Gera as giving
E    authority for this action as the special board of the Stiftung without showing that it is indeed the special board. They have to show that the Council of Gera exists and exercises governmental functions. It is essential for them to set up the decree of 1952, but that decree purports to be a decree of the German Democratic Republic and the appellants do not rely on it because it emanates
F    from a state not recognised by Her Majesty's government either de jure or de facto. (ii) This case goes further than *Luther* v. *Sagor* [16] and is a fortiori because the recognition of the Council of Gera as a governmental body would involve the recognition of an organ of an unrecognised state. (iii) To allow that the Council of Gera was a proper body to institute proceedings for the Stiftung
G    would be to recognise the authority of an unrecognised state to institute proceedings in English courts. (iv) Such proceedings as the present would not only be brought by an unrecognised state or government but would be for its benefit, because the effect of the action succeeding would be that the organs of the unrecognised

[16] [1921] 1 K.B. 456; [1921] 3 K.B. 532.

868                        HOUSE OF LORDS                        [1967]

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

state could run the Stiftung's affairs.  (v) There is no justification    A
for holding that the decree of 1952 is to be treated as a law of the
U.S.S.R. or otherwise as deriving legislative authority from the
U.S.S.R.  That would be contrary to the terms of the Foreign
Secretary's certificate and the decree itself.  In substance and effect
this would put the German Democratic Republic on a par with a
recognised state.                                                         B

The authorities on the general law are Dicey's Conflict of
Laws, 7th ed. (1958), pp. 662–4; Oppenheim's International law,
8th ed. (1955), Vol. I, pp. 765–6; Lauterpacht's Recognition in
International Law (1947), pp. 44, 70–1, 72–3, 145–50, 154, 156–7.
*City of Berne* v. *Bank of England* [17]; *Jones* v. *Garcia del Rio* [18];   C
*Thompson* v. *Powles* [19]; *Taylor* v. *Barclay* [20]; *Republic of Peru* v.
*Dreyfus Brothers & Co.* [21]; *Mighill* v. *Sultan of Johore* [22]; *Foster*
v. *Globe Venture Syndicate Ltd.* [23]; *The Gagara* [24]; *The Annette* [25];
*The Lomonsoff* [26]; *Luther* v. *Sagor* [27]; *White, Child & Beney Ltd.*
v. *Simmons* [28]; *Banque Internationale de Commerce de Petrograd*
v. *Goukassow* [29]; *Duff Development Co. Ltd.* v. *Government of*
*Kelantan* [30]; *Russian Commercial and Industrial Bank* v. *Comptoir*   D
*d'Escompte de Mulhouse* [31]; *Lazard Brothers & Co.* v. *Midland*
*Bank Ltd.* [32]; *Banco de Bilbao* v. *Sancha* [33]; *The Arantzazu*
*Mendi* [34]; *Gdynia Ameryka Linie Zeglugowe Spolka Akcyjna* v.
*Boguslawski.* [35]

There is nothing in English law which raises the possibility of
an exception to the rule stated by the respondents.                       E

As to the American position: see Professor D. P. O'Connell
on International Law (1965), Vol. I, pp. 189–99.  American law on
this point is not wholly settled or clear, but it is not established
that it is different from English law in this respect: see *The*
*Maret* [36]; *Russian Socialist Federated Soviet Republics* v.            F

[17] (1804) 9 Ves. 347.
[18] (1825) Turn. & R. 297.
[19] (1828) 2 Sim. 194.
[20] (1828) 2 Sim. 213, 220–1.
[21] (1888) 38 Ch.D. 348, 358–9; 4 T.L.R. 333.
[22] [1894] 1 Q.B. 149; 10 T.L.R. 115, C.A.
[23] [1900] 1 Ch. 811, 814–5.
[24] [1919] P. 95; 35 T.L.R. 259, C.A.
[25] [1919] P. 105.
[26] [1921] P. 97, 105; 37 T.L.R. 151.
[27] [1921] 1 K.B. 456; [1921] 3 K.B. 532, 540, 545, 546–7, 547–8, 549, 551, 559.

[28] (1922) 127 L.T. 571, 583; 38 T.L.R. 616, C.A.
[29] [1923] 2 K.B. 682; 691–2, C.A.
[30] [1924] A.C. 797, 827–8.
[31] [1923] 2 K.B. 630, 636, 663; 39 T.L.R. 574, C.A.; [1925] A.C. 112, 123–4.
[32] [1933] A.C. 289, 297–8.                                              G
[33] [1938] 2 K.B. 176, 195–6.
[34] [1939] A.C. 256, 264; 55 T.L.R. 455; [1939] 1 All E.R. 719, H.L.(E.).
[35] [1953] A.C. 11, 30, 44–5; [1952] 2 T.L.R. 317; [1952] 2 All E.R. 470, H.L.(E.).
[36] (1944) 145 Fed. 2nd 431.

**A**     *Cibrario* [37]; *Banco Nacional de Cuba* v. *Sabbatino* [38]; *Petrogradsky Mejdunarodny Kom. Merchesky Bank* v. *National City Bank of New York* [39]; and *In the Estate of Luks.* [40]  In cases in which the courts have refused recognition of a foreign law, it was not because of the objectionable character of the law but because the body which made it had no power to do so.  This applied equally to a

**B**     marriage law and a confiscatory law.

     By refusing recognition to a foreign government for a prolonged period one is sending the government to Coventry and putting it to inconvenience which may produce hardship for individual persons, including British subjects, but this may be in accordance with the policy of Her Majesty's Government and

**C**     follows from the doctrine of non-recognition.

     As to the American cases cited for the appellants, see how *U.S.* v. *Insurance Companies* [41] was dealt with in O'Connell on International Law (1865) Vol. I, pp. 189–90.  Lauterpacht on Recognition, p. 146, shows that this case is not an authority for the exception contended for by the appellants.  *Sokoloff's* case, [42]

**D**     also relied on by the appellants, indicates no more than the possibility of an exception.  Too much must not be extracted from *Salimoff's* case [43]: see Lauterpacht on Recognition, pp. 147–8.  It is very far away from the present case, which stands on its own in view of the form of the certificate.  *Uprights* case [44] was not concerned with the validity or invalidity of foreign legislation: see

**E**     also *Baldy* v. *Hunter* [45]; *MacLeod* v. *United States* [46]; *Fred S. James & Co.* v. *Second Russian Insurance Co.* [47]; *Banque de France* v. *Equitable Trust Co. of New York.* [48]

     Once there is recognition, the American courts will not inquire into the validity of a foreign act of state, unless the United States

**F**     Government intimates that it has no objection to their doing so.

     Foreign laws will only be enforced on the ground of comity and, in the absence of recognition of the foreign state, there is no comity.  The inconveniences of non-recognition are always urged in favour of recognition.  During the last 150 years the principle has been worked out that not recognising a state necessarily

**G**     involves not recognising any laws which it has purported to make.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

[37] (1923) 139 N.E. 259.
[38] (1964) 376 U.S. 398, 410–411.
[39] (1930) 170 N.E. 479, 481 et seq.
[40] (1965) 45 Misc. 2nd 72; 256 N.Y. 2nd 194.
[41] 89 U.S. 99.
[42] 145 N.E. 917.
[43] 186 N.E. 179.
[44] 13 App.Div. 2nd 36; 213 N.Y. 2nd 417.
[45] (1898) 171 U.S. 388.
[46] (1913) 229 U.S. 416.
[47] (1925) 146 N.E. 369.
[48] (1929) 33 Fed. 2nd 202.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

An unrecognised government is not always evil nor a recognised government always good.

As to the respondents' submission (8), in order to bring the action the appellants must show that they have the characteristics specified in the statute of the Stiftung and that they have been appointed in accordance with it. In order to do this, they must rely on the decree of 1952. But that decree was part of the setting up of the new order in East Germany and indicates the highly political character of the special board so appointed. The members of the Council of Gera are bound as communists to obey the directions of the East German government. The courts of East Germany are also influenced by political considerations. As to this aspect of the case: see what Cardoza C.J. said in the *Petrogradsky* case.[49] Even if the respondents are wrong in submitting that *Luther* v. *Sagor* [50] is subject to no exception, a law of this character cannot come within that case. Here there is an unrecognised decree by an unrecognised government, relating to that government. There is no authority in English or United States law for treating it as an exception to the principle that such laws have no effect in an English court. This action is in effect an attempt by an unrecognised government to extend the original confiscations of 1945. English courts will not help to enforce foreign confiscatory laws and therefore will not give the appellants the relief they seek.

As to the *Luigi Menta* case,[51] that was correctly dealt with in the Court of Appeal in the present case.[52]

No inference is to be drawn from the evidence that Her Majesty's Government regards any body purporting to act as a law-making body in Eastern Germany as the alter ego of the U.S.S.R. It does not regard the U.S.S.R. as governing through the German Democratic Republic. Accordingly, the English courts should not treat whatever is done by that body as being done on behalf of the U.S.S.R. That government is nothing at all if it does not draw its authority from the U.S.S.R. But there is no evidence of any delegation to it from the U.S.S.R. On the contrary, both claim that it is absolutely independent. There is no principle which would allow the English courts to say that, although the law in question is not a law of the U.S.S.R., it is to be treated as such. In the eyes of the U.S.S.R. this is not a law of the Soviet Government nor of the Soviet occupying authority.

49 170 N.E. 479, 481.
50 [1921] 3 K.B. 532
51 [1956] 2 Q.B. 552.
52 [1965] Ch. 596, 652, 663; [1965] 2 W.L.R. 227; [1965] 1 All E.R. 300, C.A.

A.C.                    AND PRIVY COUNCIL                              871

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A     The appellants have contended that, even if the Council of
Gera could not be relied on as providing authority to bring the
action, Dr. Schrade had sufficient authority under his power of
attorney.  But, in the absence of special rules of construction, that
foreign document must be construed according to English
principles, since prima facie foreign law is presumed to be the same
B     as English law.  On that approach, the relevant organ of the
Stiftung could not make a wholesale delegation of its powers to an
individual any more than an English board of directors could so
delegate its powers unless there was in the articles of association
power to do so: see Dicey's Conflict of Laws, 7th ed., p. 1107; *In
C     re Parana Plantations Ltd.*[53] and *Rouyer Guillet et Cie* v. *Rouyer
Guillet & Co. Ltd.*[54]  In the statute of the Stiftung there is no
contemplation of a board consisting of one person and Dr. Schrade
could not constitute a quorum capable of making a resolution on
behalf of the board.

      *Michael Kerr Q.C.* following: The argument that the German
D     Democratic Republic acted as agent for the U.S.S.R. is unaccept-
able.  (1) It rests on no basis of legal principle known to the law
and is not a necessary consequence of the Foreign Office certificate.
(2) Its acceptance would involve the drawing of inferences, unsup-
ported by any evidence, which are of a political nature and an
indeterminate character.   (3) Its acceptance would have far
E     reaching and unintended consequences.   (4) There is no ground
of law or public policy which should incline the courts to give
effect to it.

      As to (1), the act of A cannot be attributed to B or deemed
to be the act of B unless there exists one of two factual situations,
either (a) that B expressly or impliedly authorised A to act on his
F     behalf, in which case the court must be satisfied that the authority
has been proved and also that the intention of the parties to stand
in a principal and agent relationship is proved, or (b) that when A
performed the act on behalf of B he had no authority to do so but
that B subsequently ratified his act.  It is not sufficient that A
intends to act on B's behalf if he does not say so and if there is
G     no ratification.  A power of control and domination, however
great, does not in English law result in a legal attribution of A's
acts to B.  In international law there is no principle which
entitles a court to attribute to a de jure sovereign acts done
within his territory.  His attitude is quite irrelevant.  That follows

---

[53] [1946] 2 All E.R. 214, 217, C.A.      [54] [1949] 1 All E.R. 244, C.A.

872

HOUSE OF LORDS

**[1967]**

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

A

from the principle in *Luther* v. *Sagor*.[55]  The argument that an ostensible situation is a sham has never been used to validate an act; it has only been used to invalidate what the parties have done.

As to (2), if the House of Lords were to hold that the substance was different from the appearance in relation to the grant of independence to the German Democratic Republic, that would be a political inference in a manner not dealt within the evidence of either party to this case.  The House of Lords could ask the Foreign Secretary whether the indirect rule in East Germany which is suggested is factual.

(3) As to the consequences of accepting the submission, in this situation the English courts would be obliged to accord to the laws of the unrecognised East German Republic the same recognition as is accorded to those of a recognised state.  Laws made by the U.S.S.R. in this indirect way would be quite different from laws which they were entitled to make under the Berlin Declaration, and the English courts would have to recognise as valid any laws so made, whether or not they fall within the province of the rights of the U.S.S.R.  Under that declaration the U.S.S.R. had no power to set up the German Democratic Republic.  The phenomenon of powerful states dominating small states *is* world wide, for example, Hungary or Panama.  The only question is: does the law in question purport to be that of the duly recognised de jure government?  If it purports to be, then it is recognised as the law of that government.  But, if that government says that it did not make that law and the subordinate government says that it made the law, then there is no principle by which it can be treated as a law made by the de jure government merely because the latter would be entitled to legislate.  There is no presumption that any act which takes place in the territory of a de jure sovereign is his act.  On the basis of the appellants' argument the English courts might have to recognise the legislation of any unrecognised government.  The present position is analogous to that which arises when rebels have gained control of part of a sovereign's territory.  The government they set up can derive no authority from the de jure sovereign and its acts and those of its officers must be treated as nullities until Her Majesty's Government have given it de facto recognition.

(4) The only safe legal basis is to ask: has this been proved to be the act of the U.S.S.R.?  If the answer is " No," there is no way in which this law can be attributed to the U.S.S.R.

B

C

D

E

F

G

[55] [1921] 3 K.B. 532.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    *Guy Aldous Q.C.* in reply. One must see exactly what the Foreign Office certificate proves: see J. L. Brierley's Law of Nations, 6th ed. (1963), pp. 146–8. The practice of the British Government in recognising Governments de jure or de facto is stated. Recognition does not depend on whether or not Her Majesty's Government likes the particular foreign government.

B    The certificate of September 16, 1964, shows that the German Democratic Republic is not so recognised, and that as a fact there has been no abdication by the U.S.S.R. The factual position shown by the Foreign Office certificate must be accepted. The U.S.S.R. cannot, by setting up what in the eyes of Her Majesty's Government is a sham régime, force other countries to accept that

C    the laws made in the name of that régime were not the act of the U.S.S.R., which is responsible for all that goes on in Eastern Germany. When a hired servant gives orders to under-servants, his orders are valid because they stem from the master.

The Stiftung is entitled to institute proceedings to protect its name and goodwill. Under article 4 of its statute the special board

D    has a general power in this connection, which is not restricted by anything in article 8. The boards of management of the optical works and glass works continue to exist at Jena and have approved the institution of these proceedings. The meaning of the statute is not controlled by the attitude of Her Majesty's Government on the question of recognition and should be construed without

E    regard to it.

The relevant law is the German law in force at Jena.

*Mark Littman Q.C.* submitted that the following questions should be put to the Foreign Office: " (1) (a) Does Her Majesty's Government recognise the U.S.S.R. as being not only de jure entitled to exercise governing authority in the said zone but also

F    as in fact doing so? (b) Does Her Majesty's Government recognise the U.S.S.R. as exercising such authority in the said zone, if at all, (inter alia) through the instrumentality of the so-called ' German Democratic Republic '? (2) Does Her Majesty's Government recognise the purported legislation of the ' German Democratic Republic ' as lawful acts done by or on behalf of the U.S.S.R.

G    as de jure entitled to exercise governing authority in the said zone?"

*Guy Aldous Q.C.* Questions of law which arise from recognition are for the court and not for the Foreign Office to determine. The answers already given by the Foreign Office go as far as they can go. The situation is clearly defined in Selected Documents on Germany and the Question of Berlin 1944–1961 (Cmnd. 1961 No.

874                          HOUSE OF LORDS                          **[1967]**

H. L. (E.)

1966

———

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

———

1552) at p. 188 (Document No. 67 Joint Declaration of the Allied    A
High Commission on the Status of East Germany, April 8, 1954).
This indicates that the U.S.S.R. is the only sovereign in East
Germany. The further questions should not be put to the Foreign
Office.

[LORD REID intimated that in the opinion of their lordships the
further questions should not be put.]                               B

[The hearing of arguments arising on the cross-notice were
adjourned to the next sittings.]

January 21, 1966. *Guy Aldous Q.C.* It is submitted that the
appellants have the right to open this point.

*Mark Littman Q.C.* The respondents appealed against the
cross-notice by the other side. The Court of Appeal considered    C
only the recognition point and delivered no decision on the other
points, which were not argued. This is the respondents' first
opportunity to appeal on this point.

[LORD REID. In the special circumstances, it is better that the
respondents should open this point and reply.]                      D

*Mark Littman Q.C.* For the purposes of this part of the
argument, it must be assumed that the Council of Gera exists and
is the highest legal authority in Thuringia and is capable of acting
as the special board.

There have been conflicting decisions of the courts in West and
East Germany, the former in effect deciding in favour of the        E
respondents' contentions and the latter deciding in favour of those
of the appellants. This is a question of foreign law and the relative
priority of the two decisions must be considered. The judgment
of the West German court should be given priority as res judicata
or by estoppel.

As to estoppel, it is submitted, first, that the West German      F
court had jurisdiction, since all the parties submitted to it. The
eventual decision was framed in the sense required by the law of
estoppel and it cannot be challenged on the ground that it was
wrong or applied the wrong law. No estoppel arises from the
decision in East Germany because the respondents were not parties
to the proceedings there and the judgment was a default judgment.   G
The courts there had no jurisdiction and the respondents never
purported to submit to their jurisdiction.

Secondly, the judicial system of a country is an aspect of its
sovereignty, as much so as its legislature. One must contrast the
recognition afforded to the U.S.S.R. in relation to East Germany
and that accorded to the Federal Republic of West Germany.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    The U.S.S.R. is recognised as the occupying power and it exercises governing power within its zone in zonal matters, but it is not recognised as having power to act or speak in any matter affecting Germany as a whole. But the Federal Republic is recognised as a fully sovereign state, the state of Germany, which has been uninterruptedly recognised by the Foreign Offce since 1871. It is

B    entitled to speak for Germany as a whole in international affairs: see the communiqué of September 19, 1950, referred to in the Foreign Office certificate of November 6, 1964. The present dispute is not a purely zonal matter, but affects Germany as a whole and is, moreover, an international matter. The basic issue concerns the interpretation of German law, as distinct from zonal law. It

C    concerns the right to represent a foundation which was established, not during the occupation under a new U.S.S.R. law, but many years ago under the laws of Germany. This foundation has operated, not only in the Soviet Zone, but throughout Germany and the world. This dispute concerns the right to represent the foundation outside the Soviet Zone and outside Germany alto-

D    gether. It concerns assets in England and not in the Soviet Zone. It concerns the relative authority of the Supreme Court of the Soviet Zone and the Supreme Court of the Federal Republic when dealing with such matters. The views of the Supreme Court of the Federal Republic should be treated in England as authoritative. The courts in East Germany are influenced by

E    political considerations.

In English law the question who is entitled to represent a corporation depends on the law of the country where it is domiciled, that is, to which it owes its existence. The law of the domicile of this foundation is German law.

The issues in this application are res judicata as between the

F    parties thereto by reason of the judgment of the Supreme Court of the Federal Republic, because this issue is the same as the issue which was decided by the court. As to res judicata, see Halsbury's Laws of England, 3rd ed., Vol 15 (1956), p. 168, para. 334; p. 181, para. 355; p. 210, para. 393; Dicey's Conflict of Laws, 7th ed., p. 196 et seq. and Spencer Bower on Res Judicata, p. 91, para. 141.

G    The issue on the summons of February 7, 1956, now in question is between the defendants and some other person. But who is that person? Not the nominal plaintiff, the Stiftung, because if the issue were decided in favour of the defendants, it would establish that the nominal plaintiff was never before the court at all. The Council of Gera was a party to the German proceedings

876                              HOUSE  OF  LORDS                        **[1967]**

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

and can be regarded as parties to the present proceedings.  This    A
is not a narrow technical point; it bears on the policy of the courts
to see that there is an end of litigation.  Suppose the Council of
Gera was not a party and the solicitors were, estoppel affects, not
only the parties to proceedings, but also their privies, and in the
present case the solicitors were privies to the Council of Gera.    B
They claim the rights they are asserting because they derive them
from the Council of Gera: see Halsbury's Laws of England, 3rd
ed., Vol. 15, p. 196, para. 372; *Hancock* v. *Welsh*[56]; *Kinnersley*
v. *Orpe*[57] and Spencer Bower on Res Judicata, pp. 130–1, paras.
205, 206.

There is privity of interest between the solicitors and the    C
Council of Gera, since they are representing its interests.  The
object of estoppel is to prevent substantially the same people
litigating the same matter twice.  Here the very same issue has
already been decided by the courts in both East and West
Germany.  That issue was whether the events of 1948 paralysed
the organs of the foundation in East Germany.  The solicitors
have no authority to conduct these proceedings on behalf of the    D
appellants, because they are estopped by the judgment of the
Supreme Court of the Federal Republic in an action brought in
the name of the present appellants against the present respondents.

As to res judicata, see *Connelly* v. *Director of Public Prosecu-*
*tions*[58] and *Fidelitas Shipping Co. Ltd.* v. *V.O. Exportchleb.*[59]

If it is necessary to look behind the judgment of the West    E
German court to the underlying issue.  That can be done, since issue
estoppel is part of the law of England.  It is submitted (1) that
res judicata applies not only to the cause of action but also to the
issues; (2) that one is not restricted to looking at the formal order
and (3) that the other material to be looked at includes the plead-
ings and the reasons of the judge.  The matter often arises in the    F
Divorce Division: see Spencer Bower on Res Judicata, p. 3, para.
6; pp. 8–9, para. 13; p. 102, para. 158; p. 112, para. 170; pp. 113–5,
paras. 173–5.  It is not suggested that there are special facts
applicable in England which were not applicable in West Germany,
so that one can look to see whether the decision there rested on
any such special facts.

The principle of res judicata is correctly set out in Phipson on    G
Evidence, 10th ed. (1963), p. 518, para. 1363.  The relevant

[56] (1816) 1 Stark. 347.
[57] (1780) 2 Dougl. 517.
[58] [1964] A.C. 1254; 1353 et seq;
[1964] 2 W.L.R. 1145; [1964] 2 All
E.R. 401, H.L.(E.).

[59] [1966] 1 Q.B. 630, 641–2; [1965]
2 W.L.R. 1059; [1965] 2 All E.R. 4,
C.A.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A authorities are *Reg.* v. *Inhabitants of the Township Hartington Middle Quarter* [60]; *Flitters* v. *Allfrey* [61]; *Hunter* v. *Stewart* [62]; *Hoystead* v. *Commissioner of Taxation* [63]; *Marginson* v. *Blackburn Borough Council* [64]; *Bright* v. *Bright* [65]; *Thompson* v. *Thompson* [66]; *Warren* v. *Warren* [67]; *Thoday* v. *Thoday* [68]; *Fidelitas Shipping Co. Ltd.* v. *V.O. Exportchleb* [69]; *Randolph* v. *Tuck* [70]; *Penn-Texas Corporation* v. *Murat Anstaldt (No. 2)* [71]; *Henderson* v. *Henderson* [72]; *Ellis* v. *M. Henry* [73]; *Castrique* v. *Imrie* [74]; *New Brunswick Railway Co.* v. *British & French Trust Corporation Ltd.* [75]; *In re Dulles' Settlement (No. 2)* [76] and *Ricardo* v. *Garcias.* [77]

As to the question who are parties or privies, see Spencer Bower on Res Judicata, pp. 126–7, paras. 197–8, and the summary of the American authorities in the American Restatement of the Law (Judgments) (1943), ss. 79, 83, 84 and 85. " Privy " covers a person who is in control of the proceedings. If the Council of Gera would have been estopped from putting forward this claim, the solicitors whom they have instructed are also estopped. It is enough that they have been professionally employed; they are representing the same interest. The term " party " includes servants. *Laidlaw* v. *Blackwood* [78] is distinguishable on the facts.

As to foreign judgments, see *Henderson* v. *Henderson* [79]; *Kok Hoong* v. *Leong Cheong Kwang Mines Ltd.* [80] and *Bank of Australasia* v. *Nias.* [81] The English courts will not treat a foreign judgment as ineffective for the purposes of estoppel just because, in the opinion of the English court, it is wrong, or a wrong system of law was applied according to foreign rules on conflict of laws, or the foreign court adopted an incorrect view on some point of

---

[60] (1855) 4 E. & B. 780.
[61] (1874) L.R. 10 C.P. 29, 40.
[62] (1861) 4 De G. F. & J. 168, 178.
[63] [1926] A.C. 155, 163–8; 42 T.L.R. 207, P.C.
[64] [1939] 2 K.B. 426, 435–6; 55 T.L.R. 389; [1939] 1 All E.R. 273, C.A.
[65] [1954] P. 270, 272–4, 280–1; [1953] 3 W.L.R. 659; [1953] 2 All E.R. 939.
[66] [1957] P. 19, 28–9, 36–7, 38, 44; [1957] 2 W.L.R. 138; [1957] 1 All E.R. 161, C.A.
[67] [1962] 1 W.L.R. 1310, 1312, 1313; [1962] 3 All E.R. 1031.
[68] [1964] P. 181; [1964] 2 W.L.R. 371; [1964] 1 All E.R. 341, C.A.
[69] [1966] 1 Q.B. 630, 640, 641–2.
[70] [1962] 1 Q.B. 175, 182–3, 184; [1961] 2 W.L.R. 855; [1961] 1 All E.R. 814.

[71] [1964] 2 Q.B. 647; [1964] 3 W.L.R. 131; [1964] 2 All E.R. 594, C.A.
[72] (1843) 3 Hare 100.
[73] (1871) L.R. 6 C.P. 228.
[74] (1869) L.R. 4 H.L. 414, H.L.(E.).
[75] [1939] A.C. 1, 19–20, 20–21, 23, 35; T.L.R. 360; [1938] 4 All E.R. 747, H.L.(E.).
[76] [1951] Ch. 842, 851; [1951] 2 T.L.R. 145; [1951] 2 All E.R. 9.
[77] (1845) 12 Cl. & F. 368, 387, H.L.(E.) 69, C.A,
[78] (1843) 15 Sc.Jur. 484.
[79] 3 Hare 100, 113–15; (1844) 6 Q.B. 288, 296 et seq.
[80] [1964] A.C. 993, 1010–11; [1964] 2 W.L.R. 150; [1964] 1 All E.R. 300, P.C.
[81] (1851) 16 Q.B. 717, 734–5.

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———

English law.  But if the proceedings of the foreign court were
contrary to natural justice, that would justify an English court in
refusing to have regard to its judgment.  Or, if the English court
were satisfied that the foreign court was not trying to apply the
law, it would take that into account.  But none of these considera-
tions are relevant to the present case: see Spencer Bower on Res
Judicata, p. 162, para. 272; *Luther* v. *Sagor* [82] and *Godard* v. *Gray*.[83]

A


B

As to the position of the first and second defendants, Cross J.
said in his judgment [84] that they could not invoke the doctrine of
res judicata.  But the defendants and each of them have been
acting in concert and jointly and they are within the category of
privity.  The principle is broad enough to cover this case.  The
action is brought against the three defendants as joint tortfeasors
in respect of a matter in which they have acted in concert and they
have identical interests so as to come within the rule, the object
of which is to prevent a plaintiff from relitigating a matter with
the person with whom he has already litigated it and also to
prevent him getting in by the back door by suing persons who are
jointly liable with the person he has already sued: see Spencer
Bower on Res Judicata, p. 126, para. 197; pp. 127–8, para. 198;
pp. 130–1, para. 206; and *Flitters* v. *Allfrey*.[85]

C


D

So far as the opinion delivered by the East German Court is
concerned, the respondents were not parties to it and it was
delivered without jurisdiction.  Dicey on Conflict of Laws, 7th ed.,
pp. 1016–7, rule 189, sets out the five cases in which a foreign court
has jurisdiction to give a judgment in personam which is capable
of enforcement or recognition in England.  That judgment comes
within none of them: see also pp. 1018–9, 1027–8.  The relevant
cases are *Emanuel* v. *Symon* [86]; *In re Dulles' Settlement (No. 2)* [87]
and *In re Trepca Mines Ltd.*[88]

E

The judgment of the Federal Supreme Court was delivered on
November 15, 1960.  That of the Supreme Court of the German
Democratic Republic was delivered on March 23, 1961.  There-
fore, it was too late for the latter judgment to create an estoppel
since there cannot be two estoppels per rem judicatam: see Spencer
Bower on Res Judicata, pp. 160–1, paras. 266, 267.

F

The West German judgment should be preferred to the East
German judgment (1) on the ground of estoppel; (2) on the ground

G

---

[82] [1921] 3 K.B. 532, 558–9.
[83] (1870) L.R. 6 Q.B. 139, 148–9.
[84] [1964] R.P.C. 299, 333.
[85] L.R. 10 C.P. 29, 41.

[86] [1908] 1 K.B. 302, 309–10; 24
T.L.R. 85, C.A.
[87] [1951] Ch. 842.
[88] [1960] 1 W.L.R. 1273, 1280–1;
[1960] 3 All E.R. 304, C.A.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A  of the Foreign Office certificate and (3) on the ground of the intrinsic merit of the judgment.

The following questions should be put to the Foreign Office: (1) Does Her Majesty's Government recognise that the determination of the status of and the right to represent a body under the law of the State of Germany prior to 1945 and now having its Sitz

B  in the territory of the zone allocated to the U.S.S.R. are matters (a) which affect Germany as a whole and (b) which, if arising outside Germany, are within the scope of the communiqué dated September 19, 1950, as referred to in the answer to question 2 in the certificate dated November 6, 1964? (2) What states, governments or authorities now functioning in Germany or any parts of

C  it does Her Majesty's Government recognise as entitled to determine any such matter as is referred to in question 1?

[LORD REID intimated that in the opinion of their Lordships these questions should not be put.]

As to the effect which English courts should give to decisions of foreign courts on a matter of foreign law, see *Guaranty Trust*

D  *Co. of New York* v. *Hannay & Co.*[89]; *Bankers and Shippers Insurance Co. of New York* v. *Liverpool Marine & General Insurance Co. Ltd.*[90] and *Evera S.A. Commercial* v. *Bank Line Ltd.*[91]

Her Majesty's Government recognises the Soviet Government as de jure entitled to govern in East Germany. The government

E  of West Germany is recognised as a sovereign body. The situation is that the courts in East Germany are saying one thing and those in West Germany another. There are no special statutes in the Eastern Zone applying to this matter and so the law which should be applied there is the German Civil Code and the articles of association of the Stiftung. The English courts are here concerned

F  with the law of Germany as to the right to represent a German corporation. This depends on the law of the domicile of the corporation as understood in English private international law: see Dicey's Conflict of Laws, 7th ed., p. 477, rule 76. If a French corporation was required to have its central office in Burgundy, it would be regarded as incorporated under the law of France,

G  not of Burgundy. Since the incorporation of the Stiftung the original principalities have become part of the single state of Germany and, when the German Civil Code came into existence,

[89] [1918] 2 K.B. 623, 637–8; 34 T.L.R. 427, C.A.
[90] (1926) 24 Ll.L.R. 85, 87, 92, 93, H.L.(E.).
[91] [1961] 1 Lloyd's Rep. 231, H.L.(E.).

HOUSE OF LORDS     **[1967]**

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A

it applied to existing foundations and still applies. This foundation was not domiciled in one part of Germany, as distinct from Germany as a whole. Even if the *Stiftung* had its centre of gravity at Jena, that did not so locate it there that its capacity to act through its organs depended on the law of that particular part of Germany. The law which governs the whole of Germany must be distinguished from the local laws passed in the different zones, for example, the Soviet Zone.

B

The English courts recognise the U.S.S.R. as the occupying power in their Zone but their authority is restricted to matters not affecting Germany as a whole. But they recognise the Federal Republic of Germany as a fully sovereign state, the only German government entitled to speak as representative of the German people in international affairs and the successor of the Weimar Republic. The present matter is not purely zonal, but concerns Germany as a whole and comes within the category of an international affair within the declaration of September 19, 1950. There is no question of the meaning and effect of zonal law and it concerns an old foundation, not established under the authority of the U.S.S.R., which operated throughout Germany and the world and not just in the Soviet Zone. The question is not as to the right to represent that body in the Soviet Zone but as to the right to represent it in the international sphere outside Germany. It concerns its assets in the international sphere and not just in the Soviet Zone. It raises the problem of the relative authority of the courts in East Germany and of those of the Federal Republic of Germany. The latter have the higher claim to authority in these matters: see the Reciprocal Enforcement of Judgments (Germany) Order, 1961 (S.O. 1961 No. 1199) Schedule, articles I (3), III, IV and V (1). There is no comparable arrangement for the recognition of the courts and judgments of East Germany. This is another indication of the high degree of recognition granted by Her Majesty's Government to the Federal Republic of Germany. If there is any doubt or ambiguity in the Foreign Office certificate already given, it can be resolved by inviting a further answer from the Foreign Office.

C

D

E

F

In the case before the Federal Supreme Court the right questions were put and the contentions were fairly stated and understood. The reasoning of the judgment was cogent and its conclusions were correct. But, whether they were correct or not, the court was entitled to treat the law of East Germany, not as foreign law but as something of which it could take judicial notice.

G

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    As to the confiscation point, a decree made in East Germany has purported to extend the confiscation of all the property of the Stiftung to its assets in England. The English courts will not give effect to such legislation: see *Leconturier* v. *Rey.*[92] They will look behind the formal relationships of the parties to the action. So that if a decision of a foreign court giving effect to confiscatory legislation is on the face of it delivered in relation to a contract

B    or a liquidation, the English courts will look behind these to the reality of the situation: see *Banco de Vizcaya* v. *Don Alfonso de Bourbon y Austria*[93]; *Government of India, Ministry of Finance (Revenue Division)* v. *Taylor*[94] and an article on " Prerogative Rights of Foreign States and the Conflict of Laws " by Dr. F. A.

C    Mann (1954), Transactions of the Grotius Society, Vol. 40, pp. 25, 34 et seq., 46–47. In the present case the claim is for the enforcement of confiscatory legislation, either directly or indirectly.

[Their Lordships indicated that the latter contentions raised a substantive defence which should not be argued on the summons,

D    but remained open to the respondents in the action.]

*Michael Kerr Q.C.* following. There are two aspects of the jurisdiction point on which there are several authorities: (1) the application of issue estoppel, the question whether one looks at the formal order or the record and (2) the meaning and scope of the expressions " parties " and " privies " in connection with

E    res judicata.

Starting with issue estoppel regarded from the point of view of the common law in civil matters, once an issue of fact or law or mixed fact and law has been litigated and determined by a court of competent jurisdiction the parties and their privies are estopped from relitigating it. The questions arise: (a) What material

F    may be looked at to determine the existence of the estoppel? (b) Are foreign judgments treated differently from English judgments? It is a question of evidence whether an issue has been litigated and determined. When the judgment shows what issues have been determined, the court will look at that. " It is the res judicata, not the record of it, which creates the estoppel ": Spencer

G    Bower on Res Judicata, p. 5 and see *Reimers* v. *Druce*[95] and *In re Truford.*[96] A judgment can only be impeached if the court

---

[92] [1910] A.C. 262; 26 T.L.R. 368, H.L.(E.).
[93] [1935] 1 K.B. 140; 50 T.L.R. 282.

[94] [1955] A.C. 491, 509–10; [1955] 2 W.L.R. 303; [1955] 1 All E.R. 292, H.L.(E.).
[95] (1857) 26 L.J.Ch. 196.
[96] (1887) 36 Ch.D. 600, 613–17; 3 T.L.R. 798.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

which pronounced it had no jurisdiction or if it offends against     A
natural justice. In *Kali Krishna Tagore* v. *Secretary of State for
India* [97] the court looked at the actual judgment and not merely
at the order. Spencer Bower on Res Judicata, pp. 175 et seq.,
distinguishes between res judicata in the ordinary sense and res
judicata as a bar to subsequent recovery: see also *Sri Raja Rao
Lakshmi Kontaiyammi* v. *Sri Raja Inuganti Rajagopa Rao*.[98]     B
These cases were followed in a line of Australian authorities:
*Gray* v. *Dalgetty & Co. Ltd.*[99]; *Rex* v. *Wilkes* [100]; *Mraz* v. *The
Queen (No. 2)* [101] and *Brown* v. *Robinson*,[102] and see *Sealfon* v.
*United States* [103]; Spencer Bower on Res Judicata, p. 47, para. 64,
and *Connelly* v. *Director of Public Prosecutions*.[104]

No distinction can be drawn between foreign judgments and     C
English judgments.

As to the next point, the meaning and scope of the expressions
" parties " and " privies," there are few decisions in England. It
is not possible to get any definition of the terms which is both
concise and exhaustive; there are too many permutations. A
" privy " is a person so situated in relation to a party in the earlier     D
proceedings and the new proceedings that further proceedings by
him as agent would amount in substance to the relitigation of one
or more of the issues already decided in the earlier proceedings, a
relitigation between the real parties and interests. A party or
privy includes any person who is a real party in interest to the
claim or defence in question, that is, any person who participates     E
in the conduct of the proceedings, whether alone or with other
persons, or as a representative on the record, who is acting in the
interest of a party, whether or not that representative has a
personal interest in the proceedings. The Council of Gera is
covered by this definition, being in opposition to the respondents'
claim, and they cannot shelter behind the solicitors on the record.     F
Conversely, there is included any person on the record who
represents anyone who is a real party or has a real interest, and
who acts on that person's behalf so as to be in privity with that
person, whether or not he himself has any personal interest in the
proceedings. A principal and agent are in privity.

One may illustrate the position with three cases. In the first     G
case take Action 1 (*Company* v. *C and D*): A and B instruct

[97] (1888) L.R. 15 Ind.App. 186,
P.C.
[98] (1898) L.R. 25 Ind. App. 102,
107–8, P.C.
[99] (1916) 21 C.L.R. 509, 543.
[100] (1948) 77 C.L.R. 511, 518–19.

[101] (1956) 96 C.L.R. 62, 69–70.
[102] (1960) S.R.(N.S.W.) 297, 301–2.
[103] (1948) 332 U.S. 575, 578, 579.
[104] (1964) A.C. 1254, 1321, 1333–4,
1343 et seq., 1366.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A   solicitors to issue a writ in the name of the company against C and D for a declaration that C and D are not directors of the company, and other ancillary relief. C and D issue a summons to stay the action on the ground that it is brought without the company's authority. (C and D may also add a claim that their costs are to be paid by the solicitors personally, but whether or not they do B   so is irrelevant.) A and B file evidence in answer to the summons to the effect that A and B authorised the action and that they are entitled to do so as directors of the company. (The solicitors may also file evidence that they received their instructions from A and B and believe A and B to be entitled to act as directors of the company, but it is submitted that whether or not they do so is C   irrelevant). C and D file evidence denying that A and B are directors and asserting that C and D are the directors. On the hearing of the summons the judge decides that A and B are not directors and that C and D are directors. The summons therefore succeeds and he stays the action. (He may or may not also order the solicitors to pay C and D's costs, but it is submitted that D   whether or not he does so is irrelevant.) Action 2 (i) (*C and D v. the Company*), C and D sue the company for directors' fees. On the instructions of A and B, a solicitor enters an appearance for the company and pleads that C and D are not directors. C and D plead estoppel per rem judicatam on the basis of the issue raised and determined in their favour in the summons in Action E   1. This plea must succeed, for the simple reason that the issues in, and the formal parties to, Actions 1 and 2 (i) are identical. Alternatively, Action 2 (ii) (*C and D v. A and B*). Since A and B continue to assert that they are directors, C and D bring an action to restrain them from claiming to be entitled to act as directors of the company. A and B plead that they are directors and C and D F   are not. C and D plead that A and B are estopped per rem judicatam from raising this issue on the ground that it has already been determined in the summons in Action 1. Their estoppel could be upheld on the grounds that: (i) this issue was raised and litigated in that summons, (ii) C and D were parties to this issue, (iii) A and B were parties to this issue. They were not G   parties to Action 1, but upon the trial of the summons they became the opposing party to the issue raised and litigated by that summons, the " real party in interest " to the summons. (iv) The conclusion that they were the real party in interest to that summons can also be stated by saying that the solicitors (who may be regarded as the formal parties to the summons) represented A and

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
—

A   B in the issue litigated in that summons and that accordingly there
was privity between A and B and the solicitors. (It should be
noted in this connection that in all these illustrations A and B
are clients of the solicitors on that side: compare the definition of
" clients " in section 86 (1) of the Solicitors Act, 1957, formerly
section 81 of the Solicitors Act, 1932.)  (v) The same conclusion
B   can also be stated by saying that in the summons in Action 1
the issue which was litigated was between the company and C
and D, namely, that the company cannot be represented by A and
B, and that A and B are the real parties in interest or privy to
that issue.   These are semantic differences, not real distinctions.
(vi) It would be contrary to common sense that there should be an
C   estoppel in Action 2 (i) but not in this action, when the issue and
the real parties to that issue were precisely the same in Actions
1, 2 (i) and 2 (ii), and a relitigation of that issue would in substance
be a relitigation between precisely the same parties.

In the second case take Action 1 (*Company* v. *C and D*): As
in the first case, but C and D's summons fails.   On the summons
D   the judge decides that C and D are not the directors and that A
and B are.   The action proceeds and an injunction is given against
C and D to restrain them from acting as directors of the company.
Action 2:  C and D are not put off and sue A and B for a
declaration that A and B are not directors of the company.   A and
B plead estoppel on the basis of the summons in Action 1.   C
E   and D plead that there is no estoppel because (a) A and B were
not parties to Action 1; (b) the decision in Action 1 was merely
that C and D were not directors, not that A and B were.   The
plea of estoppel would succeed because (a) A and B were parties
or privies to the issue tried in the summons in Action 1 for the
same reasons as those submitted in relation to Action 2 (ii) in the
F   first case; (b) the evidence shows that the issue raised and decided
in the summons in Action 1 was not only that C and D were not
directors, but also that A and B were.

The third case may be considered in two parts: I. Action 1
(*Company* v. *C and D* in Jurisdiction X): As in Action 1 in the
second case, C and D's summons to stay fails and it is held that
G   A and B are entitled to represent the company.   Action 2
(*Company* v. *C and D* in Jurisdiction Y): Upon C and D issuing
the summons to stay, A and B plead that C and D are estopped
by the issue raised and decided in the summons in Action 1.   It
is submitted that (as in Action 2 (i) in the first case) the plea of
estoppel must succeed because the issue and the formal parties are

A identical. II. (the present case) Action 1 (*Company* v. *C and D* in Jurisdiction X*): Proceedings as in Action 1 in the first case. The summons to stay the action succeeds and it is held that A and B are not entitled to represent the company, the converse result of Action 1 in I. above.  Action 2 (*Company* v. *C and D* in Jurisdiction Y): Upon C and D issuing a summons to stay on the

B ground that A and B have no right to represent the company and that this issue has been decided in the summons in Action 1, C and D would be entitled to rely upon the estoppel in the same way as A and B are entitled to rely on it in I. above.  The only difference is that in I. the summons to stay fails in Jurisdiction X, thus raising an estoppel in favour of A and B in Jurisdiction Y;

C whereas in this case the summons to stay succeeds in Jurisdiction X, thus raising an estoppel in favour of C and D in Jurisdiction Y. Further, it makes no difference in either I. or II. above whether the solicitors on either side in Jurisdictions X and Y are identical or not; in either event the estoppel will operate in favour of, or against (as the case may be) the real parties to the issue raised and

D determined in the summons, for the reasons submitted in relation to Action 2 (ii) in the first case.

As to estoppel: see *In re Defries*.[105]  As to the position of the solicitors, see *Myers* v. *Rothfield*,[106] reversed in the House of Lords sub nom. *Myers* v. *Elman*.[107]  In this litigation if the Stiftung is not a party against the respondents, it must be the Council of

E Gera.  But the council cannot be heard to argue the same point that has already been decided in West Germany, nor can the solicitors of whom the council are the clients: see the definition of " client " in section 86 (1) of the Solicitors Act, 1957.

It is enough to show that the persons instituting these proceedings have already instituted previous proceedings in which they

F have failed.  Privity is a wide concept, wide enough to embrace such a case as this.  The solicitors are parties to these proceedings and privies of the Council of Gera.  It does not matter whether or not they are protagonists: see Spencer Bower on Res Judicata, p. 126, para. 197.  An estoppel would have been created if the West German case had been decided the other way.

G The American authorities on this point are the Corpus Juris, Vol. 50 (Judgments), pp. 275–7, para. 756; p. 281, para. 757; p. 297, para. 768; *Bruszewski* v. *United States* [108]; *Gibson* v. *United*

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

---

[105] (1883) 48 L.T. 703.
[106] [1939] 1 K.B. 109, 124–5; [1938] 3 All E.R. 498, C.A.
[107] [1940] A.C. 282, 336; 56 T.L.R. 177; [1939] 4 All E.R. 484, H.L.(E.).
[108] (1950) 181 Fed. 2nd 419.

886                              HOUSE OF LORDS                         [1967]

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

*States* [109]; *Chicago Rock Island and Pacific Railway Co.* v.          *A*
*Schendel* [110]; *Warren Featherbone Co.* v. *De Camp* [111]; *Cuneo*
*Importing Co.* v. *American Transportation Co.* [112]; *Cutler* v.
*Jennings* [113] and *Don Chemical Co.* v. *Benton.* [114]  The conclusions
to be deduced from those cases are: (1) Where there is a judgment
against A upon an issue with B, B can rely on the judgment as
creating an estoppel when the same issue arises in proceedings           *B*
instituted by C where C is in a significant relationship with A.
(2) There is a significant relationship where C is a person who
institutes the proceedings upon the instructions of A or conducts
the proceedings under the control of A or derives his alleged
authority to bring the proceedings from A.  For " significant
relationship " one can say " privity."  None of these principles        *C*
would have applied to *Laidlaw's* case. [115]

   *Guy Aldous Q.C.*  Counsel on the appeal are instructed to
appear on behalf of the Carl-Zeiss-Stiftung, neither for the Council
of Gera nor for the solicitors.  On the cross-appeal they are
instructed on behalf of the six individual partners of the firm of
solicitors.                                                             *D*

   Two points arise on the cross-appeal: (1) Whether under
German law the effect of the confiscation of the assets of the two
businesses of the foundation under the Soviet military decree of
1948 was to deprive the organs of the foundation of their capacity
to act, so that the Council of Gera was not capable of acting as the
special board of the foundation, and (2) whether because of the
Federal Supreme Court's decision in November, 1960, it was res
judicata, at least against the third defendants in the present action
(the third respondents), that the Council of Gera could not represent
the foundation and therefore the Council of Gera were estopped
from bringing this action as against at least the third defendants.
The cause of action is misappropriation by passing off the name
and marks of the Carl-Zeiss-Stiftung and the question is whether
the plaintiffs in the action are the persons to take proceedings to
protect the name and trade marks.

   The appellants put their case thus: (1) The Carl-Zeiss-Stiftung
is an existing corporation domiciled at Jena.  (2) Therefore the
law governing the question whether it has validly authorised these   *E*
proceedings in the law in force at Jena at the date of the authorisa-
tion.  (3) According to that law these proceedings are validly

[109] (1954) 211 Fed. 2nd 425.          [113] (1925) 130 A. 583.
[110] (1926) 270 U.S. 611, 617.        [114] (1962)  357 S.W. 2nd 565.
[111] (1907) 154 Fed. 198.             [115] 15 Sc.Jur. 484.
[112] (1917) 241 Fed. 421; 247 Fed.
413.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A　authorised and on this point every court in East Germany would follow the decision of the East German Supreme Court. To establish these matters proves the appellants' case.

The vital question is: what is the local law? That must be decided as a fact on the evidence before the court. The local law is proved by the evidence of persons who know how that law is

B　interpreted in the local courts. It is common ground that every court in East Germany would hold these proceedings properly brought. The relevant law is the law which would be applied there, not the law which the courts in England or West Germany think ought to be applied: see *Lazard Brothers.*[116]

It is conceded that Carl-Zeiss-Stiftung is an existing corporation.

C　The key to the case is its place of domicile. It is contrary to the evidence to say that its domicile is in Germany as a whole and not at Jena. Every Stiftung had to be established according to the laws of a particular " land " and on those laws the control of it depended. The legal domicile of this Stiftung has always been at Jena and the relevant law in this case is the law governing there

D　at the date of the authorisation of the legal proceedings. This is recognised in English law. In its judgment the West German court was purporting to administer the law in force in East Germany. A similar question as to which board of directors of a Spanish bank had the legal right to represent it during the Spanish Civil war arose in *Banco de Bilbao* v. *Sancha.*[117] The only way of

E　proving the law of East Germany is to call expert witnesses to prove how the courts there would interpret the code. It is irrelevant to call experts from West Germany to say how they think the East German courts would decide. Even if the judges in East Germany decide according to the wishes of the state, that is equivalent to a state decree and is accordingly the law.

F　As to the ascertainment of the law of a foreign country on a point which has already been the subject of a decision by a court of that country: see the *Bankers and Shippers* case[118]; the *Guaranty Trust* case[119]; the *Evera* case[120]; *Baron de Bode's* case[121]; *The Sussex Peerage* case[122] and *Buerger* v. *New York*

G　*Life Assurance Co.*[123] The court would revolt against a conclusion which would put the foundation into a state of perpetual

[116] [1933] A.C. 289, 296 et seq., 302.
[117] [1938] 2 K.B. 176, 194–5.
[118] 24 Ll.L.Rep. 85, 87–8, 90–1, 92, 94.
[119] [1918] 2 K.B. 623, 637–41, 644.
[120] [1961] 1 Lloyd's Rep. 231.
[121] [1845] 8 Q.B. 208, 250–1.
[122] [1844] 11 Cl. & F. 85.
[123] (1927) 96 L.J.K.B. 930; 43 T.L.R. 60, C.A.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

immobility: *A.G. Der Manufacturen D.A. Woronin Leutchig* v. *Frederick Huth & Co.*[124] The findings of Cross J. are correct. They involve the conclusion that the board of management in East Germany was properly appointed.

As to the question of res judicata, counsel on this side are appearing for the Carl-Zeiss-Stiftung and they are not affected by the pleadings of other persons for whom they do not appear; they are not putting forward arguments on behalf of anyone else. Success on the main part of the case would involve success in proving that the Carl-Zeiss-Stiftung are the right parties. There can be no estoppel against the Carl-Zeiss-Stiftung by reason of the proceedings in West Germany to which they were not parties: see *Buerger's* case.[125] *Nana Ofori Atta II* v. *Nana Abu Bonsra II*[126] does not help in this case.

On this part of the case it is submitted: (1) Since there is no estoppel against the Stiftung, counsel can put forward contentions on their behalf, because they were parties to the summons of February 7, 1956. This summons was sent both to the plaintiffs and to the solicitors: compare the form in the Encyclopedia of Forms and Precedents, Vol. V, p. 241.

(2) The submission by the defendants that the Council of Gera are the parties to these proceedings is wrong. On the footing that the solicitors are parties to these proceedings and that counsel on this side represent them (although they deny it), the solicitors are not privies of the Council of Gera. Not being privies to the Council of Gera, they are not bound by the West German judgment.

(3) Issue estoppel has no application in foreign judgments. It is quite different from res judicata in the case of English judgments.

(4) The judgments of the West German courts are perverse in that they purported to apply as the law of East Germany, that which they knew perfectly well was not the law there.

(5) The appellants do not put forward any counter estoppel.

Estoppel is a rule of law or evidence which prevents a party from proving facts which would be in his favour. Here no estoppel is alleged against the Stiftung and it cannot be estopped from proving such facts as it may wish.

The Council of Gera are not parties to these proceedings, and it is contrary to all accepted ideas or jurisprudence that a person

[124] (1941) 70 Ll.L.Rep. 262, 269.   [126] [1958] A.C. 95; [1957] 3 W.L.R.
[125] 96 L.J.K.B. 930.                        830; [1957] 3 All E.R. 559, P.C.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

should be held to be a party who has never received any documents and is not named as a party and has had no opportunity to address the court: see *Daimler Co. Ltd.* v. *Continental Tyre & Rubber Co. (Great Britain) Ltd.*[127] The solicitors are only brought in for the purpose of making them pay costs. They could leave it to the Stiftung to argue, and abide by the result. Their only interest is to defend themselves against the claim for costs made against them personally on the basis of a breach of warranty of authority: see *Yonge* v. *Toynbee.*[128]

It is argued by the respondents that the solicitors are privies of the Council of Gera, because the council were in control of the previous proceedings. But, in the first place, privity is limited to privity of interest and there is no such privity between the two. In the second place, no one was in control but the Stiftung.

As to the question of privity, there can be privity of interest or privity of contract, but only the former need be considered here. The interest which was the subject of the West German proceedings was a claim by the present appellants that the trade marks registered in West Germany should be assigned to them. There was also an issue whether certain entries in the commercial register should be altered. The solicitors had no interest in any of these things at all; their only interest now is to be paid their fees and to resist an order against them for costs. They have no interest in the question whether or not their clients have any power to institute any proceedings. So far as the Council of Gera are concerned, their interest is quite different from that of the solicitors. The solicitors are looking to the authority of the special board in representing the Stiftung and they represent nobody else. There is no privity between the Stiftung and the Council of Gera in the capacity of special board. As to who are privies, see Spencer Bower on Res Judicata, pp. 130–1, paras. 205 and 206; Halsbury's Laws of England, 3rd ed., Vol. 15, p. 196, para. 372 and *Mercantile Investment and General Trust Co.* v. *River Plate Trust, Loan & Agency Co.*[129]

A decision was made against the Council of Gera in the West German courts. In those proceedings the solicitors had no opportunity of being heard and accordingly they cannot now be estopped from being heard for the purpose of resisting an order that they should pay costs in the present proceedings.

[127] [1916] 2 A.C. 307, 336–7, 348; 32 T.L.R. 624, H.L.(E.).

[128] [1910] 1 K.B. 215, 227, 233–4; 26 T.L.R. 211, C.A.

[129] [1894] 1 Ch. 578; 10 T.L.R. 186.

H. L. (E.)
1966
———————
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———

Take the case of a servant, a chauffeur who having been injured in a road accident brings an action against the driver of the other car. His master backs him, undertaking to be responsible for his costs. The action fails on the ground that the accident was caused by a defect in the car which the chauffeur was driving. Afterwards the insurance company brings an action against the same defendant in respect of damage to the car which the chauffeur was driving. The insurance company would not be estopped from proving that the car was not defective. The servant's action would not bind the master because the servant's cause of action was not the master's. *Kinnersley* v. *Orpe* [130] and *Hancock* v. *Welsh and Cooper* [131] do not support the respondents' case: see *Outram* v. *Morewood* [132] and Spencer Bower on Res Judicata, pp. 199–200, para. 339. The real parties to an issue are those who can be heard and who can oppose it. There is no proof that the Council of Gera were ever in control of the proceedings.

As to the effect of foreign judgments, it was common ground before Cross J. that if there was to be estoppel per rem judicatam, it could only arise by reason of a decision of the prior court which was a final conclusion on the merits of the matter submitted to it for adjudication, so that the judgment either gives rise to a legal right or obligation or extinguishes such a right or obligation. If the West German judgment had been of that character, there might have been an estoppel, but that was not the case: see Halsbury's Laws of England, 3rd ed., Vol. 7 (1954), p. 140, para. 249; p. 150, para. 267, and Dicey's Conflict of Laws, 7th ed., pp. 981–985, r. 182; p. 1052, r. 196.

The reason for recognising a foreign judgment is that it gives rise to an obligation: *Godard* v. *Gray*.[133] From this case it appears that, for example, a foreign judgment on the meaning of the Sale of Goods Act might be challenged in an English court.

A foreign judgment does not merge the original cause of action as does an English judgment, and the principles on which we treat a foreign judgment are not the same as the principle of res judicata in England: *Nouvion* v. *Freeman*.[134]

If the West German proceedings had gone to finality and the courts there had decided that there was no passing off and that the trade marks should remain in the hands of the organisation in West Germany, that decision would establish res judicata, since the

[130] 2 Dougl. 517.
[131] 1 Stark 347.
[132] (1803) 3 East 346, 366.
[133] L.R. 6 Q.B. 139, 148–9, 152.

[134] (1887) 37 Ch.D. 244, 250, 254–5, 258, C.A.; (1889) 15 App.Cas. 1, 8–9, 13, H.L.(E.).

H. L. (E.)
1966
―――
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
―――

A  courts would have been deciding finally on matters within their jurisdiction.  But in the present case the English courts are not bound to give effect to the decision of the West Germany courts: see *Harris and Adams* v. *Quine* [135]; *In re Low* [136] and *Henderson* v. *Henderson*,[137] which illustrate the basis on which res judicata operates in relation to foreign judgments.  Issue estoppel does not
B  come into the matter.  There can be no estoppel in relation to foreign judgments unless there is a final and conclusive judgment on the merits on a precise cause of action: see *New Brunswick Railway Co.* v. *British and French Trust Corporation Ltd.*[138] and *Callandar* v. *Dittrich*.[139]

C  It is submitted: (1) The basis of the enforcement of a foreign judgment is the arising or extinction of a legal right by that judgment.  (2) The foreign judgment does not merge the cause of action.  It is possible to rely either on it (res judicata) or on the original cause of action.  (3) The right in question must have been entirely extinguished by the foreign judgment before there can be res judicata.  (4) The foreign judgment cannot have a greater effect in England than it has under the foreign law.  Thus the West
D  German judgment in the present case cannot prevent this matter being relitigated in England because it would not prevent it being relitigated in West Germany.

Issue estoppel does not come into play in the case of foreign judgment.  But, if it be held that it does, it is limited to the extent
E  suggested by the opinion of Lord Romer in the *New Brunswick* case.[140]  If issue estoppel were applied blindly to foreign judgments, the effects would be startling.  Thus often foreign lawyers will not take a particular point because their courts will not consider it sympathetically, possibly for political reasons.  It cannot be that, in such circumstances, the matter will be taken to have been
F  decided finally for ever.  In some countries there might be extraordinary procedures which would create situations in which it would be anomalous and unfair to allow estoppel.

Further, the West German judgment was perverse in the sense that the court purported to apply, as being the law of East Germany, a law which it knew to be contrary to that which every
G  court in East Germany would apply.  This case comes within the ratio of *Simpson* v. *Fogo*.[141]  The decision of the West German

---

[135] (1869) L.R. 4 Q.B. 653, 657, D.C.
[136] [1894] 1 Ch. 147, 162–3; 10 T.L.R. 106, C.A.
[137] 3 Hare 100, 110 et seq.

[138] (1939) A.C. 1, 19–20, 28, 37, 41–2.
[139] (1842) 4 Man. & G. 68, 76–7.
[140] (1939) A.C. 1, 42–3.
[141] (1861) 1 H. & M. 195, 240–1, 247.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

court should be treated on the same footing as that of the Louisiana    A
court in that case: see also *Castrique* v. *Imrie* [142] and *Liverpool
Marine Credit Co.* v. *Hunter*. [143]  There must come a point when
the English courts will refuse to allow estoppel to operate in
relation to a foreign judgment.  Long before the point at which a
judgment must be treated as perverse in an unpleasant sense the
English courts will refuse to have regard to it.  If necessary, it is    B
submitted that the West German decision was perverse in the full
sense.

As to estoppel: see also *Hall* v. *Odber* [144]; *Smith* v. *Nicholls* [145]
and *Bank of Australia* v. *Harding*. [146]  Canadian authorities on the
subject are *Clergue* v. *Humphrey* [147]; *State Bank of Butler* v.
*Benzonson* [148] and *Davidson* v. *Sharpe*. [149]                      C

The reason why English courts recognise foreign judgments is
that under such a judgment an obligation has arisen.  If the foreign
judgment has dismissed a claim it shows that the defendant is free
from any obligation.  A foreign declaratory judgment should be
recognised in the English courts: see Dicey's Conflict of Laws,
7th ed., r. 183, pp. 492, 996; r. 196, p. 1052; r. 197, p. 1054.  The    D
West German judgment, however, is not final and conclusive on
the merits.  A foreign judgment is only prima facie evidence and
is not conclusive.  What Lord Brougham L.C. said in *Houlditch*
v. *Donegal* [150] is unanswerable.  What Lord Lyndhurst L.C. said in
*Ricardo* v. *Garcias*, [151] is not inconsistent with the previous case.
Reliance is placed on *Liverpool, Brazil and River Plate Steam*          E
*Navigation Co. Ltd.* v. *Benham*. [152]  In *In re Queensland Mercantile
and Agency Co*. [153] the Court of Appeal distinguished *Simpson* v.
*Fogo* [154] but recognised it as good law: see Dicey's Conflict of
Laws, 7th ed., p. 549; *London & Mediterranean Bank* v.
*Strutton* [155]; *Luther* v. *Sagor*. [156]

In summary: (1) There is no estoppel against the Stiftung and    F
counsel are entitled to appear on its behalf in the summons to which
it is respondent.  (2) (a) if (which is denied) counsel on this side
are appearing not for the Stiftung, but for the solicitors, then the
solicitors are not privies of the Council of Gera; (b) if (which is

[142] L.R. 4, H.L. 414.
[143] (1868) 3 Ch.App. 479.
[144] (1809) 11 East 118.
[145] (1859) 5 Bing.N.C. 208.
[146] (1850) 9 C.B. 661.
[147] (1900) 31 Can.S.C.R. 166.
[148] (1914) 16 D.L.R. 848.
[149] (1920) 60 Can.S.C.R. 72.
[150] (1934) 8 Bligh (N.S.) 301, 338
et seq.

[151] (1845) 12 Cl. & F. 368, 397 et    G
seq.
[152] (1868) L.R. 2 P.C. 193, 202.
[153] (1892) 1 Ch. 219, 224 et seq.; 8
T.L.R. 177, C.A.
[154] 1 H. & M. 195.
[155] (1869) 21 L.T. 415.
[156] [1921] 3 K.B. 532, 558–9.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A  denied) the term " privy " can include a person who is under the
control of another, then it has not been proved that the respondents
are under the control of the Council of Gera.  (3) Even assuming
that the solicitors are the servants of the Council of Gera, they are
not estopped from defending themselves against this summons
which seeks an order against them personally.  No estoppel arises
B  from the West German proceedings in which they had no chance of
appearing.  (4) The first and second defendants are not privies of
the third defendant and cannot take advantage of any estoppel
arising from the West German judgment.  (5) The West German
judgment cannot prevent anyone from contending now that these
proceedings are not authorised by the Council of Gera because that
C  judgment did not extinguish any cause of action.  (6) The West
German judgment did not estop anyone from commencing any
proceedings in West Germany.  (7) The causes of action in West
Germany are different from the causes of action in England: see
*Callandar's* case.[157]  (8) The law of issue estoppel does not apply
to foreign judgments.  (9) If (which is denied) issue estoppel does
D  apply to foreign judgments it is only to the extent stated by Lord
Romer in the *New Brunswick* case.[158]  (10) The West German
decisions should not be recognised as foreign judgments capable
of giving rise to estoppel because they applied, not East German
law, but West German law in relation to the Stiftung of Jena.
(11) The West German courts did not do their best to come to a
E  judicial decision but, while purporting to apply the law of East
Germany, applied a law which they knew was not that law.  (12)
The West German judgment was not judicial, but political, and
had no validity outside West Germany.

   *Mark Littman Q.C.* in reply.  Since the application that all
proceedings be stayed for want of authority in Courts & Co. the
F  courts have been engaged in deciding that issue between whatever
persons were parties to the proceedings.  The appellants contend
that the proceedings were brought without the authority of the
Stiftung because, as a result of the confiscation in East Germany,
its organs were paralysed.  The respondents contend that Courts
& Co. received their authority from the Council of Gera.  The
G  appellants say that the matter has been clearly decided in Germany
between the same parties or parties so closely connected with
them that estoppel arises.

   As to estoppel, it is contended (1) that the Council of Gera was
a party to the proceedings in West Germany; (2) that an issue

[157] 4 Man. & G. 68.                    [158] [1939] A.C. 1, 41–2.
   A.C. 1967.                                            58

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———

identical to the present issue (namely, whether or not the confisca-    A
tion paralysed the organs of the Stiftung) was decided in West
Germany; (3) that this decision was final and conclusive, since it
was embodied in an order made to determine the case; (4) that in English
law it bound the Council of Gera and their privies, and (5) that
the contentions sought to be made against the respondents are
sought to be made by the Council of Gera or their privies and    B
accordingly estoppel arises: see the *New Brunswick* case [159] and
the *Fidelitas* case.[160]

   It is not contended that a determination by a judge on a point
of fact, which was not a necessary link in his chain of reasoning
would be res judicata.  The point of the principle of res judicata
is that there is a public interest in not relitigating the same matters,    C
so that, if any matter raised in an action is an issue which has
already been fought between the parties and decided by the court,
this doctrine of public policy applies.  In the present case the
decision on the effect of the confiscation was a question which
had in substance been decided in the earlier case.  In considering
this matter one is not confined to the formal cause of action; one    D
must look behind it and see what were the matters raised: see
Halsbury's Laws of England, 3rd ed., Vol. 15, pp. 186–7, paras.
360, 362.  Where it can be shown that a particular issue was in
fact raised and decided, the earlier judgment is conclusive.  Here
the issue which was decided was whether or not the Council of
Gera ever had authority to act as the special board of the Stiftung.    E
On that depends the question whether or not the confiscation
paralysed the Stiftung and whether the Council of Gera is
competent to bring the present action.  In *Brown* v. *Robinson* [161]
the approach of the court was perfectly reasonable and consistent
with the underlying doctrine of public policy.  It is not inconsistent
with what Lord Romer said in the *New Brunswick* case.[162]  The    F
cases of *Hartington* [163]; *Marginson* [164]; *Bright* [165]; *Hoystead* [166] and
*Fidelitas* [167] and the passages cited from Spencer Bower's book are
to be particularly noted and see *Callandar's* case.[168]

   Assuming that there is such a thing as issue estoppel, it is
reasonable that it should apply when the parties have litigated in
England and also when they have litigated abroad and the matter    G

[159] Ibid. 19–20, 21, 28, 36–37, 38, 43.
[160] [1966] 1 Q.B. 630, 639–40, 640–1.
[161] [1960] S.R.(N.S.W.) 297, 302.
[162] [1939] A.C. 1, 43.
[163] 6 E. & B. 780.
[164] [1939] 2 K.B. 426.
[165] [1954] P. 270.
[166] [1926] A.C. 155.
[167] [1966] 1 Q.B. 630.
[168] 4 Man. & G. 68, 91, 93.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    has been determined by a court of competent jurisdiction: see *Henderson* v. *Henderson* [169]; *Ricardo* v. *Garcias* [170]; *In re Dulles' Settlement (No. 2)* [171]; *Bell* v. *Holmes* [172]; *Ord* v. *Ord* [173] and Spencer Bower on Res Judicata, pp. 175–7, paras. 294 to 297; see particularly note (m).

B    When the underlying issues have been decided in a foreign court they should be treated in the same way as if they had been decided in an English court: see *Randolph* v. *Tuck* [174]; *Wood* v. *Luscombe* [175]; *Duedu* v. *Yiboe* [176] and *Kok Hoong* v. *Leong Cheong Kwang Mines Ltd.* [177] It is conceded that issue estoppel is defeated if one party discovers a fresh point of law or discovers some new evidence.

C    The appellants have submitted that foreign judgments differ from English judgments in that an English judgment merges a debt but a foreign judgment does not. But it is extremely doubtful whether this old distinction is still part of English law: see Dicey's Conflict of Laws, 7th ed., rule 182, p. 981, rule 183, p. 992; sub-rule 183, p. 996; rule 185, p. 1002; rule 186, p. 1007 and

D    Professor Horace Emerson Read's Recognition and Enforcement of Foreign Judgments (1938), pp. 116–8, 120–1.

The appellants also contended that foreign judgments are only prima facie evidence of the facts which they find. But see Spencer Bower on Res Judicata, pp. 37–40, paras. 53–5. It is hard to see how that rule, unless it is purely technical and has nothing to

E    do with the substance of res judicata, can be consistent with the rule that a final judgment of a foreign court is conclusive, as it is, save in certain circumstances, for example, where there is want of jurisdiction: see *Ricardo* v. *Garcias* [178] and *Barber* v. *Lamb.* [179]

The appellants referred to *Callandar's* case [180] and *Hull* v.

F    *Odber* [181] but they are not applicable to the present case. The latter is of doubtful validity and does not help on the point of res judicata. They also referred to *In re Low* [182] and *Harris and Adams* v. *Quine* [183] as supporting the proposition that the earlier judgment must be final and conclusive in the merits. But both these cases were decided on the ground that all that had been decided

G    [169] 3 Hare 100, 115.
[170] 12 Cl. & F. 368, 401.
[171] [1951] Ch. 842, 849, 851.
[172] [1956] 1 W.L.R. 1359; [1956] 3 All E.R. 449.
[173] [1923] 2 K.B. 432; 39 T.L.R. 437, D.C.
[174] [1962] 1 Q.B. 175.
[175] [1966] 1 Q.B. 169, 172; [1965] 3 W.L.R. 996; [1964] 3 All E.R. 972.

[176] [1961] 1 W.L.R. 1040, 1044–5, P.C.
[177] [1964] A.C. 993, 1010–11.
[178] 12 Ch. & F. 368.
[179] (1860) 8 C.B.(N.S.) 95.
[180] 4 Man. & G. 68.
[181] 11 East 118.
[182] [1894] 1 Ch. 147.
[183] L.R. 4 Q.B. 653.

HOUSE OF LORDS          **[1967]**

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

at the first trial was that no action lay in the foreign court by          A
reason of the foreign law of limitations which was part of the
lex fori: see *In re Low.*[184]

The appellants cannot say that they did not intend to submit
the matter to the foreign court before which the matter was fought
out and by which it was decided, whatever may have been in the
appellants' minds initially.  The parties here are the same as the          B
parties to the case in West Germany or their privies and estoppel
should be held to apply.

It was submitted that the only party for whom counsel were
appearing here was the Stiftung.  But this is fallacious.  It is not
disputed that the Council of Gera were parties to the proceedings
in West Germany.  Who are the parties to the present proceedings?          C
Clearly not the solicitors.  Is the Stiftung, then, represented before
the court in the present proceedings?  If counsel are making
representations on behalf of the Stiftung, it can only be because
they are instructed by solicitors who have its authority.  But if
the respondents are right in their contentions the Stiftung have
never been parties to these proceedings in any form.  Over the          D
period of this litigation counsel have been making submissions on
behalf of someone other than the Stiftung.  The only lay client
whom they claim to have is not theirs.  Either they are on a frolic
of their own or they are representing someone else.  In this context
the word " party " has a special meaning.  A person who is not
a party on the record is yet a party if he allows someone else to          E
fight his battles for him: see *Bruszewski* v. *United States.*[185]  What
is the relationship to be established for persons to be treated as
affected by an estoppel?  Here there is a close enough relationship
to make it fair and just for those who directly instruct counsel on
the other side, namely, the solicitors of the Council of Gera, to be
bound by the West German decision.  The latter are the clients          F
of the former: see the definition in section 86 (1) of the Solicitors
Act, 1957.  The Council of Gera should be responsible for the costs
of this action and the solicitors should likewise be liable on the
principle of breach of warranty of authority if that turns out to be
the case.  The solicitors are in the same position vis-à-vis the
Council of Gera who might be liable for the solicitors' costs if          G
they allowed them to hold themselves out as having their
authority.  The right inference is that the Council of Gera controls
the solicitors in these proceedings.  If it does not, who does?  On
it the solicitors rely for their authority to issue the writ and

[184] [1894] 1 Ch. 147, 161, 162–3.     [185] 181 Fed. 2nd 419, 422.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    conduct the proceedings.  It was really the council which fought
the proceedings in West Germany: see Spencer Bower on Res
Judicata, p. 127, para. 198, *Kinnersley* v. *Orpe* [186] and *Hancock*
v. *Welsh and Cooper.* [187]

In order to show that a matter is res judicata by local law, it
must be established that the judgment was final and conclusive,
B    that is, that it was not reversible by the court which pronounced it.

The appellants relied on what Lord Watson said in *Nouvion's*
case, [188] but see what was said by Lord Herschell [189]; see also
*Pemberton* v. *Hughes.* [190]  What has been fought out and decided
between the parties binds them.  That can be the case even in
interlocutory proceedings: *Thoday* v. *Thoday.* [191]

C    In summary:  (1) The domicile of the Stiftung, in the relevant
sense, is not Jena.  (2) Even if one must look to the law in force
at Jena, that law is the law of all Germany, the old law which
formerly prevailed there.  (3) In normal circumstances when
dealing with a sovereign state with its own judicial system and
Supreme Court a decision of that court on a matter of its own law
D    is the best evidence of the law of that place and it will be accepted
as such, save in unusual or special circumstances.  (4) What one
has here is not a usual case but a highly exceptional case and,
taking the circumstances as a whole, it is right that the judgments
both of the West German and the East German Supreme Courts
should be examined, with the aid of expert evidence, to find what
E    is the relevant law.  (5) The sitz of the Stiftung must be taken to be
at Jena, but, for the purposes of English conflict rules, that is not
the same as domicile.  A piece of domestic law gave the Stiftung
its seat or principal place of business, but the fact that this is a
particular " land " does not prevent the overriding consideration
that the law applicable is the law of Germany, for the Stiftung's
F    domicile in the relevant sense was Germany, so the law which was
to be applied in East Germany was the law of the Federal
Republic, the old law before Germany was divided.  (6) The law
is not just what the courts say; the courts are applying themselves
to something outside themselves, which they apply or interpret.
Here one is dealing with the provisions of a code, and, though
G    the decisions of a court are usually the best evidence of what the
law is, the English courts are not bound to accept them.  (7) The
decision of the East German Supreme Court goes very little way to

[186] 2 Dougl.K.B. 517.
[187] 1 Stark. 347.
[188] 15 App.Cas. 1, 13.
[189] Ibid. 6-7, 9.

[190] (1899) 1 Ch. 781; 15 T.C.R.
211, C.A.
[191] [1964] P. 181; [1964] 2 W.L.R.
371; [1964] 1 All E.R. 341, C.A.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A

showing what the law of Germany really is and it cannot be accepted as conclusive without accepting the postulate behind it that there is a state in East Germany established by the East Germans and not by the occupying power. This is not the ordinary type of case where one can look at the decision of the Supreme Court to see what the law is. (8) The decision of the Federal Supreme Court can be looked at on its merits, whereas the East German court made its decision politically. (9) On the facts the Stiftung could not continue to act in East Germany, where it was immobilised. (10) Accordingly the House of Lords should adopt the law laid down by the Supreme Court in West Germany.

B

*Guy Aldous Q.C.* on the new cases cited in reply. As to *Bell* v. *Holmes*,[192] a parallel might be suggested. Suppose an English driver in Ruritania carrying a Ruritanian passenger is involved in a collision in which his passenger is slightly injured but the driver of the other car is seriously injured. The passenger sues him in Ruritania and he lets judgment be given against him in default of defence. If the other driver sues him in England, he is not estopped from contesting his liability. As to *Ord* v. *Ord*,[193] the real distinction is between fact estoppel and cause of action estoppel. As to *Barber* v. *Lamb*,[194] that is explained in Spencer Bower on Res Judicata, p. 183, n. (o) and Professor Read on Recognition and Enforcement of Foreign Judgments, p. 117.

C

D

[The cross-appeal was ordered to stand over until the decision on the points argued was formulated.]

E

Their Lordships took time for consideration.

May 18. LORD REID. My Lords, in this action the appellants are seeking an injunction against the respondents to restrain them from selling optical instruments under the name Carl Zeiss and for other relief. The present appeal arises out of a summons taken out by the respondents on February 7, 1956, for an order for a stay of proceedings and dismissal of the action on the ground that it was commenced and is being maintained without the plaintiffs' (the appellants') authority. At various dates thereafter lengthy affidavits were filed and after long cross-examination Cross J. on March 6, 1964, refused to stay the proceedings, having decided against the respondents on the three grounds then put forward by them. The respondents appealed and, having

F

G

[192] [1956] 1 W.L.R. 1359.      [194] 8 C.B.N.S. 195.
[193] [1923] 2 K.B. 432.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

A  received new advice, put forward a new and quite different ground based on the non-recognition by Her Majesty's Government of the German Democratic Republic. The Court of Appeal on December 17, 1964, allowed the respondents' appeal on this new ground and so found it unnecessary to reach any decision on the grounds maintained before Cross J.

B      I think that it will be convenient first to deal with the new point raised for the first time in the Court of Appeal and then to deal separately with the other grounds. The issues raised are complex and difficult and your Lordships are confronted with some 1,500 pages of affidavits, cross-examination and documents. I shall therefore try to restrict my narrative to those matters

C  which are directly relevant to the issues to be decided.

It is necessary to have the appellants' history in mind. About 1846 Carl Zeiss founded an optical business in Jena. He later assumed as a partner Ernst Abbe of Jena University. Then they and Otto Schott founded a glass works. By 1891 Abbe was the owner of the whole (subject to Schott's interest) and he

D  decided to set up a Stiftung or charitable foundation to own and carry on the two businesses under the name of the Carl-Zeiss-Stiftung. The main objects were to promote "precise technical industry" (which may not be an adequate translation) and to benefit the employees and the working population of Jena.

The constitution of the Stiftung was elaborately set out. First

E  there was to be a special board for the administration of its estate and the supreme direction of its affairs and the rights and duties of the special board were to pertain to "that department of the state service of the Grand Duchy of Saxe-Weimar under which the affairs of the University of Jena are for the time being placed." Then "for directing the industrial operations of the

F  Stiftung" there were to be "boards of management of the various establishments of the Stiftung for the time being" and a permanent official, the Deputy (Stiftungs Kommissar), was to be appointed to represent the special board on the boards of management, and finally article 113 provided:

G      "Should, in consequence of political changes in the state, the provision according to 5 of this statute with reference to the representation of the Stiftung become untenable, this representation including the appointment of the Deputy of the Stiftung within the meaning of 5 and the statutory administration of the Carl-Zeiss-Stiftung shall be made over to that department of state, which with regard to the University of Jena occupies the place of the State Department of the Grand Duchy of Saxe-Weimar acting as special board,

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

provided that its seat is in Thuringia, otherwise to the highest     A
administrative authorities in Thuringia."

In 1918 under the Weimar Republic the Grand Duchy was
abolished and a new state of Thüringia was set up: thereupon
the Minister of Education of that state became the special board.
Then after 1935 under the National Socialist régime his place     B
was taken by a Reichs-Stathalter. And when Thuringia was
occupied by American forces in 1945 a new provincial govern-
ment of Thuringia was set up by them and its Ministry of
Education became the special board. On July 1, 1945, by
agreement between the allied powers Thuringia came under
Russian occupation and the present controversy turns on what
happened thereafter.                                              C

We do not have precise evidence about this, but it is said
that in 1949 the U.S.S.R. set up the German Democratic Republic
to govern that part of Germany then occupied by Russia, and
purported to make it an independent state. And it is further
said that thereafter the German Democratic Republic purported
to act as an independent state in legislating for and administer-     D
ing the Russian zone of Germany. That there is a body calling
itself the German Democratic Republic and that it does operate
in that zone is, I think, common knowledge. I do not think that
common knowledge goes farther than that, but, for the purposes
of this appeal, I am prepared to assume that the U.S.S.R. did
purport to confer independence on the Democratic Republic and     E
that that body does purport to act as if it were an independent
state.

Shortly stated, the respondents' case is that we are bound to
have regard to the basis on which the Democratic Republic
purports to act, and that as Her Majesty's Government has never
granted recognition de jure or de facto to that Republic or its     F
Government, we must refuse to recognise as effective all legisla-
tion emanating from it, and all acts done under such legisla-
tion. For reasons which I shall give later I do not think that that
is right, but first I shall explain why, if it were right, it would be
decisive of the point I am now dealing with.

In 1952 the Democratic Republic passed legislation re-organis-     G
ing local government in its " territory," and in fact this legislation
was put into effect. The old state or land of Thuringia was
abolished and in its place Districts were created, each with a
Diet and a Council or Rat. Jena fell within the District of Gera,
and the Council of Gera did in fact operate as the special board

A    of the appellants, and did in fact authorise the raising of the
present action. If the respondents' argument based on non-
recognition is well founded, then it must follow that British
courts cannot recognise either the existence of the Council of
Gera or the validity of anything done by it, and in particular
cannot recognise any authority given by it for the raising of the
B    present action. So I must now examine the principles on which
this argument is founded.

In the normal case a law is made either by the sovereign directly
or by some body entitled under the constitution of the country to
make it or by some person or body to which the sovereign has
delegated authority to make it. On the other hand, there are
C    many cases where laws have been made against the will of the
sovereign by persons engaged in a rebellion or revolution: then
until such persons or the government which they set up have been
granted de facto recognition by the Government of this country,
their laws cannot be recognised by the courts of this country,
but after de facto recognition such laws will be recognised. So
D    far there is no difficulty. But the present case does not fit neatly
into any of these categories. We are considering whether the law
of 1952 under which the Council of Gera was set up can be
recognised by our courts and therefore we must ascertain what
was the situation in East Germany in 1952.

It is a firmly established principle that the question whether
E    a foreign state ruler or government is or is not sovereign is one
on which our courts accept as conclusive information provided by
Her Majesty's Government: no evidence is admissible to contra-
dict that information.

"It has for some time been the practice of our courts . . .
to take judicial notice of the sovereignty of a state, and for
F    that purpose (in any case of uncertainty) to seek information
from a Secretary of State; and when information is so
obtained the court does not permit it to be questioned by the
parties" (*per* Lord Cave in *Duff Development Co. Ltd. v.
Government of Kelantan* [1]).

"Such information is not in the nature of evidence; it
is a statement by the sovereign of this country through one
of his ministers upon a matter which is peculiarly within his
G    cognizance" (*per* Lord Finlay [2]).

In the present case the Court of Appeal twice received such
information from the Foreign Secretary. First on September 16,
1964, it was stated: "Her Majesty's Government has not granted

[1] [1924] A.C. 797, 805–806; 40        [2] [1924] A.C. 797, 813.
T.L.R. 566, H.L.(E.).

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

HOUSE OF LORDS                        **[1967]**

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

any recognition de jure or de facto to (a) the ' German Democratic    A
Republic ' or (b) its ' Government,' " and secondly on Novem-
ber 6, 1964, a further answer was given to questions which had
been asked on October 29.

In my opinion, this latter answer is decisive on the question
which I am now considering and I must therefore quote the rele-
vant question and the relevant parts of the answer or certificate    B
given by the Foreign Secretary. The question was:

" What (a) states or (b) governments or (c) authorities (if
any) have since July 1, 1945, up to the present date been
recognised by Her Majesty's Government as (a) entitled to
exercise or (b) exercising governing authority in the area of
Germany outside the zones allocated to the Governments of    C
the United Kingdom, the United States of America and the
French Republic by the protocol of September 12, 1944, and
the agreement of July 26, 1945, concluded between the
Governments of the said states and the Union of Soviet
Socialist Republics. Has such recognition been de jure or
de facto."

The relevant parts of the certificate are as follows:    D

" The area of Germany to which the question is under-
stood to refer comprises (a) the zone of occupation allocated
to the Union of Soviet Socialist Republics under the proto-
col of September 12, 1944, and the agreement of July 26,
1945, as modified by the protocol of the proceedings of the
Berlin Conference of August 2, 1945, and (b) the ' Greater    E
Berlin ' area. The question is understood not to relate to the
areas of Germany placed under Soviet or Polish administra-
tion in pursuance of the aforesaid protocol of August 2, 1945.

" (a) From the zone allocated to the Union of Soviet
Socialist Republics Allied forces under the Supreme Allied
Commander, General Eisenhower, withdrew at or about the
end of June, 1945. Since that time and up to the present date
Her Majesty's Government have recognised the state and    F
Government of the Union of Soviet Socialist Republics as
de jure entitled to exercise governing authority in respect of
that zone. In matters affecting Germany as a whole, the
states and Governments of the French Republic, the United
Kingdom of Great Britain and Northern Ireland, the United
States of America and the Union of Soviet Socialist Republics
were jointly entitled to exercise governing authority. In the    G
period from August 30, 1945, to March 20, 1948, they did
exercise such joint authority through the Control Council for
Germany. Apart from the states, Governments and Control
Council aforementioned, Her Majesty's Government have not
recognised either de jure or de facto any other authority
purporting to exercise governing authority in or in respect of
the zone. Her Majesty's Government, however, regard the

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

A    aforementioned Governments as retaining rights and respon-
sibilities in respect of Germany as a whole."

It was not argued that the matter which I am now considering
is one affecting Germany as a whole; so the rights of the other
three allied Governments do not affect this question, and I need
only consider what the certificate says with regard to the U.S.S.R.
B    and the inferences which must be drawn from it.

The purpose of a certificate is to provide information about
the status of foreign governments and states and therefore the
statement that since June, 1945, " Her Majesty's Government have
recognised the state and Government of the Union of Soviet
C    Socialist Republics as de jure entitled to exercise governing
authority in respect of that zone" cannot merely mean that Her
Majesty's Government have granted this recognition so as to leave
the courts of this country free to receive evidence as to whether in
fact the U.S.S.R. are still entitled to exercise governing authority
there.  The courts of this country are no more entitled to hold that
D    a sovereign, still recognised by our Government, has ceased in
fact to be sovereign de jure, than they are entitled to hold that a
government not yet recognised has acquired sovereign status.  So
this certificate requires that we must take it as a fact that the
U.S.S.R. have been since 1945 and still are de jure entitled to
E    exercise that governing authority.  The certificate makes no
distinction between the period before and the period after the
German Democratic Republic was set up.  So we are bound to
hold that the setting up of that Republic made no difference in
the right of the U.S.S.R. to exercise governing authority in the
zone.  And it must follow from that that the U.S.S.R. could at any
F    time lawfully bring to an end the German Democratic Republic
and its Government and could then resume direct rule of the zone.
But that is quite inconsistent with there having in fact been any
abdication by the U.S.S.R. of its rights when the German
Democratic Republic was set up.

The judgment of the Court of Appeal appears to me to be
G    based on the view that the courts of this country can and must
accept the position that the U.S.S.R. have recognised the German
Democratic Republic as an independent sovereign state.  Har-
man L.J. says [3]: " It is in fact notorious that the U.S.S.R. has
recognised the German Democratic Republic as a sovereign state

[3] [1965] Ch. 596, 651; [1965] 2 W.L.R. 277; [1965] 1 All E.R. 300, C.A.

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———
LORD REID
———

and treats its law-making capacity accordingly." And Diplock L.J. says [4]:

> " All that I am prepared to assume—and I think it is a matter of which I can take judicial notice—is that the Government of the U.S.S.R. recognises the ' Government of the German Democratic Republic ' as the independent sovereign government of an independent sovereign state for whose territory the Government of the U.S.S.R. claims no power to make laws."

But the learned judges of the Court of Appeal do not appear to have had their attention directed to the true import of the certificate of the Secretary of State. The U.S.S.R. may have purported to confer independence or sovereignty on the German Democratic Republic but, in my judgment, that certificate clearly requires us to hold that, whatever the U.S.S.R. may have purported to do, they did not in fact set up the German Democratic Republic as a sovereign or independent state. If they retained their right to govern its territory, they could not possibly have done so; and the certificate requires us to hold that they did retain that right.

If we are bound to hold that the German Democratic Republic was not in fact set up as a sovereign independent state, the only other possibility is that it was set up as a dependent or subordinate organisation through which the U.S.S.R. is entitled to exercise indirect rule. I do not think that we are concerned to enquire or to know to what extent the U.S.S.R. in fact exercise their right of control. At a late stage in the argument before your Lordships counsel for the respondents made an application that further questions should be addressed to Her Majesty's Government. That would be a perfectly proper thing to do if your lordships were of the opinion that the existing certificate is ambiguous or insufficient. But I can see no ambiguity or insufficiency in this certificate and therefore I agree that this application was properly refused.

It was argued that the present case is analogous to cases where subjects of an existing sovereign have rebelled and have succeeded in gaining control of a part of the old sovereign's dominions. When they set up a new government in opposition to the de jure sovereign that new government does not and cannot derive any authority or right from the de jure sovereign, and our courts must regard its acts and the acts of its organs or officers as nullities until it has established and consolidated its position to such an extent as to warrant our government according de facto recognition of it.

[4] [1965] Ch. 596, 664.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

A   The case of *Banco de Bilbao* v. *Sancha* [5] affords a fairly recent example of this: there General Franco's adherents had succeeded in gaining control of a large part of Spain and the government which they set up in opposition to the Republican Government was recognised de facto by the British Government. Giving the judgment of the Court of Appeal, Clauson L.J. said [6]:

B       " . . . this court is bound to treat the acts of the government which His Majesty's Government recognise as the de facto government of the area in question as acts which cannot be impugned as the acts of an usurping government, and conversely the court must be bound to treat the acts of a rival government claiming jurisdiction over the same area, even if the latter government be recognised by His Majesty's

C       Government as the de jure government of the area, as a mere nullity, and as matters which cannot be taken into account in any way in any of His Majesty's courts."

   *Aksionairnoye Obschestvo A.M. Luther* v. *James Sagor & Co.* [7] is another good example. The case turned on whether the courts of this country could recognise a decree made in 1918 by officers

D   of the U.S.S.R. which had by revolutionary means assumed power in Russia. At the time when the case came before Roche J. His Majesty's Government had not recognised the U.S.S.R. and therefore Roche J. properly held that he could not give effect to that decree. But before the case was decided by the Court of Appeal the court were informed by the Secretary of State that His

E   Majesty's Government recognised the Soviet Government as the de facto government of Russia. Accordingly the Court of Appeal were able to give effect to the decree.

   But the present case is essentially different. The German Democratic Republic was set up by the U.S.S.R. and it derived its authority and status from the Government of the U.S.S.R. So

F   the only question could be whether or not it was set up as a sovereign state. But the certificate of our Government requires us to hold that it was not set up as a sovereign state because it requires us to hold that the U.S.S.R. remained de jure sovereign and therefore did not voluntarily transfer its sovereignty to the Democratic Republic. And, if the Democratic Republic did not become a

G   sovereign state at its inception, there is no suggestion that it has at any subsequent time attempted to deprive the U.S.S.R. of rights which were not granted to it at its inception. The courts of this country must disregard any declarations of the Government

[5] [1938] 2 K.B. 176; 54 T.L.R. 603; [1938] 2 All E.R. 253, C.A.
[6] [1938] 2 K.B. 176, 195–196.

[7] [1921] 1 K.B. 456; 37 T.L.R. 282; [1921] 3 K.B. 532; 37 T.L.R. 777, C.A.

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd
(No. 2)

LORD REID

——

A    of the U.S.S.R. in so far as they conflict with the certificate of
Her Majesty's Secretary of State, and we must therefore hold that
the U.S.S.R. set up the German Democratic Republic, not as a
sovereign state, but as an organisation subordinate to the U.S.S.R.
If that is so, then mere declarations by the Government of the
Democratic Republic that it is acting as the government of an
B    independent state cannot be regarded as proof that its initial
status has been altered, and we must regard the acts of the
German Democratic Republic, its government organs and officers
as acts done with the consent of the Government of the U.S.S.R.
as the government entitled to exercise governing authority.

    It appears to me to be impossible for any de jure sovereign
C    governing authority to disclaim responsibility for acts done by
subordinate bodies which it has set up and which have not
attempted to usurp its sovereignty. So, in my opinion, the courts
of this country cannot treat as nullities acts done by or on behalf
of the German Democratic Republic. De facto recognition is
appropriate—and, in my view, is only appropriate—where the
D    new government have usurped power against the will of the
de jure sovereign. I would think that where a sovereign has
granted independence to a dependency any recognition of the new
state would be a recognition de jure.

    The general practice of the British Government was stated in
Parliament on March 21, 1951, by the Secretary of State for
E    Foreign Affairs (Hansard, Vol. 485, col. 2410) as follows:

    " . . . it is international law which defines the conditions under
    which a government should be recognised de jure or de facto,
    and it is a matter of judgment in each particular case whether
    a régime fulfils the conditions. The conditions under inter-
    national law for the recognition of a new régime as the de
F    facto government of a state are that the new régime has in
    fact effective control over most of the state's territory and that
    this control seems likely to continue. The conditions for the
    recognition of a new régime as the de jure government of a
    state are that the new régime should not merely have effective
    control over most of the state's territory, but that it should,
    in fact, be firmly established. His Majesty's Government
    consider that recognition should be accorded when the con-
G    ditions specified by international law are, in fact, fulfilled
    and that recognition should not be given when these con-
    ditions are not fulfilled. The recognition of a government
    de jure or de facto should not depend on whether the
    character of the régime is such as to command His Majesty's
    Government's approval."

    Recognition implies independence and refusal to recognise

A    the German Democratic Republic or its Government is entirely
consistent with that statement if independence was never in fact
granted by the U.S.S.R., for no one suggests that the Democratic
Republic has, or could have, seized independence in defiance of
the U.S.S.R. So there can, in my view, be no question of awaiting
de facto recognition before we can recognise as lawful the acts of

B    the German Democratic Republic. We recognise them, not
because they are acts of a sovereign state, but because they are
acts done by a subordinate body which the U.S.S.R. set up to act
on its behalf.

I am reinforced in my opinion by a consideration of the con-
sequences which would follow if the view taken by the Court of
Appeal were correct. Counsel for the respondents did not dispute

C    that in that case we must not only disregard all new laws and
decrees made by the Democratic Republic or its Government, but
we must also disregard all executive and judicial acts done by
persons appointed by that Government because we must regard
their appointments as invalid. The result of that would be

D    far-reaching. Trade with the Eastern Zone of Germany is not dis-
couraged. But the incorporation of every company in East
Germany under any new law made by the Democratic Republic
or by the official act of any official appointed by its Government
would have to be regarded as a nullity, so that any such company
could neither sue nor be sued in this country. And any civil

E    marriage under any such new law, or owing its validity to the act
of any such official, would also have to be treated as a nullity, so
that we should have to regard the children as illegitimate. And
the same would apply to divorces and all manner of judicial
decisions, whether in family or commercial questions. And that
would affect not only status of persons formerly domiciled in

F    East Germany but property in this country the devolution of
which depended on East German law.

It was suggested that these consequences might be mitigated
if the courts of this country could adopt doctrines which have
found some support in the United States of America. Difficult
questions arose there with regard to acts of administration in the

G    Confederate states during the Civil War and again out of the
delay in recognition of the U.S.S.R. A solution of the earlier
difficulty was found by the Supreme Court in *U.S.* v. *Insurance
Companies*[8] and other similar cases. And for the latter difficulty
solutions were suggested, particularly by Cardozo C.J. in such

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

---

[8] (1874) 89 U.S. 99.

H. L. (E.)
1966
_____
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
_____
LORD REID
—

cases as *Sokoloff* v. *National City Bank of New York* [9] and *Petrogradsky Mejdunarodny Kom. Merchesky Bank* v. *National City Bank of New York*.[10]  In the view which I take of the present case, it is unnecessary to express any opinion whether it would be possible to adopt any similar solutions in this country, if the need should ever arise.

Finally, on this branch of the case I must deal briefly with three grounds on which the appellants argued that the raising of this action should be held to have been properly authorised, even if the actions of the Council of Gera must be disregarded.  These grounds involved the interpretation and effect of a power of attorney granted to Dr. Schrade in 1951 and questions as to his powers by virtue of appointments in the Stiftung which he then held.  These matters involve German law.  They only became important after the respondents put forward their new case in the Court of Appeal, so they were only dealt with cursorily, if at all, in the affidavits and in the evidence led before Cross J.  The Court of Appeal found it possible to decide these questions without receiving further evidence of German law, which the appellants wished to adduce.  In my opinion, these questions could not properly be decided on the evidence as it stands, and, if they should ever arise in any other litigation, the judgment of the Court of Appeal cannot be regarded as res judicata or as having binding effect.

The next question for consideration is whether by reason of a decision of the Federal Supreme Court of West Germany the subject-matter of the issue now before this House is res judicata so that the respondents must succeed without further inquiry.  I can deal briefly with the events which led up to that decision.  When the American forces left Jena in 1945 a number of officers of the Stiftung and of the firm Carl Zeiss went with them to West Germany.  The Stiftung and the firm already had interests there and these were developed in particular by three of these officers.  After a time relations between them and Jena became strained and legal proceedings of various kinds were begun.  Decrees were obtained in West Germany to the effect that the domicile of the Stiftung was removed from Jena to Heidenheim in Würthemberg, and goods were manufactured and sold under the name Carl Zeiss.  Then the West German firm Carl Zeiss sought to prevent sale in West Germany of the products made in Jena, and in 1953 an action was commenced at Stuttgart by " the

[9] (1924) 145 N.E. 917.          [10] (1930) 170 N.E. 479.

A   Carl-Zeiss-Stiftung of Jena represented by the Council of the District of Gera " against the firm Carl Zeiss of Heidenheim and the three individuals who were directing it. The main purpose of this action was to restrain these defendants from using the name Carl Zeiss.

B   Those defendants at once raised the preliminary objection that the Stiftung was not properly before the court, as the Council of Gera was not the legal representative of the Stiftung. The proceedings on this objection were elaborate and prolonged, but ultimately on November 15, 1960, it was sustained by the Federal Supreme Court. I do not attempt at this point even to summarise the reasons: the various judgments given in this action occupy over 200 closely typed pages of which the final judgment occupies more than 30.

C   The respondents maintain that this decision must be held decisive of the question now before this House, because the issue in this appeal is the same as that which was decided by the Federal Supreme Court. So, in the first place, it is necessary to make clear what is the question now before this House. On February 7, 1956, the respondents took out a summons

D   "for an order that all further proceedings in this action be stayed and that this action be dismissed on the ground that the same was commenced and is being maintained without the plaintiffs' authority and that Messrs. Courts & Co., the solicitors purporting to act for the plaintiffs herein, do pay to the defendants the costs of this action . . . to be taxed as between solicitor and client."

E   This question, whether these solicitors are maintaining this action without the authority of the Stiftung, is the sole question which your Lordships now have to determine.

F   There is a vast amount of authority on estoppel per rem judicatam.

"The object of the rule of res judicata is always put upon two grounds—the one public policy, that it is the interest of the state that there should be an end of litigation, and the other, the hardship on the individual, that he should be vexed twice for the same cause " (per Lord Blackburn in *Lockyer* v. *Ferryman*.[11])

G   And the general principle is clear that the earlier judgment relied on must have been a final judgment, and that there must be identity of parties and of subject matter in the former and in the

[11] (1877) 2 App.Cas. 519, 530, H.L.(Sc.).

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

A

present litigation. But each of these three requirements can give rise—and in the present case does give rise—to difficult questions.

Let me take first identity of parties. In this preliminary or interlocutory matter the issue is whether the nominal plaintiff is before the court at all. If it is decided in favour of the defendant, that establishes that the nominal plaintiff never was before the court. So I do not see how the nominal plaintiff, here the Stiftung, can be a party to that issue. And it is admitted that the Stiftung was not a party to the German proceedings. The defendants are of course parties—they raise the issue. But who is their opponent? We are not told the precise implications of the requirement of German procedure as to " representation," but I am content to assume that the Council of Gera was a party to the German proceedings: that council was ordered to pay the costs. But who is the appellant in this House? Again, I think, not the Stiftung. The issue is whether the solicitors are maintaining the action without authority and surely they must be parties—how else could they be made personally liable to the respondents in costs. And I can see no other party—no other appellant. It was argued that the Council of Gera can be regarded as parties but I can see no ground for that. There may be a question when I come to deal with privity. But the Council of Gera has never sought to be a party and no one has sought to make them a party.

Again there is no doubt that the requirement of identity of parties is satisfied if there is privity between a party to the former litigation and a party to the present litigation. The only way in which that could be satisfied in this case would be if there were privity between the Council of Gera and the solicitors. We have a letter from the Council of Gera in their capacity of special board of the Stiftung authorising the raising of this action, but we do not know whether that council has taken any further part, whether it has given any further instructions, or whether it is using the funds of the Stiftung to finance this litigation. The most that can be said is that the council is the " client " instructing the solicitors, though I doubt whether that is proved; the real question may be whether there is a " client " at all. Does this make them privies? It has always been said that there must be privity of blood, title or interest: here it would have to be privity of interest. That can arise in many ways, but it seems to me to be essential that the person now to be estopped from defending himself must have had some kind of interest in the previous litigation or its subject-matter. I have found no English case to the contrary. If that is

B

C

D

E

F

G

A    right, then there can be no privity here because these solicitors
     had no connection with and certainly no interest in the German
     litigation.

          There does, however, seem to me to be a possible extension
     of the doctrine of privity as commonly understood.  A party
     against whom a previous decision was pronounced may employ a
B    servant or engage a third party to do something which infringes
     the right established in the earlier litigation and so raise the whole
     matter again in his interest.  Then, if the other party to the earlier
     litigation brings an action against the servant or agent, the real
     defendant could be said to be the employer, who alone has the
     real interest, and it might well be thought unjust if he could vex
C    his opponent by relitigating the original question by means of
     the device of putting forward his servant.  But this is not a case
     of that character.  The Council of Gera has no substantial interest
     in this litigation.  If the plaintiff succeeds, the only persons who
     can benefit are the Stiftung or the two nationalised firms in Jena
     to which I shall refer later.  The Council of Gera is merely a
D    local public authority, like a county council, on which there has
     been imposed the duty of acting as the special board of the
     Stiftung and there is nothing to show that the council or any of
     its members will gain anything if the plaintiff wins, or lose
     anything if the plaintiff loses this case.  And here the respondents
     are seeking to make these solicitors personally liable to them in
E    solicitor and client costs—in effect seeking damages against them
     for breach of warranty of authority.  In my view, the solicitors
     cannot properly be held to be estopped from defending themselves,
     and showing that they have authority to act, by a judgment which
     had nothing to do with them.

          There is little authority bearing on a question of this kind.
F    The only modern English case cited was *Mercantile Investment
     and General Trust Co.* v. *River Plate Trust, Loan and Agency
     Co.*[12]  The facts were complicated but it is sufficient, for present
     purposes, to say that the plaintiffs in this action had obtained a
     judgment against another company (" the American company ")
     and they maintained this as an estoppel against the defendants in
G    this action (" the English company ") on the ground that, by
     reason of an indemnity given by the English company, the English
     company had assisted the American company in the previous
     action and had paid their costs, so that they were virtually parties

          [12] [1894] 1 Ch. 578; 10 T.L.R. 186.

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———
LORD REID
———

to the previous action. Romer J. dealt with this point very briefly and held that there was no estoppel.

I should also refer to *Kinnersley* v. *Orpe* [13] which was cited as relevant on privity. There Dr. Cotton claimed a right to fish and sent a servant, Orpe, to assert it. Kinnersley brought an action of trespass and succeeded. Then Dr. Cotton sent another servant, also called Orpe, to fish and this action was brought against him. The plaintiff simply produced the record in the former case and Perryn B. held this evidence conclusive, " both the Orpes having acted under the authority of Cotton, who was the real defendant in both causes." On a rule " the court also thought that the record in the former cause, though admissible evidence, was not conclusive." With regard to this case Lord Ellenborough C.J. said in *Outram* v. *Morewood* [14]:

> " As to the case of *Kinnersley* v. *Orpe*,[15] it is extraordinary that it should ever have been for a moment supposed that there could be an estoppel in such a case. It was not pleaded as such; neither were the parties in the second suit the same with those in the first."

And a little later he referred to " the defendant, who was no party to the former action."

One should not attach too much weight to this, because it was a very minor point in Lord Ellenborough's elaborate and learned judgment. But at least it never occurred to him that the doctrine of privity could be stretched to affect a defendant from whom a penalty was claimed and who had no connection with the previous case, merely because his employer had been concerned with it.

The respondent sought to rely on American authorities. Their effect is summarised in the American Restatement (Judgments), Chap. IV. The only section which seemed to me to come near to applying to the appellant solicitors is at pp. 402–403, s. 85 (2):

> " Where a person is bound by or entitled to the benefit of the rules of res judicata because of a judgment for or against him with reference to a particular subject-matter, such rules apply in a subsequent action brought or defended by another on his account."

With that I would agree; and, if these solicitors were bringing this action on account of or for the benefit of the Council of Gera, I would hold that res judicata could be pleaded against them.

---

[13] (1780) 2 Dougl.K.B. 517, 518.    [15] 2 Dougl.K.B. 517.
[14] (1803) 3 East 346, 366.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

A    But I have already stated my view that this action is not brought on account of or for the benefit of the Council of Gera and, in particular, these solicitors are not contesting the issue now before your Lordships for the benefit of that council. In so far as they are not acting to protect their own interests they are seeking to act for the benefit of the Stiftung, and it is not alleged

B    that the plea of res judicata would be good against the Stiftung.

The second requirement for res judicata is identity of subject-matter. As to this, it has become common to distinguish between cause of action estoppel and issue estoppel. There is certainly no cause of action estoppel here. The question before the German

C    court was whether the Council of Gera were the legal representatives of the Stiftung at one date. The question here is whether at a different date the solicitors had the authority of the Stiftung to raise this action. An answer, yes or no, to the first question does not necessarily imply a similar answer to the second. What the respondents maintain is that the grounds on which the German

D    court in fact decided the first question are such that we cannot decide this case in favour of the solicitors without disagreeing with at least some of the findings on which the German court based their decision. I think that that is true and the question is whether we are entitled to do that.

Issue estoppel may be a comparatively new phrase, but I

E    think that the law of England—unlike the law of some other countries—has always recognised that estoppel per rem judicatam includes more than merely cause of action estoppel. The earliest case commonly referred to on res judicata is *The Duchess of Kingston's* case [16] in 1776. The Duchess of Kingston was prosecuted for bigamy in this House. She put forward in defence a

F    decision of an ecclesiastical court that her first marriage was invalid. The first question put to the judges who were in attendance was whether a sentence of the spiritual court against the marriage was conclusive evidence. The unanimous opinion of the judges was given by De Grey C.J. and in the course of it he said [17]:

G        " From the variety of cases relative to judgments being given in evidence in civil suits, these two deductions seem to follow as generally true: first, that the judgment of a court of concurrent jurisdiction, directly upon the point, is as a plea, a bar, or as evidence, conclusive, between the same parties, upon the same matter, directly in question in another court:

[16] (1776) 20 St. Tr. 355.          [17] Ibid. 538 n.

914                          HOUSE OF LORDS                    [1967]

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

secondly, that the judgment of a court of exclusive jurisdic-     A
tion, directly upon the point, is, in like manner, conclusive
upon the same matter, between the same parties, coming
incidentally in question in another court, for a different
purpose. But neither the judgment of a concurrent or exclu-
sive jurisdiction is evidence, of any matter which comes
collaterally in question, though within their jurisdiction; nor
of any matter incidentally cognizable: nor of any matter to     B
be inferred by argument from the judgment."

In referring to a judgment being conclusive on the same
matter " coming incidentally in question in another court for a
different purpose " the judges were clearly going beyond cause of
action estoppel, but I need not attempt to discover just how far
they meant to go because this has been developed in many later     C
decisions.

In *Reg.* v. *Inhabitants of the Township of Hartington Middle
Quarter* [18] it appeared that in a previous litigation it had been
decided that two young children had a settlement in the defen-
dants' township. The question at issue in this case was the settle-
ment of their mother and it was held that the defendants were     D
estopped from denying that she had the same settlement. The
cause of action was obviously not the same. Coleridge J., in
delivering the judgment of the court, said [19]:

> " The question then is, whether the [former] judgment con-
> cludes, not merely as to the point actually decided, but as to     E
> a matter which it was necessary to decide, and which was
> actually decided, as the groundwork of the decision itself,
> though not then directly the point at issue. And we think it
> does conclude to that extent. . . . Now, it cannot be said that
> the facts we are considering were merely collateral to the
> decision in the former case. The question then was where
> two unemancipated children were settled: and it was     F
> answered by showing that they were the legitimate issue of
> William and Esther, that is, that these two were lawfully
> married, and the children born after, and that William was
> settled with the now appellants. Strike either of these facts
> out, and there is no ground for the decision: these facts
> therefore were necessarily and directly matter of enquiry.
> The question now is, where is Esther settled: and this is
> answered by showing the same two facts, the marriage of     G
> Esther and William, and the settlement of William, the two
> facts already decided. The judgments in the two cases there-
> fore rest on the same foundation; which, having been settled
> in the first, cannot be, as between the same parties, unsettled
> in the latter."

[18] (1855) 4 E. & B. 780.          [19] Ibid. 794–795.

A    In *Flitters* v. *Allfrey*[20] a landlord alleging a weekly tenancy obtained a warrant for the eviction of the tenant and then sued him in the county court for 29 weeks' rent. He failed in this action because the judge held there was a yearly tenancy. Then the tenant sued for damages for eviction. Lord Coleridge C.J. said[21]:

B         " The now plaintiff succeeded upon the trial of a plaint in the county court which involved the same question of fact as that which was in issue in this cause, viz., whether his tenancy under the defendant was a weekly or a yearly tenancy. The defendant thought the decision of the county court wrong. Upon the trial of this cause, the jury thought so too; and I agreed with them: but the plaintiff, against the right, succeeded upon an estoppel."

C    Counsel had pointed out that failure to succeed in the action for rent did not on the face of it or necessarily involve any decision that the tenancy was yearly and not weekly: but that was in fact the ground on which the county court judge decided the case and the landlord was not allowed to relitigate that issue in the tenant's subsequent action for damages.

D        These two cases appear to me to be authorities directly in favour of issue estoppel, but the complications in each were such that it is easy to miss the point, and little attention seems to have been paid to this form of estoppel until comparatively recently.

E        A case which has given rise to some difficulties is *Hoystead* v. *Commissioner of Taxation*.[22] There an appeal with regard to income tax for an earlier year had been decided on an assumption that certain beneficiaries under a will were joint owners. Then in a case as to liability to tax in a later year the commissioner tried to maintain that that assumption had been wrong but he was held to be estopped. Lord Shaw in delivering the judgment of the board, after citing numerous authorities, including the judgment of Lord Ellenborough C.J. in *Outram* v. *Morewood*,[23] said[24]:

F         " It is seen from this citation of authority that if in any court of competent jurisdiction a decision is reached, a party is estopped from questioning it in a new legal proceeding. But the principle also extends to any point, whether of assumption or admission, which was in substance the ratio of and fundamental to the decision."

G

[20] (1874) L.R. 10 C.P. 29.
[21] Ibid. 43.
[22] [1926] A.C. 155; 42 T.L.R. 207, P.C.
[23] 3 East 346.
[24] [1926] A.C. 155, 170.

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

916                         HOUSE OF LORDS                    [1967]

H. L. (E.)
1966
___
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
___
LORD REID
___

Comments were made on that passage in *New Brunswick Railway*    A
*Co.* v. *British and French Trust Corporation Ltd.*[26] by Lord
Russell[27] and Lord Romer[28] and in *Society of Medical Officers*
*of Health* v. *Hope*[29] by Lord Radcliffe. And there may well be a
difference between a case where an issue was in fact decided in
the earlier case and a case where it was not in fact decided
because the earlier judgment went by default or was founded on    B
an assumption. Indeed, I think that some confusion has been
introduced by applying to issue estoppel without modification
rules which have been evolved to deal with cause of action
estoppel, such as the oft-quoted passage from the judgment of
Wigram V.-C. in *Henderson* v. *Henderson*.[30] But it is unnecessary
to pursue that matter because in the present case the issues with    C
regard to which the respondents plead estoppel were fully litigated
in the West German court.

In *Marginson* v. *Blackburn Borough Council*[31] both the parties
had been defendants in a county court action in which a plaintiff
claimed damages for negligence and they had been held both to
blame. This was held to estop the plaintiff in this action from    D
maintaining (in his personal capacity) that he was not to blame.

> " In such a case the question arises, what was the question
> of law or fact which was decided [in the earlier case]? And
> for this purpose, it may be vital in many cases to consider the
> actual history of the proceedings " (*per* Slesser L.J., deliver-
> ing the judgment of the court[32]).                              E

*Thoday* v. *Thoday*[33] is the most recent of a series of matri-
monial cases raising this question. There are special considera-
tions in this field, so Willmer L.J. only says[34]:

> " . . . there may be cases in which a party may be held to be
> estopped from raising particular issues, if those issues are
> precisely the same as issues which have been previously
> raised and have been the subject of adjudication."           F

But Diplock L.J. dealt with the matter on more general lines and
what he says is further explained in *Fidelitas Shipping Co. Ltd.* v.
*V. O. Exportchleb*.[35] He draws a distinction between issue
estoppel and fact estoppel which I find difficult to understand.    G

[26] [1939] A.C. 1; 55 T.L.R. 260;
[1938] 4 All E.R. 747, H.L.(E.).
    [27] [1939] A.C. 1, 28.
    [28] Ibid. 42.
    [29] [1960] A.C. 551, 566; [1960] 2
W.L.R. 404; [1960] 1 All E.R. 317,
H.L.(E.).
    [30] (1843) 3 Hare 100.

[31] [1939] 2 K.B. 426; 55 T.L.R.
389; [1939] 1 All E.R. 273, C.A.
    [32] [1939] 2 K.B. 426, 437.
    [33] [1964] P. 181; [1964] 2 W.L.R.
371; [1964] 1 All E.R. 341, C.A.
    [34] [1964] P. 181, 191.
    [35] [1966] 1 Q.B. 630; [1965] 2
W.L.R. 1059; [1965] 2 All E.R. 4,
C.A.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

A　Suppose that as an essential step towards the judgment in an earlier case it was decided (a) that on a particular date A owed B £100 or (b) that on that date A was alive. The first is, or at least probably is, a question of law, the second is a pure question of fact. Are these findings to be treated differently when issue estoppel is pleaded in a later case? Or take marriage—an issue in

B　the earlier case may have been whether there ever was a ceremony (a pure question of fact) or it may have been whether the ceremony created a marriage (a question of law). I cannot think that this would make any difference if in a later case about quite different subject matter the earlier finding for or against marriage was pleaded as creating issue estoppel.

C　The difficulty which I see about issue estoppel is a practical one. Suppose the first case is one of trifling importance but it involves for one party proof of facts which would be expensive and troublesome; and that party can see the possibility that the same point may arise if his opponent later raises a much more important claim. What is he to do? The second case may never

D　be brought. Must he go to great trouble and expense to forestall a possible plea of issue estoppel if the second case is brought? This does not arise in cause of action estoppel: if the cause of action is important, he will incur the expense: if it is not, he will take the chance of winning on some other point. It seems to me that there is room for a good deal more thought before we settle

E　the limits of issue estoppel. But I have no doubt that issue estoppel does exist in the law of England. And, if it does, it would apply in the present case, if the earlier judgment had been a final judgment of an English court.

Next I must consider whether it makes any difference that the former judgment was the judgment of a foreign court. At one

F　time foreign judgments were regarded as being only evidence and not conclusive. But at least since the decision in *Godard* v. *Gray* [36] they have been regarded as equally conclusive with English judgments (subject to any difference there may be resulting from there being no merger of a cause of action in a foreign judgment). The same pleas, for example, fraud or lack of jurisdiction, are good

G　against both. It would seem that the only plea which may be available against foreign judgments alone is perversity, if *Simpson* v. *Fogo* [37] was rightly decided. In that case Page Wood V.-C. refused to give effect to a judgment of the Supreme Court of Louisiana. There was no question of perversity in the ordinary

[36] (1870) L.R. 6 Q.B. 139.　　　[37] (1862) 1 H. & M. 195.

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———
LORD REID
———

sense of obstinately or dishonestly shutting one's eyes to what     A
one knows to be right. The Supreme Court had applied what they
believed to be their common law, but it was at variance with a
generally accepted rule of private international law, which
required foreign (in this case, English) law to be applied in the
circumstances of that case. Page Wood V.-C. called [38] this "a
perverse and deliberate refusal to recognise the law of the       B
country by which title has been validly conferred." I shall have to
return to this case later.

I can see no reason in principle why we should deny the
possibility of issue estoppel based on a foreign judgment, but
there appear to me to be at least three reasons for being cautious
in any particular case. In the first place, we are not familiar with     C
modes of procedure in many foreign countries, and it may not be
easy to be sure that a particular issue has been decided or that
its decision was a basis of the foreign judgment and not merely
collateral or obiter. Secondly, I have already alluded to the
practical difficulties of a defendant in deciding whether, even in
this country, he should incur the trouble and expense of deploying     D
his full case in a trivial case: it might be most unjust to hold that
a litigant here should be estopped from putting forward his case
because it was impracticable for him to do so in an earlier case of
a trivial character abroad, with the result that the decision in that
case went against him. These two reasons do not apply in the
present case. The case for the Stiftung, or on this issue those who     E
purported to represent it, was fought as tenaciously in West
Germany as this case has been fought here, and it is not difficult
to see what were the grounds on which the West German judg-
ment was based. But the third reason for caution does raise a
difficult problem with which I must now deal.

It is clear that there can be no estoppel of this character     F
unless the former judgment was a final judgment on the merits.
But what does that mean in connection with issue estoppel? When
we are dealing with cause of action estoppel it means that the
merits of the cause of action must be finally disposed of so that
the matter cannot be raised again in the foreign country. In this
connection the case of Nouvion v. Freeman [39] is important. There     G
had been in Spain a final judgment in a summary form of proce-
dure. But that was not necessarily the end of the matter, because
it was possible to reopen the whole question by commencing a
different kind of action: so the summary judgment was not res

[38] 1 H. & M. 195, 247.          [39] (1889) 15 App.Cas. 1, H.L.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

A   judicata in Spain. I do not find it surprising that the House unanimously refused to give effect in England to that summary judgment.

When we come to issue estoppel I think that, by parity of reasoning, we should have to be satisfied that the issues in question cannot be relitigated in the foreign country. In other
B   words, it would have to be proved in this case that the courts of the German Federal Republic would not allow the re-opening in any new case between the same parties of the issues decided by the Supreme Court in 1960, which are now said to found an estoppel here. There would seem to be no authority of any kind on this matter, but it seems to me to verge on absurdity that
C   we should regard as conclusive something in a German judgment which the German courts themselves would not regard as conclusive. It is quite true that estoppel is a matter for the lex fori but the lex fori ought to be developed in a manner consistent with good sense.

D   The need to prove whether West German law would permit these issues to be re-opened there appears to have escaped the notice of the appellants' advisers and your Lordships are left in considerable difficulty. On the one hand, there is always a presumption that the foreign law on any particular question is the same as English law unless the contrary is proved. On the other
E   hand, it would be remarkable if German law had reached precisely the same stage of development on issue estoppel as the law of England has, and there are some indications in the German judgments that it has not. I have had an opportunity of reading the views of my noble and learned friend, Lord Wilberforce, on this matter. I do not dissent from them. But I must rest my
F   judgment that there is here no res judicata or estoppel on there being no sufficient identity of parties in the West German proceedings and in the matter now before your Lordships.

As I am of opinion that the respondents do not succeed on these preliminary pleas I must now turn to the substantial question in this appeal—have the respondents proved that the plaintiff's
G   solicitors have commenced and are maintaining this action without the plaintiff's authority? The plaintiff is a foreign corporation and it is not maintained that it has ceased to exist. Further, it is not disputed that the capacity of a foreign corporation and the functions and powers of its organs or officers are matters for the law of its domicile. So the first question is—what is the legal domicile of the Stiftung? Its constitution provides in article 3:

920                            HOUSE OF LORDS                        [1967]

H. L. (E.)
1966
―――
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
―――
LORD REID
―――

" The legal domicile of the Stiftung shall be Jena." I have men-    A
tioned West German decrees to the effect that the domicile
shall be Heidenheim, but counsel for the respondents stated that
he did not rely on these decrees in the present appeal. He did,
however, argue that, according to German law, its domicile is
in Germany as a whole. But Germany is, for the time being at
least, divided; the Federal Republic being sovereign in West     B
Germany, and the U.S.S.R. having sovereign authority in the
Eastern Zone. And the law in those two parts of Germany may
now not be the same.

The respondents submitted in argument that we must regard
the law of West Germany as paramount. They relied on the
language of the second Foreign Office certificate given on        C
November 6, 1964. This contained an extract from a Foreign
Minister's communiqué which stated:

> " Pending the unification of Germany, the three Governments
> consider the Government of the Federal German Republic
> as the only German government freely and legitimately
> constituted and, therefore, entitled to speak for Germany as   D
> the representative of the German people in international
> affairs."

This is followed in the certificate by the following words: " This
statement does not constitute recognition of the Government of
the Federal Republic of Germany as the de jure Government of
all Germany." It was argued that the determination of the status   E
of and the right to represent a body incorporated under the law
of the State of Germany prior to 1945 are matters which affect
Germany as a whole and which, if arising outside Germany, are
within the scope of the Foreign Office communiqué. But for the
reason given by my noble and learned friend, Lord Hodson, I
cannot accept this argument.

What, then, is the law of the Eastern Zone with regard to       F
these matters? It is well settled that you do not take the code
or statutes or other sources of law and construe them according
to English ideas. Foreign law is a question of fact to be decided
by evidence.

> " The evidence it is clear must be that of qualified experts in   G
> the foreign law. If the law is contained in a code or written
> form, the question is not as to the language of the written law,
> but what the law is as shown by its exposition, interpretation
> and adjudication " (*per* Lord Wright in *Lazard Brothers &
> Co.* v. *Midland Bank Ltd.*[40]).

―――――――――――
[40]  [1933] A.C. 289, 298; 49 T.L.R. 94, H.L.(E.).

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

A   On several occasions it has been necessary to decide in a case here what is the law of a foreign country on a point which has already been the subject of a decision by a court of that country. A good example is *Bankers and Shippers Insurance Co. of New York* v. *Liverpool Marine and General Insurance Co. Ltd.*[41]

B   In that case the question was whether according to the law of New York State it was necessary to the validity of an award that an order of court should have been obtained. The Court of Appeal in England held that it was not. Then in another case, *Bullard* v. *Morgan H. Grace & Co.*[42] the Court of Appeal of New York decided that it was necessary. Then this House reversed the decision of the Court of Appeal and followed the American decision. Lord Buckmaster said[43]: "Unaided by that authority your Lordships would, I think, have supported the judgment appealed from." Lord Sumner said[44]:

"Evidence of the opinion of the highest court of the foreign state whose law happens to form the subject matter of proof in this country, is obviously for an English court the best available evidence upon the question, and is such that, if it is clearly directed to the point in dispute and is insusceptible of any but one interpretation, other evidence of that law could hardly be set against it."

There is a quotation with approval of what Scrutton L.J. had said in the Court of Appeal[45]:

"I agree with the view of Lord Sterndale in *Hannay's* case[46] that while it is almost certain that an English court would not differ from a decision of the Supreme Court of the state on the law of that state, the decision of a subordinate court is only an 'opinion of an expert on the fact, to be treated with respect, but not necessarily conclusive'."

F   In the present case we have not only two judgments of the Supreme Court of the Eastern Zone but also uncontradicted evidence of skilled witnesses that every court in the Eastern Zone would hold that the Council of Gera is entitled to act as the special board of the Stiftung. And we have evidence that the Stiftung has brought a number of actions in recent years in East Germany and has obtained judgments in its favour. How, then, did the West German courts come to decide as they did?

---

[41] (1926) 24 Ll.L.R. 85 H.L.(E.).
[42] (1924) 206 N.Y.S. 335.
[43] 24 Ll.L.R. 85, 88.
[44] Ibid. 94.
[45] (1925) 21 Ll.L.R. 86, 91, C.A.
[46] [1918] 2 K.B. 623, 667; 34 T.L.R. 427, C.A. (In the report of the *Bankers and Shippers Insurance* case (supra) the dictum from *Guaranty Trust Co. of New York* v. *Hannay & Co.* (supra) is erroneously attributed to Lord Sterndale and in fact appears in the judgment of Scrutton L.J. in the latter case.)

H. L. (E.)
1966
─────
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
─────
LORD REID
──

Cross J. was inclined to hold that the West German courts       A
were acting perversely in disregarding the judgments of the Eastern
courts. I do not take that view. I am certainly not prepared to
hold that the West German courts gave judgments which they
knew to be wrong. They may have erred, but honest error is a
very different thing from perversity. Counsel for the appellants    B
argued that this case fell within the ratio of *Simpson* v. *Fogo*,[47]
to which I have already referred. That case was cited more than
once with approval in the nineteenth century but in *Aksionairnoye
Obschestvo A.M. Luther* v. *James Sagor & Co.*[48] Scrutton L.J. said
that it had been the subject of considerable adverse comment. In
my view, if *Simpson* v. *Fogo*[49] can stand at all it must be limited     C
to cases where the law of the foreign country applied in the foreign
judgment is at variance with generally accepted doctrines of private
international law. But then one must bear in mind what was said
by Lindley L.J. in *In re Queensland Mercantile and Agency Co.*[50]
about different countries taking different views on international law.
And Page Wood V.-C. himself indicates that there might be a
difference if the foreign judgment were founded on a statute[51] or      D
on mistake[52]—distinctions which I have difficulty in appreciating.
To distinguish *Simpson* v. *Fogo*[53] it is sufficient to say that the
West German courts did not refuse to apply the law of East
Germany: they applied what they thought was the law of East
Germany.

It is not easy to summarise the long judgment of the Federal      E
Supreme Court, but it appears to me to be based on the view
that Germany is still one country and that the law of Germany
applies equally in the East as in the West, subject only to new
local enactments, of which there are none relevant to this case.
On that view the West German courts hold themselves entitled
to override the decisions of the East German courts, if they       F
regard those decisions as wrong in law.

The main question which has given rise to this conflict in
the present case is the effect of confiscatory decrees of the Russian
Military Administration. It is not disputed that as a result there
was confiscation of the assets of the two firms Carl Zeiss and
Schott & Co., and these two businesses were then carried on as
nationalised industries—Volks Eigene Betriebe, referred to as      G
VEBs. But it is not clear how far this affected other assets of

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

**A**  the Stiftung, and it is proved that in recent years the Stiftung has been treated by the East German authorities as owning a large amount of property; it has an annual revenue of some £180,000 and employs a staff of about 170. And the Council of Gera has in fact acted as the special board and in particular has authorised the raising of various local proceedings in the Eastern

**B**  Zone.

The main ground of the West German judgment is that after the businesses of these two firms were separated from the Stiftung by confiscation it became legally impossible under its constitution for the Stiftung to carry on any activities. The only lawful course was to wind up the Stiftung as provided in its

**C**  constitution, and neither the Stiftung nor any of its organs had any power to carry on any other activity; so the Council of Gera could not authorise the proceedings in West Germany which were brought to an end by the judgment of the Supreme Court. That court was aware that the East German Supreme Court had reached a decision to the contrary, but in effect it held that the

**D**  East German court had wrongly applied the law of Germany.

I am not impressed by the reasoning in this judgment but, even if it were convincing, I cannot see how it would be relevant. The West German courts have no jurisdiction over East Germany. The two parts of Germany are at present under different sovereignties: they have separate legal systems and are separate jurisdic-

**E**  tions. According to the commonly accepted doctrine of private international law, the courts of one state or jurisdiction cannot of their own knowledge determine what is the law in a different state or jurisdiction. That has to be proved by evidence and, if it is clear, as in this case it was, and is, that all courts in one state or jurisdiction have decided and will decide a particular

**F**  question in one way, the courts of another state or jurisdiction have no right to decide that that question ought to have been decided in a different way.

Let me take an analogy. Many countries formerly under the British Crown still follow the common law. Suppose that this House were to reach a decision on a point of common law which

**G**  did not meet with general acceptance. All courts in this country must follow that decision, but courts in other common law jurisdictions are free to decide otherwise. Suppose, however, that in one of those other countries a question arose as to what is the law of England on that point: the principles of private international law would require the courts of that other country to

HOUSE OF LORDS          **[1967]**

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———
LORD REID
———

decide that the law of England is what the House of Lords has          A
said it is, and they could not say that the House of Lords had
reached a wrong decision on this point of common law, however
much they might disagree with it. If they did substitute their
own view for that of the supreme authority in England, they
would then be deciding what they thought the law of England          B
ought to be and not what in fact it is. It appears to me that the
only legitimate ground for rejecting a decision of a foreign court
as to its own law is an expectation that, if the point arose again
in the foreign country and were carried to the Supreme Court,
it would be decided differently. The West German courts appear
to take a different view of the principles of private international          C
law. The German Federal Republic is a sovereign state and its
courts are entitled to their own view. But so are we. And I
would not accept their view.

But then it is said that the courts of East Germany are
influenced by political considerations. It is true that when one
examines the judgments of the East German Supreme Court—          D
and particularly the second of them—one finds them plentifully
sprinkled with Communist clichés. No doubt professing Com-
munists find it necessary to adopt this form of embellishment. But
going behind this ornamentation I find a judicial approach and
a reasonable result. And, even if political considerations were
apparent, it would remain true that what the courts have decided          E
is in fact the law which is being enforced in the foreign
country.

And finally it is said that because the members of the Council of
Gera are Communists and bound to act as Communist theory
and government directions require, therefore they cannot act as
the special board in the interests of the Stiftung as the constitu-          F
tion of the Stiftung requires. This may be common knowledge
in West Germany, but I cannot agree that it is common know-
ledge here. On the contrary, it is common knowledge here that
individuals often fail to live up to—or to live down to—their
principles. This is an action to vindicate the right of the Stiftung
to its own property: this Communist body has authorised it,          G
whatever view Communist theory might take about it.

That brings me to an important question which was raised
in the West German case and before Cross J. The respondents
found on the principle that English courts will not assist the
enforcement of foreign confiscatory laws, and argue that therefore
the appellants cannot be given the relief which they seek in this

A    case. Your Lordships did not permit that matter to be argued in this appeal because it is not relevant on the only question now before this House—the authority of the solicitors to act for the Stiftung. But the respondents will be free to raise that issue in their pleadings and at the trial of this action, and nothing that Cross J. may have said on this matter can hamper or limit the power of the trial judge to deal with it.

B        On the whole matter I would allow this appeal and restore the order of Cross J.

    LORD HODSON. My Lords, on the first part of the case I agree entirely with the opinion which has been given by my noble and learned friend, Lord Reid. In my view, the Foreign Office

C    certificate was conclusive against the view taken by the Court of Appeal. The U.S.S.R. having the de jure sovereignty over the so-called German Democratic Republic there is no room for any other *de facto* recognition and the courts of this country must hold that the U.S.S.R. is still entitled to exercise authority over

D    the territory and to bring to an end the German Democratic Republic which only exists on sufferance. This effect of the certificate holds good so far as this country is concerned and is not affected by any pronouncement of the U.S.S.R. itself as to whether or not it recognises the German Democratic Republic as a sovereign state.

E        On the second part of the case, the respondents have argued that the solicitors, Messrs. Courts & Co., who have the conduct of these proceedings on behalf of the appellant have no authority to do so, since they are estopped by the judgment of the Supreme Court of the Federal Republic of Germany in an action brought in the name of the appellants as plaintiffs against the respondents

F    in this action. This is a formidable argument and involves consideration of the operation and effect of foreign judgments.

    The courts have moved a long way since the opinion was expressed by Lord Brougham L.C. in 1834 in the Irish appeal of *Houlditch* v. *Donegal* [54] that " the judgment of a foreign court in courts of this country is only prima facie evidence—is liable to be

J    averred against," and not conclusive." The modern doctrine accepted since the decision of *Godard* v. *Gray* [55] is that a foreign judgment may be pleaded and is conclusive.

    If this is so, I see no reason why the rule of estoppel per rem judicatam should not be applied, subject to the caution contained

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

---

[54] (1834) 8 Bligh (N.S.) 301, 338, H.L.(Ir.).          [55] L.R. 6 Q.B. 139.

HOUSE OF LORDS                        **[1967]**

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
HODSON

in Lord Brougham's observations in *Houlditch* v. *Donegal* [56] as
to the difficulties which arise from the differences in the course
of procedure as between one jurisdiction and another.

Although estoppel operates most commonly in those cases
which cover " cause of action," the English rule has always been
wide enough to cover " issue estoppel "—see *The Duchess of
Kingston's Case*,[57] a passage from which has been quoted by my
noble and learned friend, Lord Reid, and *Reg.* v. *Inhabitants of
the Township of Hartington Middle Quarter*,[58] likewise quoted
by my noble and learned friend. The estoppel here, if any, must
be issue estoppel, the issue being that of want of authority to bring
an action. Upon this the respondent succeeded in the West
German action in which judgment was delivered by the Federal
Supreme Court on November 15, 1960. On principle the judg-
ment should be binding on the parties and their privies, to
whom I will later refer. There may be difficulties in applying the
principle through the necessity of following the course of pro-
cedure when pleadings and evidence have to be examined to
ascertain what issues have been determined. There may be cases
of manifest injustice, that is, in a case, perhaps, where a defen-
dant having a minimal interest in a matter allows a case to go by
default, exposing himself to the risk of being bound by the judg-
ment when the issue turns out to be more serious for him. None
of these difficulties appears to exist in this case. The West
German judgment is detailed and elaborate and leaves no doubt
as to the precise issue about which the parties were contending,
an issue which was regarded as of prime importance by both sides.

In order to comply with rule 183 as stated in Dicey's Conflict of
Laws, 7th ed. (1958), p. 992, the judgment must be conclusive in
order to create an estoppel. In section 1 (2) (*a*) of the Foreign
Judgments (Reciprocal Enforcement) Act, 1933, the expression
" final and conclusive " is to be found, but these words are repetitive
and " conclusive " in the sense of the rule must mean that it
cannot, although it may be subject to appeal, be varied by the
court which made it, as are, for example, some maintenance or
alimony orders. *Nouvion* v. *Freeman* [59] is an example of an
action which had been tried in Spain under a summary form of
procedure leading to a " remate " judgment but held by this House
not to amount to res judicata, since it was possible to reopen the
matter which had been tried and obtain a " plenary " judgment

---

[56] 8 Bligh (N.S.) 301, 338.
[57] 20 St.Tr. 355, 538n.

[58] 4 E. & B. 780, 794–795.
[59] 15 App.Cas. 1.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord
Hodson

A    rendering the " remate " judgment inoperative. One asks, about what is the judgment to be final and conclusive? The answer is that it must be on the merits and not only as to some interlocutory matter not affecting the merits. The question here may, I think, properly be described as " on the merits," the issue being whether or not there was authority to proceed in an action representing

B    the foundation.

On this point I would respectfully dissent from the opinion expressed by Cross J., although I do not disagree with his main conclusion which distinguishes this action from that commenced by the foundation suing by the Council of Gera. There was, in my opinion, a decision against the Council of Gera on the merits

C    of its claim to represent the foundation.

There is admittedly a gap in the evidence as to whether the judgment was final and conclusive. It is for the defendants to show the estoppel and, to prove it, they must establish as a matter of German law that the judgment is final and conclusive. This they have failed to do by express evidence and, as my noble

D    and learned friend, Lord Wilberforce, points out in his opinion, there are passages in the evidence which at least suggest the possibility of want of authority being relitigated in the German courts.

For my part, I think it would be legitimate to rely on the assumption commonly made in English courts that in the absence

E    of evidence of foreign law it is taken to be the same as English law and to hold that the judgment relied on for the estoppel is final and conclusive.

Another argument against the estoppel was put forward by the appellants which I do not find it possible to accept. It was based

F    on the rule which still subsists in English law, notwithstanding animadversions which have been passed on it, that the cause of action in a foreign case does not merge in the judgment but remains available to be sued upon, the foreign judgment being only evidence of the cause of action not, as in this country, that in which the cause of action has merged. It seems to me that this

G    argument does not logically involve that there can be no estoppel in the case of a foreign judgment. Indeed, the cases are consistent in admitting that there may be an estoppel notwithstanding the absence of merger.

If the fact that the cause of action does not merge prevents the estoppel where issue estoppel is concerned, it must similarly,

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
HODSON

one would suppose, do so where cause of action is in question. No one has suggested that the latter contention is sound.

There was a further contention, accepted by the learned judge, that there could be no estoppel because the judgment of the West German court was perverse in that they knowingly and wilfully declined to give effect to the relevant law, that of East Germany. Like others of your Lordships, I find this conclusion too difficult to sustain, although, in fairness to the learned judge, it should be said that there was strong support for this conclusion in the case of *Simpson* v. *Fogo*,[60] upon which reliance was placed on behalf of the appellants. " Perverse " is a strong word in this context, meaning, I would say, " obstinate in error " and inappropriate to describe the reasoning of the West German court.

There remains only the question of privity. On this I am in agreement with the learned judge. There was here no privity in estate. The only privity could be privity in interest. The action in West Germany was begun by the Council of Gera claiming to represent the foundation and, upon the issue of the right to represent, judgment was given against the Council of Gera, which was ordered to pay the costs. The Council of Gera itself never had any interest in the subject-matter of the action. It was only required to act in order that the foundation might seek to enforce its rights, that is to say, the rights of the foundation itself.

This action is in truth an action by the foundation suing by Messrs. Courts & Co., a firm of solicitors, who again have themselves no interest in the subject-matter of the action. The Council of Gera is not itself before the court. The way in which the respondents seek to put the matter of privity is founded on an extended view of privity taken in America, where authorities show a broader concept of the privity necessary to establish estoppel. This is to be found in the American Restatement (Judgments), Chap. IV, s. 85 (2) which reads:

> " Where a person is bound by or entitled to the benefit of the rules of res judicata . . . such rules apply in a subsequent action brought or defended by another on his account."

The argument is that the solicitors are bringing this action on account of the Council of Gera but this is not my view of the case. They are acting on behalf of the foundation, and the judgment given in the West German court against the Council of

---

[60] 1 H. & M. 195.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord
Hodson

A Gera on their claim to represent the foundation does not raise an estoppel against the solicitors acting in this action.

It is upon this last ground, namely, absence of privity, that I would hold that there is no estoppel against the solicitors, preventing them from representing the foundation in this action.

B If there is no estoppel, there remains to be considered whether the effect of the confiscation of the foundation's business was to make it legally impossible to carry on under its constitution. On this question I am in entire agreement with the learned judge, and would accept his finding that the foundation still maintained its existence so as to enable it to give authority to the solicitors to sue on its behalf. This is partly a question of law and partly C one of fact. If it is right to apply the law of the domicile of the foundation—Jena is in East Germany and the law applicable is that administered in the court of that part of Germany. The respondents argued that the law applicable to the matters in dispute between the parties should, in any event, be the law of the Federal German Republic. They relied on the language of the D second Foreign Office certificate given on November 5, 1964. This contained an extract from a Foreign Ministers' communiqué which stated:

"Pending the unification of Germany, the three Governments consider the Government of the Federal German Republic as the only German government freely and legitimately constituted E and, therefore, entitled to speak for Germany as the representative of the German people in international affairs."

This is followed in the certificate by the following words: "This statement does not constitute recognition of the Government of the Federal Republic of Germany as the de jure government of all Germany."

F It was argued that the determination of the status of and the right to represent a body incorporated under the law of the State of Germany prior to 1945 and now having its "Sitz" in the territory of the zone allocated to the U.S.S.R. are matters which affect Germany as a whole and, if arising outside Germany, are within the scope of the Foreign Office communiqué.

G True that the judicial system is an organ of the sovereign power, but the explanatory footnote to the communiqué indicates the limits to be put on the Foreign Office certificate and does not support the contention that the West German courts, as courts of the Federal German Republic, are entitled to speak for Germany as a whole. That the communiqué is directed to

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
HODSON

political representation only is, I think, clear from the language **A**
of the certificate, which makes clear that the Government of.
the Federal Republic is not thereby to be regarded as being
recognised as the de jure government of all Germany. There are
in the two parts of Germany two separate legal systems operat-
ing independently of one another, the East German courts deriving
their authority from the sovereignty of the U.S.S.R. and the West **B**
German courts from the sovereignty which lies in the Federal
Republic of Germany as at present constituted. I do not think
that there is any justification for the view that the law common
to the whole of Germany as distinguished from zonal law should
be applied on the ground that the Carl-Zeiss-Stiftung came into
existence many years ago before Germany was divided and that **C**
this case concerns operations and issues outside Germany as a
whole, namely, in England and not in the Soviet Zone itself. The
law in the two parts of Germany not being the same, we must
apply the law of the Eastern Zone.

The facts as to the activities of the foundation are not in
dispute, and if the law in operation in the Eastern Zone is **D**
applied to those facts the appellant must succeed on this issue.

I would allow the appeal.

LORD GUEST. My Lords, the somewhat complicated facts out of
which this appeal arises have been so fully rehearsed in the
courts below that I find it necessary only to state them in broad **E**
outline in order to decide the various points at present in issue
between the parties.

The history of Carl-Zeiss-Stiftung begins in 1846, when optical
works at Jena were founded by Carl Zeiss. Thereafter, glass
works were founded and Zeiss was joined by Ernst Abbe and
Otto Schott. In 1891 a " Stiftung " or foundation was formed **F**
which was administered by a special board, the optical business
and the glass business being run by two separate boards of
management. The articles of the Stiftung and constitution have
been set out in the courts below, and it is only necessary now to
state that the legal domicile of the Stiftung was Jena (article 3)
and that the organisation of the Stiftung was to be, by article 4, **G**
by a special board for representing the Stiftung as an incorporated
body, for the administration of its estate and effects and for the
supreme direction of its affairs. Article 113 is in the following
terms:

" Should, in consequence of political changes in the state,
the provision according to 5 of this statute with reference to

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD GUEST

A    the representation of the Stiftung become untenable, this representation including the appointment of the Deputy of the Stiftung within the meaning of 5 and the statutory administration of the Carl-Zeiss-Stiftung shall be made over to that department of state, which with regard to the University of Jena occupies the place of the State Department of the Grand Duchy of Saxe-Weimar acting as special board,
B    provided that its seat is in Thuringia, otherwise to the highest administrative authorities in Thuringia."

The business owned by the Stiftung prospered and their products have become world famous. Besides the business the Stiftung owned a large amount of property and substantial capital investments.

C    In terms of article 113, owing to the changing political situation in Germany, certain changes in the constitution of the special board took place. Upon the amalgamation in 1918 of certain States in Germany, including the Grand Duchy of Saxe-Weimar-Eisanach, in which Jena was situated, into the state of Thuringia, the Thuringia Minister of Education became the special board. In
D    1935, when the Weimar Republic was replaced by the Third Reich, the " Reichs-Stathalter " as the highest administrative authority in Thuringia became the special board of the Stiftung.

In April, 1945, when the Hitler régime collapsed, the office of Reichs-Stathalter was abolished. Jena was first occupied by American troops, but shortly after it became part of the Russian
E    Zone of Occupation and on July 1, 1945, it was occupied by the Soviet forces. When the Americans left they took with them all the members of the boards of management, a number of leading scientists, engineers and senior executives and a large amount of material.

On October 30, 1945, Marshal Zhukov, Head of the Russian
F    Military Administration, made an order, " SMAD 124," providing for the sequestration of certain types of property within the Russian Zone which included the foundation. Russian officers were stationed in the works until March, 1947, and nearly all the machinery and plant was taken to Russia by way of reparations, together with a number of workpeople. At the same time
G    great efforts were made on the German side to get the works running again, and by the beginning of 1948 the works at Jena had been re-equipped.

In January, 1948, a central body known as the German Economic Council was set up with legislative authority in East Germany, subject to the overriding power of the Russian Military

932                          HOUSE OF LORDS                     [1967]

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Guest

Administration. Between April and June, 1948, orders were      A
made by the Russian authorities confiscating the optical and
glass business of the Stiftung. The confiscated business became
the "People's Owned Enterprises"—"Volks Eigene Betriebe"
(VEBs)— and became known as VEB Carl-Zeiss Jena and VEB
Schott Jena respectively.

   It is now possible to pass over a great amount of history       B
recited in the opinion of Cross J. and come to 1949. In that year
the German Democratic Republic came into being. As a result
of an East German law dated July 23, 1952, and an order made
under it, the Province of Thüringia was divided into three dis-
tricts and the governmental functions of the province transferred
to the administrative organs of the respective districts. The      C
district in which Jena is situated is the District of Gera, and this
body, which stands in the same relation to the University of Jena
as the State Department of the Grand Duchy stood to it in the old
days, is the Council (Rat) of Gera. It is common ground that,
as a matter of political geography, the Council of Gera would
be the special board within the meaning of article 113.           D

   This action, which is an action for passing off, was commenced
on October 20, 1955, by the appellants. On February 7, 1956,
the respondents issued a summons against the appellants asking
that all further proceedings in the action be stayed and the action
dismissed on the ground that it had been commenced and was
being maintained without the appellants' authority. Affidavits   E
were lodged by both parties and the application to stay was
heard by Cross J. with cross-examination during November and
December, 1963, and January, 1964. The judge gave judgment
on March 6, 1964, dismissing the summons. When the case came
before the Court of Appeal the respondents applied for an order
that a letter be addressed to Her Majesty's Secretary of State for   F
Foreign Affairs concerning the recognition of the German Demo-
cratic Republic, a point which had not been taken in the court
below, and had been expressly disclaimed before Cross J.

   The Court of Appeal accepted the respondents' arguments
based upon the non-recognition by Her Majesty's Government of
the German Democratic Republic and ordered that the writ and   G
all subsequent proceedings be set aside on the grounds that the
action was instituted and all subsequent proceedings on behalf of
the appellants have been taken without the authority of the
appellants.

   The position, accordingly, is that the special board of the

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD GUEST

A    Stiftung is now, as a matter of geography, the Council of Gera, established by the law passed on July 23, 1952, by the German Democratic Republic. The decision of the Court of Appeal was that as the Council of Gera was set up by the German Democratic Republic, a government not recognised by Her Majesty's Government, the special board has no locus to commence proceedings in
B    the English courts, and the action accordingly was commenced without authority.

     Several arguments not including the non-recognition point were taken before Cross J. and decided adversely to the respondents. The Court of Appeal, in view of their decision on the non-recognition point, did not deal with these other points.

C      I have had the advantage of reading in advance the speech prepared by my noble and learned friend, Lord Reid, on the question of the recognition by the English courts of the Council of Gera as authorising the present action. I agree with his opinion, and I have nothing to add.

D      The first question which arises on what may conveniently be described as the second stage of the case is whether the appellants are estopped per rem judicatam by the judgment of the West German court from arguing, in answer to the respondents' summons to stay the proceedings, that the appellants have authority to raise this action in name of the Carl-Zeiss-Stiftung. A considerable part of the argument was devoted to this question,
E    which is not without difficulty and raises a number of complicated issues.

     The doctrine of estoppel per rem judicatam is reflected in two Latin maxims, (1) interest rei publicae ut sit finis litium, and (2) nemo debet bis vexari pro una et eadem causa. The former is public policy and the latter is private justice. The rule of estoppel
F    by res judicata, which is a rule of evidence, is that where a final decision has been pronounced by a judicial tribunal of competent jurisdiction over the parties to and the subject-matter of the litigation, any party or privy to such litigation as against any other party or privy is estopped in any subsequent litigation from disputing or questioning such decision on the merits (Spencer Bower
G    on Res Judicata, p. 3).

     As originally categorised, res judicata was known as " estoppel by record." But as it is now quite immaterial whether the judicial decision is pronounced by a tribunal which is required to keep a written record of its decisions, this nomenclature has disappeared and it may be convenient to describe res judicata in its true and

934                          HOUSE OF LORDS                    [1967]

H. L. (E.)
1966
───
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
───
Lord Guest
───

original form as "cause of action estoppel." This has long been      A
recognised as operating as a complete bar if the necessary con-
ditions are present. Within recent years the principle has deve-
loped so as to extend to what is now described as "issue estoppel,"
that is to say, where in a judicial decision between the same parties
some issue which was in controversy between the parties and was
incidental to the main decision has been decided, then that may       B
create an estoppel per rem judicatam. The issue arising upon the
summons to stay the proceedings is whether Messrs. Courts,
purporting to act for the plaintiffs, the Carl-Zeiss-Stiftung, have
the necessary authority to raise the action in name of the Carl-
Zeiss-Stiftung. The estoppel which is alleged to have been created
is by the decision of the West German courts where in an action      C
between the Carl-Zeiss-Stiftung of Jena, represented by the
Council of the District of Gera, and the Carl-Zeiss-Stiftung
Heidenheim, Brenz, the present respondents, to restrain the
defendants from, inter alia, using the name of Zeiss or Carl Zeiss
and from using certain trade marks, it was held that the action
was inadmissible on the ground that the constitution of the         D
Stiftung is no longer effective, so that the legal basis for adminis-
tration of the Stiftung in accordance with the article has been
removed and that the Council of Gera has no authority to repre-
sent the Carl-Zeiss-Stiftung before the court. The English action
is of a different character, namely, a summons to stay proceedings
on the ground of lack of authority. It is, therefore, plain that     E
there is no cause of action estoppel because the cause of action in
each case is different. Accordingly, if there is estoppel it must be
" issue estoppel."

The law on the matter is not altogether clear, but I am pre-
pared to assume that, at any rate in relation to estoppel founded
on an English judgment there may be issue estoppel. This was        F
referred to as early as 1776 in *The Duchess of Kingston's Case*,[61]
as interpreted in *Reg. v. Hartington Middle Quarter (Inhabi-
tants)*.[62] It has been approved recently by Lord Denning M.R.
and Diplock L.J. in *Fidelitas Shipping Co. Ltd.* v. *V/O Export-
chleb*.[63] (See also *Thoday* v. *Thoday*,[64] Diplock L.J.) Although
not described as "issue estoppel," it is inferentially approved in    G
the most recent textbook on Res Judicata by Spencer Bower at p. 9,
where he speaks of a judicial decision which involved " a determi-
nation of the same question as that sought to be contraverted in

61 20 St.Tr. 355.                    63 [1966] 1 Q.B. 630, 640–1.
62 4 E. & B. 780.                    64 [1964] P. 181, 197–198.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD GUEST

A  the litigation in which the estoppel is raised." The doctrine of issue estoppel has also been accepted as good law by the courts in Australia for a number of years.

The requirements of issue estoppel still remain (1) that the same question has been decided; (2) that the judicial decision which is said to create the estoppel was final; and, (3) that the
B  parties to the judicial decision or their privies were the same persons as the parties to the proceedings in which the estoppel is raised or their privies. I have for the moment postponed the question whether issue estoppel, if valid in relation to an English judgment, applies to a foreign judgment. There is little doubt that the same question was incidentally decided in the West
C  German action as arises in the present summons, namely, whether the Council of Gera have authority to raise the action in name of the Carl-Zeiss-Stiftung.

I turn, therefore, at once to the question of finality. This is understood to mean "final and conclusive on the merits" of the cause (Dicey, Conflict of Laws, 7th ed., r. 196, p. 1052). The
D  decision upon which the issue estoppel arises must itself be final in this sense. In other words, the cause of action must be extinguished by the decision which is said to create the estoppel (see *Nouvion* v. *Freeman*,[65] Lord Herschell: "It puts an end to and absolutely concludes that particular action.") The West German judgment was not a judgment on the merits, but on a preliminary
E  point relating to the capacity of the Carl-Zeiss-Stiftung to sue and it was there held that the Council of Gera had no authority to raise the action in name of the Carl-Zeiss-Stiftung. I have difficulty in seeing how a decision on capacity to sue can ever be final or conclusive. The West German judgment related to the position in 1960 when it was pronounced, but non constat the position is
F  the same when the English action was tried. The appellants would clearly be entitled to show that a change of circumstances had occurred to affect their capacity to sue. If this is so, it would defeat the whole purpose of estoppel which is to preclude them from leading evidence to that effect. I can best illustrate the position by reference to what would happen if the decision in
G  West Germany had been given by the Scots courts. The decision would have been to sustain the plea of "No title to sue," but this would not have been final and conclusive as the interlocutor sustaining the plea would have been one of dismissal. A subsequent action would not be barred per rem judicatam.

[65] 15 App.Cas. 1, 9.

936                         HOUSE OF LORDS                    **[1967]**

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD GUEST

A       Another aspect of finality relates to the requirement that the decision relied upon as estoppel must itself be res judicata in the country in which it is made. This is made clear in *Nouvion* v. *Freeman*.[65] (See also Cheshire, Private International Law, 7th ed. (1965), p. 562; Dicey, Conflict of Laws 7th ed., p. 1036.) It would, indeed, be illogical if the decision were to be res judicata in England, if it were not also res judicata in the foreign jurisdiction. I am not satisfied that the respondents have discharged the burden of proof upon them of establishing that the West German judgment is res judicata in West Germany. I would, accordingly, hold that the West German judgment is not final and conclusive and for these reasons does not create an estoppel.

    The next requirement is that the judgment should have been between the same parties or their privies. The parties to the West German judgment, it is conceded, were the Council of Gera, on the one hand, and the respondents on the other hand. The parties to the present proceedings are the respondents and the Carl-Zeiss-Stiftung. As the question is whether the Carl-Zeiss-Stiftung is properly a party to the proceedings, the Stiftung is plainly not the other party for the purposes of res judicata, notwithstanding Mr. Aldous's ingenious argument that the only party he appears for is the Stiftung. Who are the other parties? I am unable to agree that the Council of Gera are parties. They do not appear on the proceedings as parties, they are not represented, and no order for costs could be made against them. They have no interest in the subject-matter of these proceedings. They only come into the picture as the body who, according to article 4 of the Code, are entitled to represent the Carl-Zeiss-Stiftung. In these circumstances, the only other possible parties to the proceedings are the solicitors, Messrs. Courts, to whom the summons is directed. As they were not parties to the West German proceedings, they would only be obnoxious to the plea of res judicata, if they were the privies of the Council of Gera. There is a dearth of authority in England upon the question of privies. The two cases of *Kinnersley* v. *Orpe* [66] and *Hancock* v. *Welsh and Cooper*,[67] referred to by the respondents are, in my opinion, of no assistance. " Privies " have been described as those who are " privy to [the party] in estate or interest " (Spencer Bower on Res Judicata, p. 130). Before a person can be privy to a party there must be community or privity of interest between them. Messrs. Courts

----

[65] 15 App.Cas. 1.
[66] 2 Dougl.K.B. 517.

[67] (1816) 1 Stark. 347.

A  have no interest in the merits of this action. Their interest is
merely to defend themselves against the claim made against them
for costs by the respondents which is on the basis of breach of
warranty of authority (see *Yonge* v. *Toynbee* [68]). In this matter
the Council of Gera have no interest. It is only, as I understand,
by the form of procedure chosen by the respondents that Messrs.

B  Courts have been made parties to these proceedings. Assuming
that the summons had not been directed to them, but that the
respondents had been successful in the West German proceedings
and in this summons, the latter would then have been entitled on
the authorities to raise an action against the solicitors for breach
of warranty of authority claiming the costs in the action. Could

C  it possibly have been said in these circumstances that the solici-
tors were estopped by the West German judgment, of which they
had no knowledge, from arguing that they had authority to raise
the present action? I apprehend not, and this must be on the basis
that they are not privies to the Council of Gera. It was argued for
the respondents, although without clear authority in this country,

D  that "privy" covers a person who is in control of the proceedings.
Reference was made to the American Restatement of the Law
(Judgments) (1942), s. 84, where it is said that a person who is
not a party but who controls an action is bound by the judgment
as if he were a party if he has a proprietary or financial interest in
the judgment as a privy. But this cannot apply to the solicitors

E  who are not in control of the proceedings and have no proprietary
or financial interest in the judgment. They are instructed by the
Carl-Zeiss-Stiftung who, on their side, control the proceedings.
No case has been referred to in England in which a solicitor has
been held privy to the party instructing him. In Scotland an
attempt to make a solicitor a party for the purpose of res judicata

F  failed (*Laidlaw* v. *Blackwood* [69]). We were referred to a number of
American cases dealing with privies. I am not prepared in this
country to extend the doctrine to the extent which it apparently
has reached in that country.

   I now pass to the question reserved in an earlier part of my
speech, namely, whether issue estoppel can ever be operated by a

G  foreign judgment. This was doubted by Cross J. It is clear that a
foreign judgment can operate as res judicata in a cause of action
estoppel properly so called (Dicey's Conflict of Laws, 7th ed.
rr. 182 and 183, pp. 981 and 992). But different considerations

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD GUEST

[68] [1910] 1 K.B. 215; 26 T.L.R.      [69] (1843) 15 Sc.Jur. 484.
211, C.A.

H. L. (E.)
1966
―――――
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
―――――
LORD GUEST
―

A

may, I apprehend, apply to issue estoppel. The first matter to be observed is that a foreign judgment does not have the same finality and conclusiveness as an English judgment. In the case of the latter the cause of action is merged with the judgment, so that action can only be brought to enforce the judgment. Not so in the case of foreign judgments. Sub-rule 183 of Dicey's Conflict of Laws, p. 996, states: " A foreign judgment does not of itself extinguish the original cause of action in respect of which the judgment was given." The plaintiff, therefore, has the option either of suing on the judgment or on the original cause of action. The doctrine of non-merger stated in *Nouvion* v. *Freeman* [70] is still, as I understand it, good law, notwithstanding the animadversions of Professor Horace Emerson Read in his book, Recognition and Enforcement of Foreign Judgments (1938), pp. 120–121 and the doubt expressed by Dicey in his Conflict of Laws on p. 997. If this be sound, it means that the unsuccessful litigant can, if he is defendant, table fresh defences to the original cause of action. From this it follows that "issue estoppel" could never operate to shut out the defendant from litigating issues which may have incidentally been determined in the foreign suit.

There are, in my view, moreover, considerations of policy and expediency which make it undesirable that the doctrine of issue estoppel should be introduced in the case of foreign judgments. There has been no case in which it has been applied in England and while, perhaps, not all estoppels are odious, considerable caution, in my view, should be exercised before the principle is extended any further. In operating issue estoppel it may be necessary, in order to ascertain what issues have been inferentially or incidentally decided, to look, not only at the judgment, but also at the pleadings and, it may be, at the evidence. We are not familiar in this country with the practice and procedure in foreign countries, and it may be a matter of considerable nicety in certain cases to find out what issues were determined and whether they were incidental or collateral to the main decision.

For all these reasons I would concur with Cross J. in holding that the plea of res judicata is not open to the respondents.

If the appellants are not estopped per rem judicatam by the West German judgment from arguing that the Council of Gera are entitled to represent the Carl-Zeiss-Stiftung, then the matter is at large for the decision of this House. Whether this action is properly authorised by the Carl-Zeiss-Stiftung is a question of

[70] 15 App.Cas. 1.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
LORD GUEST

A    foreign law to be decided as a question of fact. The law to be applied is the law of the domicile of the Stiftung, which is in Jena, and the law is that of East Germany as shown by " its exposition, interpretation and adjudication " (*Lazard Brothers & Co.* v. *Midland Bank Ltd.*)[71] It must be the law as in practice interpreted and enforced by the courts of law of the foreign country.

B    A considerable volume of expert evidence on both sides was devoted to the question. But in this case one starts with the judgment of the East German courts that the Carl-Zeiss-Stiftung still exists as a juristic person, notwithstanding the confiscation of its assets in East Germany by the Soviet authorities. This judgment is embodied in the opinion of the Supreme Court of the

C    German Democratic Republic, dated April 6, 1954, as confirmed by the judgment of the German Democratic Republic Supreme Court, dated March 23, 1961, affirming the judgment of the District Court of Leipzig. Technically, no foreign judgment would bind the courts of this country, but prima facie a judgment would be accepted by the English courts as representing the law:

D    " . . . the comity of international affairs would require special and unusual circumstances to lead this House away from the clear decision of a final court " (*Bankers and Shippers Insurance Co. of New York* v. *Liverpool Marine and General Insurance Co. Ltd.*,[72] Lord Buckmaster).

E       " Evidence of the opinion of the highest court of the foreign state whose law happens to form the subject-matter of proof in this country, is obviously for an English court the best available evidence upon the question, and is such that, if it is clearly directed to the point in dispute and is unsusceptible of any but one interpretation, other evidence of that law could hardly be set against it " (Lord Sumner [73]).

F    The experts on foreign law from both sides were unanimous that all East German courts would follow the decision of the Supreme Court of the German Democratic Republic that the Carl-Zeiss-Stiftung still exists as a juristic person with its domicile at Jena, and that the Carl-Zeiss-Stiftung had the capacity to sue for the protection of its name, trade-marks and goodwill. The only criti-

G    cism which is made by the West German lawyers of the East German judgment is that there are no free judges in East Germany and that no East German court would dare to come to a contrary conclusion. But this is only the opinion of the West German lawyers, and there is not a shred of evidence to support it. Upon

[71] [1933] A.C. 289, 298.
[72] 24 Ll.L.Rep. 85, 87.
[73] Ibid. 94.

940                    HOUSE OF LORDS                    [1967]

H. L. (E.)
1966
───
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
───
LORD GUEST
───

the question of fact as to what the East German law is, the     A
evidence is really all the one way, consisting of the judgment of
the highest court in East Germany and the opinion of the East
and West German lawyers who gave evidence.

In this state of evidence there is no need to examine further
the decisions of the West German courts or the East German
courts. Indeed, in this state of affairs the English courts would not    B
be entitled, in my view, to express their views as to the soundness
or otherwise of either decision (see *Buerger* v. *New York Life
Assurance Co.*) [74]   The English courts must accept the East German
decision as being the law of East Germany.

Upon the whole matter, I would allow the appeal and restore
the judgment of Cross J.                                         C

LORD UPJOHN. My Lords, the issues between the parties in
this singularly complicated appeal fall into two watertight
compartments.

Into the first compartment falls an issue which has been
described in argument as the "non-recognition" point. It has    D
been admirably and elaborately argued before your Lordships,
but in the end the point may shortly be stated: whether the
English courts will recognise the legislative and other acts of the
German Democratic Republic which operates in the Russian
Zone of Germany, having regard to the fact that Her Majesty's
Government has not granted any de jure or de facto recognition    E
to that Republic or its Government. This issue was raised for
the first time in the Court of Appeal, who held that, as it was
common knowledge that the U.S.S.R. had recognised the German
Democratic Republic as an independent sovereign state but Her
Majesty's Government had not done so, the courts of this country
would not recognise any acts done by that Government or by any    F
person appointed by it. This conclusion necessarily led to the
result on the facts of this case, to which I shall refer later, that
the action was not properly authorised and that the solicitors
who issued the writ were acting without authority to do so. The
result of the decision of the Court of Appeal is of course to deny in
the courts of this country to the inhabitants, organisations and    G
institutions of East Germany any lawful origin to any acts or
events based on any executive, judicial or legislative acts or
directions of the Government of the German Democratic Republic
since it was set up by the U.S.S.R.: a most deplorable result in

───
[74] (1927) 96 L.J.K.B. 930; 43 T.L.R. 601, C.A.

A  respect of any highly civilised community, with which we have
substantial trading relationships, I believe, which should be
avoided unless our law compels that conclusion.

My Lords, my noble and learned friend, Lord Reid, whose
opinion I have had an opportunity of reading, has advanced very
powerful reasons for preferring the view that the answers of Her
B  Majesty's Secretary of State for Foreign Affairs, to the requests
for information submitted to him by the Court of Appeal in
accordance with the well-settled practice, must lead to the
conclusion that, so far as the courts of this country are concerned,
we ought to assume that, whatever may be thought to be common
knowledge on this point, the German Democratic Republic is a
C  subordinate body set up by the U.S.S.R. as the de jure Govern-
ment of East Germany to act upon its behalf, and that its legisla-
tive executive and judicial acts must receive recognition. I agree
entirely with the reasons and conclusions of my noble and learned
friend, and I cannot usefully add anything upon this issue.

It, therefore, becomes necessary to examine the second com-
D  partment with which the Court of Appeal quite reasonably did
not deal, having regard to their decision on the non-recognition
point.

The issues here are even more complex, and are threefold.
Taking them in the order which I think is most convenient, they
may be described (as in the arguments addressed to your
E  Lordships) as (1) the confiscation point, (2) the estoppel point, (3)
the Supreme Court point.

The confiscation point depends on proof of the fact that the
commercial assets of the Stiftung (Jena) abroad have been confis-
cated by legislation in East Germany and upon the respondents'
F  argument that in such event the English courts would not assist
the enforcement of expropriatory or penal legislation outside the
territorial jurisdiction of that country.

But that plainly is an issue in the action itself; it is a matter
for allegation in the pleadings and goes to the question of the
relief (if any) that should be granted.

G  It is not a matter which can be dealt with on this appeal, which
is concerned solely with the authority of Courts & Co. to issue a
writ in the courts of this country on behalf of the Stiftung, which
has nothing to do with the issues in the action, a matter I shall
develop later.

Apart from this, I should be very reluctant to deal with this
matter, even if it were open to your Lordships to do so, on the

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
LORD UPJOHN

942                    HOUSE  OF  LORDS                    [1967]

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Upjohn

materials at present available.  Plainly there is much scope for    A
further exploration of the relevant facts before this issue in the
action can be satisfactorily decided.  When (if pleaded) the matter
comes on for trial the learned trial judge must not consider himself
hampered, restricted or in any way bound by any findings or
observations of Cross J. on this matter.

I turn, then, to the estoppel point.  This raises a matter of    B
some general importance.

This is an appeal based on a summons dated February 7, 1956,
whereby the respondents claimed against the solicitors, Courts
& Co. (respondents to the summons), that they issued a writ in
the name of the Stiftung as plaintiffs without authority to do so
and that, therefore, the action should be stayed and Courts & Co.    C
ordered to pay the respondents' costs on a common fund basis.

This form of summons is well known and is based not on any
misconduct on the part of the solicitor, as was at one time thought
to be necessary to empower the court to exercise its summary
jurisdiction over a solicitor, but, as was pointed out by Lord Porter
in *Myers* v. *Elman*,[75] is based on the proposition that the solicitor    D
is not party to the action, but that the court exercises its summary
powers over the solicitor who by issuing a writ warrants his
authority to do so, and so, if he has no authority, may I add,
commits a tort against the so-called defendants; he therefore has
to pay them damages by indemnifying them against the expenses
to which they have been put by paying costs taxed on the common    E
fund basis rather than on a party and party basis.

It is alleged by the respondents that upon this summons
Courts & Co. cannot contest this issue, for it has already been
tried conclusively between the parties or their privies in earlier
proceedings in the West German Federal Court so that they are
estopped per rem judicatam, or more shortly this matter is res    F
judicata.  It is clear that a party relying on such a plea must at
least prove that the earlier proceedings were determinative of the
issues arising in the second proceedings; that the same parties or
their privies are common to both proceedings and that the earlier
proceedings were within the jurisdiction of the court and were
final and conclusive of the relevant issues.    G

This makes it necessary to answer to a number of questions:
1. Are the issues in the former proceedings the same as in the
latter? 2. Who are the parties to the earlier proceedings? 3. Who
are the parties to these subsequent proceedings? 4. If there is no

[75] [1940] A.C. 282, 336; 56 T.L.R. 177; [1939] 4 All E.R. 484, H.L.

A  complete identity of parties in (2) and (3) above, are the different parties properly described as in privity one with another for the purpose of the doctrine? 5. Even if the answer to question (1) is yes, is the matter of the lis between the parties such as to give rise to res judicata? 6. Does the doctrine if applicable between two sets of English proceedings apply where the former proceedings

B  were in a foreign court? And, if so, 7. Were these proceedings final and conclusive between the parties?

To answer these questions some facts must necessarily be set out but I shall be as brief as I can. For this purpose it may be taken as common ground that a local government body acting in that part of Eastern Germany known as Thuringia and called the

C  Council of Gera (to which I will refer as " the council ") is the special board within the meaning of article 113 of the articles of association of the Stiftung and, as such (as provided by article 4), entitled to represent the Stiftung in the supreme direction of its affairs, including, of course, the power and right to instruct its legal advisers to bring or defend actions on its behalf. However,

D  in proceedings culminating in the Supreme Court of the Federal Republic of West Germany it was held that the council had no right to instruct anyone to act for the Stiftung in proceedings in those courts because, since the confiscation of its industrial assets by certain decrees of the Russian occupying forces in 1948, the Stiftung, though continuing as a legal entity, became an empty

E  shell incapable of giving any instructions and the council was in effect divested of its powers to act on its behalf. Whether this is a correct conclusion is the Supreme Court point which I shall examine later, though with extreme brevity.

It must be noted that in contrast to our procedure it appears that in the West German courts the person giving the instructions

F  on the part of a purely juridical person appears on the record; at all events, in the West German proceedings in the Supreme Court the plaintiff is described as " the Carl Zeiss Foundation of Jena represented by the Council of the District of Gera plaintiffs and appellant."

In the proceedings before your Lordships Courts & Co. at

G  once concede that they have received instructions to issue the writ in the name of the Stiftung from the council. That is a sufficient statement of the facts to answer the first two questions: 1. The issue whether the council had authority to give instructions to begin proceedings in the name of the Stiftung in this country depends on precisely the same facts, circumstances and arguments

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Upjohn

944                    HOUSE OF LORDS                    [1967]

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD UPJOHN

A

as were advanced before the West German courts and decided against it. It is not suggested that there has been any relevant change in those facts or circumstances since 1960, when judgment was delivered in the Supreme Court. 2. The parties to the West German proceedings, I am prepared to assume, are (a) the council and, (b), the third respondents.

B

The third question has given rise to much argument and some difference of opinion among your Lordships. Counsel for the appellants has argued that the Stiftung are parties to the summons; a somewhat dangerous argument, I would have thought, for it seems to presuppose that, regardless of the question of Courts & Co.'s authority to sue, they are parties and so the same argument must apply to the West German proceedings and, if so, identity of parties seems to be established.

C

However, I reject the argument. If the summons succeeds it does so on the footing that the Stiftung is not a party to the writ or the summons and for that reason the action is stayed and the solicitor made personally liable for breach of warranty of authority. Under our procedure in such circumstances no order of any kind, even for costs, can be made against the Stiftung.

D

Secondly, it seems to me clear that the council are not, under our procedure, parties to the writ or the summons. It can make no difference that in this case in some earlier proceedings in another country they are named in the record of those proceedings. The solicitor is in a special position, for, in respect of a purely juridical person, only a solicitor can issue a writ. He does not thereby become a party to the proceedings but, for the reasons already mentioned, as an officer of the court, he can be made a respondent to a summons to strike out the writ. His liability depends not on agency, for if the summons succeeds he has no principal; it depends solely upon his position as a solicitor issuing a writ and thereby warranting his authority to do so to the defendants named in the writ. I am quite unable to understand the argument that those de facto instructing him become parties to the writ or to the summons seeking to strike out the writ. It may be that such body of persons may be liable to the solicitor for breach of warranty of authority, if they have no principal, but that does not make them party to the proceedings nor liable for breach of warranty to the defendants for they, unlike the solicitor who has issued the writ, have warranted nothing to them. To hold the contrary would make all those along the line who may have given instructions to the solicitors to

E

F

G

A   issue a writ from a junior clerk of the instructing body upwards liable as parties to the defendants; but this has never been the law of our country.

So I answer this question by saying that the parties to the summons under appeal are (a) the third respondents, (b) Courts & Co.

B   As to question four, the third respondents are parties to both proceedings but there is no identity between the Council and Courts & Co.; so the next question is whether they are in privity one with another for the purpose of the doctrine.

The position of the solicitor in proceedings such as these is clear-cut; as I have already pointed out, he is no party to the

C   proceedings; the sole question is as to his authority to initiate proceedings. It is not an issue in the action at all, and that is why it cannot be taken as a plea in defence in contrast to the confiscation point.

This House in *Russian Commercial and Industrial Bank* v. *Comptoir D'Escompte de Mulhouse* [76] approved the decision of

D   Warrington J. in *Richmond* v. *Branson & Son* [77] where he said:

" But the real question is the authority of the solicitor. Is that a question which can be raised as a relevant issue in the action and at the trial? . . . it is impossible, according to the ordinary practice and procedure of the court, to justify that proposition."

E   The solicitor has no interest in the action as such, nor under our system (unlike that pertaining, for example, in the U.S.A.) is he permitted even to participate in the proceeds of a successful judgment. His duty is to render his services to his client in the litigation to the best of his skill and ability and his sole reward is the costs which by law he may charge.

F   I can see nothing in the solicitors' relationship with his client which renders them privy to one another in the ordinary sense in which privy or privity is used for the purposes of the doctrine.

As has been said in Halsbury's Laws of England, 3rd ed., Vol. 15 (1956), pp. 196–197, para. 372, privies are of three classes: (1) privies in blood, (2) privies in law and (3) privies in estate,

G   but they all have an interest in the subject-matter of the action. Though your Lordships have been referred to a number of authorities in other courts which may expand the meaning of privy, none touch on the question before your Lordships, where the lis has nothing to do with the substance of the action itself.

[76] [1925] A.C. 112; 40 T.L.R. 837,     [77] [1914] 1 Ch. 968, 974.
H.L.(E.).

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No 2)
LORD UPJOHN

H. L. (E.)
1966
─────
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Upjohn
───

In my opinion, Courts & Co. cannot be described as privy to the council so as to preclude them from trying to establish their authority to issue the writ, unless, by reason of some requirement of the law to meet new conditions, a greatly extended meaning beyond anything it has borne before is to be given to the word, a matter to which I shall return later.

I turn to the fifth question I have posed. Res judicata may be divided into a number of classes or branches. The most ancient is estoppel by record, strictly so called. It still exists, though is usually overtaken by the broader principles I shall next discuss. A defendant who has failed even to enter an appearance and who has taken no part in the earlier litigation may be estopped by record if his defence in the second action was necessarily and with complete precision decided by the previous judgment (see per Lord Maugham L.C. in *New Brunswick Railway Co.* v. *British & French Trust Corporation Ltd.*).[78] How narrow is the estoppel in such a case is shown by the actual decision there. This narrow concept of estoppel has no application to the present case, for the questions are different; the first is as to the authority of the council to initiate proceedings on behalf of the Stiftung in West Germany, and the second as to the authority to initiate proceedings in these courts. Nor is the judgment of the foreign court one of record.

The broader principle of res judicata is founded upon the twin principles so frequently expressed in Latin that there should be an end to litigation and justice demands that the same party shall not be harassed twice for the same cause. It goes beyond the mere record; it is part of the law of evidence for, to see whether it applies, the facts established and reasons given by the judge, his judgment, the pleadings, the evidence and even the history of the matter may be taken into account (see *Marginson* v. *Blackburn Borough Council*[79]). Res judicata itself has two branches: (1) cause of action estoppel—that is where the cause of action in the second case has already been determined in the first. To such a case the observations of Wigram V.-C. in *Henderson* v. *Henderson*[80] apply in their full rigour. These observations have been so often approved in your Lordships' House that I will not repeat them. I need not pursue this matter further for the alleged res judicata with which your Lordships are concerned certainly has nothing to do with any cause of action in the proceedings. (2) Issue

[78] [1939] A.C. 1, 21.
[79] [1939] 2 K.B. 426.
[80] 3 Hare 100, 115.

A    estoppel—a convenient phrase first coined apparently by Higgins J.
in the High Court of Australia in *Hoystead* v. *Federal Commissioner of Taxation*,[81] whose dissenting judgment was upheld by
the Privy Council in 1926.[82] But issue estoppel has been recognised ever since *The Duchess of Kingston's Case*[83] and there are
many quite early examples of it, see, for example, *Reg.* v. *Inhabitants of the Township of Hartington Middle Quarter*[84] and many
B    others.

Recently in *Thoday* v. *Thoday*[85] and in *Fidelitas Shipping Co.
Ltd.* v. *V.O. Exportchleb*[86] the Court of Appeal applied to issue
estoppel the full breadth of the observations of Wigram V.-C. in
*Henderson* v. *Henderson*.[87] While in this case it is not necessary
C    to decide whether that is right, because for the reasons given in
the answer to the first question that I posed for myself it does
not arise, I should be reluctant to support that view. As my
noble and learned friend, Lord Reid, has already pointed out
there may be many reasons why a litigant in the earlier litigation
has not pressed or may even for good reason have abandoned a
D    particular issue. It may be most unjust to hold him precluded from
raising that issue in subsequent litigation and see Lord Maugham's
observations in the *New Brunswick* case.[88] All estoppels are not
odious but must be applied so as to work justice and not injustice
and I think the principle of issue estoppel must be applied to the
circumstances of the subsequent case with this overriding
E    consideration in mind.

My Lords, I only desire to add one observation upon those
cases; once it is clear that the principle of res judicata is part of
the law of evidence I find it difficult to understand the distinction
drawn by Diplock L.J. in *Thoday* v. *Thoday*[89] between issue
estoppel and fact estoppel, but that does not call for further
F    consideration here.

So if Courts & Co. are debarred from arguing their authority
to issue the writ, it is because of an issue estoppel. But I have
already shown that this lis is not and cannot be an issue in the
action at all. It is a matter which would seem, to paraphrase the
words of De Grey C.J. in *The Duchess of Kingston's Case*[90]
G    quoted by Lord Reid, to be a matter collateral or incidentally
cognisable and therefore not the subject of estoppel. No authority

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
Lord Upjohn

[81] (1921) 29 C.L.R. 537, 561.
[82] [1926] A.C. 155; 42 T.L.R. 207,
P.C.
[83] 20 St.Tr. 355.
[84] 4 E. & B. 780.
[85] [1964] P. 181.

[86] [1966] 1 Q.B. 630.
[87] 3 Hare 100.
[88] [1939] A.C. 1, 21.
[89] [1964] P. 181.
[90] 20 St.Tr. 355, 538 n.

.HOUSE OF LORDS

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Upjohn
───

has been cited to your Lordships which bears any resemblance   A
to the present case.

All the authorities we have examined on issue estoppel have
been cases where the earlier action dealt with issues or points
which, however inferentially or incidentally, arose in the course of
trying the substance of the issues between the parties to the action;
not with a lis having nothing to do with those issues, which arises   B
only between the defendant and the solicitor issuing the writ.

Ought the principles of issue estoppel to be extended to a case
such as this? I can see no reason for doing so. Under our system
the respondent to the summons is necessarily a solicitor, an
officer of the court. It would require strong reasons to preclude
him from defending his issue of a writ by reason of some decision   C
to which he was no party and of which he may be in complete
ignorance. Justice does not require the invocation of the doctrine
to protect the defendant from being doubly harassed, for if an
officer of the court with full knowledge of some earlier proceedings
in these courts which covers exactly and precisely the question
of his authority issues a writ, the arm of the court is long enough   D
and strong enough to prevent an abuse of its process without resort
to the doctrine.

The application of the doctrine may, on the other hand, lead
to much injustice. Such summonses are normally heard at a very
early stage of the proceedings on evidence frequently hurriedly
prepared (in marked contrast to this most exceptional case) and   E
some point may have been overlooked or misunderstood in the
earlier proceedings.

I would deny to these purely incidental proceedings in the
action the doctrine of issue estoppel and for the same reasons I
would refuse to extend the meaning of the word privy to cover
the case of two successive solicitors (for that is what it amounts   F
to) who have issued writs in the name of a common principal;
the only so called privity between them is that they have succes-
sively issued writs upon the instructions of some persons purport-
ing to act for the principal but that person cannot himself or itself
be a party to any proceedings. So I would regard the doctrine as
entirely inappropriate to this form of proceedings.   G

My Lords, in these circumstances, I can answer the remaining
questions nos. 6 and 7 very shortly.

I accept at once that for the purpose of the doctrine of res
judicata in general a prior foreign judgment may be just as
effective as an English one. But, even if I had come to the

A  conclusion that the doctrine applied to successive summonses, the
first of which was decided in our courts, raising the question of
authority to issue a writ, I would deny the benefit of the doctrine
to a prior foreign judgment, for the simple reason that I do not
think it is necessary in the interests of justice to do so and it may
easily be productive of grave injustice. Questions of authority
B  and, indeed, the very concept of authority for this purpose depend
so much on matters of procedure in each court and on the precise
rules governing the issue of writs therein by persons other than
the parties themselves that it is difficult to apply a judgment in
the one case to another under a different jurisprudence. This
case provides a good example; under our system the council
C  could never be a party to the writ or the summons.

Finally, with regard to question no. 7, the respondents have
failed to prove that the proceedings in West Germany were final
and conclusive as must necessarily be proved for an estoppel to
be successfully established (see *Nouvion* v. *Freeman* [91]).

In conclusion upon the estoppel point, even if I had reached
D  a contrary conclusion as between the third respondents and
Messrs. Courts & Co., I should require much persuasion that the
first and second respondents who are alleged to be passing off the
goods of the third respondents as and for the goods of the Stiftung
and thus committing independent torts in this country, are entitled
to the benefit of the alleged estoppel, but the point is not an
E  important one.

So it is necessary to turn to the Supreme Court point. I have
already set out very briefly the grounds upon which the West
German Federal Court held that the council had not authority to
act for the Stiftung, and the real issue is whether that decision is
right or whether on the same facts the decision of the Supreme
F  Court of the East German Republic deciding that the council had
authority to issue a writ is to be preferred. This is a question of
foreign law which by the law of this country is essentially a matter
of fact. It has been discussed very fully by my noble and learned
friend, Lord Reid, in his opinion and by Cross J. in the court of
first instance. I agree entirely with what my noble and learned
G  friend has said and also with what Cross J. said, though I think
he went too far in describing the judgment of the West German
Supreme Court as perverse. As a piece of legal reasoning the
decision of the West German courts seems to me quite unconvinc-
ing and, for my part, I can see no ground for holding that the

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

LORD UPJOHN

[91] 15 App.Cas. 1.

HOUSE OF LORDS    **[1967]**

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD UPJOHN

A    council ceased to have any authority to act on behalf of the Stiftung or that the Stiftung itself was but an empty shell in existence but incapable of acting when all the known facts indicate the contrary. I only desire to add that the respondents, in inviting us to prefer the decision of the West German Federal Supreme Court, advanced an argument based on the certificate dated

B    November 6, 1964, given by Her Majesty's Secretary of State for Foreign Affairs when in answer to question (2) submitted to him he quoted a communiqué dated September 19, 1950, where it was stated that

"Pending the unification of Germany the three Governments consider the Government of the Federal Republic as the only German Government freely and legitimately constituted and

C    therefore entitled to speak for Germany as the representative of the German people, in international affairs."

It was said that this statement authorised the West German Government to speak in the name of the whole German people and this gave a superior sanctity to the decision of the West

D    German Supreme Court over the decision of the East German Supreme Court. The argument seems to me to be fallacious. It has never been the practice of Her Majesty's Secretaries of State to express any views upon the law. While they constantly express views on recognition in answer to questions submitted to them by the courts, the legal consequences that flow from recognition

E    is a matter which is always left to these courts.

My Lords, for these reasons I would allow this appeal and restore the order of Cross J.

LORD WILBERFORCE. My Lords, the substantive issue in this litigation is whether the right to use in this country the name of Carl Zeiss, or Zeiss, in relation to certain glass, or optical, goods,

F    and to profit from the goodwill attached to those names, belongs to a body of persons in the West German Federal Republic, or to a body of persons in that part of Germany which is outside of, and to the east of the Republic, which I will call for convenience "East Germany." The rights in question are claimed by both sides to belong to a corporate entity called Carl-Zeiss-Stiftung

G    (the word "Stiftung" denotes approximately a foundation with corporate status), the contest being as to which body of persons is entitled to control that corporate entity. The writ in the action was issued in the name of the Stiftung through English solicitors on the authority of a Dr. Schrade, who in turn claimed to act on the authority of the Council of Gera (alleged to be

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A   the "special board" of the Stiftung), and also in other capacities, and in accordance with accepted procedure, the issue must be tested in limine, whether the Stiftung is legally before the court. This procedure has some inconveniences, both because it normally (and here) takes the form of an application against the solicitors (the difficulty as to which will hereafter appear) and also in that

B   it is traditionally carried out by a motion or summons, supported by affidavit evidence, but without pleadings defining the precise matters in dispute. In a case such as the present, where important and difficult questions of law, including foreign law, arise this may result in some confusion, and I think that it would be advantageous if some method could be found in such cases of

C   defining the issues to be presented to the court.

     The issues as to the right or otherwise of Dr. Schrade to authorise the proceedings on behalf of the Carl-Zeiss-Stiftung, as these were debated before Cross J. in the Chancery Division, and to which the evidence was directed, were issues, under several headings, of German law and no question arose as to the status,

D   internationally, of East Germany or of the "government" which claims authority in Eastern Germany. The affidavits on either side were drafted on the basis that, for the purpose of the summons to stay the proceedings, no challenge was made to the validity of East German legislation, and before the court leading counsel for the defendants (the respondents in this appeal) dis-

E   claimed any intention to question the status of that government, or to inquire whether it was recognised by Her Majesty's Government. The facts with regard to, or bearing upon recognition, were therefore not examined at that stage. But in the Court of Appeal the respondents sought to base their case upon non-recognition of the "government" in East Germany and that court, inevitably,

F   as I think, because of the public interest involved, allowed them to take the point. Inquiry was made in the usual manner of the Secretary of State and, certificates given by him having shown that Her Majesty's Government does not recognise the "government" of East Germany either de jure or de facto, the respondents argued, and the Court of Appeal accepted, that the ground on

G   which Cross J. held the action to be validly commenced no longer existed. The Court of Appeal also decided against various alternative claims by the appellants as to the authorisation of the proceedings, which Cross J. had not found it necessary to consider. Correspondingly, the Court of Appeal did not find it necessary to deal with some difficult issues decided in the

H. L. (E.)

1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———
LORD
WILBERFORCE
———

appellants' favour by Cross J.  I leave all these aside for the
moment in order to concentrate upon that contention which is
affected by the *non-recognition argument.*

First, I must explain how the right of Dr. Schrade to authorise
the proceedings is connected with the question of non-recognition.
I can do this quite summarily, since the history and the constitution
of the Carl-Zeiss-Stiftung have already been fully explained.

Since the establishment of the Carl-Zeiss-Stiftung in 1891 at
Jena as a charitable foundation, it has by its constitution been
linked with the public administration of that district in Germany
in which Jena lies. This was at that time the Grand Duchy of
Saxe-Weimar. The " special board " of the foundation, which
is the organ of the Stiftung which (under the issue I am now
considering) authorised the present action to be brought, was
then the department responsible for the University of Jena.
Later, under the Weimar Republic, the appropriate district was
the state of Thuringia and the authority its Minister of Educa-
tion. There was a displacement during the National Socialist
régime but in 1945, when American forces occupied this part of
Germany, Thuringia was restored as a province or Land and its
Minister again became the special board.  It is interesting, and
relevant to a later argument, to note that this reconstitution of
the regional administration in this part of Germany was apparently
accomplished without any formality; it simply took place under
the authority of the occupant and, as one of the expert witnesses
said, I think correctly, the fact, that the occupation authorities
allowed the Ministry of Education to operate, endowed the acts
of that Ministry with legal validity. This factual state of affairs
seems to have continued without change when in July, 1945,
East Germany, including Thuringia, was taken over by the forces
of the U.S.S.R. The local administration continued: the Minister
continued to act as the special board and, as regards this period
which lasted until 1952, no challenge has been made to the validity
of that board or to action taken by it.  Its legal life-blood can only
have been derived from the Minister of Thuringia, who in turn
derived authority either from the U.S.S.R. as the holder of sovereign
power (I shall explain this later) or possibly from the previous
authority of the U.S.A.

It is upon events occurring in 1952 that the respondents rely
for their contention that the special board which authorised this
action had, so far as the courts of this country are concerned, no
legal existence. On July 23, 1952, under a " law " passed by the

A  " government " of the German Democratic Republic (as East
Germany is called by those in control of it) and an order made on
the following day under that law, the Province or Land of
Thüringia was divided into three districts and its functions were
transferred to the administrative organs of the respective districts.
The district in which Jena is situated is that of Gera and the
B  body which (admittedly) assumed the position corresponding to
the former Minister of Thuringia was the Council of Gera.

On these facts, the respondents contend that, since the Coun-
cil of Gera depends for its creation upon a legislative act of the
" government of the German Democratic Republic " and as no
such government is recognised in this country, there is no legal
C  basis for the Council of Gera as the special board, so that the
purported authority is simply a nullity.

It is as well, before considering the legal consequences of non-
recognition, to appreciate what the respondents' contention in-
volves.  The Stiftung is a corporate body established for industrial
and trading purposes under the law of Germany; one of whose
D  constitutional organs—the special board—is an administrative
authority exercising power at the place of the body's operations.
As a fact, there is no doubt that at the relevant date this authority
was there, that it was exercising its functions, that it was operat-
ing as the special board, that (this is proved by the evidence) it
would be recognised by the local courts as so doing.  Yet, so it is
E  said, because the law and the order which set it up are derived
from a body not recognised as a lawful government, this authority,
qua organ of the Stiftung, has no legal existence: all its trans-
actions in private law are void, as are presumably all other
transactions carried out under its authority or by persons who
derive their authority from it.  By logical extension it seems to
F  follow, and counsel for the respondents accepted, that there is,
for many years has been and, until the attitude of Her Majesty's
Government changes, will be, in East Germany a legal vacuum;
subject only, it may be, to the qualification that pre-existing
German law, so far as it can continue to be operated or have
effect, may continue in force.  Whether in fact it can continue to
G  be operated to any great extent if its operation depends upon
administrative or judicial authorities set up by the non-existent
" government " must be doubtful.  But the respondents, so far
from shrinking from these consequences, insist upon them as the
necessary and, as they say, intended consequences of non-recogni-
tion.  And correspondingly, they argue that if recognition were to be

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

954                          HOUSE OF LORDS                    [1967]

H. L. (E.)

1966
―――――
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
―――――
Lord
Wilberforce
―――――

given by the courts to legislative acts of the non-recognised          A
" government " that would be tantamount to recognition of that
government, and so in conflict with the policy of the executive.

   My Lords, if the consequences of non-recognition of the East
German " government " were to bring in question the validity of
its legislative acts, I should wish seriously to consider whether
the invalidity so brought about is total, or whether some mitiga-     B
tion of the severity of this result can be found.  As Locke said:
" A government without laws is, I suppose, a mystery in politics,
inconceivable to human capacity and inconsistent with human
society," and this must be true of a society—at least a civilised
and organised society—such as we know to exist in East Germany.
In the United States some glimmerings can be found of the idea       C
that non-recognition cannot be pressed to its ultimate logical
limit, and that where private rights, or acts of everyday occurence,
or perfunctory acts of administration are concerned (the scope
of these exceptions has never been precisely defined) the courts
may, in the interests of justice and common sense, where no con-
sideration of public policy to the contrary has to prevail, give     D
recognition to the actual facts or realities found to exist in the
territory in question.  These ideas began to take shape on the
termination of the Civil War (see U.S. v. Insurance Companies[92]),
and have been developed and reformulated, admittedly as no
more than dicta, but dicta by judges of high authority, in later
cases.  I mention two of these, Sokoloff v. National City Bank[93]   E
and Upright v. Mercury Business Machines Co. Inc.,[94] a case
which was concerned with a corporate body under East German
law.  Other references can be found conveniently assembled in
Professor D. P. O'Connell's International Law (1965) vol. I, pp.
189 et seq.  No trace of any such doctrine is yet to be found in
English law, but equally, in my opinion, there is nothing in those   F
English decisions, in which recognition has been refused to par-
ticular acts of non-recognised governments, which would prevent
its acceptance or which prescribes the absolute and total invalidity
of all laws and acts flowing from unrecognised governments.  In
view of the conclusion I have reached on the effect to be attributed
to non-recognition in this case, it is not necessary here to resort to  G
this doctrine but, for my part, I should wish to regard it as an
open question, in English law, in any future case whether and to
what extent it can be invoked.

―――――――――――――――――――――――――――――――――
[92] 89 U.S. 99.                    [94] (1961) 13 App.Div. 2d 36; 213
[93] 145 N.E. 917.                  N.Y. 2d 417.

A.C.                AND PRIVY COUNCIL                955

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A     I return now to consideration of the effect of the refusal to recognise the "government" of East Germany. The respondents, claiming that non-recognition of a government entails automatically non-recognition of all laws enacted by that government, rely upon the well-known line of cases following upon *Aksionairnoye Obschestvo A.M. Luther* v. *James Sagor & Co.*,[95] where non-

B     recognition had these consequences.

But before their argument can be made good, they must show that the present refusal of recognition is given in a situation comparable with that which is found in the cases. This is the critical issue here and it is on this that the respondents' argument, in my opinion, breaks down. For the present situation, as

C     regards sovereignty in Germany, is incomparable with any that has previously come before our courts and, as I shall hope to show, gives rise to different consequences.

The classic cases of non-recognition of governments arise in two types of situation: first, where some new state comes into existence, as by separation from another state or states (in such

D     a case there may be a question of non-recognition of the state itself as well as of the government); instances of this are cases concerned with breakaway Spanish colonies—*Jones* v. *Garcia del Rio*[96] (Peru); *Thompson* v. *Powles*[97] (Guatemala); *Taylor* v. *Barclay*[98] (Colombia); secondly, where a new government claims authority over an existing state, or part of it. Instances of this are

E     *City of Berne* v. *Bank of England*[99]; *Aksionairnoye Obschestvo A.M. Luther* v. *James Sagor & Co.*[100] (U.S.S.R.); *White, Child & Beney Ltd.* v. *Simmons*[101] (U.S.S.R.) and numerous cases relating to Russian banks. But neither of these is the situation in East Germany. When Germany surrendered unconditionally to the Allied Powers in 1945, instead of proceeding to the traditional

F     status of belligerent occupancy, they brought a novel legal situation into being. The state of Germany remained (and remains) in existence; governing authority or supreme authority in respect of Germany as a whole was reserved to the four Allied Powers acting jointly, and governing authority in respect of each zone was left to be exercisable by that one of the Allied Powers to which the zone

G     was allocated; in the Eastern part of Germany in which Jena is situated by the U.S.S.R. There is no controversy about this: the facts were so stated by the executive and accepted by the courts

---

[95] [1921] 1 K.B. 456; [1921] 3 K.B. 532, C.A.
[96] (1823) Turn. & R. 297.
[97] (1828) 2 Sim. 194.
[98] (1828) 2 Sim. 213.

[99] (1804) 9 Ves. 347.
[100] [1921] 3 K.B. 532.
[101] (1922) 127 L.T. 571; 38 T.L.R. 616, C.A.

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———
LORD
WILBERFORCE
———

in the cases of *Rex* v. *Bottrill, Ex parte Kuechenmeister* [102] and *Preston (orse. Putynski)* v. *Preston (orse. Putynska) (orse. Basinska).* [103] It is against this background that the certificates of the Secretary of State were given in these proceedings in September and November, 1964. The certificate of November 6, 1964, and the questions to which it was directed have been set out in the opinion of my noble and learned friend, Lord Reid, and I shall not repeat them here. The following are, in my opinion, the conclusions to be drawn from the certificate:

A

B

> (1) The governments of the four Allied Powers retain rights and responsibilities in respect of Germany as a whole;
> (2) In respect of the Eastern Zone—called "the zone of occupation allocated to the U.S.S.R." in which Jena is—the state and Government of the U.S.S.R. are recognised as de jure entitled to exercise governing authority;
> (3) This recognition is stated to extend to the period since "at or about the end of June, 1945" to the "present date," that is, November 6, 1964;
> (4) Apart from the four Allied states and their Governments and the Control Council for Germany (an organ of the four Allied Governments) Her Majesty's Government have not recognised de jure or de facto any other authority purporting to exercise governing authority in or in respect of the Eastern Zone.

C

D

There should be added to these facts that stated by the earlier certificate dated September 16, 1964, that

> (5) Her Majesty's Government have not granted any recognition de jure or de facto to the "German Democratic Republic" or its "Government"—the inverted commas are as in the certificate itself.

E

The first question for a court when presented with this certificate (for convenience I treat the two as a single statement) is to consider whether it completely states the facts and whether there is any ambiguity in it. If so, it may be appropriate to ask the Secretary of State for a supplementary statement. There are only two questions which might arise in relation to the Eastern Zone. The first is whether it is admissible in the courts of this country to take account of the fact (if such be the case, as to which I shall make some observation later) that the U.S.S.R. itself considers that there is in existence in the Eastern Zone a government independent of the U.S.S.R., viz., the "government" of the "German Democratic Republic." In my opinion, the

F

G

[102] [1947] K.B. 41; 62 T.L.R. 570; [1946] 2 All E.R. 434, C.A.     [103] [1936] P. 141; [1963] 2 W.L.R. 1435; [1963] 2 All E.R. 405, C.A.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A  answer to this must be negative: to make any such assertion would be in direct contradiction to the certificate which states without qualification that the U.S.S.R. and its Government is entitled de jure to exercise governing authority there and that nobody else is, either de jure or de facto. What view another state may take as to the legal or factual situation in any territory

B  is irrelevant to the recognising (or non-recognising) state and, after the latter has defined its own attitude, is inadmissible in its courts. As a well-known international law authority puts it: " The recognising state is not concerned with the question whether the state of things which it is recognising "—and I add " or not recognising "—" is legal by the national law of another state "

C  (The Law of Nations (1963) Brierly/Waldock, p. 147). The second question is whether consistently with the certificate it is possible to assert that the U.S.S.R. is not de facto exercising governing authority or control in the Eastern Zone. It was, indeed, suggested by the respondents that there was a deliberate and significant abstention in the certificate from any positive asser-

D  tion to this effect, two points being particularly relied on. First it was said that although the question was put what state or governments have been recognised as " exercising governing authority " in the Eastern Zone, no answer to this was specifically given. Secondly, although in relation to Germany as a whole it was said that until March 20, 1948, the four Allied Powers " did

E  exercise . . . joint authority through the Control Council for Germany " no comparable statement was made concerning the Eastern Zone. Either, therefore, the inference should be drawn that Her Majesty's Government did not regard the U.S.S.R. as " exercising governing authority " in the Eastern Zone, or at least the certificates were ambiguous and further inquiry ought to be

F  made.

   I have no temptation, in a matter of this kind, to speculate or to read into the certificate anything which is not there, but I cannot find that the certificate is either incomplete or ambiguous. In stating that the U.S.S.R. is exercising de jure governing authority and that no other body is exercising de facto authority,

G  the two certificates to my mind say all that need or can be said. De jure recognition in all cases but one is the fullest recognition which can be given: the one exception is the case where there is concurrently some other body de facto exercising a rival authority to that of the " de jure " sovereign (as in the case of *Banco de Bilbao* v. *Sancha* [104]). But any such possibility as this is

[104] [1938] 2 K.B. 176; 54 T.L.R. 603; [1938] 2 All E.R. 253, C.A.

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———
LORD
WILBERFORCE
———

excluded by the terms of the certificates. Moreover, some more enlightenment (if any be needed) as to what is meant by de jure recognition may be drawn from the official statement made by Mr. Secretary Morrison on March 21, 1921, (quoted in full by my noble and learned friend, Lord Reid) in which he said:

> "The conditions for the recognition of a new régime as the de jure government of a state are that the new régime should not merely have effective control over most of the state territory, but that it should, in fact, be firmly established"

—a statement which is not necessarily binding on successor Secretaries of State but which is reproduced, as still effective, in the 1963 edition of Brierly's Laws of Nations (p. 148). This shows that, if nothing more is said, de jure recognition presupposes effective control in fact. It is consistent with this approach that Mr. Secretary Gordon Walker, when asked what states or governments are recognised as (a) entitled to exercise or (b) exercising governing authority, answered only the first question: after doing so there was no occasion to go further. That in doing so there was no intention to deny effective control in fact to the de jure sovereign is shown by the fact that the reply relates, without distinction, to the whole period from 1945–1964. For at any rate for some years after 1945, it would not be possible to dispute that the U.S.S.R. was directly governing the Eastern Zone, which must dispose of any conjecture that in the words he has used for the period as a whole the Secretary of State is distinguishing between what could be done and the actuality of the situation. The certificates therefore in my opinion establish the U.S.S.R. as de jure entitled to exercise governing authority and in full control of the area of the Eastern Zone.

This makes possible a determination of what is the legal character of enactments by the "German Democratic Republic." To say that this is an unrecognised government, though in a sense correct, may be misleading: it is so in a sense quite different from the sense in which the expression was used of, for example, the Russian revolutionary government prior to (de facto) recognition in 1921, whose status and the validity of whose legislation was considered in *Aksionairnoye Obschestvo A.M. Luther* v. *James Sagor & Co.*[105] If that government was not recognised, there was nothing which could give international validity to its laws. But the "German Democratic Republic" is making laws in and as to a territory where a recognised

[105] [1921] 3 K.B. 532.

A.C.                    AND PRIVY COUNCIL                    959

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A    " sovereign " exists. Is there, then, any reason for denying validity
to its acts? The respondents say that there is: that no docu-
mentary authority has been proved to show that the " German
Democratic Republic " had power, under the U.S.S.R., to make
the law in question, or any law: that there must be either a
constitution, or some enabling provision, or some express
B    authority from the " sovereign " or proof positive of some other
connection with the government, to avoid the consequences that the
law is simply a nullity, and that none such has been proved.

     This argument, in my opinion, is unduly formalistic. The
U.S.S.R. and the other Allied Powers assumed power in Germany
after a military collapse followed by a declaration that they had
C    done so: an exceptional, if not unprecedented step which, and
the consequences of which, however, we are bound to recognise.
Thereafter, for a period, they exercised their power directly
through their military commanders-in-chief. After a time they
set up or allowed to be set up zonal or regional authorities to carry
out tasks of government or administration. The United States
D    military authorities, as we know, set up or allowed a " government "
in the Land of Thuringia, which was continued by the U.S.S.R.
when they took over. It is unnecessary in circumstances such as
these to seek for a formal constitutional chain of power. Given
the continuance of de jure authority and complete control, it
follows that acts done by what are (as we are bound to hold)
E    necessarily subordinate bodies are done under the governing
authority of the occupying power. The argument to the contrary
becomes all the more unrealistic when it is seen that the respon-
dents themselves, in the evidence filed in these proceedings, have
gone to considerable pains to demonstrate the subservient, or
F    puppet, character of the " German Democratic Republic " and
its Government. Thus Dr. Walter David, after stating that the
Eastern section of Germany (including Jena) remains under the
occupation of a foreign power, Russia, continues that the inten-
tions of Dr. Abbé, the founder of the Carl-Zeiss-Stiftung, " cannot
be implemented if the Council of Gera (*or indeed any authority
G    under Russian or communist control*) were the special board."
And Dr. Richard Moser von Filseck says:

          " In East Germany a centralised régime *has been set up by
     the Soviet Union to which it is subservient*. . . . The Council
     of Gera is, therefore, the *representative of that political power*
     which carried out the expropriation of the assets of the
     foundation enterprises."

          A.C. 1967.                              62 (2)

H. L. (E.)
1966
_____
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
_____
LORD
WILBERFORCE
_____

A

The latter power was the U.S.S.R. Other passages are to a similar effect. Together with the certificate they present a consistent picture of subordinate central and local authorities exercising authority under the sovereignty or control of the U.S.S.R. as occupying power.

I must notice here two arguments:

B

(i) In the Court of Appeal, it was assumed, as a matter of which judicial notice should be taken, that the "German Democratic Republic" was independent of the U.S.S.R., the conclusion from this being that its acts could not be derived from or attributed to the authority of the latter. Thus Harman L.J. said [106]:

C

"It is in fact notorious that the U.S.S.R. has recognised the German Democratic Republic as a sovereign state and treats its law-making capacity accordingly."

And Diplock L.J.[107] thought that he could take judicial notice that

D

". . . the Government of the U.S.S.R. recognises the 'Government of the German Democratic Republic' as the independent sovereign government of an independent sovereign state for whose territory the Government of the U.S.S.R. claims no power to make laws."

E

I have already stated my opinion that, in the face of the Foreign Office certificate, recognition (if given) by the U.S.S.R. of the German Democratic Republic is something of which the courts of this country cannot take account. But, in addition, as to judicial knowledge, or notoriety, it is not shown, at any rate to my satisfaction, that *in 1952* when the critical "law" was enacted even the U.S.S.R. was claiming that the German Democratic Republic was independent of it or was disclaiming its own authority. Without elaboration, it is sufficient to say that from official documents to be found in Command Paper 1552, which the respondents made available to us, the contrary is seen to be clearly the case, and such is also the effect of the respondents' evidence. There is only one piece of evidence to the contrary, a single answer given by Professor von Moser in cross examination to the effect that sovereignty was transferred to the German Democratic Republic in 1949. But this was not directed to the issue now being considered (which had not at that time been raised) and its true meaning was not explored; its apparent meaning seems to be contradicted both by the facts and by the considered evidence on

F

G

[106] [1965] Ch. 596, 651.          [107] Ibid. 664.

A affidavit of the same witness to which I have referred. The Court of Appeal did not rely on it and it should be disregarded.

(ii) It was said by the respondents that to recognise the law setting up the Council of Gera of July 23, 1952, would in effect be to recognise the Government of East Germany and to create a conflict with the views of the executive. The principle is well

B established that the courts of Her Majesty do not speak with a different voice from that of Her Majesty's executive government (it was stated as early at *Taylor* v. *Barclay* [108] and has been accepted ever since) but we are not here under the risk of committing the courts to action of this kind. Merely because in the

C class of case, of which *Aksionairnoye Obschestvo A.M. Luther* v. *James Sagor & Co.* [109] is an example, non-recognition of a "government" entails non-recognition of its laws, or some of them, it does not follow that in a different situation this is so, nor that recognition of a law entails recognition of the law-maker as a government with sovereign power. The primary

D effect and intention of non-recognition by the executive is that the non-recognised "government" has no standing to represent the state concerned whether in public or private matters. Whether this entails non-recognition of its so-called laws, or acts, is a matter for the courts to pronounce on, having due regard to the situation as regards sovereignty in the territory where the

E "laws" are enacted and, no doubt, to any relevant consideration of public policy. I can see no inconsistency in (a) accepting the view of the executive that there is no recognised (that is, independent) government in the Eastern Zone apart from the de jure governing authority of the U.S.S.R. and (b) attributing legal validity, if no other legal obstacle exists, to a "law" or act of

F that "government" as a subordinate or dependent body.

On consideration, therefore, of the whole of the situation in the Eastern Zone of Germany I reach the conclusion that the challenge to the validity of the law of July 23, 1952, setting up the Council of Gera fails. I should add that, even if there was a change in the situation in the Eastern Zone between 1952 and the

G issue of the writ in 1955 (in the direction of a discontinuance of Russian control), it has not been suggested that this would have invalidated a law already passed.

I must next mention the alternative contentions of the appellants with regard to the right to institute the present proceedings.

[108] 2 Sim. 213.            [109] [1921] 3 K.B. 532.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
LORD
WILBERFORCE

H. L. (E.)
1966
―――
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
―――
Lord
Wilberforce
―――

A

These are three, namely, that Dr. Schrade (who instructed solici-
tors on behalf of the plaintiffs) had authority so to do  (i) under a
power of attorney granted on June 29, 1951, by the then special
board, namely the Ministry of Education of the Land of Thüringia,
(ii) as mandatory or proxy mandatory under article 9 of the
constitution, (iii) as the (i.e., the sole member of the) board of
management of the optical works, entitled to act, under article
114, in the absence of a special board.

B

These alternative contentions were not dealt with by Cross J.
because he held that the action was validly authorised by the
Council of Gera as the special board so that the alternatives did
not arise.  They were considered by the Court of Appeal and
rejected there after careful examination by both Harman L.J. and
Diplock L.J. It was complained by counsel for the appellants that
the learned Lords Justices, on certain points, came to conclusions
on what were essentially matters of German law without sufficient
evidence, and your Lordships were invited to receive fresh affidavits
as to these matters.  In my opinion, the expert evidence filed at
the trial by either side was on some points incomplete and
obscure, and if these three points had to be decided it would be
unsafe to agree or disagree with the conclusions of the Court
of Appeal on the existing material.

C

D

If, however, the appellants are entitled to succeed on the other
points raised in this appeal, it would be unnecessary for them to
rely on these alternatives or to call any further evidence, and they
could be left undetermined, as they were left by Cross J.  I pro-
ceed, therefore, to consider the issues which Cross J. decided in
favour of the appellants, and which the respondents now contest.
These are: (1) Whether the appellants are estopped from con-
tending that the Council of Gera had authority to commence this
action on behalf of the Stiftung by certain judgments given in the
Federal Republic of Germany; (2) Whether, if there is no estop-
pel, it has been established on the evidence that the Council of
Gera had such authority; (3) Whether the appellants are entitled
to bring the present proceedings in view of the confiscation in
East Germany of the optical business.  The third question was
dealt with briefly by Cross J. but he expressed some doubt whether
it was not more properly one which should be left for decision at
the trial rather than decided at the present preliminary stage.  In
my opinion, this doubt was justified and the issue, which may be
a substantial and difficult one, cannot properly be decided on
this appeal.  It should be left to the trial as an open issue on

E

F

G

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord
Wilberforce

A    which the parties can put their case unfettered by the tentative
conclusions of Cross J. The remaining two questions require
decision.

(1) *Estoppel*: The judgment mainly relied on by way of
estoppel is the judgment in West Germany of the Federal High
Court (I take the translation which was used before Cross J.) of
B    November 15, 1960. There are other decisions, but they carry the
matter no further. This judgment was given in proceedings com-
menced in the Provincial Court (Landgericht) at Stuttgart on
April 28, 1954, the parties to which were the Carl-Zeiss-Stiftung
represented by the Council of Gera as plaintiff and three individuals
(Bauersfeld, Heinrichs and Kuppenbender) and the firm of Carl
C    Zeiss of Heidenheim as defendants. As regards these parties it is
not disputed (a) that the Carl-Zeiss-Stiftung named as plaintiff
is the same as the body named as plaintiff in this action, (b) that
the firm Carl-Zeiss of Heidenheim named as defendant is the
same body as that named as the third defendant to this action.
It was also accepted that the effective plaintiff in those pro-
D    ceedings was the Council of Gera and that the substantive claim
sought to be brought for trial related to the use of the names
Zeiss or Carl-Zeiss and of certain trade marks in the Federal
Republic of Germany, so differing from the substantive claim in
the present action, which relates to similar matters in this
country.

E    Objection was taken, before the West German action could
be tried on the merits, to the right of the Council of Gera to
represent the Stiftung and proceedings on this preliminary issue
went through a number of stages and appeals. Finally, the
Federal High Court, by its judgment of November 15, 1960, held
that the action was inadmissible, on the ground that the Council
F    of Gera had no authority to represent the Carl-Zeiss-Stiftung. The
action was, therefore, dismissed and the Council of Gera was
ordered to pay the costs.

Several questions, some of difficulty, arise in considering
whether the respondents in the present action can rely on the
G    judgment of the Federal High Court by way of estoppel or as res
judicata. The first question arises from the fact that what is
relied on here is not the mere fact of a judgment and not a decision
on the substantive " cause of action " or claim which the Carl-
Zeiss-Stiftung was trying to make good, but only a decision on a
particular issue: in other words, what has come to be called an
" issue estoppel." I must begin by ascertaining what is meant by

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———
Lord
Wilberforce
———

" issue estoppel " in English law and then consider how far this    A
kind of estoppel, or something analogous to it, may be applied
to judgments of foreign courts.

A convenient starting point, as regards the English doctrine,
is to be found in the judgments of the Court of Appeal in *Fidelitas
Shipping Co. Ltd.* v. *V/O Exportchleb.*[110]   The case was con-    B
cerned with an interim award made in a commercial dispute
embodied in a special case on which the court had given a decision
and it was held that an issue raised by the special case so deter-
mined was the subject of " issue estoppel " so that it could not
be raised again. Lord Denning M.R. said this[111]:

> " The law, as I understand it, is this: if one party brings    C
> an action against another for a particular cause and judg-
> ment is given on it, there is a strict rule of law that he can-
> not bring another action against the same party for the same
> cause. Transit in rem judicatam; see *King* v. *Hoare.*[112] But
> within one cause of action, there may be several issues raised
> which are necessary for the determination of the whole case.
> The rule then is that, once an issue has been raised and dis-
> tinctly determined between the parties, then, as a general    D
> rule, neither party can be allowed to fight that issue all over
> again. . . ."

He goes on to deal with " points " within issues, including those
which though not actually raised could have been raised, an
argument which is not material here, and which I prefer to leave
open.                                                                E

Similarly in the judgment of Diplock L.J. there is a useful
passage which contains these words.[113]

> " The final resolution of a dispute between parties as to
> their respective legal rights or duties may involve the deter-
> mination of a number of different ' issues,' that is to say, a
> number of decisions as to the legal consequences of particular    F
> facts, each of which decisions constitutes a necessary step in
> determining what are the legal rights and duties of the parties
> resulting from the totality of the facts. . . ."

He continues by making a distinction between issue estoppel and
fact estoppel which may deserve some further exploration, but it
does not arise here.                                                 G

The doctrine of issue estoppel generally is not a new one.
It can certainly be found in the opinion of the judges delivered
by De Grey C.J. in *The Duchess of Kingston's Case,*[114] a pas-
sage from which has been quoted by my noble and learned friend,

---

[110] [1966] 1 Q.B. 630.                [113] [1966] 1 Q.B. 630, 641–2.
[111] Ibid. 640.                        [114] 20 St.Tr. 355, 538n.
[112] (1844) 13 M. & W. 494, 504.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A    Lord Reid, and an accepted re-statement of it was given by Coleridge J. in *Reg.* v. *Inhabitants of the Township of Hartington Middle Quarter*,[115] which is also quoted by my noble and learned friend. Mr. Spencer Bower, in his work on Res Judicata states the principle as being " that the judical decision *was, or involved,* a determination of the same question as that sought to be contro-

B    verted in the litigation in which the estoppel is raised" (Res Judicata, p. 9)—a formulation which invites the inquiry how what is " involved " in a decision is to be ascertained. One way of answering this is to say that any determination is involved in a decision if it is a " necessary step " to the decision or a " matter which it was necessary to decide, and which was actually decided,

C    as the groundwork of the decision" (*Reg.* v. *Inhabitants of Hartington Middle Quarter Township* [115]). And from this it follows that it is permissible to look not merely at the record of the judgment relied on, but at the reasons for it, the pleadings, the evidence (*Brunsden* v. *Humphrey* [116]) and if necessary other material to show what was the issue decided (*Flitters* v. *Allfrey* [117]).

D    The fact that the pleadings and the evidence may be referred to, suggests that the task of the court in the subsequent proceeding must include that of satisfying itself that the party against whom the estoppel is set up did actually raise the critical issue, or possibly, though I do not think that this point has yet been decided, that he had a fair opportunity, or that he ought, to

E    have raised it.

     This being the position as regards English judgments, one must next inquire whether a similar principle should apply as regards foreign judgments. It has taken some time before the recognition of foreign judgments by English courts was placed on a logical footing. Unlike English judgments, they were not

F    considered to be judgments of a court of record so that the simplest form of estoppel—by record—could not be applied to them. They were, in the early stages of private international law, considered only to be prima facie evidence of the rights of the parties and were examinable on the merits. This attitude can be found as late as 1834 in the Irish appeal of *Houlditch* v. *Donegal* [118]

G    where Lord Brougham L.C. expressed his disagreement with the opinion of the Lord Chancellor of Ireland that an English Chancery decree was conclusive, in strong terms. He said:

     " The leaning of my opinion is so strong that I can hardly call it the inclination of an opinion; and we know it is the

---

[115] 4 E. & B. 780, 794.        [117] L.R. 10 C.P. 29.
[116] (1884) 14 Q.B.D. 141, C.A.      [118] 8 Bligh(N.S.) 301, 338.

H. L. (E.)

1966

———

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

———

LORD
WILBERFORCE

———

general sense of lawyers in Westminster Hall (notwithstanding   **A**
dicta of considerable weight coming from very learned judges'
obiter dicta to the contrary) that the judgment of a foreign
court in courts of this country is only prima facie evidence—
is liable to be averred against and not conclusive. One argu-
ment is clear—that the law in the course of procedure abroad
sometimes differs so mainly from ours in the principles upon
which it is bottomed, that it would seem a strong thing to   **B**
hold that our courts were bound conclusively to give execu-
tion to the sentence of foreign courts. . . ."

But the Lord Chancellor's remarks showed that the tide was
running in the direction of recognition and in *Ricardo* v. *Garcias* [119]
this House assented to the view that when a foreign judgment
comes in collaterally, or the defendant relies upon it under the   **C**
exceptio rei judicatae, it is then received as conclusive and
Lord Brougham's earlier remarks came to be explained as refer-
ring only to the limited grounds on which foreign judgments may
be examined such as fraud, public policy or want of jurisdiction
(see Spencer Bower on Res Judicata, p. 38). In this respect,
foreign judgments retain their distinction from English judgments.   **D**
But, these limitations apart, the modern doctrine (usually derived
from *Godard* v. *Gray* [120]) is that a foreign judgment may be
pleaded and is conclusive.

Is, then, what may be pleaded in defence to a claim limited
to what may be called " cause of action " estoppel, that is, a
judgment which negatives the plaintiff's cause of action, or does   **E**
it extend to any matter raised between the parties necessary to
the decision and actually decided? There is no clear authority on
the point. *Henderson* v. *Henderson*,[121] in any event a decision of
a colonial court, was a simple example of cause of action estoppel,
and the same appears to be true of the more complicated case
of *Callandar* v. *Dittrich*.[122]   **F**

The appellants, arguing against issue estoppel in the case of
foreign judgments, invoke a rule by which it appears that a plain-
tiff who has obtained a foreign judgment may sue here either on
that judgment or on his original cause of action, a rule vouched
by a number of decided cases, which maintains a precarious
foothold as a sub-rule in Dicey's Conflict of Laws, 7th ed., p. 996.   **G**
But this rule, which, if surviving at all, is an illogical survival,
affords no sound basis for denying a defendant the benefit of a
decision on an issue; if it proves anything it proves too much, and

[119] (1845) 12 Cl. & F. 368 H.L.        [121] 3 Hare 100.
(E.).                                    [122] (1842) 4 Man. & G. 68.
[120] L.R. 6 Q.B. 139.

A  would deny both parties to a foreign proceeding the benefit of any
   estoppel at all.

        As a matter of principle (and we are really thrown back upon
   principle), whether the recognition of judgments is based upon a
   recognition of vested rights, or upon considerations of public
   interest in limiting relitigation, there seems to be no acceptable
B  reason why the recognition of foreign judgments should not
   extend to the recognition of issue decisions. From the nature of
   things (and here it is right to recall Lord Brougham's warning)
   this, in the case of foreign judgments, may involve difficulties and
   necessitate caution. The right to ascertain the precise issue
   decided, by examination of the court's judgment, of the pleadings
C  and possibly of the evidence, may well, in the case of courts
   whose procedure, decision-making technique, and substantive law
   is not the same as our own, make it difficult or even impossible to
   establish the identity of the issue there decided with that attempted
   here to be raised, or the necessity for the foreign decision. And
   I think that it would be right for a court in this country, when
D  faced with a claim of issue estoppel arising out of foreign proceed-
   ings, to receive the claim with caution in circumstances where the
   party against whom the estoppel is raised might not have had
   occasion to raise the particular issue. The fact that the court can
   (as I have stated) examine the pleadings, evidence and other
   material, seems fully consistent with its right to take a broad view
E  of the result of the foreign decision. But with these reservations,
   where after careful examination there appears to have been a
   full contestation and a clear decision on an issue, it would in my
   opinion be unfortunate to exclude estoppel by issue decision from
   the sphere of recognition. If that is so, in this case where an
   explicit statement is available of the decision of the Federal High
F  Court, of the reasons for it, and of the issue as defined between
   the parties to it, and where the English court has the assistance
   of expert witnesses to explain the foreign decision, the difficulty
   should not be too great in ascertaining whether the same issues as
   were there decided are involved in the present action.

        The appellants, indeed, say that the issue is not the same:
G  that in the German proceedings it was whether the Council of
   Gera representing the Carl-Zeiss-Stiftung could sue in respect of
   certain matters in Germany and that here the issue is whether
   this can be done in respect of matters arising here. But that is to
   argue for " cause of action " estoppel only: if issue estoppel
   exists, the issue is whether (briefly) the Carl-Zeiss-Stiftung has

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

968                    HOUSE OF LORDS                    **[1967]**

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A

become paralysed or its organs rendered ineffective so that it cannot act in the manner in which it is purporting to act. Identity of issue is, to my mind, clearly shown.

Next as to identity of parties. Normally to establish this should be the simplest part of the case. But there is a peculiar difficulty here because of the way in which the present issue arises. The proceedings profess to be brought by the Carl-Zeiss-Stiftung but since it is a legal person there must be some actual person, or persons, to bring it before the court, who has or have power to do so. The Council of Gera claims to be the relevant organ for this purpose; and it is clear that it is on their authority that the action was started. The question to be decided is whether the Carl-Zeiss-Stiftung is before the court or whether it is not: so according to the eventual decision the plaintiff may or may not be the Carl-Zeiss-Stiftung. Obviously in these circumstances the test of identity of parties cannot be the formal test of identity on the record, so what is it to be? Cross J. decided that there was not identity of parties and I understand that the majority of your Lordships agree with him. I regret that I cannot share this view. The point, no doubt, merits longer argument, but in view of the numerous points discussed in this appeal I shall abstain from giving at any length the reasons why I think identity of parties exists. Briefly, in my opinion, one must look to see who in reality is behind the action: and the reality is that a body of persons, namely, the Council of Gera, is seeking in these proceedings, precisely as in Germany they sought, to set the Carl-Zeiss-Stiftung as plaintiff in motion before the court. One may consider the simpler case of a limited company. If certain persons, claiming to be its directors, start an action in the company's name, the defendant may seek and may obtain a decision that the company is not properly before the court because the persons concerned had no right to commit the company to the action. As a result the action is struck out. Can it be that those same persons may start another action in the company's name against the same defendant making the same claim? According to the appellants' argument the relevant party as regards the application to strike out the action is the solicitors, so that if the directors started their second action through the same firm there would be an estoppel; but if they employed a second—or a third—firm there would not be. I can hardly think so bizarre an argument can be correct. There must surely be an estoppel in the second action for the reason that the effective party to the decided issue (not to the action) is the same

B

C

D

E

F

G

A    in each case—namely the directors. Admittedly, as I mentioned
at the start of this opinion, the involvement of the solicitors in
the proceedings, according to our practice, introduces a complica-
tion. But this does not, to my mind, prevent the party to the
proceedings (who is behind the solicitors as we know) being the
Council of Gera. To treat the solicitors as the parties to these
B    proceedings seems to me, with respect to the argument, both lack-
ing in reality and unduly technical. There is naturally no authority
which deals with such a situation as this but I find of assistance
a passage from the American Restatement (Judgments), s. 85 (2),
which reads:

C        " Where a person is bound by or entitled to the benefit of
the rules of res judicata . . . such rules apply in a subsequent
action brought or defended by another on his account."

We were also referred to passages from the Corpus Juris Secundum,
Tit. Judgments, ss. 756 et. seq., and to American authorities there
cited which show that U.S. courts take a flexible view of the
requirements of these estoppel rules. The present case seems to
D    me one which does not require much, if any, adjustment, to fit
into the rules as to parties. If the Council of Gera is not itself
the party, then the case seems to fall within the " Restatement "
rule. So I do not think that the estoppel fails on this ground.

To my mind, a more serious obstacle to the efficacy of the
estoppel is to be found in the requirement that the foreign judg-
E    ment should be final and conclusive or, as it is sometimes put,
conclusive on the merits. I have no difficulty as to the latter
element, for I cannot accept the argument that, for this purpose,
the merits means the merits of the action as stated in the plaintiff's
claim. The defendants' contention that the Stiftung's ability to
act has been fatally impaired is just as much an argument on the
F    merits: indeed, the issue which group of persons is entitled to
control the Stiftung is at the root of the present dispute. But the
remaining requirement is more difficult.

The textbooks are in agreement in stating that for a foreign
judgment to be set up as a bar in this country it must be res
judicata in the country in which it is given (see Dicey, Conflict of
G    Laws, 7th ed., p. 1036; Cheshire Private International Law, 7th
ed., p. 562). The chief authority cited for this is *Nouvion* v.
*Freeman*,[123] in which both Lindley L.J. in the Court of Appeal
and Lord Herschell in this House expressed themselves strongly
in this sense. No doubt that was rather a special case since the

[123] (1887) 37 Ch.D. 244; 3 T.L.R. 566, C.A.; 15 App.Cas. 1, H.L.

H. L. (E.)

1966

*Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)*

LORD
WILBERFORCE

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
———
LORD
WILBERFORCE
———

remate judgment was no more than provisional, but, generally, it    **A**
would seem unacceptable to give to a foreign judgment a more
conclusive force in this country than it has where it was given.
In relation to the present case I think that " conclusive " must be
taken in the sense that if the Stiftung represented by the Council
of Gera were to attempt to commence another action in West
Germany against the same defendants as were parties to the    **B**
previous action they would, by the force of the previous judgment,
be prevented from proceeding with it. Moreover, I think that it is
for the defendant, who sets up the bar, to establish the conclusive
character of the judgment. This must be so on principle and
there is support for it in *Behrens* v. *Sieveking*.[124] Unfortunately
there is no clear evidence whether the judgment of the Federal    **C**
High Court is res judicata (in the sense I have mentioned) in
Germany or not. The respondents rely on the accepted presump-
tion that the foreign law is the same as English law, but this
presumption, never more than a fragile support, is less than ever
reliable here when the question is what is the effect of a particular
judgment which has no exact parallel in English law. There are in    **D**
fact indications in the evidence to the contrary.

In 1957 an action, commenced in Dusseldorf in West Ger-
many, came on appeal before the Federal High Court. The parties
to that action were " the firm Carl Zeiss of Heidenheim, repre-
sented by Dr. Bauersfeld " as plaintiff and (inter alios) V.E.B.
Carl Zeiss Jena as defendants. The defendants took the point that    **E**
the plaintiff lacked capacity to sue and was not properly repre-
sented, alleging that Dr. Bauersfeld had resigned from the board
of management of the Stiftung. The Federal High Court in its
decision of July 24, 1957, rejected this objection, on the ground
that it was not satisfied that Dr. Bauersfeld had resigned.

In 1959 another action, also commenced in Dusseldorf in    **F**
West Germany, came on appeal before the Federal High Court
with the same plaintiff and (inter alios) the same defendants as in
the 1957 appeal. The defendants again took the point that the
plaintiff had not the capacity to sue and was not properly repre-
sented because Dr. Bauersfeld had resigned from the board of
management of the Stiftung. The Federal High Court again    **G**
rejected the objection and in doing so used these words:

> " It had already negatived the question by its judgment dated
> July 24, 1957, with detailed reasons.  This must stand even
> after repeated examination and assessment of the objections
> raised against it by the appeal ";

[124] (1837) 2 Myl. & Cr. 602.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A     and later: " The court maintains its view even after a re-
examination." The significance of these two judgments in rela-
tion to the conclusive effect, in a subsequent action, of a decision,
by way of objection, that a plaintiff was not properly represented
in an earlier proceeding between the same parties, was not
explored at the trial. But, if the fate of the estoppel turned on
B     this point (as it would on my view as to identity of parties) I
should be strongly inclined to hold that the defendants (the present
respondents) had not established to the satisfaction of the court
that the judgment of November 15, 1960, was conclusive in
West Germany as regards other proceedings, even between the
same parties, and that consequently it could not be conclusive as
C     regards other proceedings here. The estoppel fails in any event in
view of the conclusion reached by your Lordships as to identity
of parties. This being so, it is not necessary to consider whether
the appellants, for their part, could set up the judgments given in
East Germany as a counter-estoppel, or to decide on the effect of
an estoppel as regards the first and second defendants to the
D     present action.

      (2) I now consider, free from any estoppel, whether the Council
of Gera had authority to commence these proceedings on behalf
of the Stiftung. The evidence before the learned judge consisted
in the main, of decisions of courts in both East and West Ger-
many. There were also affidavits by experts on each side, on
E     which extensive cross-examination took place. On the appellants'
side most reliance was placed on two judgments of the Supreme
Court in East Germany, an advisory opinion given on April 6,
1954, and a judgment on appeal from the District Court of Leipzig
dated March 23, 1961. This judgment was given in proceedings
F     brought by the Stiftung (represented by the Council of Gera as
the special board and by its mandatory, Dr. Schrade) and V.E.B.
Carl Zeiss (the public body which had taken over the optical
works in 1940) against " the firm Carl Zeiss of Oberkochen " (a
·description intended to apply to the present third defendants) to
restrain them from using the name Carl-Zeiss in the German
G     Democratic Republic. Notice of these proceedings was apparently
given to the defendants but they did not appear or take any part
in the action. These two decisions, which enter in great detail
into both the facts and the law, state as the conclusions of the
Supreme Court, (i) that the Stiftung continued to exist as a legal
entity, (ii) that the Council of Gera was the special board of the

H. L. (E.)
1966
─────
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
─────
LORD
WILBERFORCE
─────

Stiftung, (iii) that article 116, which provided for liquidation of the Stiftung, had not come into play.                                                                    **A**

On the side of the respondents, reliance was in the main placed on the judgment of the Federal High Court of West Germany of November 15, 1960, coupled with that of the Provincial Court of Appeal of Stuttgart dated October 29, 1958, the reasoning of which was approved by the Federal High Court. The effect of these **B** judgments was that, under East German law, the articles of the Stiftung had been inoperable since and by reason of the con- fiscations of the undertakings of the Stiftung in 1948 and that in any event the Council of Gera was not capable of exercising the functions of the special board by reason (inter alia) of the political and economic conditions in the " German Democratic Republic."   **C**

There is thus a direct conflict between the views of the two highest courts. The expert evidence divides itself similarly into two sides supporting the one or the other set of judgments. The existence of the Stiftung as a legal entity, though at one time disputed, is now accepted by both sides and the essential questions which have to be decided may be summarised as being (1) whether **D** the Stiftung, from 1948 onwards, was incapable of acting and its articles were inoperative and (2) whether the Council of Gera was capable or incapable of fulfilling the functions conferred by the articles on the special board.

Each of these questions may be " classified " as questions relating to the constitution of a foreign corporation, and so, **E** according to English private international law, to be decided according to the law prevailing at the place where the Stiftung was incorporated (see Dicey, Conflict of Laws, 7th ed., r. 78 (2)). So far as German private international law is concerned, it appears that account is taken of the law prevailing at the place of the " domicile " of the corporation. There is no dispute that **F** the place of incorporation was Jena, and although an attempt has been made to transfer the domicile or seat of the Stiftung to West Germany, the courts of West Germany have been prepared to assume for the purpose of their decisions (rightly in my opinion) that this remains in Jena. The question, then, on either approach, is, what is the relevant applicable law prevailing at **G** Jena? The expert evidence establishes, in my opinion, that the law applicable to Stiftungen in Germany rests on the triple foun- dation of (i) the German Civil Code (BGB) of 1900 and in parti- cular articles 80–88; (ii) the Legal Code of the Land of Thuringia of 1923, and (iii) the articles. From this it would seem to follow

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A    that the relevant law should be that stated by the courts having jurisdiction in Thuringia, or whatever geographical area corresponds to Thuringia, namely, the Provincial Court at Leipzig and on appeal the Supreme Court in East Germany.

In general, it may be taken to be the case that the best evidence as to the law of a foreign country is the law as stated by its court

B    of last resort. All five speeches in this House in *Bankers and Shippers Insurance Co. of New York* v. *Liverpool Marine & General Insurance Co.*[125] accepted this. Lord Buckmaster, after pointing out that no foreign judgment is technically binding, said that [126] it would require "special and unusual circumstances" to lead the House away from a clear decision of a final

C    court. His opinion was expressed in relation to a matter of construction of a statute, but the principle must apply equally to other matters of foreign law. I need not quote from the other speeches which were, if anything, expressed in still stronger terms. Similarly, in *Lazard Brothers & Co.* v. *Midland Bank Ltd.*,[127] Lord Wright said that the question is what the foreign

D    law is shown to be by its exposition, interpretation and adjudication. So it would seem that there are strong reasons—if not quite conclusive—why courts in this country should accept the East German judgments as stating the relevant law.

The respondents contest this conclusion on several grounds. They submit that the questions of law, as to the constitution of

E    the Stiftung, should properly be considered to be questions not of East German law but of German law. The questions relate, they say, to the issue how the Stiftung may be represented in Germany as a whole and internationally and how, if at all, it may protect assets outside the Eastern Zone. Formally, the questions of law concern the interpretation, or application of the German Civil

F    Code, under which the Stiftung was formed, not of any zonal law. As to such a legal question the decisions of courts of the Federal Republic of Germany have a superior or (alternatively) an equal right to international recognition as compared with those of East German courts.

G    The claim for superior status was based principally upon the terms of the certificate of the Secretary of State given on November 6, 1964, already considered in another context and set out in the opinion of my noble and learned friend, Lord Reid. This certificate makes it clear, so it is said, that the rights of the

[125] 24 Ll.L.R. 85.                    [127] [1933] A.C. 289, 298.
[126] Ibid. 87.

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

U.S.S.R. as de jure " sovereign " in the Eastern Zone are confined    A
to that zone and explicitly recognises (following a communiqué
of the Western Allies on September 19, 1950) the Government of
the Federal Republic as " entitled to speak for Germany as the
representative of the German people in international affairs." So,
it is argued, in what is essentially an international matter, the
courts of the Federal Republic should be accepted as the proper    B
organ to declare what the law of Germany is.

I recognise the ingenuity of this argument but I am not con-
vinced by it. Read as a whole, the certificate gives recognition to
the U.S.S.R. as de jure entitled to exercise governing authority in
respect of the Eastern Zone; and (negatively) the certificate also
states, after the passage on which the respondents rely, that the    C
communiqué of 1950 does not constitute recognition of the
Government of the Federal Republic as the de jure Government
of all Germany. The right to exercise governing authority
includes, in my opinion, the right to set up or maintain courts and
the recognition of the one carries with it the recognition, as a
source of law, of the decisions of the courts. The right to " speak    D
for Germany as the representative of the German people in inter-
national affairs " is a right of diplomatic representation which is
not coincident with, and does not impinge upon, the right of the
governing authority in each part of Germany to make and state
the law in the part over which it has power. Furthermore, it by
no means follows from the fact that the present claim of the    E
Stiftung extends beyonds the frontiers of East Germany that the
legal question we are considering is one of international or inter-
zonal concern. The legal question relates to the constitution of
the Stiftung, which depends on the law of the place where it is
localised. Your Lordships were invited by the respondents to
consult the Secretary of State on the matters discussed above, and    F
to seek a further certificate as to the proper authority to determine
the status of and right to represent the Stiftung. This course, in
my opinion, should not be followed. The questions, which it was
suggested should be asked, were questions of law which it is the
function of the courts to determine and which they are in a
position to determine on the basis of the certificate previously    G
given, the terms of which are sufficiently clear.

The argument, therefore, that superior recognition should be
given to the West German judgments, in my opinion, should not
be accepted. But there remains the further submission that the
West German judgments should at least be considered side by

A  side with those of the East German courts—as rival pieces of
evidence entitled to equal weight—and a decision reached on their
respective merits. The arguments for this are that the circum-
stances prevailing in Germany are unusual, that the legal ques-
tions involved are common to both parts of divided Germany,
that the East German judgments consist of an advisory opinion
B  and a default judgment, whereas those of West Germany were
given in contested proceedings brought at the present appellants'
choice in the courts of West Germany, and (ultimately if the com-
parison is admissible) that the West German judgments are
superior in legal reasoning.

C      These are difficult questions indeed. I am prepared to go so
far with the respondents as to agree that it may be right in the
present circumstances to look beyond the decisions of the East
German courts and to consider, and at least to test them by, the
rival decisions in West Germany. But, in making this comparison,
there are two points to bear in mind. First: the question to be
resolved is not merely one of interpretation of a common code—
D  the Civil Code of 1900—(I pass over for this purpose the Thürin-
gian Law of 1923, whose provisions are of a general character
with no direct bearing on the issues). It is a question of the
application of the somewhat general provisions of the Civil Code
to a factual situation peculiar to the Eastern Zone, the answer to
E  which, by agreement of both sets of courts, depends upon a
consideration of the effect of the 1948 (Eastern Zone) decrees on
the actual business undertaking in Jena of the Stiftung. Both
sets of courts in fact give considerable attention to the factual
situation prevailing in Jena since 1948. On such matters, prima
facie, preference should be given to the East German courts, as
F  the appropriate tribunal to deal with the impact of East German
legislation on an organisation in their zone. Secondly: in so far
as the questions for decision are general questions of law, rather
than questions depending on local considerations, there is no
reason why, given a separation of de jure sovereignty between
the two parts of Germany, there should not be differences of
G  interpretation and application of rules of law formerly common
to the whole of Germany. The respondents' experts, indeed,
asserted that there were such differences: their contentions were
that decisions in East Germany were those appropriate to a
centralised socialist state whose courts were guided by considera-
tions of policy. If this argument could have been carried to the
point of showing that the courts of East Germany are not courts

H. L. (E.)
1966
___
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
___
LORD
WILBERFORCE
___

976                           HOUSE OF LORDS                    [1967]

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A

of law at all or that their decisions were corrupt or perverse, that might (I do not say would) be a ground for disregarding them in favour of decisions of other courts shown to act more judicially. But the evidence did not, in my opinion, approach this point, and a mere difference in philosophy, or even of method, so far from entitling us to prefer the West German approach, on the contrary gives support to those who argue that the East German variety of German law should be taken as being the law in East Germany. With these considerations in mind, I consider the two sets of judgments. They have been analysed in detail by Cross J. and (subject to the one point to which I return later) I am satisfied to accept his analysis. I only make some observations of my own in recognition of their careful re-examination by counsel in the present appeal and because these issues have not been considered by the Court of Appeal.

B

C

The East German Supreme Court bases its decisions on the following main points: (1) the confiscations which took place in 1948 were not of the whole business of the Stiftung but were separate acts of confiscation of the assets of the two individual businesses—the optical works and the glass works; (2) the Stiftung as such retains considerable assets: these produce an income of some £180,000 per annum. It is able with these assets to fulfil many of the charitable functions for which it was created. The Supreme Court refers to establishments for the development and training of optical personnel, for the promotion of studies, research and training in natural sciences and mathematics, as well as for social and health care of the employees of the plants of the foundation, for example, schools for opticians, libraries, clinics, recreation and rest homes, and their findings as to these matters were supported by evidence before Cross J. There was also evidence as to the ownership of trade marks and other industrial property and as to assets of the Stiftung outside East Germany, but this was perhaps controversial and it is safer to leave these matters out of account; (3) the Stiftung employs over 400 persons and there are about 4,000 pensioners who are paid according to the pensions statute of the Stiftung. There remain also other beneficiaries within the purposes of the Stiftung; (4) the Stiftung is in a position to take and does take legal action for the protection of its assets; (5) the resolution of the German Economic Commission of June 16, 1948, contemplated that the Stiftung should remain in existence and that its constitution should be amended to reflect its changed position. This was not done, but

D

E

F

G

A   it is consistent with the resolution to hold that the original articles continue in effect.

    The principal reasons for the judgment of the West German Supreme Court are (1) that the articles became unworkable after 1948 because they were dependent for their working on the continued ownership of some business by the Stiftung. After
B   1948 the Foundation ceased to have any interest in its former businesses which became nationalised undertakings. According to the " Soviet Zone view," as interpreted by the Federal High Court, this interfered with the organisation of the Stiftung to such a far-reaching effect that in the Eastern Zone the Stiftung no longer had capacity to act as a juristic person; (2) that the centre
C   of gravity of the Stiftung's organisation lay in the industrial enterprises and the removal of these destroyed the balance on which the organisation of the governing bodies of the Stiftung depended; (3) that the Council of Gera, because of its political complexion, cannot act as a special board or represent the interests of the Stiftung or carry on the affairs of the Stiftung
D   consistently with the intentions of the founder, Abbé.

    As between these opinions, and taking also into account the expert evidence on them, much of which was not challenged, and certain supplementary evidence (particularly of Dr. Schrade) regarding the factual position at Jena, I think that the learned judge was fully justified in coming to the conclusion that the
E   East German decisions should be preferred. The decisions of the West German courts carry less conviction: on points (1) and (2) because they were less fully informed than the East German courts as to the existing activity and assets of the Stiftung and because they based their decisions on a view as to the law in the Eastern Zone which is not in agreement with that law as declared
F   by the Supreme Court in that zone; on point (3) because it is really impossible to say that, and if so when, the authority designated as the special board diverged from the intentions of the founder so radically that it ceased to be capable of acting. In fact both Supreme Courts claimed that the intentions of the founder were reflected in the very different philosophies prevailing
G   in their respective zones so that, as Cross J. observed, the only safe course is to keep to the natural sense of the articles which base the constitution of the special board on considerations of administrative geography.

    I must add one point as to the respective merits of the judgments. The learned judge, in that part of his judgment dealing

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord
Wilberforce

978                         .⁻ HOUSE  OF  LORDS                    **[1967]**

<div style="float:left">

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———
LORD
WILBERFORCE
———

</div>

A.

with res judicata, after a careful analysis of the West German
judgments, expressed the view that these were perverse, and so in
any case ought to be disregarded. He, of course, had the advan-
tage of hearing the expert witnesses which we have not, but even
allowing for this, I do not think that a finding of perversity ought
to stand. In my opinion, the case amounts to this: (1) that the
law prevailing in East Germany should be taken to be that declared
by the East German courts; (2) that the West German decisions
proceeded on a view as to the law in East Germany which, for
reasons I have given, ought not to be accepted in preference to
the view of the East German courts themselves. Further than this
I do not think that the evidence requires or indeed entitles us to
go. For my part, I accept the West German decisions as judicial
in the fullest sense, which could readily be accepted if they stood
alone. This being so, I do not consider it necessary (as on some
future occasion it may be) to examine the limits in law of the
doctrine of perversity, some of the authorities on which (for
example, *Simpson* v. *Fogo* [128]) seem to me to present difficulties.

My Lords, in this long and involved case we have heard many
arguments from counsel on either side and many authorities have
been referred to. It involves I hope no disrespect to those argu-
ments not to examine them all. In the end, and on the whole of
the case, the conclusion emerges that the respondents' preliminary
attack on the validity of the action fails: I would allow the appeal
and restore the judgment of Cross J.

*Appeal allowed.*

Solicitors: *Courts & Co.; Herbert Smith & Co.*

F. C.

[128] 1 H. & M. 195.

---

END  OF  VOLUME  1

---

590

Sir David Cairns        Stonegate Securities v. Gregory (C.A.)               [1980]

However, for the reasons I have already given, and for those which      A
have been given more fully by Buckley and Goff L.JJ., I agree that the
right course for this court to take is to delete the condition and to make
the amendments necessary to make quite plain what the defendant is
restrained from doing.

> *Appeal allowed.*
> *Order of Blackett-Ord V.-C. discharged.*          B
> *Injunction in terms of notice of appeal*
>   *with amendments as indicated in judg-*
>   *ment of Buckley L.J. substituted.*
> *Plaintiff's costs of motion before Blackett-*
>   *Ord V.-C. and of appeal, to be taxed in*
>   *favour of defendant.*                           C

Solicitors: *Halliwell Landau & Co., Manchester; Willey, Hargrave
& Co., Leeds.*

L. G. S.

D

---

[COURT OF APPEAL]

MIDLAND BANK TRUST CO. LTD. AND ANOTHER *v.* GREEN      E
AND ANOTHER

[1970 G. No. 334]

1977  Oct. 17, 18, 19, 20, 21                               Oliver J.

1979  March 12, 13, 14;              Lord Denning M.R., Eveleigh L.J.      F
      April 11                             and Sir Stanley Rees

*Land Charge—Charges registrable—Estate contract—Unregistered
option to purchase farm—Farm conveyed to grantor's wife at
gross undervalue—Whether court can inquire into adequacy of
consideration—Whether wife " purchaser . . . for money or
money's worth "—Whether option void against wife—Whether*      G
*fraud—Land Charges Act 1925 (15 & 16 Geo. 5, c. 22), s. 13 (2)*

In 1961 a father granted to his son a 10-year option to
purchase the farm which the son farmed as a tenant. The
option was not registered under the Land Charges Act 1925,
and in 1967 the father, wishing to deprive the son of his option,
conveyed the farm, then worth about £40,000, to the mother      H
for £500. When the son found out about the conveyance
he sought to register the option and give notice exercising it.
In proceedings commenced, after the mother's death, by the
son (and carried on after his death by his executors, the present
plaintiffs), against, *inter alia,* the mother's estate for, *inter alia,*

A    a declaration that the option was binding on the estate, the judge held that the mother was " a purchaser of a legal estate for money or money's worth " against whom the unregistered option was void under section 13 (2) of the Land Charges Act 1925.[1]

On appeal by the plaintiffs:—

*Held,* allowing the appeal (Sir Stanley Rees dissenting), that, in determining whether a legal estate had been purchased " for money or money's worth " within the meaning of section 13

B    (2) of the Land Charges Act 1925, the court could inquire into the adequacy of the consideration and the genuineness of the transaction, at least where the land had not been dealt with further (post, pp, 624D–E, 627H—628A, 629D–E); and that the conveyance of the farm to the mother at a gross undervalue was not a purchase " for money or money's worth " and, accordingly, the option was not void for non-registration as against the mother's estate.

C    *Per* Lord Denning M.R. The provisions for protecting a purchaser are of no avail when the sale to him is done in fraud of the holder of the estate contract (post, p. 624F). Fraud in this context covers any dishonest dealing done so as to deprive unwary innocents of their rightful dues (post, p. 625B).

*Per* Sir Stanley Rees. Unless fraud is proved or the conveyance is a sham or the consideration nominal or illusory

D    then an unregistered estate contract is void against the purchaser (post, p. 635E–G).

Decision of Oliver J. post, p. 598A; [1978] 3 W.L.R. 149; [1978] 3 All E.R. 555 reversed.

The following cases are referred to in the judgments in the Court of Appeal:

E    *Crofter Hand Woven Harris Tweed Co. Ltd.* v. *Veitch* [1942] A.C. 435; [1942] 1 All E.R. 142, H.L.(Sc.).

*Hollington Brothers Ltd.* v. *Rhodes (Note)* [1951] 2 All E.R. 578.

*Hornal* v. *Neuberger Products Ltd.* [1957] 1 Q.B. 247; [1956] 3 W.L.R. 1034; [1956] 3 All E.R. 970, C.A.

*Lazarus Estates Ltd.* v. *Beasley* [1956] 1 Q.B. 702; [1956] 2 W.L.R. 502; [1956] 1 All E.R. 341, C.A.

*Madell* v. *Thomas & Co.* [1891] 1 Q.B. 230, C.A.

F    *Miles* v. *Bull* [1969] 1 Q.B. 258; [1968] 3 W.L.R. 1090; [1968] 3 All E.R. 632.

*Mogul Steamship Co. Ltd.* v. *McGregor, Gow & Co.* (1889) 23 Q.B.D. 598, C.A.

*Monolithic Building Co., In re* [1915] 1 Ch. 643, C.A.

*Polsky* v. *S. and A. Services* [1951] 1 All E.R. 185.

*Snook* v. *London and West Riding Investments Ltd.* [1967] 2 Q.B. 786;

G    [1967] 2 W.L.R. 1020; [1967] 1 All E.R. 518, C.A.

*Stock* v. *Frank Jones (Tipton) Ltd.* [1978] 1 W.L.R. 231; [1978] I.C.R. 347; [1978] 1 All E.R. 948, H.L.(E.).

*Twyne's Case* (1601) 3 Co.Rep. 80b.

*Watson, In re, Ex parte Official Receiver in Bankruptcy* (1890) 25 Q.B.D. 27, C.A.

H    The following additional cases were cited in argument in the Court of Appeal:

*Amos, In re* [1891] 3 Ch. 159.

_____

[1] Land Charges Act 1925, s. 13 (2): see post, p. 627D.

592

*Beesly* v. *Hallwood Estates Ltd.* [1960] 1 W.L.R. 549; [1960] 2 All E.R. 314.    A

*Bolton (H.L.) (Engineering) Co. Ltd.* v. *T. J. Graham & Sons Ltd.* [1957] 1 Q.B. 159; [1956] 3 W.L.R. 804; [1956] 3 All E.R. 624, C.A.

*Fry* v. *Lane* (1888) 40 Ch.D. 312.

*Greene* v. *Church Commissioners for England* [1974] Ch. 467; [1974] 3 W.L.R. 349; [1974] 3 All E.R. 609, C.A.

*Vane* v. *Vane* (1873) L.R. 8 Ch.App. 383.

*Vartoukian* v. *Daejan Properties Ltd.* (1969) 20 P. & C.R. 983.    B

The following cases are referred to in the judgment of Oliver J.:

*Beddoe, In re* [1893] 1 Ch. 547, C.A.

*Bolton (H. L.) (Engineering) Co. Ltd.* v. *T. J. Graham & Sons Ltd.* [1957] 1 Q.B. 159; [1956] 3 W.L.R. 804; [1956] 3 All E.R. 624, C.A.

*Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd. (No. 2)* [1967] 1 A.C. 853; [1966] 3 W.L.R. 125; [1966] 2 All E.R. 536, H.L.(E.).    C

*Eton College* v. *Minister of Agriculture, Fisheries and Food* [1964] Ch. 274; [1962] 3 W.L.R. 726; [1962] 3 All E.R. 290.

*Green* v. *Green* (unreported), February 19, 1976, Templeman J.

*Hollington Brothers Ltd.* v. *Rhodes (Note)* [1951] 2 All E.R. 578.

*Inland Revenue Commissioners* v. *Gribble* [1913] 3 K.B. 212, C.A.

*Jones* v. *Trinder, Capron & Co.* [1918] 2 Ch. 7, C.A.

*Monolithic Building Co., In re* [1915] 1 Ch. 643, C.A.    D

*Moritz, decd., In re* [1960] Ch. 251; [1959] 3 W.L.R. 939; [1959] 3 All E.R. 767.

*Vane* v. *Vane* (1873) L.R. 8 Ch.App. 383.

The following additional cases were cited in argument before Oliver J.:

*Addiscombe Garden Estates Ltd.* v. *Crabbe* [1958] 1 Q.B. 513; [1957] 3 W.L.R. 980; [1957] 3 All E.R. 563, C.A.    E

*Fidelitas Shipping Co. Ltd.* v. *V/O Exportchleb* [1966] 1 Q.B. 630; [1965] 2 W.L.R. 1059; [1965] 2 All E.R. 4, C.A.

*Fry* v. *Lane* (1888) 40 Ch.D. 312.

*Holder* v. *Holder* [1968] Ch. 353; [1968] 2 W.L.R. 237; [1968] 1 All E.R. 665, C.A.

*Hollingsworth* v. *Lee* [1949] V.L.R. 140.    F

*Lindsay Petroleum Co.* v. *Hurd* (1874) L.R. 5 P.C. 221, P.C.

*Mountford* v. *Scott* [1975] Ch. 258; [1975] 2 W.L.R. 114; [1975] 1 All E.R. 198, C.A.

*Smith* v. *Morrison* [1974] 1 W.L.R. 659; [1974] 1 All E.R. 957.

ACTION

By writ dated January 27, 1970, as amended, the original plaintiff,    G
Thomas Geoffrey Green, commenced proceedings against the defendants,
Walter Stanley Green and Robert Derek Green, as personal representatives
of Evelyne Green, for, inter alia, (1) a declaration that an option granted to
the plaintiff for the purchase at £75 per acre of Gravel Hill Farm, Thornton-
le-Moor, Lincolnshire, was binding on the estate of Evelyne Green; (2)
specific performance of the contract arising by reason of the option and    H
the exercise thereof by the plaintiff; (3) all necessary accounts and
inquiries; (4) damages in lieu of or in addition to specific performance;
(5) damages for conspiracy; and against Walter Stanley Green personally

A  for damages for conspiracy. By order dated January 19, 1973, Beryl Rosalie Kemp became a defendant as the executrix of Walter Stanley Green, and, by order dated November 16, 1973, the proceedings were ordered to be carried on by the Midland Bank Trust Co. Ltd. and Margaret Ann Green, as executors of the plaintiff, as plaintiffs.

B  The facts are stated in the judgments of Oliver J. and Lord Denning M.R.

*Jeremiah Harman Q.C.* and *Jonathan Parker* for the plaintiffs. Where a transaction which can be described as a sham or a conspiracy, where the expressed consideration is grossly inadequate, the undervalue may be so great that it can be said to be the badge of fraud. Walter's conveyance to his wife, Evelyne, may have been effective to convey the land to her, but it was a sham, being in truth a voluntary conveyance, dressed up as a sale. A " purchaser " is defined in section 205 (1) (xxi) of the Law of Property Act 1925, as meaning a " purchaser in good faith for valuable consideration " and as including " a lessee, mortgagee or other person who for valuable consideration acquires an interest in property . . ." But while " valuable consideration " includes marriage, it does not include a " nominal consideration in money; . . ."

D  By section 13 (2) of the Land Charges Act 1925, a land charge class D, which includes an option or estate contract, is void against a purchaser of the land charged therewith unless the charge is registered before completion of the purchase, but there is an important proviso to the effect that the subsection only applies in favour of a purchaser of a legal estate " for money or money's worth." By section 20 (8) of the Act, a " purchaser " means any person who " for valuable consideration, takes any interest in land or in a charge on land; . . ."

E  The word " purchaser " has diverse meanings, but it has come to mean, not just one who acquires otherwise than by escheat or descent, but one who acquires under a contract of sale on payment of the purchase price. The words of James L.J. in *Vane* v. *Vane* (1873) L.R. 8 Ch.App. 383, 398, show that a person may be described as a purchaser when in truth he should not properly be so described. The word is used by Buckley L.J. in *Inland Revenue Commissioners* v. *Gribble* [1913] 3 K.B. 212, 217 et seq., in its ordinary commercial sense. As Buckley L.J. states, the word may mean one of four things, viz., (1) its ordinary commercial meaning, i.e., a buyer for money; (2) a person who becomes a purchaser for money or money's worth; (3) a purchaser for valuable consideration which need not be money or money's worth, but may be the consideration of marriage; and (4) its technical meaning, a person who does not take by descent.

G  The plaintiffs contend that in the Land Charges Act 1925, " purchaser " is used to refer to any person who comes into a transaction as a commercial matter, which carries with it overtones of the normal way in which a sale is carried through, namely with solicitors on both sides, a contract in writing, requisitions on title and, above all, negotiation of the price. Section 13 of the Land Charges Act 1925 was designed to protect one who comes into a transaction as a commercial contract. The transaction here bears none of the badges of a purchase. The gross undervalue is a

594

relevant factor to be considered. Whilst the court will not normally
consider the adequacy of the price, there must come a point at which
the disparity between price and value renders the transaction no true sale.
An analogy can be drawn with the former jurisdiction to set aside sales
of reversions. The position as to this was altered by statute, 31 Vict. c. 4,
so that thereafter the sale of a reversion could not be set aside merely
on the grounds of inadequacy of price. But in *Fry* v. *Lane* (1888) 40 Ch. D.
312, Kay J., having considered that Act, said at p. 321, that it was obvious
that the undervalue must not be " . . . so gross as to amount of itself to
evidence of fraud . . ."

Here the parties to the conveyance were husband and wife; there was
no conceivable commercial purpose for a sale, and the price paid was but
a minute fraction of the true value of the farm conveyed. The price, in
other words, was the badge of a sham or fraud. The value of the farm
in 1967 was £81,000, yet the price paid by Evelyne was only £500.

Others factors which go to prove that the sale was a sham, apart from
the relationship between the parties, were the hurriedness with which the
transaction was carried through, the purpose of the parties to defeat
the rights of a third party which was known to both parties to the contract,
and the total lack of the normal stages of a conveyance on sale. The
transaction was in reality a gift, and not a sale. If any person who takes
a legal estate for money is to be treated as a " purchaser ", then the
court must face the difficult problem which arises when the " money "
is only £1 or a penny. To use such a test would be to make the statute
an instrument of fraud. Here there was undoubtedly a conspiracy between
Walter and Evelyne to injure their son Geoffrey in his legal rights.
[Reference was made to *H. L. Bolton (Engineering) Co. Ltd.* v. *T. J.
Graham & Sons Ltd.* [1957] 1 Q.B. 159 and *Hollingsworth* v. *Lee* [1949]
V.L.R. 140.]

*Harman Q.C.* sought to introduce into the evidence, under the Civil
Evidence Act 1968, an affidavit sworn in the *Beddoe* application by Walter.

*Leonard Hoffmann Q.C.* with *Gavin Lightman* and *F. P. Hinks* for the
defendants. It would be a breach of confidentiality for the affidavit to be
used as evidence at the trial or anywhere else. The point has been the
subject matter of a ruling by Templeman J. in interlocutory proceedings
[*Green* v. *Green* (unreported), February 19, 1976]. A paragraph of the
plaintiffs' reply, which pleaded an estoppel based on the attitude adopted
by the defendants on the *Beddoe* application, was struck out by Temple-
man J. as being scandalous. It is inadmissible to reopen a matter which
has already been decided interlocutorily between the parties: see *Fidelitas
Shipping Co. Ltd.* v. *V/O Exportchleb* [1966] 1 Q.B. 630. This therefore
raises an issue estoppel per rem judicatam. In the case of a " without
prejudice " statement, no one is entitled to use it, because a person
must as a matter of policy be free to make admissions.

*Harman Q.C.* No question of res judicata arises. The issue which
Templeman J. decided was whether or not the paragraph in the plaintiffs'
reply should be struck out. The averment was that there had been an
election by the defendants in the *Beddoe* application which gave rise to
an estoppel. The paragraph was struck out and the decision to that extent
is binding as res judicata. But Templeman J. did not decide anything

1 Ch.          **Midland Bank Trust Co. v. Green (C.A.)**

A  about the use of Walter's affidavit as evidence of fact at the trial. *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd. (No. 2)* [1967] 1 A.C. 853 shows that in order to create an issue estoppel the issue must be one which it was *necessary* for the judge to decide. It could not be a res judicata if it was not an issue of fact. In his judgment, Templeman J. did not refer to *In re Moritz, decd.* [1960] Ch. 251.

B  The normal practice of a *Beddoe* application, where there is an opposing party, is for him to be excluded at certain points while certain evidence is being given, and that procedure was adopted in this case. The affidavit was voluntarily supplied by the defendant Walter to the plaintiffs, and it was referred to in the defendants' list of documents. Templeman J. treated the matter as if the affidavit had been delivered in the course of the *Beddoe* application, but in fact it was done privately by Walter. There

C  is no "without prejudice" aspect which applies to a statement of fact by a witness. The essence of Geoffrey's affidavit was that Walter would have been a prime witness were he alive, and that he could not have been stopped from giving evidence in the witness box. *In re Moritz, decd.* demonstrates that a *Beddoe* application is not to be treated as if it were a "without prejudice" proceeding. Any claim to privilege as to the contents of the affidavit must have been waived by its having been included

D  in the defendants' list of documents in the action.

Proceedings in chambers are protected by the rule that publication of anything done or said there is a contempt of court. But section 12 of the Administration of Justice Act 1960 provided that the publication of information relating to proceedings before any court sitting in private was not of itself to be a contempt of court, except in certain specified

E  instances, and those instances do not cover the present case. Affidavits are always filed. In the old days it was the right of any person to inspect the file, but the rules have now been changed so that one cannot now do so until they reach the Public Record Office. There can be no question of confidentiality as to documents which are going to become public in this way. Where the interests of justice require that one party should be able to open his heart to the judge, preservation from publication

F  of the confidential document is achieved by the procedure adopted in *In re Moritz, decd.* [1960] Ch. 251. If it was part of the ratio decidendi of Templeman J.'s judgment, then such decision was inconsistent with *In re Moritz,* to which no reference was made. Furthermore such a decision could not be res judicata since it formed no part of the formal proceedings, which consist of the pleadings and the order. To give rise to an issue estoppel, it must be an issue necessarily arising.

G  *Hoffmann Q.C.* There is a general rule of policy which prevents the use of material contained in affidavits sworn on a *Beddoe* application on behalf of a party without that party's consent. It cannot be contended that the unilateral act by Walter in disclosing the contents of his affidavit to Geoffrey amounted to a waiver of confidentiality. The paragraph in the plaintiffs' reply was struck out by Templeman J. because the material could

H  not be used. There is thus an estoppel per rem judicatam.

[OLIVER J. ruled that Walter's affidavit, sworn in the *Beddoe* application, was admissible in evidence.]

596

**Midland Bank Trust Co. v. Green (C.A.)**                          **[1980]**

Evelyne was not a party to any contract with her son Geoffrey. Conse- A
quently an alternative action in damages pleaded against her estate is an
action in tort based on the tort of conspiracy. The old rule of actio
personalis moritur cum persona was altered by section 1 of the Law
Reform (Miscellaneous Provisions) Act 1934. That Act was repealed
by the Proceedings Against Estates Act 1970, but section 3 (3) of
that Act does not enable proceedings to be revived where they would
have become statute barred under the earlier Act. Therefore no claim B
based on conspiracy is maintainable as against Evelyne's estate, since any
action for damages should have been commenced within six months
of the crucial date, the grant of probate of Evelyne's will on November 29,
1968.

As to the effect of the Land Charges Act 1925, three facts are
established: (1) that the option was not registered; (2) that Walter executed
a conveyance of the legal estate to Evelyne; and (3) that the consideration C
which she paid was the sum of £500. Was she a purchaser as defined
in the Act? If the answer is yes, then was the consideration " money or
money's worth " and was she a purchaser of the legal estate?.

Various meanings can no doubt be given to the word " purchaser ",
but precision is important in dealing with a conveyancing statute. The
draftsman provided a precise definition in section 20 (8) of the Land D
Charges Act viz., " ' Purchaser ' means any person (including a mortgagee
or lessee) who, for valuable consideration, takes any interest in land or in
a charge on land; and ' purchase ' has a corresponding meaning; . . ."
Here Evelyne plainly took an interest in the land and the transaction was
plainly treated as effective. Equally she plainly paid money as a considera-
tion for the conveyance. The amount of course is very little compared
with the value of the property, but under the Land Charges Act 1925 E
it seems that even a nominal consideration would suffice: *Mountford* v.
*Scott* [1975] Ch. 258. There is thus a marked divergence between the
meaning of purchaser in the Land Charges Act 1925 and the Land
Registration Act 1925, section 3 (xxi), as compared with that in section 205
(i) (xxi) of the Law of Property Act 1925. [Reference was made to *Smith*
v. *Morrison* [1974] 1 W.L.R. 659, 676; *Hollington Brothers Ltd.* v. *Rhodes* F
*(Note)* [1951] 2 All E.R. 578; *In re Monolithic Building Co.* [1915] 1 Ch.
643, 662 and to *Megarry & Wade, The Law of Real Property,* 4th ed.
(1975), pp. 1048 et seq.] All that needs to be done here is to apply
the plain words of the Land Charges Act 1925.                      .

The general principle as to the operation of the doctrine of election
is that if a party to a contract declares that he is not going to fulfil his
obligations, then, while that situation continues, the other party may treat G
the contract as repudiated and may claim damages. If repudiation
is accepted, the obligation of the party in default becomes one to pay
damages: see *Fry on Specific Performance,* 6th ed. (1921), p. 477.

Geoffrey concurred with the other executors of Evelyne in swearing
an estate duty affidavit which described the land as her unincumbered
property, valuing it at £40,000, without making any adverse claim. Also H
he signed a cheque for payment of stamp duty at £400. He continued
to pay rent to his mother, and he entered into a new agreement with his
other co-executors. All these acts constituted an election to treat the

A   contract as discharged. This was done with full knowledge of all the facts and with advice. If the advice was wrong, that is unfortunate for him.

Even if these facts do not operate as a discharge of contractual obligations, they do operate as an acquiescence in the position, which disentitles the plaintiffs to specific performance.

On the evidence the court can take the view that there is a high probability that Walter thought that there was a binding option, and,
B   since the option was discussed in their presence on several occasions, may conclude that both Walter and his wife, Evelyne, knew of the existence of the option.

Walter's motive, after a quarrel with Geoffrey, seems to have been to put it out of his power to comply with the option. There is no evidence as to Evelyne's motive, but there is evidence that Geoffrey and his mother
C   were not on good terms. Provided that the property was conveyed for valuable consideration, the option would not bind Evelyne. Her motive would be immaterial. No question of fraud or deceit arises. Evelyne was merely taking advantage of the legal rights conferred on her by the statute.

As to acquiescence, see *Snell's Principles of Equity,* 27th ed. (1973),
D   p. 632; *Lindsay Petroleum Co.* v. *Hurd* (1874) L.R. 5 P.C. 221 and *Holder* v. *Holder* [1968] Ch. 353.

*Harman Q.C. in reply.* Section 20 of the Land Charges Act 1925 provides that the definition of " purchaser " is only to apply " unless the context otherwise requires," and here the context does " otherwise require," because if one attempts to read the words of the definition in section 13 (2) of the Act, in place of the word " purchaser," the result
E   is nonsense and is contradictory, viz., " Provided that . . . this subsection only applies in favour of *any person . . . who, for valuable consideration, takes any interest in* [*that*] *land of a legal estate for money or money's worth.*" That is just gibberish. The right conclusion is that "purchaser" in the proviso bears some other meaning than the technical one in section 20 (8). The word plainly bears the meaning ascribed to it in ordinary parlance, namely a " purchaser " in the commercial sense. [Reference was
F   made to sections 199 and 205 (1) (xxi) of the Law of Property Act 1925.] " Purchaser " here means one who is in good faith. Section 199 means that a purchaser in bad faith *is* affected. The proviso to section 13 (2) of the Land Charges Act 1925 is limited to purchasers whose purchase is a genuine transaction of bargain and sale, and if they are not of that nature they are not protected by the proviso. The language of the
G   conveyance, which described Evelyne as " the purchaser," is not con- clusive; nowhere does the conveyance describe the transaction as a " conveyance on sale " : *Addiscombe Garden Estates Ltd.* v. *Crabbe* [1958] 1 Q.B. 513.

The consideration was totally inadequate; it appears to have been paid as a cloak to conceal the true value. The statute should not be allowed to be used as an instrument of fraud.
H   There is no authority on election which suggests that where a man has a remedy against A, which is partial and inadequate, he is electing to abandon his more complete and better remedy against B. It is a choice

598

between two inconsistent lines of conduct as regards the same party. Acquiescence in the present case does not afford a defence.

    A

OLIVER J.  This is in many ways a tragic and very unhappy family dispute.  Walter Stanley Green was a Lincolnshire farmer.  He was married and his wife was Evelyne Green.  They had two sons, Geoffrey and Derek, and three daughters.  I hope it will not be considered disrespectful if, for convenience, I refer to all the members of the family by their Christian names.

    B

Now Walter appears to have been a man of some substance.  He was the freehold owner of more than one farm, and one farm which he owned was known as "Thoresway," which was a farm of 600–700 acres and which appears to have been farmed originally by him and his younger son, Derek, together, either in partnership or under some other arrangement.  Another farm was Gravel Hill Farm at Thornton-le-Moor in Lincolnshire.  That was a smaller farm amounting to some 300 acres, and it was farmed by Walter's elder son, Geoffrey.  Geoffrey had a tenancy of the land at £3 an acre, or thereabouts, which was granted to him in 1954.

    C

Walter retired from active farming in 1960, and at that time, or thereabouts, he sold Thoresway—or his interest in Thoresway—to Derek at a price of £75 an acre, which was well below the market value at the time.  Geoffrey wanted to buy Gravel Hill Farm at a similar price, but it seems that Walter had some knowledge, or that he had been advised, of the death duty advantages attendant upon the possession of agricultural property, and he was desirous, at that time at any rate, of retaining agricultural investment.  So he and Geoffrey went to a firm of solicitors in Brigg, Messrs. Hett, Davy & Stubbs—now Messrs. Hett, Stubbs & Kemp —and those solicitors drew up, and Walter signed, an option agreement which was dated March 24, 1961.  That agreement was in these terms. It was addressed to

    D

    E

"Thomas Geoffrey Green Gravel Hill Farm Thornton-le-Moor.  In consideration of the sum of £1 paid by you to me I hereby give you the option of purchasing the Gravel Hill Farm now in your occupation at the sum of £75 . . . per acre.  This option to remain effective for ten years.  Dated this March 24, 1961."

    F

It bore a sixpenny stamp and was signed by Walter.

The evidence of Geoffrey's widow—she was not cross-examined on this and I accept her evidence—is that thereafter the existence of the option and the possibility of Geoffrey's exercising it were discussed on frequent occasions between Walter and Geoffrey in the presence of Walter's wife, Evelyne.  It appears that Geoffrey and his wife were in the habit of visiting Walter and Evelyne at weekends; and Mrs. Geoffrey Green's evidence was, and again I accept it, that Evelyne must have known all about the option, or about its existence at any rate.  Whenever it was discussed, Mrs. Green told me, Walter said that he still wanted to retain an agricultural investment and, in the result, up to August 1967 the option had not been exercised.  It had not only not been exercised but it had not been registered under the Land Charges Act 1925; so that

    G

    H

A as a matter of law Walter could still sell the land elsewhere free from the option although, of course, that would be a clear breach of his contract with Geoffrey.

On August 14, 1967, a Mr. Harrod, a partner in a well-known firm of solicitors in Spalding, Messrs. Roythorne & Co., received a telephone call from Walter's younger son, Derek. It appears that Mr. Harrod had previously acted for Derek in various matters. He was the litigation
B partner in Roythorne. Derek asked him to come over to his—that is Derek's—farm and Mr. Harrod did so and he was introduced to Walter, whom, he told me, he had not previously met. Walter then gave Mr. Harrod certain instructions. Now, although these are in fact privileged they were introduced in evidence, and Mr. Hoffmann took no objection to Mr. Harrod telling me about them. Walter told Mr. Harrod that he had signed what he " thought " was an option in favour of his son. That,
C on Mrs. Green's evidence, which as I have said I accept, was, I think, somewhat disingenuous because Walter knew perfectly well that he had signed a document which was an option. There is no question of his " thinking " that it was an option; he knew quite well that it was an option. He instructed Mr. Harrod there and then to prepare a conveyance of Gravel Hill Farm in favour of his, Walter's, wife Evelyne, who was
D not present on this occasion and whom Mr. Harrod had not at this stage ever met, for a consideration of £500, and there is no dispute between the parties in this action—and indeed it is a matter of plain common sense—that £500 was a totally inadequate consideration for a farm of 300 acres whether tenanted or not. Walter, at the same time, gave an authority to Mr. Harrod addressed to the National Provincial Bank Ltd.
E at Brigg, where, apparently, he had his account, to collect the title deeds: and he also gave him an authority addressed to Hett, Stubbs & Kemp, who had been, up to that time, his solicitors, to hand over all the documents which they had relating to his affairs. The latter authority certainly, and probably the former, were prepared by Mr. Harrod and signed by Walter. In fact the documents with Hett, Stubbs & Kemp turned out, in the end, to consist of very little. They were, I think,
F Walter's will and the title deeds to his and Evelyne's house, The Old Rectory, Croxby.

On that same evening, Mr. Harrod sent off a search requisition to the land registry with a request to notify the result by telephone. He was notified by telephone, or his firm was notified by telephone, that the search was negative and that was confirmed on August 15. Mr. Harrod
G told me that he was unable to deal with the matter personally on August 16 because he was then involved in some planning inquiry at Brigg, which kept him rather late, but on the morning of August 17 he gave instructions to his conveyancing partner, Mr. Jenkinson, to go to Brigg, to go to the bank, pick up the title deeds, to arrange for the use with a friendly firm of solicitors in Brigg of a secretary and a typewriter and office space and,
H there and then, to prepare a conveyance for £500 and to take it to a nursing home at Cleethorpes for execution by Walter and his wife. Walter had apparently, at that time, been going to Cambridgeshire to stay with a daughter, but Mr. Harrod had learned that Walter had been taken

600

Oliver J.          **Midland Bank Trust Co. v. Green (C.A.)**          **[1980]**

ill and was going to a nursing home in Cleethorpes. Mr. Jenkinson, as       A
one would expect, did as he was instructed. He collected the deeds, he
prepared a conveyance, and he took it to Cleethorpes for execution by
Walter and his wife. That conveyance is a conveyance in the ordinary
form of a conveyance on sale. It is made on August 17, expressed to be
between Walter Stanley Green who is described as " the vendor " and
Evelyne Green his wife, who is described as " the purchaser." It recites
Walter's seisin in fee simple and an agreement to sell to the purchaser       B
for a like estate at the price of £500. Then there is the operative part.
The document is in some respects curious because Mr. Jenkinson had
inserted in it a certificate of value which certified that the transaction was
one in respect of which the amount or value, or the aggregate amount or
value, of the consideration did not exceed £5,500. This was palpably
wrong in a conveyance of a valuable estate of this sort at what was,
quite obviously, a grotesque under-value, and I do not think that Mr.       C
Jenkinson could really have thought about it very seriously. No doubt
he was in a hurry at the time. I think in the witness box he was disposed
to admit himself that if he had been served with a document of this
sort in the course of investigating title he would, on the face of the docu-
ment, have felt that it was a matter about which he would at least be
justified in raising a requisition. But I accept from him that there was       D
nothing sinister in this. I think he made an error of judgment.

As I say, he took the conveyance, when prepared, to Cleethorpes. He
told me that he read it and explained it to Walter and his wife and they
executed it and Evelyne gave Mr. Jenkinson a cheque for £500, drawn on
her bank account, and he took it, together with the conveyance and the
title deeds, back to his office. The very next day, August 18, that
cheque was negotiated and paid into Roythorne & Co.'s client account       E
to the credit entry of " W. S. Green re your affairs " and the conveyance
was dated August 17.

In September 1967, Geoffrey, having made up his mind to exercise
the option, visited his parents and it appears from his widow, Mrs. Green's,
evidence that he learned that the land had been conveyed to his mother
at a sum of £500. Mrs. Green told me that his understanding was that       F
they were not prepared to discuss with him the exercise of the option and,
indeed, he was very upset and immediately went and took legal and other
advice. No doubt it was as a result of that that on September 5, 1967,
an estate contract was registered, but that was a case of bolting the stable
door after the horse had gone.

On October 6 Geoffrey, through his solicitors, gave a formal notice of
exercise of the option. Nothing turns on that and I do not think that it       G
is in dispute that, if and so far as the option was still capable of being
exercised, that notice was an effective exercise which brought into being
—subject to one point which has not been very strenuously argued by
Mr. Hoffmann—a contract between Walter and Geoffrey for the sale of the
farm—a contract which, of course, Walter at this stage had disabled him-
self from performing.
H

There followed correspondence between the respective solicitors in
which Messrs. Roythorne pointed out that the option was, at the material
time—*that is the date of the conveyance to Evelyne*—unregistered.

**1 Ch.**        **Midland Bank Trust Co. v. Green (C.A.)**

A   Perhaps, not surprisingly, neither Walter nor his wife Evelyne complied with the option notice and Geoffrey continued as tenant of the farm; the rent due in March was tendered on a "without prejudice" basis and then on March 28, 1968, the picture changed suddenly because Evelyne died quite unexpectedly. By her will, which was dated December 20, 1967, she had appointed Walter, Geoffrey and Derek to be her executors and she gave a life interest to her husband Walter and the residue on trust for
B   sale, and for equal division of the proceeds of sale between her five children.

After her death, not altogether surprisingly, the Inland Revenue declined to accept a 10 shilling deed stamp and assessed stamp duty on a value of £40,000, which was the value which had been agreed between Roythorne and the district valuer.

C   Between March and November correspondence between the solicitors concerning the question of whether Geoffrey would join in proving the will took place. He ultimately determined to prove and he signed an Inland Revenue affidavit on October 14, 1968, which showed the farm as an asset of the estate valued at £40,000 but without any notation of any adverse claim against the estate either by him or anybody else. At the same time, however, Geoffrey's solicitors were threatening proceedings
D   against Walter for damages. On September 30, 1968, Walter executed a deed of gift of his property at Croxby to Derek and his sisters and I have been told, although I do not think there is any specific evidence of this, that at the same time he gave away substantially the whole of such other property as he had. I do not think that this is in issue and the inference seems to me, so far as it is material in these proceedings, to be irresistible that he was taking steps to put assets out of his control—
E   to put them out of his control and also out of the reach of Geoffrey against whose claim for breach of contract there really could be no defence. Such proceedings as had been threatened were, in fact, commenced on November 25, 1968, and a statement of claim was endorsed on the writ pleading the grant of the option, its exercise, Walter's failure to comply and that the property was, as indeed is clearly the
F   case, very much more valuable than the price contained in the option; and then there was a claim for damages. That was a claim based entirely, at that stage of course, on breach of contract. These are events which have assumed some importance in the case because they have been relied on by the defendants as establishing that Geoffrey had elected in some way to affirm the purchase by his mother, and to proceed for damages. It should, however, be mentioned that all this was being done against the
G   background of negotiations which were then in train between Geoffrey, through his solicitors, and the other executors and the family generally, to try to settle the dispute on the basis of Geoffrey's purchasing the farm. The price proposed was, no doubt, in excess of the option price but nevertheless the basis was that he should become the purchaser of the farm. That applies equally to another act relied on by the defendants, which
H   is the concurrence by Geoffrey, as executor, in paying the stamp duty assessed on the conveyance, an act which he did in response to an express request to the then executors' solicitors, Messrs. Roythorne, in March 1969. On November 29, 1968, probate was granted, and on April 14,

602
Oliver J.                Midland Bank Trust Co. v. Green (C.A.)              [1980]

1969, Walter and Derek, on the one hand, as executors of Evelyne, and     A
Geoffrey for himself, agreed a new rent of £2,250 for Gravel Hill Farm
with his co-executors.   That is yet another act relied on as an election to
affirm the transaction with his mother Evelyne.

A defence was served in Geoffrey's action for damages against his
father and a list of documents was served, but otherwise that action seems
to have remained more or less inactive for the next nine months and part
of the explanation for that may well have been due to the fact that, as     B
appears from the correspondence, Walter, at some stage in 1969, decided
to consult some other solicitors, he apparently having—temporarily at any
rate—repented of what he had done.   Geoffrey also changed his solicitors
and on January 27, 1970, he started this action against his father Walter
and Derek, as executors of his mother, seeking a declaration that the
option was binding on her estate and specific performance.   That was
amended in October 1970 to include a claim for damages for conspiracy     C
against her estate and against Walter personally.   There was also a claim
that the land was held by the estate as trustee for Walter, but that has
not, I think, been seriously pursued before me.

On February 8, 1972, Walter died and on January 19, 1973, his sole
personal representative, Mrs. Kemp, was added as a defendant.   She served
a defence formally adopting the defence already served by the other     D
defendants.   On October 7, 1975, that defence was struck out for failure
to comply with an order for discovery.   So far, therefore, as Walter's
estate is concerned, the action is undefended.   On May 11, 1973, Geoffrey,
the plaintiff in the action, died and his will was subsequently proved by
the present plaintiffs, Midland Bank Trustee Co. Ltd. and his widow,
Margaret Ann Green, on October 2, 1973.   On November 16, 1973, it
was ordered that the action be carried on by them as plaintiffs.     E

So as the matter now comes before the court, it is a claim by Geoffrey's
executors against Derek as the sole surviving personal representative of
Evelyne, for specific performance of the option and for damages for con-
spiracy, and against Walter's executrix for damages, the latter claim being
undefended.

I have stated facts which are not substantially in dispute.   What is     F
in issue on the pleadings is the question of whether the conveyance con-
stituted a bona fide sale by a vendor to a purchaser or whether it was, in
truth, a fraudulent and colourable transaction or a sham.   There are
certain facts, here, which it has been necessary to investigate and I must,
I think, state my conclusions.   In the first place, no evidence has been
adduced to suggest that the conveyance did not do, and was not intended     G
to do, what, on the face of it, it did, namely to vest the legal estate in the
land in Evelyne and to vest it in her beneficially.   Secondly, there was
nothing illusory, I am quite satisfied, about the £500.   It was paid to
Walter and there is no reason to suggest or believe that it was not retained
by him for his own use and benefit.   Thirdly, there is no reason to suppose
that it did not genuinely come from Evelyne's own pocket.   This is a case     H
where I am bound to say—and I made some remarks during the course
of the hearing about it—discovery has left something to be desired.   That
may be something of an understatement.   But very late in the day there

A   was produced a copy of Evelyne's bank account which shows that this sum of £500 was raised on overdraft from the bank on her current account. Mr. Harrod, the partner in Roythorne who was responsible for the litigation, very frankly admitted before me that the failure to produce this before was entirely his responsibility and was due to an oversight on his part, and I entirely accept that. In the event I do not think that any harm has been done by the late production.

B   There remains the question of the state of mind of the parties at the date of the execution of the conveyance. The instructions given to Mr. Harrod must, I think, lead to the conclusion that Walter had obtained from somewhere advice that an option could be defeated by a sale to a third party. Mr. Harrod recollects giving no such advice but I find on the evidence before me that the conclusion is really irresistible that, prior to

C   the conveyance, Walter and Evelyne thought, and intended, that the effect of it would be to defeat the option. In support of this I have, first of all, Mrs. Green's unchallenged evidence that the option and her husband's desire to exercise it were subjects of discussion in the presence of Walter and Evelyne. Secondly, I have the admission which is contained in a letter written by Mr. Harrod in December 1969. Mr. Harrod thinks he must have written it with hindsight but even if that is so, he can, I think,

D   only have got the information in it from Walter who, after all, knew his own state of mind better than anybody else. I need not read the letter in full. It was a letter written by Messrs. Roythorne to Walter's then solicitors. As I have said, he changed solicitors, temporarily at any rate, in 1969 and consulted a firm called Beckett and Co. They communicated with Messrs. Roythorne and Messrs. Roythorne sent a reply on December 15, 1969, in which they said:

E
> ". . . At the time when we were first consulted by Mr. W. S. Green he was very anxious to find some way of avoiding the option in favour of his son Mr. Geoffrey Green. Whether he should have done so or not was a matter upon which we were not asked to advise."

F   Thirdly, there is the conduct of both Walter and Evelyne after the conveyance, when it would have been so easy to put things right if it had not been intended to defeat Geoffrey's option. Fourthly, there is the almost unseemly haste with which the transaction was effected. And finally, and perhaps conclusively, there is an affidavit by Walter himself. This has given rise to a curious and unusual point on which I was required to rule, although it may, perhaps, be said that there were already strong enough

G   circumstances in the undisputed facts in the correspondence to enable the court to draw any necessary inferences. Paragraphs 7 and 9 of the statement of claim contain pleas of conspiracy and that the conveyance was a fraudulent and colourable transaction. Paragraph 7 states:

H
> ". . . if, contrary to the plaintiff's contention, the purchase price of £500 was paid . . ."—that was then in issue—" . . . then (i) the said expressed purchase price . . . was a very small fraction of the real value of Gravel Hill Farm at the date of the . . . conveyance "—and that, I think, is indubitable—" and (ii) the said conveyance did not

604
Oliver J.            Midland Bank Trust Co. v. Green (C.A.)            [1980]

constitute a bona fide sale by a vendor to a purchaser but was on the    A
contrary a fraudulent or colourable transaction or sham."

And in paragraph 9 it is pleaded alternatively:

". . . the conveyance was executed pursuant to an agreement or
arrangement made between . . ." Walter and Evelyne ". . . whereby
they conspired together to defraud and injure the plaintiff by com-
pleting a sale or what purported to be a sale of Gravel Hill Farm    B
by . . ." Walter to Evelyne ". . . and to deprive the plaintiff of the
benefit of the said option."

I need hardly mention the difficulty of direct proof of allegations of
this sort in view of the deaths of Walter, Evelyne and Geoffrey. Apart
from Derek, who was not called to give evidence before me, these were
the only people who could have had any personal knowledge of the trans-    C
action, apart perhaps from Mr. Harrod who, of course, was in a position
where any advice that he gave or anything that he was told for the purpose
of giving advice, was privileged. This has brought to light the question
of evidence upon which I had to rule.

After the commencement of the action, Evelyne's executors made a
*Beddoe* application [see [1893] 1 Ch. 547] for directions which came before
Brightman J. It was an application in the usual way by originating    D
summons, and in that application both Walter and Geoffrey swore affidavits.
Geoffrey of course as an executor and also a beneficiary, was a party, and
a necessary party, to that application.

Shortly before the trial but in good time—although not the time
required by the rules—the plaintiffs' solicitors gave notice under the Civil
Evidence Act 1968 to put in those affidavits as evidence of the facts    E
therein stated. That of Walter in particular contains an important admis-
sion. Walter's affidavit had already been relied on, without objection
being taken, in some particulars which were served in 1971. The intro-
duction of the affidavit as evidence at the trial under the Civil Evidence
Act 1968 was, however, objected to by Mr. Hoffmann on the ground that
the use of the affidavit in evidence at the trial—initially I think he was
prepared to go further and say " or anywhere else " although he sub-    F
sequently modified that—would be a breach of confidentiality and I have
been referred to an interlocutory judgment of Templeman J. in this action
on February 19, 1976, which, it is submitted by Mr. Hoffmann, concludes
the matter against the plaintiffs. I have heard a considerable argument
about this and I must therefore state the facts about the application
because although I do not think that in the result the introduction of this    G
evidence seriously affects the legal result of the case, on the view of the
law which I take, I ought, I apprehend, to make and state my findings of
fact and findings of law on this, in case the matter goes further or the
question arises again in other proceedings.

On December 18, 1972, the plaintiff delivered a reply which contained
this paragraph:
H
"Further or alternatively:—in proceedings the short title and
reference to the record whereof are . . ." and there then follows the
reference to the record of the *Beddoe* application—" the second

A    defendant "—that is Derek—" (jointly with the above named Walter Stanley Green) sought for and obtained relief on the basis of an election to treat the transaction effected by the said conveyance as a sham, and not or alternatively not a bona fide transaction. Such election was made by reason of the evidence adduced by the second defendant and the said Walter Stanley Green in the said proceedings. The plaintiff was a party to the said proceedings and appeared therein, and further was represented and made submissions by coun-

B    sel in the said proceedings on the footing that the second defendant and the said Walter Stanley Green accepted that the said transaction was a sham and not a bona fide transaction. In the premises the second defendant is now estopped from contending that the said transaction was a bona fide sale."

C    So the plea there was one of estoppel based upon the attitude which had been taken up by Walter and Derek in the *Beddoe* application.

On November 5, 1975, application was made to strike this out as scandalous and that came before Templeman J. as a procedure summons. Before referring to the transcript of his judgment which is before me on this matter, I must state some of the background facts. The *Beddoe* application was made by Walter and Derek, and Geoffrey was made a

D    party. I have been told by Mr. Harman, on instructions, that the plaintiffs on the summons, i.e. the defendants in this action, availed themselves of what they conceived to be the privilege which was conferred on them by the practice, sanctioned by *In re Moritz, decd.* [1960] Ch. 251, of withholding the evidence from Geoffrey and excluding Geoffrey and his counsel from part of the hearing of the summons. As I shall subsequently

E    point out, I am not sure that the privilege conferred on them by the decision in *In re Moritz, decd.* in fact enables them to withhold an affidavit. However, they did not, apparently, serve the affidavit upon Geoffrey. It appears from Geoffrey's affidavit that Walter, who, I think it is obvious from correspondence before me now, was then acutely unhappy about what had happened, had personally shown him the draft of

F    the affidavit and he was thus able to comment on it in an affidavit which he filed in those proceedings. On those affidavits and after hearing arguments, Brightman J. gave directions to Walter and Derek, Geoffrey and his counsel being excluded from part of that hearing while the argument was in process. Thereafter, Derek, in his list of documents on behalf of the defendants on the present proceedings, disclosed the *Beddoe*

G    summons and the affidavits in schedule 1, part 1, of the list of documents. They claimed no privilege and raised no objection to production. I mention this because on the assumption that that is correct, it seems that Templeman J. may possibly have given his judgment under some misapprehension about how Walter's affidavit had in fact come into the hands of Geoffrey and his advisers.

H    I do not propose to read the whole of the judgment which Templeman J. then gave. What he said for material purposes was this. He referred to the *Beddoe* application and the nature of such an application, and he said:

606

"... of course, it is necessary for defendants to open their hearts to
the judge and tell him exactly what the action looks like.  The judge
is acting in some respects as though he were the adviser and trustee
giving guidance.  The application is invariably heard in chambers,
and nothing is published because of the jurisdiction of the judge to
look after the estate, and because any information made public
would be available to the plaintiff in the action, and might well be
prejudicial to the defence and the estate which the judge is there to
protect.  Over the whole of such an application there is an aura of
confidentiality, which is preserved by hearing everything in chambers.
It so happened that the plaintiff [Geoffrey], apart from being the
plaintiff in these proceedings, was the son of the deceased, and inter-
ested in her estate, and, therefore, he was interested in the application
and therefore, rightly or wrongly, the affidavit evidence sworn in
support of that application was served upon him, and he turned up
in chambers."

Then he mentions that Brightman J. gave certain directions and continued:

"The plaintiff, having, as I have said (because he was interested in
the estate) received a copy of the affidavit sworn in this highly con-
fidential application, thought himself justified in making use of the
affidavit for the purposes of this action."

Templeman J. refers to the paragraph in the reply which I have read and
he says that it was

"... a bold claim that somehow in that application some kind of
election was made by the defendants, and that election estops them
from putting forward part of the defence they have put forward and
wish to persist in.  Well, that struck me at first blush as a scandalous
assertion in the reply, and if it is scandalous I must strike it out.  If
the plaintiff thinks that the order made in chambers by Brightman J.
was wrong, or anything ought to be disclosed, he can always go back
to the judge.  It is a matter entirely for him.  But that does not justify
the plaintiff pleading at the moment confidential matters without the
slightest attempt to refer back to Brightman J., who decided these
confidential matters.  It is said: 'Oh, well, we have the affidavit, and
the affidavit is not now in chambers, so we can go along and tell
everybody about it.  We won't tell anyone what was said before the
judge in chambers but we will produce this affidavit.'  In my judg-
ment, the same aura of confidentiality hangs over that affidavit as
hangs over the whole of the proceedings in chambers and I am
surprised that any attempt should be made to exploit it."

It is this last sentence that Mr. Hoffmann relies upon as creating an
estoppel per rem judicatam, but I think it is important to place it in its
proper context.  The question before the court on that occasion was
whether, when a party to a *Beddoe* application has taken up a particular
attitude either through his counsel or in his affidavit, that can be seized
on by the other party in his pleading as the foundation for a plea of
estoppel or election.  Templeman J. was clearly of the view that, as a
matter of practice and policy, that was wrong because it is important that

A  parties in a fiduciary position should be able to take the directions of the
court without feeling that they are going thereby to be restricted in some
way in the prosecution of their case.  And, if I may say so with respect,
I would in no way dissent from that.  But he was not in any way con-
cerned, nor, so far as I know, was it argued before him at all, with the
very much broader question of whether, when a party has put on affidavit
evidence of facts and that affidavit has been filed by or on behalf of the
B  party to a *Beddoe* application, after the deponent's death that affidavit
can be tendered as evidence of the same facts either by or against the
party or his representatives and whether in the same or some other pro-
ceedings.  That point, which is the point that I am concerned with, was
not so far as I am aware argued before him, and I do not for one moment
think that he intended to decide it or even considered it.

C  Assuming therefore that the broad statement that " the same aura of
confidentiality hangs over the affidavit as hangs over the whole of the
proceedings in chambers," were wide enough to cover the point now in
issue—of which, taken in its context, I am by no means convinced—I find
myself unable to accept Mr. Hoffmann's primary submission on this matter
which is that the point is, so far as this trial is concerned, res judicata.
If there is any estoppel per rem judicatam it is what is called an issue
D  estoppel and without referring in detail to the speeches in the House of
Lords in *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd.* (*No. 2*) [1967] 1
A.C. 853, I can, I think, take the principles from *Spencer Bower and Tur-
ner, Res Judicata*, 2nd ed. (1969), p. 18 where he sets out what is involved
in the burden of showing res judicata.  He lists there six matters: (i) that
the alleged judicial decision was what in law is deemed such; there is no
E  doubt about that in this case; (ii) that the particular judicial decision relied
upon was in fact pronounced, as alleged; which of course is the case;
(iii) that the judicial tribunal pronouncing the decision had competent juris-
d'ction in that behalf; there is no dispute about that; (iv) that the judicial
decision was final; and in the sense in which that word is used here I
think that this decision was a final decision, though made on an inter-
locutory application; (v) that the judicial decision was, or involved, a
F  determination of the same question as that sought to be controverted in
the litigation in which the estoppel is raised; and (vi) that the parties to
the judicial decision, or their privies, were the same persons as the parties
to the proceedings in which the estoppel is raised, or their privies, or that
the decision was conclusive in rem.

In elaboration of that, at p. 179, he points out that the determination
G  must be fundamental and not collateral and he states that what one has
to look at is the record—the formal judgment or order.  Where an express
declaration as to any particular question or issue appears on the face of
the record of a formal judgment or where from the judgment itself the
actual grounds of the decision can be clearly ascertained, there is no
necessity for further search.  But it is not in general permissible where
H  there is no such express declaration in the formal record to examine what
was said by judges in delivering their judgment for the purpose of dis-
covering what were the real grounds of their decision.  He adds that that
was considered inconvenient and points out that it is legitimate to look

608

Oliver J.                    **Midland Bank Trust Co. v. Green (C.A.)**                    **[1980]**

at the report of the judgment as delivered to ascertain, not what the
fundamental grounds of the decision actually *were*, but for what they
*were not*, for the purpose of negativing any contention that some one
particular ground was the only possible and necessary basis of the decision.

The wide statement, on the assumption still that it bears the meaning
which Mr. Hoffmann *seeks to attribute to it, was not one which, in my
judgment, necessarily* arose for decision.  The only issue on the procedure
summons was whether, where proceedings have taken place in chambers
in this way, it can be subsequently relied upon as an estoppel in some
way prejudicial *to him that a party took up a particular attitude or made*
a particular submission.  It is true, of course, that, in arriving at his
conclusion, Templeman J. based himself upon what was said in the
affidavits; but he was not concerned there at all with the question of
*whether the affidavit could be used as proof of the facts which were set
out in it.  That is the only purpose for which the documents are sought
to be used on this occasion.

On the point which it falls to me to decide, therefore, I can see no
issue estoppel here.  Indeed, I think it would be most surprising if there
were, for the order which was made on the record is one which was made
" upon reading the pleadings " which included at that date particulars
referring in terms to the facts contained in Walter's affidavit but as facts
to be relied on under paragraph 7 of the statement of claim and not in
support of some pleaded estoppel or election.  Those particulars were not
struck out or sought to be struck out.

Mr. Hoffmann, however, has submitted that even if there is no issue
estoppel here, nevertheless there is some general principle that protects
evidence of facts given on a *Beddoe* application from being used or
referred to.  He was, I think, inclined at first to put it as generally as that
—that no affidavit filed on a *Beddoe* summons could be used or referred
to in any other proceedings than that summons.  Such a proposition
clearly does not in my judgment bear examination.  In the absence of a
direction by the judge that there should be no publication—and there was
no such direction here—the publication of matters in chambers is not
per se a contempt of court any longer.  The affidavits are filed and
formerly could be inspected by anybody on payment of the appropriate
fee, which was why, as I understand it, the practice grew up of giving
confidential evidence by way of an exhibited statement which was not
filed.  Although the affidavits are not now open to immediate public
inspection, they are open to inspection once they get into the Public
Record Office.  That, no doubt, is a fairly lengthy process, but at the
time when the *practice in relation to Beddoe* applications grew up, they
could be inspected by anybody on payment of the appropriate fee and it
is difficult to see how any general confidentiality could be claimed for
documents which then were—and still are, ultimately—open to public
inspection.

Quite apart from this, suppose that affidavits are filed containing false
statements which lead the court to give directions for an action to be
prosecuted or defended by trustees.  Beneficiaries subsequently challenge
the payment by the trustees of the costs of the unsuccessful proceedings

**1 Ch.**                 **Midland Bank Trust Co. v. Green (C.A.)**                 **Oliver J.**

A  on the ground that the court's directions were procured by fraud. Is it to be said that they cannot refer to the affidavits by which the fraud was perpetrated? That cannot, in my judgment, be right and I think that Mr. Hoffmann was disposed to concede it.

Mr. Hoffmann confined himself to the much more modest proposition that an affidavit sworn in a *Beddoe* summons cannot be referred to in the proceedings which are the subject matter of the summons without

B  the consent of the party on whose behalf the affidavit was sworn. I am bound to say that I know of no authority for such a proposition. Indeed it seems to me to contradict what is implicit in *In re Moritz, decd.* [1960] Ch. 251 namely that if the exhibits to the affidavit *are* furnished to or get into the hands of the opposite party to the litigation, they can be used by him to the detriment of his opponent. *In re Moritz, decd.*

C  enshrines the practice of the Chancery Division which entitles an applicant for directions as to litigation to withhold from the other party the exhibits to his affidavits and the argument conducted before the judge. The reasoning behind that is, of course, that the party would otherwise be entitled to use it as a weapon to the prejudice of the applicant. At the time of *In re Moritz, decd.* the former R.S.C., Ord. 61, rr. 17 and 18 were in force which enabled inspections to take place of all filed documents

D  on payment of the prescribed fee and although the right has since been restricted, that restriction cannot, I think, have altered the basis of the Chancery practice. If, as Mr. Hoffmann suggests, there is some general principle of confidentiality which protects the use of all material delivered to anyone in the course of a *Beddoe* application, it would, it seems to me, be unnecessary to withhold it, at any rate so far as its use in evidence

E  is concerned, although it might well be, I suppose, that there were other reasons for withholding exhibited material, such as counsel's opinions. In exercising its jurisdiction to give directions, the court, as Wilberforce J. pointed out in *Eton College* v. *Minister of Agriculture, Fisheries and Food* [1964] Ch. 274, is exercising an essentially administrative function, and will adapt its practice so far as is practicable in order to do justice in the particular circumstances of the case.

F  I am bound to say that I know of no general principle which would prevent any party to the litigation from inspecting and making use of a filed document. Indeed, the rules of court make express provision for him to be given notice of filing and R.S.C., Ord. 63, r. 4, whilst now restricting the right of public examination, makes an express exception so far as the parties are concerned. Rule 4 (3) provides:

G  " Nothing in the foregoing provisions shall be taken as preventing any party to a cause or matter searching for, inspecting and taking or bespeaking a copy of any affidavit or other document filed in the central office in that cause or matter or filed therein before the commencement of that cause or matter but made with a view to its commencement."

H  Indeed, it is clear from *Jones* v. *Trinder, Capron & Co.* [1918] 2 Ch. 7 that a filed document may be used even after an order removing it from the file has been made.

Ch. 1980—26 (1)

610
Oliver J.                    Midland Bank Trust Co. v. Green (C.A.)                    [1980]

That, as it seems to me, is the whole point of the practice generally
adopted of dealing with confidential matter by exhibited statements or    A
documents which are not filed.  I doubt, in fact, whether the direction
given in *In re Moritz, decd.* [1960] Ch. 251 could have been given in
the case of the affidavit itself although the point did not arise there
because the only question with which the court was concerned was
inspection of the exhibits.  It seems to me, however, that the Rules of the
Supreme Court give an express right to a party to see and take copies of    B
filed material.

In any event, I do not think I have to decide any such general question
in this case and I must be cautious of expressing wide general propositions
which go beyond the immediate case before me.  I am concerned with a
particular limited question here and on these facts it seems to me that
even if there was any such confidentiality as to the admissions or state-
ments which are contained in Walter's affidavit as Mr. Hoffmann claims,    C
that was waived by their publication, first by Walter himself to Geoffrey
and secondly by their inclusion without any claim of privilege in the list
of documents served by Derek.

Mr. Hoffmann argues that such affidavits are akin to "without
prejudice" correspondence and therefore cannot be used even in cross-
examination and even if the deponent is called at the trial and gives    D
evidence which flatly contradicts what he has said in his affidavit.  I do
not think that this analogy really runs; the privilege conferred by "without
prejudice" negotiations is based, as I understand it, upon some express or
implied agreement that it should not be referred to in evidence except in
the event of a final and concluded agreement of compromise.  I can see
no such implication where a party, who may be under the Chancery
practice entitled *to withhold any exhibited controversial evidence from his*    E
opponent on a *Beddoe* application, deliberately discloses it to him.  What
Mr. Hoffmann seeks to suggest, in effect, is that the fact that an affidavit
is sworn on a *Beddoe* application confers some sort of proprietary interest
not, I think, in the deponent but in the party on whose behalf the affidavit
is sworn.  I do not think that there can be any proprietary interest in
evidence and it would seem to me lamentable if, when a deponent is dead    F
and his affidavit on a *Beddoe* application prior to the proceedings may
be the only available direct evidence of relevant or even critical facts, it
cannot be referred to except by permission of one or other party to the
litigation who may have a direct interest in suppressing it.  If there is
any such principle of confidentiality in respect of filed evidence it must,
I think, be one which it is open to the trial judge to over-ride in an appro-
priate case.  But in any event, as I say, I am clearly of the view that in    G
this case the privilege of confidentiality, if there be such, was waived and
I have admitted the affidavits in evidence.

Having said that, they contain, I think, very little that adds to what
was already pretty clear from the correspondence and the surrounding
circumstances.  Walter gives some evidence about the value of the farm
which he puts at £150 an acre at the time of the grant of the option and    H
about £185 an acre at the time when he swore his affidavit in 1970.  The
material passage upon which Mr. Harman relies is in paragraph 4.  Speak-
ing of the date of the conveyance to Evelyne, Walter said:

A
"At this date and for a few months prior thereto, there was and had been a serious quarrel between Geoffrey and the testatrix and myself. Neither the option nor any estate contract constituted by the option and the notice of intention to exercise it had been registered at the land charges registry, and the testatrix and I were advised by our solicitors that in these circumstances if I transferred the farm to a purchaser, the purchaser would take free of Geoffrey's rights there-

B
under. Thereupon in order to defeat Geoffrey's option over the farm, on August 17, 1967, I sold and conveyed the farm (subject to the tenancy) to the testatrix in consideration of the payment by her to me of £500."

C
That is, of course, a clear admission of his motives as against Walter himself and against his estate. The only material passage which I find in the other affidavit which was filed on behalf of Geoffrey is the statement, which I see no reason to doubt, that in March 1970 Geoffrey saw his father Walter who showed him a copy of the draft of his affidavit.

On that evidence and in the light of the other matters I have referred to, I am unable to resist the conclusion that both Walter and Evelyne knew of the option, that they conceived and became parties to the con-
D
veyance in the belief that it would frustrate the effective exercise of the option and that the defeat of the option was their primary purpose and intent in entering into and completing the transaction. What then are the consequences? First, there cannot, I think, be any answer so far as Walter's estate is concerned to a claim for damages. There will therefore be judgment against the defendant, Beryl Rosalie Kemp, in her capacity as executrix of Walter, for an inquiry as to damages, with liberty to apply.

E
So far as Evelyne's estate is concerned, there is however what appears to me to be a complete answer to any such claim. The claim, being one in tort, is one which under the old law would not have survived the death of Evelyne; under the Law Reform (Miscellaneous Provisions) Act 1934, it would have survived but only if the action was commenced within six months of the grant of representation to her estate, i.e. November 29,
F
1968. Since this action was not commenced until January 1970, it is, as I say, clearly out of time. Although the relevant provisions of the Act of 1934 relating to the time limitation were repealed by the Proceedings Against Estates Act 1970, section 3 (3) of that Act prevents the revival of any cause of action which was already barred, as this one was, when the Act came into force. Mr. Harman, although not making any concession, felt unable to argue against those propositions.

G
The only live question, therefore, so far as Evelyne's estate is concerned, is specific performance and, as one would expect, Mr. Hoffmann relies upon section 13 of the Land Charges Act 1925, which was the relevant legislation in force at the material time. That section provides in subsection (2) that "A land charge of class B, class C or class D,"—and of course an option or estate contract is a class C (iv):

H
"created or arising after the commencement of this Act, shall (except as hereinafter provided) be void as against a purchaser of the land charged therewith, or of any interest in such land, unless the land charge is registered in the appropriate register before the completion

Ch. 1980—26 (2)

of the purchase:"—and then there is this important proviso—
"Provided that, as regards a land charge of class D and an estate    A
contract created or entered into after the commencement of this Act,
this subsection only applies in favour of a purchaser of a legal estate
for money or money's worth."

If Evelyne was a purchaser of the legal estate for money or money's worth
within that proviso that must be the end of the case.  Mr. Harman argues    B
thus.  First of all, he says, in the proviso which I have just read, the word
"purchaser" *is used to refer and to refer only to* a person who comes
into a matter as a commercial matter—one who acquires the legal estate
under a contract of sale.  He has referred me to a number of cases, for
instance, *Vane* v. *Vane* (1873) L.R. 8 Ch.App. 383; *Inland Revenue Com-
missioners* v. *Gribble* [1913] 3 K.B. 212 and *H. L. Bolton (Engineering)
Co. Ltd.* v. *T. J. Graham & Sons Ltd.* [1957] 1 Q.B. 159 for the various    C
meanings of the term and for the ordinary meaning of the term.  The
present transaction, he says, bears none of the badges of a purchase.
There was no negotiation of the price.  There were no normal con-
veyancing stages and there was no conceivable commercial purpose in
the transaction; it was merely a gift dressed up to look like a sale.  The
difficulty, I feel, about that submission is that the statute with which    D
I am concerned contains its own artificial definition of a purchaser and
the question is not, as it seems to me, whether Evelyne was a purchaser
in the ordinary sense of the term as outlined in, for instance, *H. L. Bolton
(Engineering) Co. Ltd.* v. *T. J. Graham & Sons Ltd.*, but whether she was
a purchaser within the statutory definition which is contained in the Act.
That statutory definition is in section 20 (8) which is in these terms:

> "'Purchaser' means any person (including a mortgagee or lessee)    E
> who, for valuable consideration, takes any interest in land or in a
> charge of land; and 'purchase' has a corresponding meaning; . . ."

Mr. Harman seeks to escape from this by pointing out that section 20
expressly provides that the definitions only apply "unless the context
otherwise requires."  The context does here, he says, "otherwise require"    F
because if you write out the statutory definition in full in the proviso to
section 13 (2) in place of the word "purchaser" it makes no sense at
all; in fact it makes nonsense and is contradictory.  Therefore, he says,
"purchaser" in the proviso has some other meaning.  The meaning he
ascribes to it is the ordinary meaning which in common parlance one
would have, i.e. a purchaser under a contract.

I am bound to say, with respect and with regret, that I find that too    G
facile a test.  The main subsection applies only to a purchaser as defined.
It is then provided that that which, ex hypothesi, applies only to a
statutory purchaser shall apply only in particular circumstances, that is
to say, in the case of the "purchaser of a legal estate for money or
money's worth" in the case of particular land charges.  I can see no
reason for giving a restricted meaning to the word "purchaser" beyond    H
that which the section requires, the only requirements being, as I see it,
*the substitution of the legal estate for* "any interest in the land" and of
"money or money's worth" for "valuable consideration."  Mr. Harman

A

also relies on the definition of purchaser which is contained in section 205 (1) (xxi) of the Law of Property Act 1925 which is in these terms:

> "'Purchaser' means a purchaser in good faith for valuable consideration and includes a lessee, mortgagee or other person who for valuable consideration acquires an interest in property . . ."

B

Then there is an exception for Part I of the Act which I do not think I need trouble with—and it continues:

> "'purchase' has a meaning corresponding with that of 'purchaser'; and 'valuable consideration' includes marriage but does not include a nominal consideration in money; . . ."

He also refers to section 199 of the Act which provides:

C

> "A purchaser shall not be prejudicially affected by notice of—(i) any instrument or matter capable of registration under the provisions of the Land Charges Act 1925, or any enactment which it replaces, which is void or not enforceable as against him under that Act or enactment, by reason of the non-registration thereof; . . ."

D

He translates section 199 into a positive provision by implication that a purchaser in bad faith *is* affected, using "bad faith" in the sense of a deliberate design to take advantage of the statutory provisions of the Land Charges Act 1925 or of a fraudulent intention. This, he says, was not a real purchase at all; it was a sham; it was a disguised gift with a consideration put in merely to enable the statutory provisions of the Land Charges Act 1925 to be invoked.

E

Again, regretfully, I do not feel that I can accept that submission. The transaction was not in my judgment a sham in the accepted sense of the word at all. There was a genuine passing of the legal estate by Walter to his wife without any reservation of any interest to Walter. It was, and was intended to be, a beneficial transfer of the legal estate. There was a genuine payment of the expressed consideration of £500 and there was an acceptance of that payment. That there may have been some ulterior motive for the transaction does not as it seems to me make the transaction other than what it was. Obviously a substantial and indeed an almost overwhelming element of gift existed here but in my judgment that cannot matter.

F

G

Mr. Hoffmann argues that really I have only to look at two main questions. I think in fact, in his argument, he sub-divided them into sub-questions but basically they come to this—(1) was Evelyne a purchaser as defined? and (2) was the consideration for the purchase "money or money's worth" and did she acquire a legal estate?

H

First of all, did she take any interest in the land? She plainly did; the legal estate was conveyed to her. Secondly, did she take it for valuable consideration? The conveyance recites that the money was paid as consideration for the conveyance, the evidence establishes that she did pay the money and one can see no reason why she should have paid that money except for the conveyance of that land to her. I do not think that it can matter what her motive was in entering into this transaction. She was acquiring a legal estate and paying no doubt a wholly inadequate sum for it; but that she was paying money for it seems to

614
Oliver J.                Midland Bank Trust Co. v. Green (C.A.)                [1980]

me to be beyond doubt. The fact that she knew and indeed intended     A
that the transaction should have a particular effect as regards Geoffrey's
option does not seem to me to make her any less a purchaser within the
statutory definition or a purchaser for money or money's worth.

Mr. Hoffmann has referred me to some well known cases on this
branch of the law, *Hollington Brothers Ltd.* v. *Rhodes (Note)* [1951] 2
All E.R. 578 and *In re Monolithic Building Co.* [1915] 1 Ch. 643 which
established that actual knowledge in this context is really immaterial.  I     B
therefore find myself compelled to accept Mr. Hoffmann's argument and to
hold that Evelyne was a purchaser for money or money's worth of the legal
estate against whom Geoffrey's option was, under the statutory provisions,
void.

I said in the course of the hearing that the merits appeared to me to
be all one way. Mr. Hoffmann cautioned me against jumping to any
such conclusion without any full knowledge of the family quarrels which     C
have gone on or of the circumstances.  I accept that and will qualify it
to this extent, that, so far as the evidence before me goes, it seems to
me that the merits are all one way.  The conclusion I have reached there-
fore is one which I reach with regret, because as it seems to me Geoffrey
had a clear legal right which was deliberately frustrated by his parents
in breach of the contract created by the option.  Nevertheless I cannot,     D
with the best will in the world, allow my subjective moral judgment to
stand in the way of what I apprehend to be the clear meaning of the
statutory provisions.  That, therefore, it seems to me, concludes the case.
It is unnecessary for me to deal with the other defences which have been
raised by the defendants, defences of laches, acquiescence, election and
estoppel.  I need only say this, that having considered the circumstances
I am not satisfied that, if I were in Mr. Harman's favour on the main     E
point, any of those defences could avail the defendants.  But they do
not in the circumstances arise and regretfully I feel therefore that as
against the estate of Evelyne, i.e., against the defendant, Derek Green, in
his capacity as surviving executor, I must dismiss the claim.

> *Judgment against first defendant for damages*     F
> *and costs, up to date that her defence was*
> *struck out, together with costs of first two*
> *days of the hearing.*
> *Claims against remaining defendants dismissed*
> *with costs, save that plaintiff have costs of*
> *half a day's hearing to be set off against*
> *such costs.*     G

Solicitors: *Sidney Torrance & Co. for J. Levi & Co., Leeds; Simmons*
*& Simmons for Roythorne & Co., Spalding.*

T. C. C. B.

_____

H

APPEAL from Oliver J.

By notice dated March 23, 1978, the plaintiffs appealed on the grounds
that (1) the judge, having found (a) that the primary purpose and object of

1 Ch.                    Midland Bank Trust Co. v. Green

A    the conveyance to Evelyne Green was to defeat Thomas Geoffrey Green's
     option and (b) that the £500 paid by Evelyne Green was a " grotesque
     undervalue," was wrong in holding that Evelyne Green was nevertheless a
     purchaser for the purposes and within the meaning of the proviso to section
     13 (2) of the Land Charges Act 1925 and that she accordingly took the
     property free from the option; (2) the judge was wrong in holding that the
     expression " a purchaser of a legal estate for money or money's worth"
B    in the proviso to section 13 (2) included a purchaser otherwise than in
     good faith; and (3) the judge was wrong in holding that a purchaser having
     actual knowledge of an estate contract which had not been registered took
     free therefrom.

          *Jeremiah Harman Q.C.* and *Jonathan Parker* for the plaintiffs.  The
     plaintiffs' case depends on the construction of " purchaser " in the Land
C    Charges Act 1925 and on whether the principle that fraud unravels all
     things applies.
          A document might be a genuine conveyance but it does not follow
     that it represents a genuine sale and purchase, and a transaction which is
     merely a device has the badge of a transaction which is not a proper sale
     and purchase.  Where the motive for a transaction is an intent to injure
D    it makes the purchase in bad faith.  The difference lies in the primary
     purpose and intent of the transaction.  A genuine purchaser buying with
     knowledge of an option has as his primary purpose and intent the obtain-
     ing of the land.  In the present case the primary purpose and intent was
     not the obtaining of the land but the defeating of the option.  Thus,
     there is a difference between a bona fide purchase where the defeating
     of the option is an incidental result of the primary purpose and the
E    present case where the whole object was to defeat the option holder's
     rights.
          Where one has a transaction conceived purely for the purpose of
     injuring another party the court can say that Parliament could never
     have deliberately created an instrument to facilitate such a purpose.
          In section 199 of the Law of Property Act 1925 the words " shall not
F    be prejudicially affected by notice " do not mean that a purchaser " may
     not be affected by notice."  The section could not have been inserted
     unless it was possible for a purchaser to be affected by notice.  It is to be
     noted that a " purchaser " within the meaning of the Law of Property
     Act 1925 is a purchaser in good faith: see section 205 (1) (xxi).  It would
     not have been the intention of the legislature to protect a mala fide
     purchaser with notice.  A purchaser in good faith can only mean some-
G    one who is not purchasing in the course of illegal or fraudulent dealings.
          As to sections 13 (2) and 20 (8) of the Land Charges Act 1925, in
     order to find out whether a definition is intended to be excluded by the
     context one has to read in the definition in full, and if the two do not fit
     together one can say that the definition cannot have been intended to
     apply in the particular context.  The definition of " purchaser " in
H    section 20 (8) is expressed to be " unless the context otherwise requires,"
     and when one reads that definition into section 13 (2) it makes complete
     nonsense, but if one gives " purchaser " its ordinary meaning, i.e., a
     person who acquires property under a contract for sale, it fits in with

616

**Midland Bank Trust Co. v. Green**                    **[1980]**

the intention of the legislature. " Purchaser " should be given a meaning    A
different from the statutory definition because otherwise the statute
becomes an engine of fraud. This does not result in giving different
definitions to " purchaser " in the substantive part of section 13 (2) and in
the proviso because " purchaser " cannot be read in its statutory sense
wherever it occurs in the section.

Remembering that the Land Charges Act 1925 has to be construed    B
with the Law of Property Act 1925, which refers directly to matters
registrable under the Land Charges Act, and that the definition of
" purchaser " in the Law of Property Act contains the reference to good
faith, clearly both were intended to be run together.

Cases in which the courts have interpreted " purchaser " in other
statutes include *Vane* v. *Vane,* L.R. 8 Ch.App. 383, 398–399; *In re Amos*
[1891] 3 Ch. 159, 165, and *H. L. Bolton* (*Engineering*) *Co. Ltd.* v. *T. J.*    C
*Graham & Sons Ltd.* [1957] 1 Q.B. 159, 168, 169, 170. They show that
the word " purchaser " in a statute is susceptible of different meanings
according to the context, that there is no rigid adherence to one meaning
and that if a certain meaning will not effect the purpose for which
Parliament was legislating it should not be given that meaning.

In the present instance " purchase " should be given its ordinary every-
day meaning of bought in a regular way, and it is very odd to have    D
only a conveyance and no contract. The transaction between the father
and mother is attacked on the ground that it was in no true sense a
purchase. The element of purchase was a sham or a cover for what
was in truth a voluntary conveyance or gift, given the disproportion
between the value of the property and the price which was so small as to
be nugatory. Add to that that the purpose was to defeat the option and
that the conveyance was executed with almost indecent haste and the    E
transaction bears no resemblance to a purchase by the mother. Ade-
quacy of consideration is not always irrelevant: see *Fry* v. *Lane,*
40 Ch.D. 312, 320–321, 322. The undervalue if gross is a factor which
will be taken into account in determining whether there has been a pur-
chase. The transaction was in effect a transfer between two persons for
bogus consideration.    F

The plaintiffs' case is also put on the basis that the conveyance
amounted to the carrying out of a fraudulent transaction and that
fraud unravels everything: see *Lazarus Estates Ltd.* v. *Beasley* [1956]
1 Q.B. 702, 712, 719, 721–722. The principle that no court will allow
a person to keep an advantage obtained by fraud applies to the mother,
and the judge's findings can only amount to a finding of a conspiracy
to defraud between her and the father. Purpose and intent is the    G
vital factor in determining whether there is a conspiracy to defraud.
The mother's conscience is bad and equity can allow the option to be
enforceable against her. [Reference was made to *Hollington Brothers Ltd.*
v. *Rhodes* (*Note*) [1951] 2 All E.R. 578; *In re Monolithic Building*
*Co.* [1951] Ch. 643; *Beesly* v. *Hallwood Estates Ltd.* [1960] 1 W.L.R.
549 and *Crofter Hand Woven Harris Tweed Co. Ltd.* v. *Veitch* [1942]    H
A.C. 435.]

" Purchaser " in the Land Charges Act 1925 cannot be read as
including a person who is not buying the property because he wants it

A but who is a conspirator taking the property in order to injure another.  Though it is not fraud to take advantage of one's legal rights, i.e., to seek to achieve a legitimate benefit for oneself, it is fraud to seek to use one's legal rights to inflict deliberate damage on some other person.  It would be wrong to allow machinery provided for the protection of genuine purchasers to be used to further such a pur-
pose.  Undoubtedly the conveyance constituted a breach of contract
B by the father, and the mother aided and abetted that breach.

The *Monolithic, Hollington* and *Beesly* cases are wholly distin-
guishable and show that a conspiracy to injure can be regarded as an exact parallel to a purchase by someone with actual notice of an unregistered option whose purpose is not to advance his own interests but to injure another, and that is not a transaction which can be described as a " purchase."

C *Leonard Hoffmann Q.C.* and *Gavin Lightman* for the defendant Robert Derek Green.  This is not a case of fraud.  Fraud involves deception and dishonesty: all one has here is a deliberate breach of contract.  That is something which happens all the time in a com-
mercial context and it is never suggested that it is fraud.  There is no finding of fraud in the judgment because the question never arose.

D It is not a sufficient answer to the defendant's case to say that there was fraud in the old sense of effecting the transaction with knowledge of the option because the whole purpose of the Land Charges Act 1925 is that a person in such a position should not be bound by the option: see section 13 (2).  " Purchaser " is a term of art defined in section 20 (8), and " valuable consideration " means anything of value; so, just as the £1 paid for the option was " valuable considera-
E tion " the £500 paid on the conveyance was also " valuable considera-
tion " even though neither could be described as adequate.  See also section 205 (1) (xxi) of the Law of Property Act 1925, which provides that valuable consideration does not include a nominal consideration. By no stretch of the imagination can £500 be described as nominal but, in any event the Land Charges Act 1925 does not exclude even
F nominal consideration from being valuable consideration.

As to nominal consideration, see *Davidson's Precedents in Conveyanc-
ing,* 5th ed. (1885), p. 63.  If one had always to consider whether con-
sideration was adequate it would make the system of conveyancing unworkable.  Of course, if one had a conveyance whereby money was expressed to be paid but it was never intended that it should be paid, that would not be a purchase for valuable consideration, but the
G conveyance in the present case precisely reflects what the parties inten-
ded.  In *Vartoukian* v. *Daejan Properties Ltd.* (1969) 20 P. & C.R. 983, 988, Stamp J. said that he was not concerned with investigating the adequacy of the consideration.

Under the proviso to section 13 (2) the valuable consideration has to be " money or money's worth."  It would be a misuse of
H language to say that £500 was not " money or money's worth."  Even if one reads in the words " in good faith," the most that can be said is that the father and the mother knew perfectly well that what they were doing was defeating the option, but the purpose of section 13 (2) of

618

the Land Charges Act 1925 was to make knowledge immaterial. Other
sections are more restrictive, including references to " in good faith "
and " with notice," which confirms that the omission of such pro-
visos in section 13 (2) was quite deliberate.

 There is no necessary relationship between adequacy of considera-
and the question of whether a transaction is in good faith. To be
in good faith a transaction must not be intended to be something other
than that which it appears to be. [Reference was made to *Hollington
Brothers Ltd.* v. *Rhodes* (*Note*) [1951] 2 All E.R. 578, 580 and
*Megarry & Wade, The Law of Real Property,* 4th ed., p. 1048.] The
policy and wording of the Land Charges Act 1925, section 13 (2),
are clear, and the principle of construction which should be applied
is that found in *Stock* v. *Frank Jones* (*Tipton*) *Ltd.* [1978] 1 W.L.R.
231, 235, 238.

 As for the plaintiffs' argument based on section 199 of the Law of
Property Act 1925, simply as a matter of ordinary language, if under
the Land Charges Act 1925 an interest is void as against a purchaser
it is impossible to see how any amount of notice can resurrect it. It
is clear from the context of section 199 (1) (i) that " purchaser " must
mean " purchaser for the purposes of the Land Charges Act 1925 "; and
see *Wolstenholme and Cherry's Conveyancing Statutes,* 13th ed. (1972),
p. 328. Thus, the two statutes are harmonised.

 To say that the right of the option holder bound the conscience
of the mother is simply another way of saying that he had an equitable
interest. What Lord Cozens-Hardy M.R. was saying in *In re Mono-
lithic Building Co.* [1915] 1 Ch. 643 was that if you induce someone not
to register their charge in order to secure some advantage then your
security will be postponed to his. That is actual fraud. The argu-
ment on fraud is really a circular one, because in order to establish
fraud the plaintiffs have to assume that the mother was not entitled
to take free of the option, but, if as a matter of construction she was
so entitled, for her to do so cannot be described as fraud. Simply
to say that the purpose of the transaction was to defeat the option
gets one nowhere because that must be the purpose of anyone who
knows what the effect of the transaction would be. [Reference was
made to *Greene* v. *Church Commissioners for England* [1974] Ch.
467.]

 The plaintiffs are seeking a declaration that the option is binding
on the mother and her estate and the answer is that it is is not because of
section 13 (2). To establish that one has to ask four questions. Did
the mother take an interest in land? Was that interest a legal interest?
Was it for valuable consideration? Was that valuable consideration
money or money's worth? The answers to all four are " yes," and in
the end that is how the judge approached the matter.

 *Lightman* following. The purpose of the transaction was not to
defraud but to defeat the option. The Land Charges Act 1925 super-
seded the new Act which had been passed in 1922. In section 3 (1)
of that Act one finds substantially the same scheme as in section 13 (2)
and one also finds the same definition of " purchaser." Similarly, where
notice or bona fides was relevant it was expressly provided for.

A   For a definition of a "sham" transaction, see *Snook* v. *London and West Riding Investments Ltd.* [1967] 2 Q.B. 786, 802, which was considered in *Miles* v. *Bull* [1969] 1 Q.B. 258, 262, 263–264, 265. A transaction can be perfectly genuine although the purpose for which it was entered into was to defeat the rights of some other party.

*Harman Q.C.* in reply. The statute cannot have been intended and should not be allowed to effectuate a conspiracy to defraud or to injure,
B   and the correct view of the judgment is a finding of a conspiracy between the father and mother, the matter having been investigated on the facts and at law in argument in the face of express averments in the pleadings that the whole transaction was one only designed to injure the son.

As for the citation from *Vartoukian* v. *Daejan Properties Ltd.*, 20 P. & C.R. 983, 990, nothing could be further from the present case. The citations from *Stock* v. *Frank Jones (Tipton) Ltd.* [1978] 1 W.L.R.
C   231 are accepted, but the question is not one of construction but of whether the courts will allow an Act of Parliament to be the very instrument by which a conspiracy to do a wrongful act is carried out.

It was said that this was not a case of fraud but simply of deliberate breach of contract, and reference was made to *In re Monolithic Building Co.* [1915] 1 Ch. 643, 670, but that is of little assistance, while *Greene*
D   v. *Church Commissioners for England* [1974] Ch. 467 concerned a purchaser taking advantage of his own legal rights owing no obligation himself to the option holder.

The defendant conceded that a transaction, apparently protected by the statute could be investigated if it could be shown to be a sham in the sense that nothing was intended to be paid. That must mean that one is entitled to look at the reality of the transaction, and once that is con-
E   ceded why should one be estopped from alleging that the transaction constituted a wrongful act and that Parliament did not create the Act to further such a transaction.

*Cur. adv. vult.*

F   April 11. The following judgments were read.

LORD DENNING M.R. The Greens are a Lincolnshire farming family. This story might be called the Green Saga. The father and mother were Walter and Evelyne Green. They had two sons, Geoffrey and Derek, and three daughters. The father Walter had the freehold of two farms. They were a few miles apart in the northern part of Lincolnshire called Lindsey. One was a farm of 700 acres called Thoresway, near Market
G   Rasen, which he farmed himself with his younger son Derek, the other, of 300 acres called Gravel Hill Farm, he let to his elder son Geoffrey as a tenant ever since he came of age.

When father Walter was about 62 years of age, he decided to retire. He let each son have a farm as his own. Geoffrey was aged about 28 and Derek a year or two younger. Both married with children. He sold the 700
H   acre farm to his younger son Derek at £75 an acre. That was well below the market price. But he did not treat Geoffrey, the elder son, so favourably. He only gave him an option to buy his farm, Gravel Hill Farm, the 300 acre farm. It was to be at the same price as Derek's, £75 an acre,

620
Lord Denning M.R.        Midland Bank Trust Co. v. Green        [1980]

but it was only an option.  The father did this so as to enable him to get
out of death duties.  The option was to be effective for ten years.  Mean-
while, the elder son Geoffrey was only to be a tenant of his farm.

    The option was drawn up by the family solicitor, Mr. Stubbs, of Brigg,
about seven miles away.  Father and son went to see him at Brigg.  The
solicitor wrote it out.  Father Walter signed it.  It figures so largely in this
case that I will set it out in full:

> " To Thomas Geoffrey Green, Gravel Hill Farm, Thornton-le-Moor.
> In consideration of the sum of one pound paid by you to me I here-
> by give you the option of purchasing the Gravel Hill Farm now in
> your occupation at the sum of £75 (seventy-five pounds) per acre.
> This option to remain effective for ten years.
>
> Dated March 24, 1961.
>
>                                                   W. S. Green."

    The option was signed over a sixpenny stamp and kept by Mr. Stubbs in
his office at Brigg.  Now Mr. Stubbs was a very careful and meticulous
solicitor, but strangely enough he made a serious mistake.  He ought to have
registered the option as an estate contract under the Land Charges Act
1925.  It was the simplest thing in the world to do.  But he did not do it.
Why he did not, no one knows.  It is a mystery.  Neither father Walter nor
elder son Geoffrey knew of this mistake.  They thought everything was in
order: and continued for years to think so.  The mistake was afterwards
to cost everyone dear.

    For six years the family lived happily as families do.  The father
Walter and mother Evelyne retired to the Old Rectory at Croxby, near
Caistor, three or four miles away.  The sons and their wives went over at
weekends to see them, taking the grandchildren with them.  Geoffrey
wanted to exercise the option.  He and his wife Margaret often discussed it
with his father and mother.  But father said no.  He wanted to keep Gravel
Hill Farm as an agricultural investment so as to save death duties.  Mother
Evelyne was there at all these discussions and knew all about them.  She
knew that Geoffrey wanted to exercise the option.

    Then something transpired which was to shake the family to its roots.
Father Walter decided to deprive the elder son Geoffrey of the option.  He
met a lawyer somewhere or other and told him of the option.  We do not
know who this lawyer was.  But he seems to have suggested to the father
a way of getting out of the option.  This lawyer said to father Walter:
" See if the option has been registered.  If it has not been registered as a
land charge, you can sell Gravel Hill Farm over the head of Geoffrey and
get rid of the option."  That unknown lawyer went further.  He seems to
have made inquiries at the registry and found that the option was not
registered.  He told father Walter.  Father Walter told his wife, mother
Evelyne.  They both told the younger son, Derek.  Together the three of
them hatched a plot.  I call it a plot because it certainly was.  It was that
father Walter should sell Gravel Hill Farm to mother Evelyne for £500
and convey it to her.  It was to be done quickly—without the elder son
Geoffrey knowing anything about it.  The conveyance was to take place
before Geoffrey could exercise the option.  Once the conveyance was
executed, his option would be defeated.

A      We would much like to know the reason for this plot: but the court has been left completely in the dark. Father and mother are dead. Geoffrey is dead. Derek, the younger son, probably knows. But he did not give evidence. (His lawyers advised him that the reason was not relevant.) At any rate Derek took the initiative in carrying out the plot. He telephoned his own separate solicitor, Mr. Harrod, of Spalding. That was in Holland in the south of the county, 60 miles away from Brigg. He did

B  not telephone the family solicitor, Mr. Stubbs, at Brigg because Mr. Stubbs knew all about the option and would not of course allow any such plot to go through: so Derek the younger son got his own solicitor Mr. Harrod to come over the 50 or 60 miles to his (Derek's) farm: and Derek got his father Walter to meet him there. Father Walter had never met Mr. Harrod before, but he there and then instructed Derek's solicitor. He told him to prepare a conveyance of Gravel Hill Farm from his (Walter's)

C  name into his wife (Evelyne's) name for the sum of £500. That was a grotesquely small sum. It was worth £40,000 or £50,000. Father Walter gave authority to Mr. Harrod to collect the title deeds from the bank at Brigg so as to draw up the conveyance. He made it clear that it had to be done as quickly as possible. It had to be done before Geoffrey got to hear of it and before the option was registered.

D      That meeting at Derek's farm was on August 14, 1967. Mr. Harrod did as he was instructed. Never in the history of conveyancing has anything been done so rapidly. It was all done and completed in three days. A search was requested of the registry. The reply was got by telephone that no option was registered. Mr. Harrod's partner, Mr. Jenkinson, went over from Spalding to Brigg (60 miles). He collected the title deeds of Gravel Hill Farm from the bank at Brigg. He did not go back to his

E  own office at Spalding to draw up the conveyance. He went to a friendly firm of solicitors at Brigg, borrowed the use of a secretary and office space and prepared the conveyance. He took it over from Brigg to Cleethorpes (about 15 miles) where father Walter was in a nursing home. There it was executed by father Walter and mother Evelyne. Father Walter transferred Gravel Hill Farm to his wife for £500. Mother Evelyne gave the solicitors

F  a cheque (in their favour) for £500 drawn on her bank account—overdrawn for the purpose. The solicitor, Mr. Jenkinson—by an error of judgment— certified that the value of the land did not exceed £5,500. Whereas it was worth at least £40,000: and was being transferred for £500. Dated August 17, 1967. All in three days.

      The deed was done. This is how Walter himself described it in an
G  affidavit made on June 24, 1970, after his wife's death:

        " Neither the option nor any estate contract constituted by the option and the notice of intention to exercise it had been registered at the Land Charges Registry, and the testatrix and I were advised by our solicitors that in these circumstances if I transferred the farm to a purchaser, the purchaser would take free of Geoffrey's rights there-
H  under. Thereupon in order to defeat Geoffrey's option over the farm, on August 17, 1967, I sold and conveyed the farm (subject to the tenancy) to the testatrix in consideration of the payment by her to me of £500."

622
**Lord Denning M.R.**        Midland Bank Trust Co. v. Green        **[1980]**

As happens in families, one of them could not keep a secret. A rumour reached the elder son Geoffrey: "Father has sold your farm to Mother for £500." At once he went over to his father and said: "I want to exercise the option." Father said: "I am not going to discuss it with you." Geoffrey went off to his solicitors. Then those solicitors did what they ought to have done six years before. On September 5, 1967, they registered the option. But it was too late. Three weeks too late. The conveyance had been executed on August 17, 1967. It was, as the judge said, "a case of bolting the stable door after the horse had gone." On October 6, 1967, Geoffrey's solicitors gave notice exercising the option. But was it any good then? Was it not also too late?

Six months later on March 28, 1968, the mother Evelyne died quite unexpectedly. She left her property to her husband Walter for life and afterwards for her five children equally. So if the conveyance of Gravel Hill Farm is valid, it goes to all five children.

Walter and Geoffrey both died in the next year or two. Walter died on February 8, 1972. Geoffrey died on May 11, 1973. His wife and children have remained on at Gravel Hill Farm, farming it and paying an agreed rent for it. If the conveyance to the mother was good—and free of the option—they will have to leave. The farm will have to be sold and the proceeds divided among the five children of Walter and Evelyne. Only one-fifth for Geoffrey's widow and children. That does seem most unfair to Geoffrey, his widow and children, who have farmed it all their lives and ought in justice to be able to remain there.

*The litigation*

Now for the story of the litigation. It bids fair to rival in time and money the story of *Jarndyce* v. *Jarndyce.*

First, Geoffrey, while alive, sued Walter for damages for breach of the option contract. This took Walter by complete surprise. The unknown lawyer never warned him that this might happen. He at once got rid of all his assets so as to avoid paying any damages to Geoffrey. He gave his property at Croxby to the younger son Derek and his sisters. The judge suggested that he repented of what he had done.

Second, Geoffrey also, while alive, started an action against his mother's estate represented by her executors (who were his father Walter and his brother Derek). He claimed that the option was binding on her estate. He also claimed damages for conspiracy. Then Walter died and his daughter Beryl was added as defendant as his sole personal representative; Geoffrey died and his widow and the bank became his executors.

Third, Geoffrey, while alive, started an action against the family solicitors for negligence in failing to register the option. After his death it was continued by his executors. This resulted in the reported case of *Midland Bank Trust Co. Ltd.* v. *Hett Stubbs & Kemp* [1979] Ch. 384, covering 47 pages.

All sorts of points have arisen in the course of interlocutory proceedings. At one stage Beryl failed to plead plene administravit and may find herself personally liable. At another stage there was a prolonged argument whether there could be a conspiracy between husband and wife. This

A   resulted in a judgment covering 25 pages: see *Midland Bank Trust Co. Ltd.* v. *Green (No.* 3) [1979] Ch. 496.

It looks to me as if there may be claims made against some solicitors or others for negligence in some stages of this litigation.

*The one point in the case*

B   Having thus told the story, I come to the one point in this case: is the option binding on the mother's estate? If it is, Geoffrey's widow is entitled to call for a conveyance to her of Gravel Hill Farm on payment of £75 an acre, that is £22,500: and all the outstanding litigation will come to an end—save for endless arguments about the costs involved. If the option is not binding on the mother's estate, then Gravel Hill Farm will belong to her estate: and all the outstanding litigation will continue to vex the courts for years to come. The value of farming land has gone up so

C   much that it may have reached £1,500 an acre: at which Gravel Hill Farm would be worth about £454,500. A prize worth a fight.

We have been shown an opinion given by counsel to father Walter on March 10, 1970, while father and Geoffrey were still alive. It said:

D   "I have no doubt that T. G. Green had a good cause of action against his mother and could have enforced his option against her as soon as he learnt of the sale. The sale was clearly a sham, and in purpose and effect a gift. Accordingly, notwithstanding non-registration of the option, the option ran with the land and bound the mother, for she was not a bona fide purchaser for money or money's worth."

But Oliver J. in his considered judgment held the contrary: see ante, p. 614B:

E   "I . . . find myself compelled . . . to hold that Evelyne was a purchaser for money or money's worth of the legal estate against whom Geoffrey's option was, under the statutory provisions, void."

*The statutory provisions*

F   The option was an "estate contract" within Class C (iv) of section 10 (1) of the Land Charges Act 1925 as to which section 13 (2) of the Act says:

"A land charge of . . . Class C . . . shall (except as hereinafter provided) *be void as against a purchaser* of the land charged therewith, or of any interest in such land, unless the land charge is registered in the appropriate register before the completion of the purchase: Pro-

G   vided that, as respects . . . an estate contract created or entered into after the commencement of this Act, this subsection only applies *in favour of a purchaser of a legal estate for money or money's worth.*"

And "purchaser" is defined in section 20 (8) as meaning:

"any person (including a mortgagee or lessee) who, for valuable consideration, takes any interest in land or in a charge on land; . . ."

H   But that is "unless the context otherwise requires."

To these must be added section 199 (1) of the Law of Property Act 1925:

"A purchaser shall not be prejudicially affected by notice of—(i) any instrument or matter capable of registration under the provisions of the Land Charges Act 1925 . . . which is void or not enforceable as against him under that Act . . . by reason of the non-registration thereof; . . ."

And "purchaser" there means by section 205 (xxi):

"a purchaser in good faith for valuable consideration . . . 'purchase' has a meaning corresponding with that of 'purchaser'; and 'valuable consideration' includes marriage but does not include a nominal consideration in money; . . ."

Upon reading those various provisions, it is significant that section 13 makes an estate contract void for non-registration except as against "a purchaser of a legal estate for money or money's worth." It is significant that this does not include "in good faith" or "valuable consideration." And there is an express provision that such a purchaser in good faith for valuable consideration is not to be prejudicially affected by "notice" of non-registration. Somehow or other we must reconcile these.

*The construction of those sections*

To my mind the key words are "for money or money's worth." They mean for an adequate sum in money or money's worth. I cannot believe that the legislature intended to protect a purchaser who paid far less than the land was worth—in collusion with the vendor. If that were the case, it would open the door to fraud of the worst description. All that a man —who had contracted to sell his land—would have to do to get out of his bargain would be to convey it to his wife for a very small sum. I know that, in the ordinary law of contract, we never inquire into the adequacy of the consideration. But this is different. "Money or money's worth" means a fair and reasonable value in money or money's worth: not an undervalue: particularly a gross undervalue as here.

*Fraud*

Apart from that, I am clearly of opinion that these provisions for protecting a purchaser are of no avail when the sale to him is done in fraud of the holder of the estate contract. This is shown by *In re Monolithic Building Co.* [1915] 1 Ch. 643 where it was held that a purchaser, who paid full value, was protected notwithstanding that he had full notice. But Lord Cozens-Hardy M.R. expressly said, at p. 663:

"I put aside altogether any question of fraud. The doctrine of the court in a case of fraud, of course, proceeds upon a different footing, and any security may be postponed if you can find fraud in its inception."

and Phillimore L.J. said, at p. 670:

"Let us not import considerations which may be applicable, or which it might be desirable to make applicable, where there is dolus malus . . ."

A    With that encouragement, I am prepared to say as I did in *Lazarus Estates Ltd.* v. *Beasley* [1956] 1 Q.B. 702, 712:

> " No court in this land will allow a person to keep an advantage
> which he has obtained by fraud.  No judgment of a court, no order
> of a Minister, can be allowed to stand if it has been obtained by fraud.
> Fraud unravels everything."

B       By fraud here, I do not mean only the sort of fraud which is actionable
in deceit.  I mean the sort of fraud as was spoken of by Lord Coke when
he condemned conveyances made in fraud of creditors: see *Twyne's Case*
(1601) 3 Co.Rep. 80b.  Fraud in this context covers any dishonest dealing
done so as to deprive unwary innocents of their rightful dues.  The marks
of it are transactions done stealthily and speedily in secret for no sufficient
consideration.  All these appear in this conveyance made by Walter to
C    his wife Evelyne.

       If the judge had viewed the case in this light he would certainly have
decided in favour of Geoffrey's widow.  He said, ante, p. 614c:

> " The conclusion I have reached therefore is one which I reach
> with regret, because as it seems to me Geoffrey had a clear legal
> right which was deliberately frustrated by his parents in breach of the
D    contract created by the option."

       If it were necessary, I should have thought that the agreement between
Walter and Evelyne might amount to a conspiracy.  The predominant pur-
pose was to damage Geoffrey: see *Crofter Hand Woven Harris Tweed Co.
Ltd.* v. *Veitch* [1942] A.C. 435, 445; and I see no reason why, in modern
times, husband and wife should not be liable to an action for conspiracy.
E    But it is unnecessary to go so far.  Suffice it that in my opinion the agree-
ment was made—and the conveyance executed—deliberately to deprive
Geoffrey of the benefit of his option.  That was a fraud upon Geoffrey.
The mother was a party to the fraud.  She cannot be allowed to take
advantage of it to the prejudice of Geoffrey.  Nor can her executors take
advantage of it as against his widow and children.  The mother's estate
F    took Gravel Hill Farm subject to the option, even though it had not been
registered at the Land Registry.  The option was duly exercised on
October 6, 1967.  The mother's estate should honour it by transferring
Gravel Hill Farm to Geoffrey's estate.  I would allow the appeal
accordingly.

G       EVELEIGH L.J.  I am left with a very uncomfortable feeling that the
court is being kept in the dark.  Counsel for the defendants has urged the
court not to speculate.  That is a temptation which is difficult to resist but
on the other hand I think it would be wrong to allow speculation to
influence one's decision in this case.  On the one hand, one might conjure
up reasons for criticising Walter's conduct to a greater degree than the
facts found by the judge warrant.  On the other hand, it is not difficult to
H    think of excuses for him.  It may be that we are dealing with a family
arrangement which has gone wrong.  It may be we are dealing with the
case of a man mindful of the interests of his family who is seeking so to
arrange his affairs as to avoid greater death duties.

626
Eveleigh L.J.          Midland Bank Trust Co. v. Green          [1980]

Geoffrey had an option to buy the farm for £75 an acre. The option    A
was not registered. Walter conveyed the farm to his wife and the
consideration expressed in the conveyance was £500. The farm was
worth at least £40,000. It could be foreseen that it would become even
more valuable. It is today worth about £400,000. Both Walter and his
wife knew of the option and they knew that it was not registered. Walter
conveyed to his wife in order to defeat Geoffrey's option.

Section 199 of the Law of Property Act 1925 and section 13 of the    B
Land Charges Act 1925 relate to this transaction. By reference to the
respective definition sections and to the wording of the sections themselves
one finds that the provisions of section 199 apply to a bona fide purchaser
for valuable consideration which includes marriage. The provisions of
section 13 of the Land Charges Act 1925 so far as they are relevant apply
to a purchaser for valuable consideration in the form of " money or
money's worth." There is no reference to bona fides.    C

It is difficult to reconcile the two sections and the view has been put
forward that section 199 was really unnecessary in view of the provisions
of section 13. It has been said that section 199 might have been an over-
sight.

In such a carefully prepared scheme of legislation as we see in the six
Acts of Parliament of 1925, I feel that section 199 was designed to fulfil a    D
void in the picture which would or might have existed if section 13 had
stood alone. Seeing that section 199 makes specific reference to the pro-
visions of section 13 I cannot but conclude that section 199 was inserted to
be complementary to section 13 for the express purpose of putting the
effect of section 13 into perspective. The scheme of the Land Charges Act
1925 was to allow the relevant interests in land to be dealt with unencum-
bered by other interests which were not registered. Thus it is provided    E
that the unregistered estate contract shall be void as against a purchaser for
valuable consideration in the form of money or money's worth. It does
not make the contract void for all purposes. The intention is that the land
or the relevant interest in it shall pass unencumbered. The provisions are
designed to preserve priorities and not to rob various transactions referred
to in section 13 of all effect. Thus, for example, whilst an unregistered    F
prior mortgage may be postponed to a subsequent registered mortgage it
would seem that the prior mortgagee could exercise the mortgagor's equity
of redemption.

Section 13 does not in as many words deal with the effect upon a pur-
chaser of notice of the charge. As the contract is void it might be said
that notice could not possibly make any difference. On the other hand, it    G
might be said that whilst the purchaser's title was unaffected some residual
personal liability lay with him. To induce a vendor to sell when there is
knowledge of a binding option given to someone else would on the face of
it appear to be the tort of inducing a breach of contract. It might also be
said that the transaction could involve a conspiracy. Since the decision of
*Crofter Hand Woven Harris Tweed Co. Ltd.* v. *Veitch* [1942] A.C. 435 it    H
might be difficult to argue conspiracy where full consideration was given
for the property because the predominant object would not be to harm
someone else. Other considerations might well arise, as they have done in

**1 Ch.**                    Midland Bank Trust Co. v. Green                    **Eveleigh L.J.**

A   the present case, when it is claimed that the consideration is wholly inadequate.

It seems to me that the provisions of section 199 might well be invoked as a defence when an essential ingredient in a claim against a purchaser included knowledge of the land charge. But it would only come to the assistance of a bona fide purchaser of the land. I would hesitate long before coming to a firm conclusion as to the purpose of section 199 of the B   Law of Property Act 1925 and it is not necessary for this case that I should do so. I am of the opinion, however, that its careful provisions are quite deliberate and emphasise that the provisions of the Land Charges Act 1925 are designed to protect title to the land itself but not to protect the personal liability of those dealing with it in bad faith in whose hands the land still is. As no one else has yet acquired an interest in the land, I see no C   obstacle to the court inquiring into the bona fides of the purchaser and consequently the genuineness of the transaction with a view to deciding whether the purchaser should be allowed to deal with the land as unencumbered land.

Section 13 (2) of the Land Charges Act 1925 provides:

D   "A land charge of Class B, Class C, or Class D, created or arising after the commencement of this Act, shall (except as hereinafter provided) be void as against a purchaser of the land charged therewith, or of any interest in such land, unless the land charge is registered in the appropriate register before the completion of the purchase: Provided that, as respects a land charge of Class D and an estate contract created or entered into after the commencement of this Act, this subsection only applies in favour of a purchaser of a legal estate E   for money or money's worth."

The section is providing that the charge in question shall be void for the purpose of charging the land. It is made void, however, only where there is a purchaser as defined in section 20 (8), that is:

"any person (including a mortgagee or lessee) who, for valuable consideration, takes any interest in land or in a charge on land; . . ."

F   and where he takes that interest "for money or money's worth." As I read section 13, it applies to a transaction where the money or money's worth provides the reason for the vendor parting with his interest and for the purchaser acquiring his. £500 is money. However, when the estate that is conveyed is worth some £40,000, it seems to me wholly unrealistic to G   conclude that the transfer was for £500. There are many cases in the law of contract where inadequate valuable consideration has been held to suffice but there the importance of consideration is to provide a test whereby legal relations can be said to have been concluded. It is the hallmark by which we recognise a binding contract. Something more than that, in my opinion, is envisaged by section 13 of the Land Charges Act 1925. In very many cases there will be a deed that of itself will produce a binding legal transaction. H   I do not think that money or money's worth is to be treated in the same way as valuable consideration is treated in the law of contract. There the adequacy of the consideration is irrelevant. Under section 13 I do not

628

Eveleigh L.J.          Midland Bank Trust Co. v. Green          [1980]

think that this is so. The requirement of a return in money or money's A
worth goes to the quality of the transaction. It envisages a transaction
where the failure to register should not be allowed to prejudice the pur-
chaser. In other words, a transaction where it is right that the land should
be free of the charge.

Counsel has argued that it is not permissible to go behind the trans-
action. This would include the contention that it is not permissible to
inquire into the true value of the land. It is said that we are dealing with a B
genuine conveyance which transfers the legal estate and as that is achieved
it is wrong to say that the conveyance is a sham. I do not say that the
conveyance is a sham. In my opinion, however, the consideration of £500
expressed in the conveyance is a sham. It is not for £500 that the property
was conveyed. The true transaction, in my opinion, was a gift coupled with
a token of £500 sought to be included to meet the requirements of section
13 of the Land Charges Act 1925. It is not dissimilar from the giving of C
a halfpenny when one makes a friend a present of a knife.

I think that the court is always entitled to look behind the form adopted
and ascertain the true nature of the transaction. The cases where a bill of
sale masquerades as a hire purchase agreement are good examples of this:
see *In re Watson* (1890) 25 Q.B.D. 27. In those cases the whole of the docu-
ment is treated as being a deceptive form to cover the real nature of the D
transaction. In the present case I do not say that the conveyance was a
deceptive form but I do think that the statement of the consideration was
deceptive. Money would never have passed had it not been thought
necessary in order to satisfy section 13. Its role in this transaction was
simply a token. I do not regard the transaction as a conveyance following
a contract of sale of the land. I regard it as a conveyance giving effect to a
gift coupled with the reference to a payment of £500 in an attempt to secure E
the advantage of section 13. In my opinion, the court is entitled to ask
the true value of the land in order to discover the true character of the
£500.

In *Polsky* v. *S. and A. Services* [1951] 1 All E.R. 185, 188, Lord
Goddard C.J. said:

>  " The court has to determine whether the transaction in question is a F
>  genuine sale by the original owner of the chattel to the person who is
>  finding the money and a genuine re-letting by the latter to the original
>  owner on hire purchase terms, or whether the transaction, though
>  taking that form, is nothing more than a loan of money on the
>  security of the goods."

He went on to say, at p. 188: " The court is not to look merely at the G
documents. It must discover what the real transaction was." As Lord
Esher M.R. said in *Madell* v. *Thomas & Co.* [1891] 1 Q.B. 230, 234:

>  ". . . the court is to look through or behind the documents, and to
>  get at the reality; and, if in reality the documents are only given as
>  a security for money, then they are bills of sale."

I test the matter in this way. Let us assume that the law forbids the H
gift of property between husband and wife. Could it be said that the
payment of £500 robbed the transaction of its character as a gift and made
it a sale? In my opinion it could not.

A   When we refer to section 205 of the Law of Property Act 1925, we find that "purchaser" means "a purchaser in good faith for valuable consideration" and that "valuable consideration" includes marriage but does not include a nominal consideration in money. I do not say that it is permissible to import the definition section from the one Act into the other, but to refuse to acknowledge that the £500 is money for which the property was conveyed gives consistency to the scheme to be found in B   the two Acts.

If I am wrong in saying that £500 was not valuable consideration in money for which the estate was transferred within the meaning of the words in section 13, I think that the case could be approached in another way. I can assume, contrary to my opinion, that section 13 has made Geoffrey's charge void as against his mother in so far as it can be said C   that she holds unencumbered land which another purchaser can safely take. Nonetheless the mother will have induced a breach of contract and could be sued for this by Geoffrey. She could not invoke section 199 because she was not a bona fide purchaser and because (I would be prepared to say) the £500 was only a nominal consideration: see section 205 (1) (xxi) of the Law of Property Act 1925. If she can be sued for damages for breach of contract in that she has caused Geoffrey to lose D   the land, it seems to me that the court should be in a position to order her to convey the land to Geoffrey upon payment by him of the option price provided that no one else has an adverse claim to the land. There is nothing, as I see it, in such a situation which should prevent the court from restoring the status quo before the breach of contract.

However, I prefer to approach this case upon the basis I have first indicated above. At least as long as the land has not been dealt with E   further, I think that the court can look at the reality of the transaction. I do not regard the sum of £500 as being valuable consideration for which the legal estate was transferred to the mother.

I would therefore allow this appeal.

F   SIR STANLEY REES. The background of this most unfortunate case and all the relevant facts have been so fully canvassed in the judgment at first instance of Oliver J. and in the judgment of Lord Denning M.R. that I can proceed at once to consider what I regard as the two major issues which confront us. They are, first, whether fraud in relation to the conveyance of Gravel Hill Farm to Evelyne has been established by the evidence against Walter and Evelyne. If it were established then counsel G   on behalf of the plaintiffs finally claimed a declaration that Evelyne took the farm subject to Geoffrey's option and that accordingly her estate is bound thereby. Alternatively, if fraud were established, the plaintiffs might be entitled to have the conveyance set aside on the principle succinctly encapsulated by Denning L.J. in the sentence "Fraud unravels everything": *Lazarus Estates Ltd.* v. *Beasley* [1956] 1 Q.B. 702. Whichever approach is adopted the plaintiffs would be entitled to acquire the H   freehold subject to payment of the price specified in the option of £75 per acre for 303 acres, namely, £22,725.

The second major issue is as to whether upon the evidence the unregis-

630

tered option is void (as against the conveyance to Evelyne) pursuant to
section 13 (2) of the Land Charges Act 1925.

    I turn to deal with the fraud issue.  The issue of fraud was pleaded
thus in the amended statement of claim:

> "... the said conveyance was executed pursuant to an agreement or
> arrangement made between [Walter and Evelyne] whereby they con-
> spired together to defraud and injure [Geoffrey] by completing a sale
> or what purported to be a sale of Gravel Hill Farm by [Walter to
> Evelyne] and to deprive [Geoffrey] of the benefit of the said option."

The statement of claim was originally dated January 27, 1970, and when
the action came on before Oliver J. seven years later in October 1977 the
issues before the judge were thus stated by him, ante, p. 602E:

> "... it is a claim by Geoffrey's executors against Derek as the sole
> surviving personal representative of Evelyne, for specific performance
> of the option and for damages for conspiracy, and against Walter's
> executrix "—who is his daughter Beryl—" for damages, the latter claim
> being undefended."

I add that the claim against Walter's estate was undefended because the
defence was struck out for failure to comply with an order for discovery.
Oliver J. continued, at p. 602F:

> "What is in issue on the pleadings is the question of whether the
> conveyance constituted a bona fide sale by a vendor to a purchaser or
> whether it was, in truth, a fraudulent and colourable transaction or
> a sham."

    The case strongly presented to us by Mr. Harman was that Walter and
Evelyne were guilty of a fraudulent conspiracy in order to deprive Geoffrey
of his option and he argued that certain passages in Oliver J.'s judgment
disclose that the judge had found fraud proved against Walter and Evelyne.
Accordingly, it is necessary to consider at the outset what are the essential
ingredients of a fraudulent conspiracy in civil law and what is the onus of
proof in relation to it.

    As to the essential ingredients of the tort of conspiracy, I go first to
*Crofter Hand Woven Harris Tweed Co. Ltd.* v. *Veitch* [1942] A.C. 435.
The case is so familiar that I need not recite the facts.  As to the tort of
conspiracy in civil law Viscount Simon L.C. said, at p. 440:

> "The appellants, therefore, in order to make out their case have to
> establish (a) agreement between the two respondents (b) to effect an
> unlawful purpose (c) resulting in damage to the appellants."

So the object of the conspiracy must be to effect an unlawful purpose.
Viscount Simon L.C., at p. 442, emphasises the importance of the wrong-
fulness of the intention by citing and approving a statement of Bowen L.J.
in *Mogul Steamship Co. Ltd.* v. *McGregor, Gow & Co.* (1889) 23 Q.B.D.
598 in which he said, at p. 612: "An intent to 'injure' in strictness means
more than an intent to harm.  It connotes an intent to do wrongful harm."
Upon that passage Viscount Simon L.C. comments [1942] A.C. 435, 442:
"A bad motive does not per se turn an individual's otherwise lawful act
into an unlawful one."

A    Viscount Simon L.C. further points out that even where there is an inducement by one party to procure another to break a contract there may be a justification.  As an example he says, at pp. 442–443 :

> " In some cases, however, B may be able to justify his procuring of the breach of contract, e.g., a father may persuade his daughter to break her engagement to marry a scoundrel.  (This is not, of course, to say that the scoundrel would not have an action against the daughter
B    for breach.)  The father's justification arises from a moral duty to urge [his daughter] that the contract should be repudiated."

Finally, Viscount Simon L.C. deals with the object or purpose of the persons combining together in this passage, at p. 445 :

> " It is enough to say that if there is more than one purpose actuating a combination, liability must depend on ascertaining the predominant purpose.  If that predominant purpose is to damage another person and
C    damage results, that is tortious conspiracy.  If the predominant purpose is the lawful protection or promotion of any lawful interest of the combiners (no illegal means being employed), it is not a tortious conspiracy, even though it causes damage to another person."

D    We were reminded of Lord Cozens-Hardy M.R.'s dictum in *In re Monolithic Building Co.* [1915] 1 Ch. 643, in which he said, at p. 663 :

> " The doctrine of the court in a case of fraud, of course, proceeds upon a different footing, and any security may be postponed if you can find fraud in its inception.  But it is not fraud to take advantage of legal rights, the existence of which may be taken to be known to both parties."

E    I have already referred to Denning L.J.'s sentence as to the effect upon a transaction when fraud is proved.

The burden of proof of the allegation of fraud made against Walter and Evelyne, of course, rests upon the plaintiffs who allege it.  Although fraud is alleged, the standard of proof in civil proceedings is no higher than to establish the allegation upon a balance of probabilities.  But as Denning
F    L.J. said in *Hornal* v. *Neuberger Products Ltd.* [1957] 1 Q.B. 247, 258 :

> " . . . the standard of proof depends on the nature of the issue.  The more serious the allegation the higher the degree of probability that is required : but it need not, in a civil case, reach the very high standard required by the criminal law."

G    In the instant case the plaintiffs are handicapped in that Walter and Evelyne and Geoffrey are dead and therefore were unable to give evidence.  Derek was available to give evidence.  We were told at the Bar that Derek was not called as a witness as the result of counsel's advice.  I am not myself prepared to draw any inference hostile to the case of any party to these proceedings as a result of the failure of Derek to give evidence.  In particular I think it would be wrong and dangerous to do so in a case
H    involving a charge of fraud alleged against two elderly folk who are dead and have not been able to defend themselves against the serious attack which has been made against their integrity and sense of duty as parents.

632
Sir Stanley Rees        Midland Bank Trust Co. v. Green        [1980]

It is with the foregoing principles in mind that I turn to consider the
evidence in relation to the allegation of fraud made against Walter and
Evelyne. [His Lordship reviewed the evidence stating that in view of
the powerful comments made as to the inadequacy of the £500 paid by
Evelyne for the farm it was to be observed that for the wholly nominal
(and perhaps, upon the evidence, even illusory) sum of £1 Geoffrey gained
his option to buy the farm for one half its true value then about £40,000
and now said to be worth 10 times more; that Walter had been generous
to Geoffrey for in 1954 he had let Gravel Hill Farm to him at 30s. per
acre and between 1954 and 1967 he made gifts in kind and in money
which Walter said amounted to a total of £23,000 but which Geoffrey
assessed at about £12,000; that by Evelyne's will dated December 20, 1967
(only 4 months after the conveyance of the farm to her), she left Gravel
Hill Farm subject to Walter's life interest to the five children in equal
shares so that Geoffrey became entitled to 20 per cent. of the value of
the farm instead of 100 per cent. less the £22,725 he would have had to
pay if he had exercised his option.  His Lordship then continued:—]
Mr. Harman submitted that Oliver J. had made a finding of fraud
against Walter and Evelyne.  I have been unable to discover any such
finding in the judge's most careful judgment.  If he had found fraud, he
would undoubtedly have stated such a finding explicitly; furthermore, it
is inconceivable that he would have failed to set aside the conveyance and
made such an order as to ensure that Gravel Hill Farm was held subject to
the option.  What he did was to give judgment against Walter's estate for
damages for conspiracy and he held that any claim there might be against
Evelyne's estate was statute barred by the provisions of the Law Reform
(Miscellaneous Provisions) Act 1934.  As we are informed, the judge has
recently decided that the tort of conspiracy may be committed by a husband
and wife conspiring together.  He considered the provisions of section 13
(2) of the Land Charges Act 1925 to which I shall refer in a moment and
found that the conveyance fell within the ambit of the section and the
option was void in relation to the transfer of the farm.

Accordingly, in my judgment, the judge did not find fraud proved,
though it is plain that he considered that the merits of the case were all in
favour of Geoffrey.

The plaintiffs have clearly established that Walter and Evelyne set out
deliberately to defeat Geoffrey's option and carried out the transactions
swiftly and secretly so as to prevent Geoffrey from taking steps to protect
his option.  They have shown that to have been their primary intention.
The family background to the case as well as what was done with the
farm, in my judgment, plainly gives rise to an inference that the motive
of Walter and Evelyne was to redistribute their assets among the family in
a manner which they considered justified in the family interest.  Similarly,
the evidence does support an inference that Walter and Evelyne were
acting spitefully and deceitfully and without any just cause at all to de-
prive their eldest son Geoffrey of his contractual right in the farm which he
had worked since 1954.  If the latter inference were established and the
former disproved by the plaintiffs, that would clearly justify a finding of
fraud.  In my judgment, the evidence on a balance of probabilities is

A  in favour of the inference that Walter and Evelyne acting as they believed fairly in the family's interest had just cause to act as they did. What they did would harm Geoffrey by depriving him of his option and was a breach of contract committed by Walter and procured by Evelyne. But as Viscount Simon L.C. pointed out in the *Crofter* case [1942] A.C. 435, in a family situation there may well be a justification for such action so that it would not amount to fraud. It is not, however, necessary in order to decide

B  the issue of fraud to hold that the inference from the facts against fraud is stronger than the inference in favour of fraud. It is sufficient to say that the plaintiffs have not established their allegation of fraud to the standard required.

Accordingly, in my judgment, Oliver J. was correct in not finding fraud proved against Walter and Evelyne. But if, contrary to my view, he did find fraud proved, I should hold that he was not justified in so finding.

C  I now come to consider the second main issue, namely, whether pursuant to section 13 (2) of the Land Charges Act 1925 Geoffrey's option is void as against the conveyance executed by Walter and Evelyne. If it is void, then Evelyne's estate is entitled to the unencumbered benefit of the farm but if it is not then her estate is subject to the option and Geoffrey's estate is entitled to recover the farm of 303 acres upon payment of £22,725.

D  I approach this aspect of the case upon the basis that fraud has not been established against Walter and Evelyne for the reasons I have already stated.

Lord Denning M.R. has most helpfully set out the relevant statutory provisions so that I need not re-state them. The central question which remains is whether Evelyne was within the meaning of the proviso to section 13 (2) " a purchaser of a legal estate for money or money's worth."

E  It has been argued by Mr. Harman that the conveyance was a sham in the sense that it was not the purchase of a legal estate but merely a gift transaction dressed up as a sale with the intention of destroying the option. In *Snook* v. *London and West Riding Investments Ltd.* [1967] 2 Q.B. 786 Diplock L.J. considered the concept of a sham transaction, at p. 802:

F  "As regards the contention of the plaintiff that the transactions between himself, Auto Finance and the defendants were a ' sham,' it is, I think, necessary to consider what, if any, legal concept is involved in the use of this popular and pejorative word. I apprehend that, if it has any meaning in law, it means acts done or documents executed by the parties to the ' sham ' which are intended by them to give to third parties or to the court the appearance of creating between

G  the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create. But one thing, I think, is clear in legal principle, morality and the authorities (see *Yorkshire Railway Wagon Co.* v. *Maclure* (1882) 21 Ch.D. 309 and *Stoneleigh Finance Ltd.* v. *Phillips* [1965] 2 Q.B. 537), that for acts or documents to be a ' sham,' with whatever legal consequences follow

H  from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating. No unexpressed intentions of a ' shammer ' affect the rights of a party whom he deceived."

In *Miles* v. *Bull* [1969] 1 Q.B. 258 Megarry J. adds these comments about a sham, at p. 264:

A

> "On the other hand, a transaction is no sham merely because it is carried out with a particular purpose or object. If what is done is genuinely done, it does not remain undone merely because there was an ulterior purpose in doing it."

and he adds this experienced comment in relation to the level of prices in family dealings: "After all, some genuine transactions within the family are carried out at low prices; . . ."

B

The deed of conveyance dated August 17, 1967, recited that the vendor had agreed to sell the fee simple of the farm to the purchaser for £500. The deed thereupon conveyed the beneficial interest in the estate to Evelyne.

The £500 was paid by Evelyne to Walter. The parties certainly intended that the farm should be conveyed from Walter to Evelyne. That the ulterior motive for the transaction was to defeat Geoffrey's option, that the price was exceedingly low—perhaps only 1/80th of the true value of the farm in 1967—and that the normal step of a written contract preceding the conveyance did not take place—all these factors undoubtedly existed. Nevertheless, I respectfully agree with Oliver J.'s view that the conveyance did and was intended to convey the estate from Walter to Evelyne. It was not a "sham" and cannot in my view be converted into a sham because of the motive or reason for the transaction, namely, because the parties wished to take advantage of the provisions of section 13 (2). So no fraud has been proved and the transaction was not a sham. But it remains to consider whether Evelyne was a "purchaser . . . for money or money's worth" within the ambit of the proviso to section 13 (2).

C

D

There is a powerful argument in support of the view that the phrase "money or money's worth" does not, or at least cannot be permitted to, bear the ordinary meaning of the words. It is suggested that the phrase should be so construed that "money or money's worth" means a fair and reasonable value.

E

The circumstances in which a gloss may properly be placed upon the words of a statute has recently been considered by the House of Lords in *Stock* v. *Frank Jones (Tipton) Ltd.* [1978] 1 W.L.R. 231, and Lord Simon of Glaisdale said, at p. 237:

F

> "All this is not to advocate judicial supineness; it is merely respectfully to commend a self-knowledge of judicial limitations, both personal and constitutional. To apply it to the argument on behalf of the appellant based on anomaly, a court would only be justified in departing from the plain words of the statute were it satisfied that: (1) there is clear and gross balance of anomaly; (2) Parliament, the legislative promoters and the draftsman could not have envisaged such anomaly, could not have been prepared to accept it in the interest of a supervening legislative objective; (3) the anomaly can be obviated without detriment to such legislative objective; (4) the language of the statute is susceptible of the modification required to obviate the anomaly."

G

H

In my respectful opinion, the intention of Parliament in this proviso is

A  clear.  It was, to adopt the words of Harman J. in *Hollington Brothers Ltd. v. Rhodes (Note)* [1951] 2 All E.R. 578, 580, ". . . the policy of the framers of the legislation of 1925 to get rid of equitable rights of this kind unless registered."  The equitable rights to which Harman J. was referring were created by an unregistered estate contract.

Further, one may assume that the presence in section 3 (1) and (3) of the Land Charges Act 1925 itself of the express words " in good faith "
B  preceding the same phrase for " money or money's worth " indicates that the omission of any qualifying words in the proviso to section 13 (2) was deliberate.

I respectfully agree with the reasoning and the opinion of Oliver J. in relation to the arguments advanced by Mr. Harman on two points.  I think that despite the definitions of " purchaser " in section 20 (8) in the Land Charges Act 1925 as a person who takes " for valuable consideration "
C  and by section 205 (1) (xxi) of the Law of Property Act 1925 as a person who acquires " in good faith for valuable consideration " one must look to the specific and clear definition which is contained in the proviso to section 13 (2) and not elsewhere.  Nor do I think that one can read section 199 (1) of the Law of Property Act 1925 as giving rise to a valid argument that a purchaser who enters into a transaction with the deliberate intention of
D  taking advantage of the provisions of the Land Charges Act 1925 is to be prejudicially affected by an unregistered estate contract.

I recognise that difficulties may arise in cases in which the consideration for a contract for the sale of an estate may be what has been called nominal or illusory in deciding whether in a given case the price is " nominal " or " illusory."  Equally there could be difficulty in some cases in deciding what is a valuable consideration agreed in good faith.  But I am driven
E  to the conclusion that unless fraud is proved or unless the conveyance is a sham or unless the consideration is nominal or illusory then an unregistered estate contract is void against it.  Were this not the case one would be departing from the sound ordinary rule in contract law that the court will not look into the adequacy of consideration and from what seemed to Harman J. and seems to me the policy of the Land Charges Act 1925,
F  namely, to get rid of the equitable rights arising from unregistered estate contracts.  Nevertheless, the protection remains that " fraud unravels all."
Accordingly, I would dismiss the appeal.

*Appeal allowed with costs.*
*Leave to appeal.*

G  Solicitors: *Sidney Torrance & Co. for J. Levi & Co., Leeds; Simmons & Simmons for Roythorne & Co., Spalding.*

C. N.

H

END OF VOLUME AND CHANCERY SERIES FOR 1980.

# SUBJECT MATTER

## ADMINISTRATION OF ESTATES
### Matrimonial home
#### *Appropriation*
Intestacy—Value of widow's interest in estate less than value of house—Notice electing to exercise her rights and requiring appropriation of house " in or towards satisfaction " of her interests in estate—Whether notice valid—Intestates' Estates Act 1952, s. 5, Sch. 2, paras. 1, 5              *In re* **Phelps, decd.,** C.A. **275**

## BANKRUPTCY
### Annulment
#### *Discretion of court*
Annulment without public examination—Exercise of discretion—Failure to allow cross-examination of debtor—Opposition to annulment from one creditor only—Bankruptcy Act 1914, ss. 15 (1), 29
*In re* **A Debtor (No. 37 of 1976),** *Ex parte* **Taylor v. The Debtor,** D.C. **565**

### Discharge
#### *Power of court*
Automatic discharge after five years—Court's discretion to order discharge—Facts and circumstances to be considered—Appellate court's duty—Insolvency Act 1976, s. 7—Bankruptcy Act 1914, s. 26 (3)
*In re* **Reed (A Debtor),** *Ex parte* **The Debtor v. The Official Receiver,** D.C. **212**

## CHARITY
### Education
#### *School site*
Land conveyed for school for poor of parish—Closure of school—Reverter of land under statute—Whether property reverting to original grantor—Whether legal estate vesting in grantee's successors in title—Schools Sites Act 1841, s. 2
*In re* **Clayton's Deed Poll,** Whitford J. **99**

## COMMON RIGHTS
### Common land
#### *" Waste land of a manor "*
Waste land severed from manor in 1878—Whether land registrable as " common land "—Commons Registration Act 1965, ss. 1 (1) (*a*), 22 (1) (*b*)
*In re* **Box Hill Common,** C.A. **109**

## COMPANY
### Officer
#### *" Manager " or " officer "*
Allegation of false accounting by departmental manager—Whether officer committing " offence in connection with . . . company's affairs "—Jurisdiction to order production and inspection of books—Companies Act 1948, ss. 441 (1) (3), 455 (1)
*In re* **A Company,** C.A. **138**

### Winding up
#### *Execution*
Arrest of vessel—Issue of writ in rem by creditor—Writ not served and ship not arrested—Caveat entered in Admiralty Register—Subsequent liquidation of company—Application by creditor for leave to proceed with action in rem—Whether secured creditor—Whether leave to be granted to proceed with action—Companies Act 1948, s. 231              *In re* **Aro Co. Ltd.,** C.A. **196**

#### *Fraud*
Agreement between company and second company to pay sum for cancellation of agency agreement between them—Agreement between company and third company to sell company's factory premises at alleged undervalue—Liquidator's proceedings by summons to avoid both agreements—Whether summonses properly brought in Companies Court—Companies (Winding-up) Rules 1949, r. 68—R.S.C., Ord. 5, r. 2—Law of Property Act 1925, s. 172 (1)
*In re* **Shilena Hosiery Co. Ltd.,** Brightman J. **219**

638                    SUBJECT MATTER

**COMPANY**—*continued*
  **Winding up**—*continued*
   *Petition*
    Creditor—Debt disputed on substantial grounds—Whether prospective creditor to be
     restrained from presenting petition—Form of injunction—Jurisdiction of Com-
     panies Court—Companies Act 1948, ss. 223, 224 (1) (c)
                          **Stonegate Securities Ltd. v. Gregory, C.A. 576**

   *Voluntary liquidation*
    Potential claims to dividends and repayment of capital by holders or former holders
     of shares, share warrants to bearer and bonds—Whether such holders to be treated
     as members or contingent creditors of company—Whether assets held in trust for
     members—Companies Act 1948, ss. 212 (1) (g), 302, 343 (1)—Companies (Winding-
     up) Rules 1949, r. 106 (1) (2)
                   *In re* **Compania de Electricidad de la Provincia de Buenos Aires Ltd.,**
                                              Slade J. **146**

**CONFLICT OF LAWS**
  **Jurisdiction**
   *Movables*
    Assignment—Sale in Italy of goods stolen in England—Buyer bringing goods into
     England—Ownership—Law applicable
                   **Winkworth v. Christie Manson and Woods Ltd.,** Slade J. **496**

**COPYRIGHT**
  **Infringement**
   *Artistic work*
    Design—Fabric design selected in Hong Kong—Shirts bearing design made in
     Hong Kong and imported into U.K.—Sale to public—No inquiry as to copyright—
     No prior knowledge—Whether " publication "—Whether infringement of copy-
     right—Damages—Copyright Act 1956, ss. 1 (1), 3 (5) (b), 18 (1), 49 (2) (c)
                          **Infabrics Ltd. v. Jaytex Ltd., C.A. 282**

**COURT OF APPEAL**
  **Jurisdiction**
   *Judge's decision " not . . . appealable "*
    Error of law in construction of statute—Whether jurisdiction to hear appeal—
     Companies Act 1948, s. 441 (3)            *In re* **A Company, C.A. 138**

**DAMAGES**
  **Sale of land**
   *Damages in lieu of specific performance*
    Option to purchase house on dissolution of medical partnership—House belonging
     to junior partner and wife—Senior partner exercising option—Junior partner's
     failure to obtain wife's consent to sale—No evidence of attempt to persuade wife
     to sell property—Measure of damages—Date for assessing damages—Chancery
     Amendment Act 1858 (Lord Cairns' Act), s. 2      **Malhotra v. Choudhury, C.A. 52**

**EASEMENT**
  **Prescription**
   *Right to light*
    Greenhouse—Claim for sufficient light to cultivate plants—Whether specially high
     amount of light—Whether right to extraordinary amount of light capable of being
     acquired by prescription—Whether right is to light for illumination only or capable
     of including sun's warmth—Prescription Act 1832, s. 3
                          **Allen v. Greenwood, C.A. 119**

  **Right of way**
   *Way of necessity*
    Landlocked building plot—No right of way over proposed new roads until built—
     Whether way of necessity to be implied from grant—Public policy against land
     being made unusable—Right of way to plot—Whether means of access to plot
     beyond—Express or implied intention of parties
                          **Nickerson v. Barraclough,** Sir Robert Megarry V.-C. **325**

SUBJECT MATTER                           639

**FAMILY PROVISION**
  **Dependant**
    *Maintained by deceased*
      Couple living as man and wife—Home owned by woman—Man paying for accommo-
      dation and contributing to household budget—Whether assumption of responsibility
      by woman for man's maintenance—Arrangements " immediately " before death—
      Whether " substantial contribution " towards maintenance " otherwise than for full
      valuable consideration "—Inheritance (Provision for Family and Dependants) Act
      1975, ss. 1 (1) (*e*) (3), 3 (4)     *In re* **Beaumont, decd.,** Sir Robert Megarry V.-C. **444**

  **Son**
    " *Reasonable financial provision* "
      Son sharing accommodation with father—Father dying intestate—Son in good health
      and earning—Deceased's wife, estranged from husband and son, living on pension
      and supplementary benefit—Whether disposition of estate failed to make reasonable
      financial provision for son—Inheritance (Provision for Family and Dependants)
      Act 1975, ss. 1 (1) (2) (*b*), 2 (1), 3     *In re* **Coventry, decd.,** Oliver J. and C.A. **461**

**INSURANCE**
  **Contract**
    *Definition*
      Membership of medical defence union—Whether contract of insurance—Whether
      union carrying on insurance business—Insurance Companies Act 1974, ss. 12 (1),
      85 (1)                    **Medical Defence Union Ltd. v. Department of Trade,**
                                              Sir Robert Megarry V.-C. **82**

**LAND CHARGE**
  **Charges registrable**
    *Estate contract*
      Unregistered option to purchase farm—Farm conveyed to grantor's wife at gross
      undervalue—Whether court can inquire into adequacy of consideration—Whether
      wife " purchaser . . . for money or money's worth "—Whether option void against
      wife—Whether fraud—Land Charges Act 1925, s. 13 (2)
                                  **Midland Bank Trust Co. Ltd. v. Green,** Oliver J. and C.A. **590**

    *Right of pre-emption*
      Conveyance of land with right of first refusal to purchase retained lands during
      lives of parties to conveyance—Right of pre-emption registered—Subsequent
      lease of retained lands with option to purchase after grantors' deaths—Option
      registered—Conveyance in purported exercise of right of pre-emption—Subsequent
      purported exercise of option—Whether right of pre-emption creating interest in
      land—Whether right of pre-emption taking precedence over option to purchase
                                              **Pritchard v. Briggs, C.A. 338**

**LIMITATION OF ACTION**
  **Period of limitation**
    *Debt*
      Company in voluntary liquidation—Potential claims by holders or former holders
      of shares and bonds—Whether action upon speciality or simple contract—Whether
      company's balance sheets acknowledgment of debt—Limitation Act 1939, ss. 2 (1)
      (*a*) (3), 18 (1) (5), 24 (2)
            *In re* **Compania de Electricidad de la Provincia de Buenos Aires Ltd.,**
                                              Slade J. **146**

**PRACTICE**
  **Chancery Division**
    *Summonses*
      Adjournment to judge—Whether summonses to be heard first—Considerations where
      difficult point of law raised—R.S.C., Ord. 32, r. 14 (1)
                                  *In re* **Beaumont, decd.,** Sir Robert Megarry V.-C. **444**

**PUBLIC POLICY**
  **Easement**
    *Right of way of necessity* see EASEMENT

640                              SUBJECT MATTER

**REVENUE**
    **Capital transfer tax**
      *Settlement*
        Trust for settlor's children subject to overriding power of appointment—Trustees'
        power to accumulate and apply income for duties, taxes, outgoings—Appointment
        of cash to beneficiary—Whether beneficiary's interest "interest in possession"
        before appointment—Whether chargeable to capital transfer tax—Finance Act
        1894, s. 2 (1) (*b*) (as substituted by Finance Act 1969, s. 36 (2))—Finance Act
        1969, s. 37 (1)—Finance Act 1975, s. 21, Sch. 5, paras. 3, 6 (2)
                          **Pearson v. Inland Revenue Comrs.,** Fox J. and C.A. **1**

      *Tax avoidance*
        Settled property—Trustees appointing part of settled property to be held on different
        trusts to main trust fund—Beneficiaries assigning equitable interests in main fund
        to overseas company—United Kingdom trustees of main trust replaced by non-
        resident trustees—Deemed disposal of main trust fund by non-resident trustees
        —Whether exercise of power of appointment creating separate settlement—Whether
        United Kingdom trustees liable to capital gains tax arising on deemed disposal—
        Finance Act 1965, s. 25 (1) (3) (11), Sch. 10, para. 12 (1)
                                  **Roome v. Edwards,** C.A. **425**

**SALE OF GOODS**
    **Implied term**
      *Obligation to account*
        Conditions of sale reserving beneficial ownership until payment made for goods—
        Goods mixed with other materials in manufacturing process—No obligation to
        keep separate goods not paid for—Buyers in liquidation—Whether charge created
        over goods not paid for—Whether charge extending to products manufactured
        from such goods—Whether registrable charge—Companies Act 1948, s. 95 (1) (2) (*f*)
                        *In re* **Bond Worth Ltd.,** Slade J. **228**

**SOLICITOR**
    **Negligence**
      *Beneficiary under will*
        Solicitors' negligence in preparation of will—Resulting financial loss to beneficiary—
        Whether solicitors owing duty of care to beneficiary
                     **Ross v. Caunters,** Sir Robert Megarry V.-C. **297**

**TRUSTS**
    **Trustee**
      *Compensation*
        Settlement—Beneficiaries' shareholdings in private company vesting absolutely—Sub-
        sequent sale of company as whole—Date when compensation to be calculated—
        Whether assumed liability for taxation in absence of breach of trust to be deducted
        from compensation—Rate of interest payable on compensation—Whether payable
        on disbursements—Whether costs taxable on party and party or common fund basis
             **Bartlett v. Barclays Bank Trust Co. Ltd. (No. 2),** Brightman L.J. **515**

      *Compromise of litigation*
        Testator settling his chattels on successive life interests—Testatrix bequeathing her
        chattels to beneficiaries—Allegation that chattels given to beneficiaries were pro-
        perty of testator—Summons for directions—Court's direction that executors take
        proceedings to recover chattels—Beneficiaries offering compromise—Whether
        trustees empowered to accept compromise—Trustee Act 1925, s. 15
             *In re* **Earl of Strafford, decd.,** Sir Robert Megarry V.-C. and C.A. **28**

      *Duty of trustee*
        Trustee corporation specialising in trust management—Trust property comprising
        majority shareholding in private company—Whether duty of trustee with regard
        to management of company higher than ordinary trustee
             **Bartlett v. Barclays Bank Trust Co. Ltd. (No. 1),** Brightman J. **515**

SUBJECT MATTER                                    641

**VENDOR AND PURCHASER**
    **Contract**
        *Formation*
           Exchange of contract arranged by telephone conversation between solicitors—Whether
           concluded contract—Professional practice between solicitors
                                                                **Domb v. Isoz,** C.A. **548**

**WORDS AND PHRASES**
    " *Common land* "—Commons Registration Act 1965, s. 22 (1)
                                   *In re* **Box Hill Common,** C.A. **109**
    " *Immediately* "—Inheritance (Provision for Family and Dependants) Act 1975, s. 1 (1) (*e*)
                            *In re* **Beaumont, decd.,** Sir Robert Megarry V.-C. **444**
    " *In or towards satisfaction* "—Intestates' Estates Act 1952, Sch. 2, para. 1
                                        *In re* **Phelps, decd.,** C.A. **275**
    " *Interest in possession* "—Finance Act 1975, Sch. 5, para. 6 (2)
                        **Pearson v. Inland Revenue Comrs.,** Fox J. and C.A. **1**
    " *Manager* "—Companies Act 1948, s. 455 (1)        *In re* **A Company,** C.A. **138**
    " *Not . . . appealable* "—Companies Act 1948, s. 441 (3)     *In re* **A Company,** C.A. **138**
    " *Offence in connection with . . . company's affairs* "—Companies Act 1948, s. 441 (1)
                                          *In re* **A Company,** C.A. **138**
    " *Officer* "—Companies Act 1948, s. 455 (1)         *In re* **A Company,** C.A. **138**
    " *Otherwise than for full valuable consideration* "—Inheritance (Provision for Family
        and Dependants) Act 1975, s. 1 (3)
                          *In re* **Beaumont, decd.,** Sir Robert Megarry V.-C. **444**
    " *Publication* "—Copyright Act 1956, s. 3 (5) (*b*)
                                  **Infabrics Ltd. v. Jaytex Ltd.,** C.A. **282**
    " *Purchaser . . . for money or money's worth* "—Land Charges Act 1925, s. 13 (2)
                       **Midland Bank Trust Co. Ltd. v. Green,** Oliver J. and C.A. **590**
    " *Reasonable financial provision* "—Inheritance (Provision for Family and Dependants)
        Act 1975, s. 1 (2) (*b*)                  *In re* **Coventry, decd.,** Oliver J. and C.A. **461**
    " *Substantial contribution* "—Inheritance (Provision for Family and Dependants) Act 1975,
        s. 1 (3)                    *In re* **Beaumont, decd.,** Sir Robert Megarry V.-C. **444**
    " *Waste land of a manor* "—Commons Registration Act 1965, s. 22 (1) (*b*)
                                   *In re* **Box Hill Common,** C.A. **109**