IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------------- X
                                                      :
DK ACQUISITION PARTNERS, L.P.,                        :
KENSINGTON INTERNATIONAL LIMITED,                     :
RUSHMORE CAPITAL-I, L.L.C., RUSHMORE                  :
CAPITAL-II, L.L.C., and SPRINGFIELD                   :
ASSOCIATES, LLC.,                                     :
                                                      :
                          Plaintiffs, :
                                                      :
                v.                                    :
                                                      :
JPMORGAN CHASE & CO., JPMORGAN                        :
CHASE BANK, J.P. MORGAN SECURITIES,                   :
INC., CITIGROUP INC., CITIBANK, N.A. and              :
CITIGROUP GLOBAL MARKETS, INC. f/k/a                  :
Salomon Smith Barney,                                 :
                                                      :
                          Defendants. :
--------------------------------------------------------------- X
```

Civil Action No. 08 Civ. 0446 (LTS)

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., AND J.P.
MORGAN SECURITIES, INC.'s MOTION FOR SUMMARY JUDGMENT
WITH RESPECT TO PLAINTIFFS' CLAIMS BASED ON WESTLB DEBT

# Part II of III

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
*Attorneys for Defendants JPMorgan Chase & Co.,
JPMorgan Chase Bank, N.A., and J.P. Morgan
Securities Inc.*

# APPENDIX OF ENGLISH CASES AND

# AUTHORITIES

## TAB 5

Where a petitioner having obtained a divorce on the ground of adultery in an undefended suit, filed a petition for damages against the co-respondent who alleged connivance and conduct conducing, the co-respondent was held estopped from denying adultery and raising connivance which, as an absolute bar, was concluded by the decree.[73]

In Australia a wife who failed to seek maintenance for a child about to be born (where paternity was denied) when consenting to a decree for judicial separation in which there was no order for maintenance for herself or the other children (custody being given to the husband) was precluded from making application to a magistrate for maintenance for that child, though she could have applied in the Supreme Court for a variation of the original order.[74]

Similarly, where, on the trial of an interpleader issue, a trustee in bankruptcy contended that a deed of assignment was invalid on one ground, judgment against him negatived invalidity on any other ground.[75] And, where a local authority consented to an order in respect of the pollution of a river, it was precluded from later setting up excuses it might then have raised.[76]

An action for conspiracy failed because the defendants' acts were held to be lawful. A second action alleging an agreement to do those acts by unlawful means was held to be an abuse of process, for though this claim had not been litigated in the first action, it could and should have been raised.[77] An action brought against a town council for flooding allegedly caused by its dam failed. The plaintiff then brought an action for flooding in later years alleging a different causal link between the dam and the flooding. The Supreme Court of Canada held that the second action failed as the issue of causation was *res judicata*.[78]

**191**   A general adverse decision imports an adverse decision on any fundamental allegation by the successful party which his opponent failed to challenge, including an implied allegation. Thus, in an action on an agreement for lease the plaintiff is necessarily alleging the subsistence and validity of the agreement and where the defendant failed to put these matters in issue, judgment for the plaintiff established the validity of the agreement and precluded the defendant from later setting up the Statute of Frauds.[79] Where a defendant failed to plead that there was no consideration for an agreement and the plaintiff recovered, the defendant was estopped on that issue.[80] Where a master conducted an inquiry as to the amount due from a widower to his wife's estate, including any balance of a farming partnership, the certificate estopped the widower from alleging that the farmland was a partnership asset.[81]

---

73   *Hopkins v Hopkins* (1933) 50 TLR 99. *Aliter* as regards the plea of conduct conducing; a discretionary bar not concluded by the decree.
74   *Brown v Brown* (1905) 3 CLR 373.
75   *Re Hilton* (1892) 67 LT 594.
76   *River Ribble Joint Committee v Croston UDC* [1897] 1 QB 251.
77   *Greenhalgh v Mallard* [1947] 2 All ER 255, CA, approved in *Wright v Bennett* [1948] 1 All ER 227, CA, at 230; where the court preferred to invoke the inherent jurisdiction to dismiss frivolous or vexatious claims. In *Re a Debtor* [1958] 1 All ER 581 the Court of Appeal held that a solicitor could be examined under the Bankruptcy Act although the bankrupt had previously brought proceedings against him under what is now RSC O 106 r 3 for the delivery of a cash account in relation to the same transactions.
78   *Town of Grandview v Doering* (1975) 61 DLR (3d) 455.
79   *Humphries v Humphries* [1910] 2 KB 531, CA, at 534–7. See now Law of Property (Miscellaneous Provisions) Act 1989.
80   *Cooke v Rickman* [1911] 2 KB 1125.
81   *Public Trustee v Kenward* [1967] 1 WLR 1062.

192    Where there was no duty to raise some question, or doing so would have involved some detriment to a party's legal position, an adverse decision does not involve an adverse decision on that question. A judgment for an account of tithes "subtracted" does not import a decision that a particular *modus* has existed from time immemorial;[82] judgment for the price of goods or work, to which the defendant might have pleaded a breach of warranty in reduction of the price, but was not bound to, did not import a decision negativing any breach of contract by the plaintiff;[83] an employer sued in the county court for wages who refrained from setting up a claim for damaging materials, preferring the statutory remedy in a court of summary jurisdiction, was not estopped from pursuing that remedy.[84] Generally, the failure of a party to plead matters in confession and avoidance which would not have conflicted with any traversable allegation does not make a general adverse judgment a decision negativing that affirmative matter.[85] Thus where a defendant suffered default judgment for instalments of a debt and was sued for further instalments he was free to plead defences under the moneylending and bills of sale legislation.[86]

193    Wherever a plaintiff has separate causes of action (though they arise out of the same transaction) as distinct from several remedies for one cause of action,[87] he is under no duty to join all available causes of action in the first proceeding.[88] But this is subject to qualification where an attempt to raise another cause of action would be an abuse of process.[89] However the dismissal of a claim for actionable misrepresentation[90] was held to create a cause of action estoppel against a claim for negligent misrepresentation.[91]

82   *Collins v Gough* (1785) 7 Bro Parl Cas 94 at 99.

83   *Rigge v Burbidge* (1846) 15 M & W 598; *Davis v Hedges* (1871) LR 6 QB 687 where the ground of the decision was that, though the defendant had an option to plead the inferiority of the goods or work as a defence, there was no obligation to do so. The court however reaffirmed "the general rule that, where a party has the opportunity to raise some question and does not avail himself of it, he is in no better position than if he had raised it". See now s 53 of the Sale of Goods Act 1979 which codifies the rights of the buyer in such cases. Thus where a party sued for fees and the defendant raised lack of diligence and a failure to exercise due care by the plaintiff, and paid a lesser amount into court, but made no counterclaim, the acceptance of the payment in by the plaintiff did not bar a later action by the defendant for professional negligence. See *Hoppe v Titman* [1996] 1 WLR 841, CA.

84   *Hindley v Haslam* (1878) 3 QBD 481.

85   *Howlett v Tarte* (1861) 10 CBNS 813, an action for rent to which the defendant raised a plea in confession and avoidance by the substitution of an agreement from year to year for the agreement sued upon, and the plaintiff by his replication set up a judgment in a former action for rent under the same agreement in which the defendant had not raised that plea and the defendant was held not estopped. Contrast *Humphries v Humphries* [1910] 2 KB 531, CA, cited para 191 n 79 where the allegation being traversable there was an estoppel.

86   *Kok Hoong* [1964] AC 993.

87   See *United Australia Ltd v Barclays Bank Ltd* [1941] AC 1 at 27–8; *Saminathan v Palaniappa* [1914] AC 618 para 199 n 138.

88   See *Thompson v Ross* [1943] NZLR 712 at 719. The plaintiff, who had failed in an action based on innocent misrepresentation inducing a contract for sale, was not precluded from instituting a second action based on breach of a warranty to the same effect. See also *Duedu v Yiboe* [1961] 1 WLR 1040, PC, where a plaintiff who had succeeded in an action for possession was not barred from suing for a declaration of title.

89   See generally Ch 21 on merger and identity of causes of action, and Ch 26 on the inherent jurisdiction to prevent abuse of process.

90   Under s 52 of the Australian Trade Practices Act which imposes civil liability for misleading and deceptive conduct without the need to prove fraud.

91   *Trawl Industries Pty Ltd v Effem Foods Pty Ltd* (1992) 36 FCR 406 at 418–22.

**194**    The need to keep this principle within limits is illustrated in a will construction case where related questions had been raised on an earlier summons and the estoppel was rejected.[92] A court will be reluctant to find a *res judicata* estoppel[93] unless the point was actually decided in the earlier proceedings[94] or there was a duty to raise it.[95]

**195**    Only a decision adverse to the party failing to plead some matter can imply an adverse decision on it. If the decision was in his favour, any admission on the pleadings is of no effect in later proceedings.[96]

## Ignorance of the matter previously omitted

**196**    If a party can show that at the time of the former proceedings he was excusably ignorant of some matter, which would have altered the whole aspect of the case, he is entitled to claim that no issue estoppel should take effect against him.[97] The estoppel however stands if there was no newly discovered fact,[98] if it was newly discovered only in the sense that the party realised its importance,[99] if the party had actual knowledge of the fact[100] or might with reasonable diligence have acquired such knowledge,[101] or if it was not sufficiently material.[102]

In the second edition the cases cited to support these principles were either Scottish, or not directly in point. However, there had been dicta to this effect by Diplock LJ in 1967,[103] and more dicta followed.[104] Finally, in *Arnold*[105] Lord Keith, speaking for the House, held that English and Scots law on this question were the same.[106]

But if an action is brought prematurely, for example before a period of credit has expired or a contract has been rescinded, a later action will not be barred.[107] Similarly if an action fails because a composition with creditors remains in force, an action brought

92  *Kennedy v Kennedy* [1914] AC 215 para 199 n 133; *Re Koenigsberg* [1949] Ch 348, CA, at 362 noted para 446 nn 46–51.

93  *Re Koenigsberg* at 365.

94  As in *Re Waring* [1948] Ch 221.

95  *Re Koenigsberg* at 363; *Re Westlake* [1940] NZLR 887 noted para 199 n 147.

96  In *Boileau v Rutlin* (1848) 2 Exch 665 Parke B at 681 said: "the facts actually decided by an issue in any suit cannot be again litigated between the same parties, and are evidence between them, and that conclusive...; and so are the material facts alleged by one party which are directly admitted by the opposite party, or indirectly admitted by taking a traverse on some other facts, but only if the traverse is found against the party making it"; *Hutt v Morell* (1849) 3 Exch 240 at 241. See also *Hoystead* [1926] AC 155 at 168–9, and *Kok Hoong* [1964] AC 993.

97  See *Lockyer v Ferryman* (1877) 2 App Cas 519; *Phosphate Sewage Co v Molleson* (1879) 4 App Cas 801; *Boswell v Coaks (No 2)* (1894) 86 LT 365n, HL. See also *Town of Grandview v Doering* (1975) 61 DLR (3d) 455, SCC.

98  As in *Boswell v Coaks (No 2)*.

99  As in *Greathead v Bromley* (1798) 7 Term Rep 455; *Phosphate Sewage Co v Molleson*.

100  As in *Greathead v Bromley*; *Lockyer v Ferryman*; and *Phosphate Sewage Co v Molleson*.

101  As in *Shoe Machinery Co v Cutlan* [1896] 1 Ch 667 at 672.

102  See the citations in n 96.

103  *Mills v Cooper* [1967] 2 QB 459 at 468–9.

104  *R v Humphrys* [1977] AC 1 at 19, 30, 48–9, 51; and *Hunter v Chief Constable* [1982] AC 529 at 545.

105  [1991] 2 AC 93.

106  Ibid at 108–9. See also *Bryant v Collector of Customs* [1984] 1 NZLR 280, CA, at 284; and *Rogers v R* (1994) 181 CLR 251 at 257, 274, 280. This qualification where additional evidence is discovered does not apply to cases of cause of action estoppel or merger. Ibid at 104.

107  *Palmer v Temple* (1839) 9 Ad & El 508 at 521. See also *Lordsvale Finance plc v Bank of Zambia* [1996] 3 All ER 156 at 162–163 (claim for penalty interest not *res judicata* because demand had not been made).

after it has become void will not be barred.[108] Where an application for interest was dismissed because it was not made to the trial judge this did not bar an application to the trial judge.[109] A council prosecution for breach of the building line having failed because it had not given a notice to the occupier as required by the statute, a prosecution after notice was given was not barred.[110] These cases illustrate the wider principle that a decision in favour of a defendant will not prevent the plaintiff commencing fresh proceedings "founded on any new or altered state of circumstances".[111]

Where the decision was subject to reconsideration in the light of further evidence, as the dismissal of a suit for jactitation of marriage, negativing the marriage "so far as yet appears", there is obviously no *res judicata* estoppel.[112]

## Foreign judgments

197   The same principles were applied in older cases[113] to foreign judgments where a party failed to raise a question he should have raised. It is not clear how far these decisions will be followed in relation to foreign default judgments but otherwise the law is now clear. In *Carl-Zeiss (No 2)* Lord Reid said:[114]

> "I can see no reason in principle why we should deny the possibility of issue estoppel based on a foreign judgment, but there appear to me to be at least three reasons for being cautious in any particular case. In the first place, we are not familiar with modes of procedure in many foreign countries, and it may not be easy to be sure that a particular issue has been decided or that its decision was a basis of the foreign judgment, and not merely collateral or *obiter*. Secondly, I have already alluded to the practical difficulties of a defendant in deciding whether even in this country he should incur the trouble and expense of deploying his full case in a trivial case: it might be most unjust to hold that a litigant here should be estopped from putting forward his case because it was impracticable for him to do so in an earlier case of a trivial character abroad with the result that the decision in that case went against him".

Lords Hodson,[115] Upjohn[116] and Wilberforce[117] expressed similar views. Subsequently in *The Sennar (No 2)* the House upheld an issue estoppel based on a foreign decision. Lord Diplock said:[118]

> "It is far too late ... to question that issue estoppel can be created by the judgment of a foreign court if that court is recognised in English private international law as being a court of competent jurisdiction".[119]

108  *Hall v Levy* (1875) LR 10 CP 154.
109  *Tek Ming Co v Yee Sang Co* [1973] 1 WLR 300, PC.
110  *Jenkins v Merthyr Tydvil UDC* (1899) 80 LT 600.
111  *Corpn Liverpool v Chorley Waterworks Co* (1852) 2 De GM & G 852 at 866; *Moss v Anglo–Egyptian Co* (1865) 1 Ch App 108 at 115; *Re Anglo–French Co-operative Society* (1880) 14 Ch D 533 at 536.
112  *The Duchess of Kingston's Case* (1776) 2 Smith LC (13 edn) 644 at 651.
113  The authorities cited in the 1st ed were *Henderson* (1843) 3 Hare 100; *Godard v Gray* (1870) LR 6 QB 139; *Ellis v M'Henry* (1871) LR 6 CP 228; and *Re Trufort* (1887) 36 Ch D 600.
114  [1967] 1 AC 853 at 918; see also at 917 quoted para 50 n 145.
115  Ibid at 925–6.
116  Ibid at 948–9.
117  Ibid at 965–7.
118  [1985] 1 WLR 490, HL, at 493.
119  Ibid at 500, and *Carl-Zeiss (No 3)* [1970] Ch 506.

## The same question

**198**   It is a necessary condition for an estoppel that a question in the second proceedings is the same as that decided or covered by the first. The difficulty of deciding whether the question is the same is demonstrated by the conflicting judgments of Rich J and Dixon J on the one hand, and of Starke J on the other in *Blair v Curran*.[120] In earlier proceedings, a court construed a clause in a will which governed the destination of particular property. In later proceedings, the destination of other property under the same words came in question. Rich and Dixon JJ upheld a *res judicata* estoppel, Rich J doing so in spite of "the difference in subject matter".[121] Dixon J[122] held that the questions were the same. Starke J, on the other hand, could not "assent to the applicability of these principles [of estoppel] in cases in which the subject matter of the litigation was not the same"[123] but thought that the earlier decision should be followed. It is submitted, as Dixon J held, that the proper inquiry was whether the same question arose. This is supported by a Privy Council decision that a finding that the plaintiff had not been adopted was binding in a later suit over different property.[124] It is thought therefore that the decision in *Re Manly's Will Trusts (No 2)*[125] was unsound. Walton J there held that a decision on a clause dealing with the destination of the share of one deceased daughter did not create a *res judicata* on the destination of the share of another deceased daughter under that clause. It is submitted that the questions were the same and the estoppel should have been upheld.[126]

These principles were considered in *Turner v London Transport*[127] where a plea of issue estoppel failed because "the findings of the industrial tribunal were not sufficiently clear and precise".[128] Browne LJ said:[129]

> "The essential foundation of a plea of issue estoppel must be that the issue or issues raised in the first proceedings, and the issue or issues raised in the second proceedings are identical. It is for the party who seeks to rely on the estoppel to establish this identity".

**199**   Where the question in the second proceedings is not the same as that decided in, or covered by, the first, there is no estoppel. Thus, a party against whom judgment has been given when suing in a representative capacity was not estopped from suing in a different representative capacity, because the questions were not the same.[130] Conversion is not the same cause of action as trespass so judgment for the defendant in an action on one did not preclude the plaintiff from suing on the other.[131] An adverse decision which

---

120  (1939) 62 CLR 464.
121  Ibid at 502.
122  Ibid at 531–3.
123  Ibid at 510.
124  *Rajah of Pittapur v Sri Rajah Garu* (1884) LR 12 Ind App 16 at 18–19.
125  [1976] 1 All ER 673. Cf *Bader Bee v Habib Merican Noordin* [1909] AC 615.
126  Walton J also held that the parties were different but this too was erroneous because in the first proceedings the trustees represented the class of future great grandchildren no member of that class then being in existence. See *Re Whiting's Settlement* [1905] 1 Ch 96.
127  [1977] ICR 952, CA.
128  At 963.
129  At 964. See also per Lane LJ para 180 n 10.
130  *Robinson's Case* (1603) 5 Co Rep 32b; *Overton v Harvey* (1850) 9 CB 324 at 336; *Hacking v Lee* (1860) 9 WR 70. See also Ch 8.
131  *Lacon v Barnard* (1626) Cro Car 35; *Put and Hardy v Rawsterne* (1681) T Raym 472; and para 415, provided the second action is not an abuse of process. See Ch 26.

Case 1:08-cv-00446-LTS   Document 34-2   Filed 07/11/2008   Page 1 of 3

292        THE QUEEN v. HARTINGTON MIDDLE QUARTER.   4 EL. & BL. 790.

decision was only as to the settlement of the children : the Sessions add a fact which shews only the ratio decidendi.   The order, therefore, is as if the words "the lawful children of William Gould and Esther Gould, absent," were not inserted: had the words been "as the lawful children" &c., it might have been otherwise.   The decision in *Rex* v. *Towcester* (Cald. 497) cannot be supported.   *Rex* v. *Hinxworth* (Cald. 42) was correctly decided : the estoppel arose upon the face of the order.   *Rex* v. *Rudgely* (8 T. R. 620) was decided on the authority of *Rex* v. *Towcester* (Cald. 497).   The rule appears to be correctly laid down in 3 Stark. Ev. 1005 (3d ed.): that an order of removal, "unappealed from, is conclusive, not only as to the settlement of the parties removed, but also as to all facts which are necessarily involved in the adjudication. Thus, if a woman be described in the removal order as the wife of A. B., the order unappealed against will be conclusive, not only as to the settlement of the woman, but also as to the fact of marriage and the settlement of the husband, for they are involved in the judgment of the justices."   For this, *Rex* v. *Binegar* (7 East, 377) is referred to.   In that case the husband and wife were both referred to in the order. [Coleridge J. The rule is thus laid down in 2 Nol. P. L. 143 (4th ed.): "If the woman be described in the order as the wife of A., it is conclusive of the husband's settlement, although it has not given her the addition of wife, provided she is **[790]** called in it by her supposed husband's name.   Likewise if she is removed as E. S., widow, it is equally conclusive that her husband, if living, is settled in the parish.   Because the order conveys a notice on the face of it, that the husband's settlement might come in question under it ; for being removed as a widow, the presumption is, that she was removed to the place where her husband was settled."]   The word "might" there is scarcely consistent with the rule: but, in other respects, the language is not adverse to the appellants.   The rule laid down by the Judges in the *Duchess of Kingston's Case* (a) is that "neither the judgment of a concurrent or exclusive jurisdiction is evidence, of any matter which came collaterally in question, though within their jurisdiction ; nor of any matter incidentally cognizable ; nor of any matter to be inferred by argument from the judgment."   That appears to make the evidence in the present case, not only not conclusive, but not admissible.   And *Rex* v. *Knaptoft* (2 B. & C. 883) agrees with this.   In *Barrs* v. *Jackson* (1 Y. & Coll. Cas. Ch. 585) Vice Chancellor Knight Bruce decided that the grant of letters of administration is not conclusive evidence as to who is next of kin.   That decision was reversed by Lord Cottenham C. ; *Barrs* v. *Jackson* (1 Phillips's Rep. 582) : but the principle then affirmed was that, where the precise question in the Ecclesiastical Court had been who was next of kin, the grant of letters of administration by that Court was conclusive between the same parties : and this stops much short of the principle for which the respondents must contend.   In *Regina* v. *Sow* (4 Q. B. 93) this Court refused **[791]** to receive the examinations in evidence for the purpose of shewing on what ground the order of removal had been made : and there Coleridge J. said : "The order is conclusive as to what is necessarily involved in it ; but the question is whether you can prove in this way that a particular fact was so, the fact not appearing on the face of the order." [Coleridge J. But here the fact is found.]   The finding must have been founded on extrinsic evidence: the question, therefore, is still the same.   The language of the Court in *Regina* v. *Wye* (7 A. & E. 761) is quite consistent with the rule cited from Starkie.   An estoppel, being a presumption against the truth, will not be favoured ; and here it is expressly found that the truth is the other way.   [Erle J. Suppose an action of trespass brought by an heir at law against an alleged devisee, who pleads Not possessed ; that the jury find for the heir at law : and that afterwards the same issue is raised between them as to other land : cannot the heir at law shew that the will under which such other land is claimed was the will which was in question in the former trial, and make use of the verdict?]   Not, strictly, as estoppel : it may be evidence for some purposes : in *Regina* v. *Sow* (4 Q. B. 93) it was sought to use the examinations as admissions ; and, so far, they were held to be receivable.

Cur. adv. vult.

Coleridge J. now delivered the judgment of the Court.

The facts of this case may be shortly stated.

In October 1849, two justices removed two children **[792]** of tender age, John and William Gould, from the now respondent township of Levenshulme to the now

appellant township of Hartington Middle Quarter.   In the order they were described as the lawful children of William and Esther Gould.   They were at the time unemancipated, and were adjudged to be settled in the appellant township in right of their father's settlement therein.   They were received; and the order was never appealed against, although William Gould, the father, was not in fact settled as supposed, and the officers of the appellant township were aware of it, and they made a communication to the respondents in which they attributed the order to a mistake made by them between *Hartington Middle Quarter* and Hartington Town Quarter, in which last the father, William, was in truth settled.

On the 2d March 1854, the order now in *question* was made in respect of Esther Gould, the wife of William, and the mother of the two children, a lunatic.   Her settlement was thereby adjudged to be with the appellants.   They appealed; and the order was confirmed, subject to the single question, whether the appellants are or are not concluded by the order of October 1849, unappealed against: and this is the point we have now to decide.

The order of 1849 was a judgment in rem, conclusive against all the world, as to the then settlement of the two children expressly removed by it.   This will not be disputed; and it is unnecessary to cite any authority for what stands on a principle so sound and so often recognised.   And the same rule will hold in respect of the settlement of any one deriving from either of them, so long as that one of them retains the adjudged settle-[793]-ment.   If John or William should marry, and have issue, and die without having acquired a settlement elsewhere, it could not be disputed, immediately after the death, that the settlement of his widow and unemancipated children, after proof of her marriage and their legitimacy, *was* in the appellant township; for that on which their settlement would, under these circumstances, depend was the very point decided by the competent tribunal in 1849.   Indeed, under the circumstances, the decision on their settlement was legally involved in the judgment of 1849: it is therefore res judicata; and reason and policy alike forbid its being again drawn into controversy.   The mistake of fact which occasioned a wrong judgment makes no difference: if the matter cannot be brought into controversy, of course the mistake cannot be got at; and, though this may seem to produce injustice in the particular instance, as all estoppels are liable to do, yet in the long run the ends of equity and strict justice both are best served by holding strictly to the rule.

The present case, however, is not precisely in its facts the one just supposed.   The order now under consideration adjudicates on a settlement not derived from that of William or his brother John, but dependent on the same two facts on which their's depended, and which must have been decided by the Court when it adjudicated on their's, namely, the settlement of William the elder, and his marriage with Esther the present pauper.   They must be taken to be settled with the appellants on a judicial finding that the father was settled there, and was married to Esther before their birth: and she will be settled there also, on a finding of the same two facts, there being no evidence of any subsequently acquired settlement.

[794] The question then is, whether the judgment concludes, not merely as to the point actually decided, but as to a matter which it was necessary to decide, and which was actually decided, as the groundwork of the decision itself, though not then directly the point at issue.   And we think it does conclude to that extent.

It is unnecessary now to rely on the judgment having been in rem; for it was a judgment between the same parties: the matters which are cardinal in the present litigation cannot now be disputed, without asserting that the decision upon them in the former case was erroneous.   But this they cannot do directly; they have passed their time, and neglected the lawful mode; they cannot now shew by adducing new evidence that the Court was misled as to the facts, nor by new argument or authority that it drew a wrong conclusion in law.   In the case of *Regina* v. *Wye* (7 A. & E. 761), a case sometimes misunderstood, this principle was very clearly affirmed, in accordance with prior decisions.   If, then, the former decision cannot be impeached, and these facts are so cardinal to it that without them it cannot stand, on principle, when these facts are again in question between the same parties, they must be considered as having been conclusively determined.

Now, it cannot be said that the facts we are considering were merely collateral to the decision in the former case.   The question then was, where two unemancipated children were settled: and it was answered by shewing that they were the legitimate

issue of William and Esther, that is, that these two were lawfully married, and the children born after, and that William was settled with the now appellants. Strike either of these facts out, and **[795]** there is no ground for the decision : these facts therefore were necessarily and directly matter of inquiry. The question now is, where is Esther settled : and this is answered by shewing the same two facts, the marriage of Esther and William, and the settlement of William, the two facts already decided.

The judgments in the two cases therefore rest on the same foundation ; which, having been settled in the first, cannot be, as between the same parties, unsettled in the latter.

Two cases were mainly relied on in the argument for the appellants ; *Rex* v. *Knaptoft* (2 B. & C. 883) and *Regina* v. *Sow* (4 Q. B. 93). In the latter, indeed the point now under discussion was never arrived at ; the Court deciding that an examination could not be received in evidence to shew the ground on which the order was made, and the order by itself shewing nothing as to that. The former was the case of an order quashed ; it had been made for the removal of the pauper's brother to the appellant parish ; the case did not state on what ground it was quashed : and, as there is no necessary connection between the settlement of two brothers at any given time, the adjudication that one was not settled with the appellants at some prior date could per se prove nothing as to the settlement of the other at the same date. Many supposable grounds might exist for the decision as to the one, which might not be applicable as to the other : So far, therefore, as the mere decision goes, there is no question but that it was correct ; and it raises no difficulty in our way now. The judgment itself, however, certainly proceeds on the assumption **[796]** that "the point then tried, and upon which the Sessions actually adjudicated, was, that the pauper had not at that time any derivative settlement in Knaptoft, because his father was not then settled there ; that in fact the point tried was, whether the father's settlement was then in Knaptoft." The rule laid down in *The Duchess of Kingston's Case* (20 How. St. Tr. 538 (note)), with its qualifications, is then cited ; and the Court determines that the question on the father's settlement arose only collaterally, and therefore that the judgment was no evidence as to that fact in another case between the same parties. It is not quite clear, whether the Court relied on the distinction which it notices between the negative nature of a judgment quashing an order and the affirmative nature of one confirming it, nor whether the same conclusion would have been come to if the order had been affirmed on the ground of the father having been settled in Knaptoft. The language of the judgment is somewhat indistinct upon this point. But, if it was intended to decide, as a general proposition, that the fact on which a judgment is based is only collaterally under consideration by the Court which pronounces the judgment, in such sense that the judgment can be evidence only of the very fact decided, we feel no difficulty in saying that, at least in respect of orders of sessions, this is a construction of the language of the celebrated judgment in *The Duchess of Kingston's Case* (20 How. St. Tr. 538 (note)) which will not square with several decisions, and certainly is of such paramount and peculiar importance in this branch of the law that we should not be justified in throwing any doubt upon the cases to which we refer. *Nympsfield* v. *Woodchester* (2 Str. 1172), *Rex* v. **[797]** *St. Mary Lambeth* (6 T. R. 615), *Rex* v. *Rudgeley* (8 T. R. 620) and *Rex* v. *Catterall* (6 M. & S. 83) have long been considered authorities shewing that orders of removal, unappealed against or confirmed on appeal, are conclusive evidence, not merely of the fact directly decided, but of those facts also which are mentioned in them, and necessary steps to the decision. Unless they are necessary steps, the rule fails, and they are collateral facts only. In this case, the marriage of Esther with William, and his settlement, were necessary steps to the decision in 1849 : and therefore we think the appellants concluded by it now, when the same facts come again in question as the basis of the present decision.

Order of Sessions confirmed.

MEMORANDUM.

In this vacation Humphry William Woolrych Esq., of the Inner Temple, barrister at law, was called to the degree of the coif, and gave rings with the motto, Leges, juraque.

End of Hilary Vacation.

**A. C.**        AND PRIVY COUNCIL.        155

[PRIVY COUNCIL.]

HOYSTEAD AND OTHERS . . . . . APPELLANTS ;

AND

COMMISSIONER OF TAXATION . . . RESPONDENT.

J. C.*
1925
Dec. 17.

ON APPEAL FROM THE HIGH COURT OF AUSTRALIA.

*Estoppel—Estoppel by Judgment—Admission in previous Litigation—Matter fundamental to previous Judgment—Land Tax Assessment Act, 1910–1916 (Aust.), s. 38, sub-s. 7.*

Under a will the annual income from an estate in Australia was divisible by the trustees between the testator's daughters. The trustees objected to an assessment for the financial year 1918–1919 under the Land Tax Assessment Act, 1910–1916, of Australia; they claimed under s. 38, sub-s. 7, of the Act a deduction of 5000*l.* in respect of the share of each daughter. A case was stated for the opinion of the Full Court of the High Court upon the questions : (1.) Whether the shares of the joint owners, or of any and which of them, in the land were original shares within s. 38 ; (2.) How many deductions of 5000*l.* the respondent should make. The Full Court answered these questions as follows : (1.) The shares of the six children surviving at the date of the assessment ; (2.) Six. Judgment upon the objection was entered accordingly. Upon the assessment for 1919–1920 the Commissioner allowed only one deduction of 5000*l.*, contending that the beneficiaries were not joint owners within the meaning of the Act. Upon a case stated the Full Court upheld that view, and held that the Commissioner was not estopped by the previous decision :—

*Held,* that the Commissioner was estopped, since although in the previous litigation no express decision had been given whether the beneficiaries were joint owners, it being assumed and admitted that they were, the matter so admitted was fundamental to the decision then given.

*Carter* v. *James* (1844) 13 M. & W. 137 and *Howlett*] v. *Tarte* (1861) 10 C. B. (N. S.) 813 explained.

Judgment of the High Court reversed.

APPEAL (No. 3 of 1925) by special leave from a judgment of the High Court of Australia in its appellate jurisdiction (November 2, 1923) affirming a judgment of Starke J. (October 16, 1923) pursuant to a judgment of the Full Court of the High Court (December 16, 1921) upon a case stated

* *Present :* LORD SHAW, LORD SUMNER, LORD PHILLIMORE, LORD DARLING, and LORD SALVESEN.

Case 1:08-cv-00446-LTS    Document 34-3    Filed 07/11/2008    Page 2 of 18

J. C.
1925
HOYSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.

by Starke J. under s. 46, sub-s. 3, of the Land Tax Assessment Act, 1910–1916, of the Commonwealth.

The appellants were trustees under the will of Charles Campbell, deceased, a station owner resident in Melbourne. The questions arising upon the appeal were : (1.) whether upon an assessment for land tax for the financial year 1919–1920 under the above-mentioned Act the appellants were entitled under s. 38, sub-s. 7, to deduct 5000*l.* in respect of the share of each surviving daughter of the testator in the income derived from working the testator's station, or (as was held in Australia) to deduct only one sum of 5000*l.*; and (2.) whether the respondent was estopped from denying that the said beneficiaries were taxable as joint owners within that sub-section, having regard to the judgment of the High Court as to the assessment for the financial year 1918–1919.

The facts, and the material provisions of the Act, appear from the judgment of the Judicial Committee. The said judgment proceeded entirely upon the question of estoppel above mentioned.

The Full Court (Knox C.J., Starke and Higgins JJ.) held that the beneficiaries were not taxable under the Act as joint owners, and that only one deduction of 5000*l.* could be made ; further (Higgins J. dissenting) that the Commissioner of Taxation was not estopped by the judgment with regard to the assessment for 1918–1919. The decision of the Full Court upon the case stated is reported at 29 C. L. R. 537. The decision upon the case stated upon the objection to the 1918–1919 assessment is reported at 27 C. L. R. 440.

1925. Oct. 22, 23, 26, 27. *Clauson K.C.*, *W. A. Greene K.C.* and *du Parcq* for the appellants contended that under the Act the beneficiaries were taxable as joint owners ; further, that the respondent was estopped by the decision as to the 1918–1919 assessment. In support of the latter contention reference was made to cases mentioned in the judgment of the Bench, also to : *In re South American and Mexican Co.* (1) ; *Cooke* v. *Rickman* (2) ; *Jones* v.

(1) [1895] 1 Ch. 37.                    (2) [1911] 2 K. B. 1125.

*Lewis* (1) ; *Reg.* v. *Inhabitants of Hartington* (2) ; *Reg.* v. *Hutchings.* (3)

*Sir John Simon K.C.* and *Hon. Geoffrey Lawrence K.C.,* for the respondent, contended that no estoppel arose, as the question whether the children of the testator were joint owners under the Act was not litigated in the previous proceedings ; they referred to : *Duchess of Kingston's* case (4) ; *Blackham's* case (5) ; *Outram* v. *Morewood* (6) ; *Carter* v. *James* (7) ; *Boileau* v. *Rutlin* (8) ; *Goucher* v. *Clayton* (9) ; *Irish Land Commissioners* v. *Ryan* (10) ; *Kennedy* v. *Kennedy* (11) ; *Cromwell* v. *County of Sac* (12) ; and *New Orleans* v. *Citizens' Bank.* (13)

*Clauson K.C.* replied.

Dec. 17.   The judgment of their Lordships was delivered by

LORD SHAW.   This is an appeal by special leave from two judgments of the Full Court of the High Court of Australia given on December 16, 1921, and November 2, 1923.   The first judgment was given upon a special case which had been stated for the opinion of the Full Court by Starke J. upon the hearing of an appeal by the appellants against their assessment by the Commissioner of Taxation for the purpose of land tax for the financial year 1920–1921.   That learned judge, giving effect to the answers made by the Full Court to the questions in the special case, dismissed the appellants' appeal and, on November 2, 1923, the Full Court affirmed his judgment.   The substance of the appeal has reference to the correctness of the answers given to the questions in the special case.   These questions and answers will be afterwards stated.

Mr. Charles Campbell, a merchant and station owner, resident in Melbourne, died on September 13, 1905, possessed

J. C.
1925
⌣
HOYSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.
—

(1) [1919] 1 K. B. 328, 344.
(2) (1855) 4 E. & B. 780.
(3) (1881) 6 Q. B. D. 300, 303.
(4) (1776) 2 Sm. L. C. 754.
(5) (1708) 1 Salk. 290.
(6) (1803) 3 East, 346.
(7) 13 M. & W. 137.
(8) (1848) 2 Ex. 665.
(9) (1865) 34 L. J. (Ch.) 239.
(10) [1900] 2 I. R. 563.
(11) [1914] A. C. 215, 220.
(12) (1876) 94 U. S. 351.
(13) (1897) 167 U. S. 371, 396, 397.

J. C.
1925
HOYSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.

of considerable real and personal estate in Australia.  Seven children survived him.  By his will he devised and bequeathed his station properties and the stock, etc., thereon upon trust to carry on and work the properties until twenty-one years from his death.  The income was to be enjoyed by his children, and should any child predecease him, leaving issue, the issue was to enjoy the parent's share of income.  There are various provisions as to the particular dates and periods from and during which annual income should be reckoned.  In the view taken in this case these points are immaterial.  Upon the expiration of the twenty-one years the trustees were directed to sell the properties and stock, etc., and to divide the proceeds equally among such children as should be living at the expiration of the twenty-one years, grandchildren again taking their parent's share.

As mentioned, the seven children named in the will were alive at the testator's death ; but one married daughter died in January, 1912, leaving two children.  A question was raised in the proceedings after mentioned as to the rights of these grandchildren, and it was held that they were not entitled to what is termed in the statute an " original share in the land," they not having a " first life or greater interest . . . . in the land or income therefrom."  This question is frequently referred to in the course of the case : but the judgment upon it was accepted at their Lordships' Bar ; and that matter is accordingly no longer in issue.  The appeal may be, therefore, treated as an appeal by the six children of the testator named in his will and still surviving.  The question in the case has reference to the taxation to be imposed upon the estate, or upon various portions of or interests therein, under Mr. Campbell's will.

This depends upon the construction to be given to certain sections and sub-sections of the Land Tax Assessment Act, 1910–1916.

The relevant provisions of the Act are as follows :—

" 10.—(1.) Subject to the provisions of this Act, land tax shall be levied and paid upon the unimproved value of all lands within the Commonwealth which are owned by

A. C.                    AND PRIVY COUNCIL.                    159

taxpayers, and which are not exempt from taxation under
this Act.

"11.—(1.) Land tax shall be payable by the owner of land
upon the taxable value of all the land owned by him. . . . .

"(2.) The taxable value of all the land owned by a person
is . . . . (b) in the case of an owner . . . . the balance of the
total sum of the unimproved value of each parcel of the land,
after deducting the sum of 5000l."

So far for the simplest case—namely, that of owners.

The case of joint owners is specifically dealt with in s. 38.
The sub-sections thereof which are material to the question
in the appeal are :—

"(1.) Joint owners of land shall be assessed and liable for
land tax in accordance with the provisions of this section.

"(2.) Joint owners (except those of them whose interests
are exempt from taxation under s. 13 or s. 41 of this Act)
shall be jointly assessed and liable in respect of the land
(exclusive of the interest of any joint owner so exempt) as
if it were owned by a single person, without regard to their
respective interests therein or to any deductions to which
any of them may be entitled under this Act, and without
taking into account any land owned by any one of them in
severalty or as joint owner with any other person.

"(3.) Each joint owner of land shall in addition be
separately assessed and liable in respect of : (a) his individual
interest in the land (as if he were the owner of a part of the
land in proportion to his interest), together with (b) any
other land owned by him in severalty, and (c) his individual
interests in any other land."

Sub-ss. 7 and 8, in the construction of which arises the
true subject of controversy in the appeal, are as follows :—

"(7.) Where, under a settlement made before July 1, 1910,
or under the will of a testator who died before that day, the
beneficial interest in any land or in the income therefrom is
for the time being shared among a number of persons, all of
whom are relatives of the settlor or testator by blood, marriage,
or adoption, in such a way that they are taxable as joint
owners under this Act, then, for the purpose of their joint

J. C.
1925
HOYSTEAD
v.
COMMIS-
SIONER
OF
TAXATION.

J. C.

1925

HOYSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.

assessment as such joint owners, there may be deducted from the unimproved value of the land, instead of the sum of 5000*l.* as provided by para. (*b*) of sub-s. 2 of s. 11 of this Act, the aggregate of the following sums namely : In respect of each of the joint owners who hold an original share in the land under the settlement or will (*a*) the sum of 5000*l.* . . . .

" Provided that, where the same persons have a beneficial interest in land or in the income therefrom under more than one settlement or will or under a settlement and will, they shall be jointly assessed in respect of the whole of their interests under the settlements or wills or settlement and will, and there may be deducted in the joint assessment from the unimproved value of the land comprised in the joint assessment, instead of the sum of 5000*l.* as provided by para. (*b*) of sub-s. 2 of s. 11 of this Act, the aggregate of the following sums—namely : In respect of each of the joint owners who holds an original share in the land being jointly assessed (*a*) the total sum of 5000*l.*, . . . .

" (8.) In this section, ' original share in the land ' means the share of one of the persons specified in the settlement or will as entitled to the first life or greater interest thereunder in the land or the income therefrom, or to the first such interest in remainder after a life interest of the settlor or after a life interest of the wife or husband of the settlor or testator."

In the full argument on the appeal much stress was laid upon the definition section of the statute and specially upon the following definitions :—

" ' Owner,' in relation to land, includes every person who jointly or severally, whether at law or in equity (*a*) is entitled to the land for any estate of freehold in possession ; or (*b*) is entitled to receive, or in receipt of, or if the land were let to a tenant would be entitled to receive, the rents and profits thereof, whether as beneficial owner, trustee, mortgagee in possession, or otherwise ; and includes every person who by virtue of this Act is deemed to be the owner.

" ' Joint owners ' means persons who own land jointly or in common, whether as partners or otherwise, and includes

persons who have a life or greater interest in shares of the income from the land."

While the present appeal concerns the assessment for the year 1920–1921, its determination may depend upon, or at least it is material to see what had been done by and decided between the parties concerning the assessment of two years before—namely, for the year 1918–1919.

By their return under s. 15, sub-s. 1, of the Act in respect of land tax for the financial year 1918–1919 the appellants claimed seven deductions of 5000*l*. The respondent on that occasion, in assessing, disallowed the deductions claimed in respect of the shares of the beneficiaries. The appellants thereupon lodged objections and claimed to be entitled to seven deductions as being trustees for persons taxable as joint owners and holders of the original shares within s. 38 of the Act. In accordance with the statute the objections were treated as an appeal, and were so transmitted to the High Court.

In the opinion of the Board it is highly important to keep fully in view what were the exact terms of that objection. (It is again explained that no question arose before the Board as to seven deductions, as it was not argued that grand-children but only that each of the six children were entitled to a deduction of 5000*l*. For the sake of convenience accordingly the word " seven " is named as " six " throughout.)

The objection was in the following terms : " I hereby give you notice that I object to the assessment of land tax under the above register number, and contained in the notice of assessment issued by you under date April 12, 1919, for the following reasons : 1. That the beneficiaries named in the will of the testator Charles Campbell who died before the first day of July, 1910, all of whom are relatives of the testator by blood, marriage or adoption are entitled to the beneficial interest in the lands known as ' the station properties ' or in the income therefrom in such a way that they are taxable as joint owners under the Land Tax Assessment Acts 1910–1916 and that they are the holders of original shares in such lands being entitled to the first life or greater interest in such lands

J. C.

1925

HOYSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.

J. C.

1925

HOYSTEAD

*v.*

COMMIS-
SIONER
OF
TAXATION.

or the income thereof.  2. That the taxpayer is entitled to six deductions of 5000*l.* each pursuant to the provisions of ss. 38 and 38A of the Land Tax Assessment Acts 1910–1916 and any amendments thereof.

"Date May 3, 1919."

The Commissioner of Taxation disallowed the objection.

In the transmission to the High Court, according to the procedure under the statute, the Commissioner of Taxation thus narrated what had been done : "And whereas pursuant to reg. 40 (1.) of the regulations made under the said Act the taxpayers being dissatisfied with such assessment did within 30 days from date of the service of the said notice of assessment namely on May 3, 1919, lodge an objection in writing dated the same day with the Commissioner against such assessment. And whereas the Commissioner considered such objection and pursuant to reg. 40 (2.) of the said regulations gave written notice to the taxpayer on July 29, 1919, wholly disallowing the said objection, And whereas the taxpayers being dissatisfied with the decision of the Commissioner on August 4, 1919, required the objection to be treated as an appeal and trans-mitted to the High Court of Australia in its original jurisdiction at Melbourne pursuant to reg. 40 (2.) of the said regulations, Now therefore the Commissioner of Taxation as required by the taxpayers as aforesaid hereby transmits the said objection to the High Court of Australia at Melbourne."

At the hearing Gavan Duffy J. stated a case for the opinion of the Full Court upon the questions : (1.) Whether the shares of the joint owners or of any and which of them in the land were original shares within s. 38 : and (2.) How many deductions of 5000*l.* the respondent should make.

The Full Court (Knox C.J. and Starke J. ; Isaacs J. dissenting) having heard the appeal pronounced judgment thereupon, holding that the questions should be answered as follows : (1.) The shares of the six children surviving at the date of the assessment. (2.) Six.

This opinion on the special case being given, the further hearing of the appeal was resumed before Gavan Duffy J. and, upon May 24, 1920, he pronounced a final order.  It

narrated the notice of objection of the appellants and the memorandum of the respondent transmitting the objection for determination of formal appeal, together with the subsequent presentation of the case for the opinion of the Full Court, and it concluded : " This Court doth order that this appeal be and the same is hereby allowed and that the number of deductions of 5000*l.* to be made by the respondent in the said assessment be six."

The learned judge (in the subsequent special case about to be referred to) narrated what had happened at this last stage of that litigation, in this language : " (3.) That the hearing of the appeal was purely formal. No arguments were adduced by either party. The parties treated the answers of the High Court to the questions stated as covering the whole ground of the appeal. The attention of the justice who heard the appeal was not directed to the question whether the beneficiaries under the will of Charles Campbell were taxable as joint owners and he did not in fact decide that question."

Matters were allowed to rest upon this footing for another year. And then, in the subsequent year, the whole matter was reopened by the action of the Commissioner of Taxation who, in respect of the same estate and the same parties, reverted to the position that the taxable value should not be six sums of 5000*l.* as decided in the former case, but one sum of 5000*l.* To this it was answered, to put the matter briefly, that the former decision was right upon its merits, but that whether so or not, the respondent was estopped by the judgment already pronounced. If this argument be sound there is an end of the case ; and it will be unnecessary to enter upon the merits of the difference between the parties upon the construction of the statute.

In the opinion of their Lordships the contention of the appellants is sound, and the respondent is estopped by judgment.

It is, however, necessary to examine carefully the argument presented against such estoppel. It amounts to this—that in the former case it was not matter of decision that the appellants were joint owners, but was matter of admission.

J. C.
1925
⌣
HOYSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.
——

J. C.

1925

HOYSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.
—

In the judgment of Isaacs J., who dissented from his two learned brethren, he pointed this out in such a way as to suggest that, although the Court had been bound to accept the admission, still it was erroneous in law.  Accepting this hint, the respondent proceeded as for the year 1920–1921 to challenge the fact of joint-ownership which it was alleged had been matter of admission, and to assess upon the footing that the number of deductions from the capital should be one, and should not be six, as had been decided.

To this a notice of objection was lodged on May 16, 1921, the first head being that " the said assessment is erroneous in matter of law " and the second being as follows : " That the beneficiaries in the station properties trust come within the definition of joint owners and that the six deductions of 5000*l.* each under s. 38, sub-s. 7, of the Act as claimed in the trustee's return and as allowed by the High Court of Australia in respect of the trustee's return for 1918–1919 have wrongly been disallowed in the said assessment—and that such assessment should accordingly have been made on a taxable balance of 183,254*l.*"

The objection, being transmitted as an appeal, came before Starke J., and a special case was stated by him for the opinion of the Full Court, which contained the following questions— namely : " 2.  How many deductions of five thousand pounds are the trustees entitled to on the footing that the Commissioner is not estopped by any judgment ?  3.  Is the Commissioner estopped by judgment from contending that the trustees are not entitled to six deductions of five thousand pounds ? "

The Full Court (Knox C.J., Starke and Higgins JJ.) answered as follows : 2. One—pursuant to s. 11 of the Act. 3. No.  Higgins J. dissented as to answer 3, and stated that in his opinion the respondent was estopped by the previous judgment.

The appellants contend that the dissent of the learned judge was right and that the question how many deductions of 5000*l.* the trustees are entitled to has already been settled for the years 1918–1919 and settled expressly by the High

J. C.
1925
HOYSTEAD
v.
COMMIS-
SIONER
OF
TAXATION.

Court of Australia. This was the subject of a full argument in which the respondent contended that the previous litigation proceeded upon the footing of an admission that Mr. Campbell's children were joint owners and that such an admission was erroneous in law. Arguing on the merits, he maintained that, a proper construction being put upon the terms of Mr. Campbell's will, such error is made out, and that accordingly no decision of the Courts was obtained on what it is argued was the true point for determination in the later appeal.

As to the amount of deduction to be made under the Act, being either six sums of 5000*l.* or one sum of 5000*l.*, the former litigation settled six ; the judgment under appeal settled one. There is accordingly between the same parties in regard to the same property a definite prescription of deduction from assessable values. The Board is of opinion that that prescription was as conclusively settled in the former litigation as language could settle it, it having been " How many deductions of 5000*l.* the respondent should make ? " and the judicial answer being " six." Apart from the other arguments and the authorities to be presently alluded to, the case appears thus to be concluded in favour of the appellants.

Very numerous authorities were referred to. In the opinion of their Lordships it is settled, first, that the admission of a fact fundamental to the decision arrived at cannot be withdrawn and a fresh litigation started, with a view of obtaining another judgment upon a different assumption of fact ; secondly, the same principle applies not only to an erroneous admission of a fundamental fact, but to an erroneous assumption as to the legal quality of that fact. Parties are not permitted to begin fresh litigations because of new views they may entertain of the law of the case, or new versions which they present as to what should be a proper apprehension by the Court of the legal result either of the construction of the documents or the weight of certain circumstances. If this were permitted litigation would have no end, except when legal ingenuity is exhausted. It is a principle of law

J. C.
1925
HOYSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.

that this cannot be permitted, and there is abundant authority reiterating that principle. Thirdly, the same principle— namely, that of setting to rest rights of litigants, applies to the case where a point, fundamental to the decision, taken or assumed by the plaintiff and traversable by the defendant, has not been traversed. In that case also a defendant is bound by the judgment, although it may be true enough that subsequent light or ingenuity might suggest some traverse which had not been taken. The same principle of setting parties' rights to rest applies and estoppel occurs.

Out of respect to the learned judges in the Courts below and to the sustained argument at the bar, one or two of the cases of outstanding authority are referred to.

In *Outram* v. *Morewood* (1), an action of trespass over a certain vein of coals lying under the close of the plaintiff, it was held that if a verdict be found on any fact or title, distinctly put in issue in an action of trespass, such verdict may be pleaded by way of estoppel in another action between the same parties or their privies, in respect of the same fact or title.

In a previous action an issue was found for the plaintiff and against the wife, one of the two subsequent defendants, her husband being the other defendant with her in the action under decision. Lord Ellenborough C.J. said (2) : " The operation and effect of this finding, if it operate at all as a conclusive bar, must be by way of estoppel. If the wife were bound by this finding, as an estoppel and precluded from averring the contrary of what was then so found, the husband, in respect of his privity, either in estate, or in law, would be equally bound." And in subsequent portions of his judgment (3) he spoke as follows : " A finding upon title in trespass not only operates as a bar to the future recovery of damages for a trespass founded on the same injury, but also operates by way of estoppel to any action for an injury to the same supposed right of possession. . . . . And it is not the recovery, but the matter alleged by the party, and upon which the recovery

(1) 3 East, 346.          (2) Ibid. 353.          (3) Ibid. 354, 355.

proceeds, which creates the estoppel. The recovery of itself in an action of trespass is only a bar to the future recovery of damages for the same injury : but the estoppel precludes parties and privies from contending to the contrary of that point, or matter of fact, which having been once distinctly put in issue by them, or by those to whom they are privy in estate or law, has been, on such issue joined, solemnly found against them."

The rule extends, not merely to Courts having the same jurisdiction but to the judgments of all Courts of competent jurisdiction. A striking instance of this was the case of *Barrs* v. *Jackson* (1), in which a judgment was pronounced by Knight-Bruce V.-C. in the course of which much citation was made as to Courts of ecclesiastical jurisdiction. The decision of the Vice-Chancellor is compendiously stated in the headnote. It was to the following effect : " In a suit instituted in the Chancery Division for the distribution of the assets of an intestate, the grant of letters of administration is not conclusive evidence upon the question who is the intestate's sole next of kin."

This judgment was reversed, and a judgment in a directly contrary sense was pronounced by Lord Lyndhurst. (2)

A further instance, this time of the application of the doctrine to estoppel in the Court of King's Bench by reason of a judgment of a county court, is the case *In re Graydon* (3), in which a county court judge had held that a sum of 20*l.* was in the nature of personal earnings on the part of a bankrupt patentee and belonged to the bankrupt. Subsequent royalties having become due the trustee applied to the Bankruptcy Court for a declaration that they vested in him after-acquired property. It was held that the judgment of the county court estopped the trustee from asserting that the royalties were not the bankrupt's personal earnings. The question as to the quantum of the allowance to be made to the bankrupt was another matter, and that allowance was varied ; but Vaughan Williams J. said that he thought the fair inference

J. C.

1925

HOYSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.

(1) (1842) 1 Y. & C. 585.          (2) (1845) 1 Phil. 582.
(3) [1896] 1 Q. B. 417.

J. C.
1925
⌣
HOYSTEAD
v.
COMMIS-
SIONER
OF
TAXATION;
—

from the judgment of the county court judge was that the trustee did decide that the sums in question were in the nature of personal earnings. The trustee was accordingly estopped from denying this to be the nature of the payments when made. It plainly appears that the learned judge was himself of opinion that the royalties were not the personal earnings of the bankrupt ; but this very properly made no difference upon the point of estoppel. The trustee was estopped from making that assertion by the judgment of the county court.

But the respondent maintained with much elaboration that an analysis of the first judgment pronounced by the Full Court showed that the grounds of that judgment, which it was maintained were erroneous in law, proceeded upon an admission that Mr. Campbell's children were joint owners ; and he founded strongly upon such statements from the Bench as that of Starke J., already quoted, that attention had not been directed to the question of joint ownership in the debates in the former case.

It might be sufficient to say, in answer to the entire argument on this head, that whether the point as to joint ownership depended upon admission of fact upon evidence led or upon argument upon construction of a statute, that is, as already stated, nothing to the point in considering the question of estoppel. There would be no quieting of litigation unless the judgment was taken as it stands. It is plain that the res in the present case was adjudged, that res being, in figures, that six times 5000l. should be the suitable deduction from the assessed property.

In the citation of authority upon this topic confusion is apt to be introduced by lack of the following consideration of a point peculiar in former days to English procedure.

Two authorities were relied upon by counsel for the respondent. Taking them in order of date they are *Carter* v. *James* (1), decided in 1844, and *Howlett* v. *Tarte* (2), decided in 1861. As is shown by passages in the judgment of Alderson B. in the one and Byles J. in the other, they depended upon the old rules of pleading. The rule that pleadings

(1) 13 M. & W. 137.                    (2) 10 C. B. (N. S.) 813.

must not be double, as expressed by Stephen on Pleading (ch. 3, s. 3), and Bullen & Leake (3rd ed., p. 441), prevented a defendant from pleading more than one plea to the declaration, or if there were several counts in the declaration more than one plea to each count, and prevented a plaintiff from pleading more than one replication to each plea.

J. C.
1925
HOYSTEAD
v.
COMMIS-
SIONER
OF
TAXATION.

The strictness of the common law rule was relaxed by the statute 4 & 5 Anne, c. 16, s. 4, enabling a defendant with leave of a judge to plead several pleas, and by the Common Law Procedure Act, 1852, and the rules of Hilary Term, 1853, extending this principle to replications, and allowing certain specified pleas to be pleaded as of right without leave.

But till the Judicature Acts, 1873 and 1875, it remained the law that, except in those cases specially mentioned, several pleas and several replications could only be pleaded by the leave of the Court or a judge, and this leave was by no means obtainable as a matter of course, and was indeed not seldom refused.

It was customary in order to save a possible estoppel for a defendant who had two answers each of which seemed to be good, but who was limited by the rules to one, to insert in his plea or accompany his plea with a protestation, and the pleading was known as a protestando. In this way the defendant, while protesting that he had other answers to the declaration, nevertheless being confined to one answer, put forward one only. Alderson B. refers in his judgment already cited to " the ancient practice " of pleading the facts with a protestation. Protestandos, however, were abolished by the Rules of Court of 1834, and their value was always doubtful.

While the rules against double pleading were in force, it would have led to much injustice if a suitor who had two answers to a claim, or two replies to a defence, but was prevented from raising more than one, was deemed to have admitted that he had no other answer or reply than that to which he had to confine himself, and this is the ratio decidendi of the two cases on which reliance was placed for the respondent. Thus explained they in no way derogate from the general principles of law.

J. C.
1925
HOYSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.

It is seen from this citation of authority that if in any Court of competent jurisdiction a decision is reached, a party is estopped from questioning it in a new legal proceeding. But the principle also extends to any point, whether of assumption or admission, which was in substance the ratio of and fundamental to the decision. The rule on this subject was set forth in the leading case of *Henderson* v. *Henderson* (1) by Wigram V.-C. as follows : " I believe I state the rule of the Court correctly when I say, that where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the Court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of res judicata applies, except in special cases, not only to points upon which the Court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time." This authority has been frequently referred to and followed, and is settled law.

" I think," said Williams J. in *Howlett* v. *Tarte* (2), " it is quite clear upon the authorities to which our attention has been called, and upon principle, that, if the defendant attempted to put upon the record a plea which was inconsistent with any traversable allegation in the former declaration, there would be an estoppel."

This passage has been accepted expressly over and over again, as for instance by Phillimore J. (now Lord Phillimore) in *Humphries* v. *Humphries* (3) and Farwell L.J., in the same case on appeal. (4) An instance of the application of the principle to the construction of clauses in the

(1) (1843) 3 Hare, 114.
(2) 10 C. B. (N. S.) 813, 826.
(3) [1910] 1 K. B. 796, 801.
(4) [1910] 2 K. B. 531, 535.

testator's will is to be found in the judgment of this
Board pronounced by Lord Macnaghten in *Badar Bee* v.
*Habib Merican Noordin.* (1)   It must, however, be pointed
out that *Carter* v. *James* (2) and *Howlett* v. *Tarte* (3) turned
upon default in pleading in the prior proceedings, relied upon
as an estoppel ; but in a case like the present, where there
are no pleadings at all, the main question is whether a prior
opportunity of raising the point now foreclosed by estoppel
had in substance arisen and been passed by.   In short, the
present point was one which, if taken, went to the root of
the matter on the prior occasion, so that its omission was
no mere default in pleading but a real attempt to divide one
argument into two and to multiply litigation.

 Reference may be finally made in a word to the argument
submitted to the Board to the effect that the admission and
assumption of joint ownership made in the former case between
these parties were upon a matter which was only incidentally
or collaterally related to the point actually discussed and
litigated.

 Much stress was laid on the fact that, in the present case,
an express decision upon the point of joint ownership was
come to, and that this was not so in the former case.   To
which the answer is contained in a reference to the language
of s. 38, sub-s. 7, of the statute as follows—namely, that where,
under a settlement, income is shared by relatives of the
settlor " *in such a way that they are taxable as joint owners*
under this Act," then, for the purpose of their joint assessment
" *as such joint owners* there may be deducted . . . . in respect
of each of the joint owners who hold an original share in the
land " 5000*l.*   The former judgment was pronounced by the
Australian Courts under that section.   It was not merely
incidental or collateral to the question so decided that the
appellants were joint owners.   It was fundamental to it.
Unless it had been decided that, under the settlement,
Mr. Campbell's children had a beneficiary interest in land or
income " in such a way that they are taxable as joint owners "

J. C.
1925
HOYSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.

  (1) [1909] A. C. 615.  (2) 13 M. & W. 137.
   (3) 10 C. B. (N. S.) 813.

       **3**   N 2

J. C.

1925

HOVSTEAD
*v.*
COMMIS-
SIONER
OF
TAXATION.

they could not have been taxed at all.  On this portion of the case their Lordships' opinion is entirely in accord with the judgment of Higgins J. in the Full Court.

Their Lordships will humbly advise His Majesty that the appeal be allowed with costs to the appellants both here and below, and that it be remitted to the High Court of Australia to direct that question 3 of the special case—namely, " Is the Commissioner estopped by judgment from contending that the trustees are not entitled to six deductions of 5000*l*.," be answered in the affirmative, and that the other questions are thus superseded.

Solicitors for appellants : *Radcliffes & Hood, St. Barbe Sladen & Wing.*

Solicitors for respondent : *Coward, Chance & Co.*

———

[HOUSE OF LORDS.]

H. L. (E.)

1925

Dec. 11.

———

ADELAIDE    STEAMSHIP    COMPANY, LIMITED    .    .    .    .    .    .    .    .    } APPELLANTS ;

AND

ATTORNEY-GENERAL    .    .    .    .    .    RESPONDENT.

*Shipping—Charterparty—Requisition—Charterparty T. 99—Ambulance Transport—Consequences of warlike Operations—Collision caused by Negligence of requisitioned Ship—Liability of Crown—Measure of Damages—Indemnity against Damages payable to third Parties—Compensation for Loss of Hire.*

The steamship *Warilda* was taken over during the war by the Admiralty on the terms of Charterparty T. 99 for use as an ambulance transport. Whilst carrying wounded soldiers from Havre to Southampton the *Warilda* came into collision with another ship, and both ships were damaged.  In an action arising out of the collision it was held that the collision was caused by the negligence of the master of the *Warilda*, and that the *Warilda* was liable to the other ship for damages.  Charterparty T. 99 provided (cl. 19) that the Admiralty would take over war risks excluded from an ordinary marine policy by the f. c. and s. clause,

———

\* *Present :* VISCOUNT CAVE L.C., LORD ATKINSON, LORD BUCKMASTER, LORD CARSON, and LORD BLANESBURGH.

723

1 A.C.

A                                [HOUSE OF LORDS]

*In re* STATE OF NORWAY'S APPLICATION
*In re* STATE OF NORWAY'S APPLICATION (No. 2)

[CONSOLIDATED APPEALS]

B
1987  Oct. 19, 20, 21, 22, 23,              May, Balcombe and Woolf L.JJ.
      27;
      Dec. 18
1988  Oct. 17, 18, 19, 20, 24;                      Lord Keith of Kinkel,
1989  Feb. 16                        Lord Brandon of Oakbrook, Lord Griffiths,
                                      Lord Goff of Chieveley and Lord Lowry

C
*Evidence—Foreign tribunal, for—Jurisdiction of English court—
Letters rogatory—Request for examination of witnesses—Evidence
required for proceedings relating to tax assessment—Whether
proceedings in "civil or commercial matter"—Whether jurisdiction
in English court to order examination—Exercise of discretion—
Evidence (Proceedings in Other Jurisdictions) Act 1975 (c. 34),
ss. 1, 9(1)*

D
        A county tax committee in Norway raised a supplementary
retrospective tax assessment against the estate of the deceased,
a Norwegian who had resided in Norway. The assessment
related to the assets of a company of which the deceased was
alleged to be the beneficial owner as the settlor, or the person
in control, of a trust which owned the company's shares. The
deceased's estate brought an action against the State of Norway
E    in a city court, seeking to set aside the assessment, and in
separate proceedings appealed against the assessment to the
Norwegian Tax Committee. The city court, on an application
by the state, issued a letter of request addressed to the English
High Court requesting the oral examination of two witnesses
residing in England, viz., a director of the trust's bank who had
given the trust financial advice and a senior employee of the
bank who had been treasurer of the company, in respect of
F    eight specified matters. The state applied to a master in
chambers under section 1 of the Evidence (Proceedings in Other
Jurisdictions) Act 1975[1] for an order requiring the witnesses to
give the evidence sought, and the estate supported the
application. The master made the order sought. McNeill J. in
chambers refused the witnesses' application to set aside the
order. On appeal by the witnesses and cross-appeal by the state
G    and the estate, the Court of Appeal held, inter alia, that the
proceedings in the city court were civil proceedings in both
Norwegian and English law, even though they concerned fiscal
matters, and were therefore "proceedings in any civil or
commercial matter" for the purposes of the Act, but (by a
majority) that the court should not accede to the request since
its terms were so wide that they were designed to elicit
information which might lead to the obtaining of evidence
H    rather than to establish particularised allegations of fact, and it
was therefore "fishing."

---

[1] Evidence (Proceedings in other Jurisdictions) Act 1975, s. 1: see post, p. 794D–F.
S. 9(1): see post, p. 800B–C.

724

The city court issued a second letter of request requesting the oral examination of the witnesses on 12 specified issues, and setting out the specific questions which it was intended should be put to them as to the existence or otherwise of particular facts or states of affairs. On the state's application, the master in chambers made an order under section 1 of the Act for the witnesses to be examined in relation to the matters set out in the letter of request. Kenneth Jones J. in chambers refused the witnesses' application to set aside the master's order.

On appeal by the witnesses, on the ground, inter alia, that the court had no jurisdiction under the Act to accede to the request because the proceedings in the city court were not "proceedings in a civil or commercial matter" for the purpose of the Act, the Court of Appeal held that the Act excluded fiscal matters and that therefore the English court had no jurisdiction to entertain the request of the city court.

On appeal by the state and the estate:

*Held,* allowing the appeal, (1) that the Evidence (Proceedings in Other Jurisdictions) Act 1975, was to be construed by reference to its legislative history, by which Parliament had conferred on the courts a broad jurisdiction in the obtaining of evidence for the assistance of courts of other countries and accordingly the definition of "civil or commercial matter" in section 9 had not been intended to be given a restricted construction derived from the distinction between public and private law in civil law systems; that jurisdiction to obtain evidence would be established if the relevant proceedings were proceedings in a civil or commercial matter in both the United Kingdom and the requesting state and that the proceedings in the city court fell within the definition of a civil or commercial matter both in the United Kingdom and Norway (post, pp. 790D–G, 796E–F, 800B–F, 803D–F, G—804C, 805D–F, 806E–G, 811G–H).

*In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, H.L.(E.) considered.

(2) That although the courts did not assist in the direct or indirect enforcement in England of the revenue law of a foreign state, such a rule did not extend to the seeking of assistance in obtaining evidence to be used for the enforcement of the revenue laws of the foreign state in that state itself; that, further, there were no grounds for interfering with the judge's findings that the second letter of request did not amount to "fishing" or with his decision that public policy outweighed the witnesses' duty of confidence as bankers; and accordingly the witnesses could be ordered to give evidence (post, pp. 790D–G, 809C–F, 810C–E, 811E–G, G–H, H—812A).

*Government of India v. Taylor* [1955] A.C. 491, H.L.(E.) applied.

Order of the Court of Appeal in *In re State of Norway's Application* [1987] Q.B. 433; [1986] 3 W.L.R. 452 affirmed and in *In re State of Norway's Application (No. 2)*, post, p. 732B, reversed.

The following cases are referred to in the opinion of Lord Goff of Chieveley:

*Attorney-General of New Zealand v. Ortiz* [1984] A.C. 1; [1982] 3 W.L.R. 570; [1982] 3 All E.R. 432, C.A.; [1984] A.C. 1; [1983] 2 W.L.R. 809; [1983] 2 All E.R. 93, H.L.(E.)

725

A    *Bemberg v. Fisc de la province de Buenos Aires,* 24 February 1949; Tribunal
de la Seine; Semaine Juridique, 1949, II, 4816; Recueil Sirey, 1949, 2,
101

*India (Government of) v. Taylor* [1955] A.C. 491; [1955] 2 W.L.R. 303;
[1955] 1 All E.R. 292, H.L.(E.)

*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L.
Docket No. 235 (Nos. 1 and 2), In re* [1978] A.C. 547; [1978] 2 W.L.R.
B    81; [1978] 1 All E.R. 434, H.L.(E.)

The following additional cases were cited in argument in the House of
Lords:

*Air France v. Saks* (1985) 105 S.Ct. 1388; 470 U.S. 392; 84 L. Ed. 2d 289

*Bavaria Fluggesellschaft Schwabe & Co. KG v. Eurocontrol*
(Cases 9–10/77) [1977] E.C.R. 1517; [1980] 1 C.M.L.R. 566, E.C.J.

C    *Block v. Compagnie Nationale Air France* (1967) 386 F. 2d 323

*British Steel Corporation v. Granada Television Ltd.* [1981] A.C. 1096;
[1980] 3 W.L.R. 774; [1981] 1 All E.R. 417, H.L.(E.)

*Buchanan (James) & Co. Ltd. v. Babco Forwarding & Shipping (U.K.) Ltd.*
[1978] A.C. 141; [1977] 3 W.L.R. 907; [1977] 3 All E.R. 1048, H.L.(E.)

*Dalmia Dairy Industries Ltd. v. National Bank of Pakistan* [1978] 2 Lloyd's
Rep. 223, C.A.

D    *Extradition Act, 1870, In re, Ex parte Treasury Solicitor* [1969] 1 W.L.R. 12;
[1968] 3 All E.R. 804

*Fothergill v. Monarch Airlines Ltd.* [1981] A.C. 251; [1980] 3 W.L.R. 209;
[1980] 2 All E.R. 696, H.L.(E.)

*Huntington v. Attrill* [1893] A.C. 150, P.C.

*LTU Lufttransportunternehmen GmbH & Co. K.G. v. Eurocontrol* (Case
29/76) [1976] E.C.R. 1541; [1977] 1 C.M.L.R. 88, E.C.J.

E    *Netherlands, State of the v. Rüffer* (Case 814/79) [1980] E.C.R. 3807; [1981]
3 C.M.L.R. 293, E.C.J.

*United States of America v. Harden* (1963) 41 D.L.R. (2d) 721

*Williams and Humbert Ltd. v. W.& H. Trade Marks (Jersey) Ltd.* [1986]
A.C. 368; [1986] 2 W.L.R. 24; [1986] 1 All E.R. 129, H.L.(E.)

The following cases are referred to in the judgments in the Court of Appeal
F    in Norway 2:

*Air France v. Saks* (1985) 105 S. Ct. 1388; 470 U.S. 392; 84 L. Ed. 2d 289

*Bavaria Fluggesellschaft Schwabe & Co. KG v. Eurocontrol* (Cases 9–10/77)
[1977] E.C.R. 1517; [1980] 1 C.M.L.R. 566, E.C.J.

*Block v. Compagnie Nationale Air France* (1967) 386 F. 2d 323

*Bonalumi v. Secretary of State for the Home Department* [1985] Q.B. 675;
[1985] 2 W.L.R. 722; [1985] 1 All E.R. 797, C.A.

G    *Buchanan (James) & Co. Ltd. v. Babco Forwarding & Shipping (U.K.) Ltd.*
[1978] A.C. 141; [1977] 3 W.L.R. 907; [1977] 3 All E.R. 1048, H.L.(E.)

*Campbell (Donald) & Co. Ltd. v. Pollak* [1927] A.C. 732, H.L.(E.)

*Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2)* [1967] 1 A.C. 853;
[1966] 3 W.L.R. 125; [1966] 2 All E.R. 536, H.L.(E.)

*Close v. Steel Co. of Wales Ltd.* [1962] A.C. 367; [1961] 3 W.L.R. 319;
[1961] 2 All E.R. 953, H.L.(E.)

H    *Commissioner of Stamps, Straits Settlements v. Swan* [1933] A.C. 378, P.C.

*Dalmia Dairy Industries Ltd. v. National Bank of Pakistan* [1978] 2 Lloyd's
Rep. 223, C.A.

*Deumeland v. Germany* (1986) 8 E.H.R.R. 448

*Dreyfus v. Peruvian Guano Co.* (1889) 43 Ch. D. 316, C.A.

726

*Duedu v. Yiboe* [1961] 1 W.L.R. 1040, P.C.

*Extradition Act, 1870, In re, Ex parte Treasury Solicitor* [1969] 1 W.L.R. 12; [1968] 3 All E.R. 804

*Feldbrugge v. The Netherlands* (1986) 8 E.H.R.R. 425

*Fidelitas Shipping Co. Ltd. v. V/O Exportchleb* [1966] 1 Q.B. 630; [1965] 2 W.L.R. 1059; [1965] 2 All E.R. 4, C.A.

*Fothergill v. Monarch Airlines Ltd.* [1981] A.C. 251; [1980] 3 W.L.R. 209; [1980] 2 All E.R. 696, H.L.(E.)

*Gourdain v. Nadler* (Case 133/78) [1979] E.C.R. 733; [1979] 3 C.M.L.R. 180, E.C.J.

*Huntington v. Attrill* [1893] A.C. 150, P.C.

*India (Government of) v. Taylor* [1955] A.C. 491; [1955] 2 W.L.R. 303; [1955] 1 All E.R. 292, H.L.(E.)

*Khan v. Golechha International Ltd.* [1980] 1 W.L.R. 1482; [1980] 2 All E.R. 259, C.A.

*LTU Lufttransportunternehmen GmbH & Co. K.G. v. Eurocontrol* (Case 29/76) [1976] E.C.R. 1541; [1977] 1 C.M.L.R. 88, E.C.J.

*Maliban Biscuit Manufactories Ltd. v. Subramaniam* [1971] A.C. 988; [1971] 3 W.L.R. 469, P.C.

*Netherlands, State of the v. Rüffer* (Case 814/79) [1980] E.C.R. 3807; [1981] 3 C.M.L.R. 293, E.C.J.

*Norway's (State of) Application, In re* [1987] Q.B. 433; [1986] 3 W.L.R. 452, C.A.

*Penn-Texas Corporation v. Murat Anstalt (No. 2)* [1964] 2 Q.B. 647; [1964] 3 W.L.R. 131; [1964] 2 All E.R. 594, C.A.

*Reg. v. Southampton Justices, Ex parte Green* [1976] Q.B. 11; [1975] 3 W.L.R. 277; [1975] 2 All E.R. 1073, C.A.

*Shoe Machinery Co. v. Cutlan* [1896] 1 Ch. 667

*Slack v. Leeds Industrial Co-operative Society Ltd.* [1923] 1 Ch. 431, C.A.; [1924] A.C. 851, H.L.(E.)

*Tennekoon, Commissioner for Registration of Indian and Pakistani Residents v. Duraisamy* [1958] A.C. 354; [1958] 2 W.L.R. 994; [1958] 2 All E.R. 479, P.C.

*Thoday v. Thoday* [1964] P. 181; [1964] 2 W.L.R. 371; [1964] 1 All E.R. 341, C.A.

*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2), In re* [1978] A.C. 547; [1978] 2 W.L.R. 81; [1978] 1 All E.R. 434, H.L.(E.)

*Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd.* [1975] A.C. 581; [1975] 2 W.L.R. 690, P.C.

The following additional cases were cited in argument in the Court of Appeal in Norway 2:

*Allsop and Joy's Contract, In re* (1889) 61 L.T. 213

*Asbestos Insurance Coverage Cases, In re* [1985] 1 W.L.R. 331; [1985] 1 All E.R. 716, H.L.(E.)

*Bemberg v. Fisc de la province de Buenos Aires,* 24 February 1949; Tribunal de la Seine; Semaine Juridique, 1949, II, 4816; Recueil Sirey, 1949, 2, 101

*British Steel Corporation v. Granada Television Ltd.* [1981] A.C. 1096; [1980] 3 W.L.R. 774; [1981] 1 All E.R. 417, Sir Robert Megarry V.-C., C.A. and H.L.(E.)

*Getty (Sarah C.) Trust, In re* [1985] Q.B. 956; [1985] 3 W.L.R. 302; [1985] 2 All E.R. 809

*Hennessy v. Wright (No. 2) (Note)* (1888) 24 Q.B.D. 445, C.A.

A

B

C

D

E

F

G

H

1 A.C.                In re Norway's Application (Nos. 1 & 2) (C.A.)

A    *Hoystead v. Commissioner of Taxation* [1926] A.C. 155, P.C.
     *Jacobs v. London County Council* [1950] A.C. 361; [1950] 1 All E.R. 737,
       H.L.(E.)
     *Kok Hoong v. Leong Cheong Kweng Mines Ltd.* [1964] A.C. 993; [1964] 2
       W.L.R. 150; [1964] 1 All E.R. 300, P.C.
     *Reg. v. Board of Visitors of Hull Prison, Ex parte St. Germain* [1979] Q.B.
       425; [1979] 2 W.L.R. 42; [1979] 1 All E.R. 701, C.A.
B    *Reg. v. Hutchings* (1881) 6 Q.B.D. 300, C.A.
     *Reg. v. Secretary of State for the Environment, Ex parte Hackney London
       Borough Council* [1983] 1 W.L.R. 524; [1983] 3 All E.R. 358, D.C.;
       [1984] 1 W.L.R. 592; [1984] 1 All E.R. 956, C.A.
     *Salomon v. Customs and Excise Commissioners* [1967] 2 Q.B. 116; [1966] 3
       W.L.R. 1223; [1967] 3 All E.R. 871, C.A.
     *Securities and Exchange Commission v. Stockholders of Santa Fe International
       Corporation* [1985] E.C.C. 187
C    *Spens v. Inland Revenue Commissioners* [1970] 1 W.L.R. 1173; [1970] 3 All
       E.R. 295

     The following additional cases, although not cited to the court, were
referred to in counsel's written submissions to the Court of Appeal in Norway 2:

     *Barham v. Lord Huntingfield* [1913] 2 K.B. 193, C.A.
D    *Connelly v. Director of Public Prosecutions* [1964] A.C. 1254; [1964] 2
       W.L.R. 1145; [1964] 2 All E.R. 401, H.L.(E.)
     *Griffiths v. Davies* [1943] K.B. 618; [1943] 2 All E.R. 209, C.A.
     *London (Mayor and Aldermen of the City of) v. Cox* (1867) L.R. 2 H.L.
       239, H.L.(E.)
     *Panthalu v. Ramnord Research Laboratories Ltd.* [1966] 2 Q.B. 173; [1965]
       3 W.L.R. 682; [1965] 2 All E.R. 921, C.A.
E    *Reg. v. Commissioners for Special Purposes of the Income Tax* (1888) 21
       Q.B.D. 313, C.A.
     *Rex v. Lincolnshire Justices, Ex parte Brett* [1926] 2 K.B. 192, C.A.
     *Sebright v. Hanbury* [1916] 2 Ch. 245
     *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B.
       461, C.A.
     *Waring, In re; Westminster Bank v. Burton-Butler* [1948] Ch. 221; [1948] 1
       All E.R. 257
F

     APPEAL and CROSS-APPEAL from Kenneth Jones J.
     By a letter of request dated 10 March 1986 addressed to "the High
Court of Justice in England," the City Court of Sandefjord, Norway
requested, inter alia, that Lord Kindersley and Mr. A. J. Hardman be
caused to appear before an examiner of the court to be examined orally
G on oath (or solemn affirmation) as witnesses by lawyers representing the
defendant and the plaintiff in a civil case in the city court, no. 135/83/A:
*Estate of Shipowner Anders Jahre v. State of Norway (Ministry of
Finance)*, and their testimony reduced to writing and returned to the city
court. The letter stated that it had been represented to the court by both
parties that justice could not be done between them, nor the issues
resolved at trial, without such testimony, which was intended to be given
H in evidence at the trial, and that their evidence was sought in relation to
particular issues, which the court was satisfied were central to the
proceedings and in respect of which the court was satisfied that the
witnesses were able to give evidence which was both relevant and

728

A

admissible. Schedule 1 to the letter stated that the issues in respect of which the evidence was sought were (1) whether Anders Jahre ("the deceased") had, directly, or indirectly, become the legal or beneficial owner of the shares of Continental Trust Co. Inc. ("C.T.C.") and/or of assets held in the name of C.T.C.; (2) whether the deceased had, directly or indirectly, controlled or had the use, for his own benefit, of the shares of C.T.C. and/or of assets held in its name; (3) whether both before and after the formation of a charitable foundation which held the shares in C.T.C. the assets of C.T.C. were dealt with and disposed of for the benefit of the deceased; (4) whether such dealings or dispositions included payments into and out of C.T.C.'s accounts with a Scandinavian bank, payments to an unnumbered personal account with a Paris bank arising from the sale of C.T.C.'s shares in a company, and the payment of 20,000,000 N. Kroner to the Sandefjord city authorities to finance the construction of a new town hall; (5) whether the settlor of the C.T.C. shares and/or the assets of C.T.C. held in the name of the foundation was the deceased; (6) if such settlor was not the deceased, whether the settlor(s) had been acting as nominee(s) or agent(s) for him and/or were known by the witnesses to be connected or associated with him; (7) if such settlor(s) had been acting as nominee(s) or agent(s) for the deceased or persons known by the witnesses to be connected or associated with him, what was the identity of such person(s); (8) if the settlor of the shares and/or assets was the deceased or his nominee or agent or person(s) known by the witnesses to be connected or associated with him, what was or were the name of the foundation, its constitution and objects, its accounts and financial management generally, the names of the trustees and beneficiaries, and who had had authority to elect or remove trustees and to alter the trust deed; (9) whether following the formation of the foundation in 1976 the person from whom the witnesses had received their instructions in relation to dealings with the disposition of the assets of C.T.C. had been the deceased; (10) if that person had not been the deceased, whether such person(s) had been acting as his nominee(s) or agent(s) and/or had been known by the witnesses to be connected or associated with him; (11) if those persons had been acting as nominee(s) or agent(s) for the deceased, what was the identity of such persons; and (12) whether the nature and extent at the material times of the assets, if any, held or applied by or in the name of C.T.C. or of the foundation for the benefit, direct or indirect, of the deceased had been as least as great as specified in an assessment to tax against the estate of the deceased, dated 14 September 1983.

B

C

D

E

F

G

On the state's ex parte application Master Creightmore in chambers on 2 April 1986, inter alia, appointed an examiner and ordered the witnesses to attend before him to be examined on oath or affirmation in relation to the matters set out in Schedule 1 to the letter of request. The witnesses applied by summons to have that order set aside. Master Prebble by consent adjourned the application to the judge in chambers under R.S.C., Ord. 32, r. 12. On 20 October 1986, and by an order dated 18 November 1986, Kenneth Jones J. dismissed the witnesses' application, but ordered that Master Creightmore's order take effect subject to (i) the deletion of paragraphs 8 and 12 of Schedule 1 to the

H

1 A.C.                    In re Norway's Application (Nos. 1 & 2) (C.A.)

A     letter of request and, from paragraphs 6, 7 and 10, of references to persons "known by the witnesses to be connected or associated with" the deceased, and (ii) a direction that the witnesses be not required to reveal the identity of the settlor or to answer any questions under paragraphs 7, 9, 10 and 11 unless the witnesses or one of them should have said in evidence that the settlor had, in relation to the C.T.C. shares and/or C.T.C.'s assets held in the name of the foundation, been

B     acting as the deceased's nominee or agent; and he granted leave to appeal.

      By a notice of appeal dated 17 December 1986 the witnesses appealed, on the grounds that (A) as to jurisdiction (1) the judge had wrongly held that the legal process pending before the city court constituted proceedings in "a civil or commercial matter" within sections

C     1 and 9(1) of the Evidence (Proceedings in Other Jurisdictions) Act 1975; (2) in construing the words "civil proceedings" in section 1(b) and "civil or commercial matter" in section 9(1) of the Act of 1975 the judge ought to have applied thereto a generally acceptable international interpretation; (3) the judge ought to have held that, applying such a generally acceptable international interpretation to sections 1 and 9(1) of the Act of 1975, the legal proceedings pending before the city court did

D     not constitute "proceedings in a civil or commercial matter;" (4) further or alternatively, the judge's finding that the process pending before the city court constituted such proceedings according to the law of Norway had been against the weight of the evidence; (5) the judge had wrongly taken into account and treated as before him certain matters in an affidavit sworn for the purposes of the first appeal; (6) the judge ought

E     to have held that the contents of that affidavit were inadmissible on the question of Norwegian law which he was required to determine; (7) the judge had wrongly held that the evidential burden lay on the witnesses to satisfy the court that the legal process pending before the city court did not constitute "proceedings in a civil or commercial matter" according to the law of Norway; (8) the judge ought to have held that the evidential burden lay on the state and the estate; (9) the judge had

F     misdirected himself in failing to consider whether the legal process pending before the city court constituted proceedings in a civil or commercial matter as a matter of substance under Norwegian law; (10) the judge had misdirected himself in placing reliance on section 47 of the Norwegian Law Courts Act 1915, which dealt with matters of procedure and not substance under Norwegian law; (11) the judge had

G     misdirected himself in effectively holding that, since procedurally under Norwegian law the process pending before the city court constituted civil proceedings, such process therefore constituted proceedings in a civil matter under Norwegian law; (12) there had been no or no sufficient evidence before him on which the judge could have so found; (13) on the evidence before him the judge ought to have held that the process pending before the city court did not constitute "proceedings in a civil or

H     commercial matter" according to Norwegian law, and/or that the state and the estate had not satisfied the evidential burden which lay on them; (14) since the letter of request sought to carry over into the United Kingdom against British nationals, not subject to the jurisdiction of the

730

Norwegian state or courts, an investigation or inquiry into the exigibility
of tax retrospectively assessed on the estate of a deceased Norwegian
national, the judge ought to have held that the letter infringed the
sovereignty of the United Kingdom and/or that compliance with it would
be contrary to public policy; (15) the judge ought to have held that as
the "evidence" sought by the letter was required for an ulterior purpose,
viz. to be placed before the Norwegian National Tax Committee in
connexion with a process which it was not suggested was a civil
proceeding within section 1 of the Act of 1975, the letter fell outside the
scope of that section; (16) the judge had further misdirected himself in
law in not holding that, on the basis of the evidence before him, the
purpose of the letter was fishing; (17) the judge had no jurisdiction to
re-write the letter by making the amendments and giving the directions
which he had; (18) the judge had erred in law in effectively holding that
by making those amendments and giving those directions he could bring
the letter within the ambit of the Act of 1975 so that the court could
give effect to it; (19) in the premises the judge had erred in law in
holding that Master Creightmore had had jurisdiction to make his order,
and should have held that the English courts had not jurisdiction to give
effect to the letter; (B) as to discretion: (20) the judge had erred in
principle in the exercise of his discretion in failing to give any sufficient
weight to the following factors, (a) that by requiring the testimony of
the witnesses to be given on the application of the state the English
courts would be giving assistance and/or a measure of approbation
within the jurisdiction to the enforcement whether directly or indirectly
of the revenue laws of Norway, (b) the giving of testimony by the
witnesses, who were not subject to the Norwegian court's jurisdiction,
would necessarily involve the involuntary disclosure of confidential
information concerning the affairs of other persons, similarly not subject
to that jurisdiction, which had come into the witnesses' possession in
their capacity as officers of a merchant bank carrying on business in
London, and which the witnesses and the bank were under a duty to
their principal not to disclose, (c) the giving of testimony by the
witnesses pursuant to the letter of request would be contrary to public
policy, (d) it was apparent both from the letter and from the evidence
filed on behalf of the state that the testimony was sought for the purpose
of eliciting information as to the existence or contents of documents,
and (e) the purpose of the application for the master's order had been
fishing; (21) the judge had further erred in the exercise of his discretion
in amending the letter and giving the directions in that by making such
amendments and giving such directions the judge had effectively re-
written the letter, and the conduct of any examination of witnesses
pursuant to the amended letter would be likely to be unworkable in
practice and to result in further applications to the court.

By a notice dated 6 January 1987, the State of Norway cross-
appealed, for the variation of Kenneth Jones J.'s order by the removal
of the amendments and the directions, on the grounds that (1) the judge
had erred in making the deletions from paragraphs 6, 7 and 10 of
Schedule 1 to the letter of request, since the inquiries which they had
required did not render the scope of the questioning permitted under

A  the letter too wide or "fishing," whereas to preclude such questions would have unduly restricted or hindered the conduct of the examination; (2) likewise, the judge had erred in directing that the witnesses should not be required to reveal the identity of the settlor, unless they had stated in evidence that he had been a nominee or agent of the deceased, whereas the direction ought to have required them to reveal the settlor's identity if they had stated in evidence either that he had been the

B  deceased's nominee or agent, or that he was known to them to have been connected or associated with the deceased; (3) the judge had erred in holding that paragraph 8 of the Schedule "in all probability" offended against section 2(4) of the Act of 1975, and that paragraph 12 "most certainly" did so, and in deleting those paragraphs on those grounds: the letter was concerned not with the production of documents but with

C  the giving of oral testimony, and it was no ground of opposition to the making of an order for giving of oral testimony under the Act that the witnesses might have to look at documents, the production of which had not been ordered, in order to answer questions put to him; (4) the judge had erred in holding that paragraph 8 was objectionable on the basis that the inquiry went beyond the affairs of the foundation, in so far as they related to C.T.C. and comprised the assets and operation of the

D  trust as a whole, since the matters specified in paragraph 8 in relation to the foundation might be relevant in Norwegian proceedings, even if they did go beyond the connexion between the foundation and C.T.C., and those matters did not render the request unacceptably wide.

By the same notice the state gave notice of its intention to contend that the judge's decision should be affirmed on the additional or

E  alternative grounds that (1) the judge should have held that the witnesses were precluded from asserting that the city court proceedings were not civil proceedings under Norwegian law, by virtue of the doctrine of issue estoppel, having regard to the facts that McNeill J. and the Court of Appeal had held, as part of their rationes decidendorum in relation to an earlier letter of request [1987] Q.B. 433 that those proceedings were civil proceedings under Norwegian law, and the witnesses had not

F  sought on the earlier application to argue before McNeill J. or the Court of Appeal, although they had had ample opportunity to do so, that those proceedings were not civil proceedings under Norwegian law; (2) the judge had erred in holding that since, as he had held, the witnesses could not have appealed against the earlier decision of the Court of Appeal, the doctrine of issue estoppel could not apply so as to

G  preclude the adducing evidence of Norwegian law on the instant application, and in particular had erred in holding (a) that a necessary precondition to the existence of an issue estoppel was the availability of an appeal to the party against whom the estoppel was asserted, whereas he should have considered whether the non-availability of an appeal would have caused any material injustice had he applied the (flexible) doctrine of issue estoppel, and have held that it would not, and (b) in

H  holding that the dictum of Lord Denning M.R. in *Penn-Texas Corporation v. Murat Anstalt (No. 2)* [1964] 2 Q.B. 647, 660 applied in the instant case; and (3) that the judge had erred in holding that the witnesses could have appealed against the earlier decision of the Court of Appeal.

732

The facts are stated in the judgment.                                                    A

*Michael Crystal Q.C., J. A. Jolowicz* and *John Higham* for the witnesses.
*Anthony Boswood Q.C.* and *Stephen Moriarty* for the State of Norway.
*Nicholas Bratza* for the estate.

*Cur. adv. vult.*    B

18 December, 1987.    The following judgments were handed down.

MAY L.J. This is an appeal against an order of Kenneth Jones J. of 20 October 1986. He then had before him a summons on behalf of Lord Kindersley and Mr. A. J. Hardman ("the witnesses") to set aside an ex parte order of Master Creightmore of 2 April 1986. That summons    C
originally came before Master Prebble who, by consent, adjourned it to the judge in chambers under R.S.C., Ord. 32, r. 12.

This litigation has had a long history and an application similar to that before the judge was before McNeill J. in July 1985 and on appeal before the Court of Appeal in December 1985 and February 1986. The decision of this court on that occasion has been fully reported as *In re State of Norway's Application* [1987] Q.B. 433. In the course of his judgment, at    D
pp. 456–488, Kerr L.J. set out fully the course which the proceedings had taken until then and all the background facts and allegations. As Kenneth Jones J. said in his judgment presently under appeal, much of what Kerr L.J. said in relation to the litigation is relevant to the instant application and appeal, and I gratefully incorporate it in this judgment by reference and without unnecessarily repeating it.

Nevertheless, for I hope the easier understanding of this judgment I    E
will briefly set out the background to the case. One Anders Jahre was in the 1970s the president of a Panamanian corporation by the name of Continental Trust Co. Inc. ("C.T.C."). In 1976 Lord Kindersley, a director of Lazards, was appointed one of the advisers to a charitable foundation formed in that year which became the sole owner of the entire issued share capital of C.T.C. In 1977 Mr. Hardman, an employee of Lazards, was appointed assistant secretary of C.T.C. and in 1978 the treasurer of the    F
corporation. In the same year Herr Jahre retired as the corporation's president. He was a wealthy Norwegian shipowner. He died domiciled in Norway on 26 February 1982. In the course of the administration of his estate, on 14 September 1983 the relevant tax authorities raised a supplementary tax assessment on it retrospectively for the years 1970 to 1982 for the sum of 337,999,317 N. Kroner on the basis that the deceased had directly or indirectly been the owner of C.T.C. and that there was    G
reason to disregard the latter's corporate form as a real company.

On 3 November 1983 the estate commenced proceedings in the Sandefjord City Court in Norway for an order nullifying the supplementary tax assessment. By what is apparently a parallel procedure, the estate also appealed to the Norwegian National Tax Committee on 31 January 1984. It was subsequently agreed between the estate and the state that any    H
evidence given by the proposed witnesses pursuant to the letters of request to which I shall refer would be presented both to the City Court and also to the National Tax Committee. I interpolate that in January 1984 Mr. Hardman retired as the assistant secretary and treasurer of C.T.C.

A    On the estate's application to the Sandefjord City Court, subsequently supported by the state, the office of the stipendiary magistrate in Sandefjord issued a first letter of request to the United Kingdom courts on 5 November 1984 for oral testimony to be given and documents to be produced by the witnesses. The master made the usual ex parte order. The witnesses then issued a summons to discharge it. This came before McNeill J. who upheld the master's order and effectively granted the joint

B    application of the estate and the state subject to certain directions which he then gave. The witnesses then appealed successfully against the judge's order. This was the decision of the first Court of Appeal to which I have already referred.

There were seven issues in that first appeal which can be listed as follows.

C    *A. Civil Proceedings: "civil or commercial matter"*

The question was whether the Sandefjord proceedings fell within the ambit of the Evidence (Proceedings in Other Jurisdictions) Act 1975.

*B. Tax gathering*

A phrase taken from the speech of Lord Somervell of Harrow in

D    *Government of India v. Taylor* [1955] A.C. 491, 514. The contention was that compliance with the first letter of request would be contrary to public policy and the settled principles that our courts would not lend their assistance to the enforcement, directly or indirectly, of foreign tax liabilities.

*C. Sovereignty*

The contention was that since the Sandefjord proceedings were

E    concerned with the estate's assessment to tax in Norway, compliance by an English court with the letter of request was precluded by section 4 of the Protection of Trading Interests Act 1980 on the ground that the request, or compliance with it, would infringe the jurisdiction of the United Kingdom or be prejudicial to its sovereignty.

*D. Dual purpose*

F    This concerned the intention to make the testimony of the witnesses available to the National Tax Committee, in addition to the Sandefjord court.

*E. "Fishing"*

The contention was that the terms of the first letter of request were far too wide to be an acceptable request for evidence under the Act of 1975,

G    irrespective of certain limitations contained in directions given by McNeill J.

*F. Confidentiality*

It was submitted that in all the circumstances the witnesses should not be ordered to break their duty of confidentiality to their customers by

H    answering the questions raised by the letter of request.

*G. Discretion*

It was submitted that whereas issues A and C went to the jurisdiction of our courts to comply with the letter of request, issues B, D and E went

734

to both jurisdiction and to the court's general discretion, whereas issue F    A
went solely to discretion.

In the event the witnesses failed before the Court of Appeal on issues
A, B, C and D but succeeded on issues E and F. The question whether
the decision of what I will continue to call the first Court of Appeal
created any precedent or issue estoppel binding on us was the first question
argued on the hearing of the instant appeal. To this I shall have to return
later.    B

At this point I set out the relevant provisions of the Act of 1975. The
long title is in these terms:

"An Act to make new provision for enabling the High Court, the
Court of Session and the High Court of Justice in Northern Ireland to
assist in obtaining evidence required for the purposes of proceedings in
other jurisdictions; to extend the powers of those courts to issue
process effective throughout the United Kingdom for securing the    C
attendance of witnesses; and for purposes connected with those
matters."

Section 1 provides:

"Where an application is made to the High Court, the Court of
Session or the High Court of Justice in Northern Ireland for an order    D
for evidence to be obtained in the part of the United Kingdom in
which it exercises jurisdiction, and the court is satisfied—(a) that the
application is made in pursuance of a request issued by or on behalf of
a court or tribunal ('the requesting court') exercising jurisdiction in
any other part of the United Kingdom or in a country or territory
outside the United Kingdom; and (b) that the evidence to which the
application relates is to be obtained for the purposes of civil    E
proceedings which either have been instituted before the requesting
court or whose institution before that court is contemplated, the High
Court, Court of Session or High Court of Justice in Northern Ireland,
as the case may be, shall have the powers conferred on it by the
following provisions of this Act."

Section 2 provides:    F

"(1) Subject to the provisions of this section, the High Court, the
Court of Session and the High Court of Justice in Northern Ireland
shall each have power, on any such application as is mentioned in
section 1 above, by order to make such provision for obtaining
evidence in the part of the United Kingdom in which its exercises
jurisdiction as may appear to the court to be appropriate for the
purpose of giving effect to the request in pursuance of which the    G
application is made; and any such order may require a person specified
therein to take such steps as the court may consider appropriate for
that purpose. (2) Without prejudice to the generality of subsection (1)
above but subject to the provisions of this section, an order under this
section may, in particular, make provision—(a) for the examination of
witnesses, either orally or in writing; (b) for the production of
documents; . . . (3) An order under this section shall not require any    H
particular steps to be taken unless they are steps which can be
required to be taken by way of obtaining evidence for the purposes of
civil proceedings in the court making the order (whether or not

A    proceedings of the same description as those to which the application for the order relates); but this subsection shall not preclude the making of an order requiring a person to give testimony (either orally or in writing) otherwise than on oath where this is asked for by the requesting court. (4) An order under this section shall not require a person—(*a*) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his

B    possession, custody or power; or (*b*) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."

Section 3 provides:

C    "(1) A person shall not be compelled by virtue of an order under section 2 above to give any evidence which he could not be compelled to give—(*a*) in civil proceedings in the part of the United Kingdom in which the court that made the order exercises jurisdiction; or (*b*) subject to subsection (2) below, in civil proceedings in the country or territory in which the requesting court exercises jurisdiction. . . . (4) In this section references to giving evidence include references to answering any question and to producing any document . . ."

D    Section 9(1) provides: "In this Act—'civil proceedings,' in relation to the requesting court, means proceedings in any civil or commercial matter. . . ."

In his judgment on the first occasion when this matter came before the Court of Appeal [1987] Q.B. 433, Kerr L.J. was critical about the cogency and extent of the evidence then before the court upon what I may describe

E    as the "international" aspect and the Norwegian law issue. At the end of his judgment he said, at p. 488:

"Finally, I would add that if this judgment reflects the ultimate outcome of this appeal, then I hope that any renewal of the present letter of request in some more limited and acceptable form—if this can be devised—should be accompanied by clear evidence as to what is

F    properly to be regarded as a 'civil or commercial matter' by the law of Norway, and in particular whether Norwegian law distinguishes between public and private law. I feel, frankly, uneasy about my acceptance, dubitante, of the very limited evidence in this connection on the present application. I would also urge that at any rate in the international context, particularly in relation to the concept of 'civil and commercial matters' in The Hague and similar bilateral

G    Conventions, as well as of the Act of 1975, it would be desirable to recognise a clear-cut distinction between private and public law in our jurisprudence, in the same way as in other legal systems."

As Kenneth Jones J. said, this passage was naturally construed, first, by the state and the estate as an invitation to make a fresh application for a letter of request in "some more limited and acceptable form." Secondly,

H    the witnesses read it as an invitation, if a fresh application were made, to adduce further evidence and material to the court about the law of Norway and to reopen issue A. Both sides acted swiftly. A second joint application was made in Norway by the state and the estate on 7 March 1986 and pursuant to it a second letter of request was issued by the stipendiary

736

May L.J.                In re Norway's Application (No. 2) (C.A.)              [1990]

magistrate in Sandefjord on 10 March 1986. The topics upon which the
evidence of the witnesses is now sought are set out in Schedule 1 to the
letter of request, but I need not detail them fully at this stage of this
judgment.

A

Before the judge below and here it was again first argued on behalf of
the witnesses that the underlying proceedings in the Sandefjord court did
not fall within the ambit of the Act of 1975. But on behalf of both the
state and the estate the preliminary points were taken, first, that as a
matter of law he was bound by way of legal precedent by the construction
placed by the first Court of Appeal on the relevant provisions of that Act.
Secondly, that in so far as the issues raised questions of fact rather than of
English law, particularly questions of the relevant Norwegian law, the
witnesses were estopped from reopening the issue by the earlier decision of
the Court of Appeal.

B

When this matter was first before the Court of Appeal, Kerr L.J.
reluctantly found it impossible to give any "international" interpretation to
the definition of "civil proceedings" in section 9(1) of the Act of 1975. He
held that the proper approach to the problem required the court addressed
to satisfy itself that relevant proceedings concerned a civil or commercial
matter under the law of the requesting court, but that the court addressed
would only accept the foreign classification for the purpose of assuming
jurisdiction if it were not in conflict with any fundamental principle
recognised under its own laws. On the limited material before the court on
that occasion Kerr L.J. reluctantly concluded that the Sandefjord
proceedings could be regarded as in a civil matter by the law of Norway
and that as they were clearly to be so characterised by English law the first
letter of request was within the scope of the Act of 1975, and that
accordingly the English courts had jurisdiction to give effect to it, subject
to the resolution of the other issues involved. With this view both Glidewell
and Ralph Gibson L.JJ. agreed.

C

D

E

In relation to the second letter of request Kenneth Jones J. held, first,
that he was bound by this decision on the proper construction of section
9(1) in English law by the court. But on this point he also held, secondly,
that the witnesses were not estopped from re-arguing the question of
Norwegian law. Nevertheless, he thirdly and finally decided on the material
before him, which he thought was still far from clear, that in Norwegian
law the proceedings before the Sandefjord court would be categorised as
proceedings in a civil matter for the purposes of the English Act of 1975.

F

Before us the witnesses have once more argued for an international
construction of section 9(1). In any event, and in the alternative, they have
contended that the judge's finding on Norwegian law was wrong. They
necessarily submitted that they were bound neither by precedent nor issue
estoppel to prevent them so arguing.

G

The respondent state and estate have contended the reverse: first, that
the witnesses were bound by both precedent and issue estoppel; and,
secondly, if they were not, that the proper construction of the Act of 1975
did not admit of an international one and, further, that the previous
decision of the two judges at first instance and of this court on the question
of Norwegian law had been correct.

H

Before Kenneth Jones J. Mr. Crystal for the witnesses did not argue
the issues of tax gathering (B), sovereignty (C), or dual purpose (D), but
reserved his position on them for a higher court. He has formally argued

A    these issues before us, though more on paper by way of his full and helpful skeleton argument than orally, but he has recognised the difficulties in his way posed by the earlier decision of this court on these issues. The respondents have sought to uphold these earlier decisions and have contended that they apply equally to the second letter of request as to the first. I should add that the decision on these issues in the first Court of Appeal was unanimous.

B        On the issue of "fishing," issue E, in relation to the first letter of request, Kerr and Glidewell L.JJ. held in favour of the witnesses. Ralph Gibson L.J. took the opposite view. On the second letter of request, Kenneth Jones J. held that with limited deletions which he ordered the questions sought to be asked would not be "fishing." As might be expected, on the instant appeal the witnesses have contended that the judge was wrong, whilst the respondents have argued the reverse. By a
C    cross-notice the state has further contended that the judge was wrong even to order the limited deletions which he did.

        On the issue of confidentiality, issue F, on the previous occasion in this court Kerr L.J. again held in favour of the witnesses and Ralph Gibson L.J. in favour of the present respondents. Although I respectfully do not think that Glidewell L.J. expressed any final conclusion on this issue, on a careful reading of his judgment I think that in general he took the same
D    view as did Kerr L.J. Before Kenneth Jones J. the two issues of "fishing" and "confidentiality" appear to have been argued together. The judge held against the witnesses, who now appeal. The state and estate have submitted that the judge was correct.

        When this matter was first before the Court of Appeal on the first letter of request, in the light of the majority decision on issues E and F the
E    question of discretion did not directly arise. Ralph Gibson L.J. would clearly have exercised his discretion in favour of the witnesses' proposed examination. On the second letter of request, Kenneth Jones J. took the same view as had Ralph Gibson L.J. on the first. On this appeal the parties have taken the appropriate opposing stances.

        The first issues which have therefore to be considered in this appeal are whether the first decision of the Court of Appeal created any precedent in
F    law or issue estoppel binding on us and the witnesses. In so far as the latter are concerned, a subsidiary issue has been argued, namely even if otherwise there would be issue estoppel, can this deprive the court of a jurisdiction which it would otherwise possess under the statute? In addition, we have heard argument on each of the seven issues listed by Kerr L.J. [1987] Q.B. 433, 466.

        I turn therefore to the issue of precedent. The question is whether the
G    decision of the Court of Appeal on the previous occasion on the question of law of the proper construction of section 9(1) of the Act of 1975 is binding as a legal precedent on us. The general principles are well known: they are stated in *Halsbury's Laws of England*, 4th ed., vol. 26 (1979), para. 573 in this way:

        "The use of precedent is an indispensable foundation upon which to
H        decide what is the law and its application to individual cases; it provides at least some degree of certainty upon which individuals can rely in the conduct of their affairs, as well as a basis for orderly development of legal rules. The enunciation of the reason or principle

upon which a question before a court has been decided is alone    A
binding as a precedent."

In *Close v. Steel Co. of Wales Ltd.* [1962] A.C. 367, 388 Lord Denning
quoted Sir Frederick Pollock, *The Progress of Continental Law in the
Nineteenth Century (Continental Legal History Series)*, p. xliv, on the same
point to this effect:

"Judicial authority belongs not to the exact words used in this or that    B
judgment, nor even to all the reasons given, but only to the principles
recognised and applied as necessary grounds for the decision."

Precedents therefore are to be contrasted with dicta, which are
statements which are not necessary to the decision, which go beyond it and
lay down a rule that is unnecessary for the purpose in hand. They have no
binding authority on another court, although they may have some    C
persuasive efficacy.

On the previous occasion that this matter came before the Court of
Appeal, Kerr L.J. considered the question of the proper construction of
section 9(1) in detail and I am respectfully most grateful for the help that I
have derived from his judgment. He ultimately concluded that he could not
adopt any what I might call "international" interpretation of the phrase
"civil or commercial matter" in the relevant subsection. However, at the    D
end of this part of his judgment he said, [1987] Q.B. 433, 477E: "In any
event, in view of my conclusions on issues E and F, in this judgment the
matter becomes academic."

I think that Glidewell L.J. in his turn also rejected the international
approach to the question of construction, but not in terms which lead me
in any way to think that he relied upon this for his ultimate decision in the
case. As I have already said, in my respectful opinion he expressed no final    E
view on issue F, that is to say confidentiality, but expressly agreed with
Kerr L.J. in his decision on issue E, that is to say that of "fishing." In his
judgment, at p. 491F, Glidewell L.J. said: "Thus I have reluctantly come to
the conclusion that on this sole ground the order sought by the State of
Norway and the estate should not be made." I think that this makes clear
upon what basis the last occasion Glidewell L.J. decided that the appeal
should be allowed.    F

Finally, Ralph Gibson L.J. did not specifically refer to the issue of
international construction in the course of his judgment. Nevertheless he
agreed generally with the views of Glidewell L.J. on issue A as a whole.

On this analysis I do not think that any views expressed by this court
on the previous occasion, that as a matter of law one could not give any
international construction to the relevant phrase in the Act of 1975, formed
any part of the ratio for their ultimate decision. Consequently that which    G
they did say on this particular point is not in my opinion binding upon us.

I should, however, refer to an argument put to us attractively by Mr.
Bratza on behalf of the estate founded upon the decision of the Court of
Appeal in *Slack v. Leeds Industrial Co-operative Society Ltd.* [1923] 1
Ch. 431. The question in that case was whether on a proper construction
of section 2 of Lord Cairns' Act (the Chancery Amendment Act 1858) a
court had any jurisdiction to award damages in substitution for an    H
injunction where the injury to the plaintiff's rights was only apprehended in
the future, but no present actionable interference existed. In an earlier
case, *Dreyfus v. Peruvian Guano Co.* (1889) 43 Ch. D. 316, all three

A   members of the Court of Appeal had expressed the view after full argument that there was no such jurisdiction in those circumstances. However, for two members of the court such a conclusion was not necessary for their decision in that earlier case; the third member of the court in any event dissented. In *Slack v. Leeds Industrial Co-operation Society Ltd.* [1923] 1 Ch. 431 Lord Sterndale M.R. and Warrington L.J. clearly took a contrary view on the question of construction but, in the

B   light of the earlier dicta, the former said, at p. 452:

> C   "It is hardly possible to imagine dicta which are not binding decisions of greater weight, and as I have already pointed out, though they have been referred to on several occasions they have never elicited any expression of disapproval. . . . I think . . . that it is open to us to decide the question contrary to those dicta, and the question is whether we ought to do so. I am of opinion that we ought not, and that if opinions of such weight given after such careful consideration more than 30 years ago, often mentioned and considered during that time and never disapproved, are to be overruled, it should only be done by the final tribunal of appeal and not by a court of co-ordinate jurisdiction."

D   Warrington L.J. in his turn said, at p. 456:

> E   "In order to get rid of the effect of the opinions deliberately expressed by three judges of this court it is in my judgment not enough to say 'they are mere dicta.' They are not views casually expressed on a point not really adequately considered, but they are arrived at and expressed with the same care and deliberation as if they had been necessary for the decision of the case. Although therefore they are not absolutely binding as would be an actual decision of the court necessary to its judgment, they are entitled to such weight that we ought to follow them unless we find that they have been overruled or that they are inconsistent with previous decisions."

F   Mr. Bratza submitted that following those views so firmly expressed in *Slack's* case, we should not lightly depart from and indeed should follow the considered and reasoned view of Kerr L.J. who is extremely experienced in this type of case.

However, when *Slack's* case reached the House of Lords [1924] A.C. 851, the decision of the Court of Appeal was reversed and in particular for present purposes, Lord Dunedin said, at pp. 863–864:

> G   "My Lords, I cannot help remarking that I think the judgments in this appeal are in a peculiar position. On the question of construction of the statute all four judges are—so far as their own opinions are concerned—of one mind that the jurisdiction in question is conferred by the words used. . . . [Lord Sterndale M.R. and Warrington L.J.] took up a position which personally I cannot quite appreciate. They said that *Dreyfus* did not bind them, but that the dicta in *Dreyfus* must be followed, and if wrong must be put right by a higher court, that is, your Lordships' House. My Lords, if a decision is binding, there is an end of it. But if you have only to do with dicta, though such dicta may well serve to help you form your own opinion, I cannot see that they ought to overrule it."

I respectfully agree with Lord Dunedin and in my opinion the principle is   A
as I have quoted from *Halsbury's Laws of England*, 4th ed., vol. 26,
para. 573. For this reason I must reject Mr. Bratza's argument. As I have
said, I, of course, accord the greatest respect to the earlier judgment of
Kerr L.J. but I do not think that it or any decision of the previous Court
of Appeal is binding upon us on this question of construction.

    Different from their view on the question of law concerning a possible
international construction of the relevant section of the Act of 1975,   B
however, I think that each member of the Court of Appeal on the first
occasion did hold that the proceedings in the Sandefjord court were civil
proceedings under Norwegian law. This was, of course, a question of fact.
In these circumstances it was contended both before the judge below and
before us that the witnesses were in any event estopped from contending
that this was not so. It was submitted that it was a clear case for the
application of the principle of issue estoppel.   C

    The principle contended for was that stated recently in *Thoday v.
Thoday* [1964] P. 181, 198, by Diplock L.J.:

> "There are many causes of action which can only be established by
> proving that two or more different conditions are fulfilled. Such causes
> of action involve as many separate issues between the parties as there
> are conditions to be fulfilled by the plaintiff in order to establish his   D
> cause of action; and there may be cases where the fulfilment of an
> identical condition is a requirement common to two or more different
> causes of action. If in litigation upon one such cause of action any of
> such separate issues as to whether a particular condition has been
> fulfilled is determined by a court of competent jurisdiction, either
> upon evidence or upon admission by a party to the litigation, neither
> party can, in subsequent litigation between one another upon any   E
> cause of action which depends upon the fulfilment of the identical
> condition, assert that the condition was fulfilled if the court has in the
> first litigation determined that it was not, or deny that it was fulfilled if
> the court in the first litigation determined that it was. . . . The
> determination by a court of competent jurisdiction of the existence or
> non-existence of a fact, the existence of which is not of itself a
> condition the fulfilment of which is necessary to the cause of action   F
> which is being litigated before that court, but which is only relevant to
> proving the fulfilment of such a condition, does not estop at any rate
> per rem judicatam either party in subsequent litigation from asserting
> the existence or non-existence of the same fact contrary to the
> determination of the first court. It may not always be easy to draw the
> line between facts which give rise to 'issue estoppel' and those which
> do not, but the distinction is important and must be borne in mind."   G

It was submitted that it was a condition precedent to the validity of the first
letter of request that the Sandefjord proceedings were indeed civil
proceedings under Norwegian law; that this point was argued at length on
behalf of the witnesses in relation to that first letter of request; that there
was no reason at all why the witnesses could not have adduced all the
evidence on Norwegian law at that stage which was relevant to the point   H
and which they subsequently sought to introduce in relation to the second
letter of request; that after hearing the argument and evidence the issue
was fully considered by the Court of Appeal and clearly decided against
the witnesses; that whether or not the conclusion as to Norwegian law was

1 A.C.    In re Norway's Application (No. 2) (C.A.)    May L.J.

A    part of the ratio of the decision on the previous occasion, nevertheless the unanimous finding by the members of the court was fundamental to their decision and was clearly not incidental or collateral.

However, it seems clear to me that Kerr L.J. did not think that the parties would be precluded from canvassing this particular issue on a later occasion. His inferential invitation to consider a renewal of the first letter of request, accompanied by substantially clearer and fuller evidence about

B    Norwegian law, the terms of which I have already quoted, makes this clear. He gave direct expression to his unease about his then acceptance of the very limited evidence on this point that there was before the Court of Appeal on the previous application. I cannot think that the question of possible issue estoppel was not present to his mind. I think it at least well arguable that he expressly decided the appeal then before that court on the issues of fishing and confidentiality so that the parties should not thereafter

C    be precluded from having the Norwegian law issue reopened and fully considered on adequate material.

In the court below on the present second occasion the judge was referred to the decision in *Penn-Texas Corporation v. Murat Anstalt (No. 2)* [1964] 2 Q.B. 647 and in particular to the following passage from the judgment of Lord Denning M.R., at pp. 660–661:

D    "In my opinion a previous judgment between the same parties is only conclusive on matters which were essential and necessary to the decision. It is not conclusive on other matters which came incidentally into consideration in the course of the reasoning: see the *Duchess of Kingston's Case* (1776) 20 S.T. 355 and *Reg. v. Hutchings* (1881) 6 Q.B.D. 300. One of the tests in seeing whether a matter was necessary to the decision, or only incidental to it, is to ask: Could the party have

E    appealed from it? If he could have appealed and did not, he is bound by it, see *Bader Bee v. Habib Merican Noordin* [1909] A.C. 615, 623 by Lord Macnaghten. If he could not have appealed from it (because it did not affect the order made), then it is only an incidental matter, not essential to the decision, and he is not bound."

F    The judge then accepted the submission made on behalf of the witnesses and repeated before us that they could not have appealed the decision of the previous Court of Appeal on this Norwegian law point because they had succeeded overall. Consequently there could be no estoppel.

In challenging this contention in the instant appeal, counsel for the State of Norway submitted that there was no general or absolute rule of law that an issue estoppel is incapable of arising merely because the party

G    against whom the finding was made was unable to appeal against the decision. There is no reference to such a rule in recent authoritative decisions on the point, such as those of the Privy Council in *Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd.* [1975] A.C. 581 and the Court of Appeal in *Khan v. Golechha International Ltd.* [1980] 1 W.L.R. 1482. We were also referred to *Spencer Bower and Turner, Res Judicata,* 2nd ed. (1969), p. 144, para. 181. In any event, it was contended that

H    there was good authority to the contrary. In *Shoe Machinery Co. v. Cutlan* [1896] 1 Ch. 667 there had been an earlier action between the same parties in which a patentee had claimed damages for an infringement of his patent and an injunction. In answer the defendant had denied not only the

742
May L.J.                    In re Norway's Application (No. 2) (C.A.)                    [1990]

infringement but also the validity of the patent. On that first occasion the    A
court had upheld the validity of the patent, but had granted no injunction
or damages on the ground that the evidence of the alleged infringement
had not been admissible. In the second action between the same parties in
respect of the same patent the defendant again denied its validity. The
patentee contended that, as the question of the validity of the patent had
been decided on the first occasion, the defendant was estopped from        B
raising that issue again on the second. Romer J. decided this question in
favour of the patentee. Counsel for the state submitted to us that clearly
the judge's earlier decision that the patent was valid could not have been
appealed, and yet he had held that there had been an issue estoppel. In
reply counsel for the witnesses submitted that Romer J. had so decided
because he took the view that there could have been an appeal against his
earlier decision, if only against the order for costs. He relied on the     C
following passage from Romer J.'s judgment, at p. 670:

    "It was because the issue of validity had been found in favour of the
    plaintiffs that the court ordered the defendants to pay the plaintiffs the
    costs of that issue; and because the plaintiffs had failed on the issue of
    infringement that the court ordered the plaintiffs to pay the defendants'
    costs of that issue, and declared that there should be a set-off. Now      D
    clearly, in my judgment, that decision of the court, so far as concerns
    the question of the validity of the patent, and the order which directed
    the defendants to pay the costs of that issue, could have been
    appealed from. It was a deliberate finding on the question of validity—
    a question fairly raised for the decision of the court as between these
    two parties and fairly fought out before it; and I cannot see why the
    decision given by the court then on that issue is not to bind the parties   E
    to it."

Authority for the proposition that in special circumstances an appeal will
lie to the House of Lords on a question issue of costs alone can be found
in *Donald Campbell & Co. Ltd. v. Pollak* [1927] A.C. 732.

    However, I do not read Romer J.'s judgment, in so far as it dealt with   F
the contention that there could be no estoppel because there had been no
right of appeal, as being based on the proposition that there would at least
have been a right of appeal on his earlier order on costs. I think that he
took the view that even though the defendant had succeeded in the action
as a whole, he nevertheless could have appealed the determination of the
validity of the patent had he wished to do so. He put the matter again in
this way, at pp. 671–672:                                                    G

    "It appears to me that it sufficiently appears from this judgment [on
    the first occasion] that I did not dismiss this action so far as concerns
    this patent, and I found the issue of validity and determined it in
    favour of the plaintiffs, and I ordered the defendants to pay the costs
    of it. I cannot doubt that if the defendants had chosen to appeal from
    that part of the judgment they were entitled to have had that appeal    H
    heard by the Court of Appeal."

For present purposes it is unnecessary to decide whether the judge's view
was correct. Even if the case were binding on us, I do not think

A that it is sufficiently clear authority to support the argument which was based upon it.

The *Shoe Machinery Co.* case was referred to in the opinion of the Privy Council in *Duedu v. Yiboe* [1961] 1 W.L.R. 1040. In that case the Ghana Court of Appeal held that in earlier proceedings between the parties the issue of ownership of a parcel of land had been decided in the respondent's favour. Consequently in subsequent proceedings seeking

B a declaration of title to that land the appellant was estopped by the earlier decision. On a full reading of the report, I think that the Judicial Committee did so hold notwithstanding the fact that the respondent could not have appealed in the earlier proceedings because he had succeeded in defeating his opponent's claim for damages for trespass. In my judgment, this decision of the Privy Council, although not strictly

C binding upon us, is good persuasive authority for the proposition that there can be an issue estoppel even though the previous decision could not have been appealed. Nevertheless, this is in no way inconsistent with the proposition that whether or not an earlier decision could have been appealed is in many cases a good test of whether it brought into being an issue estoppel.

D In my opinion similar considerations arise on this question of issue estoppel as they do on the question of precedent. I respectfully agree with the statement of the general principle by Diplock L.J. in *Thoday v. Thoday* [1964] P. 181, 198. But, as Lord Denning M.R. pointed out in *Fidelitas Shipping Co. Ltd. v. V/O Exportchleb* [1966] 1 Q.B. 630, the principle is to be applied flexibly. In *Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2)* [1967] 1 A.C. 853, 947, Lord Upjohn said:

E "All estoppels are not odious but must be applied so as to work justice and not injustice and I think the principle of issue estoppel must be applied to the circumstances of the subsequent case with this overriding consideration in mind."

As I have already said, in my view whether or not the decision on the previous occasion was appealable is only one test which may or may not

F be of help in a given case. The basic requirement for the operation of the general principle is that the earlier determination relied on as raising an issue estoppel shall have been fundamental to the decision first arrived at. The matter is fully dealt with in *Spencer Bower and Turner, Res Judicata*, 2nd ed., paras. 210–211, of which the opening passage reads, at p. 179:

G "Even when in one way or another it can be demonstrated that the court has *expressly* determined, in the earlier proceeding, the same issue as is now in dispute, an issue estoppel will not by any means always be the result. Only determinations which are necessary to the decision—which are fundamental to it and without which it cannot stand—will found an issue estoppel. Other determinations,

H without which it would still be possible for the decision to stand, however definite be the language in which they are expressed, cannot support an issue estoppel between the parties between whom they were pronounced."

In these circumstances it is unnecessary for me to express any   A
decided view on the question whether the court can be deprived by the
operation of the principle of issue estoppel of a jurisdiction which it
would otherwise possess under the statute. Nevertheless, having had the
question fully argued before us, my present opinion is that it cannot.

Being therefore bound neither by precedent nor by the principle of
issue estoppel to follow without more the conclusions reached on the   B
point by the first Court of Appeal, I turn to consider afresh the first and
fundamental question in this case, namely the proper construction of the
phrase "proceedings in any civil or commercial matter" in section 9(1) of
the Act of 1975 and whether the Sandefjord proceedings fall within that
construction. Three preliminary comments can be made. First, the
answer to this fundamental question will define the jurisdiction of the
court addressed in the United Kingdom, in this case the High Court and   C
then this court on appeal from the latter. Second, on a first reading of
the phrase in a common law context, the courts are in my view
immediately presented with a patent difficulty. Parliament cannot have
intended that the words "or commercial" should be ignored; it is a trite
comment that a commercial proceeding in an English court is in English
law a civil proceeding; thus the phrase "civil or commercial," which ex   D
hypothesi contrasts the two types of proceedings, has no intelligible
common law meaning. Although, for the reasons which I have already
given, we are not bound by the decision on this point by the first Court
of Appeal, the views then expressed of course carry very considerable
persuasive effect and, if I may respectfully say so, I have been greatly
assisted by them.   E

I therefore turn to consider the views expressed, first, by Kerr L.J.
[1987] Q.B. 433, 471A–473G. On the question of how an English court is
to approach and resolve the problem of construction posed by section
9(1) it has never been disputed that reference to the Convention can
properly be of assistance. As Kerr L.J. said, at pp. 471–472:

> "since it was pointed out in the *Westinghouse* case [1978] A.C. 547   F
> that one of the purposes of the Act of 1975 was to implement the
> Convention, this must be the starting point. Where English
> legislation has been enacted to give effect to a Convention, reference
> to it may—and should where necessary—be made to it to see
> whether it assists in the interpretation of the legislation, not only
> where the Convention is annexed (see *Fothergill v. Monarch Airlines
> Ltd.* [1981] A.C. 251, in particular *per* Lord Diplock, at pp. 280B–   G
> 283D), but even where it is not: see *Salomon v. Customs and Excise
> Commissioners* [1967] 2 Q.B. 116, *per* Lord Denning M.R., at
> pp. 141E–142A and *per* Diplock L.J., at pp. 142G–145B. In statutes
> giving effect to Conventions, an interpretation 'on broad principles
> of general acceptation' is desirable: see *Stag Line Ltd. v. Foscolo,
> Mango & Co. Ltd.* [1932] A.C. 328, *per* Lord MacMillan, at p. 350.   H
> However, sometimes this may not be possible: see *James Buchanan
> Co. Ltd. v. Babco Forwarding & Shipping (U.K.) Ltd.* [1978] A.C.
> 141, in particular *per* Lord Wilberforce, at pp. 152–153."

A    But having thus reached the convention, Kerr L.J. thought that it itself provided no assistance on the question at all. In asking where an English court then went, he suggested that four possible categories presented themselves: (1) a generally accepted international interpretation; (2) classification under the law of the requesting court; (3) classification under the law of the court addressed; (4) a combination of (2) and (3): the court addressed would satisfy itself that the proceedings concerned a civil or commercial matter under the law of the requesting court, but

B    would only accept this categorisation for the purposes of assuming jurisdiction if it were not in conflict with any fundamental principle recognised under the laws of the court addressed.

On the material and the submissions presented to the court on that occasion, Kerr L.J. reluctantly concluded that (4) provided the best

C    answer. Nevertheless, I think that it is clear that had he felt able to so to hold, he would have preferred category (1).

With the help of the substantial additional material and argument which were put before us, I have found myself driven to the conclusion that the generally accepted international interpretation comprised in the first category referred to by Kerr L.J. is not only correct but also to be preferred. It is unnecessary to set out or to refer in detail to all the fresh

D    material to which we were referred. I have, however, derived substantial assistance from, and I am especially grateful for the argument for the witnesses formulated on material assembled by their legal advisers, particularly by Professor J. A. Jolowicz of the University of Cambridge, and also for the comments of Dr. F. A. Mann in his critical note on the decision of the first Court of Appeal "'Any Civil or Commercial

E    Matter'" (1986) 102 L.Q.R. 505.

I have already drawn attention to the difficulty, if not impossibility, of attributing an intelligible common law meaning to the phrase in section 9(1)—"civil or commercial." The combination of "civil" and "commercial" points away from a classification under the common law and since that combination is carried over from the Convention of 1970 into the Act of 1975, I think it right to assume that Parliament intended

F    to point in the same direction. This would not be the first time in this field where Parliament has chosen to do so: see *per* Kerr L.J. [1987] Q.B. 433, 475A–D. As I have already said, the terms of the Convention of 1970 are expressed to have the same meaning in each of the two authentic texts and consequently one of those can be looked at to clarify the meaning of the other. The phrase "civil or commercial matter,"

G    which is a translation of the French "matière civile ou commerciale" clearly directs one's attention to the civil law systems.

Next, the use of the word "matière" indicates or describes the nature of the litigation, the subject matter of the dispute: see *Dalloz, Lexique de Termes Juridiques*, 5th ed. (1981), p. 270. On such an approach, different from that based upon procedural considerations, the duality and indeed the dichotomy between "civil" and "commercial" points even

H    more strongly away from a classification under the common law. In French law, however, there exists a clear distinction between "civil" and "commercial" which is rooted in history: see *René David, English Law and French Law* (1980), p. 36 et seq. Whether the distinction should or

can be maintained may be a matter of controversy. The authority just A
referred to shows that in some countries the view has prevailed that the
distinction should be repudiated, for instance in Switzerland, Italy and
the Netherlands.

However, it is also apparent that civil law countries draw a clear
distinction between private and public law, a distinction which, as Kerr
L.J. remarked, is only beginning to emerge in this country. I respectfully
agree with the view also expressed by Kerr L.J. that the draftsman of B
the Convention of 1970, when using the phrase "matière civile ou
commerciale" must have had this distinction in mind. Viewed through
the eyes of a civil lawyer, the Sandefjord proceedings would be
categorised as being concerned with a "matière fiscale" within the sphere
of public law and as such not comprised within the phrase "matière
civile ou commerciale." Further, as Kerr L.J. also said, international C
assistance in revenue matters is generally given by Double Tax
Conventions, which normally provide for the "exchange of information."

Against this background, and remembering the widening legal
horizons towards which our courts have increasingly to look, it is not
difficult in my view to conclude that jurisdiction under the Act of 1975
in respect of letters of request only arises if the English court is satisfied D
that the proceedings in the requesting court are either civil or commercial
in the sense in which civilian legal systems would understand these
words. In other cases this could be a matter of some difficulty and
require much further discussion and argument. For the purposes of the
instant case, however, it is accepted that if this is the correct approach,
then the proceedings in the Sandefjord court are indeed concerned with
"matière fiscale" in a civil law classification and as such are not E
proceedings sufficient to found the basic jurisdiction.

I turn briefly to consider the factors which in the view of Kerr L.J.
militated against the choice of a generally accepted international
interpretation as the proper construction of the phrase used in section
9(1) of the Act of 1975. He first pointed out that the subject matter of
the European Convention on Jurisdiction and the Enforcement of F
Judgments in Civil and Commercial Matters 1968 was the recognition
and enforcement of foreign judgments; not merely the more limited one
of providing judicial assistance for the provision of evidence in foreign
courts. Further, the European Court is expressly empowered by the
E.E.C. Treaty to interpret the Convention of 1968 authoritatively. It
does so in the sense which is "communautaire" within the members of
the European Economic Community. It is not so empowered with G
regard to the Convention of 1970.

With respect, I am not persuaded that this makes any difference;
each convention is concerned with an aspect of international legal
procedures. Unless there is good reason not to do so, I prefer to
construe the phrase "matière civile ou commerciale," and thus its
English translation, in the same way in each convention. If this is a H
correct approach, then the decision in *State of the Netherlands v. Rüffer*
(Case 814/79) [1980] E.C.R. 3807 confirms and does not weaken the
view I have formed on the Convention of 1970 and Act of 1975.

A     Kerr L.J. then drew attention to the fact that whereas the Convention of 1968 and the Civil Jurisdiction and Judgments Act 1982 expressly exclude "in particular . . . revenue, customs or administrative matters" from "civil or commercial matters," neither the Convention of 1970 nor the Act of 1975 do so. However, he also pointed out that this was done to resolve any doubts about the scope of "civil or commercial matters" in relation to member states which draw no clear distinction between B public and private law. This corresponds with the view expressed in other material put before us but which was not before the first Court of Appeal—Kohler, "The Case Law of the European Court on the Judgments Convention—Part II" (1982) 7 E.L.Rev. 103, 104 et seq.— that the phrase or sentence quoted was not an amendment of 1968. I respectfully agree with Kerr L.J. that it is unfortunate that no such C clarification was attempted of the Convention of 1970 and the Act of 1975, but the fact that it was not does not lead me to construe the latter differently.

     Finally, Kerr L.J. pointed out again that the common law does not, at any rate at the present time, recognise any clear distinction between public and private law, although such a distinction is certainly beginning to be recognised. He suggested that it would be wrong to reach any D interpretation of the Act of 1975 even impliedly upon the existence of any such distinction. It seemed to him inconceivable that in 1975 Parliament could have intended that inter-United Kingdom requests for evidence in civil proceedings should be based upon a categorisation by reference to public and private law. For my part, however, I am not prepared to accept that the draftsman of the Act of 1975 did not E appreciate that while the distinction inherent in this well known phrase certainly underlay its use in the Hague Convention, nevertheless it could not conveniently be fitted into an inter-United Kingdom arrangement, at any rate without further definition or explanation. The draftsmen were skilled and experienced lawyers whom one might expect to have had more than a nodding acquaintance with the concepts of civil law. It is in my view not difficult to accept that in drafting the Act of 1975 based F upon the international Convention of 1970 they would have had substantial contact and discussion with lawyers in other relevant countries when drawing up the Act and adhering to the Convention and would have been aware of what they were doing.

     As to the three other possible categories considered by the first Court of Appeal, it rejected the second and this was not contended for G before us. As Balcombe L.J. points out in his judgment, which I have had the advantage of reading in draft, if an English court were to be wholly bound by the classification of the requesting court, it might be required to assist in proceedings which were classified by English law as criminal or penal. This would be contrary to the well-established principles of international law reiterated, for instance, in *Huntington v. Attrill* [1893] A.C. 150, 156.

H     The third of the possible categories listed by Kerr L.J. might appear to have the greatest attraction for an English court in the instant case, and indeed to any court addressed whatever the circumstances. If the proper construction of the Convention and, in so far as the United

748

A

Kingdom is concerned, that of section 9(1) of the Act of 1975, enabled one to prefer this category, then it would enable the courts of this country to accept jurisdiction in those cases in which our law indicated that it was right and proper to do so. However one's immediate attraction to the third category as keeping the question of jurisdiction to be decided by one's own law is very soon diluted by the difficulty to which I have already referred of resolving the patent dichotomy between "civil" and "commercial."

B

As to the fourth possible category, I respectfully and gratefully adopt the comments of Balcombe L.J. in his judgment on this point, also on the view (which I respectfully agree to have been erroneous) of Dr. Mann that categories (2) and (4) must fall together, and on the passage from the judgment of Glidewell L.J. in the first Court of Appeal decision [1987] Q.B. 433, 489A–C.

C

Finally, apart from the purely constructional arguments which I have rehearsed, a substantial attraction for me in the choice of a generally acceptable interpretation of the relevant phrase in the Convention and the Act is that it will produce uniformity. That may be based upon a civilian law approach rather than upon a common law one, but if in a particular instance the one produces certainty and uniformity in a particular context and the other does not, then as a common lawyer I am content. The English courts will now be able to treat letters rogatory under the Act in the same way from whichever country they come if the substance of the proceedings in that other country is the same, however differently they may be viewed under the several legal systems of the requesting countries: cf. e.g. *LTU Lufttransportunternehmen GmbH & Co. KG v. Eurocontrol* (Case 29/76) [1976] E.C.R. 1541, 1552–1553 and *Gourdain v. Nadler* (Case 133/78) [1979] E.C.R. 733.

D

E

In my opinion, therefore, the proper construction of the phrase "proceedings in any civil or commercial matter" in section 9(1) of the Act of 1975 is that which accords with a generally acceptable international interpretation. It is that which a civilian lawyer would give to it and to the corresponding French phrase of which it is the translation. Reverting for a moment to the judgment of Kerr L.J. [1987] Q.B. 433, 476F, the question which arose in *James Buchanan & Co. Ltd. v. Babco Forwarding & Shipping (U.K.) Ltd.* [1978] A.C. 141, a decision referred to by the Lord Justice, was the proper measure of damages on the facts of that case based upon a detailed construction of a small part of one of the articles of the Contract for the International Carriage of Goods by Road Convention scheduled to the Carriage of Goods by Road Act 1965. In that case the interpretation argued for, but held by the House of Lords to be incorrect, may well have been assumed and unproved. That is not the situation in the instant case. The interpretation of "matière civile ou commerciale" is neither assumed nor unproved. In a civil jurisdiction its interpretation is clear and incapable of dispute. Where the Act of 1975 clearly adopted a translation of the phrase and having done so produced a result which is unintelligible at common law, to choose the civil law interpretation in the Act which has the international flavour that it does, is not in my view properly to be described as speculative and in any event it forthwith eases the pain and

F

G

H

A  self humiliation which the very difficult search for an alternative interpretation would involve.

Having reached this conclusion on the fundamental question of construction, it is unnecessary for me to express any detailed views on the remaining issues in this appeal. Equally conscious that anything that I did say would be obiter, I gratefully adopt and agree with the observations on those issues which are contained in the judgment herein

B  of Balcombe L.J.

In these circumstances and for all these reasons I would allow this appeal and discharge the order of Master Creightmore.

C  BALCOMBE L.J. The facts in this matter are fully set out in the judgment of May L.J. and I need not repeat them. The live issues which we have to decide may be summarised as follows:

(1) Has the question whether the Sandefjord City Court proceedings are "civil proceedings" within the definition of section 9(1) of the Evidence (Proceedings in Other Jurisdictions) Act 1975 been determined as far as we are concerned by the decision of the Court of Appeal on the first letter of request in *In re State of Norway's Application* [1987]

D  Q.B. 433 (hereafter referred to as "the first Court of Appeal decision")? This in turn divides into three sub-issues: (A) Are we bound, as a matter of precedent, by the construction given to the Act of 1975 in the first Court of Appeal decision? (B) Even if we are not strictly bound, should we not nevertheless follow the first Court of Appeal in their construction of the Act of 1975? (C) In any event, as between the parties to these proceedings, is the question whether the Sandefjord

E  court proceedings are qualifying proceedings under the Act of 1975 the subject of an issue estoppel arising from the first Court of Appeal decision, by which the appellant witnesses are bound?

(2) If the first Court of Appeal decision is not determinative of this issue, what is the proper meaning of the phrase "proceedings in any civil or commercial matter" in section 9(1) of the Act of 1975?

F  (3) If Norwegian law is relevant in determining whether the Sandefjord court proceedings are qualifying proceedings under the Act of 1975, are they "proceedings in any civil or commercial matter" according to the law of Norway?

(4) In any event, should the second letter of request be struck down or amended on the grounds of either (i) "fishing" or (ii) confidentiality?

G  Certain other issues were raised by the notice of appeal and the respondent's notice, but as these were not argued before us I need not consider them further. So I turn to consider the issues as set out above.

1(A) *Precedent: Are we bound by the first Court of Appeal's construction of the Act of 1975?*

H  The enunciation of the reason or principle upon which a question before the court has been decided—the ratio decidendi—is alone binding as a precedent. Statements which are not necessary to the decision, which go beyond the occasion and lay down a rule that is unnecessary for the purpose in hand are generally termed "dicta": see *Halsbury's*

A

*Laws of England,* 4th ed., vol. 26 (1979), paras. 573–574 and *Penn-Texas Corporation v. Murat Anstalt (No. 2)* [1964] 2 Q.B. 647, 661.

In the first Court of Appeal decision, an appeal by the witnesses against an order directing them to attend to give evidence pursuant to the first letter of request was allowed by a majority (Kerr and Glidewell L.JJ., Ralph Gibson L.J. dissenting). The ratio decidendi of the first Court of Appeal decision was that the first letter of request was too wide—that it was a fishing request: see *per* Kerr L.J. [1987] Q.B. 433, 466E, 477E, 482B–484H; *per* Glidewell L.J., at pp. 490G–491G. Kerr L.J., at pp. 484E–487A, would also have allowed the appeal on the ground of confidentiality—that the balancing exercise which the court had to perform came down against the witnesses being compelled to violate their duty of confidence. Glidewell L.J., at p. 491C–G, would not have allowed the appeal on this ground. All three Lords Justices were of the considered view that the Sandefjord City Court proceedings were "civil proceedings" as defined by section 9(1) of the Act of 1975. However, that view was not necessary for the decision of the majority, since they decided to reject the first letter of request on grounds not connected with that issue of jurisdiction. The majority need have not dealt with the issue at all, or they could have merely assumed that jurisdiction existed; in either event their *decision* would have remained the same. Kerr L.J. recognised that his decision on the jurisdiction issue was not part of the ratio decidendi, since he referred to it as "academic," and he clearly did not consider that any future court would be precluded from considering the matter afresh: see [1987] Q.B. 433, 477E–F.

Accordingly I am quite clear in my mind that we are not bound, as a matter of precedent, by the construction given to the Act of 1975 in the first Court of Appeal decision.

B

C

D

E

1(B) *Should we follow the first Court of Appeal in their construction of the Act of 1975?*

Although the judgments of the first Court of Appeal on this question of construction are technically dicta only, nevertheless they are dicta to which great weight must be given since, in the case of Kerr and Glidewell L.JJ., they represent their considered views on this issue.

F

"Dicta are of different kinds and of varying degrees of weight. Sometimes they may be called almost casual expressions of opinion upon a point which has not been raised in the case, and is not really present to the judge's mind. Such dicta, though entitled to the respect due to the speaker, may fairly be disregarded by judges before whom the point has been raised and argued in a way to bring it under much fuller consideration. Some dicta however are of a different kind; they are, although not necessary for the decision of the case, deliberate expressions of opinion given after consideration upon a point clearly brought and argued before the court. It is open no doubt to other judges to give decisions contrary to such dicta, but much greater weight attaches to them than to the former class:" *per* Lord Sterndale M.R. in *Slack v. Leeds Industrial Co-operative Society Ltd.* [1923] 1 Ch. 431, 451.

G

H

A    In the same case Warrington L.J. said, at p. 456:

> "In order to get rid of the effect of the opinions deliberately expressed by three judges of this court it is in my judgment not enough to say 'they are mere dicta.' They are not views casually expressed on a point not really adequately considered, but they are arrived at and expressed with the same care and deliberation as if
>
> B    they had been necessary for the decision of the case. Although therefore they are not absolutely binding as would be an actual decision of the court necessary to its judgment, they are entitled to such weight that we ought to follow them unless we find that they have been overruled or that they are inconsistent with previous decisions."

C    Basing himself upon these and other passages from the judgments of Lord Sterndale M.R. and Warrington L.J. in *Slack's* case, Mr. Bratza, for the estate, addressed to us a most persuasive argument that, in the absence of any compelling reasons to the contrary, we should follow the considered dicta of the first Court of Appeal, leaving it to the House of Lords to put matters right, if necessary.

D    The decision of the Court of Appeal in *Slack's* case was reversed by the House of Lords [1924] A.C. 851 on the point of substance, but in the course of his speech Lord Dunedin said, at p. 864:

> "Lord Blanesburgh, then Younger L.J. . . . was, however, out-voted by his two colleagues, who took up a position which personally I cannot quite appreciate. They said that *Dreyfus* did not bind them, but that the dicta in *Dreyfus* must be followed, and if wrong
>
> E    must be put right by a higher court, that is, your Lordships' House. My Lords, if a decision is binding, there is an end of it. But if you have only to do with dicta, though such dicta may well serve to help you to form your own opinion, I cannot see that they ought to overrule it. It is a different question when a practice follows on dicta. A practice it might not be right to disturb, but then it is the practice and not the dicta that forms the binding authority."

F

   This seems to me to be the answer to Mr. Bratza's submission. While I would naturally wish to give the utmost respect to the views of Kerr and Glidewell L.JJ., unless those views have hardened into a practice which it would be wrong for us to disturb, then we must, so it seems to me, make up our own minds on this issue and if, after giving all due weight to those views, we are satisfied that they were wrong, then we

G    both can and should depart from them.

### 1(C) *Issue estoppel*

   In my judgment the same considerations which preclude the judgments of the first Court of Appeal from constituting a binding precedent also preclude their constituting an issue estoppel by which the

H    witnesses are bound.

> "Even when in one way or another it can be demonstrated that the court has *expressly* determined, in the earlier proceeding, the same issue as is now in dispute, an issue estoppel will not by any means

752

Balcombe L.J.    In re Norway's Application (No. 2) (C.A.)    [1990]

always be the result. Only determinations which are necessary to the decision—which are fundamental to it and without which it cannot stand—will found an issue estoppel. Other determinations, without which it would still be possible for the decision to stand, however definite be the language in which they are expressed, cannot support an issue estoppel between the parties between whom they were pronounced:" see *Spencer Bower and Turner, Res Judicata,* 2nd ed., p. 179, para. 210.

The editor continues, at pp. 181–182, para. 211:

"In order to make this essential distinction [between the fundamental and the collateral] one has always to inquire with unrelenting severity—is the determination upon which it is sought to found an estoppel so fundamental to the substantive decision that the latter *cannot stand* without the former. Nothing less than this will do."

And later, at p. 186, para. 215:

"Not every finding of fact in a judge's judgment, not every issue of fact determined by a judge or jury, is res judicata between the parties in later proceedings. Thus, a decision of fact or law *against* the party in whose favour the substantial dispute was ultimately decided will not found an estoppel in a later proceeding; and this because it cannot have been necessary to the substantive decision. It is merely collateral, clearing the way perhaps to the point where a substantive decision can be given, but not fundamental or necessary to the decision itself. Moreover, it would be not only illogical but unjust to make it the foundation of a subsequent estoppel; for, the substantive decision being in his favour, no appeal is available on such a collateral decision to the person against whom it was given."

These statements from this authoritative work are fully supported by the cases there cited and by the many authorities to which we were referred, and which I do not find it necessary to set out in extenso.

Kenneth Jones J. in the court below held that the witnesses were not estopped from arguing that the proceedings in the Sandefjord court were not civil proceedings within the ambit of the Act of 1975, although he expressed his conclusion as resulting from the fact that the witnesses could not have appealed against the first Court of Appeal decision on the jurisdiction issue. I agree with his decision, although I would prefer to base my judgment on the wider proposition that the first Court of Appeal's decision on the jurisdiction issue was not fundamental to its substantive decision. I agree with the editor of *Spencer Bower and Turner, Res Judicata,* 2nd ed., when he says, at p. 182, para. 211 that the question of appealability is but a useful test to decide whether the determination which is alleged to create an issue estoppel is fundamental to the substantive decision.

Mr. Boswood, for the State of Norway, placed much reliance, on this question of appealability, on the decision of Romer J. in *Shoe Machinery Co. v. Cutlan* [1896] 1 Ch. 667. In that case patentees claimed damages for an infringement and an injunction. The defendants denied the infringement and also denied the validity of the patent. The court

1 A.C.          In re Norway's Application (No. 2) (C.A.)          Balcombe L.J.

A    upheld the validity of the patent, but granted no injunction or damages.
The judgment as drawn up was, so far as relevant, in the following
terms, at pp. 667–668:

"And the court not dealing in any way with any alleged infringement
of the letters patent . . . by the manufacture of machines made
subsequent to the date of the issue of the writ in this action, and
being of opinion that the alleged infringements of the said letters
B    patent mentioned in the statement of claim and particulars of
breaches were not infringements of the said last-mentioned patent,
doth not think fit to make any order for an injunction in respect of
the said letters patent . . . and pursuant to section 31 of the
Patents, Designs, and Trade Marks Act 1883, the judge doth certify
that the validity of the said patents came into question."

C
It was also ordered that it should be referred to the taxing master to tax
the plaintiffs' cost of the action "so far as it relates to the issue of
validity" of the patent and to tax the defendants' cost of the action so
far as it related to the issue of infringement of the patent, and a set off
of costs was ordered.

D    In a second action between the same parties in respect of the same
patent, the defendants again denied the validity of the patent. The
question then arose whether the defendants were estopped from raising
in the second action the question of the validity of the patent. They
argued that they were not so estopped, as on the form of the judgment
as drawn up (there having been no declaration of the validity of the
patent) they could only appeal on two points, costs and the certificate of
E    validity. But the Court of Appeal, in an earlier case, had held that no
appeal lay against the grant of a certificate of validity. Romer J. held
that the question of the validity of the patent was res judicata between
the parties. In the course of his judgment he said, at pp. 670–672:

"It was because the issue of validity had been found in favour of the
plaintiffs that the court ordered the defendants to pay the plaintiffs
the costs of that issue; and because the plaintiffs had failed on the
F    issue of infringement that the court ordered the plaintiffs to pay the
defendants' costs of that issue, and declared that there should be a
set-off. Now clearly, in my judgment, that decision of the court, so
far as concerns the question of the validity of the patent, and the
order which directed the defendants to pay the costs of that issue,
could have been appealed from. . . . I desire to say emphatically
that I dealt with the issues separately, and it was because I came to
G    a decision on the issues that I awarded the costs. And further, in
my opinion, this sufficiently appears from the words of the judgment
itself. It is not necessary, in considering the question of res judicata,
that there should be an express finding in terms, if, when you look
at the judgment and examine the issues raised before the court, you
see that the point came to be decided as a separate issue for
decision, and was decided between the parties. It was not necessary,
H    in my opinion, therefore, that there should be—though I agree that
it might have been better if there had been—in the judgment in the
case a separate declaration stating the validity of the patent: a

declaration which clearly the court had jurisdiction to put into the    A
judgment if it had thought fit. . . . It appears to me that it
sufficiently appears from this judgment that I did not dismiss this
action so far as concerns this patent, and I found the issue of
validity and determined it in favour of the plaintiffs, and I ordered
the defendants to pay the costs of it. I cannot doubt that if the
defendants had chosen to appeal from that part of the judgment
they were entitled to have had that appeal heard by the Court of    B
Appeal."

The industry of counsel has only discovered one reported case in
which *Shoe Machinery Co. v. Cutlan* has been cited, viz. the decision of
the Privy Council in *Duedu v. Yiboe* [1961] 1 W.L.R. 1040. *Shoe
Machinery Co. v. Cutlan* [1896] 1 Ch. 667 was there cited without any    C
word of qualification, but a careful reading of the decision shows that
the proposition for which it was cited—that an express finding in terms
in a judgment is not necessary to found an estoppel—does not deal with
the point whether the finding as to the validity of the patent in *Shoe
Machinery Co. v. Cutlan* was fundamental to the substantive decision in
that case and whether it was possible for the defendants to have
appealed against a judgment in that particular form.    D

*Shoe Machinery Co. v. Cutlan* was a decision at first instance which
is not binding upon this court. Although it was decided over 90 years
ago, no practice appears to have arisen based upon it. Since the point
was not argued before us, I say nothing as to the validity of the decision
on its particular facts, so far as it relates to the issue of the validity of a
patent when that is called in question, but I am not prepared to accept it    E
as creating any general exception to the rule as set out in *Spencer Bower
and Turner, Res Judicata*, 2nd ed. and cited above.

Mr. Boswood also sought to argue that the witnesses could have
appealed to the House of Lords against the order for costs made in the
first Court of Appeal decision if this order was founded on a wrong view
of the law, and in support of this proposition cited *Donald Campbell &
Co. Ltd. v. Pollak* [1927] A.C. 732. Whether or not they could have    F
appealed against the order for costs seems to me to be immaterial: as I
have already said, the question of appealability is no more than a test to
decide whether a particular issue was fundamental to the substantive
decision. I am satisfied that the first Court of Appeal's determination on
the jurisdiction issue was not fundamental to its substantive decision,
which was to reject the first letter of request on the grounds of "fishing"
and (in the case of Kerr L.J.) confidentiality. So in my judgment the    G
witnesses are not precluded by issue estoppel from again raising the
question whether the Sandefjord court proceedings are qualifying
proceedings under the Act of 1975.

I have some sympathy with Mr. Boswood's submission that this
decision means that the jurisdiction issue can in theory be re-litigated on
each occasion that a fresh letter of request is made, provided that all    H
previous letters of request have been rejected on grounds that do not go
to the issue of jurisdiction. However, I do not see why the court should
not be asked to include in its order, where appropriate (i.e. if it

A    considers that the issue has been fully argued and that all relevant evidence has been adduced), a declaration as to jurisdiction. Once such a declaration has been included in the order, then an estoppel by record will arise; further, it would then be possible for the dissatisfied party (in this case the witnesses) to appeal against the declaration.

B    In the circumstances I do not find it necessary to reach a decision on the question, which was raised in the course of argument, whether it can ever be possible for jurisdiction to be conferred on the court by estoppel, e.g. because a party is estopped from denying the existence of a state of affairs necessary to found the court's jurisdiction in the particular case. However, I very much doubt whether jurisdiction can be conferred by estoppel: see *Halsbury's Laws of England*, 4th ed., vol. 10 (1975), p. 326, para. 718; vol. 16 (1976), p. 1008, para. 1501, note 3.

C    2. *What is the proper meaning of the phrase "proceedings in any civil or commercial matter" in section 9(1) of the Act of 1975?*

D    Section 1 of the Act of 1975 provides that, for the High Court to make an order for evidence to be obtained pursuant to a request from an overseas court, the High Court must be satisfied that the evidence is to be obtained "for the purposes of civil proceedings" in the overseas court. Section 9(1) of the Act of 1975 provides that "'civil proceedings,' in relation to the requesting court, means proceedings in any civil or commercial matter."

E    This issue—whether the Sandefjord proceedings fall within the ambit of the Act of 1975—was referred to as Issue A in the first Court of Appeal decision. It requires the court to construe the phrase "proceedings in any civil or commercial matter" in the context in which it appears in the Act of 1975. The first Court of Appeal considered that there were four possible categorisations, and no further possibilities were suggested in argument before us. They are: (1) a generally *acceptable* international interpretation (the first Court of Appeal referred to a generally *accepted* international interpretation, but it was never suggested, and cannot have been intended, that the construction adopted should depend upon some sort of international opinion poll); (2) classification under the law of the requesting court; (3) classification under the law of the court addressed; (4) a combination of (2) and (3): the English court addressed would satisfy itself that the proceedings concerned a civil or commercial matter under the law of the requesting court, but would only accept this categorisation for the purposes of assuming jurisdiction if it were not in conflict with any fundamental principle recognised under English law.

F

G    Kerr L.J. was evidently much attracted to the international interpretation. He considered it at great length, but eventually rejected it [1987] Q.B. 433, 476 because

H    "contrary to my first, and what would have been my preferred, conclusion, I find it impossible, *on the material before us* to give to 'civil or commercial matter' in section 9(1) of the Act of 1975 any interpretation which can be seen as being broadly acceptable internationally as well as within the three law districts of the United Kingdom. The approach of the European Court in *Rüffer's* case [1981] 3 C.M.L.R. 293, would in my view undoubtedly provide the

756

Balcombe L.J.        In re Norway's Application (No. 2) (C.A.)        [1990]

best answer, *but on the material before us* it has not been established  A
in the present context." (My emphasis.)

So he eventually came down in favour of category (4).

Glidewell L.J. had no such hesitation. He categorised the international
approach, at p. 489F, as "neither logical nor desirable." He, too,
accepted category (4), whilst acknowledging, at p. 489, that this could  B
result in a case in one requesting country being a "civil or commercial
matter," whereas an identical case in another requesting country would
not, so that the English court would in every case have to consider the
law of the requesting country, and possibly be bound to entertain a
request from one country, whilst having to refuse a request in an
identical case from another.

On this issue Ralph Gibson L.J. merely expressed his agreement  C
with Glidewell L.J.

At one point in his judgment Kerr L.J. said [1987] Q.B. 433, 472F–G:

"Throughout the hearing of this appeal I felt that if ever there was
a case where the assistance of an experienced comparative lawyer
would have been welcome, this is so here."

The witnesses hearkened to this cri de coeur, and their legal team  D
before us was augmented by the presence of Professor Jolowicz, who
holds the chair of comparative law at the University of Cambridge, and
much new material, some of which is also mentioned later in this
judgment, was presented to us. We were also referred to the note "'Any
Civil or Commercial Matter'" (1986) 102 L.Q.R. 505 by the distinguished
jurisprudent Dr. F. A. Mann, expressing strong support for Kerr L.J.'s  E
preferred international interpretation.

Before I turn to the four possible categories in detail, I mention
certain general matters which in my judgment are appropriate for the
court to consider in its approach to this question of construction.

(a) To an English lawyer a civil matter, in the context of proceedings
in a court of law, is any matter which is not criminal. Thus to an English
lawyer a commercial matter is a civil matter. The dichotomy "any civil  F
or commercial matter" has no meaning to an English lawyer.

(b) It was common ground, both in the first Court of Appeal and
before us, that the Act of 1975 was passed mainly in order to give effect
to the accession by the United Kingdom to the Hague Convention on
the Taking of Evidence Abroad in Civil or Commercial Matters ("the
Convention of 1970"). That this was a purpose of the Act of 1975 was  G
recognised in the speeches of the House of Lords in *In re Westinghouse
Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235
(Nos. 1 and 2)* [1978] A.C. 547. It is true that the Convention of 1970 is
not mentioned in the Act of 1975. However:

"it is now clear that where the source of the legislation in question
is not the ordinary parliamentary process, but is an international
treaty or convention and the statute is designed to give effect to  H
that treaty or convention, it is legitimate to look at that source in
order to resolve ambiguities in the legislation which has made those
treaty or convention provisions part of the ordinary municipal law

A    of this country: " *per* Lord Roskill in *Fothergill v. Monarch Airlines Ltd.* [1981] A.C. 251, 299.

(c) The Convention of 1970 was concluded in the English and French languages, both texts being equally authentic. In the English text the introduction includes the statement "Desiring to improve mutual judicial co-operation *in civil or commercial matters*," while Chapter I, article 1

B    reads: "*In civil or commercial matters* a judicial authority of a contracting state may . . . request the competent authority of another contracting state . . . to obtain evidence." In both these passages, and elsewhere in the Convention (see articles 15 and 17) the English phrase "in civil or commercial matters" corresponds to the French phrase "en matière civile ou commerciale."

C    (d) In construing an international treaty (the Warsaw Convention relating to international transportation by air) the higher courts of the United States have enunciated certain principles of construction. In *Block v. Compagnie Nationale Air France* (1967) 386 F. 2d 323 the United States Court of Appeals (Fifth Circuit) held that a multilateral treaty was like a "uniform law" within the United States, and the court had an obligation to keep interpretation as uniform as possible. In that

D    case the court noted that the underlying concepts of the convention were civilian in origin. The majority felt, at p. 336, that

> "the determination in an American court of the meaning of an international convention drawn by continental jurists is hardly possible without considering the conception, parturition and growth of the convention."

E    In *Air France v. Saks* (1985) 105 S.Ct. 1338 the United States Supreme Court held that it was the responsibility of the court to give the specific words of a treaty a meaning consistent with the shared expectations of the contracting parties. The court said, at p. 1342: "We look to the French legal meaning for guidance as to these expectations because the Warsaw Convention was drafted in French by continental jurists." I

F    appreciate that these cases are concerned with the interpretation of an international convention itself, but in my judgment we should apply similar principles in construing the Act of 1975, passed to give effect to an international convention, and incorporating phraseology taken from that convention which has no generally accepted meaning to an English lawyer.

G    (e) International comity. As Kerr L.J. said in the first Court of Appeal decision [1987] Q.B. 433, 470B: "the court should strive to give effect to the request of the foreign court unless it is driven to the clear conclusion that it cannot properly do so." Whilst I accept that this is a factor which must in any event be taken into account, in my judgment it is of more significance when considering factors where the court has a discretion to exercise, than where the court is seeking to construe the enabling Act to see whether or not it has jurisdiction to accede to the

H    request. In any event, it would point in the opposite direction to the next factor.

(f) Consistency of interpretation. In my judgment there is much to be said in favour of a construction which leads to the conclusion that

758

what falls within the ambit of the Act of 1975 does not depend upon the A
meaning given to "civil or commercial matter" by the law of the
requesting court. Such a construction would permit the building up of a
series of precedents as to what does or does not fall within the ambit of
the Act, without in every case having to consider the law of the
requesting court. This would enable the English courts to deal with
individual requests with a measure of certainty as to the jurisdiction, and
a consequent saving of costs to the parties.                               B

With these introductory matters in mind, I turn to consider the four
possible categories for the interpretation of "civil or commercial matter."

(1)  *The international interpretation*

(i) "Matière civile ou commerciale" (of which "civil or commercial   C
matter" is a translation) stems from French law. It is a concept current
in many or all civil law systems, based on the Roman *jus civile*. This
system has been categorised as belonging to the Romano-Germanic legal
family, as distinct from the common law family and other legal systems.
A feature of this system is that the law has evolved, primarily for
historical reasons, as an essentially *private* law, as a means of regulating
the private relationships between individual citizens: see *David and*  D
*Brierley, Major Legal Systems in the World Today*, 3rd ed. (1985),
pp. 22–24.

(ii) "Matière" indicates the nature of the litigation, the subject
matter of the dispute: see *Dalloz, Lexique de Termes Juridiques*, 5th ed.
(1981), p. 270.

(iii) In French law, and in other systems of law within the Romano-   E
Germanic legal family, there is a distinction between "civil" and
"commercial" law, which is rooted in history: see *René David, English*
*Law and French Law* (1980), p. 36 et seq.; and the *International*
*Encyclopedia of Comparative Law*, vol. VIII, ch. 2, "Civil Law and
Commercial Law" by D. Tallon. From this latter work it appears that
whilst those legal systems which recognise openly the autonomy of
commercial law all belong to the Romano-Germanic legal family, not all  F
systems within that family recognise the autonomy (e.g. Switzerland),
and in others (e.g. Holland and Italy) there is a movement for the
merger of civil and commercial law. However, the Nordic countries
(Sweden, Norway, Denmark, Finland and Iceland) have no autonomous
system of commercial law: see also the *International Encyclopedia of*
*Comparative Law*, vol. II, ch. 2 "The Civil Law System" by C. Szladits,
at pp. 70–73.                                                            G

(iv) Civil law countries draw a fundamental distinction between
private and public law. This fundamental division is considered a basic
division, the *summa divisio*, in all legal systems belonging to the civil
law family of laws.

"Public law is that body of law which governs the affairs of the   H
communities (the states, municipalities, public corporations, etc.)
among themselves and the acts of the authorities to which the
individual is subject. Private law regulates legal relations in which
persons confront each other as individuals, theoretically, at least, on

A    an equal footing:" *International Encyclopedia of Comparative Law,* vol. II, ch. 2, p. 15; see also pp. 20, 48.

Whether fiscal matters are to be treated as part of administrative law, or as a separate category of their own, it is beyond dispute that they are part of public law. Civil or commercial matters are equally incontestably part of private law.

B    "According to the view held in continental European states, administrative matters (including fiscal matters) . . . fall outside the purview of the term 'civil or commercial:'" *Encyclopedia of Public International Law,* vol. 9, p. 242.

Apart from the citations above, and those set out by Kerr L.J. [1987] Q.B. 433, 473, reference can also be made to *Merryman and Clark's* C    *Comparative Law: Western European and Latin American Legal Systems* (1978), pp. 819–820.

(v) The Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters of 1968 ("the Brussels Convention")— to which the United Kingdom acceded in 1978 and to which effect has been given by the Civil Jurisdiction and Judgments Act 1982—also D    applies in "civil and commercial matters": see article 1. In *State of the Netherlands v. Rüffer* (Case 814/79) [1980] E.C.R. 3807, the European Court of Justice held that an action by a Dutch public authority to recover from the owner of a wrecked vessel the costs of removing the wreck from a public waterway was not a "civil or commercial matter" within the ambit of the Brussels Convention. The European Court followed its own earlier decisions there cited and held, at p. 3819, E    para. 7:

"that the concept 'civil and commercial matters' used in article 1 of the Brussels Convention must be regarded as an independent concept which must be construed with reference first to the objectives and scheme of the Convention and secondly to the general principles which stem from the corpus of the national legal F    systems."

It said, at p. 3821, para. 14:

"As the court has stated in the authorities cited above the Brussels Convention must be applied in such a way as to ensure, as far as possible, that the rights and obligations which derive from it for the contracting states and the persons to whom it applies are equal and G    uniform. By that same case law such a requirement rules out the possibility of the Convention's being interpreted solely in the light of the division of jurisdiction between the various types of courts existing in certain states: on the contrary it implies that the area of application of the Convention is essentially determined either by reason of the legal relationships between the parties to the action or H    of the subject matter of the action."

I accept, of course, that this construction of the phrase "civil or commercial matter" by the European Court of Justice in the context of a different Convention and as between members of the European

760

Economic Community cannot be decisive in the instant case. Nevertheless    A
the approach of the European Court in that case is one which I find
persuasive and to follow it would lead to a generally acceptable
international interpretation of this widely used phrase.

Thus far I have followed, with some minor variations, the factors
which Kerr L.J. in the first Court of Appeal decision considered as
leading towards an international interpretation: see [1987] Q.B. 433,
472–473. He then changed direction and, at pp. 473–478, listed those    B
factors which persuaded him, reluctantly, to abandon his preferred,
international, interpretation. I now consider these seriatim.

"(vi) . . . (a) the subject matter of the [Brussels Convention] is the
recognition and enforcement of . . . judgments; not merely judicial
assistance for the provision of evidence in foreign courts." In my
judgment this is a distinction without a difference: both matters are part    C
of an international procedure. At the very least one approaches the
question of construction of a single phrase—"matière civile ou
commerciale"—with an inclination to give it the same meaning in each
of the international Conventions where it appears. There is no logic in
refusing to recognize a judgment based on a foreign tax claim, but to be
willing to assist in gathering evidence which may lead to an unenforceable
judgment.    D

"(b)" The judgment of the European Court of Justice is "communau-
taire" within the E.E.C. Thus the phrase "matière civile ou commerciale"
has a definitive interpretation for those countries which are members of
the E.E.C. This provides the best available guide for what is likely
to receive general international acceptance—what, in the course of
argument, was described as "the lowest common denominator" as to the    E
meaning of the phrase.

With all respect to Kerr L.J., I do not accept that the use of the
words "*mutual* judicial co-operation," in the preamble to the Convention
of 1970, points away from a multilateral, or general international,
interpretation of the Convention. This is a phrase commonly used in
international conventions: see, e.g., the Convention of 1931 between the
United Kingdom and Norway regarding legal proceedings which,    F
incidentally, also applies "only to civil and commercial matters." I do
not find that the use of the word "mutual" points either towards, or
against, an international interpretation.

"(c)" Article 1 of the Brussels Convention, in the form in which it is
set out in Schedule 1 to the Civil Jurisdiction and Judgments Act 1982 is
in the following terms:    G

"This Convention shall apply in civil and commercial matters
whatever the nature of the court or tribunal. It shall not extend, in
particular, to revenue, customs or administrative matters."

The second sentence, which was not part of the original text, and was
added on the accession of Denmark, Ireland and the United Kingdom to
the Brussels Convention, was not an amendment but a clarification of    H
the scope of the Convention: see Kohler, "The Case Law of the
European Court on the Judgments Convention—Part II" (1982) 7 E.L.
Rev. 103, 104. Thus, while agreeing with Kerr L.J. that it is unfortunate

761

1 A.C.        In re Norway's Application (No. 2) (C.A.)        Balcombe L.J.

A   that there was no similar clarification in the Convention of 1970 or the Act of 1975, I do not accept that this suggests a different interpretation of the phrase "civil or commercial matter" in the Convention of 1970 or the Act of 1975: indeed the contrary is the case.

"(vii)" As Kerr L.J. points out, section 2 of the Foreign Tribunals Evidence Act 1856 (19 & 20 Vict. c. 113) points away from a purely common law categorisation of the phrase "civil or commercial matter,"

B   although it is fair to say that that section points more towards an interpretation according to the law of the requesting court than to an international interpretation. However the Evidence by Commission Acts 1859 (22 & 23 Vict., c. 20) and 1885 (48 & 49 Vict. c. 74), since they do not use the phrase at all, throw no light on the question.

"(viii)" Since it is common ground that the Act of 1975 was passed mainly to give effect to the Convention of 1970 and that reference could

C   be made to the Convention of 1970 in construing the Act of 1975 (see [1987] Q.B. 433, 471G–H) the fact that the Act of 1975 does not expressly refer to the Convention of 1970 is irrelevant.

"(ix)" The fact that the common law does not—yet—recognise any clear distinction between public and private law is, in my judgment, irrelevant, because one cannot approach the construction of the phrase

D   "civil or commercial matter" in the Act of 1975 from a common law standpoint. As I have already said, this phrase to a common lawyer has no sensible meaning. To a civilian it has a very clear meaning. I accept that, as the Act of 1975 applies between the courts of the different parts of the United Kingdom, as it does in relation to all foreign countries, the internationalist interpretation will result in inter-United Kingdom

E   requests for evidence in civil proceedings being based upon a categorisation by reference to the civil law. But this is the result of Parliament using a phrase having meaning only to a civilian lawyer, and in my judgment this is a small price to pay for the uniformity and consistency of approach which, as I have said in introductory paragraph (f) above, is an approach to be favoured.

"(x)" This point falls to be dealt with more conveniently under

F   classifications (2) to (4).

So, in my judgment, the factors which led Kerr L.J. to abandon his preferred international interpretation, when carefully analysed, do not lead to that conclusion.

I can now summarise my reasons for favouring the international interpretation.

G   (i) The phrase "civil or commercial matter" has no intelligible meaning at common law. Unless the words "or commercial" are to be ignored, the use of the phrase points away from a common law interpretation of the word "civil," i.e. a purely procedural interpretation. This is reinforced by the use of the word "matter" as indicating the subject matter of the litigation.

(ii) In the Convention of 1970, to give effect to which the Act of

H   1975 was passed, the words "in civil or commercial matters" correspond to the French phrase "en matière civile ou commerciale."

(iii) In civil law countries the dichotomy between civil and commercial law is widespread. In those countries the phrase "civil matter" would not

762

include a commercial matter: hence the inclusion of the words "or    A
commercial."

(iv) So the use of the phrase "civil or commercial matter" in the
Act of 1975 points to a civilian meaning for those words.

For the purposes of this judgment I do not find it necessary or
desirable to consider what matters are, according to this interpretation,
included within, or excluded from, the scope of the phrase "civil or
commercial matters." It is sufficient to say that no civil law country    B
would ever treat a disputed tax claim as being a civil or commercial
matter.

For these reasons I favour the generally acceptable international
interpretation—i.e. an interpretation according to the civil law—of
the phrase "proceedings in any civil or commercial matter" in section
9(1) of the Act of 1975. However, before coming to a final conclusion    C
on this question, it is necessary to consider the other possible
categorisations.

### (2) *Classification under the law of the requesting court*

This categorisation was rejected by the first Court of Appeal and
was not pursued before us. If the English court were to be wholly    D
bound by the classification of the requesting court, it might be
required to assist in criminal or penal proceedings (as classified by
English law), even though these were classified as "proceedings in a
civil or commercial matter" by the requesting court. This would be
contrary to well established principles of English jurisprudence: see
*Huntingdon v. Attrill* [1893] A.C. 150, 155, a case which was cited to
the first Court of Appeal, although not referred to in the judgments:    E
see [1987] Q.B. 433, 436–437.

### (3) *Classification under the law of the court addressed—i.e. English law*

Although this categorisation was rejected by the first Court of
Appeal and was not pursued before us, it cannot be dismissed out of    F
hand. Although the instinctive reaction of a common lawyer is to give
the phrase "civil or commercial matter" a procedural interpretation—
see, e.g., *In re Extradition Act 1870, Ex parte Treasury Solicitor*
[1969] 1 W.L.R. 12, 15, *per* Chapman J.—nevertheless English courts
can and do draw distinctions as a matter of substance between
criminal and civil matters, regardless of the form of the proceedings.    G
Thus in *Bonalumi v. Secretary of State for the Home Department*
[1985] Q.B. 675, this court held that an order made on an application
in the High Court by the Home Secretary under the Bankers' Books
Evidence Act 1879 to inspect the bank accounts of Mr. Bonalumi, so
that they could be used as evidence in criminal proceedings in
Sweden, was an order made in a criminal cause or matter under
section 18(1)(*a*) of the Supreme Court Act 1981, so as to exclude an    H
appeal to the Court of Appeal, notwithstanding the civil procedural
form of the application. Nevertheless, the obvious difficulty in giving
an English interpretation to the phrase is the dichotomy between

763

1 A.C.                In re Norway's Application (No. 2) (C.A.)                Balcombe L.J.

A    "civil" and "commercial" which, as I have already said more than
once, has no intelligible meaning to an English lawyer.

(4)  *The combination of (2) and (3)*

     This was the preferred categorisation of the first Court of Appeal:
reluctantly on the part of Kerr L.J.; without hesitation on the part of
Glidewell L.J., with whom Ralph Gibson L.J. agreed. In the note
B    "'Any Civil or Commercial Matter,'" 102 L.Q.R. 505, 507 Dr. Mann
said that if possibility (2) was inapposite—as he held it was for
reasons developed in *Huntington v. Attrill* [1893] A.C. 150—"possibility
(4) must necessarily suffer the same fate." No one before us sought to
support the exclusion of possibility (4) on this basis, for the very good
reason, as stated by Kerr L.J. [1987] Q.B. 433, 477A–c, that the
C    combination of English law with the law of the requesting court was
for just this purpose: to ensure that the English court would not be
precluded from rejecting a classification by the law of the requesting
court if this offended fundamental principles of English law.

     Nevertheless, the same problems will arise under this head as arise
under classification (3) above, viz. where the law of the requesting
court, like English law, does not recognise the dichotomy between
D    "civil" and "commercial." This would be the case when a request
comes from any country with a system of law derived from the
common law and, on the evidence before us, is equally the case under
Norwegian law, which primarily uses "civil" in a procedural sense to
distinguish it from "criminal." But when the law of the requesting
court, as with English law, does not normally make a distinction
E    between "civil" and "commercial" matters according to subject matter,
then a difficulty is bound to arise. That difficulty is well exemplified in
the present case by the voluminous evidence of Norwegian law, with
Professor Fleischer on behalf of the State of Norway stating
categorically that the Sandefjord proceedings are civil proceedings
under Norwegian law, whereas Professors Huser, Bernt and Haerem,
for the witnesses, were equally firm that the Sandefjord proceedings
F    were not proceedings in a civil or commercial matter according to
Norwegian law. This difference was not resolved by the cross-
examination (at length) of these eminent jurists, and by the nature of
things could not have been, for a perusal of their affidavits and the
transcripts of their cross-examination makes it clear that they were
approaching the question from wholly different standpoints; Professor
G    Fleischer from a procedural standpoint, the others from a substantive
one. The dilemma is well expressed in the following passage from the
judgment of Glidewell L.J. in the first Court of Appeal decision
[1987] Q.B. 433, 489:

         "If proceedings similar to those in the Sandefjord court were
     taking place in the High Court in England, and that court applied
H        for an order for the examination of witnesses to a court in a
     jurisdiction whose relevant statute was in terms identical to those
     of the Act of 1975, the English High Court would of course say
     that the proceedings were civil proceedings. But if asked to
     explain its process of reasoning, it might do so in some such

terms as these: 'We do not usually categorise actions which come    A
before our courts in terms of their subject matter. We do so in
order to comply with sections 1 and 9 of your statute. We say
that these proceedings are civil proceedings under English law;
therefore they are proceedings in a "civil matter;" therefore they
are civil proceedings within the definition in your statute.' It
seems to me that this circular process of reasoning is, in essence,
that adopted by the Solicitor-General of Norway, in paragraph 5    B
of his affidavit of 26 June 1985. I therefore do not share the
doubts which have troubled Kerr L.J. as to whether the evidence
before us should satisfy us that the *Sandefjord* proceedings are 'in
a civil . . . matter.' In my view the evidence makes it clear that
they are."

With all respect to Glidewell L.J., I do not agree with the reasoning    C
contained in the following passage, at p. 489B–C: "We say that these
proceedings are civil proceedings under English law; *therefore* they
are proceedings in a 'civil matter.'" I do not accept that, because
proceedings may be civil proceedings under English law (classified
procedurally), *therefore* they are proceedings in a "civil matter"    D
(classified substantively), more especially where the context requires
that a "civil" matter must be distinguished from a "commercial"
matter, although both are, by English procedural tests, "civil"
proceedings.

So, although I can understand the reasons which prompted the
first Court of Appeal to choose the fourth categorisation, in my
judgment it provides a less satisfactory interpretation than the
international interpretation—category (1).                          E

So I answer main question 2 above: the proper meaning of the
phrase "proceedings in any civil or commercial matter" in section 9(1)
of the Act of 1975 is that which accords with a generally acceptable
international interpretation, which is the meaning which a civilian
lawyer would give to the phrase. This necessarily excludes a disputed
tax claim, and therefore excludes the *Sandefjord* proceedings.      F

In view of my answer to main question 2, issues 3 and 4 do not
arise. However as it seems probable that this case will go further, I
venture to express an opinion an these issues recognising, as I do,
that my views are necessarily obiter!

### 3. *The Norwegian law issue*                                     G

On the basis—contrary to my view expressed above—that
Norwegian law is relevant in determining whether the Sandefjord City
Court proceedings are qualifying proceedings under the Act of 1975,
the judge held that these proceedings are "proceedings in any civil or
commercial matter" according to the law of Norway.

His reasons for reaching this conclusion may be summarised as
follows:                                                             H

(i) This was the conclusion in the first Court of Appeal decision,
upon the evidence then before that court. At the very least this threw
the evidential burden of proving the contrary on to the witnesses.

765

1 A.C.            In re Norway's Application (No. 2) (C.A.)            Balcombe L.J.

A      (ii) The evidence before the first Court of Appeal included the affidavit of the Solicitor-General of Norway sworn on the first application. Although there was no affidavit of the Solicitor-General before Kenneth Jones J., he said: ". . . I regard that as a technicality and that I can take full account of paragraphs 4 and 5 of the Solicitor-General's affidavit of 26 June 1985 and treat its contents as being in evidence before me." (The effect of those paragraphs was that the

B     Sandefjord proceedings were civil proceedings for the purpose of the courts' system and the administration of justice in Norway, i.e. applying a procedural test in the same way that they would be described as "civil proceedings" if they were being carried on in an English court.)

C      (iii) By issuing the letters of request, the Norwegian court was evidently satisfied that the request was a proper one. (This was a ground upon which the first Court of Appeal relied, and which the judge took as his starting point.)

     (iv) The evidence of the Norwegian professors before him disclosed a division so deep that it did not enable him to say with confidence that the evidential burden thrown upon the witnesses had been

D     discharged. However, if he had to make a choice, he preferred the evidence of Professor Fleischer for the State of Norway that the Sandefjord proceedings were proceedings in a civil matter under Norwegian law.

     These findings are attacked by the witnesses on a number of grounds.

     (a) Before the hearing before Kenneth Jones J., the parties had

E     expressly agreed that the affidavit of the Solicitor-General should not be treated as evidence, expert or otherwise, on the second application. Neither counsel invited the judge to rely on this affidavit. This contention is borne out by the correspondence between the parties, and Mr. Boswood, for the State of Norway, did not seek to argue the contrary before us. In my judgment, therefore, it is clear that, in

F     reaching his decision on this issue, the judge took into account material on which he was not entitled to rely.

     (b) The issuance of the letters of request, being in a form submitted by the lawyers for the State of Norway and the estate, was no evidence of Norwegian law on the question which the English court had to decide. In my judgment the fact that the Norwegian

G     court saw fit to issue the letters of request in their form as drafted—which, in the case of the second letter of request, asserts that the Sandefjord action "is a civil action under the law of Norway, and the proceedings are a 'civil matter' under the law of Norway, for the purposes of" the Convention of 1970—is a matter which an English court must take into account on this issue. However, it is not something to which, in the circumstances in which the letters of

H     request were prepared, the English court should attach great weight: see *In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, 609–610, *per* Lord Wilberforce.

1 A.C. 1990—30

766

A

(c) These errors vitiate the judge's conclusions on the Norwegian law issue. We could, if necessary, order a retrial of the Norwegian law issue before another judge, but since his decision did not turn on the question of credibility of the expert witnesses, this court is in as good a position as he was to decide this issue, albeit technically one of fact. I agree: see *Dalmia Dairy Industries Ltd. v. National Bank of Pakistan* [1979] 2 Lloyd's Rep. 223, 285–286.

B

(d) On a proper analysis of the evidence of the four professors, Norwegian law would not, *as a matter of substance*, characterise the Sandefjord proceedings as a civil matter. As I have already said, it is clear that the Norwegian lawyers were faced with the same problem as English lawyers—that the dichotomy between "civil" and "commercial" matters is not one with which Norwegian law is familiar, because Norwegian lawyers, like English lawyers, would normally adopt a procedural approach. However, for the same reasons that have persuaded me against the adoption of category (4) under issue 2, above, it seems to me that the evidence given on behalf of the witnesses is to be preferred to that of Professor Fleischer on behalf of the State of Norway on this issue.

C

So, had it been material, I would have answered question 3 by saying that the Sandefjord City Court proceedings are not "proceedings in any civil or commercial matter" according to the law of Norway.

D

4. *Fishing/Confidentiality*

(a) *Fishing.* I approach this issue with Lord Wilberforce's statement in *In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1972] A.C. 547, 612 very much in my mind:

E

"following the spirit of the Act [of 1975] which is to enable judicial assistance to be given to foreign courts, the letters rogatory ought to be given effect to so far as possible."

Having carefully considered the second letter of request, I am satisfied that, subject to the detailed modifications ordered by Kenneth Jones J. to paragraphs 6, 7, 10 and 12 of Schedule 1 to the letter, and to one further modification mentioned below, the second letter of request cannot be rejected, as was the first letter of request, as a fishing application. The one further modification to which I refer relates to paragraph 8 of Schedule 1. Kenneth Jones J. rejected this paragraph in toto. In its original form I am not surprised at that decision, but in the course of the hearing before us the State of Norway put in a modified proposal for paragraph 8. If that paragraph were amended to read:

F

G

"If the settlor of the shares and/or assets was Anders Jahre or his nominee or agent, what was or were: the name of the 'Foundation,' its constitution and objects, and the names of the trustees and beneficiaries, and who had authority to elect or remove trustees and to alter the trust deed; were the financial aspects of the 'Foundation' including its accounts managed from Norway?"

H

767

A    I would have been prepared to restore the paragraph, thus modified, to the second letter of request.

(b) *Confidentiality.* As the judge said, following Kerr L.J. in the first Court of Appeal decision, the resolution of this issue requires the performance of a balancing exercise by the court. The judge exercised his discretion on this question and I know of no reason why this court should interfere with that exercise.

B

*Conclusion*

For the reasons given in my answers to questions 1 and 2 above, I would allow this appeal and discharge the order of Master Creightmore dated 2 April 1986.

C

WOOLF L.J. I am saved the burden of having to set out the background to the present appeal as this has already been clearly set out in the judgments of May and Balcombe L.JJ. and the earlier judgments of the other division of the court. The long history of these proceedings does not disclose a happy situation. The Hague Convention of 1970 was implemented to "improve mutual judicial co-operation in

D    civil or commercial matters." The Evidence (Proceedings in Other Jurisdictions) Act 1975 was intended to give effect to the United Kingdom's ratification of the Convention and in the terms of its long title "to assist in obtaining evidence required for the purpose of proceedings in other jurisdictions." It is indeed unfortunate that notwithstanding these commendable objectives of the Act and the Convention these proceedings should have been so drawn out and

E    expensive. However this history is explained partly by the difficulty, complexity and importance of the issues involved and partly by the fact that on the previous occasion when the proceedings were before the Court of Appeal ("the first appeal"), as Kerr L.J. made clear in his judgment, the parties did not provide all the assistance and evidence needed to come to an exhaustive determination of the issues

F    involved. In this appeal we certainly cannot complain of too little assistance. It is out of deference to that assistance that I set out my own reasoning even though by doing so I risk dulling the clarity which the judgments of May and Balcombe L.JJ. have introduced to the issues, since I come to the same conclusion as they do by a route which is mine alone.

G    *The jurisdiction issue*

The most important issue before this court is undoubtedly the question as to whether the proceedings which have been brought by the estate of Anders Jahre before the City Court of Sandefjord are civil proceedings as defined in section 9(1) of the Act of 1975. That is to say are they proceedings in a "civil or commercial matter?" If they

H    are not proceedings in a civil or commercial matter then it is quite clear that the High Court has no jurisdiction to assist the Norwegian court and it is for this reason that it is appropriate to refer to this issue as being the jurisdiction issue.

768
Woolf L.J.                In re Norway's Application (No. 2) (C.A.)                [1990]

If there had not been the previous proceedings in relation to the   A
first letter of request, in order to determine the jurisdiction issue the
court's task would be confined to having to determine the proper
interpretation of "proceedings in any civil or commercial matter" in
the context of the Act of 1975 and then to apply that interpretation in
order to decide whether the Norwegian proceedings were proceedings
in a civil or commercial matter. However, because of the first appeal
in relation to the first letter of request, it is also necessary to consider   B
whether this court is bound as a matter of legal precedent to follow
the interpretation given on the first appeal and whether issue estoppel
operates so as to prevent this court in relation to the second letter of
request departing from the determination on the first appeal that the
Norwegian proceedings were in fact proceedings in a civil or
commercial matter.                                                            C
   It is preferable to deal with these questions of legal precedent and
issue estoppel at the outset.

*Precedent*

   It is not surprising that before Kenneth Jones J., it was not argued
on behalf of the witnesses that the interpretation of the Act of 1975
adopted by the Court of Appeal at the first hearing should not be   D
followed by him. Obviously, whether or not the interpretation of the
provisions of the Act by the Court of Appeal were strictly binding
upon him, Kenneth Jones J. would feel most reluctant to adopt a
different interpretation. However, before this court Mr. Crystal, on
behalf of the estate, sought to re-open the whole question of
interpretation and in doing so had the assistance of a distinguished   E
comparative lawyer, the absence of whom Kerr L.J. had regretted in
his judgment in the first appeal. In addition Mr. Crystal had relied
upon a substantial quantity of what I will call additional international
material in support of his argument. With this help, Mr. Crystal
submits an international interpretation ought to be given to the
definition of civil proceedings contained in section 9(1) of the Act of
1975.                                                                        F
   As I read the judgments of this court on the first appeal, there are
at least differences in emphasis between the approach which was
adopted to the question of interpretation by Glidewell L.J. (with
whom Ralph Gibson L.J. agreed on this point) and Kerr L.J.  Glidewell
and Kerr L.JJ. (Kerr L.J. reluctantly) did not apply to the definition
contained in the Act a "generally accepted international interpretation"   G
and decided that what was required before the court could give effect to
an application for assistance by the foreign court was that the application
should relate to the proceedings which would be classified both under
the law of the requesting court and under the law of this the addressee
court as proceedings concerning a civil or commercial matter. However,
Kerr L.J. left open the question as to whether or not the view of the
court addressed on the question of classification went to jurisdiction or   H
discretion and went on to say [1987] Q.B. 433, 477:

   "Where does that leave the present case? If the *substance* of a
   dispute is clearly a matter of *public* law in the jurisprudence of the

769

A    requesting court, then I would not accept that it can properly be regarded as 'matière civile ou commerciale' for the purposes of the Hague Convention or any legislation based upon it. But although I regard the evidence on Norwegian law as insufficiently searching, particularly on the characterisation of the substance of these proceedings by reference to the distinction between public and private law which may well be recognised in Norway as in civil law

B    countries, I do not feel able to conclude on the evidence that the Sandefjord action cannot be regarded as a proceeding in a civil matter by the law of Norway. Mr. Boswood offered to produce a further affidavit on this point, but we declined it at this late stage. However, since the Norwegian court was evidently satisfied that the request was a proper one under its own law, and the evidence of

C    the Solicitor-General supports it, I would reluctantly give it the benefit of the doubt, which I nevertheless retain. In any event, in view of my conclusions on issues E and F, in this judgment the matter become academic. I would only add that if a similar issue should arise in the future, I hope that our courts will be provided with more satisfactory evidence in the light of the considerations to which I have referred."

D    Glidewell L.J. thought it was most unlikely that the need to comply with the English classification would cause any difficulty since, as he said, at p. 489A:

"We have no evidence that there is any jurisdiction in which *proceedings* in a 'civil or commercial matter' would not be regarded as *civil proceedings* in the English sense." (Emphasis added.)

E    In addition Glidewell L.J. took the view that, where under the law of the requesting state the classification of the proceedings would not normally be on the basis of their subject matter but on their procedural characteristics, e.g. whether they were criminal or civil proceedings, it was perfectly appropriate to adopt a procedural rather than a substantive

F    classification. However both Kerr and Glidewell L.JJ., on the evidence before them, came to the conclusion that under Norwegian law the proceedings would be classified as a civil or commercial matter which meant that if the first letter of request had been in a satisfactory form the state and the estate would have succeeded on the appeal. However both Lords Justices (differing from Ralph Gibson L.J.) were of the view that having regard to the terms of the request which they regarded as

G    "fishing" it would not be appropriate for the court to give effect to the first letter of request and on this ground by a majority the witnesses' appeal was allowed.

In these circumstances although Mr. Crystal did not go so far as to submit that the views expressed by this court on the first appeal as to interpretation were obiter, he did submit that they did not form part of the ratio which was binding on this court. In a powerful, succinct and

H    highly persuasive argument Mr. Bratza, on behalf of the estate, accepted that this court was not strictly bound by the previous decision on the question of interpretation but submitted that as the decision on the first appeal was reached following detailed argument and after careful

consideration, this court, as a matter of propriety between two courts of    A
co-ordinate jurisdiction, should not in the absence of the most compelling
circumstances depart from the interpretation adopted.

 That the previous decision is not strictly binding upon this court is in
my view made clear by the decision of this court in *Penn-Texas
Corporation v. Murat Anstalt (No. 2)* [1964] 2 Q.B. 647, a decision
which happened to involve the interpretation of the predecessor of the
Act of 1975, namely, the Foreign Tribunals Evidence Act 1856. Lord    B
Denning M.R., having indicated, at p. 660, that

> "a previous judgment between the same parties is only conclusive
> on matters which were essential and necessary to the decision. It is
> not conclusive on other matters which came incidentally into
> consideration in the course of the reasoning,"
C

made the following statement which would apply equally to these
proceedings, at p. 661:

> "The ruling on the second point in *Penn-Texas (No. 1)* [1964] 1
> Q.B. 40 was not necessary to the decision. The result would have
> been the same, even if the ruling had been the other way. The
> ruling is not therefore absolutely binding, and we are at liberty to    D
> depart from it if convinced it is wrong."

 In support of his submission Mr. Bratza referred the court to *Slack
v. Leeds Industrial Co-operative Society Ltd.* [1923] 1 Ch. 431. In that
case, with regard to dicta which did not constitute a decision binding
upon a subsequent court, Lord Sterndale M.R. said, at p. 451:

> "Dicta are of different kinds and of varying degrees of weight.    E
> Sometimes they may be called almost casual expressions of opinion
> upon a point which has not been raised in the case, and is not really
> present to the judge's mind. Such dicta, though entitled to the
> respect due to the speaker, may fairly be disregarded by judges
> before whom the point has been raised and argued in a way to
> bring it under much fuller consideration. Some dicta however are of    F
> a different kind; they are, although not necessary for the decision of
> the case, deliberate expressions of opinion given after consideration
> upon a point clearly brought and argued before the court. It is open
> no doubt to other judges to give decisions contrary to such dicta,
> but much greater weight attaches to them than to the former class."

 At the end of his judgment the Master of the Rolls added, at p. 452:    G

> "I am of opinion . . . that if opinions of such weight given after
> such careful consideration more than 30 years ago, often mentioned
> and considered during that time and never disapproved, are to be
> overruled, it should only be done by the final tribunal of appeal and
> not by a court of co-ordinate jurisdiction."

Warrington L.J., at p. 456, said very much the same thing.    H
 Mr. Bratza submitted that in this case, having regard to the care with
which the matter was dealt with on the first appeal, the decision of this
court in relation to the nature of the Norwegian proceedings is within

A   the top scale of judicial dicta and should only be overruled by the House of Lords and not his court.

Mr. Bratza also in the course of his argument examined the submissions before the other divisions of this court and the new material relied on by Mr. Crystal and contended that the witnesses' case has not materially changed so there was no compelling reason justifying this court departing from the previous decision. While there are obviously

B   differing standards of dicta and the previous court's conclusion on the jurisdiction issue commends the greatest respect, it is material that Kerr L.J. regarded the point as being "academic" and regretted the absence of the additional assistance which this court has had. Furthermore, as Balcombe L.J. has pointed out the House of Lords in *Slack's* case [1924] A.C. 851 took a very different view from the Court

C   of Appeal. In this situation the appropriate approach is that indicated by Lord Denning M.R. to which reference has already been made. This court should follow the earlier decision unless we are satisfied it is wrong.

*Issue estoppel*

D   Although I have dealt with this aspect of the appeal as though the question were one of the judicial precedent, in argument it was also approached on the basis of res judicata. However, as the previous court's conclusions on the jurisdiction issue were unnecessary for their decision there can be no question of res judicata. The position is however different with regard to issue estoppel. The previous decision of the Court of Appeal was unanimous (although Kerr L.J. was reluctant

E   and retained doubts as to its correctness) that the proceedings before the Sandefjord court would be classified under Norwegian law as proceedings in a civil or commercial matter. This was a decision on an important issue in the proceedings. However it is to be noted that while it is a determination of fact as to the categorisation of the proceedings under foreign law, that finding of fact depends upon the construction which is placed under the vital phrase "civil or commercial matter" and the

F   difference of emphasis as to this, to which I have already drawn attention, explains why Glidewell L.J. found the determination of this issue more straightforward than did Kerr L.J. Kerr L.J. lays more stress on the substance of the proceedings in the Norwegian court than Glidewell L.J., who considered the Norwegian court would determine the matter having regard to the nature of the proceedings rather than

G   their subject matter. Accordingly, if the approach adopted by Glidewell L.J. is, in the view of this court, not the appropriate method of classification, this could affect the premise upon which the argument in favour of issue estoppel is based.

Kenneth Jones J. came to the conclusion that there was no issue estoppel because, having regard to the Court of Appeal's conclusions which were in favour of the witnesses, the witnesses were not in a

H   position to appeal on this issue: a test referred to by Lord Denning M.R. in *Penn-Texas Corporation v. Murat Anstalt (No. 2)* [1964] 2 Q.B. 647, 661. While Mr. Boswood accepted that the availability of a right of appeal was a useful rule of thumb, he correctly submitted that the

A

fundamental question was whether a previous finding was "essential and necessary to the decision," and he also submitted that in fact there was a right to appeal in this case and in any event, if there was not, the absence of a right of appeal did not mean that issue estoppel could not arise.

B

Having regard to the argument which Mr. Boswood advanced based on the order for costs which was made by the Court of Appeal on the previous hearing, I would be prepared to accept that technically it would have been possible for the witnesses to have sought leave to appeal in respect of the Court of Appeal's decision in respect of the first letter of request. However I regard it as quite unrealistic to expect the witnesses to have tried to exercise any such right of appeal and I am certain that if they had sought to do so, they would never have received leave. In these circumstances, in considering whether issue estoppel operates, the only realistic approach is that adopted by the judge. The decision on the first appeal in respect of the issue as to the method of classification which would be adopted under Norwegian law can be treated as not being the subject of a right of appeal. It is relevant here to refer to the speech of Lord Upjohn in *Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2)* [1967] 1 A.C. 853, 947:

C

D

"As my noble and learned friend, Lord Reid, has already pointed out there may be many reasons why a litigant in the earlier litigation has not pressed or may even for good reason have abandoned a particular issue. It may be most unjust to hold him precluded from raising that issue in subsequent litigation and see Lord Maugham's observations in *New Brunswick Railway Co. v. British & French Trust Corporation Ltd.* [1939] A.C. 1, 21. All estoppels are not odious but must be applied so as to work justice and not injustice and I think the principle of issue estoppel must be applied to the circumstances of the subsequent case with this overriding consideration in mind."

E

Earlier in his speech Lord Upjohn had also pointed out that with regard to res judicata generally, at p. 946, that issue estoppel

F

"goes beyond the mere record; it is part of the law of evidence for, to see whether it applies, the facts established and reasons given by the judge, his judgment, the pleadings, the evidence and even the history of the matter may be taken into account. . . ."

G

Adopting this approach to the previous proceedings in this case, I have no doubt that it would be wrong to regard the witnesses as being disentitled from re-opening the question of Norwegian law which inferentially if not expressly Kerr L.J. was inviting them to do in any subsequent proceedings. As to *Shoe Machinery Co. v. Cutlan* [1896] 1 Ch. 667 I respectfully adopt the analysis of the effect of that case set out by Balcombe L.J. in his judgment.

H

However, even if I were minded to take a different view, I would not have felt it right on the issue of classification under Norwegian law to have treated the issue as being the subject of issue estoppel. If the witnesses' contention as to Norweign law were right, then subject to the

1 A.C.                    In re Norway's Application (No. 2) (C.A.)                    Woolf L.J.

A    question as to the proper interpretation of section 9 of the Act of 1975, the proper classification of the Norwegian proceedings would determine whether the English court had jurisdiction to act on the letter of request. The jurisdiction of the High Court to act on the Norwegian court's request is purely statutory and is dependent on the English court being satisfied that the evidence to which the application relates is required for the purposes set out in section 1(*b*) of the Act of 1975. If

B    there is evidence available to the court which would indicate that the evidence requested is not required for this purpose, then no principle of estoppel can prevent the court investigating the matter. The parties cannot confer jurisdiction under the Act of 1975 on the court by consent and this being so, I cannot see how the failure of one party in previous proceedings to produce evidence or to advance an argument going to

C    the issue of jurisdiction can prevent the court considering that evidence in subsequent proceedings where the same question of jurisdiction arises. Despite the researches of counsel no previous decision was found which in relation to the High Court clearly established that this was the situation. However it seems to me that the principle is so clear and so obvious that it can be said with confidence that a party cannot be prevented by any rule of issue estoppel from putting before the court

D    evidence to establish that the court has no jurisdiction to make the order which is being sought.

    Mr. Boswood correctly warned the court of the dangers of adopting this view because of the risk of the same issue being constantly relitigated. However, this risk is reduced by the fact that the court can always protect itself against abuse of its process by preventing an issue

E    being raised vexatiously independently of estoppel and what I have said as to the question of jurisdiction would not apply where the previous decision constitutes a binding precedent.

*Construction of "civil or commercial matter"*

    On this issue I acknowledge at the outset that I have derived considerable assistance from the judgment of Kerr L.J. on the first

F    appeal. However, although I accept and gratefully adopt a substantial proportion of Kerr L.J.'s reasoning, I ultimately differ from his conclusion in a way which is highly significant to the outcome of this appeal.

    Before turning to matters of detail which cause me to differ from the conclusions of Kerr L.J., I regard it as necessary to draw attention to

G    certain broad features of the Act of 1975.

    1. Although the Act of 1975 was undoubtedly passed in order to give effect to the principles of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters of 1970 (the "Convention of 1970"), the Act applies to letters of request in respect of civil proceedings pending or contemplated from any country irrespective of whether or not the countries subscribe to the Convention of 1970.

H    2. The Act of 1975 clearly draws a distinction between civil and criminal proceedings and whatever the context in which the phrase civil proceedings is used in the Act it does not include and is used in contradistinction to criminal proceedings.

774
Woolf L.J.          In re Norway's Application (No. 2) (C.A.)          [1990]

3. While the Convention of 1970 is not expressly referred to in the  A
Act of 1975 it is clear (as was accepted by all their Lordships in *In re
Westinghouse Electric Corporation Uranium Contract Litigation M.D.L.
Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547 and by the parties on
this appeal) that part of the purpose of the Act was to give effect to the
Convention of 1970. Accordingly, it is appropriate to have regard to the
Convention of 1970 for assistance in interpreting the Act of 1975 in so
far as its.language does not make its meaning clear. However, it should  B
not be forgotten in seeking aid from the Convention that the Act also
applies to the different jurisdictions within the United Kingdom and
therefore it would be less likely that Parliament would intend an
international interpretation to be adopted if that international interpreta-
tion would lead to difficulties in applying the Act within the United
Kingdom.                                                                 C
4. Although in the *Westinghouse* case their Lordships did not consider
that any assistance could be obtained from the legislation which the Act
of 1975 replaced (see e.g. Lord Diplock at p. 633 on this issue) it is
relevant to note that the Act of 1975 replaced the Foreign Tribunals
Evidence Act 1856 and the Evidence by Commission Acts 1859 and
1885 and while the former Act which applied to requests from foreign   D
courts referred expressly to civil or commercial matters the later Acts
which dealt with requests within "Her Majesty's dominions" did not do
so.
5. The definition in section 9(1) of civil proceedings as meaning
proceedings in any civil or commercial *matter* indicates that whether the
proceedings are civil proceedings in the requesting court is not to be
decided by evaluating the procedure adopted but on the basis of the    E
subject matter of the proceedings. While Glidewell L.J. is no doubt
right in saying [1987] Q.B. 433, 489B, "we do not usually categorise
actions which come before our courts in terms of their subject matter"
the English courts can and sometimes have to do so. For example, for
the purposes of section 18(1)(*a*) of the Supreme Court Act 1981 and
for the purposes of R.S.C., Ord. 53, r. 3(4) it is necessary to decide
whether proceedings are in a criminal cause or matter, and in order to  F
decide whether this is the case it is necessary to examine the substance
of the proceedings. Although an application for judicial review
procedurally would be classified as civil, it becomes a criminal cause or
matter if the application for judicial review is in relation to the decision
of a magistrates' court in a criminal matter such as a motoring offence.
On the other hand an application for judicial review in respect of a     G
decision by a magistrates' court exercising its criminal jurisdiction to
forfeit recognisances entered into by sureties in respect of bail granted
to an accused charged with a criminal offence is not a criminal cause or
matter. As Lord Denning M.R. said in *Reg. v. Southampton Justices, Ex
parte Green* [1976] Q.B. 11, 15–16:

"A recognisance is in the nature of a bond. A failure to fulfil it  H
gives rise to a civil debt. It is different from the ordinary kind of
civil debt, because the enforcement is different. It is enforceable
like a fine. . . . But that method of enforcement does not alter the

A    nature of the debt. It is simply a civil debt upon a bond and as such
is not a criminal cause or matter."

6. Although the definition in section 9(1) relates to civil proceedings
in the requesting court, there is nothing in the language used in that
section or section 1(b) to indicate that the English court has to adopt the
classification which would be adopted by the requesting court if that
classification is different from that which would be adopted by the
B    English court. The language is equally consistent with the classification
being carried out in accordance with the classification which would be
adopted by either the requesting or the English court, though obviously
if classifying is being carried out in accordance with the concepts of the
assisting court, the concepts may have to be adapted to accommodate
any peculiarities of the legal system of the requesting court.

C    With these preliminary remarks I turn to consider the reasoning of
Kerr L.J. in order to identify the limited but critical extent to which I
differ from his reasoning.

I begin by agreeing that if there were an acceptable
interpretation of civil proceedings as defined by section 9(1) which could
be practically applied to requests for assistance within the United
D    Kingdom as well as to those from abroad then I consider that it would
be desirable and appropriate to adopt that interpretation so that this
country will deal uniformly with all applications, and it is to be hoped
that other countries who subscribe to the Convention of 1970 would do
likewise.

In considering whether it is possible to apply an acceptable
international interpretation in agreement with Kerr L.J. I regard the
E    reference in section 9 to a civil or commercial matter as being derived
from "matière civile ou commerciale" under French law and that the
duality of "civil" and "commercial" points away from a classification
under common law and suggests a classification in accord with that
which would be adopted by civil law jurisdictions. I also, of course,
accept that Kerr L.J. [1987] Q.B. 433, 473 is right to say that

F    "civil law countries draw a fundamental distinction between private
and public law (droit civil and droit administratif)" and that it is to
be expected that "this distinction must have been crucially present
to the mind of anyone seeking to circumscribe and distinguish
'matières civiles et commerciales' from other—that is, 'public law'—
proceedings. Relations between states and their public authorites on
the one hand, and private citizens or corporations on the other, fall
G    within the sphere of public law. Civil and commercial matters do
not because they are concerned with private disputes."

However, as Professor Szladits points out, while

"the fundamental division between private law and public law is
considered a basic distinction, the summa divisio in all legal systems
belonging to the civil law families of law the scope of this division
H    differs considerably within the different legal systems, and
consequently the theoretical analysis and reasons, as well as the
practical effects, of these divisions also differ:" see *International
Encyclopedia of Comparative Law*, vol. 2, ch. 2, para. 25.

776
Woolf L.J.          In re Norway's Application (No. 2) (C.A.)          [1990]

Although the division is by no means as well developed as in civil    A
jurisdictions, in the majority if not all the common law jurisdictions the
distinction between private and public law is now also well recognised.
However the recognition of the distinction does not solve the problem.
It cannot be ignored that in almost every jurisdiction, the line of division
between public and private law differs and the range of differences is
very substantial. Professor Szladits draws attention to these differences    B
and their historical explanation. Because of these differences it is, in my
view, impossible to say that there is some internationally acceptable
definition of civil or commercial matter which can be identified by
construing that phrase as meaning private law matters as opposed to
criminal or public law matters. To do so would not provide an
interpretation which is uniform. It would merely alter the problem to
what is meant by public and private law unless you can also identify the    C
legal system whose division between public and private law is to be
applied.

If one system were to be chosen, then the obvious candidate would
be the French system. That system recognises not only the difference
between public law and private law but also the difference between civil
and commercial matters. However, the French classification is so    D
different from our own as well as other common law and civil law
jurisdictions that I cannot regard it as being internationally acceptable or
as one Parliament could have intended to adopt. Adapting and modifying
the language of Kerr L.J. [1987] Q.B. 433, 475H–476B, it appears
inconceivable that in 1975 Parliament could have intended that inter-
United Kingdom requests for evidence of civil proceedings should be
based upon a categorisation by reference to the French concept of the    E
distinction between public and private law. To adopt the French
classification would result in a wholly unwarranted restriction on the
operation of the Act of 1975 since many actions which in this country
would undoubtedly be regarded as civil proceedings and as having no
public or administrative law element would under the French system be
excluded from the application of the Act of 1975. I find nothing in the
Act or the Convention to justify such a consequence.    F

Regrettably it is not possible to approach the interpretation of the
Convention of 1970 or the Act of 1975 in the same way as they could be
approached if they formed the subject matter of community law. If they
were part of community law then it would be possible to give to the
expression civil and commercial matters the meaning which would be
determined by community law and this would unquestionably be a great    G
advantage. However the decisions of the European Court, in particular
in *State of the Netherlands v. Rüffer* (Case 814/79) [1980] E.C.R. 3807
and in *Bavaria Fluggesellschaft Schwabe & Co. KG v. Eurocontrol*
(Cases 9–10/77) [1977] E.C.R. 1517, make it clear that you cannot adopt
the same approach to community and non-community legislation. The
jurisdiction of the European Court of Justice in respect of the former is
critical. In *State of the Netherlands v. Rüffer* [1980] E.C.R. 3807 the    H
concept "civil or commercial matters" in the Brussels Convention was
interpreted in a sense communautaire and that interpretation would be
recognised by the English courts in applying the Civil Jurisdiction and

I A.C.          In re Norway's Application (No. 2) (C.A.)          Woolf L.J.

A    Judgments Act 1982 which was passed primarily for the implementation
of that Convention. However in *Bavaria Fluggesellschaft Schwabe & Co.
KG v. Eurocontrol* (Cases 9–10/77) [1977] E.C.R. 1517, the European
Court recognised that even with regard to an area to which the Brussels
Convention applied, a different interpretation from that which was
applicable under the Brussels Convention would be given to a bilateral
agreement entered into between two members of the community. As the
B    courts said, at p. 1526:

       "Although this result may lead to the same expression in the
       Brussels Convention and in a bilateral agreement being interpreted
       differently, this is due to the different systems in which the concept
       'civil or commercial matters' is used."

C        As the note, "Social Security and the Right to a Fair Hearing: The
Strasbourg Perspective," by A. W. Bradley [1987] P.L. 3 makes clear,
the recent decisions of the European Court of Human Rights in
*Feldbrugge v. The Netherlands* (1986) 8 E.H.R.R. 425 and *Deumeland
v. Germany* (1986) 8 E.H.R.R. 448 also illustrate how difficult it is to
find a uniform recognition of the distinction between public and private
D    law. Those cases concerned complaints that the way in which claims for
sickness benefit and an industrial widow's pension were dealt with by the
appropriate domestic tribunals infringed article 6(1) of the European
Convention for the Protection of Human Rights and Fundamental
Freedoms in that the claimants had not been granted a fair hearing
within a reasonable time in the determination of their civil rights and
obligations. Previous decisions of the Strasbourg court have assumed
E    that article 6(1) is primarily concerned with the protection of private
rather than public law rights but the majority decisions in these cases
confirmed that civil rights and obligations in article 6(1) of the
Convention was an autonomous concept and were not influenced either
by the fact that under both Dutch and German law (as in English law)
the claims would be regarded as falling within the public law sphere, or
the minority's contention, that the result was inconsistent with the
F    history of the drafting of article 6(1).
        While I would not dissent from the approach laid down by Sandra
O'Connor J. in the United States Supreme Court in *Air France v. Saks*
(1985) 105 S.Ct. 1338, 1342 that "it is our responsibility to give the
specific words of the treaty a meaning consistent with the shared
expectations of the contracting parties" the difficulty of doing this on the
G    basis of a distinction between public law and private law is that there are
no identifiable shared expectations as to the distinction between the two
categories which can be used as a means of deciding what is meant by
public as opposed to civil proceedings.
        However, the fact that there is no internationally acceptable
interpretation of a civil or commercial matter does not mean that it is
necessary to give those words the identical meaning which they would
H    have in a domestic context in this country or in the domestic context of
the requesting state. While I cannot identify an acceptable international
interpretation of the phrase, I do accept that the material which is
before the court is overwhelmingly to the effect that whatever else is or

778

Woolf L.J.                In re Norway's Application (No. 2) (C.A.)                [1990]

is not included in the concept of a civil or commercial matter, matières <span style="float:right">A</span>
fiscal are not within that concept and this can be taken into account in
construing the section. Even in common law jurisdictions, so far as
enforcement of judgments is concerned it has been recognised that
revenue matters come within a different and special category and are
subject to rules of public policy which do not apply to other civil
proceedings. I here refer to the speech of Lord Somervell of Harrow in
*Government of India v. Taylor* [1955] A.C. 491, 514–515, cited by
Kerr L.J. [1987] Q.B. 433, 478B–479B. Taking into account the well
established approach of the courts to assisting in tax gathering by a
foreign state, I would regard the proper interpretation of the words civil
or commercial matter in the Act of 1975 as excluding "matières fiscales."
I am encouraged to adopt this view by Dr. F. A. Mann's note "'Any
Civil or Commercial Matter'" (1986) 102 L.Q.R. 505, 509 on the
decision on the first appeal and his statement that "it can be asserted
with confidence that very few states (if any) will ever regard a tax claim
as a civil or commercial matter."

The fact that I come to this conclusion is probably sufficient for the
purposes of determining this appeal. However, in order to justify my
rejection of a general international approach to the phrase civil or
commercial matter I should shortly indicate how I believe it is possible
to give effect to the wording of the Act of 1975 and to do so without
creating the difficulties which are inherent in adopting the approach
accepted on the first appeal which were dramatically illustrated by the
problems which faced Kenneth Jones J. when he sought to ascertain
what would be the classification which would be adopted by a Norwegian
court.

I have already indicated that I cannot find any indication in the Act
that it is necessary to look to the requesting state's classification. As the
classification controls the United Kingdom's court's jurisdiction, I would
regard it as more likely that it is the United Kingdom court's classification
which was to prevail and I regard the choice of the United Kingdom
court as being preferable to the dual classification suggested on the first
appeal.

The great advantage of adopting a United Kingdom court's
classification is that it will only be necessary to look to the requesting
court for factual information as to the nature of the proceedings before
the requesting court. In the normal case a translation of the pleadings in
the requesting court and some limited background information will be
ample. There would certainly not be any need to obtain the extensive
conflicting expert evidence which has been assembled in this case. Given
the material to which I have referred it should be a relatively easy task
for the English court to make up its mind whether, on the proper
interpretation of a civil or commercial matter, the substantive nature of
the proceedings before the requesting court falls within the wording of
the statute.

This appears to be the predominant approach according to the
editors of the *Encyclopedia of Public International Law*, vol. 9, in the
chapter dealing with Legal Assistance between States in Civil Matters, at
pp. 242–243:

A    "The substantive nature of a case determines whether a case is civil, criminal or administrative. The branch of the judicial administration handling the case and the type of procedure used for the request are irrelevant. It is not clear, however, whether the determination is made according to the law of the requesting state or of the requested state. The special commission on the operation of the Hague Convention on Evidence Abroad (1970) was divided, but

B    the predominant opinion was that with regard to the Convention the characterisation by the law of the *requested* state should prevail."

In the note 102 L.Q.R. 505, to which I have already made reference, Dr. Mann is also of the view that there is a very great deal of support for this approach and in this connection the passage in the speech of Lord Watson in *Huntington v. Attrill* [1893] A.C. 150, 155, which is

C    cited by Dr. Mann, is not without relevance.

However, although the English court has to perform the act of classifying the nature of the foreign proceedings, it does not do so by adopting any parochial classification of a procedural nature. As the Act requires, the English court has to look at the substantive nature of the matter which is before the foreign court to decide whether it constitutes

D    a civil or commercial matter as that phrase is interpreted by the English court.

Against this interpretation Mr. Boswood relied heavily on the decision of Chapman J. in *In re Extradition Act 1870, Ex parte Treasury Solicitor* [1969] 1 W.L.R. 12. That case concerned the application of the Foreign Tribunals Evidence Act 1856. In his judgment Chapman J. indicates that "civil or commercial matter" in section 1 of the Foreign

E    Tribunals Evidence Act 1856 did cover all kinds of suits, petitions, summonses and applications but the judge was primarily concerned with the meaning of any criminal matter of a political character. The judge was not concerned with a situation where a contrast was drawn between civil proceedings in general and proceedings in a civil or commercial matter and I do not regard the case as requiring me to take a different

F    view of the interpretation from that which I have indicated above which I believe to be the correct interpretation.

The other cases upon which the State of Norway relied were the three Privy Council decisions in which public law and fiscal proceedings were regarded as civil proceedings. However in those cases (*Commissioner of Stamps, Straights Settlements v. Swan* [1933] A.C. 378, *Tennekoon,

G    Commissioner for Registration of Indian and Pakistani Residents v. Duraisamy* [1958] A.C. 354 and *Maliban Biscuit Manufactories Ltd. v. Subramaniam* [1971] A.C. 988) there was no question of any special meaning being given to the term civil cause or civil action and the context was quite different. I accordingly find that the cases provide no assistance.

H    Finally on this issue I should make it clear that it is possible that there may be other areas, apart from the fiscal, where there is sufficient unanimity of approach to exclude what would normally be regarded as a civil or commercial matter under English law from that phrase as used in the Act of 1975 having regard to the intent and purpose of that Act.

However such other areas did not have to be identified and were not      A
identified for the purposes of the present appeal.

*Norwegian law*

Having regard to my view of the proper interpretation of the phrase
civil or commercial matter, there can be no doubt that the proceedings
before the Norwegian court are fiscal proceedings and therefore not      B
proceedings in relation to which the Act of 1975 is available. Having
looked at the pleadings, it appears the proceedings are no different
(save that they take place before a civil as opposed to an administrative
tribunal) from the proceedings which would take place before the
general or special commissioners in this country if a taxpayer were to
appeal against an assessment. This being so I do not consider that it is      C
possible to treat the proceedings as not being of a fiscal nature because
the application to the Norwegian court is by the estate and the estate as
well as the state require the evidence which they believe the witnesses
can give for use in a court.

If it is wrong to treat a fiscal matter as coming within a special
category, then looking at the substance of the proceedings with English
eyes, I would regard it as being a civil or commercial matter. They      D
would be similar to an application for judicial review in respect of a tax
decision or an appeal in a tax case to the High Court from the decision
of the commissioners, both of which proceedings I would regard as
being civil matters under the normal English classification. On this
approach the Privy Council decisions relied upon by the State of Norway
would be relevant.

Finally if, contrary to my view, the classification as a matter of      E
substance has to be carried out in accordance with Norwegian law, then
I would regard the proceedings as not being a civil or commercial
matter. I appreciate that this is contrary to the decision of Kenneth
Jones J. However, his decision was based upon the approach indicated
by Glidewell L.J. on the first appeal. With the assistance of Mr. Crystal
I am satisfied, on a reading of the expert witnesses' reports and      F
evidence, that if the substance as opposed to the procedure is looked at
under Norwegian law the Norwegian proceedings are to be regarded as
proceedings in a fiscal matter which would not be treated by the
Norwegians as being a civil or commercial matter.

*The factual issues*                                                      G

Under this heading I propose to deal with the remaining issues. I will
deal with them in the same order as they were dealt with by Kerr L.J.
on the first appeal. They are: B—Tax gathering; C—Sovereignty;
D—Dual purpose; E—Fishing; and, F—Confidentiality. No separate
oral argument was advanced before us on issues B, C and D. We did
however have the benefit of written submissions. Bearing in mind that
having regard to my views as to jurisdiction these issues do not strictly      H
arise, I will deal with them very briefly. I have treated them as being
factual issues because to a large extent the outcome on the issues
depends upon the facts.

1 A.C.              In re Norway's Application (No. 2) (C.A.)              Woolf L.J.

A   *B. Tax gathering; C. Sovereignty*

I have reservations as to whether our approach to the question of tax gathering should be the same today as it has been in the past. Having regard to the scale of international tax avoidance and the undesirable manifestations which are associated with it, a powerful argument could be advanced for saying it is very much in the interests of this country and the majority of the other countries in the world that there should be
B   co-operation in this field. However, it would be wholly inappropriate in this appeal to seek to undermine the well established policy identified in the speech of Lord Somervell of Harrow in *Government of India v. Taylor* [1955] A.C. 491. It is sufficient if I say that I agree with the decision on the first appeal that this case raises special considerations because the estate are at one with the State of Norway in seeking to
C   support the letter of request. The support of the estate could not make what in my view was not a civil or commercial matter into a civil or commercial matter. However, it can and does change the situation with regard to the policy issues from what it would have been otherwise and so the request could not be rejected because it might provide assistance in foreign tax gathering.

D   I also agree with the decision of the first Court of Appeal on the question of sovereignty. Section 4 of the Protection of Trading Interests Act 1980 has no application to the facts of the present case.

*D. Dual purpose*

The difficulty that I have with regard to this issue is because of the wording of the Act of 1975. I find it difficult to understand why, if the
E   proceedings before the National Tax Committee are not within section 1, the proceedings before the court should be. However, assuming the distinction can be drawn between the two sets of proceedings either on the basis that the tax committee is not a tribunal or otherwise, then I would regard this as a matter going to discretion and on the basis that the estate supports the letters of request I would not refuse assistance on
F   this ground.

*E. Fishing*

I have difficulty in applying the concept of fishing to a request that a witness should be required to give oral evidence. It is in English proceedings commonly used on applications for interrogatories and it
G   may be said that there is little distinction between oral cross-examination and written cross-examination and the administering of interrogatories. However, interrogatories are in my view part of the process of discovery and so far as the giving of evidence (albeit prior to the trial) is concerned, different considerations could apply. Questions of privilege are dealt with expressly in section 3. But subject to the question of privilege, what I would expect normally to concern the court when
H   considering whether effect should be given to a request, is whether the request is confined to seeking to obtain evidence which will be relevant to the proceedings in the foreign court. If it is, then normally that will be the end of the matter. Under the Act of 1975 the court does however

782
Woolf L.J.          In re Norway's Application (No. 2) (C.A.)          [1990]

have a general discretion and if there are special circumstances making it    A
important that the examination is confined the court can take the
appropriate action. Here the question of confidentiality can be highly
significant. However subject to confidentiality I can see no possible
objection to the latest request, which is clearly designed to obtain
evidence for use at the hearing. In this connection I should make it
clear that what I have said already, which is of general application, is on
the assumption that the evidence of the witness is required for the    B
hearing. If the examination of the witness is sought as part of a pre-trial
process, in other words as part of the process of discovery, then
different considerations would apply and the principle of fishing could
when appropriate be invoked. Here therefore I would regard Ralph
Gibson L.J. as indicating the correct approach rather than the majority
on the first appeal who, as I understand their judgments, would extend    C
principles which I would regard as applicable to discovery to evidence
required for the hearing itself.

However whether the approach is that indicated by the majority on
the first appeal or by Ralph Gibson L.J. or in this judgment (in so far as
it differs from that adopted by Ralph Gibson L.J.) I am quite satisfied
that the letter of request is not flawed on the grounds of fishing. On the
contrary the letter was designed to elicit evidence which was highly    D
relevant to the proceedings before the Norwegian court. If this had not
been the case, then the court in refusing to give effect to the letter
would not ordinarily do so on a jurisdictional basis but as a matter of
discretion.

*F. Confidentiality*    E

The witnesses undoubtedly owe a duty of confidentiality to their
clients which the English court will protect so long as this can be done
consistently with the duty this court has to assist the Norwegian courts
where it is appropriate to do so. As was pointed out on the first appeal
and by Kenneth Jones J. this involves a balancing exercise. The
importance of the evidence which has been requested in the proceedings    F
has to be taken into account in performing the exercise. The court can
and should, where this is necessary in order to do justice, give directions
or otherwise restrict the request as authorised by the English court to
protect a duty of confidence. If the proceedings were taking place before
an English court the English court would seek to preserve confidentiality
and the broad approach to the request should be the same.

Kenneth Jones J. performed the balancing exercise, he directed    G
himself properly when so doing and I can see no reason whatever for
interfering with the conclusion to which he came. Criticisms are made as
to the directions which Kenneth Jones J. made as to the amendment of
the letter of request. However, this being a matter for his discretion, I
would not interfere with the decision that he made, save in respect of
the modified request which was put before this court but was not
available to Kenneth Jones J.    H

I would therefore allow the appeal. I do so on the short ground that
on the proper interpretation of the Act of 1975 the fiscal proceedings
which are now being conducted before the Sandefjord City Court are

A   not capable of being regarded as a "civil or commercial matter" for the purposes of the Act of 1975. I come to this conclusion notwithstanding the fact that it would be my view that if the English court had jurisdiction to assist the Norwegian court it certainly should do so. This would however require a further treaty and a statute to implement that treaty which were designed to provide for assistance in relation to proceedings in matières fiscales.

B   I agree with the order proposed by May and Balcombe L.JJ.

> *Appeal allowed with costs.*
> *No order as to costs below.*
> *Certificate for three counsel.*
> *Time for applying for leave to appeal against first decision of Court of Appeal extended.*
> *Leave to appeal in respect of both decisions of Court of Appeal on all issues.*
> *Leave to cross-appeal.*

D   *Solicitors: Linklaters & Paines; Freshfields; Macfarlanes.*

C. R. S.

E   APPEAL AND CROSS-APPEALS from the Court of Appeal.

These were consolidated appeals (1) by the state of Norway and the estate of the late Anders Jahre against the decision of the Court of Appeal in *In re State of Norway's Application (No. 2)* (May, Balcombe and Woolf L.JJ.), ante, p. 732B, ("*Norway 2*"), allowing the appeal by Lord Kindersley and Mr. A. J. Hardman, proposed witnesses in an action in the City Court of Sandefjord, from the order of Kenneth Jones J. on 18 November 1986 upholding the decision of Master Creightmore F   that the witnesses be examined before him pursuant to a letter of request made by the city court dated 10 March 1986; and by the witnesses in a cross-appeal as to costs; and (2) by the witnesses against the decision of the Court of Appeal in *In re State of Norway's Application* (Kerr and Glidewell L.JJ., Ralph Gibson L.J. dissenting) [1987] Q.B. 433 ("*Norway 1*"), which in their Lordships' House was in G   effect an appeal against costs only.

G   *Anthony Boswood Q.C.* and *Stephen Moriarty* for the State of Norway and for the estate. The principle issue in the appeal is whether proceedings brought by the estate against the State of Norway before the City Court in Sandefjord in Norway to have quashed an assessment to tax made by the Vestfold County Tax Committee are "civil H   proceedings" within section 1 of the Evidence (Proceedings in Other Jurisdictions) Act 1975. Section 9(1) of the Act of 1975, in turn, defines "civil proceedings" as meaning, in relation to the requesting court, "proceedings in any civil or commercial matter."

784

A

The Court of Appeal below held that a "civilian" interpretation, which is generally accepted (or acceptable) internationally, involves looking at the *substance* of the proceedings; what is the "substantive" meaning of a "civil . . . matter"?; what is its "subject-matter" or "nature"? It held that it is equated with a private law matter, so any public law matter is excluded. However, while the civilian distinction between "public" and "private" law can be made in general and simple terms, excluding any proceedings to which the state is a party, looking further, the distinction becomes obscure. On more detailed analysis, there is no inherent or theoretical logical distinction between public and private law.

B

The distinction as it appears to operate in practice gives rise to at least three problems for present purposes. 1. Within a particular legal system at any one time the distinction may be controversial and unclear. In Italian law, the distinction is accepted, yet in certain circumstances the State is under the jurisdiction of the ordinary courts. Are such cases public or private law matters? In French law, certain matters that would otherwise clearly be public matters are dealt with in a special way and are referred to the ordinary courts. Are such cases public or private law matters? (In France a special court, the Tribunal des Conflicts, exists to resolve conflicts between private and public courts.) And further, what of labour law? Is it public or private? 2. From time to time the distinction may change. 3. As between different civilian systems, the distinction may be applied differently. Bankruptcy falls within public law in Germany, but within commercial law in France. Similar differences between systems are to be found in respect of the law of contract and of tort.

C

D

E

Once the lowest common denominator has been found, a very large category of cases (for example, all cases to which the State was a party) would have been excluded from the Act—which applies to requests within the United Kingdom—because some third country (with no interest at all in the proceedings) would apply that denominator. Nor is it any answer to say that whatever else may or may not be included, matières fiscales are not civil or commercial matters. That would presuppose a civilian approach to characterisation.

F

Proceedings which other jurisdictions plainly regard as being within the phrase (including tax proceedings) would be excluded. The general assumption that France, at least, would regard proceedings of this kind as clearly falling outside the definition should be treated with some caution. See, for example, *Bemberg v. Fisc de la province de Buenos Aires,* February 24, 1949; Tribunal de la Seine; Semaine Juridique, 1949, II, 4816; Recueil Sirey, 1949, 2, 101. It would follow, too, from the approach of the Court of Appeal in *Norway 2,* ante, p. 732B, that, in relation to Commonwealth countries, the previously unfettered powers contained in the Evidence by Commission Acts 1859 and 1885 had been brought down to the lowest common denominator. While the Act of 1975 is discretionary, the wording of the Convention itself (the Hague Convention of 1970 relating to the Taking of Evidence Abroad in Civil or Commercial Matters) seems to presuppose an accommodating approach: see Articles 12, 23, 28, 33 and 36.

G

H

A  The approach of the Court of Appeal below accords little or no weight to the views of the requesting court as to what are proceedings in a civil or commercial matter under its own law. Prima facie the Norwegian Court is the more appropriate forum to decide on the nature of its proceedings and the Sandefjord court has said ab initio that these were qualifying proceedings. The Court of Appeal's analogy with *Huntington v. Attrill* [1893] A.C. 150, 155 was inapt. As to the Court of

B  Appeal's approach to the relevance of the Brussels Convention of 1968 on Jurisdiction and the Enforcement of Judgments in Civil or Commercial Matters and the approach of the European Court thereto (which has held that public law proceedings were no "civil or commercial matters" for the purposes of that Convention), there is no illogicality in treating the processes in the two conventions differently. The European Court

C  had to decide the question in the Brussels Convention in a sense communautaire: see *L.T.U. Lufttransportunternehmen GmbH & Co. KG v. Eurocontrol* (Case 29/76) [1976] E.C.R. 1541; [1977] 1 C.M.L.R. 88. *Bavaria Fluggesellschaft Schwabe & Co. KG v. Eurocontrol* (Cases 9–10/77) [1977] E.C.R. 1517; [1980] 1 C.M.L.R. 566 makes it clear that this restrictive interpretation does not prevent effect being given to a wider interpretation as between two member states. That reasoning is a

D  fortiori where the phrase is used in a different Convention and many of the adherent countries (like Norway) are not members of the European Community.

  As to the cases on interpretation of treaties cited by Balcombe L.J., ante, p. 757c–f, 1. international materials can be looked at where a Treaty is the source of English legislation—a fortiori where the Treaty is

E  enacted as part of English law and the foreign text prevails: see *Fothergill v. Monarch Airlines Ltd.* [1981] A.C. 251, 274g–278e *per* Lord Wilberforce, 281d–283d *per* Lord Diplock, 293c–295d *per* Lord Scarman. 2. The process needs however to be approached with caution: see *James Buchanan & Co. Ltd. v. Babco Forwarding & Shipping (U.K.) Ltd.* [1978] A.C. 141, 152g–153g. 3. The reason for looking at international

F  materials in such circumstances (as expressed by, for example, O'Connor J. in *Air France v. Saks* (1985) 105 S.Ct. 1388; 470 U.S. 392; 84 L.Ed. 2d. 289) does not apply when, self evidently, the parties had no shared expectations. [Reference was also made to *Block v. Compagnie Nationale Air France* (1967) 386 F.2d. 323].

  It has never been disputed that proceedings of this sort are "civil proceedings" in England. *In re Extradition Act 1870, Ex parte Treasury*

G  *Solicitor* [1969] 1 W.L.R. 12, 14–15, illustrates the instinctive "procedural" approach of English law to "civil or commercial matter." The Act of 1975 uses the phrase "civil or commercial matter" because the phrase had been used in the Act of 1856 and in the 1970 Hague Convention, so as to enable requests to be made in *commercial* proceedings which are not *civil* proceedings by the law of the requesting court, and to give

H  effect to the principle of reciprocity. Without any definition of "civil proceedings" in relation to the requesting court, our courts would— because of the all-embracing concept of "civil proceedings"—have to entertain requests coming from countries whose courts would refuse—

because of their narrower view of "civil or commercial matter"—to    A
entertain similar requests.

Although we contend for a dual construction of the requirement that
a request for evidence be for the purpose of civil proceedings, we do not
oppose a construction of section 9(1) of the Act of 1975 which would
require the proceedings to be regarded as in a civil or commercial
matter merely by the law of the requesting court. Contrary to what the
Court of Appeal in both *Norway 1* [1987] Q.B. 433 and *Norway 2*, ante,    B
thought, this would not require an English court to assist a foreign court
in relation to proceedings which an English court would not characterise
as civil. It would merely give the court a jurisdiction to assist, which it
could decline to exercise as a matter of discretion.

Because the Court of Appeal in *Norway 2* felt that the "international"
approach was correct for the purposes of interpreting the English statute,    C
they felt able to say that this was a preferable approach in Norway. But
why look at the matter "substantively" under Norwegian law at all? The
question is not: how does the Norwegian legal system interpret this (or
any other) Treaty? On the contrary, we are concerned with the question,
asked by the English statute: are these proceedings in a civil or
commercial matter in Norway? That question falls to be answered by the
ordinary domestic law of Norway. In the ordinary usage of Norwegian    D
lawyers, a civil case (or a civil matter) means anything which is not a
criminal case. There is a clear evidence of a claim to tax having been
treated as a civil claim by the Norwegian Supreme Court.

Kenneth Jones J. was right to treat the burden on this issue as lying
on the witnesses as 1. the issue of the letter of request by the Norwegian
court must of itself raise a prima facie case that the proceedings are    E
what the Norwegian court says they are; and 2. by reason of section 4(2)
and (4) of the Civil Evidence Act 1972. There were no proper grounds
for the Court of Appeal in *Norway 2* to differ from the finding of fact
made by Kenneth Jones J. that Norwegian law would regard the
Sandefjord litigation as being "proceedings in a civil or commercial
matter." *Dalmia Dairy Industries Ltd. v. National Bank of Pakistan*
[1978] 2 Lloyd's Rep. 223, 285–286 is to be distinguished.    F

In any event, the Court of Appeal erred in holding that the witnesses
were not issue estopped by the earlier finding of fact by McNeill J. and
the Court of Appeal in *Norway 1* that the Sandefjord proceedings were
proceedings "in a civil or commercial matter." It is accepted that an
issue estoppel can only arise where a determination of fact or law is
necessary to a decision or fundamental to it. In the instant case, it was a    G
condition of the court's considering the first request that the proceedings
should be civil proceedings under Norwegian law—otherwise all the time
spent on "fishing," confidentiality, etc., was wasted.

[Reliance was placed on written submissions for the remaining issues,
namely tax gatherings (no infringement of the rule in *Government of
India v. Taylor* [1955] A.C. 491 because request involving obtaining    H
evidence to decide if a subsisting assessment should stand was not tax
gathering; and a fortiori where the application was supported by the
taxpayer; in any event, any "tax gathering" was intra- not extra-
territorial); "fishing" (it was evidence relevant to an existing prima facie

1 A.C.          In re Norway's Application (No. 1 & 2) (H.L.(E.))

A    case, not evidence designed to discover whether there might be a new case); and confidentiality (the balancing exercise was properly undertaken by the judge in his discretion).]

Michael Crystal Q.C., J.A. Jolowicz and David Alexander for the witnesses. The phrase "proceedings in any civil or commercial matter" gives rise to an apparent difficulty. Parliament cannot have intended the words "or commercial" to be ignored but in English law, proceedings in

B    a commercial matter are proceedings in a civil matter. The dichotomy between proceedings in civil and commercial matters has no meaning to an English lawyer. Read as enacted, the phrase points away from a common law interpretation. The major purpose of the Act of 1975 was to give effect to the 1970 Hague Convention: see, for example, In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L.

C    Docket No. 235 (Nos 1 and 2) [1978] A.C. 547, 653E–G per Lord Keith of Kinkel. Reference may accordingly be made to the 1970 Convention to see whether it assists in the interpretation of the Act of 1975. Since the combination of "civil" and "commercial" points away from a classification under the common law and is carried over from the 1970 convention into the Act of 1975, it is right to assume that Parliament intended to point in the same direction. The phrase "civil or commercial

D    matter" (a translation of the French "matière civile ou commerciale") clearly directs attention to the civil law systems. The use of the word "matière" indicates or describes the nature of the litigation, the subject matter of the dispute. On such an approach, different from that based on procedural considerations, the duality and dichotomy between "civil" and "commercial" points even more strongly away from a classification

E    under the common law.

In civil law countries the dichotomy between civil and commercial law is widespread: the phrase "civil matter" would not necessarily include a commercial matter; hence the inclusion of the words "or commercial." Civil law countries draw a fundamental distinction between private and public law; and civil and commercial matters are incontestably part of private law. Whether fiscal matters are to be treated as part of

F    administrative law or as a separate category of their own, it is beyond dispute that they are part of public law. No civil law country would ever treat a disputed tax claim as being a civil or commercial matter.

The use of the word "matter" indicates that whether the proceedings in the requesting court are proceedings in a civil or commercial matter is not to be decided by evaluating the procedure adopted but on the basis

G    of the subject matter of the proceedings. Each of the 1968 Jurisdiction and Judgments Convention and the 1970 Convention is concerned with an aspect of international legal procedures. Unless there is good reason not to do so the phrase "matière civile ou commerciale" (and its English translation) should be construed in the same way.

A generally acceptable interpretation will produce uniformity. The English courts can treat letters rogatory under the Act of 1975 in the

H    same way from which ever country they come if the substance of the proceedings in that other country is the same, however differently they may be viewed under the several legal systems of the requesting countries. In construing an international Convention or an Act of

788

Parliament based on such a Convention the courts have an obligation to    A
keep interpretation as uniform as possible. If the underlying concepts of
the Convention are civilian in origin, the courts should look to the civil
law countries for guidance. Because proceedings, if brought in England,
would be classified as civil under English law it does not follow that they
are proceedings in a "civil matter" (classified substantively) especially
where the context distinguishes between "civil" and "commercial"    B
matters, although proceedings in both "civil" and "commercial" matters
are by an English procedural classification civil proceedings. The English
court does not classify the nature of the foreign proceedings by adopting
any parochial classification of a procedural nature. It looks at the
substantive nature of the matter before the foreign court to see if it is "a
civil or commercial matter." Whatever else is or is not included in the
concept of a civil or commercial matter, "matières fiscales" are not    C
within the concept and this can be taken into account in construing
section 9(1) of the Act of 1975.

The choice of a generally acceptable interpretation of the phrase
"civil or commercial matter" in the Act of 1975 and the 1970 convention
would produce uniformity in the application of the Act of 1975 and
consistency with similarly worded international conventions. Compare
*State of the Netherlands v. Rüffer* (Case 814/79) [1981] 3 C.M.L.R. 293.    D
The subject of evidence as regards other jurisdictions is part of
international procedural law which includes, for example, jurisdiction
and enforcement of judgments in civil and commercial matters. Article 1
of the Brussels convention of 1968 on Jurisdiction and the Enforcement
of Judgments in Civil and Commercial Matters, as clarified by the
Accession Convention of 1978, provides that it "shall apply in civil and    E
commercial matters whatever the nature of the court or tribunal. It shall
not extend, in particular, to revenue, customs or administrative matters."

Accordingly the phrase "civil or commercial matter" in section 9(1)
should be given a generally acceptable international interpretation, that
is, that which a civilian lawyer would give to it—not on the basis of
minute differences, but by reference to fundamental principles. Taxation
is plainly within public law. It is not submitted that the distinction    F
between public and private law is applied in identical fashion in every
civil law country or that "civil or commercial" is equivalent to "private."
It is contended that there is substantial and sufficient common ground
concerning the application of the distinction in those countries for it to
be clear that certain matters, including fiscal matters, would everywhere
be regarded as public and therefore as excluded from "civil or    G
commercial."

The distinction between civil and commercial law is a distinction
between elements of private law. The distinction between public and
private law is both fundamental in civil law countries and all embracing.
It is axiomatic that the entire corpus of the law is divided into public
and private law and the underlying basis of the distinction is that "the    H
sphere of relations between those who govern and those who are
governed raises special problems and calls for a different approach when
compared with that of relations between private persons": *David and
Brierley, Major Legal Systems in the World Today* (1985) 3rd ed., p. 81.

1 A.C.          In re Norway's Application (No. 1 & 2) (H.L.(E.))

A    Matters arising between the State when exercising the powers which
belong to it as such, on the one hand, and the subject, on the other, are
therefore generally classified as public whatever differences may exist in
the classification of cases in which the State has acted in a way in which
a private person might act. So, to take the particular example of
taxation which is an exclusive power of the State, it cannot be doubted,
as is agreed in all civil law countries and as all the Lords Justices in both
B    appeals below have accepted, that fiscal law is public law. Proceedings in
a fiscal matter are excluded from the concept of a civil or commercial
matter.

        The Norwegian law issue which is required to be resolved by the
English Court is: "How would the proceedings before the Sandejford
Court be characterised under Norwegian law as a matter of substance?",
C    that is, would a Norwegian judge characterise the substance of the
proceedings before him as proceedings in a civil or commercial matter?
The evidence demonstrated that as a matter of jurisprudence Norwegian
law recognises a clear distinction beween public law and private law;
that the distinction between public law and private law can have legal
significance in Norwegian law; that in the context of the division of the
substantive law of Norway, "private law" is synonymous with "civil
D    law"; and that tax law is part of public law. Accordingly, the proceedings
before the Sandefjord Court are, as a matter of substance, public law
proceedings. The evidence further shows that the phrase "civil or
commercial matters" can be given a substantive meaning under the law
of Norway; and the preponderant view is that the dispute before the
Sandefjord Court would not be categorised as a "civil matter" as a
E    matter of substance by a Norwegian judge who had to decide this issue.

        The State submitted to the courts below that the search for a
substantive meaning to be attached to the words "civil matter" was futile
and unnecessary and that the proceedings before the Sandefjord Court
were civil proceedings under Norwegian law because they claimed a civil
law remedy as opposed to sanctions under criminal law and as such were
subject to the general rules of procedure in civil matters. That approach
F    is misconceived. The Act of 1975 requires the English court to have
regard to the substance of the case proceeding in the foreign jurisdiction.
Where the law of the foreign jurisdiction enables the substance of the
case before it to be categorised, the English court has no justification for
ignoring that categorisation. Where, as here, the foreign law would
categorise the substance of the dispute before its court as a matter of
public law the English court will have regard to such categorisation. In
G    such circumstances a request from the foreign court will fall outside the
Act of 1975.

        [The House, after a concession from the appellants, agreed that the
issue estoppel point need not be dealt with.]

        On the issue of tax gathering and sovereignty, there is a clear and
well established rule that the English courts will not entertain an action
H    for the enforcement, either directly or indirectly, of the revenue law of a
foreign state, or lend assistance to the collection of foreign revenue,
directly or indirectly, by any measure of assistance or approbation:
*Government of India v. Taylor* [1955] A.C. 491. Reference was made to

790

A

*Williams and Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.*
[1986] A.C. 368 and *United States of America v. Harden* (1963) 41
D.L.R. (2d) 721]. This approach is not only part of the settled public
policy of this jurisdiction but is a principle of general international
acceptation. In determining whether an attempt is being made to seek
their assistance in contravention of the above rule, the English courts
look to the substance of the matter and not to the form in which the
application to the English courts is made. Here the Norwegian process is
solely concerned with the validity and enforceability of a retrospective
assessment to tax. What is being sought is impermissible assistance in
connection with the Norwegian tax gathering process.

B

Finally, the second request is too wide to be an acceptable request
for evidence under the Act of 1975—it amounts to an impermissible
"fishing" expedition; and, on the question of confidentiality, the scales
come down firmly on the side of preserving banking confidentiality.
There is a public interest in the preservation of banking confidence and
the courts have an inherent wish to respect this confidence: *British Steel
Corporation v. Granada Television Ltd.* [1981] A.C. 1096, 1168H *per*
Lord Wilberforce.

C

*Jolowicz* followed.

*Boswood Q.C.* replied.

D

Their Lordships took time for consideration.

16 February 1989. LORD KEITH OF KINKEL. My Lords, I have had
the opportunity of considering in draft the speech prepared by my noble
and learned friend Lord Goff of Chieveley. I agree with it, and for the
reasons he gives would allow the appeal in *Norway 2*, and deal with
*Norway 1* as he proposes.

E

LORD BRANDON OF OAKBROOK. My Lords, I had the advantage of
reading in draft the speech prepared by my noble and learned friend,
Lord Goff of Chieveley. I agree with it and for the reasons which he
gives I would allow the appeal in *Norway 2* and deal with *Norway 1* in
the manner which he proposes.

F

LORD GRIFFITHS. My Lords, I have had the advantage of reading in
draft the speech of my noble and learned friend, Lord Goff of Chieveley.
I agree with it, and for the reasons he gives would allow the appeal in
*Norway 2*, and deal with *Norway 1* as he proposes.

G

LORD GOFF OF CHIEVELEY. My Lords, this appeal is concerned with
letters rogatory issued by a Norwegian court, addressed to the English
High Court, requesting the oral examination of two witnesses in this
country, Lord Kindersley and Mr. A. J. Hardman. The witnesses have
opposed any order that they should submit to such oral examination;
their grounds of opposition will appear hereafter, but their principal fear
is that, if compelled to give evidence, they will be forced to break their
duty of confidentiality as bankers. The result has been extensive
litigation in this country, including two hearings before the Court of

H

791

A  Appeal; it is the second decision of the Court of Appeal which is,
primarily, the subject of the present appeal before your Lordships'
House. Before considering the substance of the appeal itself, it is
necessary for me to set out, as briefly as I can, the course of the
proceedings which have taken place. It will then be possible to identify
the issues which arise for decision on this appeal; and so to consider the
rival submissions advanced before your Lordships upon those issues.

B      At the heart of the present proceedings lies an assessment to tax
raised against the estate of a wealthy Norwegian shipowner, Anders
Jahre, who died in 1982. On 14 September 1983 the County Tax
Committee for the area in Norway in which he lived decided to raise a
supplementary retrospective tax assessment against his estate in the sum
of about 338m. Norwegian Kroner for the years 1972–82, on the ground

C  that he had failed to declare a large part of his assets. The undeclared
assets are alleged to include the assets of a Panamanian company,
Continental Trust Co. Inc. ("C.T.C."). The shares in C.T.C. form part
of the assets of a charitable foundation ("the trust") founded in 1976;
and it is alleged that the deceased was a settlor or in control of the trust,
and accordingly the beneficial owner of the assets of C.T.C. Lord
Kindersley is a director of Lazards who acted as adviser to the trust

D  since its foundation; Lazards appear to have acted as bankers to the
trust. Mr. Hardman was a senior employee of Lazards who acted as
assistant secretary, and subsequently as treasurer, of C.T.C., until the
dissolution of C.T.C. in 1984.

The assessment raised by the County Tax Committee is enforceable
as such, but may be discharged either by an order by the appropriate

E  Norwegian court declaring the assessment null and void, or upon an
appeal to the National Tax Committee ("the N.T.C."). In November
1983, the estate brought an action in the Sandefjord City Court to have
the assessment set aside; the Norwegian Solicitor-General took over the
defence of those proceedings. Subsequently, the estate also appealed to
the N.T.C. It appears that, if the order for letters rogatory is made, the
testimony of the witnesses would be made available not only to the

F  Sandefjord court but also to the N.T.C.

In June 1984 the lawyer acting for the estate addressed a request to
the Sandefjord court for the examination of Lord Kindersley; in the
request, it was submitted that Lord Kindersley might be asked to give
evidence in accordance with the Hague Convention of 1970 relating to
the Taking of Evidence Abroad in Civil or Commercial Matters ("the

G  1970 Hague Convention"), to which both Norway and the United
Kingdom are parties. Subsequently, in November 1984, the Solicitor-
General made a further request for the examination of Lord Kindersley
and Mr. Hardman. A letter of request from the Sandefjord court,
addressed to the competent court in Great Britain, requesting assistance
in the examination of both witnesses, formed the basis of the first set of
proceedings in this country (which I shall refer to as "Norway 1"). The

H  letter of request made no reference to any convention; I do not imagine
this to be in any way unusual. Attached to the letter of request were
certain pleadings, setting out the matters in respect of which evidence
was sought from the two witnesses. An order for examination of the

witnesses was sought in this country by the State of Norway, and on 14 <span>A</span>
January 1985, on an ex parte application, Master Prebble made the
requested order. The witnesses then applied to discharge that order: the
estate was then added as a respondent to the witnesses' summons. On
24 July 1985, McNeill J. dismissed the witnesses' application, but
directed that the order should take effect subject to certain qualifications
which he placed upon the matters in respect of which the testimony of
the witnesses was sought. The witnesses appealed to the Court of <span>B</span>
Appeal [1987] Q.B. 433 against the order requiring them to give
evidence: the state and the estate cross-appealed against the limitations
imposed by McNeill J. By a majority (Kerr and Glidewell L.JJ., Ralph
Gibson L.J. dissenting) the Court of Appeal allowed the appeal, on the
ground that the letter of request was in such wide terms that it amounted
to an impermissible "fishing expedition," i.e. that it was a roving inquiry <span>C</span>
designed to elicit information which might lead to the obtaining of
evidence. The majority further concluded that the appeal should also be
allowed on the basis that the order compelled the witnesses to violate
their duty of confidence as bankers.

A number of other issues were canvassed before the Court of Appeal
in *Norway 1*. In particular, they considered a submission by the <span>D</span>
witnesses that the English courts had no jurisdiction to entertain the
application, on the ground that the application was not concerned with
"proceedings in any civil or commercial matter" and so did not fall
within the jurisdiction conferred on the English courts by section 1(*b*) of
the Evidence (Proceedings in Other Jurisdictions) Act 1975. The
submission was rejected by the Court of Appeal. I shall have to
consider this point in depth at a later stage. At present, I need say no <span>E</span>
more than that the question was considered in detail by Kerr L.J. [1987]
Q.B. 433, 470–477 (with whom, on this point, both Glidewell and Ralph
Gibson L.JJ. agreed). With some reluctance he rejected an argument,
advanced on behalf of the witnesses, that the relevant words in the Act
of 1975, viz. "proceedings in any civil or commercial matter" (section
9(1)), should be interpreted as bearing a broadly acceptable international <span>F</span>
meaning, consistent with that used in civil law countries, and as such
excluding proceedings in public law matters, and therefore excluding
proceedings for the recovery of tax. In particular Kerr L.J., who
considered that the relevant proceedings must be proceedings in a civil
or commercial matter both by the law of the requesting state (here
Norway) and by the law of this country, felt unable to conclude, on the
evidence before him, that the action in the Sandefjord court could not <span>G</span>
be regarded as proceedings in a civil matter by the law of Norway. In
the closing paragraph of his judgment he said, at p. 488:

"Finally, I would add that if this judgment reflects the ultimate
outcome of this appeal, then I hope that any renewal of the present
letter of request in some more limited and acceptable form—if this
can be devised—should be accompanied by clear evidence as to <span>H</span>
what is properly to be regarded as a 'civil or commercial matter' by
the law of Norway, and in particular whether Norwegian law
distinguishes between public and private law. I feel, frankly, uneasy

793

1 A.C.          In re Norway's Application (Nos. 1 & 2) (H.L.(E.))          Lord Goff
                                                                          of Chieveley

A          about my acceptance, dubitante, of the very limited evidence in this
           connection on the present application."

           Doubtless in response to that invitation, the state and the estate
       obtained from the Sandefjord court a second letter of request, addressed
       to the English High Court, once again seeking the testimony of Lord
       Kindersley and Mr. Hardman, but limited to 12 specific issues, and
B      setting out the specific questions to be put to the witnesses. The letter
       of request contained the statement: "The action is a civil action under
       the law of Norway and the proceedings are a 'civil matter' under the law
       of Norway, for the purposes of [the 1970 Hague Convention]." It is said
       that these words were derived from the draft letter of request submitted
       to the court by the parties. No doubt they were; but they were accepted
C      by the court. At all events, the letter of request led to the proceedings
       in this country in *Norway 2*. The application for the order in this
       country was made by the State of Norway, though the application was
       supported by the estate. On an ex parte application Master Creightmore,
       on 2 April 1986, made the order requested. The witnesses applied to
       have that order set aside; on 18 November 1986, Kenneth Jones J.
D      dismissed the witnesses' application, subject to certain qualifications
       which he placed upon the testimony which the witnesses were required
       to give under the master's order. The witnesses appealed to the Court
       of Appeal, ante, p. 732B against the judge's order; the state cross-
       appealed against that part of his order which imposed limitations upon
       the testimony to be given. The Court of Appeal allowed the witnesses'
       appeal. May and Balcombe L.JJ. did so on the ground that the words
E      "proceedings in any civil or commercial matter" in the Act of 1975 were
       to be construed, in accordance with what they held to be a generally
       acceptable international interpretation, in the civil law sense as excluding
       public law matters and so excluding fiscal matters, and that therefore the
       English court had no jurisdiction to entertain the request of the
       Sandefjord court. Woolf L.J. concluded that there was no internationally
F      acceptable meaning to be attached to the words "proceedings in any civil
       or commercial matter" in the Act of 1975; he nevertheless held that that
       expression excluded fiscal matters, and on that basis he also held that
       the English court had no jurisdiction. The State of Norway and the
       estate now appeal to your Lordships' House against that decision.

           On the appeal before your Lordships' House, four issues emerged in
       the course of argument. First, the State of Norway challenged the
G      decision of the Court of Appeal that the English court had no jurisdiction
       to entertain its application. The witnesses, while seeking to uphold the
       decision of the Court of Appeal on that point, submitted, in the
       alternative, that the State of Norway's application should in any event
       be dismissed, either as "tax-gathering" and as such inconsistent with the
       well-known principle in *Government of India v. Taylor* [1955] A.C. 491;
H      or on the ground that it constituted an illegitimate "fishing expedition;"
       or because it compelled the witnesses to break their duty of confidentiality
       as bankers. It is the first two of these issues which raise the matters of
       principle for decision by your Lordships' House. I shall consider them

794

together, under the heading of "Jurisdiction." The other two issues I   A
shall consider briefly at the end of this speech.

*Jurisdiction*

    I turn first, therefore, to the central question argued before your
Lordships' House, which is whether the proceedings in the Sandefjord
court were civil proceedings within section 1(*b*) of the Act of 1975,
having regard to the definition of "civil proceedings" in section 9(1) of   B
the Act, viz. that that expression, in relation to the requesting court,
means proceedings in any civil or commercial matter.

    In order to consider this question, I must set out those parts of the
Act of 1975 which are of immediate relevance. First, the long title of
the Act reads:

    "An Act to make new provision for enabling the High Court, the   C
    Court of Session and the High Court of Justice in Northern Ireland
    to assist in obtaining evidence required for the purposes of
    proceedings in other jurisdictions; to extend the powers of those
    courts to issue process effective throughout the United Kingdom for
    securing the attendance of witnesses; and for purposes connected
    with those matters."

  D

Section 1 of the Act provides:

    "Where an application is made to the High Court, the Court of
    Session or the High Court of Justice in Northern Ireland for an
    order for evidence to be obtained in the part of the United
    Kingdom in which it exercises jurisdiction, and the court is
    satisfied—(*a*) that the application is made in pursuance of a request   E
    issued by or on behalf of a court or tribunal ('the requesting court')
    exercising jurisdiction in any other part of the United Kingdom or
    in a country or territory outside the United Kingdom; and (*b*) that
    the evidence to which the application relates is to be obtained for
    the purposes of civil proceedings which either have been instituted
    before the requesting court or whose institution before that court is
    contemplated, the High Court, Court of Session or High Court of   F
    Justice in Northern Ireland, as the case may be, shall have the
    powers conferred on it by the following provisions of this Act."

The expression "civil proceedings" is defined in section 9(1) of the Act:
"In this Act—'civil proceedings,' in relation to the requesting court,
means proceedings in any civil or commercial matter; . . ."

    It is not in doubt that a major purpose of the Act of 1975 was to   G
enable ratification of the 1970 Hague Convention. The text of the
Convention is in the English and French languages, both being
authoritative. The Convention is entitled "Convention on the Taking of
Evidence Abroad in Civil or Commercial Matters." The first two
paragraphs of article 1 of the Convention read:

    "In civil or commercial matters a judicial authority of a contracting
    state may, in accordance with the provisions of the law of that state,   H
    request the competent authority of another contracting state, by
    means of a letter of request, to obtain evidence or to perform some
    other judicial act.

1 A.C.          In re Norway's Application (Nos. 1 & 2) (H.L.(E.))          Lord Goff
of Chieveley

A          "A letter shall not be used to obtain evidence which is not intended for use in judicial proceedings, commenced or contemplated."

In the French text, the opening words of article 1 read: "En matière civile ou commerciale . . ."

B          The submissions of the witnesses on this point are, in summary, as follows. It was submitted that the main purpose of the Act of 1975 was to give effect to the 1970 Hague Convention. The words "civil or commercial matters" in section 9(1) of the Act reflect the same words in article 1 of the Convention, and should be given the same meaning. Furthermore, the distinction drawn between "civil" and "commercial" matters is inconsistent with the English procedural classification, in which civil matters embrace all matters which are not criminal, and in particular include commercial matters. This suggests that the words "civil or commercial matters" in section 9(1) of the Act should, like the same words in the English text of article 1 of the Convention, be regarded as derived from the words "matière civile ou commerciale" in the French text of article 1. In France, as in other civil law countries, civil matters are categorised as a matter of substance and are regarded as limited to private law matters, excluding public law matters and in particular fiscal matters. This approach was commended as "internationalist;" and it was suggested that it would achieve uniformity in the construction of article 1 of the Convention, and a consistent construction of section 9(1) of the Act which is derived from it. In *Norway 1* this approach was rejected, after full and careful consideration, by Kerr L.J., despite the attraction he felt for it; on this point, both Glidewell and Ralph Gibson L.JJ. agreed with Kerr L.J. However it found favour with the majority of the Court of Appeal in *Norway 2*, who felt free to depart from the conclusion reached upon it by the Court of Appeal in *Norway 1*.

F          Your Lordships are here concerned with the construction of certain words used in an Act of Parliament (the Act of 1975) which is primarily concerned with conferring jurisdiction on courts in the United Kingdom (in England, the High Court) to obtain evidence pursuant to a request from a court or tribunal outside the jurisdiction of the court (whether elsewhere in the United Kingdom or abroad). The Act of 1975 is not the first legislation to be found in the statute book conferring jurisdiction of this kind; and the expression "civil or commercial matter" is to be found in the earliest Act of Parliament concerned with this subject, the Foreign Tribunals Evidence Act 1856. The question has therefore arisen whether it is legitimate to have recourse to the earlier legislation for the purpose of construing the Act of 1975.

H          In *In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, 608, it was said by Lord Wilberforce of the Act of 1975 that: "The Act is, as I think, clear in its terms so that reference in aid of interpretation to previous statutes is not required." Furthermore, at p. 633, Lord Diplock said, with reference to previous decisions of English courts as to the meaning of different words used in the Act of 1856:

796
Lord Goff
of Chieveley          In re Norway's Application (Nos. 1 & 2) (H.L.(E.))          [1990]

> "For my part, I do not think that any assistance is to be gained          A
> from those decisions. The jurisdiction of English courts to order
> persons within [their] jurisdiction to provide oral or documentary
> evidence in aid of proceedings in foreign courts has always been
> exclusively statutory. There is no presumption that Parliament, in
> repealing one statute and substituting another in different terms,
> intended to make the minimum changes in the previous law that it
> is possible to reconcile with the actual wording of the new statute,          B
> particularly where, as in the instant case, the new statute is passed
> to give effect to a new international convention."

These observations of course carry much weight. Even so, caution has
to be exercised. When it is said that the Act of 1975 was passed with, in
part, the purpose of giving effect to the 1970 Hague Convention, this is
no doubt true; and where words in the Act are derived directly from the          C
Convention, it may well be right that reference to previous Acts of
Parliament in aid of construction would not be appropriate. This is
particularly so where, under the Act, the jurisdiction of the courts in
this country is enlarged to accommodate the Convention; though I have
to say that only minor provisions were required for this purpose. But it
is not to be forgotten that the Act of 1975 was not only passed to ensure          D
that our domestic law accommodated the 1970 Hague Convention and
so to enable its ratification by the United Kingdom. It was also passed
to embrace within one Act of Parliament the relevant powers of superior
courts in the United Kingdom, previously contained in a number of Acts
of Parliament; and the Act of 1975 confers powers which apply in
relation to other jurisdictions within the United Kingdom and, like its
predecessors, enables courts in the United Kingdom to assist courts in          E
other jurisdictions throughout the world, whether in convention countries
(including not only the 1970 Hague Convention but other conventions to
which this country is party) or in non-convention countries (of which
there are still a large number). In these circumstances, in considering
the scope of the jurisdiction conferred by the Act of 1975, it is, in my
opinion, both legitimate and appropriate to have regard to the legislative          F
history of the Act.
    I turn therefore to the earlier legislation. As I have already
indicated, the first Act of Parliament concerned with the obtaining of
evidence for the assistance of foreign courts and tribunals is the Foreign
Tribunals Evidence Act 1856 (19 & 20 Vict. c. 113). The origins of this
Act are obscure; all that we know is that the Act has no direct treaty
base. Section 1 of the Act conferred upon superior courts in the United          G
Kingdom jurisdiction:

> "to order the examination upon oath, upon interrogatories or
> otherwise, before any person or persons named in such order," of
> witnesses within the jurisdiction whose testimony "any court or
> tribunal of competent jurisdiction in a foreign country, before which
> any civil or commercial matter is pending, is desirous of obtaining . . .          H
> in relation to such matter."

The crucial point is, of course, the power to compel the witnesses to
attend any such examination.

1 A.C.        In re Norway's Application (Nos. 1 & 2) (H.L.(E.))        Lord Goff
                                                                      of Chieveley

A      Here we find the first mention in an Act of Parliament, at least in this context, of the expression "civil or commercial matter." It is plain that here the word "matter" is used as referring to the relevant proceedings; because in section 1 the "matter" is required (consistently with the long title and section 2 of the Act) to be *pending* before the foreign court or tribunal. This reinforces the natural inference that, in section 1 of the Act, the expression "civil matter" is being given no

B restricted meaning, and would be understood in this country as referring to civil, as opposed to criminal, proceedings. It is true that this gives no weight to the words "or commercial" so far as the law of this country is concerned: but it is not surprising to find these words added in relation to a jurisdiction which will be invoked by courts or tribunals in foreign countries, many of which differentiate between civil and commercial

C matters.
     Section 2 of the Act of 1856 makes provision for a certification procedure, under which a certificate of a diplomatic agent or consul of a foreign country:

> "that any matter in relation to which an application is made under this Act is a civil or commercial matter pending before a court or
D > tribunal in the country of which he is the diplomatic agent or consul having jurisdiction in the matter so pending, and that such court or tribunal is desirous of obtaining the testimony of the witness or witnesses to whom the application relates . . ."

shall be evidence of the matter so certified. This shows that the general intention of Parliament in the Act was to provide assistance in respect of
E any pending matters which, in the requesting state, would be described as civil or commercial; though it must also have been intended that the United Kingdom courts (whose jurisdiction was established under section 1) should not exercise that jurisdiction in matters which would, in the relevant jurisdiction in this country, be classified as criminal, even though in the requesting state they are classified as civil or commercial. In any event, there can be no question of the jurisdiction of the United
F Kingdom courts being dependent on a "civil law" classification of the relevant matter as civil or commercial.
     Three years after the Act of 1856 there was passed the Evidence by Commission Act 1859 (22 & 23 Vict. c. 20) (subsequently amended by the Evidence by Commission Act 1885 (48 & 49 Vict. c. 74)) which conferred upon courts or tribunals of competent jurisdiction in Her
G Majesty's dominions power to obtain evidence in relation to any action, suit, or proceeding pending in or before courts or tribunals elsewhere in Her Majesty's dominions. The words "action, suit or proceeding" are so wide that they must have been intended to embrace all kinds of proceedings, civil or criminal. Eleven years later, the jurisdiction conferred by the Act of 1856 in civil or commercial matters was extended by section 24 of the Extradition Act 1870 (33 & 34 Vict. c. 52)
H to apply in relation to "any criminal matter pending in a court or tribunal in any foreign state." The Act provided that all provisions of the Act of 1856 should be construed as if the term "civil matter" included a criminal matter; it follows that these were to be classified in

Lord Goff
of Chieveley          In re Norway's Application (Nos. 1 & 2) (H.L.(E.))          [1990]

A
the same way as "civil or commercial" matters under the Act of 1856.
Three years later, a fresh provision relating to criminal matters was
enacted in section 5 of the Extradition Act 1873, which provided that a
Secretary of State may, by order under his hand and seal, require a
police magistrate or a justice of the peace to take evidence for the
purposes of any criminal matter pending in any court or tribunal in a
foreign state.

B
    These provisions remained in force for many years, until the repeal
of all (except section 5 of the Extradition Act 1873) by the Act of 1975.
They were so repealed because, as is evident from the long title of the
Act of 1975, one important purpose of the Act was to make new
provision, in one statute, for the jurisdiction of superior courts in the
United Kingdom in relation to obtaining evidence for the assistance of
courts or tribunals in other jurisdictions, whether elsewhere in the
United Kingdom, or in the few surviving British dominions (which
include the important commercial centre of Hong Kong), or in other
countries (whether or not members of the Commonwealth). The Act of
1873 was no doubt excluded because it did not affect the jurisdiction of
the High Court, the Court of Session or the High Court of Justice in
Northern Ireland.

C

D
    Such is the legislative history. I turn to the conventions. It appears
from the evidence before your Lordships' House that the first
international conventions concerned with obtaining evidence for the
assistance of courts or tribunals in foreign jurisdictions consist of a series
of 23 bilateral conventions entered into between the United Kingdom
and various foreign countries. The first is a Convention with France in
1922; the last before the 1970 Convention was a Convention with Israel
in 1966. Apart from the Convention with Israel, all the foreign countries
concerned can broadly be described as civil law countries; they include
Norway, with which a Convention was entered into in 1931. Each
Convention has, of course, texts both in the English language and in the
language of the relevant foreign country. In each, the Convention is
stated (in the English text) to apply in civil or commercial matters.

E

F
    In the Convention with France of 1922 (as in that with Belgium in
1924) it is stated in the French text that the convention applies "en
matière civile ou commerciale." This expression is also to be found in
an earlier multilateral Convention in 1896, to which a number of
European states (though not the United Kingdom) were parties,
concerned with the service of documents (a matter also dealt with in the
bilateral conventions and now the subject of the Hague Convention of
1965). Doubtless similar expressions were used, in the various languages,
in the other 21 bilateral conventions entered into by the United
Kingdom. In all the circumstances, however, I do not regard it as a
legitimate inference that the English expression "civil or commercial
matters" in these conventions is a translation from the French "matière
civile ou commerciale," especially bearing in mind that the expression
"any civil or commercial matter" was also to be found in the United
Kingdom statute conferring the then relevant jurisdiction on our courts,
which had been on the statute book for nearly 70 years before the
Convention of 1922 with France. Doubtless all states which were parties

G

H

A  to these conventions interpreted the expression, as used in their own
languages, in their own ways. Even so, as appears from preparatory
documents relating to the 1970 Hague Convention, no difficulty was
experienced in practice in the operation of these conventions. Each
provided that any such difficulties as might arise should be settled
through the diplomatic channel. Indeed, the jurisdiction of national
courts, as in this country, is no doubt established by domestic legislation,
B  which may well be (in Norway, as in this country) of wider application,
on its face not expressly related to (though no doubt framed to
accommodate) any convention to which the country is party.

It is in these circumstances of some interest to have regard to the
position relating to Commonwealth countries. In 1859 all the relevant
countries were British dominions, and so the courts and tribunals in this
C  country and in the British dominions could, in relation to each other,
take advantage of the wide language of the Act of 1859, which referred
to "any action, suit or proceeding."

Following the Statute of Westminster and the movement to
independence after the second world war, the great majority of these
countries have acquired independent status. Nevertheless, as is normal,
much of the old imperial legislation was continued in force in relation to
D  each country on attaining independence, including the Acts of 1856 and
1859. These Acts (repealed by the United Kingdom Parliament by the
Act of 1975) have no doubt also been repealed by many Commonwealth
countries. I cannot say whether this has invariably been done or, if it
has been done, when it was done. Let me however give two examples.
In India, the two Acts were repealed, together with many other statutes,
E  by the British Statutes (Application to India) Repeal Act 1960, the
relevant law then being found in provisions of the Indian Codes of Civil
and Criminal Procedure. Under the Code of Civil Procedure 1908,
sections 76 and 78 confer jurisdiction on Indian courts relating to the
execution and return of commissions and, in the case of commissions
issued at the instance of foreign tribunals, Ord. 26, r. 19, of the relevant
Rules of Court requires only that "the proceeding is of a civil nature."
F  In New South Wales, it appears that the Acts of 1856 and 1859 will
shortly be repealed by the Evidence (Evidence on Commission)
Amendment Act 1988, which has not yet been brought into force: by
that Act, they will be replaced (see Part IX of the Act of 1988,
concerned with Taking of Evidence for Foreign and Australian Courts)
by, inter alia, new provisions applicable in relation to "proceedings in
G  any civil or commercial matter" which are very similar to sections 1, 2
and 3 of the Act of 1975. Furthermore it appears that, in relation to the
few remaining British colonies, the Acts of 1856 and 1859 having been
repealed, the provisions of the Act of 1975 (with appropriate
modifications) have been applied to them by various ordinances, in 1975
or later. It follows that, as between many countries in the common law
legal family (and, in due course, so far as New South Wales is
H  concerned, as between that state and other Australian states), the
relevant jurisdiction is expressed to be in "proceedings in civil or
commercial matters." But for some years at least in relation to many
Commonwealth countries (and, it may be, still today in relation to

800

others), the jurisdiction of the United Kingdom courts has been in    A
proceedings "in any civil or commercial matter" under the Act of 1975,
whereas the jurisdiction of the courts of other Commonwealth countries,
in relation to the United Kingdom or in relation to other countries, has
been that conferred by the Acts of 1856 and 1859, or (as in the case of
India) has otherwise been broadly defined. It is, in my opinion,
important to bear in mind, when ascertaining the jurisdiction conferred
on the courts of the United Kingdom by the Act of 1975, its impact    B
upon the relationship between the courts of this country and the courts
of Commonwealth countries, with whom, as fellow members of the
largest legal family in the world, we enjoy the closest of legal ties.

It is against this background that I turn to consider the Act of 1975,
and in particular the expression "civil proceedings" in section 1(*b*) of the
Act, as defined in section 9(1), viz. "'civil proceedings,' in relation to    C
the requesting court, means proceedings in any civil or commercial
matter."

Now it is true that the words "proceedings in any civil or commercial
matter" in section 9(1) differ from the words "any civil or commercial
matter" in section 1 of the Act of 1856; and it can be argued that, in this
slightly different phraseology, it would be tautologous to identify the
relevant "matter" with the proceedings themselves, and that it might    D
therefore be proper to apply a substantive rather than a procedural test
for the purpose of characterising the relevant proceedings as civil, and to
do so with reference to the French words in the 1970 Hague Convention.
I cannot however help thinking that this very slight change in wording
constitutes a slender basis on which to build so substantial a departure
from the previous law. Indeed, it would be remarkable if it were    E
intended to do so, when the relevant wording in the 1970 Hague
Convention mirrors that in the 23 bilateral conventions which were
operated without difficulty under the Act of 1856.

But this verbal point pales into insignificance beside the fact that the
argument advanced on behalf of the witnesses would involve a profound
departure from the established legal practice of conferring a very broad
jurisdiction upon the courts in the United Kingdom to enable them to    F
provide assistance for courts in other jurisdictions by obtaining evidence
for them. There is no hint in the statute itself that any such departure
was intended; indeed the long title to the Act makes no reference at all
to the 1970 Hague Convention. I wish to dwell for a moment on the
consequences if the witnesses' contention were to be accepted, and the
expression "proceedings in any civil or commercial matter" in section    G
9(1) were to be given a restricted construction, derived from the French
text of article 1 of the Convention, limited by reference to a civil law
meaning to be derived from the words in the French text.

I first refer to the fact that the jurisdiction under the Act can be
invoked to obtain evidence for the assistance of a court or tribunal in
another jurisdiction in the United Kingdom. No doubt, within the
United Kingdom, it is normal for a court desiring to obtain evidence    H
from another jurisdiction in the United Kingdom now to take advantage
(where necessary) of the extended power of subpoena embodied in
section 4 of the Act of 1975. But it may not always be possible to

A   obtain evidence in this way, for example where a witness is ill and so unable to comply with a subpoena; and the simple fact remains that the jurisdiction under the Act is not restricted to obtaining evidence in aid of foreign jurisdictions. It is surely improbable that Parliament should, in these circumstances, have legislated that the jurisdiction should be restricted to proceedings in a civil or commercial matter in a sense understood in civil law countries. Next, for over a century since 1859,

B   courts or tribunals in British dominions, most of them now independent members of the Commonwealth, have been able to take advantage of an unrestricted jurisdiction in all actions, suits or proceedings. It would be strange indeed if, in relation to these countries, the jurisdiction should now be limited with reference to the law of civil law countries, not only in relation to the remaining Crown colonies, but also in relation to

C   members of the Commonwealth whose courts continued after independence to enjoy an unrestricted jurisdiction. All (or very nearly all) of these countries are, as I have said, members of the common law legal family, to whom the restricted meaning of "civil or commercial matters," deriving as it does from a different system of law, is unknown.

  Furthermore the Act of 1975 confers, as I have said, a jurisdiction exercisable (like the old jurisdiction under the Act of 1856) in order to

D   assist courts or tribunals in all countries, whether or not parties to the 1970 Hague Convention. It is understandable that that Convention should have prompted the passage of the Act of 1975; but it is very difficult to see why Parliament should, for the first time, have here restricted this universal jurisdiction with reference to the French text of the Convention, and most unlikely that it should have done so sub

E   silentio, i.e. without making it express that this was indeed the legislative purpose.

  Lastly the Act provides, consistently with the law as it has stood for over 100 years (since section 24 of the Act of 1870), for courts in the United Kingdom to have jurisdiction to assist courts in other countries by obtaining evidence in criminal proceedings. This power has nothing to do with private law at all; and it would be surprising if Parliament

F   was expressly to perpetuate the power in relation to criminal proceedings, which are par excellence proceedings brought by the foreign state itself, and at the same time be held, by reference to section 9(1), to have restricted the meaning of the words "civil or commercial matter" by excluding from them what are recognised (in varying forms) as public law cases by the law of certain states. Indeed, the argument for the

G   witnesses leads to the remarkable conclusion that, if penal proceedings in the requesting court are categorised as criminal proceedings, the English court can assist under section 5; but if they are not criminal proceedings, the English court has no jurisdiction to assist.

  But the matter does not stop there. Your Lordships' House has, like the courts below, been provided with a most helpful selection of comparative law material. Study of this material reveals that it is very

H   difficult to attribute any uniform meaning to "matière civile ou commerciale" or "civil or commercial matter" in civil law countries. There appears to be little doubt that, in most if not all civil law countries, an important distinction is drawn between private law and

public law, and that public law matters are generally excluded from civil     A
or commercial matters. But the identification of public law matters
differs from country to country, sometimes in minor respects, sometimes
in major respects. I myself, like Woolf L.J. in *Norway 2,* ante, p. 767c
have derived great assistance from the substantial account, given by
Professor Charles Szladits of the Columbia Law School, of the distinction
between public law and private law in the civil law system, contained in
volume 2 of the *International Encyclopedia of Comparative Law.*     B
Volume 2, entitled "The Legal Systems of the World: Their Comparison
and Unification," is under the chief editorship of Professor René David:
Professor Szladits' account forms part of chapter 2 of the volume,
entitled "Structure and the Divisions of the Law." In his Introduction,
Professor Szladits states, at paragraph 25:

> "The fundamental division between private law and public law is     C
> considered a basic distinction, the summa divisio, in all legal systems
> belonging to the civil law family of laws. The scope of this division,
> however, differs considerably within the different legal systems, and
> consequently the theoretical analysis and the reasons, as well as the
> practical effects, of these divisions also differ. From the point of
> view of comparative law, the description of divisions of law and its     D
> explanation is a bewildering and difficult task because of their
> kaleidoscopic nature. Although the same categories can be found—
> more or less—in all the legal systems of the civil law, the disparity
> of premises on which they have been established points rather to
> historical accident and practical convenience than to any all-
> embracing logical or structural basis."

    E

Later, in paragraph 31, he states:

> "The dual division of law into public law and private law has been
> accepted in all the civil law systems. This uniformity disappears,
> however, when we consider the scope of the division, namely, what
> branches of law are subsumed under the one or the other."

He then proceeds in this section (and in the following section, concerned     F
with specific traits of public law) to illustrate by detailed reference the
divergences of approach in the various civil law systems, considering that
it is in the French and German legal systems that the didactic
classification of law differs most. It is not necessary for me to go into
detail, but I wish to quote from Professor Szladits on this distinction, at
paragraph 57:     G

> "The distinction between public law and private law 'seems to many
> Continental European lawyers to be fundamental, necessary and,
> on the whole, evident. Institutional works, student manuals and
> treatises contain discussions of the dichotomy, often in confidently
> dogmatic terms that put to rest incipient doubts.' This is an
> excellent summary of the situation generally prevailing in the civil
> law systems. Yet this division is far from 'necessary' and far from     H
> 'evident.' The criteria of distinction are established neither in
> theory nor in the practice of courts; and, in view of the ever
> increasing interpenetration of public law and private law the

1 A.C.          In re Norway's Application (Nos. 1 & 2) (H.L.(E.))          Lord Goff
of Chieveley

A    dichotomy appears to be in process of dissolution, which may
indicate that it is not even so 'fundamental' as it has been hitherto
thought to be. Yet in spite of these doubts and contradictions, the
dichotomy is firmly rooted in the thinking of the civilian lawyer."

In these circumstances, it is scarcely surprising to find, in Preliminary
Document No. 3 of August 1968 relating to what became the 1970
B    Hague Convention (Report of the Special Commission established by M.
Amram) the following statement:

    "The opening phrase of article 1 immediately precipitated a spirited
    debate on the scope of the Convention. There was no disagreement
    that the Convention should be limited to 'civil and commercial
    matters' but there was debate on the definition of a 'civil and
C    commercial matter' . . ."

However, having ascertained that previous conventions in which this
phrase was used (including the bilateral conventions to which the United
Kingdom was party) had worked effectively without any need for specific
definition of the phrase, and having regard to the historic policy of the
Hague Conference to include neither a definition nor a rule of conflicts
D    to resolve a dispute between the states on such an issue, it was decided
that article 1 should follow the historic pattern without any definition of
"civil or commercial matters."

    In these circumstances, it must in any event be very difficult to
identify, by reference to civil law systems, any "internationally acceptable
definition" of the expression "civil or commercial matters." Even if it
were appropriate to define the expression in the Act of 1975 with
E    reference to the text of the 1970 Hague Convention, no internationally
acceptable definition could be derived from that source. This reinforces
my opinion that Parliament did not intend, by any such means, to make
the profound change, now adumbrated by the witnesses, in the
jurisdiction of the courts of the United Kingdom.

    I need only add, on this aspect of the case, that I do not feel able to
draw any assistance from the Convention on Jurisdiction and the
F    Enforcement of Judgments in Civil and Commercial Matters of 1968
("the Brussels Convention"), to which the United Kingdom acceded in
1978, and to which effect was given in the United Kingdom by the Civil
Jurisdiction and Judgments Act 1982. Quite apart from the fact that the
Convention excludes certain specific matters, thus delineating the "civil
and commercial matters" to which it applies, there is a court (the Court
G    of Justice of the European Communities) which has the power and the
duty to impose a uniform meaning upon the Convention; and it is
scarcely surprising that, bearing in mind that the original signatories to
the Convention were all civil law countries, the meaning so imposed
should be derived from the civil law.

    For these reasons, in agreement with the Court of Appeal in
*Norway 1* [1987] Q.B. 433 and with Woolf L.J. in *Norway 2* ante,
H    p. 767c. I have come to the conclusion that the words "civil or
commercial matters" in the Act of 1975 cannot be construed with
reference to any internationally acceptable meaning. There remains
therefore the question how they should be construed; and to answer that

Lord Goff
of Chieveley        In re Norway's Application (Nos. 1 & 2) (H.L.(E.))        [1990]

necessary to consider by reference to which system of law this question
should be answered.                                                            A

In the courts below three alternatives were canvassed: (1) the law of
the requesting court; (2) the law of the court addressed (in the present
case, the law of this country); and (3) a combination of both laws—i.e.
jurisdiction would only be established if the relevant proceedings were
proceedings in a civil or commercial matter under the laws of both
countries. In *Norway 1*, the Court of Appeal, having rejected the          B
solution of an internationally acceptable interpretation, preferred the
third solution. In *Norway 2*, the point did not arise for May L.J. or
Balcombe L.J.; Woolf L.J. preferred the second solution. On this point
I find myself to be in agreement with the Court of Appeal in *Norway 1*.
Such a conclusion is consistent with the approach under the Act of 1856.
(It is true that the certification procedure under that Act no longer         C
applies; but that is scarcely surprising, bearing in mind the improvement
in communications.) I can discern, in the Act of 1975, no intention to
depart from the former approach, which in any event introduces a
desirable element of comity into the procedure.

It was, of course, because the Court of Appeal in *Norway 1* preferred
the third solution that Kerr L.J. regretted that he had insufficient
assistance on Norwegian law, with the consequence that, in *Norway 2*, a     D
substantial body of evidence was made available to the English court
from distinguished Norwegian lawyers. The Norwegian lawyers provided
very full and helpful written opinions on the point. Professor Huser of
the University of Bergen (whose evidence was supported by Professor
Haerem and Professor Bernt) supported the thesis advanced by the
witnesses that, by Norwegian law, civil and commercial matters did not        E
include public law matters and so excluded fiscal matters. On the other
hand Professor Fleischer, of the University of Oslo and the Norwegian
Ministry of Foreign Affairs, supported the thesis that, by Norwegian law
as by the law of this country, it was appropriate to identify civil matters
as consisting of all matters other than criminal matters, and so capable
of including fiscal matters. Both Professor Huser and Professor Fleischer
gave oral testimony in addition to their written opinions.                    F

Study of the written opinions of Professor Huser and Professor
Fleischer reveals that the difference of opinion between them stems, to a
very substantial degree, from the fact that they were asking themselves
different questions. Professor Huser's opinion was devoted to an
examination of the structure of Norwegian law, and to the division of
Norwegian law into private law and public law; his answer was that the       G
"subject matter of the Sandefjord case" should be classified as tax law,
which is part of the well-established category of public law, and so not a
civil or commercial matter. Professor Fleischer, on the other hand,
distinguished between classification of the rules of law, and classification
of the cases or matters actually before the courts. He expressed the
opinion that, in the general understanding and common usage of
Norwegian lawyers:                                                            H

"The term and concept of 'civil' refer to 'civil' as opposed to
'criminal.' The term 'civil' is used to describe both the procedure
applied by the courts—in conformity with the code on civil procedure

1 A.C.          In re Norway's Application (Nos. 1 & 2) (H.L.(E.))          Lord Goff
of Chieveley

A      as opposed to the code on the procedure in criminal cases—and the
matters brought before them."

It is apparent, therefore, that this difference of opinion could only be
resolved by identifying the correct question which should have been
posed for their consideration.

B      I therefore turn back to the Act of 1975 and ask myself—what is the
correct question which should be addressed to experts in the law of the
requesting court? The answer is, in my opinion, a very simple one. It
is that it is a matter for the law and practice of the requesting state,
having regard to the manner in which classification is ordinarily made in
that country.

C      Let me take, as an example, a request by a court in a Commonwealth
country. The court of the requesting state would (like any court in this
country) never think that it was required to delve into a distinction
founded only upon the substance of the relevant proceedings. It would
simply say to itself: in our country, unlike some other countries, we do
not draw any distinction between civil and commercial matters, and so
we can ignore that; these are plainly civil proceedings, because they are
not criminal proceedings; therefore we can apply for assistance from the
D      English court under section 1 of the Act of 1975. I have no doubt that
the English court would find such an approach entirely acceptable; and
if it is acceptable in relation to a court in a Commonwealth country, I
cannot see why any different approach should be adopted in relation to
a request for assistance from a Norwegian court.

E      In the present case Kenneth Jones J. concluded, on the evidence
before him, that, under Norwegian law, the proceedings in Norway
would be classified as proceedings in a civil matter. In my opinion, he
was entirely justified in reaching that conclusion on the evidence before
him; indeed it seems to me that the evidence of Professor Fleischer, that
this was in accordance with the general understanding and common
usage of Norwegian law, compelled that conclusion, which was also the
conclusion reached by the Sandefjord court itself. In saying this, I
F      intend no disrespect to Professor Huser and his colleagues. On the
contrary, they were in my opinion invited to consider a question
restricted to the substance of the proceedings, irrespective of the
ordinary practice in Norway; and indeed their evidence reveals that the
question they were being asked to consider was, in Norwegian terms,
somewhat unreal.

G      The judge's conclusion is moreover consistent with the view expressed
by Lord Diplock in the *Westinghouse* case [1978] A.C. 547, 633–634,
that in the ordinary way the English court should be prepared to accept
the statement of the requesting court that the evidence is required for
the purpose of civil proceedings. It is appropriate that the requesting
court should have regard to its own ordinary approach to these matters,
without indulging in an analysis which is inappropriate in its own system.
H      In this way, the Act of 1975 can be made to work sensibly in relation to
all countries in the world, common law countries and civil law countries
alike, without requiring any of them to act in any way which is foreign
to its own way of thinking; and expert evidence will, in the vast majority

806

of cases, be unnecessary. In theory, as under the Act of 1856, an    A
English court would not treat a matter as civil or commercial which
would, by English law, fall to be classified as criminal, in which event it
would treat the request as falling under section 5 of the Act instead of
under section 1. It is however difficult to imagine such a case arising in
practice.

I turn next to the question whether, as a matter of English law, the
jurisdiction of the High Court under the Act of 1975 in respect of civil    B
proceedings is wide enough to embrace proceedings in fiscal matters.
Woolf L.J. considered that it was not. He said, ante, pp. 777H—778c:

"While I cannot identify an acceptable international interpretation
of the phrase [civil or commercial matter], I do accept that the
material which is before the court is overwhelmingly to the effect
that whatever else is or is not included in the concept of a civil or    C
commercial matter, 'matières fiscales' are not within that concept
and this can be taken into account in construing the section. Even
in common law jurisdictions, so far as enforcement of judgments is
concerned it has been recognised that revenue matters come within
a different and special category and are subject to rules of public
policy which do not apply to other civil proceedings . . . Taking    D
into account the well established approach of the courts to assisting
in tax gathering by a foreign state, I would regard the proper
interpretation of the words 'civil or commercial matter' in the Act
of 1975 as excluding 'matières fiscales'."

I feel driven to state, with all respect, that in my opinion the approach
of Woolf L.J. is, on this point, not logical. My difficulty with his    E
reasoning is that he appears to conclude that "matières fiscales" should
be excluded as a matter of general international interpretation. He has
however rejected the existence of any generally acceptable international
interpretation of the expression "civil or commercial matter," and I do
not see how he can, on any such basis, exclude fiscal matters. The point
has, in my opinion, to be considered with reference to English law.

I have no doubt that, under English law, the words in section 9(1)    F
should be given their ordinary meaning, so that proceedings in any civil
matter should include all proceedings other than criminal proceedings,
and proceedings in any commercial matter should be treated as falling
within proceedings in civil matters. On this simple approach, I do not
see why the expression should be read as excluding proceedings in a
fiscal matter; so that the High Court has jurisdiction in respect of such a
matter under the Act of 1975.    G

In his case note on *Norway 1* in (1986) 102 L.Q.R. 505, 509, Dr.
F. A. Mann stated that: "it can be asserted with confidence that very
few states (if any) will ever regard a tax claim as a civil or commercial
matter." I myself have little doubt that this is broadly true in the case
of most civil law countries, with their classification of law into public law
matters (including fiscal matters) and private law matters (with which
alone civil and commercial matters are concerned); though this does not    H
appear to be true of the law of Norway, having regard to the evidence
of Professor Fleischer and the terms of the relevant parts of the

807

A    Norwegian Law Courts Act. But, so far as common law countries are
concerned, the matter is, on the material before your Lordships' House,
completely unresolved. The American Restatement of Foreign Relations
Law indicates (see paragraph 471, comment (*f*) and paragraph 473,
comment (*c*)) that the practice in the United States is to consider any
proceeding which is not criminal as coming within the provisions of the
Hague Convention, and that letters of request may be used in
B    administrative proceedings, including proceedings concerning fiscal
matters. This view appears to be consistent with the Report of the
United States Delegation to the Special Commission on the Operation
of the 1970 Hague Convention, dated June 1978, in which it is stated
that the United Kingdom delegates concurred with the United States'
interpretation of the Convention and stated that the United Kingdom
C    Central Authority followed the same practice as the United States.
There appears however to be no decision of any court in the United
States on the point: nor has any relevant decision from any other
common law country been drawn to the attention of your Lordships'
House.

It is at this stage necessary to turn to the impact upon the jurisdiction
conferred upon the courts of this country under the Act of 1975 of the
D    principle associated with the decision of your Lordships' House in
*Government of India v. Taylor* [1955] A.C. 491. In *Dicey & Morris,
The Conflict of Laws*, 11th ed. (1987), p. 100, rule 3 provides:

"English courts have no jurisdiction to entertain an action: (1) for
the enforcement, either directly or indirectly, of a penal, revenue or
other public law of a foreign state; or (2) founded upon an act of
E    state."

In that rule, it is stated that the English courts *have no jurisdiction* to
entertain such an action. However, in *Dicey & Morris* itself, at p. 101,
it is recognised that the theoretical basis of the rule is a matter of some
controversy. The editors express the opinion that the best explanation is
to be found in the speech of Lord Keith of Avonholm in *Government of
F    India v. Taylor*, where he said, at p. 511:

"One explanation of the rule . . . may be thought to be that
enforcement of a claim for taxes is but an extension of the sovereign
power which imposed the taxes, and that an assertion of sovereign
authority by one state within the territory of another, as distinct
from a patrimonial claim by a foreign sovereign, is (treaty
G    or convention apart) contrary to all concepts of independent
sovereignties."

This opinion is consistent with that expressed by Lord Denning M.R. in
*Attorney-General of New Zealand v. Ortiz* [1984] A.C. 1, 21, where he
said:

H    "By international law every sovereign state has no sovereignty
beyond its own frontiers. The courts of other countries will not
allow it to go beyond the bounds. They will not enforce any of its
laws which purport to exercise sovereignty beyond the limits of its
authority."

808

It is not necessary for the purposes of the present case to decide what is   A
the precise theoretical basis of the rule, though I am respectfully inclined
to agree with Lord Keith of Avonholm's expression of opinion. At all
events the rule cannot, in my view, go to the jurisdiction of the English
court. What the English court does is simply to decline in such cases to
exercise its jurisdiction, and on that basis the relevant proceedings will
be either struck out or dismissed.

The question arises whether, given the fundamental nature of the   B
principle embodied in rule 3 of *Dicey & Morris*, as applied in revenue
cases, the jurisdiction conferred by section 1 of the Act of 1975 should
be read as qualified by reference to that principle. I myself can see no
basis for concluding that the jurisdiction should be regarded as qualified
in this way as a matter of construction of the Act. The words in the Act
are unqualified; and the rule in *Dicey & Morris* does not, as I see it, go   C
to jurisdiction.

There remains however the further question whether, given that the
jurisdiction is unqualified, the English courts should decline to exercise
that jurisdiction in the case of letters of request for assistance in relation
to civil proceedings concerned with the enforcement of the revenue laws
of the requesting state. It can be argued that they should decline to do
so, as a matter of judicial discretion, on the basis that direct or indirect   D
enforcement of foreign revenue laws constitutes an invasion of the
sovereignty of this country, and is contrary to a fundamental rule of
English law.

It has been suggested that that question can be avoided in the
present case because the letters of request have been issued in response
to an application by a taxpayer, seeking assistance for the purpose of   E
opposing a claim by a foreign state for tax. In agreement with the
Court of Appeal in *Norway 1,* I am for my part prepared to accept that
submission. I do not see how such letters of request, or their execution,
could amount to the enforcement, direct or indirect, of a foreign
revenue law; nor do I see how they could constitute an invasion of this
country's sovereignty. Such a conclusion is, in my opinion, acceptable,
once it is recognised that the rule does not affect the jurisdiction of the   F
court, but is concerned rather with circumstances in which the court
declines to exercise its jurisdiction. In the case of an application by a
taxpayer, I do not consider that the rule requires the court to decline to
exercise jurisdiction. It is true that in the present case the request was
made by both the state and the estate. But in such a case the English
court could (if necessary) accede to the application of the estate, while   G
rejecting that of the state.

However, since the state, as well as the estate, is applying for the
assistance of the English courts, it is necessary to consider, in relation to
the application of the state, the broader question whether the execution
of letters of request in relation to foreign civil proceedings in a fiscal
matter should, if the request is made on the application not of the
taxpayer but of the taxing authority, be refused by an English court on   H
this ground. I must confess to having given the most anxious
consideration to this question. First, the rule is deeply embedded not
only in the common law but also in the law of civil law countries. An

A eloquent account of it in French law is to be found in the exposition by Professor Mazeaud of *Bemburg v. Fisc de la province de Buenos Aires,* 24 February 1949; Tribunal de la Seine; Semaine Juridique, 1949, II, 4816. Second, there appears to exist no case of fiscal proceedings, in relation to which letters of request have been executed in any jurisdiction; and it can be argued (as indeed it is argued by Mazeaud) that, if a change has to be made, it should be made by legislation and not by

B judicial decision.

Counsel for the witnesses helpfully placed before your Lordships a most useful bundle of documents concerned with double taxation conventions, including the text of the O.E.C.D. Model Agreement, and also the text of the draft O.E.C.D. Convention on Mutual Administrative Assistance in Tax Matters. This last document serves the useful purpose

C of demonstrating the range of matters which such a convention might cover, and the safeguards which might properly be embodied in it. It is right to say, however, that the draft convention provides for matters going far beyond simple requests by foreign courts for assistance in obtaining evidence in relation to pending or contemplated proceedings.

I return to the rule in *Government of India v. Taylor* [1955] A.C.

D 491. It is of importance to observe that that rule is limited to cases of direct or indirect enforcement in this country of the revenue laws of a foreign state. It is plain that the present case is not concerned with the direct enforcement of the revenue laws of the State of Norway. Is it concerned with their indirect enforcement? I do not think so. It is stated in *Dicey & Morris,* at p. 103, that indirect enforcement occurs (1) where the foreign state (or its nominee) in form seeks a remedy which

E in substance is designed to give the foreign law extraterritorial effect, or (2) where a private party raises a defence based on the foreign law in order to vindicate or assert the right of the foreign state. I have been unable to discover any case of indirect enforcement which goes beyond these two propositions. Even so, since there is no authority directly in point to guide me, I have to consider whether a case such as the present

F should nevertheless be held to fall foul of the rule. For my part, I cannot see that it should. I cannot see any extraterritorial exercise of sovereign authority in seeking the assistance of the courts of this country in obtaining evidence which will be used for the enforcement of the revenue laws of Norway in Norway itself. Let it be supposed, for example, that in *Attorney-General of New Zealand v. Ortiz* [1984] A.C.

G 1, the case was not one of New Zealand seeking to enforce its claim in this country, but of seeking the assistance of the English courts to obtain evidence to enforce its claim in New Zealand. I find it very difficult to imagine that such an application would have been refused. Nor do I consider that refusal of the application of the State of Norway in the present case could easily be reconciled with the power of the courts of this country to exercise their jurisdiction under the Act of 1975 in

H criminal proceedings—for example, criminal proceedings in Norway in a case of tax evasion.

It follows that I am unable to accept the submissions of the witnesses on the first two points argued by them before your Lordships' House.

*"Fishing" and confidentiality*                                            A

I turn then to the two remaining issues, concerned respectively with "fishing" and confidentiality. These two issues I can deal with very shortly.

On the question of "fishing," the only issue before your Lordships' House is whether the order made by Kenneth Jones J. in *Norway 2*, under which the second letter of request (subject to certain deletions   B made by him in the list of issues set out in schedule 1 to his order) was held not to constitute an impermissible "fishing expedition" but to constitute rather a legitimate request for assistance in the obtaining of evidence, should stand. The Court of Appeal in *Norway 2* decided (subject to the restoration of paragraph 8 of schedule 1 in an amended form, as set out in the judgment of Balcombe L.J., ante, pp. 766F—   C 767A) to uphold the decision of the judge on this point.

Before your Lordships' House it was submitted on behalf of the witnesses that the second letter of request, taken as a whole, was in substance no more than an exercise in "fishing" and, as such, should have been rejected in toto without attempting, by editing it, to limit it to a request for assistance in obtaining evidence. Having studied the letter of request, and the limited deletions made by the judge, I am unable to   D accept this submission. In my opinion, the true position is the reverse. The letter of request was in substance a request for what, by English law, would be regarded as assistance in obtaining evidence. The judge however formed the opinion that some of the issues identified in the letter of request went beyond evidence, and deleted them. The Court of Appeal saw no reason to differ from the judge's decision. The   E witnesses' appeal on this point is concerned only with a matter of judgment, on which your Lordships' House would not normally depart from a concurrent decision by the judge of first instance and the Court of Appeal. I can see no reason to do so in the present case.

I wish however to add that, since the state does not appeal against the deletions made by the judge, your Lordships' House does not have to consider any matter of principle on this issue, and in particular does   F not have to consider the conflict of opinion between Kerr and Glidewell L.JJ. in *Norway 1* [1987] Q.B. 433 on the one hand, and Ralph Gibson L.J. in *Norway 1* and Woolf L.J. in *Norway 2*, ante, p. 767c, on the other hand, on the principles to be applied by courts in this country in considering whether or not the matters on which the requesting state seeks assistance do or do not constitute evidence. On this question, I   G wish to reserve my opinion.

It is accepted on both sides that the question of confidentiality can only be answered by the court undertaking a balancing exercise, weighing on the one hand the public interest in preserving the confidentiality owed by the witnesses as bankers to their customers, and on the other hand the public interest in the English courts assisting the Norwegian   H court in obtaining evidence in this country. In *Norway 2*, that balancing exercise was performed by the judge. He took into account the considerations urged on behalf of the witnesses, and in particular the matters set out in affidavits sworn on behalf of them, stressing

811

A   the importance of the duty of confidentiality owed by bankers in this
country, notably in the City of London. He then said:

> "The major consideration is, undoubtedly, that referred to by Lord
> Kindersley in his letter to the Norwegian lawyer, acting for the
> estate, on 15 April 1984 namely the identity of the settlor. Lord
> Kindersley seeks that his identity and information which might
B   > indirectly reveal his identity should remain a matter of confidence
> and should not pass into the public domain, as it might do if he
> were required to give evidence in the Sandefjord proceedings. On
> the other hand, if it could be shown that the settlor in relation to
> the matters with which the Sandefjord court is directly concerned,
> was acting merely as the agent or nominee of Jahre, then the public
C   > policy of assisting a foreign court to the proper determination of the
> matter before it would, in all probability, outweigh the public
> interest in upholding the confidential relationship between the
> witnesses and the settlor."

On that basis, he decided to reject the submission of the witnesses on
the ground of confidentiality, but made his order subject to a direction:

D   > "that the said witnesses shall not be required to reveal the identity
> of the settlor, or to answer any questions under paragraphs 7, 9, 10
> or 11, unless the said witnesses, or one of them, shall have said in
> evidence that the settlor was, in relation to the C.T.C. shares
> and/or the assets of C.T.C. held in the name of the foundation
> acting as the nominee or agent for Anders Jahre."

E
The Court of Appeal unanimously decided not to interfere with the
judge's exercise of his discretion on this point. In these circumstances,
it would require cogent reasons to persuade your Lordships to interfere
with the judge's decision. For my part, I do not consider that your
Lordships should, in the present case, take that unusual step.

F       For these reasons, I would allow the appeal in *Norway 2*, and restore
the order of Kenneth Jones J. (subject to the restoration of the amended
paragraph 8 of schedule 1 to his order, to which I have already
referred).

If the remainder of your Lordships should be in agreement with the
opinion which I have expressed on the appeal in *Norway 2*, I would
suggest that counsel, having considered your Lordships' conclusion on
G   that appeal, should be given the opportunity briefly to address your
Lordships on the appeal on costs in *Norway 1*.


LORD LOWRY. My Lords, I have had the advantage of reading in
draft the speech of my noble and learned friend, Lord Goff of Chieveley.
I agree with it and, for the reasons which he gives, I, too, would allow
H   the appeal in *Norway 2*, ante, p. 732B, and restore the order of Kenneth
Jones J.

So exactly does the reasoning of that speech represent my view on
the jurisdiction issues that it would be pointless for me to add any

812

A

observations of my own. I wish, however, to take the opportunity of expressly concurring in my noble and learned friend's interpretation and application of the principle with regard to foreign proceedings in fiscal matters which was enunciated by Lord Keith of Avonholm in *Government of India v. Taylor* [1955] A.C. 491.

B

> *Appeal allowed.*
> *Order of Court of Appeal in Norway 1 affirmed.*
> *No order as to costs in House of Lords.*
> *Appeal in Norway 2 allowed.*
> *Order of Kenneth Jones J. restored, as amended.*
> *Cross-appeal dismissed.*
> *Respondents to pay costs in House of Lords and in Court of Appeal.*

C

*Solicitors: Freshfields; Macfarlanes; Linklaters & Paines.*

C. T. B.

D

E

[HOUSE OF LORDS]

LORD ADVOCATE    .    .    .    .    .    .    APPELLANT

AND

F

THE SCOTSMAN PUBLICATIONS LTD.

AND OTHERS    .    .    .    .    .    .    .    RESPONDENTS

1989    May 15, 16, 17;              Lord Keith of Kinkel, Lord Templeman,
        July 6                       Lord Griffiths, Lord Goff of Chieveley and
                                     Lord Jauncey of Tullichettle

G

*Confidential Information—Breach of confidence—Publication by third party—Former Crown servant privately publishing unauthorised book about employment with British Security Service—Book distributed to friends—Copy sent by one recipient to newspaper—Information in book not damaging to national security—Whether mere fact of publication of unauthorised material in newspaper against public interest and damaging to national security—Whether interdict against publication to be granted*

H

A former member of the British Security Service had sought authorisation from the Government for publication of a book of

that equivalents, such as "conclusive", "cannot be questioned",[56] "preclude", "bar"[57] or "obstacle",[58] are, and the principle is as accurately stated as if "estoppel" were used.[59]

## Where res judicata is the foundation of an action

**18**   Where an action, or counterclaim, is founded on a judicial decision, the decision is as conclusive and binding upon the parties as it is when set up as a bar to a claim. There is, therefore, no justification for applying the term "estoppel" to the one class of case, and withholding it from the other. But there has been some reluctance to use the term in such proceedings, and there has been a preference for such phrases as "not examinable", "not impeachable" on the merits, "not to be inquired into", or that the defendant is not "suffered", or "permitted", or "allowed", to contradict it.

## The constituents of res judicata estoppel[60]

**19**   A party setting up *res judicata* by way of estoppel as a bar to his opponent's claim, or as the foundation of his own, must establish the constituent elements,[61] namely:
(i)   the decision was judicial in the relevant sense;
(ii)   it was in fact pronounced;
(iii)   the tribunal had jurisdiction over the parties and the subject matter;
(iv)   the decision was –
     (a)   final, and
     (b)   on the merits;
(v)   it determined the same question as that raised in the later litigation; and
(vi)   the parties to the later litigation were either parties to the earlier litigation or their privies, or the earlier decision was *in rem*.

---

56   As in *LCC v Galsworthy* [1917] 1 KB 85.
57   As in *Cummings v Heard* (1869) LR 4 QB 669.
58   "Obstacle to the recovery" is used in *Palmer v Temple* (1839) 9 Ad & El 508 at 521.
59   "Conclusive evidence" is treated as a synonym of estoppel by Knight Bruce VC in *Holland v Clark* (1842) 1 Y & C Ch Cas 151 at 171. See also *Morrison, Rose & Partners v Hillman* [1961] 2 QB 266 at 277, CA – "the easiest line of approach to this question is to regard the previous decision as conclusive evidence". "Estoppel or bar" is the expression used in *Massam v Thorley's Cattle Food Co* (1880) 14 Ch D 748, CA and in *Stokes v Stokes* [1911] P 195 at 198 "the doctrine of *res judicata*, or of estoppel".
60   This paragraph from the 2nd ed was cited in *R v Duhamel (No 2)* (1981) 131 DLR (3d) 352 at 356 (Alberta CA) affd (1984) 14 DLR (4th) 92 (SCC) and in *Midland Bank Trust Co Ltd v Green* [1980] Ch 590 at 607.
61   *Marginson* [1939] 2 KB 426 per Slessor LJ at 438, CA.

CHAPTER 7

# The subject matter of the judicial decision

### Identity of subject matter essential

**176**   It is of the essence of all estoppels that there be two statements exhibiting an essential contradiction; and the result of the doctrine is that the earlier is taken as the truth. There can be no *res judicata* estoppel unless a substantial discrepancy exists between the *res judicata* and the case set up in the subsequent proceedings; and no such discrepancy can exist unless they relate to *the same* subject matter.

**177**   The party setting up the estoppel must establish identity of subject matter – that is, that his opponent is seeking to re-agitate some question of law, or issue of fact, which has been the subject of a final decision between the same parties by a tribunal of competent jurisdiction.[1]

### "Decision" can have two meanings

**178**   The term "decision" may denote either the act, or the opinion of the tribunal – either the grant or refusal of the relief sought or the determination of a question of law, or issue of fact, in contest between the parties. The judicial act is relevant for the doctrine of former recovery[2] and the judicial opinion for *res judicata* estoppel.[3]

---

1   As to *onus* see *Behrens v Sieveking* (1837) 2 My & Cr 602 (plea not alleging identity of subject matter held bad: at 603); *Moss v Anglo-Egyptian Navigation Co* (1865) 1 Ch App 108 at 114–16; *Robinson v Robinson* (1877) 2 PD 75 (wife, petitioning for divorce, moved to strike out so much of the answer as alleged her adultery with one Furber and with unknown persons, on the ground that a former suit by the husband alleging adultery by her with Furber, and with one Petrococchino, had been dismissed; but no replication, or affidavit, averring identity of subject matter, having been filed, the motion failed); *Ripley v Arthur & Co* (1902) 86 LT 735, CA, where the plaintiff moved to attach the defendant for breach of an injunction granted by default restraining the defendant from dealing in colourable imitations of the plaintiff's goods, but the plaintiff's affidavit contained no averment that the articles were the same as those the defendant was prohibited from selling, and it was held that no case of *res judicata* had been made out.

2   Ch 18.

3   *Outram v Morewood* (1803) 3 East 346 (per Lord Ellenborough CJ at 354: "it is not the recovery, but the matter alleged by the party, and upon which the recovery proceeds, which creates the estoppel. The recovery itself ... is only a bar to the future recovery of damages for the same injury, but the estoppel precludes parties and privies from contending to the contrary of that point, or matter of fact, which having been once distinctly put in issue by them, ... has been, ... solemnly decided against them".

*Inferred judicial determinations* P 180

## Express judicial declarations

179   Where the formal record states the opinion of the tribunal on any question of law, or issue of fact, there will be no difficulty in ascertaining the subject matter of the decision,[4] unless the declaration or finding is ambiguous.[5] If the subject matter of the first decision is clear, there will be no difficulty in deciding whether the question is identical with that in the later litigation.

## Inferred judicial determinations

180   Where the question on which it is desired to found a plea of *res judicata* is not the subject of an express declaration or finding, questions of difficulty arise.[6] The problem is to determine what conclusions of law and what findings of fact can legitimately be inferred from a decision which merely records a judicial act such as a money judgment, command, prohibition or dismissal.

It was decided as long ago as 1747[7] that where a question was necessarily decided in an earlier suit, although not in express terms, the same question could not be raised again between the parties in a later suit.[8] Thus a finding by an industrial tribunal that a dismissal was not unfair was inconsistent with a later claim that it was a breach of contract.[9] However the inferred judicial determination must be reasonably clear. As Lane LJ said:[10]

> " ... a case of issue estoppel cannot begin to be established unless it can be ascertained with some degree of precision what it was that the dominant judgment decided".

Because this requirement was not met in that case the decision of the industrial tribunal did not create an issue estoppel which bound the county court in an action for breach of contract. A judgment which grants or refuses relief will necessarily affirm or deny the existence of some cause of action. The decision will give rise to a "cause of action

---

4   See *Shedden v A-G* (1860) 30 LJPM & A 217 (Scottish "declarator" as to pursuer's legitimacy); *Mackintosh v Smith* (1865) 4 Macq 913, HL (Scottish "declarator" of pursuer's sanity); *Taunton Case, Waygood v James* (1869) LR 4 CP 361 (declaration as to validity of parliamentary election); *Stevens v Tillett* (1870) LR 6 CP 147 (the like); *Dundas v Waddell* (1880) 5 App Cas 249 (separate decision in Scottish action of "augmentation" by minister of parish against heritors); *Shoe Machinery Co v Cutlan* [1896] 1 Ch 667 (separate declarations as to validity of patent, and its infringement); *River Ribble Joint Committee v Croston UDC* [1897] 1 QB 251 (declaration that offence had been committed); *Badar Bee v Habib Merican Noordin* [1909] AC 615 (declaration on construction of will).
5   As in *Bernardi v Motteux* (1781) 2 Doug KB 575 (equivocal foreign prize sentence); *Dalgleish v Hodgson* (1831) 7 Bing 495 (findings of foreign prize court so wanting in precision that no estoppel could be founded on them); *Hobbs v Henning* (1865) 17 CBNS 791 (the like) at 822–5; *Harris v Taylor* [1915] 2 KB 580, CA (contradictory recitals as to whether defendant had "appeared").
6   This sentence in the 1st ed was referred to by Somervell LJ in *Re Koenigsberg* [1949] Ch 348 at 363 – "I think this is particularly true of procedure by way of originating summons".
7   *Gregory v Molesworth* (1747) 3 Atk 626.
8   *Shoe Machinery Co v Cutlan* [1896] 1 Ch 667 at 670–1. "It is not necessary ... that there should be an express finding in terms"; *Duedu v Yiboe* [1961] 1 WLR 1040, PC (judgment for possession without express finding on title, but that question necessarily decided); *Chambers v An Bord Pleanala* [1992] IR 134, SC (decision that proceedings not an abuse of process inferentially determined plaintiffs had standing).
9   *Green v Hampshire CC* [1979] ICR 861.
10   *Turner v London Transport* [1977] ICR 952, CA, at 966.

estoppel". But many decisions will necessarily include, as an essential step in their reasoning, determinations which *may* give rise to "issue estoppels".

## Cause of action estoppel

181    The term "cause of action estoppel" was first used by Diplock LJ in *Thoday v Thoday*,[11] who distinguished it from merger saying:[12]

> " ... cause of action estoppel ... prevents a party from asserting or denying as against the other party, the existence of a particular cause of action, the existence or non-existence of which has been determined by a court of competent jurisdiction in previous litigation between the same parties. If the cause of action was determined to exist i.e. judgment was given upon it, it is said to be merged in the judgment. If it was determined not to exist, the unsuccessful plaintiff can no longer assert that it does; he is estopped per rem judicatam".

## Issue estoppel

182    When the decision relied upon did not determine the cause of action sued on in the later proceedings, it may be invoked as determining, as an essential step in its reasoning, some issue in the second. *Issue estoppel* covers fundamental issues determined in an earlier proceeding, which formed the basis of the judgment. The term was coined by Higgins J in 1921 in his (dissenting) judgment in *Hoysted*.[13] It was taken up by Dixon J nearly 20 years later[14] and then by Fullagar J,[15] and has been accepted by the House of Lords.[16] Diplock LJ defined it in *Thoday v Thoday*:[17]

> " ... 'issue estoppel' is an extension of the same rule of public policy. There are many causes of action which can only be established by proving that two or more different conditions are fulfilled. Such causes of action involve as many separate issues between the parties as there are conditions to be fulfilled by the plaintiff in order to establish his causes of action; and there may be cases where the fulfilment of an identical condition is a requirement common to two or more different causes of action. If in litigation upon one such cause of action any of such separate issues as to whether a particular condition has been fulfilled is determined by a court of competent jurisdiction, either on evidence or on admission by a party to the litigation, neither party can, in subsequent litigation between one another upon any cause of action which depends upon the fulfilment of the identical condition, assert that the condition was fulfilled if the court

11   [1964] P 181, CA.
12   At 197–8. In *Workington Harbour Board v Trade Indemnity Co Ltd (No 2)* [1938] 2 All ER 101, HL, where a cause of action estoppel was upheld Lord Atkin at 106 said: "The result is that the plaintiffs, who appear to have had a good cause of action for a considerable sum of money, failed to obtain it, and on what may appear to be technical grounds. Reluctant however as a judge may be to fail to give effect to substantial merits, he has to keep in mind principles established for the protection of litigants from oppressive proceedings. There are solid merits behind the maxim *nemo bis vexari debet pro eadem causa*".
13   (1921) 29 CLR 537 at 561 upheld on appeal [1926] AC 155.
14   *Blair v Curran* (1939) 62 CLR 464 at 531.
15   In *Jackson v Goldsmith* (1950) 81 CLR 446 at 466.
16   In *Carl-Zeiss (No 2)* [1967] 1 AC 853 at 913, 926, 934, 946, 964.
17   [1964] P 181, CA, at 198; cited in *Thrasyvoulou* [1990] 2 AC 273 at 295–6.

has in the first litigation determined that it was not, or deny that it was fulfilled if the court in the first litigation determined that it was".[18]

## The same, and different, causes of action

**183**    The maxim *transit in rem judicatam* prevents a successful plaintiff from re-asserting a cause of action which he succeeded in converting into a judgment. This is the operation of the doctrine of merger. One of its most common manifestations is the finality of damages awards. A plaintiff cannot recover more if the award proves too low, and a defendant cannot recover the excess if it proves too high. On the other hand, the maxim *interest reipublicae ut sit finis litium* denies an unsuccessful plaintiff the opportunity of relitigating a case he has lost. This is *res judicata* estoppel. But where a cause of action has been the subject of final adjudication, determinations of issues which are its essential foundation may be the basis of issue estoppels if another cause of action is set up.[19]

## Evolution of the doctrine[20]

**184**    There is nothing new about issue estoppel, except its name,[21] and that now goes back to 1921.[22] The doctrine dates back to the opinion of the judges, delivered to the House of Lords in the *Duchess of Kingston's Case*.[23] The judgment of Coleridge J in *R v Hartington, Middle Quarter Inhabitants*[24] contains the classic statement of principle. "The judgment" relied upon as a *res judicata* "concludes, not merely as to the point actually decided, but as to a matter which it was necessary to decide, and which was actually decided, as the groundwork of the decision itself, though not then directly the point at issue" and is "conclusive evidence not merely of the facts directly decided, but of those facts which are ... necessary steps to the decision", in the sense that they "are

18  A negative finding that an ultimate fact was not established creates an issue estoppel that it does not exist. *Egri v DRG Australia Ltd* (1988) 19 NSWLR 600, CA.

19  Early examples are *Dacosta v Villa Real* (1734) 2 Stra 961; *Hitchin v Campbell* (1772) 2 Wm Bl 779 where the first action was for trover, and the second for money had and received (at 831: "in this second action there arises the same question of property. The first action has determined the goods not to be the assignee's. He shall not now try whether the money produced by those goods is his or no"), see also para 417 n 58; *Heston Overseers v St Bride Overseers* (1853) 1 E & B 583 (immaterial that one proceeding related to the removal, the other to the maintenance, of the pauper, the controversy being the same); *Routledge v Hislop* (1860) 2 E & E 549 (question the same, whether a servant's dismissal was justified or not, though the first proceeding was an action for damages, and the second a summons for wages before a magistrate under a statute); *Sopwith v Sopwith* (1861) 2 Sw & Tr 160 (question of husband's adultery the same, though, in the one case, the wife was petitioning for judicial separation, and in the other the husband was claiming restitution of conjugal rights); *Doglioni v Crispin* (1866) LR 1 HL 301 at 311 (identity of subject matter established "although the objects of the suits in the two countries were in some degree different"); see also *Blair v Curran* (1939) 62 CLR 464; *Re Koenigsberg* [1949] Ch 348, CA; *Wilson v Matheson* [1955] NZLR 927 at 930.

20  This paragraph from the 2nd ed was cited in *Duhamel v R (No 2)* (1981) 131 DLR (3d) 352 at 358 (Alberta CA); affd (1984) 14 DLR (4th) 92 (SCC); and in *R v Storey* (1978) 140 CLR 364 at 415 by Aickin J.

21  *Carl-Zeiss (No 2)* [1967] 1 AC 853 at 913.

22  Para 182 n 13.

23  (1776) 2 Smith LC (13th edn) 644 at 645: "neither the judgment of a court of concurrent or exclusive jurisdiction is evidence of any matter which came collaterally in question, though within their jurisdiction, nor of any matter incidentally cognisable, nor of any matter to be inferred by argument from the judgment".

24  (1855) 4 E & B 780 at 794–7.

184   *The subject matter of the judicial decision*                                          90

so cardinal to it that, without them, it cannot stand". "Unless they are necessary steps, the rule fails and they are collateral facts". The court rejected the proposition that "the judgment can be evidence only of the very fact actually decided" – which it characterised as "a construction of the language of the celebrated judgment in the *Duchess of Kingston's* case which will not square with several decisions". The rule may be stated: *Where the decision set up as a* res judicata *necessarily involves a judicial determination of some question of law or issue of fact, in the sense that the decision could not have been legitimately or rationally pronounced by the tribunal without determining that question or issue in a particular way,*[25] *such determination, even though not declared on the face of the decision, constitutes an integral part of it:*[26] *but, beyond these limits, there can be no such thing as a* res judicata *by implication.*

185   The rule has been applied in a variety of instances. The condemnation of goods for offences against the revenue involves a decision of all facts without which there would have been no power to condemn the goods, so as to estop the offender from disputing them in any information afterwards filed against him;[27] affiliation orders presuppose a finding of paternity, but a refusal to make such an order does not involve a decision negativing paternity, because it may have been based on other grounds.[28] An order for the removal of a pauper is conclusive as to matters which are "necessary steps" to the order.[29] In an action by a company for calls, where a verdict was taken for the plaintiff subject to a special case on whether the defendant was a shareholder, and judgment was given for the defendant, this was a decision that he was not,[30] though it would have been otherwise "if the special case had left it open to the court to decide in favour of the defendant upon several grounds".[31] Allowance of a creditor's claim to a lien on debentures involved a decision that the debentures were valid.[32] A conviction of the inhabitants of a township for non-repair of a road was a decision that it was a highway, because otherwise there would have been no jurisdiction to convict; but an acquittal does not involve a decision that it was not a highway, because it may have proceeded upon other grounds,

---

25   *Hoystead* [1926] AC 155. This case, no longer an authority in revenue cases (see *Caffoor v Income Tax Comr* [1961] AC 584), contains a valuable exposition of the general principles governing issue estoppel. At 170 Lord Shaw said "if in any court of competent jurisdiction a decision is reached, a party is estopped from questioning it in a new legal proceeding. But the principle also extends to any point, whether of assumption or admission, which was in substance the ratio of and fundamental to the decision".

26   In *Jaeger Co Ltd v Jaeger* (1929) 46 RPC 336 Sankey LJ said at 349: "The best statement of *res judicata* is probably that to be found in the *Digest of the Laws of Evidence* by the late Stephen J. He says in the 41st Article: 'Every judgment is conclusive proof as against parties and privies of facts directly in issue in the case, actually decided by the court, and appearing from the judgment itself to be the ground on which it was based; unless evidence was admitted in the action in which the judgment was delivered, which is excluded in the action in which that judgment is intended to be proved.' Now it will be observed that there are three conditions laid down there: the facts (1) directly in issue in the case; (2) actually decided by the court; and (3) appearing from the judgment itself to be the ground on which it was based. That does not mean the mere formal judgment as drawn up, but the judgment as delivered."

27   *Scott v Shearman* (1775) 2 Wm Bl 977; *R v Matthews* (1797) 5 Price 202n (condemnation of boat for having smuggled goods on board conclusive evidence of smuggling, ownership of the boat and forfeiture of bond given by defendant that boat should not be employed in smuggling); *A-G v Wakefield* (1797) ibid (condemnation of paper conclusive evidence it was liable to duty, and had left the defendant's mill before it had been charged, and account taken by officer); *A-G v Reynolds* (1804) ibid, 203n (condemnation of calico conclusive evidence that pieces had not been measured, marked, and stamped by officer).

28   Para 58.

29   Para 241.

30   *Re Bank of Hindustan, China, and Japan* (1873) 9 Ch App 1 at 25–6.

31   Ibid at 26.

32   *Cox v Dublin City Distillery Co Ltd (No 3)* [1917] 1 IR 203 at 224–9.

such as failure to prove non-repair.[33] On an application by a local authority for an order for payment of a frontager's contribution to the repair of a road, a decision in favour of the respondent does not involve a decision that it was a highway repairable by the inhabitants at large, this not being a "necessary step" to the decision.[34]

A judgment for damages in an action for trespass to land necessarily affirms the plaintiff's right to possession, but does not necessarily involve a decision as to title;[35] whilst a judgment for the plaintiff in ejectment, though a decision on title, is not a decision as to issues such as length of occupation, value of the premises, and the like.[36] A judgment in a probate suit does not involve any decision as to the domicile of the testator.[37] An order made by a master in an administration action for the transfer of funds to a particular account is not an inferential declaration of right.[38] A judgment against the will in an action for probate in solemn form in which the statement of claim alleged that the defendant was the widow of the testator, did not estop the parties from alleging that she was not.[39] An agreement to pay compensation registered under the Workmen's Compensation Acts estopped the employer from disputing liability for the accident; but not from contending that the worker's later death did not result from it.[40]

**186**    On an application for production of documents by a company, the court refused the order although it held there was power to make it. The decision did not estop the company on the question of power because no ruling against it could be essential to a judgment in its favour.[41] So, too, in Australia where in a suit between a fruit merchant and the Commonwealth a contention that a statutory provision was *ultra vires* had been rejected by the court which gave judgment for the plaintiff on other grounds, he was not estopped for the adverse decision was not necessary to the judgment in his favour.[42] A certificate by an officer of the court not necessary to the ultimate decision is not part of that decision.[43]

---

33  *R v Haughton Inhabitants* (1853) 1 E & B 501 at 514.
34  *R v Hutchings* (1881) 6 QBD 300, CA, at 305; *North Eastern Rly Co v Dalton Overseers* [1898] 2 QB 66 at 73–4 and see paras 115–16.
35  *Outram v Morewood* (1803) 3 East 346 at 357, 366. See also *Duedu v Yiboe* [1961] 1 WLR 1040, PC.
36  *Aslin v Parkin* (1758) 2 Burr 665 at 668; *Burnham v Carroll Musgrove Theatres Ltd* (1928) 41 CLR 540.
37  *Concha v Concha* (1886) 11 App Cas 541 at 552 per Lord Herschell: "This point in the judgment of the Probate Court was not open to appeal because it was not essential to the decision; how then can it be said that it was a matter which bound the parties?"
38  *Thompson v Thompson* [1923] 2 Ch 205 at 213–15.
39  *Part's Estate* [1954] P 89 at 94–5; the case went to appeal (ibid at 112) and the judgment was affirmed but the estoppel point was not argued.
40  *Cleverley v Gas Light and Coke Co* (1907) 24 TLR 93. See also *O'Donel v Comr for Road Transport* (1938) 59 CLR 744 considered para 199 n 153.
41  *Penn-Texas Corpn v Murat Anstalt (No 2)* [1964] 2 QB 647, CA, at 660 per Denning MR: "One of the tests in seeing whether a matter was necessary to the decision, or only incidental to it, is to ask: could the party have appealed from it? If he could have appealed, and did not, he is bound by it. ... If he could not have appealed from it (because it did not affect the order made) then it is only an incidental matter, not essential to the decision, and he is not bound". See also para 185 n 37.
42  *James v Commonwealth* (1935) 52 CLR 570. "Although the Court ruled that he was wrong upon his first ground, he is not estopped, because the decision passed in his favour. He could not appeal from the court's ruling" – per Rich J at 584. "In one sense it is true that the question was decided against him. He submitted the contention to the Court which announced an opinion that he was wrong; but that opinion was not translated into a decree or order, because upon an independent contention he succeeded. There was no judgment from which he could seek special leave to appeal, none which estopped him" – per Dixon J at 590–1.
43  *Mountcashell's Estate* [1920] 1 IR 1 at 5–6.

The authorities on the effect of sentences of the ecclesiastical courts are valuable illustrations of these principles,[44] and include one of the leading authorities. Other cases illustrative of the principles on which a decision of a question may legitimately be inferred, are those relating to orders in lunacy,[45] decisions of the General Medical Council,[46] and the judgments of English and foreign courts of admiralty.[47] On the other hand a court order approving a property settlement on divorce was held to be no bar to an action by the wife against her former husband for damages for fraud during the negotiations, no such question having been raised in the earlier proceedings.[48]

## Judgments by consent: bare dismissals: reversals on appeal

187    The conditions under which a decision may be involved in judgments or orders by consent,[49] bare dismissals,[50] or reversals on appeal,[51] have already been considered.

---

44  In *Blackham's Case* (1709) 1 Salk 290 the defendant having proved that goods belonged to Jane B in her lifetime, and he had taken out letters of administration to her estate, the plaintiff set up a marriage between himself and Jane, and the defendant replied estoppel, in that the Spiritual Court could not have made the grant except upon the supposition that there had been no such marriage; but it was held that this was a merely "collateral matter" (per Holt CJ at 290–1: "a matter which has directly been determined by their sentence cannot be gainsaid: their sentence is conclusive in such cases, and no evidence shall be admitted to prove the contrary; but that is ... only in the point directly tried; otherwise it is if a collateral matter be collected or inferred from the sentence, as in this case"). That statement of principle was followed in *Bouchier v Taylor* (1776) Hargrave's Law Tracts 472, HL, and *Barrs v Jackson* (1845) 1 Ph 582, the decision being explained on the ground that the marriage had not been in issue. See *Barrs v Jackson* at 589. The report of the former case in 4 Brown PC 708 is a mere register of the result. For the arguments and speeches, resort must be had to Hargrave's *Collection of Tracts* at 499 *et seq* "concerning the effect of sentences of courts ecclesiastical, ... when pleaded, or offered in evidence, in the courts temporal", founded on the notes made by him as junior counsel for the prosecutors in the *Duchess of Kington's Case*. At 473–6 n. he sets out the Case and Reasons of the appellant (for whom he had acted as junior counsel) in *Bouchier v Taylor* and at 472–5 states the ground of the decision: "Alice Merchant, as first cousin, and Dr Bouchier, as first cousin once removed, had been competitors in the Prerogative court for administration to ... an intestate; and AM dying during the suit, her executors became parties, and a sentence was at last pronounced, declaring that they had failed in proving her next of kin, and therefore directing administration to be granted to Dr B. Several years after, Taylor, who was AM's residuary legatee, and not a party to the suit about administration, filed a bill in chancery against Dr B for a distribution, and, though he had pleaded the sentence, the present Master of the Rolls granted an issue to try whether AM was next of kin, and his order was confirmed by the Lord Chancellor". "But Dr B appealed to the Lords; and before them two points were made: one being, whether the sentence of the ecclesiastical court was not conclusive". "On the hearing, the decree was reversed on both grounds ... Lord Mansfield ... in his reasons ... was clear that the sentence was conclusive, notwithstanding the difference, in point of objects, between the two suits; and that the court of chancery, in exercising its concurrent jurisdiction as to distribution, was concluded by sentences of the spiritual court in granting administration, and not at liberty to re-examine the points decided in the exercise of that peculiar jurisdiction". This was followed in *Barrs v Jackson* (1845) 1 Ph 582 by Lord Lyndhurst LC, who held, at 587–8, that the case was indistinguishable from *Bouchier v Taylor*.
45  Para 270 n 40.
46  Para 270 n 41.
47  Paras 252, 260–3.
48  *Gipps v Gipps* [1974] 1 NSWLR 259, CA; see also *Worman v Worman* (1889) 43 Ch D 296 (approval of compromise not a decision on breach of trust, that question not being raised).
49  Para 38.
50  Para 56.
51  Para 60 *et seq.*

## Judgments by default

**188**   A judgment by default is a final judgment,[52] and will give rise to a *res judicata* estoppel, although it may be vacated on the application of the defendant or the plaintiff.[53] The extent of the estoppel created by such a judgment must be carefully limited.[54] The defendant is estopped from setting up any defence which was "necessarily and with complete precision" decided by the default judgment.[55]

## Questions not raised in earlier proceedings

**189**   Whenever the party against whom a decision is pronounced failed to raise some question he could have raised without detriment to his interests which it was his duty to raise, the adverse decision includes an adverse decision on the omitted question. The leading authority is *Henderson* where Wigram VC said:[56]

> " ... I believe I state the rule of the court correctly when I say that, where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of *res judicata* applies, except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time".

This passage has been applied in decisions of the highest authority. In *Hoystead*[57] it was applied to assumptions fundamental to a judgment. Lord Shaw said:[58]

> "it is settled, first, that the admission of a fact fundamental to the decision arrived at cannot be withdrawn and a fresh litigation started, with a view of obtaining another judgment upon a different assumption of fact; secondly, the same principle applies not only to an erroneous admission of a fundamental fact, but to an erroneous assumption as to the legal quality of that fact. Parties are not permitted to begin fresh litigations because of new views they may entertain

---

52   *Huffer v Allen* (1866) LR 2 Exch 15. The point is taken for granted in *New Brunswick* (below) and see also *Tira Arika v Sidaway* [1923] NZLR 158 and *Linprint Pty Ltd v Hexham Textiles Pty Ltd* (1991) 23 NSWLR 508, CA at 517–18 noted para 163 n 61.

53   See para 424 n 33.

54   See *Ripley v Arthur & Co* (1902) 86 LT 735, CA, at 736, considered para 177 n 1.

55   *New Brunswick* [1939] AC 1 at 21; *Kok Hoong* [1964] AC 993 at 1012. This topic is considered in paras 48–9.

56   (1843) 3 Hare 100 at 114–15, considered para 444. For a case where an omission formed the basis of an estoppel see *Fidelitas Shipping* [1966] 1 QB 630, CA, at 649. For an Australian case in which an assumption did not found an estoppel see *Vitosh v Brisbane CC* (1955) 93 CLR 622 at 628. An application was made for mandamus to compel the council to exercise its discretion under a resolution. An action was then brought for a declaration that the resolution was invalid.

57   [1926] AC 155. Its authority in revenue cases was destroyed in *Caffoor v Income Tax Comr* [1961] AC 584, but it retains its authority as a statement of general principle.

58   Ibid at 165–6.

of the law of the case, or new versions which they present as to what should be a proper apprehension by the court of the legal result either of the construction of the documents or the weight of certain circumstances. If this were permitted litigation would have no end, except when legal ingenuity is exhausted. It is a principle of law that this cannot be permitted, and there is abundant authority reiterating that principle. Thirdly, the same principle – namely, that of setting to rest rights of litigants, applies to the case where a point, fundamental to the decision, taken or assumed by the plaintiff and traversable by the defendant, has not been traversed. In that case also a defendant is bound by the judgment, although it may be true enough that subsequent light or ingenuity might suggest some traverse which had not been taken. The same principle of setting parties' rights to rest applies and estoppel occurs".

But though this principle is generally applicable even where judgment has been given by consent, or on admissions, it may be excluded in "special circumstances".[59] This is particularly relevant to default judgments; for there is an obvious difference between such a judgment and one where the unsuccessful party has contested the substantive decision, although he may make some admission in the process.[60]

This exception was applied in *Arnold*.[61] The parties entered into a 32-year lease which provided for rent reviews. On the first review the arbitrator assessed the rent on the basis that it could be reviewed. Walton J reversed this decision, holding that the hypothetical lease for the balance of the term contained no provision for any rent review. The tenant sought leave to appeal and a certificate under section 1(7)(b) of the Arbitration Act 1979 from the judge, but these were refused. The tenant then applied to the Court of Appeal which held that it had no power to grant leave to appeal. At the next rent review the tenant challenged this interpretation but was met with a plea of issue estoppel which failed because of the special circumstances. These included the bizarre construction adopted by Walton J which had been rejected in later cases, and the absence of a right of appeal, blocked by statute and the refusal of a certificate which had been wrong if not perverse[62] having regard to the amounts involved, the continuing importance of the question, and the debatable nature of the decision.

The principal speech was by Lord Keith who held that while the bar created by merger and cause of action estoppel was absolute[63] it was not so with issue estoppel.[64] He said:[65]

> "... there may be an exception to issue estoppel in the special circumstance that there has become available to a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings. One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in special circumstances inflexible application of it may have the opposite result".

59  *Henderson* n 56 above. The words in the text from the 1st ed were adopted by Lord Maugham LC in *New Brunswick* [1939] AC 1 at 21. See also *Fidelitas Shipping* (above) per Denning MR at 640: "this is not an inflexible rule".
60  *New Brunswick* at 28, 38 and *Kok Hoong* [1964] AC 993 at 1012.
61  [1991] 2 AC 93. Claims that special circumstances existed failed in *Talbot v Berkshire CC* [1994] QB 290, CA, and in the *Indian Endurance (No 2)* [1996] 3 All ER 641, CA. Such a claim succeeded where the Supreme Court of Canada later disapproved a separate decision made in proceedings which were stiill pending. See *Hockin v Bank of BC* (1995) 123 DLR (4th) 538 (BCCA) at 552.
62  Ibid at 110.
63  Ibid at 104. See also *Chamberlain v DCT* (1988) 164 CLR 502.
64  Ibid at 106, 107.
65  Ibid at 109.

It will be important to keep this exception within narrow limits to avoid undermining the general rule and provoking increased litigation and uncertainty.[65a] Although the House relied upon a number of matters in finding that special circumstances existed it is submitted that the decisive factor was the absence of an effective right of appeal from Walton J. If a right of appeal had existed the general rule should have been applied and the estoppel enforced.[66] The case would have then been within the principle stated by Lord Macnaghten:[67]

> "If the decision was wrong, it ought to have been appealed from in due time. Nor can the [interested parties] be heard to say that the value of the subject matter on which the former decision was pronounced was comparatively so trifling that it was not worth their while to appeal from it. If such a plea were admissible there would be no finality in litigation. The importance of a judicial decision is not to be measured by the pecuniary value of the particular item in dispute".

**190**     Where a defendant, sued as executor or administrator, fails to plead *plene administravit*,[68] or where a defendant, in an action for infringement of a patent, having pleaded want of novelty did not rely on a relevant specification,[69] the adverse judgment covered the point he failed to raise. So if a plaintiff claims relief on a particular basis, an adverse decision will extend to related claims arising out of substantially the same facts.[70] Where a plaintiff complained of the infringement of a right to go upon a river bank under a prescriptive right to use both banks, dismissal of the action involved a decision that he had no right on either bank.[71] A Scottish action of declarator of marriage was brought on two grounds, only one of which the pursuer attempted to establish. It was held that a judgment for the defender imported a decision against the pursuer on both.[72]

---

65a See also *Dublin Corpn v Building and Allied Trade Union* (24 July 1996, unreported) where the Irish Supreme Court rejected a claim that special circumstances existed which should allow an action for restitution of compensation paid under an award. See also para 454 n 166a.

66 As Staughton LJ said [1990] Ch 573 at 598: "it cannot by itself be enough that the previous decision was arguably wrong in law; nor, in my judgment, is it by itself enough that the previous decision was plainly wrong in law. The remedy for such errors is that provided by the appellate process".

67 *Badar Bee v Habib Merican Noordin* [1909] AC 615 at 623. See also the cases deciding that there is no issue estoppel as to findings against the successful party who could not appeal: para 186 nn 41–2, para 205.

68 *Erving v Peters* (1790) 3 Term Rep 685 at 693 ("if an executor may plead *plene administravit*, and neglect to do so, I see no difference between such a case and one where he does so plead, and the plea is found against him"); *Palmer v Waller* (1836) 1 M & W 689. See also *Jewsbury v Mummery* (1872) LR 8 CP 56, Ex Ch (The plaintiff recovered judgment against the defendant, as executor, after the issue of *plene administravit* had been found for the plaintiff. The plaintiff sued again suggesting a *devastavit*. The defendant pleaded that the acts complained of as a *devastavit* had been done with the plaintiff's leave. The plaintiff relied upon the earlier judgment as an estoppel and it was held (at 60) that "if the defendant could have shown … that, though assets had come to his hands, he had parted with them under circumstances which precluded the plaintiff from alleging that they had not been duly administered, clearly that would have been a defence under the plea of *plene administravit*". Not having raised this point the defendant was estopped (at 61–2). See also *Levy v Kum Chah* (1936) 56 CLR 159 at 168–9 where Dixon and Evatt JJ considered the position of an executor sued for a debt of the testator who fails to plead *plene administravit*. If the creditor recovers, the judgment establishes that the executor has been in possession of assets of the testator available to satisfy the debt and if it is not paid, the executor becomes liable to satisfy it out of his own assets.

69 *Shoe Machinery Co v Cutlan* [1896] 1 Ch 667 at 672.

70 In *Blake v O'Kelly* (1874) IR 9 Eq 54 at 56–7.

71 *Long v Gowlett* [1923] 2 Ch 177 at 193–4. The situation would be different if there was a finding that the right had not been interfered with.

72 *Lockyer v Ferryman* (1877) 2 App Cas 519.