**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- X

DK ACQUISITION PARTNERS, L.P.,
KENSINGTON INTERNATIONAL LIMITED,
RUSHMORE CAPITAL-I, L.L.C., RUSHMORE
CAPITAL-II, L.L.C., and SPRINGFIELD
ASSOCIATES, LLC.,

                                    Plaintiffs,

                   v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, J.P. MORGAN SECURITIES,
INC., CITIGROUP INC., CITIBANK, N.A. and
CITIGROUP GLOBAL MARKETS, INC. f/k/a
Salomon Smith Barney,

                               Defendants.

------------------------------------------------------------- X

Civil Action No. 08 Civ. 0446 (LTS)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS**
**JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., AND J.P.**
**MORGAN SECURITIES, INC.'s MOTION FOR SUMMARY JUDGMENT**
**WITH RESPECT TO PLAINTIFFS' CLAIMS BASED ON WESTLB DEBT**

# Part III of III

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
*Attorneys for Defendants JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., and J.P. Morgan*
*Securities Inc.*

# APPENDIX OF ENGLISH CASES AND

# AUTHORITIES

## TAB 8 (Part 3 of 5)

It was thrown out, indeed, in argument, that we were bound to consider him as a principal debtor and not as a surety upon this bond, the obligatory part of the bond being joint and several without any reference to either being surety or principal. But, for the purpose of seeing the relation of the parties, we must look at the condition of the bond, as set out upon the pleadings, which plainly discloses that the defendant was a surety for the liabilities of Brown.

If the question, whether a covenant not to sue, qualified by such a proviso as that in the present case, and entered into by the creditor without the consent of the surety, discharges the surety, were a new one unaffected by authority, we should pause before deciding that such a case does not fall within the general rule of the creditor discharging a surety by entering into a binding agree-[779]-ment to give time to his principal debtor ; and we should have thought the forcible observations of Lord Truro in the recent case of *Owen* v. *Homan* (3 Macn. & G. 378) entitled to much consideration. We find, however, that the Court of Exchequer in a solemn and well considered judgment, in the case of *Kearsley* v. *Cole* (16 M. & W. 128, 136), after referring to all the authorities, states that the point must "be considered as settled :" and they rest their judgment upon this, although it was not necessary to decide it, as the surety in that case had consented to the deed : which consent they treat indeed as an additional reason ; but they expressly state that it was not necessary. They state that they "do not mean to intimate any doubt as to the effect of a reserve of remedies without such consent ;" and they add that "the cases are numerous that it prevents the discharge of a surety, which would otherwise be the result of a composition with or giving time to a debtor by a binding instrument ;" and they then explain how it is that, in their judgment, the reserve of remedies has that effect. After this judgment, and after the strong expression of opinion by the present Lord Chancellor in his judgment in the House of Lords in the case of *Owen* v. *Homan* (4 H. L. Ca. 1037), where he dissents from the remarks made by Lord Truro in the Court below, and states that, but for those remarks, he should have thought that the principle contended for by the plaintiffs was "a matter beyond doubt," we think that we ought to consider the law on this subject as settled, at least until it is questioned in a Court of error.

It seems to be the result of the authorities that a covenant not to sue, qualified by a reserve of the [780] remedies against sureties, is to allow the surety to retain all his remedies over against the principal debtor ; and that the covenant not to sue is to operate only so far as the rights of the surety may not be affected.

Probably many deeds of this nature are framed continually on the supposition that the law has been supposed to be settled, in the manner stated in the Exchequer, since the time of Lord Eldon : and we think that, sitting as a Court of coordinate jurisdiction with the Exchequer, we ought not to disturb the law stated by them in a solemn judgment to be clearly settled.

Our judgment, therefore, upon the demurrer in the present case is in favour of the plaintiff.

Judgment for the plaintiff.

*1949. 1 Ch. 361.*

THE QUEEN *against* THE INHABITANTS OF THE TOWNSHIP OF HARTINGTON MIDDLE QUARTER. Thursday, February 22d, 1855. Two pauper children were removed from L. to H. by an order of justices, which described them as the lawful children of William G. and Esther G. The order was not appealed against.—Afterwards, Esther G. was received into an asylum, being sent thither from L., as a pauper lunatic ; and subsequently two justices, on inquiry, adjudicated that the settlement of Esther G. was in H., and made an order of maintenance accordingly. H. having appealed, the order was confirmed by the Sessions, subject to a case which stated the above facts, and which also found that the two children were, at the time of the first order, unemancipated, and were, by that order, adjudged to be settled in H. on the ground of William G.'s settlement in H. (which facts did not appear by the order), and also that in fact Easter G. was not settled in H.—Held : that the first order, unappealed against, was conclusive proof that Esther G. was settled in H. : and the order of Sessions was confirmed.

[S. C. 3 C. L. R. 554 ; 24 L. J. M. C. 98 ; 1 Jur. N. S. 586 ; 3 W. R. 285. Doubted, *R.* v. *Hutchings*, 1881, 6 Q. B. D. 303. Referred to, *De Mora* v. *Concha*, 1885-86,

29 Ch. D. 301; 11 App. Cas. 541. Discussed, *Irish Land Commissioners* v. *Ryan*, [1900] 2 Ir. R. 574; *Wakefield Corporation* v. *Cooke*, [1903] 1 K. B. 424.]

Two justices of Lancashire made an order, dated 2d March 1854, which recited that, on 15th February 1848, Esther Gould, a pauper lunatic, was sent [781] to and received into the county lunatic asylum at Lancaster, and had ever since been, and then was, confined therein; and that the said justices had duly inquired into her last legal settlement; and satisfactory evidence had been obtained that the settlement was in the parish, township or place of Hartington Middle Quarter in the Bakewell Union in Derbyshire: and the justices found that E. G. was a pauper lunatic, and was then confined in the said asylum, and did, by that their order, adjudge that her last legal settlement was in Hartington Middle Quarter; and that the guardians of the Chorlton Union in Lancashire, which included the township of Levenshulme from which E. G. was sent to the said asylum, had incurred expences about her examination &c., and had paid to the treasurer of the asylum a sum for her lodging &c. in the asylum: and the justices ordered that the guardians of the Bakewell Union should pay the amount of such expences and payment to the treasurer, and should also pay to the treasurer, for the reasonable charges of the future lodging &c., the sum of &c., weekly, or such other weekly sum &c.

The overseers of Hartington Middle Quarter having appealed against this order, the Sessions confirmed the order, subject to the opinion of this Court upon a case.

The case set out the order, and proceeded as follows.

It is admitted that the grounds of removal on the one side, and the grounds of appeal on the other side, were sufficient to raise the point on which either side relied at the trial, and which is reserved for the opinion of the Court of Queen's Bench.

The respondents, in support of their case, produced an order of removal, of which the following is a copy.

[782] "To the overseers of the poor of the township of Levenshulme, in the county of Lancaster, and to the churchwardens and overseers of the poor of the parish, township or place of Hartington Middle Quarter in the county of Derby, and to each and every of them.

"County of Lancaster, to wit.—Whereas complaint hath this day been made, at Salford in the county of Lancaster, unto us, Henry Leigh Trafford and Paul Moon James, Esquires, whose names are hereunto set and seals affixed, being two of Her Majesty's justices of the peace, of, in and for the said county of Lancaster, acting together in and for the same county (one whereof is the quorum), by the overseers of the poor of the said township of Levenshulme, that John Gould, aged eleven years, and William Gould, aged five years, or thereabouts, the lawful children of William Gould and Esther Gould, absent, having come to inhabit, and are now inhabiting, in the said township of Levenshulme, not having resided in the said township for five years next before the time of the application for this our warrant and order, and not having gained a legal settlement there, nor having produced any certificate acknowledging them to be settled elsewhere, and, further, that the said John Gould, aged eleven years, and William Gould, aged five years, have become and now are actually chargeable to, and receiving relief from, the said township of Levenshulme: Now we, the justices aforesaid, upon due proof thereof, as well by examination of witnesses upon oath, as otherwise, and upon due consideration of the premises, do hereby adjudge the said complaint, and all and singular the premises, to be true, and do also adjudge that the place of the last legal settlement of the said John Gould and William Gould is [783] in the said parish, township or place of Hartington Middle Quarter in the said county of Derby; and that the said John Gould and William Gould have not become chargeable to the said township of Levenshulme in respect of relief made necessary by sickness or accident. These are therefore, in Her Majesty's name, to require and order that you, the said overseers of the poor of the said township of Levenshulme, do remove and convey the said John Gould and William Gould, from and out of your said township of Levenshulme, to the said parish, township or place of Hartington Middle Quarter, and deliver them, together with this our order, or a duplicate or true copy thereof, unto the churchwardens and overseers of the poor there, or one of them, who are hereby required to receive the said John Gould and William Gould, and provide for them according to law. Given" &c., 11th October 1849. (Signed and sealed by the two justices.)

It is admitted that this last mentioned order is a good and valid order, and was made by justices having jurisdiction to make it. That the township of Hartington Middle Quarter, mentioned in it, is the appellant township, and the township of Levenshulme, mentioned in it, is the respondent township in this appeal. That the Esther Gould mentioned in it is the Esther Gould mentioned in the order appealed against; and that the William Gould, described in each of the orders as her husband, is the same person. And that the children mentioned in the order of 11th October, namely John Gould and William Gould, were, at the time of the making of the same order, unemancipated, and, by the same order, were, adjudged to be settled in the appellant [784] township in right of the settlement therein of the said William Gould, their father. That the said children John Gould and William Gould were removed, under the said order, to the appellant township on 27th November 1849, and were received by the appellant township, when so removed: and that the said order of 11th October 1849 never was appealed against.

In fact, neither the said William Gould nor the said Esther Gould ever gained any settlement on his or her own account. The said William Gould, the husband of the said Esther Gould, was born in the township of Hartington Town Quarter, and was the son of John Gould. There was no evidence, on the hearing of the said appeal, proving any settlement except as aforesaid. On 22d October 1849, and shortly before the said children John Gould and William Gould were removed, under the order of 11th October 1849, to the appellant township, Thomas Cocker, one of the then overseers of the appellant township, wrote and sent to the overseers of the township of Levenshulme the following letter.

"Hartington Middle Quarter. Oct. 22 1849. Gentlemen: As overseer of the parish of Hartington Middle Quarter, in the Bakewell Union, I am in receipt of orders of removal of John Gould and William Gould from the parish of Levenshulme to the said parish of Hartington Middle Quarter. I now beg to state, for your information, that the said paupers have no claim in our parish to a settlement; but their settlement is in the parish of Hartington Town Quarter, in the Ashbourne Union, derived from their grandfather John Gould, whose settlement is admitted, and whose son (the father of these two children) never gained a settlement elsewhere. I have [785] no doubt the mistake arises in consequence of the parish of Hartington being divided into four quarters. I therefore hope you will not needlessly send them here.—I am, Gentlemen, Your's obediently,     "THOMAS COCKER."

The overseers of the removing township, having no proof of the settlement in this letter, removed the two paupers as before mentioned. The Sessions, on the trial of the appeal, was of opinion that the settlement of the pauper, Esther Gould, was in fact in the township of Hartington Town Quarter, and not in the appellant township; but that the appellants were concluded by the order of 11th October 1849, unappealed against, and the removal, under it, of the children John and William Gould to the appellant township, and their reception there.

If the Court of Queen's Bench should be of opinion that the appellant township is so concluded, then the order of Sessions and the order of 2d March 1854, appealed against, are respectively to be confirmed, otherwise both the said orders are to be set aside.

The case was argued in last Michaelmas Term (a).

Edward James and Monk, in support of the order of Sessions. The order of 1849, being unappealed against, as conclusive as to the settlement of the two children. Now they were removed on the ground of their father's settlement. The order, therefore, is conclusive as to the settlement of the father; and the settlement of the pauper lunatic, Esther Gould, is of course that of the father, her husband. It does not appear that there is any decision precisely in point. In *Rex* v. *Towcester* (Cald. 497) a married woman was removed, and the order of removal [786] was not appealed against; and this was treated as conclusive of the husband's settlement, though she was not described in the order as his wife. It is true that the case was not argued; it was decided on the authority of *Rex* v. *Hinxworth* (Cald. 42), where the order did describe the woman removed as the wife of the pauper whose settlement afterwards came in question. In *Rex* v. *Rudgeley* (8 T. R. 620) an order of removal of a woman therein

---

(a) Before Lord Campbell C.J., Coleridge, Wightman and Erle Js.

described as "widow" was, not being appealed against, held to be conclusive as to the settlement of the husband who at the time of that order had been supposed to be dead: and there Grose J. expressed his opinion that the reason of there being no argument in *Rex* v. *Towcester* (Cald. 497) was that the case was thought too clear to be resisted. Here the order of 1849 describes the parties removed as the children of William Gould and Esther Gould. That the settlement of the children rested on the settlement of the father appears, not only from the express statement in the case, but from the letter of the overseer of Hartington Middle Quarter. [Lord Campbell C.J. I do not see that either party can use that letter.] It shews, at any rate, that they were not removed on the ground of a birth settlement. [Lord Campbell C.J. An estoppel is strictissimi juris. Is the inference here inevitable? Coleridge J. If you go beyond what is in the order itself, do you not let in all other evidence? The point was discussed in *Regina* v. *Sow* (4 Q. B. 93).] In that case it was sought to make an order, removing the pauper's brother, evidence of the pauper's settlement by means of the examinations which shewed the settlement of the father of the two: but the Court held that this was collateral matter, as it manifestly was. **[787]** But here the case states the ground of the removal. [Lord Campbell C.J. But does the order itself shew the ground?] It does so, unless the description of the children be treated as words irrelevant to the subject matter of the order. The settlement of unemancipated children is that of the father, primâ facie: a birth settlement is good only where the father's settlement fails. Matter subsequently arising is of course an answer, as in *Regina* v. *Wye* (7 A. & E. 761), where evidence of an order, confirmed on appeal, treating D. and E. as man and wife, was held to be met by proof that the marriage had since the order been set aside as incestuous. The cases are collected in Archbold's Poor Law, 801-809 (7th ed.) [Coleridge J. *Regina* v. *Wye* (7 A. & E. 761) left the general rule untouched: The Court said that "numerous cases have decided that orders of removal, unappealed against or confirmed on appeal, are, not only evidence, but conclusive, as to all the facts mentioned in them, and which are necessary steps to the decision; and the judgment specifies, as instances, marriage, the legitimacy of children, including children emancipated at the date of the order, and children unborn at the *time*.] The order of the justices in this case, unappealed against, is tantamount to an adjudication; and the adjudication must have been on the ground on which the removal took place, because, in 1849, the evidence on appeal could not have raised any ground not raised by the examinations. In *Overseers of Heston* v. *Overseers of St. Brides* (1 E. & B. 583) an order, removing a married woman to Heston, the ground of removal being her husband's settlement in Heston, was quashed: and on a subsequent appeal, between the same parishes, against an order of maintenance adjudging the **[788]** husband, a lunatic, to be settled in Heston, the discharge of the first order was held to be conclusive against his settlement in Heston.

Pashley and Scotland, contrà. The rule undoubtedly is that the receiving by a parish of a pauper, removed under an order, admits his settlement, and consequently that of his children. But, if it is to prove the settlement of his father, it is not easy to see where the doctrine is to stop; why, for instance, it should not be taken as proof of the settlement of any remote ancestor. It is new to insist upon an estoppel as to matters only primâ facie involved in the order: and, if the rule be confined to matters which are necessarily so involved, it will not apply here; because the order might have been made upon a birth settlement of the children, settlement by estate, by apprenticeship, settlement in respect of the mother's maiden settlement if the father had none. [Coleridge J. The statement in the case, if we can act upon it, goes further.] That amounts merely to a finding of the Sessions upon parol evidence. [Coleridge J. The principle is that an order not appealed against, or an adjudication, is conclusive as to all the facts which it decides. Now, as these documents are generally short, and seldom shew the ground of decision, is not evidence admissible for the purpose of supplying that?] It is admissible for the purpose of shewing what the decision was, but not for the purpose of shewing the ratio decidendi. *Overseers of Heston* v. *Overseers of St. Brides* (1 E. & B. 583) illustrates this. The quashing of the order of removal there would not shew what was decided: but the grounds of removal shewed that the question decided was that the husband was not settled. The point, however, for **[789]** which that case has been cited on the other side really was not discussed: the principle as to orders of removal was assumed; and the only question was whether the estoppel applied to orders of maintenance of a pauper lunatic. Now here the

did not determine the validity of a will did not preclude the unsuccessful party from impugning its validity in subsequent proceedings;[132] and a decision that a clause in a will is not void for uncertainty creates no estoppel against a contention that it is void for perpetuity.[133] A declarator in Scottish proceedings that during a certain period a person was *compos mentis* did not estop a defendant sued for his illegal detention from asserting statutory authority.[134] A decision that royalties were the bankrupt's personal earnings did not preclude the trustee from claiming that they were in excess of what was required for the maintenance of the bankrupt and his family, and to that extent divisible amongst his creditors.[135] A judgment holding an underlessee liable for injury to the plaintiff's reversion by breaches of repairing covenants did not preclude the underlessor from claiming, as damages for breach of a covenant to deliver up in good repair, the amount required to put the premises into the covenanted state of repair less the amount previously awarded.[136] A judgment in the ecclesiastical court repelling a libel by the husband of his wife for adultery did not estop the husband when sued for restitution of conjugal rights from setting up the same adultery because a lower standard of proof applied.[137]

Where an action on promissory notes accepted as conditional payment failed because of material alterations to the notes, this was no bar to an action to recover the consideration. The claims arose out of the same transaction but were in respect of different causes of action.[138]

In New Zealand where the taxpayer had been acquitted on a charge brought by the Commissioner of wilfully making a false tax return this was no bar to a civil claim by the Commissioner that the return was fraudulent or wilfully misleading, for the issues were not identical and the onus of proof was different.[139]

A wife having sued for maintenance under a deed of separation the husband sought to have the deed set aside for her fraud in concealing adultery. In the first action the husband failed to prove the adultery relied on. In a later action for further instalments the court held that he could rely on other acts of which he had no knowledge at the time of the first action.[140] Where a wife's charge of cruelty has been dismissed by justices, there was no estoppel preventing her from leading the same evidence together with other evidence covering a later period to establish cruelty at a later date, for: "The conduct which is alleged to amount to persistent cruelty can only be judged in the light of the whole course of conduct and the mere fact that at an earlier stage, when the conduct was only partly completed, a court has adjudged that at that point it does not amount to persistent cruelty, does not shut that evidence out forever".[141]

---

132  *Bainbrigge v Baddeley* (1847) 2 Ph 705 at 709. Contrast *Beardsley v Beardsley* [1899] 1 QB 746, at 749: "the question decided was the validity of the will; the issue of fact is the same, whether the will relates to real or to personal property".
133  *Kennedy v Kennedy* [1914] AC 215 at 220.
134  *Mackintosh v Smith* (1865) 4 Macq 913, HL, deciding that if the defenders had acted pursuant to statutory authority, it did not matter how sane the pursuer was, while if they had not, it did not matter how insane.
135  *Re Graydon* [1896] 1 QB 417.
136  *Ebbetts v Conquest* (1900) 82 LT 560 at 572.
137  *Moore v Moore* (1840) 3 Moo PCC 84 at 86–7.
138  *Saminathan v Palaniappa* [1914] AC 618.
139  *Maxwell v IRC* [1962] NZLR 683, CA. See as to the standard of proof of a crime in civil proceedings *Nishina Trading v Chiyoda Fire Co* [1969] 2 QB 449, CA; *Rejfek v McElroy* (1965) 112 CLR 517.
140  *Ord v Ord* [1923] 2 KB 432: "in order to see what he must admit the truth of, one has always to see what was the precise question, the precise point, that has been decided" per Lush J at 440.
141  *Richards v Richards* [1953] P 36 at 40.

In *Wright v Bennett*[142] a plaintiff, having failed in an action for fraudulent misrepresentation, began a second action for conspiracy covering substantially the same ground. The action was struck out for abuse of process without deciding that a plea of *res judicata* must have succeeded.[143]

A decision refusing an order for possession on the balance of hardship will not bar later proceedings for the factors relevant to hardship may change.[144] A decision that the defendant was not a gipsy did not bar proceedings alleging that he was a gipsy on a later date.[145] The doctrine of issue estoppel therefore does not apply in a changing situation. The Employment Appeals Tribunal has held however that potential for change is not sufficient; thus a finding that a woman was not entitled to equal pay created an issue estoppel against a later claim where there was no appreciable difference in the facts.[146] Generally, the questions cannot be the same unless the point in issue in the later proceedings was also in issue in the earlier.[147]

A striking illustration of the nicety involved in the inquiry as to identity of question is in the contrast between the decisions in *Hoystead* in 1926[148] and *New Brunswick* in 1939.[149] In *Hoystead* the proceedings concerned the construction of a revenue statute as it applied to a will and the estoppel was sustained. In *New Brunswick* the court was concerned with identical bonds and the estoppel failed. The first proceeding concerned the construction of one bond but although the bonds were in identical language it was held that this did not necessarily result in the same construction. Lord Maugham LC said:[150]

> "If an issue has been distinctly raised and decided in an action, in which both parties are represented, it is unjust and unreasonable to permit the same issue to be litigated afresh between the same parties or persons claiming under them; but in my view the doctrine cannot be made to extend to presumptions or probabilities as to issues in a second action which may be, and yet cannot be asserted beyond all possible doubt to be, identical with those raised in the previous action... The issue of construction in the second action could indeed be similar to that decided in the first; but it related to a different cause of action based on other bonds and could not be asserted to be the same issue. Moreover, it is a matter of common knowledge that such bonds

142  [1948] 1 All ER 227, CA.

143  See also *Thompson v Ross* [1943] NZLR 712 at 719.

144  *Burman v Woods* [1948] 1 KB 111, CA; *Macdonald v Fyson* [1948] NZLR 669.

145  *Mills v Cooper* [1967] 2 QB 459.

146  *McLoughlin v Gordons (Stockport) Ltd* [1978] ICR 561. The dubious nature of this decision is demonstrated by the need to investigate the facts on both dates to determine whether there is an estoppel. See nn 150, 153 below and paras 209, 383. However the second claim for equal pay on the same facts was certainly an abuse of process.

147  *Moss v Anglo-Egyptian Navigation Co* (1865) 1 Ch App 108 at 114–16 (earlier finding of no breach of continuing contract no bar to allegation of fresh breach); *Re Westlake* [1940] NZLR 887. A declaration was made in the first proceedings as to the vesting of shares under a will but the contingency on which the second proceedings turned had not been raised, the argument turning on a different contingency. Myers CJ, after citing the 1st ed, held that the matter in controversy in the second proceedings was not in controversy in the first and there was no estoppel. See also *Gipps v Gipps* [1974] 1 NSWLR 259, CA, noted para 186 n 48. There may be issue estoppels in will construction cases where the same clause governs the destination of different property. See *Badar Bee v Habib Merican Noordin* [1909] AC 615 and *Blair v Curran* (1939) 62 CLR 464.

148  [1926] AC 155.

149  [1939] AC 1.

150  Ibid at 20. See also *Co-ownership Land Development Pty Ltd v Queensland Estates Pty Ltd* (1973) 47 ALJR 519 at 522 per Walsh J: "In order that the principle of issue estoppel may apply it ... must be possible to assert without doubt that the issues are identical".

are often issued at different dates and in different countries, matters which might well have a possible bearing on their true construction".

An illustration of the difficulty of determining whether the questions are the same is provided by *Shiels v Blakeley*,[151] where the validity of identical amendments to a superannuation trust deed executed on different dates was held to raise the same question.[152]

It follows from this reasoning of Lord Maugham that an issue estoppel cannot be enlarged by evidence. As Evatt J said:[153]

"... when a distinct and separate issue arises subsequently [the unsuccessful party] is not bound to submit to the second issue being established by the combination of a former issue with additional evidence, no matter how strong that evidence may be".

## Questions of law and fact

**200**  Whether a point determined by or necessarily involved in a judicial decision is in substance the same as a point raised in subsequent proceedings is a question of law.[154] Questions as to the physical identity of subject matter and as to what was actually decided in former proceedings, where this depends on oral evidence, are questions of fact.[155]

## The determinations must be fundamental, not collateral[156]

**201**  Even when the court has expressly determined the same issue in the earlier proceeding an issue estoppel will not necessarily result. Only determinations which are necessary to the decision, and fundamental to it, will found an issue estoppel. Other determinations, however positive, cannot. The authority for this may be traced to Lord Holt in *Blackham's Case*[157] but the judgment of Knight Bruce VC in *Barrs v Jackson*[158] is frequently cited. He said:

---

151  [1986] 2 NZLR 262, CA.

152  In other respects the case is troublesome. The first amendment was challenged on two grounds in separate proceedings. One action succeeded and the other failed. Had both grounds been raised in the same proceedings the plaintiffs would ordinarily have had no right of appeal and there would have been no estoppel on the ground on which they failed. The estoppel was upheld, partly because of the separate proceedings (surely questionable) and partly because of the decision in *Uren's* case. See para 206.

153  *O'Donel v Comr for Road Transport* (1938) 59 CLR 744 at 763. A decision awarding worker's compensation during a period of incapacity caused by blindness sustained in an industrial accident did not estop the employer from alleging that blindness during a subsequent period arose from a different cause. Cf *The Duchess of Kingston's Case* (1776) 2 Smith LC (13th ed) 644 at 645 (a judgment is not evidence "of any matter to be inferred by argument from the judgment"), and paras 201 n 158, 383.

154  As in *Robinson v Robinson* (1603) 5 Co Rep 32b and generally the cases where the question was determined on demurrer such as *Howlett v Tarte* (1861) 10 CBNS 813.

155  Such questions were left to the jury in *R v Sheen* (1827) 2 C & P 634 at 639–40; and in *R v Tancock* (1876) 13 Cox CC 217. See also *Overton v Harvey* (1850) 9 CB 324 at 331 and *Ripley v Arthur & Co* (1902) 86 LT 735, CA, at 736.

156  This paragraph in the 2nd ed was cited in *Duhamel v R (No 2)* (1981) 131 DLR (3d) 352 at 358 (Alberta CA), affd (1984) 14 DLR (4th) 92 (SCC), and in *Re Norway's Application (No 2)* [1990] 1 AC 723, CA, at 743, 751 by May and Balcombe LJJ.

157  (1709) 1 Salk 290 also discussed para 186 n 44.

158  (1842) 1 Y & C Ch Cas 585 at 595, 597–8; revsd (1845) 1 Ph 582 on other grounds.

"... generally the judgment, neither of a concurrent nor of an exclusive jurisdiction is conclusive evidence of any matter which came collaterally in question before it, though within the jurisdiction, or of any matter incidentally cognizable, or of any matter to be inferred by argument from the judgment; and that a judgment is final only for its proper purpose and object";

and then in the passage most usually quoted:

"But it is, I think, to be collected that the rule against re-agitating matter adjudicated is subject generally to this restriction, that, however essential the establishment of particular facts may be to the soundness of a judicial decision, however it may proceed on them as established, and however binding and conclusive the decision may as to its immediate and direct object be, those facts are not all necessarily established conclusively between the parties, and that either may again litigate them for any other purpose as to which they may come in question, provided the immediate subject of the decision be not attempted to be withdrawn from its operation so as to defeat its direct object".

These statements have been endorsed in later authorities. In *R v Hartington, Middle Quarter Inhabitants*[159] Coleridge J expressed the principle as being:

" ... the judgment concludes, not merely as to the point actually decided, but as to a matter which it was necessary to decide, and which was actually decided, as the groundwork of the decision itself, though not then directly the point at issue".

Again, Lord Shaw in *Hoystead*[160] said:

"The former judgment was pronounced ... under that section ... It was not merely incidental or collateral to the question so decided, that the appellants were joint owners. It was fundamental to it. Unless it had been decided that under the settlement Mr Campbell's children had a beneficiary interest in land or income 'in such a way as they are taxable as joint owners' they could not have been taxed at all".

Extracts from the judgments in *Blair v Curran*[161] may complete the citations. Starke J said:[162]

" ... a judgment concludes not merely the point decided but matters which were necessary to decide and which were actually decided as the groundwork of the decision itself though not then directly the point at issue and that a judgment is conclusive evidence not merely of the facts directly decided but of those facts which are necessary steps to the decision – so cardinal to it that without them it cannot stand".

Dixon J said:[163]

"In the phraseology of Lord Shaw, 'a fact fundamental to the decision arrived at' in the former proceedings and 'the legal quality of the fact' must be taken as finally and conclusively

159  (1855) 4 E & B 780 at 794.
160  [1926] AC 155 at 171.
161  (1939) 62 CLR 464.
162  Ibid at 510.
163  Ibid at 532. See also *Re Allsop and Joy's Contract* (1889) 61 LT 213 at 215: "It is new to me that on the doctrine of estoppel either side can rely upon the reasons which the learned judge gives for his coming to a conclusion upon any points".

established ... But matters of law or fact which are subsidiary or collateral are not covered by the estoppel. Findings, however deliberate and formal, which concern only evidentiary facts and not ultimate facts forming the very title to rights give rise to no preclusion. Decisions upon matters of law which amount to no more than steps in a process of reasoning tending to establish or support the proposition upon which the rights depend do not estop the parties if the same matters of law arise in subsequent litigation".

Fullagar J may be permitted a postscript:[164]

"Issue estoppel only applies to issues. There is no estoppel as to evidentiary facts found in the course of determining the affirmative or negative of an issue".

## How to distinguish the fundamental from the collateral[165]

**202** "The difficulty in the actual application of these conceptions", continued Dixon J,[166] "is to distinguish the matters fundamental or cardinal to the prior decision or judgment, or necessarily involved in it as its legal justification or foundation, from matters which, even though actually raised and decided as being in the circumstances of the case the determining considerations, yet are not in point of law the essential foundation or groundwork of the judgment". In order to make this distinction one has to inquire whether the determination was so fundamental to the decision that the latter cannot stand without it. Even where this condition is met, it is suggested by Dixon J that there is another test to pass, viz. whether the determination is the "immediate foundation" of the decision or merely "a proposition collateral or subsidiary only, i.e. no more than part of the reasoning supporting the conclusion". A mere step in the reasoning is insufficient.[167] What is required is a determination fundamental to the decision.

One test which has been suggested is: was it possible to appeal against the determination? This will not decide the question in all cases; but is often a useful test. There are many determinations which cannot effectively be challenged on appeal.[168] If there can be no effective appeal against a particular determination it is not fundamental to the judgment. But this is not the only test; the inquiry must always be – is the determination such that without it the judgment cannot stand?

## The determinations may be fact or law

**203** The determinations which will found an issue estoppel may be of law, fact, or mixed fact and law. Examples of the first are cases where the question in both proceedings has been one of construction. Such was *Hoystead*[169] where the question depended upon

---

164 *Brewer v Brewer* (1953) 88 CLR 1 at 15.
165 This paragraph in the 2nd ed was cited in *Spens v IRC* [1970] 1 WLR 1173 at 1184; *Duhamel v R (No 2)* (1981) 131 DLR (3d) 352 at 358 (Alberta CA); affd (1984) 14 DLR (4th) 92 (SCC); *Angle v Minister of National Revenue* (1974) 47 DLR (3d) 544 at 556 (SCC); and *Re Norway's Application (No 2)* [1990] 1 AC 723, CA, at 752 by Balcombe LJ.
166 (1939) 62 CLR at 533.
167 See *Re Allsop and Joy's Contract* (1889) 61 LT 213.
168 Para 205.
169 [1926] AC 155.

the construction of a revenue statute as it applied to a will. In *New Brunswick*[170] the determination in the first proceedings was one of construction but as the documents were different, although their wording was identical, the questions were not identical. In *Blair v Curran*[171] and *Re Waring*[172] the questions concerned the construction of wills.

In running-down cases,[173] the issues have generally been of fact or mixed fact and law. In *Jones v Lewis*[174] Bankes LJ held that the doctrine was applicable to a question of mixed fact and law.

## What materials may be considered

**204**    It was formerly considered that the subject matter of a decision for the purposes of *res judicata* could only be ascertained from the formal judgment or order and the court could not examine "what was said by the judges".[175] The previous author was in some doubt[176] but preferred the view that the court's reasons could be considered. There were then many cases favouring the broader view.[177]

Since then the law has been settled in favour of the broader view.[178] In *R v Humphrys*[179] Lord Hailsham said: "The court will inquire into realities, and not mere technicalities", and in *Rogers v R*[180] Brennan J said that the court could look at "any material that shows what issues were raised and decided". The point now seems to be assumed. Thus, in *Thrasyvoulou*[181] the House considered reports of planning inspectors. In *Arnold*[182] it held that issue estoppel was excluded because of the special circumstances but that question could not be investigated if the court were confined to the pleadings and the order.

170  [1939] AC 1.
171  [1939] 62 CLR 464.
172  [1948] Ch 221 considered para 16.
173  Ch 11.
174  [1919] 1 KB 328, CA, at 344–5.
175  This statement in the 1st ed was categorical and the following were cited: *Re Bank of Hindustan, China and Japan* (1873) 9 Ch App 1 at 25–6; *Waine v Crocker* (1862) 3 De GF & J 421; *Re Allsop and Joy's Contract* (1889) 61 LT 213; *Ballantyne v Mackinnon* [1896] 2 QB 455, CA; *R v Brixton Prison Governor, ex p Savarkar* [1910] 2 KB 1056, CA; *Jones v Lewis* [1919] 1 KB 328, CA.
176  2nd ed 183–6, 275–6, 289.
177  *Ord v Ord* [1923] 2 KB 432, CA; *Marginson's Case* [1939] 2 KB 426, CA; *Randolph v Tuck* [1962] 1 QB 175 at 183; *Jackson v Goldsmith* (1950) 81 CLR 446 at 467; *Patchett v Sterling Engineering Co Ltd* (1954) 71 RPC 61, CA; (on appeal Viscount Simonds reserved his opinion on whether reasons could be looked at but considered that the pleadings were available [1955] AC 534 at 541). There was no such reluctance in *Carl-Zeiss (No 2)* [1967] 1 AC 853 at 946, 965 or in *Connelly v DPP* [1964] AC 1254 at 1307. See also *Thompson v Ross* [1943] NZLR 712; *Jenkins v Tileman Ltd* [1967] NZLR 484. Older cases had also taken the broader view notably *Sri Raja Rao v Sri Raja Inuganti* (1898) LR 25 Ind App 102 at 108: "In order to see what was in issue in the suit, or what has been heard and decided the [reasons for] judgment must be looked at"; *Tagore v Secretary of State for India* (1888) LR 15 Ind App 186 at 192–3; *Hook v Administrator-General of Bengal* (1921) LR 48 Ind App 187; *O'Donel v Comr for Road Transport* (1938) 59 CLR 744 at 758; *Somodaj v Australian Iron and Steel Ltd* (1963) 109 CLR 285 at 299.
178  See, however, the cautious approach of Buckley J in *Carl-Zeiss (No 3)* [1970] Ch 506, the last time the narrow view seems to have been taken seriously. The broader view has been accepted in Canada: *Diamond v Western Realty Co* (1924) 2 DLR 922, SC at 929; *Nesbitt Thompson Deacon Inc v Everett* (1989) 37 BCLR (2d) 341 at 347–9, CA.
179  [1977] AC 1 at 41. See also *Khan v Golecha International Ltd* [1980] 1 WLR 1482, CA, at 1490.
180  (1994) 181 CLR 251 at 263.
181  [1990] 2 AC 273.
182  [1991] 2 AC 93.

*Australian Consolidated Press Ltd v Uren*    206

The court can consider the pleadings,[183] particulars, evidence,[184] the notice of appeal or cross-appeal,[185] the reasons for judgment, the summing up, any questions put to the jury[186] and its answers.

**205**    A decision of fact or law against the party who succeeded[187] will not found an estoppel because it cannot be fundamental to the decision. It would be unjust to make such a decision the foundation of an estoppel, for no appeal is available to the person against whom it was given. A similar argument applies where several factual grounds are advanced as alternative bases for a cause of action and the court finds more than one in favour of the party who succeeds. No estoppel can be founded on any of the separate findings, for the party failing on such issues cannot appeal any of them separately. To succeed on appeal he must succeed on all the issues, and if the finding on one is good, this will be fatal. There will be a cause of action estoppel, but the separate issues will not ground issue estoppels because none was fundamental to the decision.[188]

## Australian Consolidated Press Ltd v Uren[189]

**206**    In this case the Privy Council ignored these principles. Following an action for libel where the jury found for the plaintiff, the Full Court of New South Wales granted a new trial limited to damages. On a further appeal by the defendant, the High Court of Australia ordered a general new trial, this being the only relief sought by the appellant. The High Court also ruled that exemplary damages could be awarded for libel, contrary to *Rookes v Barnard*.[190] The defendant was granted leave to appeal to the Privy Council against the reasons of the High Court on this question. The respondent's objection to the competency of the appeal was overruled on the ground that the prerogative conferred power to hear such "appeals", the matter being within the discretion of the Privy Council. This was, as the previous author submitted, and the present author agrees, contrary to both principle and authority.[191]

The appellant had obtained all the relief it had sought from the High Court. The difficulty with the appeal may be demonstrated by contemplating the form of order their Lordships would have recommended if the appeal had succeeded. The appellant could not have asked for the order below to be varied in any respect. While convenience was

183  *Mangena v Wright* [1909] 2 KB 958 at 974–5; *Sterling Engineering Co Ltd v Patchett* [1955] AC 534 at 541.

184  *Ord v Ord* [1923] 2 KB 432 at 442.

185  *Jenkins v Tileman (Overseas) Ltd* [1967] NZLR 484.

186  *Macdougall v Knight* (1890) 25 QBD 1, CA; *Want v Moss* (1894) 70 LT 178, PC, at 179.

187  This para in the 2nd ed was cited in *Re Norway's Application (No 2)* [1990] 1 AC 723, CA, at 752 by Balcombe LJ.

188  *Penn-Texas Corpn v Murat Anstalt (No 2)* [1964] 2 QB 647, CA, at 660; *James v Commonwealth* (1935) 52 CLR 570 at 584, 590–1; noted more fully para 186 nn 41–2; *Lake v Lake* [1955] P 336, CA (finding of adultery against wife but petition dismissed because of condonation, wife having succeeded had no appeal against finding of adultery) and *Talyancich v Index Developments Ltd* [1992] 3 NZLR 28, CA.

189  [1969] 1 AC 590.

190  [1964] AC 1129.

191  See *R v Sillem* (1864) 10 HL Cas 704 at 724 per Lord Westbury: "An appeal is a right of entering a superior court and invoking its aid and interposition to redress the error of the court below"; *Commonwealth v Bank of New South Wales* [1950] AC 235 at 294: "An appeal is the formal proceeding by which an unsuccessful party seeks to have the formal order of a court set aside or varied in his favour by an appellate court"; *Driclad Pty Ltd v FCT* (1968) 121 CLR 45 at 64.

served, principle was ignored. The committee were obviously concerned but explained that they had been directed to hear the appeal by an Order-in-Council made on the recommendation of a different committee. However, a point as to jurisdiction may be entertained at any stage[192] and an order granting leave to appeal is interlocutory and may be revoked.[193] The decision on the competency of the appeal seems to have been ignored and hopefully will not be followed.[194]

**207**    Where the decision involved a dismissal such as a verdict for the defendant from a jury[195] or the judgment was entered by consent or by default[196] it will be necessary to refer to the pleadings and any affidavits, and in the case of a jury verdict to the summing up and any written questions left to the jury to ascertain what decisions on issues were made, consented to, or accepted. Oral evidence has also been received for the purpose of determining the grounds of a decision and the intention of the tribunal to adjudicate or not upon any specific question.[197]

### Issue estoppel and arbitration

**208**    Issue estoppel also arises from issues decided as the fundamental basis of an award in arbitration proceedings.[198] The parties having chosen the tribunal to determine their disputes, or been compelled by statute to resort to it, are bound by its determinations on any issue fundamental to its decision.

### Taxation and rating cases

**209**    Taxation and rating cases involving annual assessments are *sui generis* and are discussed in Ch 12. In any event estoppels from year to year would frequently fail because of possible changes of circumstances. A good example is *Edwards v Old Bush Mills Distillery Co Ltd*,[199] decided before it was clear that there could be no estoppel in tax cases, where the House held that a decision that a liquidator had not carried on a trade in one year was not *res judicata* in a later year for the circumstances may have changed.

### Criminal decisions: *autrefois acquit*

**210**    The general principles of *res judicata* are applicable to English criminal decisions. In order to establish a plea of *autrefois acquit*,[200] in substance a plea of *res judicata* estoppel,

---

192  *Westminster Bank Ltd v Edwards* [1942] AC 529 at 533–4, 536–7.
193  *Parke Davis v Sanofi* (1982) 149 CLR 147; *Buttes Gas v Hammer (No 3)* [1982] AC 888 para 172 n 123.
194  See however *Shiels v Blakeley* [1986] 2 NZLR 262, CA, considered para 199 nn 151–2.
195  See para 56.
196  See paras 38, 44.
197  *Ord v Ord* [1923] 2 KB 432 at 493–4.
198  *Fidelitas Shipping* [1966] 1 QB 630, CA, at 643.
199  (1926) 10 TC 285, HL.
200  Ch 13.

the offence of which the accused was acquitted must in substance be identical with the offence charged in the second proceedings. Similarly, to establish a plea of *autrefois convict*[201] the offence of which the accused was convicted must in substance be identical with the offence charged in the second proceedings.

## Criminal decisions and issue estoppel

**211**    *R v Humphrys*[202] has established that issue estoppels have no place in English criminal law.

## Divorce

**212**    Issue estoppels have only a limited application in divorce because the court has a statutory duty to investigate the facts. It has to be satisfied that a ground for divorce exists in fact and for that purpose has an inquisitorial function.[203]

---

201  Ch 23.
202  [1977] AC 1 considered Ch 13.
203  Ch 14.

## *1 Kolden Holdings Ltd v Rodette Commerce Ltd & Anor.

Court of Appeal (Civil Division)

21 January 2008

**[2008] EWCA Civ 1468**

**[2008] 1 C.L.C. 1**

Tuckey , Lawrence Collins and Rimer L JJ

Judgment delivered 21 January 2008

Conflict of laws—Related actions—Lis pendens—Court first seised—Assignment — Same parties—Stay of proceedings—Agreement between Cypriot companies to sell shares in Russian company—Share sale agreements governed by English law and containing non-exclusive English jurisdiction clause—English proceedings issued claiming breach of agreements—Vendor companies then assigned claims under agreements—Defendants issued proceedings in Cyprus—Assignee then substituted as claimant in English proceedings—Application to stay proceedings in favour of Cypriot proceedings—Whether English or Cypriot court first seised — Whether assignee and original claimants to be regarded as 'same party' — Application of good arguable case test— Council Regulation 44/2001, art. 27 .

This was an appeal by the defendant Cypriot companies, Rodette and Taplow, against the dismissal ( [2007] 2 CLC 355 ) of their application to stay the proceedings under art. 27 of Council Regulation 44/2001 .

The claimant, Kolden, was also a Cypriot company. Kolden was beneficially owned by a limited partnership, Russia Partners, incorporated in Delaware. Russia Partners was an investment fund which specialised in investments in Russia. Russia Partners incorporated companies in Cyprus to act as special purpose vehicles for its investments in Russia. Three of those companies were Amherst, Hensher and Conway which between them held 38.71% of the shares of a Russian company, Maltsovsky. In March 2004 Amherst, Hensher and Conway entered into securities sale and purchase agreements (SPAs) for the sale of their combined shareholding in Maltsovsky to the appellants. The SPAs were governed by English law and provided for non-exclusive English jurisdiction.

The SPAs contained a provision to the effect that the purchasers were acquiring the securities for purposes of further immediate distribution thereof to another Russian company (JV) in which Russia Partners indirectly held a minority interest. The appellants allegedly did not transfer the Maltsovsky shares to JV as the SPAs allegedly contemplated, but instead either retained them or transferred them to other parties.

In July 2006 Amherst, Hensher and Conway issued English proceedings seeking a declaration that the appellants were obliged on the true construction of the SPAs to transfer the Maltsovsky shares to JV; alternatively, rectification of the SPAs.

*2

In August 2006 Amherst, Hensher and Conway and three other claimants began an action in the Cyprus court alleging conspiracy and seeking damages against the appellants and others.

In November 2006, Amherst, Hensher and Conway assigned their rights under the SPAs to Kolden and Kolden applied to be substituted as claimant in the English action in the place of Amherst, Hensher and Conway.

In February 2007, the appellants issued proceedings in Cyprus seeking declarations that they were not liable under the SPAs to transfer the Maltsovsky shares to JV and that the assignments were invalid.

Kolden was then substituted as claimant in the English action and the claim form in the English action was re-issued with Kolden substituted as the sole claimant.

The judge dismissed the appellants' application for a stay of the English action pursuant to art. 27 of Councail Regulation 44/2001 , holding that when the Cyprus proceedings were begun Kolden was to be regarded as 'the same party' as the assignor companies, with the result that the English court was the court first seised of the contractual cause of action between the parties.

*Held* , dismissing the defendants' appeal:

1 The judge was right that the critical question was whether, at the time the Cyprus proceedings

were begun, there were then in existence two sets of proceedings involving the same cause of action and between the same parties within the meaning of art. 27 . If there were then two sets of proceedings involving the same cause of action and the same parties, the subsequent substitution of Kolden for the original claimants would not matter. The fact that as a matter of English law Kolden only became party to the English action when it was substituted was irrelevant. The relevant question was whether Kolden and the original claimants were to be regarded as the same party for the purposes of art. 27 . If they were, then the English court was first seised of the proceedings between the original claimants, and later by substitution Kolden, and the appellants. ( Kinnear v Falconfilms NV [1996] 1 WLR 920 and WPP Holdings Italy SRL v Benatti [2007] EWCA Civ 263; [2007] 1 CLC 324 distinguished .)

2 The judge did not err in applying the 'good arguable case' standard to determine whether the interests of parties were identical or indissocible. It was accepted for the purposes of this hearing that there was an arguable case that the assignment was valid. The good arguable case test was of sufficient flexibility to ensure that the English court performed its task under the Judgments Regulation .

*3

3 The object of art. 27 was to prevent parallel proceedings in different member states and to avoid conflicts between decisions and irreconcilable judgments. The term between 'the same parties' had an independent or autonomous meaning. In considering whether two entities were the 'same party' for the purposes of applying the regulation, the court looked to the substance, and not the form. Although the parties must be 'identical', that identity was not destroyed by the mere fact of there being separate legal entities involved. Whether they were identical for that purpose might depend on whether there was such a degree of identity between the interests of the entities that a judgment given against one of them would have the force of res judicata as against the other. It would also depend on whether the interests of the entities were identical and indissociable, and it was for the national court to ascertain whether that was in fact the case. ( Tatry v Maciej Rataj (Case C-406/92) [1995] CLC 275; [1994] ECR I-5439 and Drouot Assurances SA v Consolidated Metallurgical Industries (Case C-351/96) [1998] CLC 1270; [1998] ECR I-3075 applied .)

4 Applying those principles Kolden was to be treated as the same party as the assignors. There was the requisite privity of interest which would preclude an assignor from re-litigating any finding on liability under the contracts in a proceeding to which the assignee had been a party. The interests of assignor and assignee were indissociable in the sense of indivisible. The interest of the assignor and assignee in relation to the claim being advanced against the appellants was identical. The question of 'the same parties' was to be determined by looking at the claims, and not at the subsequent defences. Accordingly the English court was the court first seised. ( Gantner Electronic GmbH v Basch Exploitatie Maatschappij (Case C-111/01) [2003] ECR I-4207 applied .)

### The following cases were referred to in the judgment:

- AA (Somalia) v Secretary of State for the Home Department [2006] EWCA Civ 1540 .
- Bank of Tokyo-Mitsubishi Ltd v Baskan Gida Sanayi ve Pazarlama AS [2004] 2 Ll Rep 395 .
- Berkeley Administration Inc v McClelland [1990] 2 QB 407 .
- Berkeley Administration Inc v McClelland [1995] ILPr 201 .
- Beynon and Partners v C & E Commrs [2004] UKHL 53 .
- Bols Distilleries BV v Superior Yacht Services Ltd [2006] UKPC 45; [2007] 1 CLC 308; [2007] 1 WLR 12 .
- Canada Trust Co v Stolzenberg (No. 2) [1998] CLC 23; [1998] 1 WLR 547 (CA); [2001] CLC 118; [2002] 1 AC 1 (HL) .
- Compania Colombiana de Seguros v Pacific Steam Navigation Co [1965] 1 QB 101 .
- Cover Europe Ltd, Re [2002] EWHC 861 (Ch).
- Drouot Assurances SA v Consolidated Metallurgical Industries (Case C-351/96) [1998] CLC 1270; [1998] ECR I-3075 . *4
- **Effem Foods** Pty Ltd v Trawl Industries Pty Ltd (1993) 43 FCR 510 .
- EC Commission v UK (Case 353/85) [1988] ECR 817 .
- Gantner Electronic GmbH v Basch Exploitatie Maatschappij BV (Case C-111/01) [2003] ECR I-4207 .
- Gleeson v J Wippell & Co Ltd [1977] 1 WLR 510 .
- Golder v UK (1979–80) 1 EHRR 524 .
- Grovit v De Nederlandsche Bank [2007] EWCA Civ 953 .
- Grovit v Doctor [1997] CLC 1038; [1997] 1 WLR 640 .
- Gubisch Maschinenfabrik KG v Palumbo (Case 144/86) [1987] ECR 4861 .
- Johnson v Gore Wood & Co [2002] 2 AC 1 .
- Kinnear v Falconfilms NV [1996] 1 WLR 920 .

- Kokkinakis v Greece (1994) 17 EHRR 397 .
- Konkola Copper Mines plc v Coromin Ltd [2006] EWCA Civ 5; [2006] 1 CLC 1 .
- Messier Dowty Ltd v Sabena SA [2000] CLC 889; [2000] 1 WLR 2040 .
- New Testament Church of God v Stewart [2007] EWCA Civ 1004 .
- Powell v Wiltshire [2004] EWCA Civ 534; [2005] QB 117 .
- Préservatrice Foncière TIARD SA v Netherlands (Case C-266/01) [2003] ECR I-4867 .
- Public Trustee v Gray [1919] 2 Ch 104 .
- Saipem SpA v Dredging VO2 BV (The Volvox Hollandia) [1988] 2 Ll Rep 361 .
- Seaconsar (Far East) Ltd v Bank Markazi Jomhouri Islami Iran [1994] 1 AC 438 .
- Shevill v Presse Alliance SA [1996] AC 959 .
- Shevill v Presse Alliance SA (Case C-68/93) [1995] ECR I-415; [1995] 2 AC 18 .
- Sony Computer Entertainment Ltd v RH Freight Services Ltd [2007] EWHC 302 (Comm).
- Tatry v Maciej Rataj [1992] 2 Ll Rep 552 (CA); (Case C-406/92) [1995] CLC 275; [1994] ECR I-5439 .
- Turner v Grovit [1999] CLC 1281; [2000] 1 QB 345 (CA); [2001] UKHL 65; [2002] CLC 463; [2002] 1 WLR 107 .
- Turner v Grovit (Case C-159/02) [2004] 1 CLC 864; [2004] ECR I-3565; [2005] 1 AC 101 .
- Westerton, Re [1919] 2 Ch 104 .
- WPP Holdings Italy SRL v Benatti [2007] EWCA Civ 263; [2007] 1 CLC 324; [2007] 1 WLR 2316 .
- Yorkshire Regional Health Authority v Fairclough Building Ltd [1996] CLC 366; [1996] 1 WLR 210 .

## Representation

- Bernard Eder QC and Jeremy Brier (instructed by Steptoe & Johnson ) for the appellants.
- Sir Sydney Kentridge QC and David Wolfson (instructed by Skadden Arps Slate Meagher & Flom (UK) LLP ) for the respondent. *5

## JUDGMENT

Lawrence Collins LJ:

### Introduction

1 This is a dispute about forum. Rodette Commerce Ltd and Taplow Ventures Ltd ('the appellants') and the respondent Kolden Holdings Limited ('Kolden') are companies which are owned by opposing Russian interests. But, no doubt for reasons connected with rates of taxation for non-resident companies, and other benefits conferred on international business companies, each of them is incorporated in the Republic of Cyprus.

2 At the heart of the commercial dispute between the parties are allegations concerning breach of agreements about the transfer of shares in a Russian company. The agreements are expressly governed by English law, and contain a submission to the non-exclusive jurisdiction of the English court. There is no connection with Cyprus except for the fact that the companies involved are incorporated there.

3 In February 2007 the appellants commenced proceedings in Cyprus for declarations that (inter alia) they are not liable to Kolden and other companies from which it took an assignment of rights in the contracts out of which the dispute arises.

4 The appellants claim that their Cyprus proceedings should have priority over English proceedings commenced in July 2006. Kolden claims that the English proceedings should have priority. Kolden is an assignee of the original claimants in the English proceedings and was substituted as claimant in those proceedings after the commencement of the appellants' Cyprus proceedings. The point of law which arises on this appeal is whether the parties to the English proceedings and the parties to the Cyprus proceedings are the 'same parties' for the purposes of Article 27 of the Council Regulation 44/2001 (EC) on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters ('the Judgments Regulation'), which gives priority to the courts of the Member State which is first seised.

5 The proceedings in Cyprus are for negative declarations. For the purposes of Article 27 of the Judgments Regulation (and its predecessor, Article 21 of the Brussels Convention ) the European Court has held that an action for a negative declaration involves the 'same cause of action' as a claim to establish liability: Case 144/86 Gubisch Maschinenfabrik v Palumbo [1987] ECR 4861 . In that case the proceedings for the negative declaration were not the first in time, and the ruling meant

that the substantive proceedings had priority. But in Case C-406/92 The Tatry [1995] CLC 275; [1994] ECR I-5439 the reasoning was applied to give priority to the action for a negative declaration which was commenced first.

6 When I asked Mr Bernard Eder QC, who appeared for the appellants, what possible advantage his clients might obtain from having the proceedings in Cyprus, *6 not only was he without instructions, but he was unable to suggest any possible advantage they might have from suing in Cyprus.

7 About 20 years ago Kerr LJ said that claims for negative declarations, in particular, 'must be viewed with great caution in all situations involving possible conflicts of jurisdictions, since they obviously lend themselves to improper attempts at forum shopping': The Volvox Hollandia [1988] 2 Ll Rep 361 , at 371. Although that is not always the case (see Messier Dowty Ltd v Sabena SA [2000] CLC 889 , para. 36), it is hard to resist the conclusion that the present case is one of the use of a claim for negative declarations to wrest jurisdiction from the natural forum.

8 There was a one day hearing before Aikens J in June 2007, and he gave judgment in July 2007. He gave permission to appeal, and there was a one day hearing before this court in December 2007. It is apparent from the costs schedules presented to this court that the legal costs for these hearings have been, in aggregate, at least £400,000.

## The litigation

### The parties

9 Kolden is or was beneficially owned by Russia Partners Company LP ('Russia Partners'), a limited partnership incorporated in Delaware. It is an investment fund which specialises in investments in Russia. Russia Partners incorporated companies in Cyprus to act as special purpose vehicles for its investments in Russia. Three of them were Amherst Capital Investments Ltd ('Amherst'), Hensher Enterprises Ltd ('Hensher') and Conway Holdings Ltd ('Conway'). In addition to Kolden, another associated company is relevant to the present proceedings, Serpell Holdings Ltd ('Serpell'). Russia Partners was at one stage the beneficial owners of all these companies.

10 Amherst, Hensher and Conway between them held 38.71% of the shares of OAO Maltsovsky Portlandcement ('Maltsovsky'), a joint stock company incorporated under Russian law. Kolden and Serpell are the owners of shares in another Russian company called OAO Eurocement, which is also known and referred to as JSC Eurocement ('JV'). It is one of the largest cement producing companies in Russia. In 2004 Russia Partners indirectly held a minority stake of 44.4% of the shareholding of Eurocement.

11 The appellants are companies incorporated in Cyprus. Kolden claims the ultimate beneficial owner of the appellants is Mr Filaret Galchev, who is said to be the ultimate beneficial owner of the majority shareholding in JV.

*7

### Sale agreements: 18 March 2004

12 On 18 March 2004 Amherst, Hensher and Conway entered into four Agreements for the sale of their combined shareholding in Maltsovsky to the appellants. All the contracts are in the form of a Securities Sale and Purchase Agreement (the 'SPAs') and all are on the same terms. Each of the contracts specifically provides, by clause 9, that it shall be governed and construed in accordance with the laws of England. The same clause also provides:

> 'Any dispute arising under and in connection with this Agreement which cannot be mutually resolved shall be submitted to the non-exclusive jurisdiction of the Courts of England, or any other Court of competent jurisdiction.'

13 Each of the SPAs provides that the seller companies, as owners of an identified parcel of the Maltsovsky shares, will sell them to the appellants. There are four SPAs because Hensher entered into one SPA to sell some shares to Rodette and another SPA to sell some shares to Taplow. The third SPA was between Amherst and Taplow and the fourth was between Conway and Rodette.

14 Clause 2.1 of each of the SPAs states that the purchaser will take all steps necessary for re-registration of the shares in the name of the purchaser or a nominee within one business day of the

date of the SPA. Clause 6.2(d) of each of the SPAs provides:

> '6.2 The purchaser hereby represents and warrants as of the date of this Agreement and on a continuing basis hereafter that:
>
> ...
>
> (d) the purchaser is acquiring the securities in a private transaction for the purchasers' own account for purposes of further immediate distribution thereof to JSC "Eurocement" only ...'

15 Kolden claims that the appellants were therefore the middle party in what was envisaged as a series of transactions under which the Maltsovsky Shares would move from Amherst, Hensher, and Conway to JV via the appellants.

16 The total purchase price under the four SPAs was approximately US$3,350,000. That figure corresponded to the price that Amherst, Hensher, and Conway had themselves paid to acquire the Maltsovsky shares in 2002. It is alleged that this price was far below the market value of the Maltsovsky shares either in 2004 or now.

17 The appellants allegedly did not transfer the Maltsovsky shares to JV as clause 6.2(d) of the SPAs allegedly contemplated, but instead were either retained by the appellants or transferred by them to other parties. The allegation, therefore, is that Mr *8 Galchev's companies took the whole benefit of the value of the Maltsovsky shares, and not that which would be attributable to his interest in JV.

### Proceedings in England: 13 July 2006

18 On 13 July 2006 Amherst, Hensher and Conway issued proceedings in the Commercial Court ('the English action'), in which the present application was made. In these proceedings, Amherst, Hensher and Conway sought a declaration against the appellants that:

> 'On the true construction of [the SPAs] each of the first and second defendants was obliged immediately, alternatively as soon as reasonably practicable to transfer [the Maltsovsky shares] to [JV] ...'

19 As an alternative, Amherst, Hensher and Conway sought rectification of clause 6.2(d) of each of the SPAs in the following terms:

> '... in order to carry out the common intention of the parties, so as to incorporate into each [SPA] an obligation on the relevant [purchaser] immediately or alternatively as soon as reasonably practicable, to transfer [Maltsovsky shares] to [JV]'.

20 There was also a claim for damages for breach of contract.

21 The particulars of claim in the English action were not served until after Aikens J gave judgment. But it should be noted at this stage (because this played some part in the argument before this court) that the particulars claimed as loss and damage the difference between the purchase price under the SPAs ($3,350,000) and the present value of the shares, alternatively their value at such time as they were sold by the appellants to an independent and bona fide third party, or alternatively the difference between the purchase price and the value at the time of the SPAs. Paragraph 37(g) pleaded that the sellers, and Kolden, had a legitimate interest in preventing the appellants from profiting from their breach of obligation.

### Conspiracy proceedings in Cyprus: 3 August 2006

22 On 3 August 2006 Amherst, Hensher and Conway and three other claimants began an action in the Cyprus court: action No 5166/2006. The other three claimants named are Kolden, Serpell and Russia Partners. In that action the claimants seek damages against the appellants and against OAO

Eurocement Group and Mr Galchev. The endorsement on the claim form asserts that the claimants are entitled to 'compensation for conspiracy aiming at fraud' and compensation for alleged inducement to commit a breach of the four SPAs by OAO Eurocement Group and Mr Galchev. Those proceedings were served on the appellants on 8 August 2006, who entered appearances on 31 August 2006.

*9

### Assignment and notice of assignment: 15 and 20 November 2006

23 On 15 November 2006, Amherst, Hensher and Conway, as assignors, concluded a Deed of Assignment ('the Assignment') with Kolden as assignee. This Deed provides for the assignment of rights in the SPAs and rights arising from them. The assignment clause provides:

'Assignors hereby unconditionally and absolutely assign to the Assignee any and all of their rights, claims and causes of action, whether vested in them jointly or individually without limitation existing or arising from the acquisition, ownership or alienation of the shares of OAO "Maltsovsky Portlandcement" ("Maltsovsky") and rights arising from any agreement with third parties associated with Maltsovsky ("the Rights"). For the avoidance of doubt the Rights include all rights, claims and causes of action whether arising directly or indirectly from the [four SPAs].'

24 The Assignment also provides that the assignors would execute Notices of Assignment in a specified form and deliver those Notices to the counterparties to the four SPAs. The Assignment expressly states that it is governed by English law and that any dispute arising out of or in connection with the Deed of Assignment would be settled by arbitration before the London Court of International Arbitration in London.

25 Notices of Assignment were received at the registered office of the appellants on about 20 December 2006.

26 On 29 January 2007, Skadden Arps Slate Meagher & Flom (UK) LLP ('Skadden Arps'), solicitors for Kolden, wrote to Steptoe and Johnson, solicitors for the appellants, indicating that Skadden Arps had applied to the English court to substitute Kolden as claimant in the English action in the place of Amherst, Hensher and Conway, because the latter companies had assigned to Kolden their rights as against the appellants under the Assignment.

### Second and third Cyprus proceedings: 5 and 14 February 2007

27 No doubt in response, on 5 February 2007, the appellants issued proceedings in Cyprus (action No 851/2007) claiming, against Amherst, Hensher, Conway and Kolden, declarations that the assignments made by virtue of the Deed of Assignment were invalid and without legal effect, and also damages for breach of express or implied terms as to confidentiality and non-assignability in the SPAs. These proceedings were discontinued on 20 February 2007, and are not material on this appeal.

28 On 14 February 2007, the appellants issued fresh proceedings in Cyprus (action No 1067/2007, 'the Cyprus action') against Amherst, Hensher, and Conway and against Kolden. The relief sought is in summary: *10

- (a) against Amherst, Hensher, and Conway: a declaration of non-liability under the SPAs, which is the mirror image of that sought by Amherst, Hensher and Conway in the Commercial Court, i.e. the contract cause of action. The appellants claim a declaration that they, as purchasers of the Maltsovsky shares under the four SPAs were not at any time obliged to transfer those shares to JV;
- (b) against all four defendants: a declaration that the Assignments are invalid because they were in breach of express or implied terms of the SPAs and/or were champertous and/or contrary to public policy;
- (c) against Kolden: a declaration that it has no rights under the Assignments, including the right to sue; and alternatively, if that should be wrong, a declaration of non-liability in the same terms as that sought against Amherst, Hensher, and Conway;
- (d) against all four defendants: damages.

### Kolden substituted as claimant in the English action: 20 February 2007

29 On 16 February 2007, Tomlinson J gave permission, ex parte, to Kolden to be substituted as claimant in place of Amherst, Hensher and Conway (to whom I shall now refer as 'the original claimants') in the English action. On 20 February 2007 the claim form in the English action was re-issued with Kolden substituted as the sole claimant.

### Judgment of Aikens J

30 The proceedings in the English action were served on the appellants on 11 September 2006. They filed acknowledgments of service indicating an intention to contest the jurisdiction, and subsequently issued applications for stays under Articles 27 and 28 of the Judgments Regulation , which provide:

#### 30 'Article 27

1. Where proceedings involving the same cause of action and between the same parties are brought in the courts of different Member States, any court other than the court first seised shall of its own action stay its proceedings until such time as the jurisdiction of the court first seised is established.

2. Where the jurisdiction of the court first seised is established, any court other than the court first seised shall decline jurisdiction in favour of that court.

#### 30 Article 28

1. Where related actions are pending in the courts of different Member States, any court other than the court first seised may stay its proceedings. *11

2. Where these actions are pending at first instance, any court other than the court first seised may also, on the application of one of the parties, decline jurisdiction if the court first seised has jurisdiction over the actions in question and its law permits the consolidation thereof.

3. For the purposes of this Article, actions are deemed to be related where they are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings.'

31 The judge dismissed the applications. His reasoning can be summarised as follows.

32 The key question was whether, at the time the Cyprus proceedings were begun on 14 February 2007, there were then in existence two sets of proceedings involving the same cause of action and between 'the same parties' within the meaning of Article 27 of the Regulation.

33 The answer was to be found in the principles in the ruling in Case C-351/96 Drouot Assurances SA v Consolidated Metallurgical Industries [1998] CLC 1270; [1998] ECR I-3075 , which established: (a) as a matter of the independent interpretation of Article 21 of the Brussels Convention (and now Article 27 of the Regulation) two legal entities could be regarded as the same party; (b) whether that was so in any particular case would be a matter for the national court to decide; (c) the national court must look at the facts of the case concerned and, in particular, the subject matter of the two disputes in the two relevant proceedings to see if the two legal entities were to be regarded as the same party; (d) the test that the national court must apply was whether the interests of the two legal entities involved in the two disputes were identical to and indissociable from one another in relation to the subject matter of the two disputes concerned; (e) one way of demonstrating this identity of interest was by asking whether a judgment against one legal entity in respect of the subject matter of the two disputes would have the force of res judicata against the other legal entity.

34 Kolden had a good arguable case that the Assignment was a valid legal assignment. When the Cyprus proceedings were begun on 14 February 2007 Kolden fulfilled the tests for being regarded as 'the same party' as the assignor companies. From the moment the appellants received notice of the Assignment, all rights passed to Kolden, and its interest in the SPAs and any rights of action arising out of them were identical to those formerly possessed by the assignor companies. The interests of Kolden, as legal assignee, were indissociable from those of the assignor companies because the rights of Kolden were only those of the assignors.

35 Consequently, when the Cyprus proceedings were started on 14 February 2007, the English court was the court 'first seised' of the 'same cause of action' (the contract cause of action) between 'the same parties'. The English court had been seised of that *12 cause of action since 13 July 2006. The original claimants were 'the same party' as Kolden. It was irrelevant to take into account any defences that the appellants might have been able to advance against the claims of the original claimants on the contract cause of action as at 14 February 2007.

36 Accordingly the appellants' application for an order to stay the English action pursuant to Article 27 of the Regulation was dismissed. The judge added that on his findings Article 28 could not be relevant, because it was only directed at courts other than the court first seised.

## The appeal

37 The appellants appealed on the basis that the judge erred: (1) in failing to hold that Kolden only became a party to the English action after 14 February 2007 on which date the Cypriot court became first seised of proceedings between Kolden and the appellants in respect of the same cause of action for the purposes of Article 27 of the Judgments Regulation and thus no *lis pendens* arose on 14 February 2007; (2) in holding that Kolden was to be regarded as the 'same party' as the original claimants, the three assignor companies, for the purposes of Article 27 ; (3) in applying a 'good arguable case' test to determine whether the interests of the parties were identical or indissociable; (4) on the assumption that there was a good arguable case that the Assignment was valid, in holding that he had to assume that it was effective and that the interests of the parties were identical and indissociable; (5) in holding that there was a good arguable case that the Assignment was valid; (6) in failing to take account of these matters: (a) the amended claim form in the English action fails to identify a cause of action by Kolden against the appellants; (b) the original claimants can continue to influence proceedings involving Kolden by being added as claimants (e.g. in response to the contention that the Assignment is invalid), or being added as defendants by counterclaim.

38 At the outset of the hearing before this court Mr Eder QC made it clear that he was not pursuing at this stage any questions on the validity of the assignment (or the application of the jurisdiction clause to Kolden, which he had raised in his skeleton argument). In particular he accepted that the judge (and this court) could proceed on the basis that there was an arguable case that there was a valid assignment, and that the only question was whether or not Kolden were the same parties as the original claimants for the purposes of Article 27 .

39 It is common ground that the contract claim in the English action and the claim in the Cyprus action for a declaration that the appellants are not in breach are the 'same cause of action' for the purposes of Article 27 . Indeed that is the basis of the appellants' application.

40 The main point on this appeal is the application of the principles underlying the rulings in Case C-405/92 The Tatry [1995] CLC 275; [1994] ECR I-5439 and Case C-351/96 *13 Drouot Assurances SA v Consolidated Metallurgical Industries [1998] CLC 1270; [1998] ECR I-3075 on 'the same parties' in Article 21 of the Brussels Convention . The Brussels Convention has now been superseded by the Judgments Regulation . I have set out Articles 27 and 28 in paragraph 30 above. Article 21 of the Brussels Convention is in substantially the same terms as Article 27 of the Judgments Regulation . Article 28 of the Judgments Regulation differs somewhat from Article 22 of the Brussels Convention , and Article 30 of the Judgments Regulation introduces an autonomous definition of when a court is 'deemed to be seised' of an action. None of these differences is material for the purposes of this appeal.

41 The principal questions which arise on this appeal are these: First, what is the critical date for determining whether 'proceedings … between the same parties are brought in the courts of different Member States', and does Article 27 apply where the assignee has become a party to the first set of proceedings only after the second proceedings have been commenced? Second, does the 'good arguable case' test apply to determine whether parties are 'the same parties' for the purpose of Article 27 , and, if so, how should it be applied? Third, when, if at all, is an assignee to be regarded as the same party as an assignor?

## The critical date

42 The appellants' argument is as follows: no *lis pendens* arose on 14 February 2007, when the Cyprus court was seised because Kolden only became a party to the English action after 14 February 2007, and the judge erred in applying a 'relation back' principle which treats Kolden as a party to the English action at a date *prior* to the date of the assignment; the issue of when Kolden became a 'party' to the English proceedings is a matter of English law and procedure; proceedings cannot be regarded as pending 'between' the 'same parties' for the purposes of Article 27 unless and until the

relevant entities are parties in both relevant sets of proceedings ( Kinnear v Falconfilms NV [1996] 1 WLR 920) and the English court is seised of the new claimant's claim as from the time of its joinder into the proceedings: WPP Holdings Italy SRL v Benatti [2007] EWCA Civ 263; [2007] 1 CLC 324 , para. 28.

43 Kolden's response is that the relevant date of seisin for the English action is 13 July 2006, when the claim form was issued. The substitution of Kolden does not result in a new date of seisin as far as the English court is concerned and does not deprive the English court of jurisdiction which it originally had. There is, and has always been, only one English action. There is no reliance by Kolden on the 'relation back' doctrine, nor is it relevant that as a matter of English law Kolden only became party to the English action when it was substituted. But in any event an added party becomes a party from the date of the proceedings: Yorkshire Regional Health Authority v Fairclough Building Ltd [1996] CLC 366, at 371–2 and 374–5; [1996] 1 WLR 210 , at 217–8 and 221.

*14

44 I agree with the judge's conclusion that the critical question is whether, at the time the Cyprus proceedings were begun on 14 February 2007, there were then in existence two sets of proceedings involving the same cause of action and between 'the same parties' within the meaning of Article 27 of the Regulation. If on 14 February 2007 there were two sets of proceedings involving the same cause of action and the same parties, then the subsequent substitution of Kolden for the original claimants would not matter.

45 The fact that as a matter of English law Kolden only became party to the English action when it was substituted is irrelevant. The relevant question is whether Kolden and the original claimants are to be regarded as the 'same party' for the purposes of Article 27 . If they are, then the English court was and remains first seised of the proceedings between the original claimants (and later, by substitution, Kolden) and the appellants.

46 There is nothing in Kinnear v Falconfilms NV [1996] 1 WLR 920 or WPP Holdings Italy SRL v Benatti [2007] EWCA Civ 263; [2007] 1 CLC 324 which is inconsistent with this conclusion. Each case contemplated the addition of different parties involving different causes of action being added after the date proceedings were first issued. In Kinnear v Falconfilms NV Phillips J (as he then was) was concerned with new third party claims: see at p. 930. WPP Holdings Italy SRL v Benatti was concerned in the relevant aspect with the addition of a new claimant with its own cause of action: see paras. 27, 28.

## Good arguable case

47 The way the point was put in the notice of appeal was that the judge erred in applying the 'good arguable case' standard to determine whether the interests of parties were identical or indissociable. Before this court, it was argued that where there is a possibility of the assignment being invalid, it cannot be concluded that the interests of the purported assignor and those of the purported assignee are identical and indissociable. The court must form its own view on the balance of probabilities: Drouot , para. 23; WPP Holdings Italy SRL v Benatti [2007] EWCA Civ 263; [2007] 1 CLC 324 .

48 I am satisfied that there is nothing in this point for two reasons. First, Mr Eder QC accepted for the purposes of this hearing that there was an arguable case that the assignment was valid. He did not invite the court to decide a preliminary issue on the validity of the assignment. There is therefore no reason for the court not to proceed on the basis that there was a valid assignment, subject to Mr Eder's other points on the application of Article 27 . Secondly, the 'good arguable case' test is of sufficient flexibility to ensure that the English court performs its task under the Judgments Regulation .

*15

49 Jurisdictional issues ought generally to be dealt with quickly, and without oral evidence or mini-trials: Canada Trust Co v Stolzenberg (No. 2) [2001] CLC 118 at 126; [2002] 1 AC 1 at 13, per Lord Steyn. Consequently jurisdictional issues are normally resolved on the basis that the person asserting that the English court has jurisdiction or should retain jurisdiction as a result of a jurisdictional requirement in the CPR (formerly RSC Order 11 ) or the Brussels/Lugano Conventions or the Judgments Regulation must show a 'good arguable case': see, e.g. Seaconsar Far East v Bank Markazi Iran [1994] 1 AC 438 ; Canada Trust Co v Stolzenberg (No. 2) [1998] CLC 23 at 26–33; [1998] 1 WLR 547 at 553–559, affd [2001] CLC 118 at 126; [2002] 1 AC 1 at 13; Bank of Tokyo-Mitsubishi Ltd v Baskan Gida Sanayi [2004] 2 Ll Rep 395 , paras. 193–194; Konkola Copper Mines plc v Coromin Ltd [2006] EWCA Civ 5; [2006] 1 CLC 1 .

50 The 'good arguable case' test is a flexible one, depending on the issue: Canada Trust Co v Stolzenberg (No. 2) [1998] CLC 23, at 31; [1998] 1 WLR 547 , at 558, per Waller LJ. That is a lower threshold than proof on a balance of probabilities: ibid. In Bols Distilleries BV v Superior Yacht Services Ltd [2006] UKPC 45; [2007] 1 CLC 308 (a case involving a disputed jurisdiction agreement) Lord Rodger of Earlsferry agreed with Lord Steyn in endorsing the approach of Waller LJ in Canada Trust Co v Stolzenberg (No. 2) , and said (at para. 28) that 'in practice, what amounts to a "good arguable case" depends on what requires to be shown in any particular situation in order to establish jurisdiction.'

51 Despite the appellants' reliance on WPP Holdings Italy SRL v Benatti [2007] EWCA Civ 263; [2007] 1 CLC 24 there is nothing in the decision which is inconsistent with this approach. The point on 'good arguable case' arose in relation to two issues in that decision. The first issue was whether the contract at issue was an 'individual contract of employment' for the purposes of the special regime for such contracts in section 5 of the Judgments Regulation . On that issue Toulson LJ (at para. 41) dealt with the question on the flexible 'good arguable case' approach.

52 The second issue in WPP Holdings Italy SRL v Benatti was whether the Italian court had been seised prior to the English court. On that issue Toulson LJ said (at para. 62) that that issue was a procedural issue of a quite different kind from the question whether the court otherwise had jurisdiction: although the parties were agreed that the defendant in the English proceedings had the burden of showing a good arguable case that the Italian Court was first seised, he was not sure that that was correct. Article 27 required a court of its own motion to stay its proceedings if another court had been first seised of the same cause of action between the same parties. He went on: 'At first sight, this would seem to require a court, if it is aware that another court has arguably been first seised of the same cause of action between the same parties, to form its own view which court has been first seised under the test laid down in art 30. However it makes no difference in the present case and I would reserve a final opinion on the point.' What Toulson LJ said must be read in the light of the fact that this issue depended on a question of construction of the provision in Article 30 as to *16 when a court is seised. If a question of law arises it would not be appropriate to decide it on a 'good arguable case' basis. That was why Buxton LJ agreed (at para. 89) that for the reasons given by Toulson LJ (at 62) the issue was not to be determined by the burden of proof.

53 Nor does the statement in Drouot (para. 23) that 'it is for the national court to ascertain whether this [namely, whether the interests can be considered to be identical and indissociable] is in fact the case' affect this conclusion. The European Court is leaving it to the national court to decide the question, but it is not imposing a uniform rule as to the appropriate standard.

### The same parties

54 The appellants say that the interests of a (purported) assignor and (purported) assignee are neither 'identical' nor 'indissociable'. First, a valid assignment operates merely to transfer the benefit of a contract or the rights arising thereunder but it does not operate to transfer the burden. Second, the assignor continues to remain primarily liable to the obligor for the non-performance of its outstanding contractual obligations. Third, the assignors can influence proceedings involving the assignees. Kolden is suing in its own name and there is nothing to prevent the original claimants from becoming parties to the proceedings again, either by being added as claimants (e.g. in response to the contention that the assignment is invalid) or by being added as defendants by counterclaim.

55 The appellants also say: (1) The particulars of claim (especially paragraph 37(g), to which I referred at paragraph 21 above, and which pleaded that the sellers, and Kolden, had a legitimate interest in preventing the appellants from profiting from their breach of obligation) showed that Kolden was claiming damage to itself. If Kolden had simply taken the Assignment and not been substituted, the appellants would have filed proceedings in Cyprus (as they have done at present) challenging the validity of the alleged assignment, and this could have caused any subsequent English proceedings to be stayed pursuant to Article 28 of the Judgments Regulation . (2) The amended claim form is fundamentally flawed in that it fails to identify any cause of action by Kolden against the appellants. It does not plead the (purported) assignment and thus does not disclose any cause of action in favour of Kolden, contrary to CPR 16.2 . Kolden's purported rights derive from an alleged unpleaded assignment and not from any alleged breach nor the SPAs themselves.

56 Kolden says that the original claimants and Kolden are the same parties. First, judgment against Kolden would constitute *res judicata* against the original claimants, and vice versa: Gleeson v J Wippell & Co Ltd [1977] 1 WLR 510 . Second, as regards (a) the rights of the assignee and assignor, and (b) the claims brought on the basis of those rights by the assignee and assignor, there is an

identity of interest in the precise sense that there is only one interest. That is in the nature of assignment: there *17 is only one right, and there are successive owners of that one right. Third, after the assignment, the original claimants cannot influence the proceedings.

57 Kolden also says that the fact that an assignment only passes the benefit and not the burden of a contract (and that the assignor remains primarily liable to the obligor for the non-performance of its outstanding contractual obligations) is irrelevant. There are no 'outstanding contractual obligations' on the part of the original claimants. It is the appellants who continue to have an obligation under the SPAs to transfer the Maltsovsky Shares immediately onwards to JV (or to pay damages for breach of that obligation).

58 I come to my conclusions on this aspect of the appeal. The rulings in Case C- 305/92 The Tatry [1995] CLC 275; [1994] ECR I-5439 and Case C-351/96 Drouot Assurances SA v Consolidated Metallurgical Industries [1998] CLC 1270; [1998] ECR I-3075 are very fact-specific, and it is necessary to deal with the rulings in some detail to extract the principles.

### Case C-405/92 The Tatry [1995] Clc 275; [1994] Ecr I-5439

59 The facts may be summarised as follows. A cargo of soya bean oil was contaminated with diesel on a voyage from Brazil to Rotterdam (for part of the cargo) and Hamburg (for the rest) in the vessel Tatry . In November 1988, before any other proceedings had commenced, the shipowners brought an action in the Rotterdam District Court against the cargo owners (other than Philip Brothers Ltd — 'Phibro' — who owned part of the cargo carried to Rotterdam under separate bills of lading), claiming a declaration that they were not liable for the alleged contamination.

60 The cargo owners brought two Admiralty actions in rem (one of them by Phibro) in the Admiralty Court ('the cargo actions') against a sister-ship of the Tatry , the Maciej Rataj . Those actions were begun on September 15, 1989, when the Maciej Rataj was arrested. The vessel was subsequently released from arrest against the provision of a guarantee. The claims in the Admiralty actions in rem were for damages for the contaminated cargo, i.e. the same subject matter as the cause of action as in the shipowners' action.

61 The shipowners then brought an action in Rotterdam against Phibro for a declaration of non-liability. In October 1990 the shipowners brought proceedings in the Netherlands to limit their liability as against all the cargo interests.

62 The Admiralty Court refused an application by the shipowners to stay the English proceedings under Article 21 . It held that the cargo actions and the shipowners' action did not involve the same parties or subject matter. The English Court of Appeal made a reference to the European Court on the question (inter alia) whether a claim brought in rem involved the same parties and the same cause of *18 action for the purposes of Article 21 as an in personam action: Tatry v Maciej Rataj [1992] 2 Ll Rep 552 .

63 The European Court ruled: (a) the term 'the same parties' had an autonomous meaning; (b) Article 21 must be understood as requiring that the parties to the two actions be identical; (c) re-affirming Case 144/86 Gubisch Maschinenfabrik v Palumbo [1987] ECR 4861 , the question of whether the parties were the same did not depend on the procedural position of each of them in the two relevant proceedings; (d) the rules set out in Articles 21 and 22 (now 27 and 28) were designed to preclude, as far as possible, the possibility of the non-recognition of a judgment on account of its irreconcilability with a judgment given in a dispute between the same parties in the state in which recognition was sought.

64 For present purposes, the only relevant part of the ruling in The Tatry is that which held that the fact that English admiralty procedure regarded an action in rem against a ship as different from an action in personam against an owner or other interested party was irrelevant:

> '46. The national court's second question is whether a subsequent action has the same cause of action and the same object and is between the same parties as a previous action where the first action, brought by the owner of a ship before a court of a Contracting State, is an action in personam for a declaration that that owner is not liable for alleged damage to cargo transported by his ship, whereas the subsequent action has been brought by the owner of the cargo before a court of another Contracting State by way of an action in rem concerning an arrested ship, and has subsequently continued both in rem and in personam , or solely in personam , according to the distinctions drawn by the national law of that other Contracting State.

47. In Article 21 of the Convention, the terms 'same cause of action' and 'between the same parties' have an independent meaning (see Gubisch Maschinenfabrik KG v Palumbo ...). They must therefore be interpreted independently of the specific features of the law in force in each Contracting State. It follows that the distinction drawn by the law of a Contracting State between an action *in personam* and an action *in rem* is not material for the interpretation of Article 21.

48. Consequently, the answer to the second question is that a subsequent action does not cease to have the same cause of action and the same object and to be between the same parties as a previous action where the latter, brought by the owner of a ship before a court of a Contracting State, is an action *in personam* for a declaration that that owner is not liable for alleged damage to cargo transported by his ship, whereas the subsequent action has been brought by the owner of the cargo before a court of another Contracting State by way of an action *in rem* concerning an arrested ship, and has subsequently continued both *in rem* and ***19** in personam* , or solely *in personam* , according to the distinctions drawn by the national law of that other Contracting State.'

## Case C-351/96 Drouot Assurances Sa v Consolidated Metallurgical Industries [1998] Clc 1270; [1998] Ecr I-3075

65 In this case a barge sank in Netherlands waters. The hull insurer, Drouot Assurances SA ('Drouot'), acting on its own behalf, paid for the barge to be refloated. In December 1990 Drouot brought proceedings in Paris ('the French proceedings') against the cargo owner and cargo insurer for a contribution in general average.

66 But in August 1990 the owners of the cargo and the cargo insurers (together 'the cargo interests') had brought proceedings in the Rotterdam District Court ('the Dutch proceedings') against the owner of the barge. The cargo interests claimed a declaration that they were not liable to contribute in general average, on the ground that the vessel was unseaworthy at the start of her voyage because of overloading.

67 In the French proceedings the cargo interests raised an objection of *lis alibi pendens* in the form of the Dutch proceedings.

68 The Cour de cassation considered that the case raised a question on the scope of the phrase 'the same parties' in Article 21 of the Brussels Convention and referred the matter to the European Court. The issue referred was whether the owner of the barge, which was impleaded in the Dutch proceedings was, for the purposes of Article 21 and on the facts of this case, to be regarded as 'the same party' as the hull insurers of the barge, viz. Drouot, who were impleaded in the French proceedings.

69 Fennelly A-G's view was that the wording of Article 21 and the European Court's judgments in Gubisch v Palumbo and The Tatry required that a strict interpretation be given to the words 'the same parties'. He concluded:

'29. My view, therefore, is that the concept of "same parties" is to be interpreted literally and strictly. The Court has used the word "identical". This means that not only just the parties to the two actions be the same in the literal sense of the same natural or legal person, but also that they must appear in the same right. In particular, a person suing in his own right and for his own benefit is obviously not to be equated with the same person suing or being sued in a purely representative capacity, for example, as the legal personal representative of a deceased person or a person under a disability, or in any of the wide range of cases where a person may, in law, be named to represent corporate bodies or their creditors in cases of insolvency.

...

***20**

31. Moreover, I share the concerns expressed ... that a more flexible approach to the application of the condition that the parties must be the same in order for an obligation to decline jurisdiction to arise under Article 21 of the Convention could seriously imperil the right to a fair hearing and, in some cases, even the efficient administration of justice.'

He concluded, therefore, that the barge owner and the hull insurers, Drouot, were not the 'same parties' in the French and Dutch proceedings for the purposes of Article 21 . Accordingly, there could be no stay of the French proceedings.

70 The European Court did not follow the opinion of the Advocate General. It reaffirmed the view expressed in The Tatry that 'the terms used in Article 21 of the Convention in order to determine whether a situation of *lis pendens* arises must be regarded as independent': para. 16.

71 The European Court re-stated the requirement in The Tatry (para. 33) that Article 21 required the parties in the two actions to be 'identical', and continued:

> '19. It is certainly true that, as regards the subject-matter of the two disputes, there may be such a degree of identity between the interests of an insurer and those of its insured that a judgment given against one of them would have the force of *res judicata* as against the other. That would be the case, *inter alia* , where an insurer, by virtue of its right of subrogation, brings or defends an action in the name of its insured without the latter being in a position to influence the proceedings. In such a situation, insurer and insured must be considered to be one and the same party for the purposes of the application of Article 21 of the Convention.
>
> 20. On the other hand, Article 21 cannot have the effect of precluding the insurer and its insured, where their interests diverge, from asserting their respective interests before the courts as against the other parties concerned.
>
> 21. In the present case, CMI [cargo-owners] and Protea [insurers] made clear at the hearing that, in the Netherlands action, they seek to have Mr Velghe [the owner] declared exclusively liable for the foundering of the Sequana. As the insurer merely of the hull of the vessel, however, Drouot takes the view that it cannot be held liable for the fault of its insured, and thus has no interest in the Netherlands action.
>
> 22. It appears, moreover, that in the French action, Drouot has been not acting in its capacity as the representative of its insured, but in its capacity as a direct participant in the refloating of the Sequana.
>
> 23. Thus in this case it does not appear that the interests of the insurer of the hull of the vessel can be considered to be identical to and indissociable from those of *21 its insured, the owner and charterer of the vessel. However, it is for the national court to ascertain whether this is in fact the case.
>
> …
>
> 25. The answer to the question raised must be that Article 21 of the Convention is not applicable in the case of two actions for contribution to general average, one brought by the insurer of the hull of a vessel which has foundered against the owner and the insurer of the cargo which the vessel was carrying when it sank, the other brought by the latter two parties against the owner and the charterer of the vessel, unless it is established that, with regard to the subject matter of the two disputes, the interests of the insurer of the hull of the vessel are identical to and indissociable from those if its insured, the owner and the charterer of that vessel.'

72 Several other cases were relied on by the parties, but none of them takes the matter much further. The only cases which deal directly with the effect of assignment on the question of the 'same parties' are two German appellate decisions which come to opposite conclusions.

73 In Case 9 U125/99, Regional Court of Appeal, Stuttgart, 24 November 1999, the claimant company undertook four transactions on the London Stock Exchange with Union CAL Ltd which resulted in losses, and as a result Union CAL Ltd had claims for about £26,000. Union CAL Ltd assigned its claim to Union Discount Co Ltd, which brought an action for payment in England. After the proceedings became pending in London, the individual brought an action in Germany against both Union CAL Ltd and Union Discount Co Ltd for a negative declaration and a declaration that Union CAL Ltd was obliged to reimburse it in respect of all losses which exceeded the payments already made to it, and it sought a declaration against Union Discount Co Ltd that it had no liability arising under the assignment. The court stayed the proceedings under Article 22 because the second

action was related, but refused a stay under Article 21 of the proceedings against Union CAL Ltd because the claim against Union CAL Ltd was not between the same parties as the London proceedings because only Union Discount Co Ltd was the claimant in London. There is no elaboration of this conclusion.

74 In Case 16 U 110/02, Regional Court of Appeal, Cologne, 8 September 2003, a Greek distributor purchased condensed milk and other milk products from a German supplier, but failed to pay the price. The distributor brought proceedings against the German supplier in the Greek courts, for damages which were said to be greater than the price claimed. The German supplier assigned its claim to the claimant, whose liquidator brought proceedings in Germany for payment. The distributor contested the jurisdiction of the German courts on the basis of Article 27 of the Judgments Regulation . The claimant assignee argued that Article 27 had no application as the proceedings in Greece (distributor v supplier) and in Germany (assignee v distributor) *22 were not between the same parties. The Regional Court of Appeal at Cologne found that Article 27 did apply, and that as the German court was second seised, it had no jurisdiction.

75 Article 27 was held to apply even though the supplier and his assignee, were not the same party. The court held that both under German procedural law (which appears to have been the main basis of the decision) and also under the Judgments Regulation (as interpreted in Drouot ) there was identity of parties because *res judicata* effect extends to an assignee who can therefore plead *lis alibi pendens* (para. 5(a)–(c)).

76 Berkeley Administration Inc v McClelland [1995] ILPr 201 and Turner v Grovit [1999] CLC 1281; [2000] 1 QB 345 each concerned businesses controlled by Mr Felix Grovit, who has made a rich contribution to English and European jurisprudence: see also Berkeley Administration Inc v McClelland [1990] 2 QB 407; Case C-68/93Shevill v Presse Alliance [1995] ECR I-415; [1995] 2 AC 18 ; Shevill v Presse Alliance [1996] AC 959 ; Grovit v Doctor [1997] CLC 1038; [1997] 1 WLR 640 ; Grovit v Nederlandsche Bank [2007] EWCA Civ 953 .

77 But I do not consider that either of these cases is of substantial assistance. In Berkeley Administration Inc v McClelland [1995] ILPr 201 the English proceedings were by Berkeley Administration Inc who ran a chain of bureaux de change. The defendants were ex-employees, and the fourth defendant Maccorp GB was an English company set up by some of the defendants to run a rival bureaux de change business. In the course of that action an order was made against the defendants relating to commercial premises in Paris.

78 In France Berkeley applied to restrain Maccorp France (a wholly owned subsidiary of Maccorp GB) from acquiring any interest in premises in Paris, and then Maccorp GB and Maccorp France countered by issuing their own proceedings in France claiming that Berkeley were by unfair means attempting to prevent Maccorp GB from setting up business in France. The claim of Maccorp France was that the bringing of the French proceedings by Berkeley against Maccorp France was unfair competition and an abuse of process and for a declaration that there had been no unfair competition or misuse of confidential information on the part of Maccorp France or Maccorp GB. Berkeley claimed initially that under Article 21 the claims of Maccorp France and Maccorp GB ought to be stayed in favour of the English courts, but that was abandoned after the judgment adverse to Berkeley on the substance of the matter in April 1990. The French courts decided that none of the claims of any party had been made out.

79 The decision therefore concerned Article 27(3) which provides that a judgment will not be recognised if it is irreconcilable with a judgment given in a dispute between 'the same parties' in the State in which recognition is sought. Dillon LJ said (at para. 29) that because the English order relating to premises in Paris was made against Maccorp GB. Maccorp France was formed after the order was made, *23 but Dillon LJ considered that it was bound by the order (para. 13). Consequently he said (para. 29) that because the order made in England against Maccorp GB bound Maccorp France, he would regard the French proceedings brought by Maccorp GB and Maccorp France and the English action 'as being for all material purposes between the same parties.' He went on (para. 30) 'in the context of this case I would regard it as wholly unreal to separate Maccorp France, the wholly owned subsidiary acquired by Maccorp GB, as being a wholly separate company with the result that the parties are different because Maccorp France has never been formally a party to this action.' Consequently the parties were the same even though Maccorp France was not in English procedural terms a party.

80 In Turner v Grovit [1999] CLC 1281; [2000] 1 QB 345 Mr Grovit was the guiding mind, controller and ultimate owner of Harada (an Irish company) and CSA (a Spanish company). Mr Turner was employed as group solicitor, and moved to the group's Madrid office. He commenced proceedings in

the Employment Tribunal in London against Harada. Subsequently CSA issued proceedings against him in Madrid for damages for breach of a contract of service. In the Court of Appeal he was granted an injunction to restrain the Spanish proceedings on the basis that they had been brought to harass and oppress him. In support of the application for an injunction it was argued on his behalf that the Employment Tribunal was the court first seised and consequently the Spanish court would be obliged by Article 21 to decline jurisdiction. Laws LJ said (at 1299; 363—4) that even though Harada and CSA were distinct legal entities:

> '... for the purposes of article 21 ... I do not consider that Mr Supperstone [counsel for Grovit] can be heard to say that there is no identity of parties. Here the argument overlaps for that relating to abuse: the deployment of CSA, a Spanish company, as claimant in Madrid is nothing but a device to confer putative jurisdiction on the Spanish court. That is not only in the circumstances of the case abusive upon ordinary principles of our domestic law. In addition, for this court to treat it as reality rather than the sham and pretence which it plainly is, and accordingly to deny what is otherwise the clearly established jurisdiction of the tribunal under article 21, would in my judgment tend to undermine what Lord Goff of Chieveley has called in Airbus Industrie GIE v Patel [1998] CLC 702, 707G; [1999] 1 AC 119 , 132B, "the primary purpose of the Convention [viz.] to ensure that there should be no clash between the jurisdictions of member states of the Community."
>
> Moreover, there is jurisprudence of the Court of Justice to show that the issue of identity of parties, in the context of article 21, is to be regarded pragmatically, just as is that of identity of cause of action ...'

and he went on to quote paragraphs 19 and 20 of Drouot , and to conclude that for the purposes of Article 21 the cause of action, subject matter and parties were the same, *24* and it was therefore beyond argument that the employment tribunal was the court first seised.

81 But subsequently ( [2001] UKHL 65 ; [2002] CLC 463) the House of Lords referred to the European Court the question whether it was consistent with the Brussels Convention to grant anti-suit injunctions to restrain proceedings in other Contracting States, and received an answer in the negative: Case C-159/02 Turner v Grovit [2004] 1 CLC 864; [2004] ECR I-3565. Consequently the judgment of the Court of Appeal lost its substratum. Nevertheless what Laws LJ said about identity of parties being regarded pragmatically accords with the rulings of the European Court.

82 In Sony Computer Entertainment Ltd v RH Freight Services Ltd [2007] EWHC 302 (Comm) proceedings were commenced in the Netherlands, and subsequently in England. The claimant in the English proceedings was not a party to the Dutch proceedings, but the plaintiff in the Dutch proceedings sought a stay of the English proceedings on the ground that the fact that the claimant's insurer was a party to the Dutch proceedings made the two sets of proceedings between the same parties for the purposes of article 27 . It was held that they were not the same parties because a judgment in the Dutch proceedings as to the amount of damages recoverable would not be determinative (because, in particular, the claim for damages was over and above the insured sum).

83 Finally, in Re Cover Europe Ltd [2002] EWHC 861 (Ch) Mr Leslie Kosmin QC, sitting as a Deputy High Court Judge in the Chancery Division, had to consider whether a liquidator of a company, appointed under the Insolvency Act 1986 , could be regarded as the same party as the company for the purposes of Article 21 of the Brussels Convention . CEL gave a guarantee to Kvaerner (the well known Finish construction company) to secure the performance by an Italian company of its payment obligations to Kvaerner which had agreed to build a ship for it. The Italian company defaulted and subsequently went into liquidation in Italy. CEL went into members' voluntary liquidation in England, and Kvaerner submitted a proof in the liquidation in respect of CEL's liability under the guarantee. The liquidator challenged the validity of the guarantee, but instead of rejecting Kvaerner's proof, it indicated that it would issue proceedings in Rome to determine whether the guarantee was valid. Kvaerner issued an application under the Insolvency Act 1986 in England to seek a direction from the Companies Court that the liquidator should admit its proof. Subsequently the liquidator caused CEL to issue proceedings in Rome against Kvaerner and the Italian company seeking a declaration that the guarantee was invalid.

84 The Companies Court directed a trial of preliminary issues to determine whether Kvaerner's application in England should be stayed in favour of the Rome proceedings, and one of the questions was whether the two sets of proceedings involved the same cause of action and/or the same parties

within the meaning of Article 21 . The deputy judge found that although the proceedings in Rome had been issued in the name of CEL acting by its liquidator and the application in England had *25 been made in the name of the liquidator, for the purpose of construing Article 21 the issue 'must be decided as a matter of substance and not form'. There was no relevant distinction between the liquidator as respondent in making his application in England for directions and CEL acting by its liquidator as claimant in the Rome proceedings. Accordingly both proceedings were between 'the same parties' within the meaning of Article 21 .

85 The starting point is that these general propositions can be derived from The Tatry and Drouot . First, the object of Article 27 is to prevent parallel proceedings in different Member States and to avoid conflicts between decisions and irreconcilable judgments: The Tatry , para. 32; Drouot , para. 17. Second, the term between 'the same parties' has an independent or autonomous meaning: The Tatry , para. 47. Third, in considering whether two entities are the 'same party' for the purposes of applying the regulation, the court looks to the substance, and not the form: The Tatry . Fourth, although the parties must be 'identical' ( The Tatry , para. 33; Drouot , para. 18), this identity is not destroyed by the mere fact of there being separate legal entities involved: in The Tatry in the English proceedings the party was the sister-ship, and in the Dutch proceedings was the shipowner; in Drouot the barge owner and the hull insurer were held to be capable of being the 'same parties'. Fifth, whether they are identical for this purpose may depend on whether there is such a degree of identity between the interests of the entities that a judgment given against one of them would have the force of res judicata as against the other ( Drouot , para. 19). Sixth, it will also depend on whether the interests of the entities are identical and indissociable, and it is for the national court to ascertain whether this is in fact the case: Drouot , para. 23. In the context of a subrogated claim the Court also emphasised that the insured would not be in a position to influence the proceedings: Drouot , para. 19.

86 How are these principles to be applied to the present case? If there has been an effective legal assignment of the rights of the original claimants under the Assignment, then ( section 136(1) of the Law of Property Act 1925 ) the assignment is effective to transfer (from the date of notice to the 'debtor'), the legal right in the thing in action transferred, all legal and other remedies for the thing in action and also '... the power to give a good discharge for the same without the concurrence of the assignor.' As the judge said ( para. 69 of the judgment), the effect of this is that the assignee becomes the owner of the thing in action. He can sue the debtor in his own name without joining the assignor: Re Westerton; Public Trustee v Gray [1919] 2 Ch 104 . The assignor has no further interest in the right in action: see Compania Colombiana de Seguros v Pacific Steam Navigation Co [1965] 1 QB 101 , 121.

87 First, as I have said, the parties must be 'identical' ( The Tatry , para. 33; Drouot , para. 18), but this does not mean that two separate legal entities cannot be 'identical' for this purpose, as is shown by the rulings in those cases.

88 Second, a decision against one must be res judicata as against the other. In English law res judicata estoppels operate for or against not only the parties, but those *26 who are privy to them in interest, and privies include any person who is identified in estate or interest, and accordingly 'assignees will be bound as privies of the assignor' (Spencer Bower, Turner and Handley, Res Judicata (3rd edn. 1996), 230—231, citing Effem Foods Pty Ltd v Trawl Industries Pty Ltd (1993) 43 FCR 510 , 540—2). Sir Robert Megarry VC said in Gleeson v J Wippell & Co Ltd [1977] 1 WLR 510 (in a passage approved in Johnson v Gore Wood & Co [2002] 2 AC 1 at 10, per Lord Bingham of Cornhill, and applied in Powell v Wiltshire [2004] EWCA Civ 534; [2005] QB 117 ):

> '... it seems to me that the substratum of the doctrine is that a man ought not to be allowed to litigate a second time what has already been decided between himself and the other party to the litigation. But I cannot see that this provides any basis for a successful defendant to say that the successful defence is a bar to the plaintiff suing some third party, or for that third party to say that the successful defence prevents the plaintiff from suing him, unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the alter ego of the other: but it does seem to me that, having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase "privity of interest".'

89 I am satisfied that there is the requisite privity of interest which would preclude an assignor from re-litigating any finding on liability under the contracts in a proceeding to which the assignee had been a party.

90 Third, their interests must be 'identical' and 'indissociable'. The word 'indissociable' is very rarely used in English legal parlance except where it has been used to translate the same French word in judgments of the European Court of Justice and the European Court of Human Rights, and acts of the European institutions. The point frequently arises in the context of VAT in determining whether the supply of goods and services is one service, or two: see, e.g. Case 353/85 EC Commission v UK [1988] ECR 817 ; Doctor Beynon and Partners v C & E Commrs [2004] UKHL 53 . The European Court of Human Rights has emphasised that some of the rights are indissociable from 'a danger of arbitrary power' ( Golder v UK (1979–80) 1 EHRR 524 , para. 35) or indissociable 'from a democratic society' ( Kokkinakis v Greece (1994) 17 EHRR 397 , para. 31: see also New Testament Church of God v Stewart [2007] EWCA Civ 1004 , paras. 38—39). So also Council Regulation 243/2003 (Dublin II) provides in Article 4(iii) that the situation of a minor who is accompanying the asylum seeker and meets the definition of a family member is to be 'indissociable' from that of his parent or guardian: see AA (Somalia) v Secretary of State for the Home Department [2006] EWCA Civ 1540 .

*27

91 In my judgment the interests are identical, because in relation to each of the SPAs there is only one right, and there are successive owners of that one right. It follows that the interests of assignor and assignee are indissociable in the sense of indivisible. It does not matter that an assignment only passes the benefit and not the burden of a contract, nor that the assignor remains primarily liable to the obligor for the non-performance of its outstanding contractual obligations. The interest of the assignor and assignee in relation to the claim being advanced against the appellants is identical. There is also force in the point made by Kolden that the question of outstanding contractual obligations is irrelevant on the facts, as the SPAs are executed so far as the original claimants are concerned; they have no further obligations under the SPAs. It is the appellants who continue to have an obligation under the SPAs, viz. to transfer the Maltsovsky shares immediately onwards to JV (or to pay damages for breach of that obligation).

92 Fourth, in Drouot (para. 19) the European Court mentioned, in the context of subrogation, the fact that the insured could not influence the proceedings. I accept Kolden's answer to the point made by the appellants that the original claimants could influence proceedings involving assignees, because they could seek to be added to the claim, e.g. in response to the appellants' contention that the Assignment is invalid. The answer is that the question of 'the same parties' is to be determined by looking at the claims, and not at the subsequent defences.

93 This approach is supported by the European Court's decision on a similar question in relation to 'the same cause of action' in Article 27 . For the purposes of Article 27 , the question whether the 'same cause of action' is raised before the courts of two Member States is answered by looking at the claims made, and not at the defences raised at a later stage to those claims: Case C-111/01 Gantner Electronic GmbH v Basch Exploitatie Maatschappij [2003] ECR I-4207 , para. 30: whether the 'same cause of action' is raised in the two actions is to be determined on the basis of 'the respective claims in each of the sets of proceedings, and not to the defence which may be raised by a defendant.' For a similar approach on whether an action is a civil or commercial matter see Case C-266/01 Préservatrice Foncière TIARD SA v Netherlands [2003] ECR I-4867 , para. 42: 'In order to determine whether an action falls within the scope of the Brussels Convention , only the subject-matter of the action must be taken into account.'

94 Nor is there anything in the appellants' points on the claim form and the particulars of claim. The amended claim form complies with CPR 16.2 , which provides that it must contain a concise statement of the 'nature of the claim'. Nor is there anything in the suggestion that the particulars of claim, in referring to Kolden's 'interest,' shows that its interests do not coincide with those of the original claimants. All the passage was doing was responding to the allegation of champerty.

95 I also accept Kolden's submission (as indeed does Mr Eder QC) that the appellants' approach gives rise to a number of anomalous and arbitrary consequences. *28 First, if Kolden's submissions are wrong, and assignor and assignee are not the same party for the purposes of Article 27 , there would be an easy way to defeat the application of Article 27 and frustrate the purpose of the Regulation. If A sues B, and B wishes to sue A in a reverse action in another Member State, B cannot, because B's action against A will be second in time, and the court second seised would have to decline jurisdiction under Article 27 . However, if B assigns his claim to C, and C sues A, C will be

able to do so, because (on this hypothesis) Article 27 will have no application as B and C are not the same parties. So also if a claim is made in England by C1 against D, and D is warned that C2 will take an assignment of the claim and continue it in its own name, D may institute proceedings of its own in another Member State against C2 in the time gap. The result would be that the English court would be first seised only of the claim by C1, but would be second seised so far as concerns the claim involving C2. Mr Eder's only, but insufficient, answer was that the absurd consequences would be avoided by a stay under Article 28 .

96 I would therefore dismiss the appeal, and express the hope that the parties (having wasted some £400,000 on this sterile exercise) will now turn their attention to dealing with the substance of their dispute.

Rimer LJ:

97 I agree.

Tuckey LJ:

98 I also agree.

(Appeal dismissed)

*29

© 2008 Sweet & Maxwell Ltd

Westlaw.UK