Pursuant to Court Order, Certain References to Confidential Information in this Rule 56.1 Statement Have Been Filed Under Seal and are Redacted Herein

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

DK ACQUISITION PARTNERS, L.P.,
KENSINGTON INTERNATIONAL LIMITED,
RUSHMORE CAPITAL-I, L.L.C., RUSHMORE
CAPITAL-II, L.L.C., and SPRINGFIELD
ASSOCIATES, LLC.,

                      Plaintiffs,

v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, J.P. MORGAN SECURITIES,
INC., CITIGROUP INC., CITIBANK, N.A. and
CITIGROUP GLOBAL MARKETS, INC. f/k/a
Salomon Smith Barney,

                      Defendants.

Civil Action No. 08 Civ. 0446 (LTS)

---

(Caption continued on next page)

------------------------------------------------------------- X
AVENUE CAPITAL MANAGEMENT II, L.P.,
GRACIE CAPITAL, L.P., HALCYON FUND,
L.P., KING STREET CAPITAL, L.P.,
LONGACRE MASTER FUND, LTD., MAN MAC
3 LIMITED, ORE HILL FUND HUB LTD.,
MARATHON SPECIAL OPPORTUNITY
MASTER FUND, LTD., RCG CARPATHIA
MASTER FUND, LTD., REDWOOD MASTER
FUND, LTD., SCOGGIN CAPITAL
MANAGEMENT, L.P. II, SCOGGIN
INTERNATIONAL FUND, LTD., SCOTTWOOD
CAPITAL MANAGEMENT, LLC, SPCP GROUP,
LLC, STRATEGIC VALUE CREDIT
OPPORTUNITIES MASTER FUND, L.P.,
STRATEGIC VALUE MASTER FUND, LTD.,
and TRILOGY CAPITAL, LLC,

                              Plaintiffs,

    v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, J.P. MORGAN SECURITIES,
INC., CITIGROUP INC., CITIBANK, N.A., and
CITIGROUP GLOBAL MARKETS, INC. f/k/a
Salomon Smith Barney,

                              Defendants.
------------------------------------------------------------- X

Civil Action No. 08 Civ. 0447 (LTS)

# DEFENDANTS' STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1, IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rule 56.1 of the Local Rules for the Southern District of New York, Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities Inc. (collectively, "JPMorgan Chase"), and Citigroup Inc., Citibank, N.A., and Citigroup Global Markets, Inc., f/k/a Salomon Smith Barney Inc. (collectively, "Citigroup") submit this Statement of Material Facts in support of their motion for summary judgment.

I.  THE ENRON CREDIT FACILITIES

1. In May 2000, more than fifty-five financial institutions ("Original Lenders") entered into an agreement to provide Enron with a $1.25 billion, five-year revolving credit facility (the "Long-Term Revolver"). *See* Ex. 1;[1] *see also* DK Cplt. ¶ 2; Avenue Capital Cplt. ¶ 5.[2]

2. In May 2001, many of the same banks entered into an agreement to provide Enron with a $1.75 billion, 364-day revolving credit facility (the "Short-Term Revolver"; together with the Long-Term Revolver, the "Revolving Credit Facilities"). *See* Ex. 2; *see also* DK Cplt. ¶ 2; Avenue Capital Cplt. ¶ 5.

3. A third facility – a $500 million letter of credit facility in favor of Enron, involving the same banks as the Short-Term Revolver and that is relevant only for purposes of the *Avenue Capital* action – was also entered into in May 2001 (the "LC Facility"; together with the Revolvers, the "Credit Facilities"). *See* Ex. 3; *see also* Avenue Capital Cplt. ¶ 5.

4. JPMorgan Chase and Citigroup acted as Co-Arrangers and Co-Administrative Agents under the Credit Facilities, with Citigroup also acting as Paying Agent

---

[1] All citations to "Ex. __" refer to the exhibits to the Affidavit of Alan C. Turner submitted herewith.

[2] All citations to "DK Cplt" are to the Second Amended Complaint in *DK Acquisition Partners L.P., et al. v. JPMorgan Chase & Co., et al.*, No. 08 Civ. 446, and all citations to "Avenue Capital Cplt" are to the First Amended Complaint in *Avenue Capital Management II, L.P., et al. v. JPMorgan Chase & Co., et al.*, No. 08 Civ. 447.

under the Revolving Credit Facilities and JPMorgan Chase acting as Paying Agent under the LC Facility. *See* Exs. 1, 2, 3.

5. The Revolving Credit Facilities were initially unfunded and were meant to "be used for general corporate purposes, including the backstopping of Enron's commercial paper program," providing protection in the event Enron faced an immediate need for cash to redeem commercial paper upon its maturity if the company was unable to issue fresh commercial paper to replace it. *See* Exs. 4, 5.

6. On October 25, 2001, Enron was forced to borrow the full $3 billion available under the Revolving Credit Facilities. *See* Exs. 6, 7; *see also* DK Cplt. ¶¶ 3, 32; *Avenue Capital* Cplt. ¶ 198.

7. On December 2, 2001, when Enron filed for bankruptcy, the Original Lenders were still owed the $3 billion they had advanced to Enron on October 25, 2001, under the Revolving Credit Facilities, and were also ultimately owed an additional $374 million by Enron on several letters of credit that were issued and drawn under the LC Facility. *See* DK Cplt. ¶ 3; *Avenue Capital* Cplt. ¶ 210.

## II. ASSIGNMENTS UNDER THE CREDIT FACILITIES

8. The credit agreements relating to each of the three Credit Facilities ("Credit Agreements") specify the requirements that must be met for a valid assignment by an Original Lender of its rights and obligations under the Credit Facilities to another party. *See* Exs. 1 & 2 § 9.06.[3]

---

[3] Under the LC Facility, the corresponding provision is Section 10.06. *See* Ex. 3 § 10.06. Accordingly, references herein to Section 9.06 should also be read as referring to Section 10.06 of the LC Facility.

2

9. Under Section 9.06(a), an assignment of rights and obligations under the Credit Facilities requires that the assignor and assignee, among other things, execute and deliver to the Paying Agent an "Assignment and Acceptance." *See* Exs. 1 & 2 § 9.06(a).

10. Specifically, Section 9.06(a) provides:

> Each bank may, in accordance with applicable law, assign to one or more banks or other entities all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Advances owing to it and the Note held by it); <u>provided, however,</u> that . . . (iii) each such assignment shall be to an Eligible Assignee, and (iv) the parties to each such assignment shall execute and deliver to the Paying Agent (with a copy to be provided to the Co-Administrative Agents), for acceptance by the Paying Agent and recording by the Paying Agent in the Register, an Assignment and Acceptance, together with any Note then held by such assigning Bank and any Note then held by such assignee and a processing and recordation fee of $3,000[.]"

Exs. 1 & 2 § 9.06(a).

11. An "Eligible Assignee" is defined as "(a) any Bank, and (b) with the consent of the Paying Agent and the Borrower (which consent will not be unreasonably withheld), any other commercial bank or financial institution not covered by clause (a) of this definition . . . ." Ex. 1 at JPMUCI0008445; Ex. 2 at JPMUCI0003174.

12. "Banks" are defined as "the lenders listed on the signature pages hereof and each Eligible Assignee that becomes a Bank party hereto pursuant to Section 2.16, Section 2.18 or Section 9.06(a), (b) and (d)." Ex. 1 at JPMUCI0008442; Ex. 2 at JPMUCI0003171.

13. The Credit Agreements require that any Assignment and Acceptance delivered to the Paying Agent under Section 9.06 must be "in substantially the form of Exhibit F." *See* Exs. 1 & 2 § 9.06(a).

14. Exhibit F is a form Assignment and Acceptance document, laying out the terms and conditions of the assignment. Pursuant to the Assignment and Acceptance, the

3

assigning party "sells and assigns to the Assignee, without recourse, and the Assignee hereby purchases and assumes from Assignor, an interest in and to all of the Assignor's rights and obligations under the Credit Agreement and the other Loan Documents[.]" *See* Ex. 1 at JPMUCI0008571; Ex. 2 at JPMUCI0003291.

15. Where the assignee is not a "Bank" as defined in the agreements, but rather an "Eligible Assignee," Section 9.06 requires that both the Paying Agent and Enron expressly consent to the assignment by executing the Assignment and Acceptance. *See* Exs. 1 & 2 § 9.06; Ex. 1 at JPMUCI0008574; Ex. 2 at JPMUCI0003294; *see also* Ex. 10.

16. A valid transfer of an Original Lender's rights and obligations under the Credit Agreements, and valid transfers by each successor-in-interest in the chain of title between the Original Lender and the Plaintiff, requires execution, delivery and acceptance of a valid Assignment and Acceptance substantially in the Form of Exhibit F to the Credit Agreements. *See* Exs. 1 & 2 ¶ 9.06(a).

17. The Credit Agreements provide no other method for the assignment of claims under the Credit Facilities.

### III. PLAINTIFFS' PURCHASES OF ENRON DEBT

18. The *DK* and *Avenue Capital* Plaintiffs are 22 separate investment funds that specialize in purchasing distressed debt in the secondary market. *See* DK Cplt. ¶ 16; Avenue Capital Cplt. ¶ 33.

19. After Enron filed for bankruptcy on December 2, 2001, Plaintiffs purchased large amounts of Enron debt (at varying discounts to par), including debt owed by Enron under the Credit Facilities. *See* DK Cplt. ¶ 18; Avenue Capital Cplt. ¶ 34.

20.     The *DK* Plaintiffs claim to have purchased more than $1.57 billion worth of debt under the Credit Facilities. *See* Ex. 8 at 7.

21.     The *Avenue Capital* Plaintiffs claim to have purchased approximately $552 million of debt under the Credit Facilities. *See* Ex. 9 at 3.

IV. **DEFICIENCIES IN PLAINTIFFS' ASSIGNMENT DOCUMENTATION**

    A.     **Missing Assignment and Acceptance Documents**

22.     The *DK* Plaintiffs designated William C. Carey as their damages expert. In his June 1, 2006 expert report, Mr. Carey undertook to trace the *DK* Plaintiffs' chain of title for each of its alleged debt holdings. *See* Ex. 8 at 2, 8-11.

23.     Mr. Carey identified in his expert report at least twenty-six separate instances in which an Assignment and Acceptance is missing from one or more of the transactions forming the chain of title through which Plaintiffs seek to establish a valid transfer of ownership from the Original Lender to the Plaintiff. *See, e.g.*, Ex. 8 at Exhibit 1 thereto, at 11, 13, 15, 20, 21, 41, 59, 90, 126, 127, 129, 130-131, 132, 133, 135, 137, 141-144, 156, 162, 168-169, 176, 190.

24.     The *Avenue Capital* Plaintiffs' documentation likewise suffers from this defect. For example, in July 2003, Strategic Value Master Fund, Ltd. purportedly purchased ▓▓▓▓▓▓ of debt under the Short-Term Revolver from ▓▓▓▓▓▓; however, an Assignment and Acceptance does not appear to have been produced for this transaction or the prior transactions in the chain of title.

5

### B. Missing Purchase and Sale Agreements

25. Purchase and Sale Agreements produced by Plaintiffs in these actions purport to memorialize the terms of a sale of Enron debt and identify the specific interests being transferred. *See, e.g.*, Ex. 11.

26. Purchase and Sale Agreements are not effective to give the purchaser rights and obligations under the terms of the Credit Agreements, which require that an Assignment and Acceptance be delivered and accepted. *See* Exs. 1 & 2 § 9.06(a).

27. The Purchase and Sale Agreements contain provisions that expressly purport to transfer tort claims, which Plaintiffs seek to assert here. *See* Ex. 11 at ¶ 1 "Transferred Rights" (DK-KSF000208).

28. The Assignment and Acceptance documents are silent as to the transfer of tort claims. *See* Ex. 1 at JPMUCI0008571-74; *see also* Ex. 2. at JPMUCI0003291-94.

29. Plaintiffs have not produced Purchase and Sale Agreements for many of the transactions through which they claim to have acquired the right to assert tort and other claims against Defendants.

30. Mr. Carey identified in his expert report at least twenty-one instances of missing Purchase and Sale Agreements in the case of the *DK* Plaintiffs alone. *See, e.g.*, Ex. 8 at Exhibit 1 thereto, at 19, 40-41, 49, 75-76, 100-101, 103-106, 125-127, 137, 143, 156, 162, 176, 190.

31. With respect to the *Avenue Capital* Plaintiffs, an illustrative example is an October 2004 purchase by Man Mac 3 Limited of ▮▮▮▮▮ of debt under the Short-Term Revolver, for which a Purchase and Sale Agreement does not appear to have been produced.

### C. Unexecuted Documents

32. In addition, there are numerous instances in Plaintiffs' chain-of-title documentation in which the Assignment and Acceptance and/or the Purchase and Sale Agreement are not executed. *See, e.g.*, Ex. 12.

33. Mr. Carey identified in his expert report at least seven instances of unexecuted assignment documents in the *DK* Plaintiffs' documents. *See* Ex. 8 at Exhibit 1 thereto, at 23, 48, 52, 140-141, 144.

34. Such defects also affect the *Avenue Capital* Plaintiffs. For example, the Purchase and Sale Agreement produced by Strategic Value Master Fund in connection with its purchase from ▮▮▮▮▮ of ▮▮▮▮▮ of debt under the Short-Term Revolver is not executed. *See* Ex. 12.

### D. Inconsistent Documents

35. There are also a number of purported assignment transactions in which the documents are inconsistent with one another or as to which the chain of title is otherwise unclear. For example, in one such transaction, the Assignment and Acceptance states that ▮▮▮▮▮ of debt is being transferred to a purported predecessor-in-interest to a *DK* Plaintiff, whereas the Purchase and Sale Agreement states that only ▮▮▮▮▮ is being transferred. *See, e.g.*, Ex. 13.

36. Mr. Carey identified at least seven *DK* transactions that suffer from this defect. *See* Ex. 8 at Exhibit 1 thereto, at 46-47, 69-73.

### E. Identity of Original Lenders Uncertain

37. For some of Plaintiffs' transaction, the documentation does not delineate which of several possible Original Lenders' interests a particular Plaintiff acquired or currently holds.

38. For example, with respect to the *Avenue Capital* Plaintiffs, on October 2005, Redwood Master Fund, Ltd. ("Redwood") purchased from ▇▇▇ a participation interest in ▇▇▇ worth of debt in the LC Facility. *See* Ex. 14. ▇▇▇, in turn, had previously purchased an unspecified amount of debt from at least two of the Original Lenders, ▇▇▇ and ▇▇▇. Based on the documents produced by Plaintiffs, it is impossible to discern how much of Redwood's October 2005 purchase originated with ▇▇▇ as opposed to ▇▇▇.

39. In another example, in June 2003, Scoggin Capital Management, L.P. II ("Scoggin"), another of the *Avenue Capital* Plaintiffs, purchased ▇▇▇ under the Long-Term Revolver from ▇▇▇. *See* Ex 15. ▇▇▇, however, had previously purchased ▇▇▇ of debt from two different Original Lenders, ▇▇▇ and ▇▇▇, and the documents produced by Scoggin do not establish whether the debt Scoggin purchased in June 2003 originated with ▇▇▇, ▇▇▇ or perhaps both.

F. **Additional Information Provided By *Avenue Capital* Plaintiffs**

40. The *Avenue Capital* Plaintiffs have themselves identified many transactions that appear to suffer from this type of defect. *See* Ex. 17.

41. On February 8, 2006, Defendants' counsel wrote a letter to the *Avenue Capital* Plaintiffs' counsel, complaining that their production of assignment documents was incomplete and disorganized and that their responses to Defendants' interrogatories did not adequately identify the Original Lenders in whose shoes the *Avenue Capital* Plaintiffs purport to stand. *See* Ex. 16.

8

42. In response, the *Avenue Capital* Plaintiffs produced supplemental information purporting to clarify their interrogatory responses and to identify the Original Lenders for each of their alleged claims. See Ex. 17. For each Plaintiff entity, the *Avenue Capital* Plaintiffs produced a list of their alleged debt holdings, along with the date of purchase, amount purchased, and the alleged identity of the Original Lender. *Id.*

43. Tellingly, however, even by the *Avenue Capital* Plaintiffs' own admission, they were unable to identify the Original Lenders that correspond to some of their holdings. For some of their alleged holdings, the *Avenue Capital* Plaintiffs stated "Information Unavailable" as to the identity of the Original Lender. See Ex. 17. (Man Mac 3 Limited purchase of ▮▮▮▮ under LC Facility). For other transactions, the *Avenue Capital* Plaintiffs appear to identify several banks as being the Original Lenders for the same piece of debt. *See id.* (Man Mac Limited purchase of ▮▮▮▮ under the LC Facility).

G. **Testimony of Mr. Carey on Behalf of the *DK* Plaintiffs**

44. With respect to the *DK* Plaintiffs, Mr. Carey testified at his deposition in these proceedings in his expert capacity on behalf of the *DK* Plaintiffs on October 5, 2006.

45. Mr. Carey testified that in some cases, he was unable to trace the *DK* Plaintiffs' debt holdings back to a particular Original Lender based on his review of the documents alone, and instead had to rely entirely on the *DK* Plaintiffs' counsel's oral representations to him. See Ex 18 at 89:2-97:16.

46. Specifically, when an Assignment and Acceptance or Purchase and Sale Agreement was missing from Plaintiffs' documentation, Mr. Carey testified that he "was able to address inquiries to counsel and they were able to tell us how it happened." Ex. 18 at 96:21-97:9.

9

47. Mr. Carey was asked the following question at his deposition: "So some of the tracing analysis is based on oral communications you got from Plaintiffs' counsel?" Mr. Carey answered: "I think so, yes." Ex. 18 at 97:13-16.

## V. THE *AVENUE CAPITAL* PLAINTIFFS' PARTICIPATION INTERESTS

48. Based on the discovery the *Avenue Capital* Plaintiffs have provided, it appears that for a significant portion of their claims in all three Credit Facilities, they merely purchased a participation interest in debt legally held by other parties. *See, e.g.*, Ex. 14.

49. Discovery has further revealed that none of the transactions by which the *Avenue Capital* Plaintiffs acquired their participation interests were documented by use of the Assignment and Acceptance form required by the Credit Agreements. Instead, a "Participation Agreement" was typically used. *See, e.g.*, Ex. 14.

50. Many of the participation agreements that the *Avenue Capital* Plaintiffs entered into expressly state that "[p]ursuant to this Agreement, Seller wishes to grant to Participant and Participant wishes to purchase from Seller an undivided 100% participation in the Seller's interest." *See* Ex. 14.

51. The participation agreements also contain "elevation" provisions, which provide that:

> [U]pon payment of the Purchase Price to Seller, Buyer shall, until receipt of the Required Consents, automatically and without further action acquire and hold a 100% participation interest in the rights and obligations underlying the Transferred Rights (the "Participation") and agrees to reimburse Seller for the Assumed Obligations. The Parties shall thereafter use commercially reasonable good faith efforts to convert the Participation to an outright assignment as contemplated by this Agreement and, upon the receipt of all necessary consents to the Assignment (including without limitation, payment of the Transfer Fee (which shall be shared equally between Buyer and Seller) the Participation shall automatically elevate to a full assignment (the "Elevation") and the

> Transferred Rights shall be assigned to Buyer without further action by either party.

Ex. 20 § 14.1(a)

52. The "Required Consents" that must be obtained before any rights are transferred to the buyer are defined in the participation agreements as "the consent of the [Paying] Agent, the Borrower and the Issuing Bank (as defined in the Credit Agreement)." *See id.* at AC-ACM-10000033.

53. The *Avenue Capital* Plaintiffs have produced no documents in discovery evidencing that the mandatory consents called for under the participation agreements were ever obtained for any of their holdings acquired through participations.

54. The participation agreements further provide that the party from whom the participation was purchased retains responsibility and authority for asserting any claims in connection with the Credit Agreement. For example, one such agreement states that "all decisions in respect of Litigation," including claims against Defendants, "will be made by Seller in its sole discretion . . . ." Ex. 21 § 14.1(b).

55. The Credit Agreements themselves make clear that if a Bank that is party to the Credit Agreement sells a participation interest to another entity, "such Bank's obligations under this Agreement . . . shall remain unchanged . . . [and] such Bank shall remain solely responsible to the other parties hereto for the performance of such obligations . . . ." Exs. 1 & 2 § 9.06(e).

56. Of the $552 million of debt that the *Avenue Capital* Plaintiffs claim to hold in the Credit Facilities, close to ▓▓▓▓ was originally made up of such participation interests, with approximately ▓▓▓▓ under the LC Facility, approximately ▓▓▓▓ under the Long-Term Revolver, and approximately ▓▓▓▓ in the Short-Term Revolver.

VI.     THE *AVENUE CAPITAL* PLAINTIFFS' "PARTIAL ASSIGNMENTS OF INTEREST"

57.     Beginning in May 2006, the *Avenue Capital* Plaintiffs began attempting to cure their lack of standing by obtaining "Partial Assignments of Interest." *See, e.g.*, Ex. 19.

58.     To date, discovery reveals that the *Avenue Capital* Plaintiffs have attempted to convert approximately ▓▓▓▓▓ worth of their participations into Partial Assignments of Interest.

59.     The remaining amount, approximately ▓▓▓▓▓, is still held solely through participations.

60.     The Partial Assignments of Interest appear to be agreements between the *Avenue Capital* Plaintiffs and the parties from whom they previously purchased a participation interest in the Credit Facilities. *See, e.g.*, Ex. 19.

61.     The Partial Assignments of Interest provide that "notwithstanding anything to the contrary contained in the Temporary Participation Agreement . . . Assignor irrevocably sells, assigns, transfers and grants unto Assignee all of Assignor's right, title and interest in and to the portion of Assigned Rights specifically described in [the participation agreement]." Ex. 19.

62.     The Partial Assignments of Interest further provide that "Assignor agrees . . . [to] take all such actions in accordance with applicable law as Assignee may reasonably request to effect the assignment of the Assigned Claims hereunder, in each case at Assignee's expense." Ex. 19.

63.     The Partial Assignments of Interest also state that "Assignor further ratifies and authorizes the continuation of the action concerning the Assigned Claims brought by Assignee in the United States District Court for the Southern District of Texas styled 'Avenue

Capital Management II, L.P., et al, v. J.P. Morgan Chase & Co. et al., Civil Action No. H-05-3031,' to the extent such action relates to the Assigned Claims and agrees to be bound by the result in that action to the extent the results relate to the Assigned Claims." Ex. 19.

64. The Partial Assignments of Interest are executed only by the "assignor" and one or other of the *Avenue Capital* Plaintiffs. Ex. 19.

65. Under Section 9.06(a) of the Credit Agreements, a valid assignment requires that the parties to the transaction execute and submit to the Paying Agent an Assignment and Acceptance substantially in the form prescribed by the Credit Agreement. *See* Exs. 1 & 2 § 9.06(a).

66. The terms of the *Avenue Capital* Plaintiffs' Partial Assignments of Interest substantially differ from the terms set forth in the Assignment and Acceptance form prescribed by the Credit Agreements. *See* Exs. 10, 19.

67. Specifically, the Partial Assignments of Interest purport only to transfer the "assigned rights" that are described in the earlier participation agreements, but are completely silent as to any assignment of the rights and obligations described in the Credit Agreements and the Assignment and Acceptance. *See* Ex. 19.

68. Under Section 9.06(a) of the Credit Agreements, any party that was not an original signatory to the Credit Facilities who wishes to obtain an Original Lender's "rights and obligations" under the Credit Facilities must first obtain the consent of the Paying Agent and Enron for such an assignment to be valid. *See* Ex. 1 at JPMUCI0008445; Ex. 2 at JPMUCI0003174.; *see also* Exs. 1 & 2 § 9.06(a); Ex. 1 at JPMUCI0008574; Ex. 2 at JPMUCI0003294.

69. The Partial Assignments of Interest are not executed by the Paying Agent or Enron and did not receive the consents required under the Credit Agreements. *See* Ex. 19.

70. Under Section 9.06(a) of the Credit Agreements, "the amount of . . . each such assignment . . . shall in no event be less than $5,000,000." See Exs. 1 & 2 § 9.06(a).

71. Of the seventy-three pieces of debt that the *Avenue Capital* Plaintiffs originally obtained through "participations" and have attempted to convert to "Partial Assignments of Interest," only nineteen of them are for $5 million or more.

Dated: July 11, 2008

                    Respectfully submitted,

                    _/s/ Thomas C. Rice_
                    Thomas C. Rice
                    David J. Woll
                    Alan C. Turner
                    Gabriel Torres
                    SIMPSON THACHER & BARTLETT LLP
                    425 Lexington Avenue
                    New York, NY 10017
                    Telephone: (212) 455-2000
                    Facsimile: (212) 455-2502
                    trice@stblaw.com

                    *Attorneys for Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities Inc.*

                    _/s/ Michael E. Gertzman_
                    Brad S. Karp
                    Richard A. Rosen
                    Michael E. Gertzman
                    Claudia L. Hammerman
                    Robyn F. Tarnofsky
                    Julia Tarver Mason
                    Jonathan H. Hurwitz
                    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
                    1285 Avenue of the Americas
                    New York, New York 10019-6064
                    (212) 373-3000
                    (212) 757-3990 (Facsimile)
                    mgertzman@paulweiss.com

                    *Attorneys For Defendants Citigroup Inc., Citibank N.A., and Citigroup Global Markets Inc. (f/k/a Salomon Smith Barney Inc.)*