## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

DK ACQUISITION PARTNERS, L.P.,
KENSINGTON INTERNATIONAL LIMITED,
RUSHMORE CAPITAL-I, L.L.C., RUSHMORE
CAPITAL-II, L.L.C., and SPRINGFIELD
ASSOCIATES, LLC.,

                                         Plaintiffs,

                v.                                              Case No. 08 Civ. 446 (LTS)

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, J.P. MORGAN SECURITIES,
INC., CITIGROUP INC., CITIBANK, N.A. and
CITIGROUP GLOBAL MARKETS, INC. f/k/a
Salomon Smith Barney,

                                         Defendants.

--------------------------------------------------------------X

[Caption continued on following page]

```
------------------------------------------------------------X
AVENUE CAPITAL MANAGEMENT II, L.P.,            :
GRACIE CAPITAL, L.P., HALCYON FUND,            :
L.P., KING STREET CAPITAL, L.P.,               :
LONGACRE MASTER FUND, LTD., MAN MAC            :
3 LIMITED, ORE HILL FUND HUB LTD.,             :
MARATHON SPECIAL OPPORTUNITY                   :
MASTER FUND, LTD., RCG CARPATHIA               :
MASTER FUND, LTD., REDWOOD MASTER              :
FUND, LTD., SCOGGIN CAPITAL                     :
MANAGEMENT, L.P. II, SCOGGIN                    :
INTERNATIONAL FUND, LTD., SCOTTWOOD            :
CAPITAL MANAGEMENT, LLC, SPCP GROUP,           :      Case No. 08 Civ. 447 (LTS)
LLC, STRATEGIC VALUE CREDIT                     :
OPPORTUNITIES MASTER FUND, L.P.,               :
STRATEGIC VALUE MASTER FUND, LTD.,             :
and TRILOGY CAPITAL, LLC,                       :
                                               :
                          Plaintiffs,          :
                                               :
              v.                               :
                                               :
JPMORGAN CHASE & CO., JPMORGAN                 :
CHASE BANK, J.P. MORGAN SECURITIES,            :
INC., CITIGROUP INC., CITIBANK, N.A., and      :
CITIGROUP GLOBAL MARKETS, INC. f/k/a           :
Salomon Smith Barney,                          :
                                               :
                          Defendants.          :
------------------------------------------------------------X
------------------------------------------------------------X
UNICREDITO ITALIANO SPA and BANK               :
POLSKA KASA OPIEKI SA                          :
                                               :
                          Plaintiffs,          :
                                               :
              v.                               :
                                               :      Case No. 02 Civ. 5328 (LTS)
JPMORGAN CHASE BANK, J.P. MORGAN               :
CHASE & CO., J.P. MORGAN SECURITIES,           :
INC., CITIBANK, N.A., CITIGROUP, INC. and      :
CITIGROUP GLOBAL MARKETS INC.                  :
(FORMERLY SALOMON SMITH BARNEY                 :
INC.)                                          :
                                               :
                          Defendants.          :
------------------------------------------------------------X
```

**RESPONSE OF JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., AND J.P. MORGAN SECURITIES INC. TO PLAINTIFFS' JOINT STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO BREACH OF CONTRACT CLAIMS**

Pursuant to Local Civil Rule 56.1 of the Local Rules for the Southern District of New York, Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities Inc. (collectively, "JPMorgan Chase") respectfully submit this Response to Plaintiffs' Joint Statement of Material Facts in Support of Motion for Partial Summary Judgment as to Breach of Contract Claims.[1]

### RESPONSES TO STATEMENTS ALLEGED BY PLAINTIFFS TO BE MATERIAL AND UNDISPUTED

1.      JPMorgan Chase does not dispute the facts asserted in Paragraph 1, except to clarify that JPMorgan Chase Bank was itself not a party to the referenced syndicated revolving credit agreements, but its merger predecessor, The Chase Manhattan Bank, was a party to said agreements.  Hayes Exs. A, B, Revolving Credit Facility Agreements.[2]

2.      JPMorgan Chase does not dispute the facts asserted in Paragraph 2.

3.      JPMorgan Chase does not dispute the facts asserted in Paragraph 3.

4.      JPMorgan Chase does not dispute the facts asserted in Paragraph 4, except to clarify that The Chase Manhattan Bank, not JPMorgan Chase Bank, was a Co-Administrative Agent under the Long-Term Facility Agreement.  Hayes Ex. A.

5.      JPMorgan Chase does not dispute the facts asserted in Paragraph 5.

6.      JPMorgan Chase does not dispute the facts asserted in Paragraph 6.

7.      JPMorgan Chase does not dispute the facts asserted in Paragraph 7.

---

[1]     Plaintiffs' Motion for Partial Summary Judgment was filed when these actions were pending in the United States District Court for the Southern District of Texas, which does not require submission of a separate statement of undisputed facts in support of a motion for summary judgment and response thereto.

[2]     All citations to "Hayes Ex." are to the Affidavit of William J. Hayes, sworn to on April 6, 2006, and submitted in opposition to Plaintiffs' Motions for Partial Summary Judgment.

8.    JPMorgan Chase does not dispute the facts asserted in Paragraph 8, except to clarify that The Chase Manhattan Bank, not JPMorgan Chase Bank, was a Co-Administrative Agent under the 364-Day Facility Agreement.  Hayes Ex. B.

9.    JPMorgan Chase does not dispute the facts asserted in Paragraph 9.

10.    JPMorgan Chase does not dispute the facts asserted in Paragraph 10.

11.    JPMorgan Chase does not dispute that it served as administrative agent on other syndicated revolving lending facilities, but otherwise disputes the facts asserted in Paragraph 11 as argumentative and vague, and disputes the statistic referenced in Paragraph 11 which purportedly relies on evidence that is inadmissible.

12.    With respect to Paragraph 12, JPMorgan Chase does not dispute that as Co-Administrative Agent for the Revolving Credit Facility Agreements, The Chase Manhattan Bank had the duties and responsibilities set forth in the Revolving Credit Facility Agreements with respect to Co-Administrative Agents, and refers to the Revolving Credit Facility Agreements for the terms thereof.  Hayes Exs. A, B.

13.    With respect to Paragraph 13, JPMorgan Chase does not dispute that as Co-Administrative Agent for the Revolving Credit Facility Agreements, The Chase Manhattan Bank received certain fees which Lenders who were not Co-Administrative Agents did not receive, and refers to the Revolving Credit Facility Agreements for a description of the fees due to the Lenders and the Co-Administrative Agents.  Hayes Exs. A, B.

14.    JPMorgan Chase does not dispute the facts asserted in Paragraph 14.

15.    JPMorgan Chase does not dispute the facts asserted in Paragraph 15.

16.    JPMorgan Chase does not dispute the facts asserted in Paragraph 16.

17.     With respect to Paragraph 17, JPMorgan Chase does not dispute that the Revolving Credit Facility Agreements contain certain provisions concerning Notices of Borrowing, and refers to Section 2.02 of the Revolving Credit Facility Agreements for an accurate and complete description of the requirements with respect to Notices of Borrowing. Hayes Exs. A, B, § 2.02.

18.     JPMorgan Chase disputes the facts asserted in Paragraph 18 as an inaccurate and incomplete characterization of the terms of the Revolving Credit Facility Agreements. JPMorgan Chase further states that Section 2.02 of the Revolving Credit Facility Agreements provides that each Notice of Borrowing shall be "in substantially the form of Exhibit B hereto," and refers to Section 2.02 for an accurate and complete description of its terms.  Hayes Exs. A, B, § 2.02.

19.     JPMorgan Chase disputes the facts asserted in Paragraph 19 as a vague and incomplete characterization of the terms of the Revolving Credit Facility Agreements. JPMorgan Chase refers to the Revolving Credit Facility Agreements for an accurate and complete description of the rights and obligations of the parties.  Hayes Exs. A, B.

20.     JPMorgan Chase does not dispute the facts asserted in Paragraph 20.

21.     JPMorgan Chase does not dispute the facts asserted in Paragraph 21.

22.     JPMorgan Chase disputes the facts asserted in Paragraph 22 as an inaccurate and incomplete characterization of the terms of the Revolving Credit Facility Agreements. JPMorgan Chase further states that Section 3.01 of the Revolving Credit Facility Agreements, which is titled "Initial Condition Precedent," provides that the documentation identified under that section shall be "dated on or before" the day of the initial Advance, and refers to Article III

3

of the Credit Agreements for an accurate and complete description of its terms.  Hayes Exs. A,

B, Art. III.

23.    JPMorgan Chase disputes the facts asserted in Paragraph 23 as an inaccurate and

incomplete characterization of the terms of the Revolving Credit Facility Agreements.

JPMorgan Chase refers to Section 3.01(b) of the Revolving Credit Facility Agreements for an

accurate and complete description of its terms.  Hayes Exs. A, B, § 3.01(b).

24.    JPMorgan Chase disputes the facts asserted in Paragraph 24 as an inaccurate and

incomplete characterization of the terms of the Revolving Credit Facility Agreements.

JPMorgan Chase further states that Section 3.01(b) states that the documents described in that

section shall be "in form and substance satisfactory to each Co-Administrative Agent," and refers

to Section 3.01(b) of the Revolving Credit Facility Agreements for an accurate and complete

description of its terms.  Hayes Exs. A, B, § 3.01(b).

25.    JPMorgan Chase disputes the facts asserted in Paragraph 25 as an inaccurate and

incomplete characterization of the terms of the Revolving Credit Facility Agreements.

JPMorgan Chase further states that Section 3.01(b) states that the documents described in that

section shall be "in form and substance satisfactory to each Co-Administrative Agent," and refers

to Section 3.01(b) of the Revolving Credit Facility Agreements for an accurate and complete

description of its terms.  Hayes Exs. A, B, § 3.01(b).

26.    JPMorgan Chase is not currently aware of any written amendment to the

Revolving Credit Facility Agreements concerning Section 3.01(b), but otherwise disputes

Paragraph 26 as vague to the extent that it does not identify which party or parties are alleged not

to have waived Section 3.01(b).

27.    JPMorgan Chase does not dispute the facts asserted in Paragraph 27.

4

28.     The facts asserted in Paragraph 28 are directed toward Citibank and accordingly do not require any response by JPMorgan Chase.

29.     The facts asserted in Paragraph 29 are directed toward Citibank, have no bearing on the claims asserted against JPMorgan Chase, and accordingly do not require any response by JPMorgan Chase.

30.     JPMorgan Chase disputes the facts asserted in Paragraph 30 as argumentative, incomplete and misleading.  The Executive Committee of Enron's Board of Directors adopted resolutions on November 2, 1998 (the "November 1998 Resolutions") authorizing Enron's management to enter into revolving credit facilities up to $4 billion and to "execute … and deliver … all such instruments, certificates, agreements, or other documents as are necessary or advisable in connection with the Revolving Credit Agreements" and "to take any and all such further action, to amend, execute, and deliver all such further instruments and documents, for and in the name and on behalf of the Company … as in their discretion appear to be necessary, proper, or advisable to carry into effect the purposes and intentions of this and each of the foregoing resolutions."  JPMorgan Chase refers to the November 1998 Resolutions for the full terms thereof.  Hayes Ex. A at CITINEWBY 00264855, Ex. B at CITINEWBY 00802158.

31.     JPMorgan Chase disputes the facts asserted in Paragraph 31 as argumentative, incomplete and misleading.  The Executive Committee of Enron's Board of Directors adopted resolutions on November 2, 1998 authorizing Enron's management to enter into revolving credit facilities up to $4 billion and to "execute … and deliver … all such instruments, certificates, agreements, or other documents as are necessary or advisable in connection with the Revolving Credit Agreements" and "to take any and all such further action, to amend, execute, and deliver all such further instruments and documents, for and in the name and on behalf of the Company

5

… as in their discretion appear to be necessary, proper, or advisable to carry into effect the purposes and intentions of this and each of the foregoing resolutions."  JPMorgan Chase refers to the November 1998 Resolutions for the full terms thereof.  Hayes Ex. A at CITINEWBY 00264855, Ex. B at CITINEWBY 00802158.

32.    JPMorgan Chase disputes the facts asserted in Paragraph 32 as argumentative, incomplete and misleading.  The Executive Committee of Enron's Board of Directors adopted resolutions on November 2, 1998 authorizing Enron's management to enter into revolving credit facilities up to $4 billion and to "execute … and deliver … all such instruments, certificates, agreements, or other documents as are necessary or advisable in connection with the Revolving Credit Agreements" and "to take any and all such further action, to amend, execute, and deliver all such further instruments and documents, for and in the name and on behalf of the Company … as in their discretion appear to be necessary, proper, or advisable to carry into effect the purposes and intentions of this and each of the foregoing resolutions."  JPMorgan Chase refers to the November 1998 Resolutions for the full terms thereof.  Hayes Ex. A at CITINEWBY 00264855, Ex. B at CITINEWBY 00802158.

33.    The facts asserted in Paragraph 33 are directed toward Citibank, have no bearing on the claims asserted against JPMorgan Chase, and accordingly require no response by JPMorgan Chase.  To the extent any response by JPMorgan Chase is required, JPMorgan Chase disputes Paragraph 33.

34.    The facts asserted in Paragraph 34 are directed toward Citibank, have no bearing on the claims asserted against JPMorgan Chase, and accordingly require no response by JPMorgan Chase.  To the extent any response by JPMorgan Chase is required, JPMorgan Chase disputes Paragraph 34.

35.    The facts asserted in Paragraph 35 are directed toward Citibank, have no bearing on the claims asserted against JPMorgan Chase, and accordingly require no response by JPMorgan Chase.  To the extent any response by JPMorgan Chase is required, JPMorgan Chase disputes Paragraph 35.

36.    The facts asserted in Paragraph 36 are directed toward Citibank, have no bearing on the claims asserted against JPMorgan Chase, and accordingly require no response by JPMorgan Chase.  To the extent any response by JPMorgan Chase is required, JPMorgan Chase disputes Paragraph 36.  JPMorgan Chase further states that it did not have the duties alleged by Plaintiffs in Paragraph 36, and refers to the Revolving Credit Facility Agreements for an accurate and complete description of the rights and obligations of the parties.

37.    The facts asserted in Paragraph 37 are directed toward Citibank, have no bearing on the claims asserted against JPMorgan Chase, and accordingly require no response by JPMorgan Chase.  To the extent any response by JPMorgan Chase is required, JPMorgan Chase disputes Paragraph 37.

38.    The facts asserted in Paragraph 38 are directed toward Citibank, have no bearing on the claims asserted against JPMorgan Chase, and accordingly require no response by JPMorgan Chase.  To the extent any response by JPMorgan Chase is required, JPMorgan Chase disputes Paragraph 38.

39.    The facts asserted in Paragraph 39 are directed toward Citibank, have no bearing on the claims asserted against JPMorgan Chase, and accordingly require no response by JPMorgan Chase.  To the extent any response by JPMorgan Chase is required, JPMorgan Chase disputes Paragraph 39.

40.    The facts asserted in Paragraph 40 are directed toward Citibank, have no bearing on the claims asserted against JPMorgan Chase, and accordingly require no response by JPMorgan Chase. To the extent any response by JPMorgan Chase is required, JPMorgan Chase disputes Paragraph 40.

41.    JPMorgan Chase does not dispute the facts asserted in Paragraph 41, except to clarify that JPMorgan Chase Bank was itself not a party to the Syndicated L/C Facility Agreement, but its merger predecessor, The Chase Manhattan Bank, was a party to said agreement. Woll Ex. M, Syndicated L/C Facility Agreement.[3] JPMorgan Chase further states that the Syndicated L/C Facility Agreement is Exhibit E to the Siev Affidavit, not Exhibit N as Plaintiffs state.

42.    JPMorgan Chase does not dispute the facts asserted in Paragraph 42.

43.    JPMorgan Chase does not dispute the facts asserted in Paragraph 43, except to clarify that The Chase Manhattan Bank, not JPMorgan Chase Bank, was a Co-Administrative Agent for the Syndicated L/C Facility Agreement. Woll Ex. M.

44.    JPMorgan Chase does not dispute the facts asserted in Paragraph 44, except to clarify that The Chase Manhattan Bank, not JPMorgan Chase Bank, was the Paying Agent and the Issuing Bank for the Syndicated L/C Facility Agreement. Woll Ex. M.

45.    With respect to Paragraph 45, JPMorgan Chase does not dispute that as Co-Administrative Agent, Paying Agent, and Issuing Bank for the Syndicated L/C Facility Agreement, The Chase Manhattan Bank had the duties and responsibilities set forth in the Syndicated L/C Facility Agreement with respect to Co-Administrative Agents, Paying Agent,

---

[3]    All citations to "Woll Ex." are to the Affidavit of David J. Woll, sworn to on April 10, 2006, and submitted in opposition to Plaintiffs' Motions for Partial Summary Judgment.

and Issuing Bank, and refers to the Syndicated L/C Facility Agreement for the terms thereof. Woll Ex. M.

46.    With respect to Paragraph 46, JPMorgan Chase does not dispute that as Co-Administrative Agent, Paying Agent, and Issuing Bank for the Syndicated L/C Facility Agreement, The Chase Manhattan Bank received certain fees which Lenders who were not Co-Administrative Agent, Paying Agent, and Issuing Bank did not receive, and refers to the Syndicated L/C Facility Agreement for a description of the fees due to the Lenders, Co-Administrative Agents, Paying Agent, and Issuing Bank.  Woll Ex. M.

47.    JPMorgan Chase does not dispute that Sections 2.01 and 2.02 of the Syndicated L/C Agreement set forth the terms upon which letters of credit were to be requested and issued, but otherwise disputes the facts asserted in Paragraph 47 as an inaccurate and incomplete characterization of the terms of the Syndicated L/C Facility Agreement.  JPMorgan Chase refers to the Syndicated L/C Facility Agreement for an accurate and complete description of its terms. Woll Ex. M.

48.    JPMorgan Chase does not dispute the facts asserted in Paragraph 48.

49.    JPMorgan Chase does not dispute the facts asserted in Paragraph 49.

50.    With respect to paragraph 50, JPMorgan Chase is not currently aware of any written amendment to the Syndicated L/C Facility Agreement, but otherwise disputes as vague the facts asserted in Paragraph 50.

51.    JPMorgan Chase disputes the facts asserted in Paragraph 51 as vague, argumentative and misleading.  The forms used by Enron on July 23, 2001 and August 23, 2001 mistakenly referenced the Bilateral L/C Facility.  However, representatives from JPMorgan

Chase confirmed with Enron that it wanted the letters of credit issued under the Syndicated L/C Facility. Luxama Aff. ¶ 8; Mladenovic Aff. ¶ 11-13.[4]

52.     JPMorgan Chase disputes the facts asserted in Paragraph 52 as an inaccurate and incomplete characterization of the terms of the Bilateral L/C Facility Agreement, and refers to the Bilateral L/C Facility Agreement for the terms thereof. Woll Ex. Q, Bilateral L/C Facility Agreement.

53.     JPMorgan Chase disputes the facts asserted in Paragraph 53 as an inaccurate and incomplete characterization of the terms of the Bilateral L/C Facility Agreement, and refers to the Bilateral L/C Facility Agreement for the terms thereof. Woll Ex. Q.

54.     JPMorgan Chase does not dispute the facts asserted in Paragraph 54.

55.     JPMorgan Chase does not dispute the facts asserted in Paragraph 55.

56.     JPMorgan Chase does not dispute the facts asserted in Paragraph 56.

57.     JPMorgan Chase does not dispute the facts asserted in Paragraph 57.

58.     JPMorgan Chase does not dispute the facts asserted in Paragraph 58.

59.     JPMorgan Chase does not dispute the facts asserted in Paragraph 59.

60.     JPMorgan Chase does not dispute the facts asserted in Paragraph 60.

61.     JPMorgan Chase does not dispute the facts asserted in Paragraph 61.

62.     JPMorgan Chase disputes the facts asserted in Paragraph 62 as an inaccurate and incomplete characterization of the terms of the Syndicated L/C Facility Agreement. JPMorgan Chase refers to the Syndicated L/C Facility Agreement for an accurate and complete description of its terms. Woll Ex. M.

---

[4]     All citations to "Luxama Aff." and "Mladenovic Aff." are to the Affidavit of Yvon Luxama, sworn to on April 5, 2006, and the Affidavit of Olivera Mladenovic, sworn to on April 5, 2006, respectively, both of which were submitted in opposition to Plaintiffs Motions for Partial Summary Judgment.

63.     JPMorgan Chase disputes the facts asserted in Paragraph 63 as an inaccurate and incomplete characterization of the terms of the Syndicated L/C Facility Agreement.  JPMorgan Chase further states that Section 6.01 of the Syndicated L/C Facility Agreement provides that upon an Event of Default, "the Paying Agent (i) shall at the request, or may with the consent, of the Majority Banks, by notice to the Company and the Issuing Bank (if the Bank acting as such is not the Paying Agent), declare the obligation of the Issuing Bank to issue or amend Letters of Credit to be terminated," and JPMorgan Chase refers to Section 6.01 for an accurate and complete description of its terms.  Woll Ex. M, § 6.01.

64.     JPMorgan Chase disputes the facts asserted in Paragraph 64 as an inaccurate and incomplete characterization of the terms of the Syndicated L/C Facility Agreement.  JPMorgan Chase refers to the Syndicated L/C Facility Agreement for an accurate and complete description of its terms.  Woll Ex. M.

65.     JPMorgan Chase disputes the facts asserted in Paragraph 65.

66.     JPMorgan Chase does not dispute the facts asserted in Paragraph 66.

67.     JPMorgan Chase does not dispute the facts asserted in Paragraph 67.

68.     JPMorgan Chase does not dispute the facts asserted in Paragraph 68.

## ADDITIONAL MATERIAL FACTS

**PART I:  PLAINTIFFS' REVOLVING CREDIT AGREEMENT CLAIMS**

### The Revolving Credit Facility Agreements

69.     The Revolving Credit Facility Agreements provide that the role of the Co-Administrative Agents is purely ministerial and does not create any fiduciary obligation of any kind to any of the Lenders:

> The duties of the Co-Administrative Agents **shall be mechanical and administrative in nature;** the Co-Administrative Agents **shall not have,** by reason

11

of this Agreement or any other Loan Document, a ***fiduciary relationship in respect of any Bank or the holder of any Note;*** and nothing in this Agreement or any other Loan Document, expressed or implied, is intended or shall be so construed as to impose upon the Co-Administrative Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein.

Hayes Exs. A, B, § 8.02 (emphasis added).

70.    Section 8.04 of the Revolving Credit Facility Agreements provides that, in

signing the Agreements, each bank represents that it will:

> ***independently and without reliance*** upon either Co-Administrative Agent or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to ***make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents***.

Hayes Exs. A, B, § 8.04 (emphasis added).

71.    The Revolving Credit Facility Agreements state that JPMorgan Chase, as Co-

Administrative Agent, shall have no liability of any kind, except for its own gross negligence or

willful misconduct in the performance of its specified duties under the Agreements.  Hayes Exs.

A, B, § 8.02(e).

72.    The Revolving Credit Facility Agreements state that the Lenders agree to

indemnify the Co-Administrative Agents against all claims or liabilities, except those arising out

of their gross negligence or willful misconduct.  Hayes Exs. A, B, § 8.07.

73.    The Revolving Credit Facility Agreements state that JPMorgan Chase had no

obligation to ascertain whether Enron had complied with the conditions set forth in the

Agreements, including the "Initial Condition Precedent" contained in Section 3.01.  Hayes Exs.

A, B, § 8.02.

74.    Each of the Plaintiffs (or their alleged predecessors-in-interest) in signing the

Revolving Credit Facility Agreements agreed that JPMorgan Chase would have no duty or

12

responsibility to ascertain the performance or observance of any condition of any Loan Document, which includes the conditions set forth in Section 3.01(b) of the Agreements.  Hayes Exs. A, B, § 8.02.

75.    The Revolving Credit Facility Agreements state that JPMorgan Chase "shall not be responsible to any Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith."  Hayes Exs. A, B, § 8.02.

76.    Each of the Plaintiffs (or their alleged predecessors-in-interest) in signing the Revolving Credit Facility Agreements agreed that they would not hold JPMorgan Chase responsible for the validity, genuineness or sufficiency of any Loan Document or any other instrument or document furnished pursuant to the Revolving Credit Facility Agreements.  Hayes Exs. A, B, § 8.02.

77.    The Revolving Credit Facility Agreements contain two sections setting forth two different sets of conditions precedent with respect to Advances.  Section 3.01, entitled "Initial Condition Precedent," identifies various conditions that had to be satisfied before any Advances were made under the Agreements.  Section 3.02, entitled "Additional Conditions Precedent to Each Advance," identifies additional conditions that had to be satisfied in connection with each, separate Advance.  Hayes Exs. A, B, § 3.01, 3.02.

78.    The board resolution requirement that is the subject of Plaintiffs' motions is identified as an Initial Condition Precedent in Section 3.01 – *i.e.*, one that had to be satisfied prior to the initial Advance being made.

Section 3.01 provides:

"SECTION 3.01. <u>Initial Condition Precedent</u>.  The obligation of each Bank to make Advances pursuant to the terms and conditions of this

13

Agreement is subject to the condition precedent that the Paying Agent shall have received **on or before the day of the initial Advance** the following, **each dated on or before such day**, in form and substance satisfactory to each Co-Administrative Agent (copies of which shall have been provided to the Co-Administrative Agents):

[…]

(b) Certified copies of the resolutions of the Board of Directors of the Borrower approving this Agreement, each Note and each Notice of Borrowing, and of all other documents, in each case evidencing any necessary corporate action and governmental approvals, if any, with respect to each such Loan Document and certified copies of the amended and restated articles of incorporation, as amended, and bylaws, as amended, of the Borrower."

Hayes Exs. A, B (emphasis added).

79.    Section 3.02 does not require a separate, contemporaneous board resolution. Hayes Exs. A, B, § 3.02.

80.    Section 3.02 provides that each Notice of Borrowing and the acceptance of proceeds thereunder "shall constitute a representation and warranty by the Borrower [Enron]" that, inter alia, "[t]he representations and warranties contained in Section 4.01 of this Agreement are correct on and as of the date of such Advance . . . ."  Hayes Exs. A, B, § 3.02.

81.    Section 4.01(b), in turn, contains representations and warranties by the Borrower that "[t]he execution, delivery and performance by the Borrower of each Loan Document [defined to include each Notice of Borrowing] to which it is or will be a party are within the Borrower's corporate powers [and] have been duly authorized by all necessary corporate action of the Borrower . . . ."  *Id.* at § 4.01(b).

**The November 1998 Resolutions**

82.    The Executive Committee of Enron's Board adopted resolutions on November 2, 1998 authorizing Enron's management to enter into up to $4 billion of revolving credit facilities

14

and to "take any and all such further action" and "execute and deliver" all "instruments" or

"other documents" in connection therewith that management deemed "necessary or advisable"

(the "November 1998 Resolutions").  Hayes Ex. A at CITINEWBY 00264855; Ex. B at

CITINEWBY 00802158.

83.     Enron's bylaws expressly authorized the Executive Committee to exercise the

powers of the Board of Directors between regular board meetings, with certain exceptions not

applicable here.  See Hayes Ex. A at CITINEWBY 00264848; Ex. B at CITINEWBY 00802151,

Enron's bylaws, at Article IV, Section 1.

84.     The November 1998 Resolutions provide in their entirety as follows:

> RESOLVED, that the Chairman of the Board, the President, any Senior
> Vice President, any Vice President, and any Deputy Treasurer of the
> Company be, and each of them hereby is, ***authorized, empowered, and
> directed*** (any one of them acting alone), for and in the name and on behalf
> of the Company, to negotiate, execute, and deliver, on behalf of the
> Company ***without the necessity of obtaining specific Board approval***, an
> agreement or agreements providing for a committed revolving credit
> facility or facilities for the Company of up to an aggregate amount of
> $4,000,000,000 (excluding acquisition financing for Wessex Water PLC)
> from time to time and at any one time outstanding (the "Revolving Credit
> Agreements"), ***together with all such instruments, certificates,
> agreements, or other documents as are necessary or advisable in
> connection with the Revolving Credit Agreements***;
>
> RESOLVED FURTHER, that all actions heretofore taken by any officer
> of the Company, related to or in connection with the transactions
> contemplated by these resolutions, including without limitation the
> execution and delivery of any instruments or other documents as any such
> officer shall have deemed necessary, proper, or advisable, are hereby
> adopted, ratified, confirmed, and approved in all respects; and
>
> RESOLVED FURTHER, that the officers of the Company and its counsel
> be, and each of them hereby is, ***authorized, empowered, and directed*** (any
> one of them acting alone) ***to take any and all such further action, to
> amend, execute, and deliver all such further instruments and
> documents, for and in the name and on behalf of the Company***, under its
> corporate seal or otherwise, and to pay all such expenses ***as in their***

15

> ***discretion appear to be necessary, proper, or advisable*** to carry into effect
> the purposes and intentions of this and each of the foregoing resolutions.

Hayes Ex. A at CITINEWBY 00264855; Ex. B at CITINEWBY 00802158
(emphasis added).

85.     A certified copy of the November 1998 Resolutions was made part of the closing

sets for the Revolving Credit Facility Agreements that were received by each of the Lenders. *Id.*;

Hayes Aff. ¶ 12.

86.     The closing sets for the Revolving Credit Facility Agreements also contained a

certification from James V. Derrick, Jr., Executive Vice President and General Counsel of Enron,

confirming that the 1998 Resolutions authorized each Notice of Borrowing under the

Agreements:

> "The execution, delivery and performance by the Borrower of each Loan
> Document is within the Borrower's corporate powers. Each Loan
> Document [defined to include Notices of Borrowing] has been duly
> authorized by all necessary corporate action of the Borrower, and the
> Credit Agreement and the Notes have been duly executed and delivered by
> the Borrower."

Hayes Ex. A at CITINEWBY 00264866-868; Ex. B at CITINEWBY 00802174-176.

87.     At the closings of the Revolving Credit Facility Agreements in 2000 and in 2001,

the Bracewell & Patterson ("Bracewell") law firm issued an opinion letter, addressed to each of

the participating banks, stating that it had examined "the documents furnished by the Borrower

pursuant to Section 3.01 of the Credit Agreement," and that such documents "are substantially

responsive to the requirements of the Credit Agreement."  Hayes Ex. A at CITINEWBY

00264869-870; Ex. B at CITINEWBY 00802178-179 (the "Bracewell Letters").

88.     Annex A to the Bracewell Letters identified the certified November 1998

Resolutions as one of the documents reviewed by Bracewell in rendering its opinion.  Hayes Ex.

A at CITINEWBY 00264871; Ex. B at CITINEWBY 00802180.

89.    Bracewell examined the November 1998 Resolutions and concluded that they satisfied the requirement under Section 3.01(b) for board resolutions authorizing "the Agreement, each Note and each Notice of Borrowing . . . ."  Hayes Aff. ¶ 11.

90.    The November 1998 Resolutions were accompanied by a "Certificate of Assistant Secretary" of Enron, certifying the copy to be a true, correct and complete copy of resolutions duly adopted by the Executive Committee of the Board of Directors of Enron at a meeting held on November 2, 1998.  Hayes Ex. A at CITINEWBY 00264725-726; Ex. B at CITINEWBY 00802028, Certificate of Assistant Secretary.

91.    The November 1998 Resolutions were also included within the closing set for a prior iteration of Enron's revolving credit facilities.  Specifically, Enron entered into a $1.5 billion 364-day Revolving Credit Agreement dated August 3, 1999, on the authority of the November 1998 Resolutions.  The May 18, 2000 Long-Term Revolving Credit Facility and the May 18, 2000 Short-Term Revolving Credit Facility were replacement facilities for the August 3, 1999 facility and an earlier December 3, 1996 facility (Hayes Ex. A at CITINEWBY 00264425, § 1.01, "Prior Credit Facilities"), and the May 14, 2001 Short-Term Revolving Credit Facility was a replacement facility for the May 18, 2000 Short-Term Revolving Credit Facility (Hayes Ex. B at CITINEWBY 00801746, § 1.01, "Prior Credit Facilities").

**Custom and Practice in the Banking Industry**

92.    The Revolving Credit Facilities were initially unfunded and were meant to "be used for general corporate purposes, including the backstopping of Enron's commercial paper program."  Woll Ex A.

17

93.     Revolving credit facilities are designed to be available on short notice in order to meaningfully provide liquidity as and when needed.  Hayes Aff. ¶¶ 15, 16; Hevner Aff. ¶¶ 18, 19; Smith Aff. ¶¶ 8-10.[5]

94.     This concern is particularly keen for facilities – such as the Revolving Credit Facilities here – that are used to support commercial paper programs, so that a borrower has ready access to an alternative source of funds if it has trouble issuing new commercial paper to pay off the maturing paper.  Hayes Aff. ¶¶ 15, 16; Hevner Aff. ¶¶ 18, 19; Smith Aff. ¶¶ 8-10.

95.     The Revolving Credit Facility Agreements permitted Enron to obtain same-day funds from the Lenders.  Hayes Exs. A, B, § 2.02.

96.     The Revolving Credit Facility Agreements do not contain a "material adverse change" provision applicable at the time of any drawdown.  Hayes Exs. A, B, § 3.02, 4.01.

97.     It is custom and practice in the banking industry to require a borrower under a credit facility to deliver, at closing, board resolutions, such as the November 1998 Resolutions, that evidence management's authority to enter into a credit facility and to take all actions necessary or advisable thereunder, including borrowing money under the facility.  Hayes Aff. ¶¶ 17, 19-21; Hevner Aff. ¶¶ 13, 14, 16; Smith Aff. ¶¶ 11-13.

98.     It is not customary, after the closing of a credit facility agreement, to require separate, contemporaneous board resolutions authorizing each borrowing request.  Hevner Aff. ¶¶ 16, 17; Hayes Aff. ¶¶ 22, 23; Smith Aff. ¶ 17.

---

[5]     All citations to "Hevner Aff." and "Smith Aff." are to the Affidavit of Robert W. Hevner, sworn to on April 7, 2006, and the Affidavit of Mark R. Smith, sworn to on April 7, 2006, respectively, both of which were submitted by Defendants in opposition to Plaintiffs' Motions for Partial Summary Judgment.

**The Notices of Borrowing**

99.     On October 25, 2001, Enron issued Notices of Borrowing under the Short-Term and Long-Term Revolving Credit Facility Agreements for their combined amount of $3 billion. Woll Exs. B, C, Notices of Borrowing.

100.    The Notices of Borrowing were executed by Kenneth Lay, as Chairman and CEO of Enron, and were certified by Teresa Callahan, Assistant Secretary of Enron.  Woll Exs. B, C.

101.    As was Enron's right, the Notices of Borrowing sought to obtain same-day funds under the Revolving Credit Facility Agreements.  Woll Exs. B, C; Hayes Exs. A, B, §§ 2.01, 2.02.

102.    Enron was having difficulty "rolling" its outstanding commercial paper and it had decided to draw down on the Revolving Credit Facility Agreements to pay off its outstanding commercial paper and to obtain additional liquidity.  Woll Ex. D, Winokur Tr. at 351-352; Woll Ex. E, Chan Tr. at 789-791.

103.    In both of the Notices of Borrowing, Mr. Lay certified that the representations and warranties contained in Section 4.01 of the Revolving Credit Facility Agreements were still correct.  Woll Exs. B, C.

104.    One of the representations and warranties reaffirmed by Mr. Lay was that "the execution, delivery and performance by the Borrower of each Loan Document [defined to include each Notice of Borrowing] to which it is or will be a party are within the Borrower's corporate powers" and "have been duly authorized by all necessary corporate action of the Borrower . . . ."  Hayes Ex. A, B, §§ 3.02, 4.01.

105.    Under the Revolving Credit Facility Agreements, each of the participating lenders – including Plaintiffs or their predecessors-in-interest – were entitled to reasonably request that Enron provide additional "approvals, opinions or documents." Hayes Exs. A, B, § 3.02(b).

106.    Plaintiffs offer no evidence that any of the participating lenders asked Enron for a separate, contemporaneous Board resolution with respect to the Notices of Borrowing.

107.    A conference call was hosted by Enron on October 25, 2001 to discuss the drawdown under the Credit Facilities. Woll Ex. G, Cenedese Tr. at 118-123.

108.    Plaintiffs offer no evidence that any of the lenders who participated in the October 25, 2001 conference call asked Enron whether its Board had met and passed a separate, contemporaneous resolution authorizing the drawdown.

**Enron Has Never Claimed that the Notices of Borrowing Were Unauthorized**

109.    No Enron Board member has testified that they believed a separate resolution was required to authorize the Notices of Borrowing, and many have testified to the contrary. Woll Ex. D, Winokur Tr. at 1854; Woll Ex. H, Jaedicke Tr. at 1512, 786; Woll Ex. I, LeMaistre Tr. at 558; Woll Ex. E, Chan Tr. at 793; Woll Ex. J, Mendelsohn Tr. at 740-741; Woll Ex. K, Wakeham Tr. at 1035-1036.

110.    Herbert Winokur, a longstanding member of Enron's Board and head of its Finance Committee, and a voting participant in the Executive Committee meeting that passed the November 1998 Resolutions, testified as follows:

> Q: And it was your understanding coming out of the November 1998 executive committee meeting that the officers of the corporation were in fact authorized to execute whatever documents were necessary to draw down on the revolving credit facilities; is that correct? [objection]
>
> A: That's my belief, yes, ma'am.

Woll Ex. D, Winokur Tr. at 1854.

111.    Robert Jaedicke, the former chair of Enron's Audit and Compliance Committee,

testified as follows:

> "Q: And is your [recollection] that the reason that you were not presented with the
> resolution was because that credit line had been in place for a while and you
> understood that senior executives could draw on that facility without the board's
> resolution?" [objection]
>
> A: I believe that was my understanding at the time, yes.

Woll Ex. H, Jaedicke Tr. at 1512; *see also id*. at 786 (stating that Mr. Lay was authorized to

execute drawdown).

112.    Charles LeMaistre, a participant in the Executive Committee meeting that passed

the November 1998 resolutions testified as follows:

> Q:    Dr. LeMaistre, in October of 2001, you supported the drawdown of
> Enron's credit facilities, correct? [objection]
>
> A:    Yes, sir.
>
> Q:    And you understood that Enron officers were authorized to take
> appropriate and legal steps to – to effectuate the drawdown of the credit facilities;
> is that correct? [objection]
>
> A:    Yes, sir, I did.

Woll Ex. I, LeMaistre Tr. at 558.

113.    Contemporaneous notes of meetings of Enron's Board around the time of the

drawdown further demonstrate that the Board was aware of the drawdown and no Board member

questioned the authority for or the advisability of the drawdown.  Woll Ex. L, Board Secretary

Notes.

**PART II:  PLAINTIFFS' CLAIMS UNDER THE SYNDICATED LETTER OF CREDIT AGREEMENT**

**The Bilateral Letter of Credit Facility**

114.    Enron was a frequent user of letters of credit and, prior to entering into the

Syndicated L/C Facility, had bilateral letter of credit facilities established with at least nineteen

21

banks, including JPMorgan Chase and fifteen other banks on whose debt Plaintiffs base their claims.  Woll Ex. P, List of Letter of Credit Agreements.

115.    Enron established a bilateral facility with JPMorgan Chase in 1995 by entering into a Master Letter of Credit and Reimbursement Agreement, dated as of June 16, 1995 ("Bilateral L/C Agreement" or "Bilateral L/C Facility").  Woll Ex. Q, Bilateral L/C Agreement.

116.    The Bilateral L/C Agreement was an uncommitted facility, meaning that JPMorgan Chase could accept or decline letter of credit requests in its discretion.  Luxama Aff. ¶ 10; Mladenovic Aff. ¶ 14.

117.    The Bilateral L/C Agreement set forth some, but not all, of the terms governing letters of credit that would be issued under the Bilateral L/C Facility.  For example, the fees payable by Enron for each letter of credit were not pre-established in the Bilateral L/C Agreement, but had to be separately agreed to for each letter of credit.  Woll Ex. Q, § 4.3.

118.    The Bilateral L/C Facility was subject to a maximum credit limit, which fluctuated over time.  Mladenovic Aff. ¶ 3.

119.    In 2001, the credit limit for the Bilateral L/C Facility was $100 million.  Luxama Aff. ¶ 5; Mladenovic Aff. ¶¶ 3, 7.

**The Syndicated Letter of Credit Facility**

120.    In 2001, Enron indicated that it wanted to increase its letter of credit capacity, since the credit capacity under its bilateral agreements was being substantially utilized by outstanding letters of credit.  Luxama Aff. ¶ 3.

121.    On May 14, 2001 Enron established a syndicated letter of credit facility (the "Syndicated L/C Facility Agreement" or "Syndicated L/C Facility") with the same group of banks which had also entered into the Short-Term Revolving Credit Agreement, with Enron as

22

the Borrower, The Chase Manhattan Bank as Paying Agent and Issuing Bank, and Citibank and

The Chase Manhattan Bank as Co-Administrative Agents.  Woll Ex. M, Syndicated L/C

Agreement.

122.    Unlike the Bilateral L/C Facility, the Syndicated L/C Facility was "committed,"

in that, subject to the terms of its Agreement, JPMorgan Chase (as merger successor to The

Chase Manhattan Bank) was required to issue letters of credit as per Enron's requests.  Woll Ex.

M, § 2.02(a).

123.    Under the Syndicated L/C Agreement, the issuance of each letter of credit would

automatically obligate each of the other banks to "participate" in each letter of credit, to the

extent of that bank's pro rata percentage as set forth in the Agreement.  Woll Ex. M, § 2.03(a).

124.    Pursuant to the Syndicated L/C Agreement, each bank absolutely and

unconditionally agreed to pay JPMorgan Chase its pro rata percentage of each letter of credit

obligation that was not reimbursed to JPMorgan Chase by Enron.  *Id*. §§ 2.03(b), 2.04(b).

Specifically, the Syndicated L/C Agreement provided:

> Each Bank acknowledges and agrees that its obligation to acquire participations
> pursuant to this Section 2.03 in respect of Letters of Credit issued or amended
> while such Bank remains a party to this Agreement is absolute and unconditional
> and shall not be affected by any circumstance whatsoever, including any
> amendment of any Letter of Credit or the occurrence and continuation of a
> Default or Event of Default . . . .

Woll Ex. M, § 2.03(b).

125.    The Syndicated L/C Agreement further relieved JPMorgan Chase, as Issuing

Bank, from any "responsibility" or "liability" associated with any "LC Obligation," defined in

the Syndicated L/C Agreement to mean Enron's obligation to reimburse any of the Banks for

principal or interest:

> The Issuing Bank shall have no responsibility or liability to any other Bank with respect to any LC Obligation or any such participation, and no Bank shall have recourse against the Issuing Bank with respect to any LC Obligation or any such participation, except that the Issuing Bank shall pay to the Paying Agent for the account of each Bank that purchases a participation pursuant to this Section 2.03 such Bank's ratable share of the payments, if any, actually received by the Issuing Bank . . . .

Woll Ex. M, § 2.03(c).

126.    Similar to the provisions contained in the Revolving Credit Facility Agreements, the bank parties to the Syndicated L/C Agreement agreed to indemnify JPMorgan Chase, in its roles as Paying Agent, Co-Administrative Agent and Issuing Bank, for any claims or liabilities arising out of the Agreement or any other "Facility Document," except for claims of gross negligence or willful misconduct.  Woll Ex. M, §§ 7.07, 8.07, 9.01.

127.    "Facility Document" was defined to include letter of credit requests.  Woll Ex. M, § 1.01.

128.    The Syndicated L/C Agreement also expressly disclaimed any fiduciary relationship between JPMorgan Chase and any of the other banks and contained language nearly identical to Section 8.02 of the Revolving Credit Facility Agreements, stating that JPMorgan Chase "shall not be responsible to any Bank . . . for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Facility Document . . . ."  Woll Ex. M, §§ 7.02, 8.02.

### The July 23 and August 23, 2001 Requests

129.    On July 23, 2001, Enron requested that two letters of credit be issued: LC P215878, in the amount of $43,105,325 for the benefit of Union Power Partners, L.P.; and LC P215879, in the amount of $30,205,724 for the benefit of Panda Gila River, L.P. (the "July 23 Requests").  Luxama Exs. A, B.

24

130.    On August 23, 2001, Enron requested that two other letters of credit be issued: LC P216985, in the amount of $16,437,220 for the benefit of Quachita Power, LLC; and LC P216987, in the amount of $24,750,000, also for the benefit of Quachita Power, LLC. (the "August 23 Requests").  Mladenovic Exs. B, C.

131.    Enron faxed its requests for these letters of credit to the "Trade Sales" Department, an area within JPMorgan Chase that assisted customers in processing letter of credit requests.  Mladenovic Aff. ¶ 5.

132.    Yvon Luxama, a JPMorgan Chase employee with twenty years experience in JPMorgan Chase's Trade Sales Department, worked on both of the July 23 Requests.  Luxama Aff. ¶¶ 1, 7.

133.    Olivera Mladenovic, a colleague of Mr. Luxama's who had worked in the Trade Sales Department for approximately seven years, worked on both of the August 23 Requests. Mladenovic Aff. ¶¶ 1, 10-13.

134.    Mr. Luxama's and Ms. Mladenovic's role was to review the requests, clarify or obtain the necessary information and then forward the requests to Operations, the group responsible for actually issuing the letters of credit.  Luxama Aff. ¶¶ 4-6; Mladenovic Aff. ¶¶ 5-7.

135.    Both Mr. Luxama and Ms. Mladenovic had frequent discussions with Enron about its letter of credit requests and, in particular, with Jessie Mata, a Senior Treasury Specialist in Enron's Global Finance department.  Luxama Aff. ¶ 4; Mladenovic Aff. ¶ 6.

136.    The July 23 and August 23 Requests mistakenly referenced the Bilateral L/C Agreement.  Luxama Exs. A, B; Mladenovic Exs. B, C.

25

137.    At the time the July 23 and August 23 Requests were faxed by Enron to JPMorgan Chase, there was not sufficient capacity to issue such letters of credit under the Bilateral L/C Facility.  On July 23, 2001, there was only approximately $10.9 million in credit capacity remaining under the Bilateral L/C Agreement, which was not enough to accommodate either of the July 23 Requests.  Luxama Aff. ¶ 8.  On August 23, 2001, the capacity under the Bilateral L/C Agreement was only approximately $11.5 million, which was not enough to cover either of the August 23 Requests.  *Id.* ¶ 9.

138.    Enron was aware of the near-total utilization of the credit capacity under the Bilateral L/C Agreement in 2001.  Mladenovic Aff. ¶ 7.

139.    Since there was insufficient credit capacity under the Bilateral L/C Agreement to honor the July 23 or August 23 Requests, Mr. Luxama and Ms. Mladenovic called Ms. Mata and clarified that Enron wanted the letters of credit issued under the Syndicated L/C Agreement.  Luxama Aff. ¶ 8; Mladenovic Aff. ¶¶ 11-13.

140.    It was up to Enron to decide under which facility it wanted the letters of credit issued.  Luxama Aff. ¶ 6; Mladenovic Aff. ¶ 8.

141.    Neither Mr. Luxama nor Ms. Mladenovic would have unilaterally instructed the Operations group to issue the letters of credit under the Syndicated L/C Agreement without first confirming with Ms. Mata that Enron wanted them to do so.  Luxama Aff. ¶¶ 6, 8; Mladenovic Aff. ¶¶ 8-9, 13.

142.    On the August 23 Requests, Ms. Mladenovic made several contemporaneous handwritten notations referencing Enron's instructions to issue the letters of credit under the Syndicated L/C Facility.  Mladenovic Aff. ¶¶ 11-13.

143.    The July 23 Requests also contained a reference stating that the "fee" for the letters of credit should be "Per Agreement."  Luxama Exs. A, B.

144.    Since the Bilateral L/C Agreement had no provisions pre-establishing fees, the reference in the July 23 Requests to the fee being "Per Agreement" was a further indication that Enron intended to request the letters of credit under the Syndicated L/C Agreement, which did contain pre-established fees.  Luxama Aff. ¶ 7.

**Other Banks, Including At Least One Of Plaintiffs' Predecessors-in-Interest, Followed Procedures Similar To JPMorgan Chase For Enron Letter of Credit Facilities**

145.    WestLB AG ("WestLB"), one of the banks in whose shoes the DK Acquisition Plaintiffs seek to stand in this lawsuit, entered into a bilateral letter of credit agreement with Enron on July 13, 2000 (the "WestLB Bilateral Agreement").  Woll Ex. R.

146.    On at least four separate occasions, WestLB issued or amended letters of credit even though the request forms submitted by Enron referenced a different facility.  Woll Exs. T, U, V, W.

147.    Standard Chartered Bank ("Standard Chartered"), another bank that was one of the lenders under the Syndicated L/C Facility and which, along with WestLB, was one of the plaintiffs who asserted the instant summary judgment motion in the now-settled *Bayerische Landesbank* action, entered into a bilateral letter of credit agreement with Enron on August 31, 1995 (the "Standard Chartered Bilateral Agreement").  On at least five different occasions, Standard Chartered issued letters of credit under the Standard Chartered Bilateral Agreement even though four of the request forms submitted by Enron referenced a letter of credit agreement dated January 27, 1995 and one of the Enron request forms referenced a letter of credit agreement dated June 30, 1995.  Woll Exs. X, Y, Z, AA, BB, CC.

**Enron's Late Payment of Fees**

148.    Pursuant to the Syndicated L/C Agreement, JPMorgan Chase was neither required, nor unilaterally empowered, to cease issuing letters of credit upon an Event of Default. Woll Ex. M, § 6.01.

149.    Section 6.01 of the Syndicated L/C Agreement provides that, upon an Event of Default, the "Paying Agent (i) shall at the request, or may with the consent, of the Majority Banks . . . declare the obligation of the Issuing Bank to issue or amend Letters of Credit to be terminated . . . ." Woll Ex. M, § 6.01.

150.    Plaintiffs offer no evidence that the Majority Banks, defined as those having at least 51% of the pro rata percentages under the Agreement, would have instructed JPMorgan Chase to terminate its issuance or amendment of letters of credit, just because Enron was late paying relatively modest fees.

151.    It is not unusual for a customer to be late in paying letter of credit fees. Woll Ex. II, Golden Tr. at 37-39.

152.    WestLB itself continued to issue letters of credit under the WestLB Bilateral Agreement throughout 2001 even though Enron was several months late paying its fees. Woll Ex. DD.

153.    Specifically, WestLB's documents indicate that WestLB issued at least four separate letters of credit and granted six different amendments to previously-issued letters of credit during this six-month period, notwithstanding Enron's failure to pay its fees on time. Woll Ex. EE.

154.    Pursuant to the WestLB Bilateral Agreement, Enron's failure to pay fees in a timely fashion constituted an Event of Default. Woll Ex. R, §§ 9.1(a), 4.3.

155.    WestLB entered into a $245,000,000 Trade Finance and Reimbursement Agreement with Enron on September 10, 2001, at a time when such fees were still outstanding. Woll Ex. UU.

**The Avenue Capital Plaintiffs Lack Standing[6]**

156.    The Avenue Capital Plaintiffs purchased participations in contractual rights under the Credit Facility Agreements owned and held by other entities.  Woll Exs. JJ, KK, LL, MM, NN.

157.    The participation agreements on which the Avenue Capital Plaintiffs base their claims do not contain provisions affirmatively assigning all rights and obligations under the Credit Facility Agreements.  Woll Exs. JJ, KK, LL, MM, NN, OO, PP, QQ.

158.    The participation agreements provide that the Lender from which the participation was bought retains responsibility and authority for asserting claims in connection with the Credit Agreements.  Woll Exs. JJ, KK, LL; MM, NN, OO, PP, QQ.

159.    One of the participation agreements states that "all decisions in respect of Litigation," including claims against JPMorgan Chase, "will be made by Seller in its sole discretion . . . ."  Woll Ex. KK, § 14.1(b).

160.    Another participation agreement provides that, in connection with "claims that Seller [Lender] may have against the Borrower and/or any Obligor," the Lender shall take action "in accordance with the written directions of the majority . . . ."  Woll Ex. JJ, § 7.1; *see also* Woll Exs. OO, PP, QQ.

---

[6]    On July 11, 2008, Defendants moved for summary judgment against Plaintiffs based on their lack of standing to assert the claims advanced in these lawsuits.  Defendants incorporate herein the facts they have advanced in support of their motion for summary judgment for lack of standing, insofar as they concern the Avenue Capital Plaintiffs' lack of standing.

29

161.    The same participation agreement also provides that in the event the Lender receives any cash distribution in connection with the Syndicated L/C Agreement, including, specifically, in connection with any claims asserted against JPMorgan Chase, the Lender must distribute those proceeds to the participant.  Woll Ex. JJ § 5.1; *see also* Woll Ex. KK, § 8.1; Ex. LL, § 8.1.

162.    Another of the Avenue Capital Plaintiff's participation agreements explicitly states that: "Participant acknowledges that it shall be bound by any decisions of the Majority Holders to take or not take an Action."  Woll Ex. RR, § 7.01.

Dated:  September 8, 2008

Respectfully submitted,


/s/ David J. Woll
Thomas C. Rice
David J. Woll
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  (212) 455-2000
Facsimile:  (212) 455-2502

*Attorneys for Defendants JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., and J.P. Morgan*
*Securities Inc.*