IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
DK ACQUISITION PARTNERS, L.P.,
KENSINGTON INTERNATIONAL LIMITED,
RUSHMORE CAPITAL-I, L.L.C., RUSHMORE
CAPITAL-II, L.L.C., and SPRINGFIELD
ASSOCIATES, LLC.,

                                  Plaintiffs,

            v.                             Civil Action No. 08 Civ. 0446 (LTS)

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, J.P. MORGAN SECURITIES,
INC., CITIGROUP INC., CITIBANK, N.A. and
CITIGROUP GLOBAL MARKETS, INC. f/k/a
Salomon Smith Barney,

                                Defendants.
-------------------------------------------------------------- X

[Caption continued on following page]


**THE CITIGROUP DEFENDANTS' LOCAL RULE 56.1 STATEMENT
OF RESPONSES AND MATERIAL FACTS IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

------------------------------------------------------------------X
AVENUE CAPITAL MANAGEMENT II, L.P.,
GRACIE CAPITAL, L.P., HALCYON FUND,
L.P., KING STREET CAPITAL, L.P.,
LONGACRE MASTER FUND, LTD., MAN MAC
3 LIMITED, ORE HILL FUND HUB LTD.,
MARATHON SPECIAL OPPORTUNITY
MASTER FUND, LTD., RCG CARPATHIA
MASTER FUND, LTD., REDWOOD MASTER
FUND, LTD., SCOGGIN CAPITAL
MANAGEMENT, L.P. II, SCOGGIN
INTERNATIONAL FUND, LTD., SCOTTWOOD
CAPITAL MANAGEMENT, LLC, SPCP GROUP,
LLC, STRATEGIC VALUE CREDIT
OPPORTUNITIES MASTER FUND, L.P.,
STRATEGIC VALUE MASTER FUND, LTD.,
and TRILOGY CAPITAL, LLC,

                          Plaintiffs,

    v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, J.P. MORGAN SECURITIES,
INC., CITIGROUP INC., CITIBANK, N.A., and
CITIGROUP GLOBAL MARKETS, INC. f/k/a
Salomon Smith Barney,

                          Defendants.

Civil Action No. 08 Civ. 0447 (LTS)

------------------------------------------------------------------X
------------------------------------------------------------------X
UNICREDITO ITALIANO SPA and BANK
POLSKA KASA OPIEKI SA

                          Plaintiffs,

    v.

JPMORGAN CHASE BANK, J.P. MORGAN
CHASE & CO., J.P. MORGAN SECURITIES,
INC., CITIBANK, N.A., CITIGROUP, INC. and
CITIGROUP GLOBAL MARKETS INC.
(FORMERLY SALOMON SMITH BARNEY
INC.)

                          Defendants.

Civil Action No. 02 Civ. 5328 (LTS)

------------------------------------------------------------------X

Pursuant to Local Civil Rule 56.1 of the Local Rules for the Southern District of New York, Defendants Citigroup Inc., Citibank, N.A., and Citigroup Global Markets, Inc., f/k/a Salomon Smith Barney Inc. (collectively, "Citigroup"), respectfully submit this Statement of Responses and Material Facts in opposition to plaintiffs' motion for partial summary judgment.

## CITIGROUP DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

1.   Undisputed.  Citigroup further notes that J.P. Morgan Chase Bank, N.A.'s ("JPMC") and Citibank, N.A.'s ("Citibank") each agreed to commit over $100 million to the syndicated credit facilities, greater than the commitment of any other syndicate member.  (Hayes Aff., Ex. A at CITINEWBY 264465-66; Hayes Aff., Ex. B at CITINEWBY 801806, 801808.)[1]

2.   Undisputed.

3.   Undisputed.  Citigroup further notes that the Lenders under the Long-Term Facility Agreement included many of the most sophisticated financial institutions in the world, including the *UniCredito* plaintiffs, and the original syndicate members from which the *DK Acquisition* and *Avenue Capital* plaintiffs purchased their interests, such as UBS, Credit Suisse First Boston, and Merrill Lynch, among others.  (Hayes Aff., Ex. A at 264524-32.)

4-7.   Undisputed.

8.   Undisputed.  Citigroup further notes that the Lenders under the 364-Day Facility Agreement included many of the most sophisticated financial institutions in the world, including the *UniCredito* plaintiffs, and the original syndicate members from which the *DK Acquisition* and *Avenue Capital* plaintiffs purchased their interests, such as Bear Stearns,

---

[1]   All citations refer to the supporting documents attached as exhibits to Citigroup's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment.

1

Lehman Brothers, UBS, Credit Suisse First Boston, and Merrill Lynch, among others. (Hayes Aff., Ex. B at 801838-45.)

        9-10.    Undisputed.

        11.    Undisputed, insofar as Citibank has previously participated in and arranged syndicated revolving credit facilities.

        12.    Disputed as vague and argumentative. Citigroup further notes that under the terms of the agreements governing the 364-Day Facility and Long-Term Facility (the "Credit Agreements"), the "duties of the [Paying Agent and Co-Administrative Agents] shall be mechanical and administrative in nature; the [Paying Agent and Co-Administrative Agents] shall not have, by reason of this Agreement or any other Loan Document, a fiduciary relationship in respect of any Bank or the holder of any Note." (Hayes Aff., Exs. A & B at §§ 7.02, 8.02).[2]

        13-17.    Undisputed.

        18.    Disputed. The Credit Agreements require that any Notices of Borrowing issued by the Borrower be in "substantially the form of Exhibit B [attached to the Credit Agreements]," and contain certain requirements for transmission of the Notices of Borrowing by the Borrower. (*Id.* § 2.02 & Ex. B.)

        19.    Disputed as vague and argumentative. Citi further notes that the Credit Agreements expressly limited the duties of the Paying Agent and the Co-Administrative Agents to certain "mechanical and administrative" tasks, as set forth therein. (*See, e.g.*, *id.* §§ 7.02, 8.02).

---

[2] Because they are identical in all material respects, citations to the Credit Agreements refer to sections of both agreements, which are attached as Exhibits A (Long-Term Facility Agreement) and B (364-Day Facility Agreement) to the Hayes Affidavit. Unless otherwise defined, capitalized terms shall have the meanings ascribed to them in the Credit Agreements. Unless otherwise noted, all emphasis to language in the Credit Agreements is supplied.

2

20. Undisputed. Citigroup further notes that Article III of the Credit Agreements contains two sections, which set forth two distinct types of conditions precedent to the Lenders' obligations to disburse funds: (i) initial conditions precedent, enumerated in Section 3.01, that must be satisfied "on or before the day of the initial Advance"; and (ii) additional conditions precedent to each Advance, enumerated in Section 3.02, that must be satisfied "on the date of" each Advance. (*Id.* Article III.)

21. Undisputed. Citigroup further notes that such condition must be satisfied "on or before the day of the initial Advance." (*Id.* § 3.01.)

22. Undisputed. Citigroup further refers to the Credit Agreements for the full terms thereof.

23-26. Undisputed. Citigroup further refers to the Credit Agreements for the full terms thereof and notes that it received appropriate resolutions from Enron's Board of Directors, as described *infra* in paragraphs 30-32.

27. Undisputed. Citigroup further notes that in the wake of public disclosures of severe financial developments at Enron, and amid a daily barrage of media reports about Enron's accounting scandal (Gertzman Decl., Ex. C), on October 25, 2001, Enron sent to Citibank, as Paying Agent, Notices of Borrowing seeking advances in the full amount of the $3 billion available under the Credit Facilities. (*Id.*, Exs. D & E.)

28. Undisputed.

29. Disputed as argumentative and irrelevant.

30-32. Disputed as argumentative and irrelevant. On November 2, 1998, the Executive Committee of Enron's Board of Directors adopted three resolutions granting Enron's officers broad authority to act on behalf of the company in connection with its past and future

3

revolving credit facilities. (Hayes Aff., Ex. A at CITINEWBY 264855; Ex. B at CITINEWBY 802158.) Enron's bylaws conferred on the Executive Committee all the powers of the Board of Directors during the intervals between meetings of the Board of Directors. (Hayes Aff., Ex. A at CITINEWBY 264848; Ex. B at CITINEWBY 802151.) The first Board Resolution adopted on November 2, 1998, provided:

> RESOLVED, that the Chairman of the Board, the President, any Senior Vice President, any Vice President, and any Deputy Treasurer of the Company be, and each of them hereby is, authorized, empowered, and directed (any one of them acting alone), for and in the name and on behalf of the Company, to negotiate, execute, and deliver, on behalf of the Company without the necessity of obtaining specific Board approval, an agreement or agreements providing for a committed revolving credit facility or facilities for the Company of up to an aggregate amount of $4,000,000,000 (excluding acquisition financing for Wessex Water PLC) from time to time and at any one time outstanding (the "Revolving Credit Agreements"), together with all such instruments, certificates, agreements, or other documents as are necessary or advisable in connection with the Revolving Credit Agreements[.]

(Hayes Aff., Ex. A at CITINEWBY 264855; Ex. B at CITINEWBY 802158.) The second Board Resolution adopted on November 2, 1998, provided:

> RESOLVED FURTHER, that all actions heretofore taken by any officer of the Company, related to or in connection with the transactions contemplated by these resolutions, including without limitation the execution and delivery of any instruments or other documents as any such officer shall have deemed necessary, proper, or advisable, are hereby adopted, ratified, confirmed, and approved in all respects[.]

(*Id.*) The third Board Resolution adopted on November 2, 1998, provided:

> RESOLVED FURTHER, that the officers of the Company and its counsel be, and each of them hereby is, authorized, empowered, and directed (any one of them acting alone) to take any and all such further action, to amend, execute, and deliver all such further instruments and documents, for and in the name and

4

> on behalf of the Company, under its corporate seal or otherwise, and to pay all such expenses as in their discretion appear to be necessary, proper, or advisable to carry into effect the purposes and intentions of this and each of the foregoing resolutions.

(*Id.*)   In the letter that was part of the closing sets for the Credit Agreements, Bracewell & Patterson L.L.P., as counsel for the Paying Agent, opined that it had examined the documents Enron had provided pursuant to various provisions of the Credit Agreements, including Section 3.01, and that those documents "are substantially responsive to the requirements" of the Credit Agreements.  (Hayes Aff., Ex. A at CITINEWBY 264869-70; Ex. B at CITINEWBY 802178-79; Hayes Aff. ¶¶ 10-11.)

33-35.   Undisputed.

36-40.   Citibank has no knowledge of the contents of Mr. Cenedese's conversation with Ms. Wallace, or of any attempts by Mr. Cenedese to contact Chris Lyons or his deputy.  Citigroup further notes that at 3:00 P.M., on October 25, 2001, Mr. Cenedese participated in a conference call hosted by Enron to discuss the drawdown under the syndicated revolving credit facilities.  (Gertzman Decl., Ex. R.)  There is no evidence that Mr. Cenedese asked any questions during this conference call, despite the fact that both Enron and the agent banks also participated on the call.

41-68.   The corresponding paragraphs in Plaintiffs' Joint Statement of Material Facts pertain primarily to J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and J.P. Morgan Securities, Inc., (collectively, "J.P. Morgan Chase Defendants"), and therefore no response from Citigroup is required.  To the extent a response is required, Citigroup joins the responses set forth in the J.P. Morgan Chase Defendants' Statement of Responses and Material Facts in Opposition to Plaintiffs' Motion for Partial Summary Judgment.

5

**CITIGROUP DEFENDANTS' COUNTER-STATEMENT OF MATERIAL FACTS**

**The November 1998 Board Resolutions**

69. On November 2, 1998, the Executive Committee of Enron's Board of Directors adopted three resolutions granting Enron's officers broad authority to act on behalf of the company in connection with its past and future revolving credit facilities. (Hayes Aff., Ex. A at CITINEWBY 264855; Ex. B at CITINEWBY 802158.)

70. Enron's bylaws conferred on the Executive Committee all the powers of the Board of Directors during the intervals between meetings of the Board of Directors, with certain exceptions not applicable here. (Hayes Aff., Ex. A at CITINEWBY 264848; Ex. B at CITINEWBY 802151.)

71. The first Board Resolution adopted on November 2, 1998, authorized Enron officers to enter into revolving credit agreements up to an aggregate amount of $4 billion, including the documents attendant thereto, without the necessity of obtaining specific Board approval. (Hayes Aff., Ex. A at CITINEWBY 264855; Ex. B at CITINEWBY 802158.)

72. The second Board Resolution adopted on November 2, 1998, ratified, confirmed, and approved, retroactively, all actions taken by Enron officers in connection with Enron's revolving credit facilities. (*Id.*)

73. The third Board Resolution adopted on November 2, 1998, authorized Enron officers to deliver all further instruments and documents necessary to effectuate the purposes of the November 2, 1998, resolutions. (*Id.*)

**The Credit Agreements**

74. The Credit Agreements were governed by substantially identical credit agreements between and among Enron as Borrower; Citibank as Paying Agent; Citibank and

JPMC as Co-Administrative Agents; and each of the other participating banks. (Hayes Aff., Exs. A and B.)

76. The Long-Term and 364-Day Facilities closed on or about May 18, 2000 and May 14, 2001, respectively. (*Id.*)

76. In connection with the closings, Bracewell & Patterson, as counsel for Citibank as Paying Agent, sent each member of the bank syndicate a complete set of closing documents. (Hayes Aff. ¶ 12 and Exs. C & D (sample cover letters).) Each closing set included a certified copy of the 1998 Board Resolutions. (*Id.*, Ex. A at CITINEWBY 264855; Ex. B at CITINEWBY 802158.)

**Article III**

77. Article III of the Credit Agreements, entitled "Conditions to Advances," contains two sections, the first of which – Section 3.01 – enumerates initial conditions precedent that must be satisfied "on or before the day of the initial Advance." (Hayes Aff., Exs. A & B at § 3.01.)

78. Thus, before participating banks were obligated to fund, Section 3.01 requires that Citibank as Paying Agent "shall have received," "in form and substance satisfactory" to the Co-Administrative Agents, seven categories of documents. Among the documents that Citibank had to receive were: (1) certified copies of the Enron Board resolutions approving "this Agreement, each Note and each Notice of Borrowing" (*id.* § 3.01(b)); and (2) an opinion of Bracewell & Patterson, L.L.P., as counsel for the Paying Agent, stating that certain documents "are substantially responsive to the requirements of the Credit Agreement[s]." (*Id.* § 3.01(f) & Ex. E.)

7

79. In the letter that was part of the closing sets for the Credit Agreements, Bracewell & Patterson opined that it had examined the documents Enron had provided pursuant to various provisions of the Credit Agreements, including Section 3.01, and that those documents "are substantially responsive to the requirements" of the Credit Agreements. (Hayes Aff., Ex. A at CITINEWBY 264869-70; Ex. B at CITINEWBY 802178-79; Hayes Aff. ¶¶ 10-11.) In rendering its opinion, Bracewell & Patterson reviewed the certified copies of the 1998 Board Resolutions. (*Id.*, Ex. A at CITINEWBY 264871; Ex. B at CITINEWBY 802180.)

80. In contrast to Section 3.01 (Initial Condition Precedent), Section 3.02 – the second section of Article III, entitled "Additional Conditions Precedent to Each Advance" – contains conditions precedent that must be satisfied "on the date of" each Advance. (Hayes Aff., Exs. A & B at § 3.02(a).)

81. Pursuant to Section 3.02(a), Enron as Borrower had to make representations and warranties that (i) certain statements concerning its financial condition enumerated in Section 4.01 of the Credit Agreements were true, and (ii) no event of default under the Credit Agreements had occurred, or would occur, as a result of the borrowing. (*Id.*)

82. Among other things, Section 4.01 required Enron to "represent and warrant" that its financial statements complied with GAAP (*id.* § 4.01(d)), and that there had been no material adverse change in its financial position during the period spanning the end of Enron's last fiscal year and the date the Credit Agreements were executed. (*Id.* § 4.01(e).)

83. Representations and warranties made pursuant to Section 4.01 that expressly relate solely to a specific earlier date shall remain correct as of the earlier date. (*Id.* § 3.02(a)(i).)

8

84. Section 3.02(b) gives each syndicate bank the opportunity to "reasonably request" via the Paying Agent that Enron provide any "approvals, opinions or documents" – including an Enron Board resolution – and excuses a syndicate bank from funding until all such items are received. (*Id.* § 3.02(b).)

**Other contractual provisions**

85. The Credit Agreements imposed on Enron far-reaching disclosure obligations that ran directly to each syndicate bank (Hayes Aff., Exs. A & B at § 5.01(a)(viii)) and deemed Enron to be in default (triggering a variety of rights on the part of the syndicate banks) if, among other things, any of Enron's representations or warranties proved to be materially incorrect (*id.* § 6.01 (b)), or if at any time Enron failed to observe any of its contractual covenants. (*Id.* § 6.01(c).)

86. Meanwhile, the Credit Agreements limited the duties of Citibank and JPMC to specifically enumerated "mechanical and administrative" tasks and provided that the agent banks "shall not have, by reason of this Agreement or any other Loan Document, a fiduciary relationship in respect of any Bank or the holder of any Note." (*Id.* §§ 7.02, 8.02.)

87. To that end, Citibank and JPMC had no duty to ascertain or inquire as to the performance of any condition within any Loan Document or other instrument furnished pursuant to the Credit Agreements on behalf of Enron. (*Id.* §§ 7.02(iv), 8.02(c).)

88. Nor were the agent banks responsible to any syndicate bank for the sufficiency of any Loan Document or other instrument furnished pursuant to the Credit Agreements. (*Id.* §§ 7.02(v), 8.02(d).)

89. Moreover, as this Court ruled in dismissing the *UniCredito* plaintiffs' claims for fraud and fraudulent concealment, fraudulent inducement, grossly negligent

9

misrepresentation, and unjust enrichment, the Credit Agreements provided that Citibank and JPMC owed no duties of disclosure to the participating banks and were not responsible for any statements by Enron concerning its financial condition. (*UniCredito Italiano SpA* v. *JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 498, 505 (S.D.N.Y. 2003).)

**Gross Negligence**

90.     In their roles as agent banks, Citibank and JPMC shall not be held liable "for any action taken or omitted to be taken . . . under or in connection with any Loan Document, except for . . . gross negligence or willful misconduct." (Hayes Aff., Exs. A & B at §§ 7.02, 8.02.)

91.     In accordance with Citibank's credit policies, Citibank employees participated in various meetings and conference calls both with internal business people and counsel on and around October 25, 2001, to ascertain whether Enron had satisfied the conditions precedent to funding. (Gertzman Decl., Exs. M-P.)

92.     Moreover, Enron certified that the Notices of Borrowing were duly authorized. On the date of the drawdown, Enron's CEO and Chairman of the Board, Kenneth L. Lay, signed the Notices of Borrowing on behalf of Enron, and an Assistant Secretary of Enron's board certified them. In the Notices of Borrowing, Mr. Lay certified that "the representations and warranties contained in Section 4.01 of the Credit Agreement[s] are correct." (*Id.*, Exs. D & E.) Among the representations and warranties in Section 4.01 that Mr. Lay certified as correct were the following: "[t]he execution, delivery and performance by the Borrower of each Loan Document [defined in Section 1.01 to include Notices of Borrowing] . . . have been duly authorized by all necessary corporate action of the Borrower." (Hayes Aff., Exs. A & B at § 4.01(b).)

10

93. Enron's act of acceptance of the Advances from the participating banks reaffirmed the representations it made in the Notices of Borrowing. (*Id.* § 3.02(a).)

94. In addition, members of Enron's Board were aware that Enron planned to make borrowing requests under the Credit Agreements on October 25, 2001, believed that Enron was authorized to deliver the Notices of Borrowing, and testified that they would have adopted additional resolutions specifically authorizing the drawdown on October 25, 2001, had they deemed such action necessary. (Gertzman Decl., Exs. S-X.)

Dated: September 8, 2008
New York, New York

                                    Respectfully submitted,

                                    /s/  Michael E. Gertzman
                                  Brad S. Karp
                                  Richard A. Rosen
                                  Michael E. Gertzman
                                  Claudia L. Hammerman
                                  Robyn F. Tarnofsky
                                  Julia Tarver Mason
                                  Jonathan H. Hurwitz
                                  PAUL, WEISS, RIFKIND, WHARTON &
                                  GARRISON LLP
                                  1285 Avenue of the Americas
                                  New York, New York 10019-6064
                                  (212) 373-3000
                                  (212) 757-3990 (Facsimile)
                                  mgertzman@paulweiss.com

                                  *Attorneys For Defendants Citigroup Inc., Citibank N.A., and Citigroup Global Markets Inc. (f/k/a Salomon Smith Barney Inc.)*